**ORAL ARGUMENT HAS BEEN SCHEDULED FOR MAY 8, 2023**

**No. 22-1264**
**No. 22-1295**

---

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA**

---

XCEL PROTECTIVE SERVICES, INC.,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

---

# JOINT APPENDIX
# XCEL PROTECTIVE SERVICES, INC. AND NATIONAL LABOR RELATIONS BOARD

---

Jason R. Stanevich (DC53510)
jstanevich@littler.com LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203.974-8700
Facsimile: 203.974.8799

**Attorneys for Petitioner/Cross-Respondent XCEL PROTECTIVE SERVICES, INC.**

Kira Dellinger Vol
Supervisory Attorney

Micah P.S. Jost
Attorney

National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-0656
(202) 273-0264

**Attorneys for Respondent/Cross-Petitioner NATIONAL LABOR RELATIONS BOARD**

Date: March 23, 2023

**JOINT APPENDIX**

**TABLE OF CONTENTS**

**PAGES**

1. Docket Entries – Docket #: 22-1264 .......... APP 001
2. Docket Entries – Docket #: 22-1295 .......... APP 006
3. Administrative Law Judge's ("ALJ") Decision dated December 7, 2020 .......... APP 010
4. NLRB's Decision and Order dated September 8, 2022 .......... APP 075
5. Exceptions to ALJ's Decision dated January 19, 2021 .......... APP 122
6. Joint Exhibit 1 .......... APP 130
7. Joint Exhibit 2 .......... APP 133
8. Joint Exhibit 3 .......... APP 139
9. Joint Exhibit 5 .......... APP 147
10. Joint Exhibit 10 .......... APP 207
11. Respondent's Exhibit 1 .......... APP 221
12. Respondent's Exhibit 2 .......... APP 223
13. Respondent's Exhibit 13 .......... APP 248
14. Respondent's Exhibit 26 .......... APP 254
15. Respondent's Exhibit 29 .......... APP 260
16. Respondent's Exhibit 42 .......... APP 261
17. Respondent's Exhibit 43 .......... APP 263
18. Respondent's Exhibit 45 .......... APP 295
19. Respondent's Exhibit 50 .......... APP 301
20. Respondent's Exhibit 51 .......... APP 303
21. Respondent's Exhibit 52 .......... APP 305

22. General Counsel's Exhibit 1(a) ........................................................................APP 308

23. General Counsel's Exhibit 1(d) ........................................................................APP 310

24. General Counsel's Exhibit 1(f) ........................................................................APP 312

25. General Counsel's Exhibit 1(h) ........................................................................APP 314

26. General Counsel's Exhibit 1(j) ........................................................................APP 316

27. General Counsel's Exhibit 1(l) ........................................................................APP 317

28. General Counsel's Exhibit 1(n) ........................................................................APP 319

29. General Counsel's Exhibit 1(p) ........................................................................APP 320

30. General Counsel's Exhibit 1(r) ........................................................................APP 321

31. General Counsel's Exhibit 1(t) ........................................................................APP 323

32. General Counsel's Exhibit 1(bbb) ....................................................................APP 325

33. General Counsel's Exhibit 3 ............................................................................APP 341

34. General Counsel's Exhibit 4 ............................................................................APP 346

35. General Counsel's Exhibit 6 ............................................................................APP 347

36. General Counsel's Exhibit 9 ............................................................................APP 348

37. Transcript Pages of NLRB Proceedings Volume 1 (September 24, 2019).......APP 382

[40-42, 45-46, 49, 52-57, 60, 70-72, 75-77, 81, 102, 103-111, 114-116, 120-121, 125-127, 129, 135, 142-145, 160-163, 165, 167, 185-186, 188, 201-204, 216, 233-235]

38. Transcript Pages of NLRB Proceedings Volume 2 (September 25, 2019).......APP 443

[258, 280, 296, 299, 311, 333, 344, 347, 351, 355, 359, 387, 415, 418, 420-421, 428, 445-446, 449, 459, 461, 462-467, 474, 475, 476, 477-490, 504-507]

39. Transcript Pages of NLRB Proceedings Volume 3 (September 26, 2019).......APP 492

[526-527, 530-532, 534-536, 538-549, 554-555, 558-559, 563, 571, 579, 581-586, 588-589, 596-597, 604, 608-612, 615, 618-625, 627, 653-654, 657-658, 661-666, 670, 673-675, 678-679, 684-690, 705-711, 713-715, 717-718, 724-727, 742, 759-760, 771, 777-778, 803-804]

40. Transcript Pages of NLRB Proceedings Volume 4 (September 27, 2019).......APP 591

[821-825, 847, 853-858]

41. Transcript Pages of NLRB Proceedings Volume 5 (November 18, 2019).......APP 603

[872-873, 884, 888, 893-898, 945-950, 952-953, 962-963, 969, 978, 980-981, 983-984, 987, 992-1000, 1002-1007, 1014-1018, 1021-1023, 1029-1030]

**General Docket**
**United States Court of Appeals for District of Columbia Circuit**

**Court of Appeals Docket #:** 22-1264 **Docketed:** 10/13/2022
Xcel Protective Services, Inc. v. NLRB
**Appeal From:** National Labor Relations Board
**Fee Status:** Fee Paid

**Case Type Information:**
**1)** Petition for Review
**2)** Review
**3)**

**Originating Court Information:**
**District:** NLRB-1 : NLRB-19CA232786

**District:** NLRB-1 : NLRB-19CA233141

**District:** NLRB-1 : NLRB-19CA234438

**District:** NLRB-1 : NLRB-19CA237861

**Prior Cases:**
None

**Current Cases:**

| | Lead | Member | Start | End |
|---|---|---|---|---|
| Cross-appeal | | | | |
| | 22-1264 | 22-1295 | 11/22/2022 | |

**Panel Assignment:** Not available

Xcel Protective Services, Inc.
Petitioner

Kevin Michael Kraham, Attorney
Direct: 202-423-2404
Email: kkraham@littler.com
Fax: 866-207-8485
[COR LD NTC Retained]
Littler Mendelson PC
Firm: 202-842-3400
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006

Jason Robert Stanevich, Esquire
Direct: 203-974-8716
Email: jstanevich@littler.com
Fax: 203-654-7243
[COR NTC Retained]
Littler Mendelson PC
Firm: 203-974-8700
265 Church Street
Suite 300
New Haven, CT 06510

v.

National Labor Relations Board
Respondent

Ruth E. Burdick, Deputy Associate General Counsel
Direct: 202-273-2960
Email: appellatecourt@nlrb.gov
[COR LD NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

Micah Prieb Stoltzfus Jost
Direct: 202-273-0264
Email: micah.jost@nlrb.gov
[COR LD NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch

Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

Kira Dellinger Vol
Direct: 202-273-0656
Email: kira.vol@nlrb.gov
[COR LD NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

David S. Habenstreit
Direct: 202-273-0979
Email: appellatecourt@nlrb.gov
Fax: 202-273-0191
[COR NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

Xcel Protective Services, Inc.,

                    Petitioner

        v.

National Labor Relations Board,

                    Respondent

| Date | Document | Docket Text |
|---|---|---|
| 10/13/2022 | | PETITION FOR REVIEW CASE docketed. [22-1264] [Entered: 10/14/2022 01:45 PM] |
| 10/13/2022 | 54 pg, 806.8 KB | PETITION FOR REVIEW [1969033] of a decision by federal agency filed by Xcel Protective Services, Inc. [Service Date: 10/13/2022 ] Disclosure Statement: Attached. [22-1264] [Entered: 10/14/2022 01:46 PM] |
| 10/14/2022 | 1 pg, 39.01 KB | CERTIFIED COPY [1969035] of Petition for Review sent to respondent [1969033-2] [22-1264] [Entered: 10/14/2022 01:47 PM] |
| 10/14/2022 | 2 pg, 44.58 KB | CLERK'S ORDER [1969036] filed directing party to file initial submissions: PETITIONER docketing statement due 11/14/2022. PETITIONER certificate as to parties due 11/14/2022. PETITIONER statement of issues due 11/14/2022. PETITIONER underlying decision due 11/14/2022. PETITIONER deferred appendix statement due 11/14/2022. PETITIONER procedural motions due 11/14/2022. PETITIONER dispositive motions due 11/28/2022; directing party to file initial submissions: RESPONDENT entry of appearance due 11/14/2022. RESPONDENT procedural motions due 11/14/2022. RESPONDENT certified index to record due 11/28/2022. RESPONDENT dispositive motions due 11/28/2022 [22-1264] [Entered: 10/14/2022 01:48 PM] |
| 10/26/2022 | 1 pg, 1.11 MB | ENTRY OF APPEARANCE [1970738] filed by Ruth E. Burdick and co-counsel Kira Dellinger Vol on behalf of Respondent NLRB. [22-1264] (Vol, Kira) [Entered: 10/26/2022 03:43 PM] |
| 10/26/2022 | 1 pg, 1.11 MB | ENTRY OF APPEARANCE [1970739] filed by Ruth E. Burdick and co-counsel Micah P.S. Jost on behalf of Respondent NLRB. [22-1264] (Jost, Micah) [Entered: 10/26/2022 03:45 PM] |
| 10/26/2022 | 1 pg, 1.11 MB | ENTRY OF APPEARANCE [1970740] filed by Ruth E. Burdick on behalf of Respondent NLRB. [22-1264] (Burdick, Ruth) [Entered: 10/26/2022 03:46 PM] |
| 11/11/2022 | 1 pg, 127.37 KB | ENTRY OF APPEARANCE [1973338] filed by Kevin M. Kraham and co-counsel Jason R. Stanevich on behalf of Petitioner Xcel Protective Services, Inc.. [22-1264] (Stanevich, Jason) [Entered: 11/11/2022 11:37 AM] |
| 11/14/2022 | 1 pg, 534.68 KB | DOCKETING STATEMENT [1973371] filed by Xcel Protective Services, Inc. [Service Date: 11/14/2022 ] [22-1264] (Stanevich, Jason) [Entered: 11/14/2022 09:44 AM] |
| 11/14/2022 | 3 pg, 115.38 KB | STATEMENT OF ISSUES [1973382] filed by Xcel Protective Services, Inc. [Service Date: 11/14/2022 ] [22-1264] (Stanevich, Jason) [Entered: 11/14/2022 10:06 AM] |
| 11/14/2022 | 6 pg, 143.67 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [1973383] filed by Xcel Protective Services, Inc. [Service Date: 11/14/2022 ] [22-1264] (Stanevich, Jason) [Entered: 11/14/2022 10:11 AM] |
| 11/14/2022 | 2 pg, 112.93 KB | STATEMENT OF INTENT REGARDING APPENDIX DEFERRAL [1973384] filed by Xcel Protective Services, Inc. [Service Date: 11/14/2022 ] Intent: AppxDeferred [22-1264] (Stanevich, Jason) [Entered: 11/14/2022 10:14 AM] |
| 11/14/2022 | 51 pg, 655.18 KB | UNDERLYING DECISION IN CASE [1973576] submitted by Xcel Protective Services, Inc. [Service Date: 11/14/2022 ] [22-1264] (Stanevich, Jason) [Entered: 11/14/2022 04:28 PM] |
| 11/22/2022 | 1 pg, 38.15 KB | CLERK'S ORDER [1974769] filed consolidating cases 22-1295 (Cross-appeal started 11/22/2022) with 22-1264 [22-1264, 22-1295] [Entered: 11/22/2022 02:35 PM] |
| 11/28/2022 | 5 pg, 180.03 KB | CERTIFIED INDEX TO RECORD [1975090] filed by NLRB in 22-1264, 22-1295 [Service Date: 11/28/2022 ] [22-1264, 22-1295] (Burdick, Ruth) [Entered: 11/28/2022 11:14 AM] |
| 11/28/2022 | 1 pg, 39.58 KB | CERTIFIED COPY [1975170] of Petition for Review sent to respondent [1974764-2] [22-1295] [Entered: 11/28/2022 01:58 PM] |
| 12/01/2022 | 3 pg, 79.74 KB | CLERK'S ORDER [1975728] filed setting briefing schedule: PETITIONER Brief due 01/10/2023. RESPONDENT Brief due on 02/09/2023. PETITIONER Reply Brief due 03/02/2023. DEFERRED APPENDIX due 03/09/2023. Final Briefs due 03/23/2023. [22-1264, 22-1295] [Entered: 12/01/2022 12:04 PM] |
| 01/10/2023 | 52 pg, 549.15 KB | PETITIONER BRIEF [1980932] filed by Xcel Protective Services, Inc. [Service Date: 01/10/2023 ] Length of Brief: 52 pages. [22-1264] (Stanevich, Jason) [Entered: 01/10/2023 03:42 PM] |
| 01/11/2023 | 53 pg, 538.54 KB | PETITIONER BRIEF [1981037] filed by Xcel Protective Services, Inc. [Service Date: 01/11/2023 ] Length of Brief: 53 pages. [22-1264] (Stanevich, Jason) [Entered: 01/11/2023 11:27 AM] |
| 01/24/2023 | 4 pg, 119.51 KB | UNOPPOSED MOTION [1982928] to extend time to file brief to 02/23/2023 filed by NLRB in 22-1264, 22-1295 [Service Date: 01/24/2023 ] Length Certification: 289 words. [22-1264, 22-1295] (Burdick, Ruth) [Entered: 01/24/2023 04:12 PM] |
| 01/26/2023 | 1 pg, 39.93 KB | CLERK'S ORDER [1983214] filed granting respondent's unopposed motion to extend time [1982928-2], The following revised briefing schedule will now apply: RESPONDENT Brief due on 02/23/2023. PETITIONER Reply Brief due 03/16/2023. DEFERRED APPENDIX due 03/23/2023. Final Briefs due 04/06/2023. [22-1264, 22-1295] [Entered: 01/26/2023 09:28 AM] |
| 02/23/2023 | | |

| Date | Pages | Docket Text |
|---|---|---|
| | 76 pg, 453.31 KB | RESPONDENT BRIEF [1987208] filed by NLRB in 22-1264 [Service Date: 02/23/2023 ] Length of Brief: 12,861 words. [22-1264, 22-1295] (Burdick, Ruth) [Entered: 02/23/2023 11:40 AM] |
| 02/23/2023 | 59 pg, 427.24 KB | MOTION [1987216] to lodge brief in support of exceptions filed by NLRB in 22-1264, 22-1295 (Service Date: 02/23/2023 by CM/ECF NDA) Length Certification: 292 words. [22-1264, 22-1295] (Burdick, Ruth) [Entered: 02/23/2023 11:57 AM] |
| 03/10/2023 | 1 pg, 41.94 KB | CLERK'S ORDER [1989675] filed scheduling oral argument on Monday, 05/08/2023. [22-1264, 22-1295] [Entered: 03/10/2023 03:41 PM] |
| 03/16/2023 | 22 pg, 266.44 KB | PETITIONER REPLY BRIEF [1990523] filed by Xcel Protective Services, Inc. in 22-1264 [Service Date: 03/16/2023 ] Length of Brief: 3,765 words. [22-1264, 22-1295] (Stanevich, Jason) [Entered: 03/16/2023 05:43 PM] |
| 03/17/2023 | 4 pg, 111.7 KB | NOTICE [1990625] concerning oral argument format filed by NLRB in 22-1264, 22-1295 [Service Date: 03/17/2023 ] [22-1264, 22-1295] (Burdick, Ruth) [Entered: 03/17/2023 12:47 PM] |
| 03/20/2023 | 1 pg, 39.9 KB | CLERK'S ORDER [1990789] filed that the request to appear remotely for oral argument on May 8, 2023, be granted. The Court will conduct a hybrid argument with counsel for the respondent appearing remotely and all other participants in the courtroom. [22-1264, 22-1295] [Entered: 03/20/2023 10:42 AM] |

**General Docket**
**United States Court of Appeals for District of Columbia Circuit**

**Court of Appeals Docket #:** 22-1295 **Docketed:** 11/18/2022
NLRB v. Xcel Protective Services, Inc.
**Appeal From:** National Labor Relations Board
**Fee Status:** Fee Waived

**Case Type Information:**
**1)** Cross-Application Enforcement
**2)** Enforcement
**3)**

**Originating Court Information:**
**District:** NLRB-1 : NLRB-19CA232786

**District:** NLRB-1 : NLRB-19CA233141

**District:** NLRB-1 : NLRB-19CA234438

**District:** NLRB-1 : NLRB-19CA237861

**Prior Cases:**
None

**Current Cases:**

| | **Lead** | **Member** | **Start** | **End** |
|---|---|---|---|---|
| Cross-appeal | | | | |
| | 22-1264 | 22-1295 | 11/22/2022 | |

**Panel Assignment:** Not available

National Labor Relations Board
Petitioner

Ruth E. Burdick, Deputy Associate General Counsel
Direct: 202-273-2960
Email: appellatecourt@nlrb.gov
[COR NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

David S. Habenstreit
Direct: 202-273-0979
Email: appellatecourt@nlrb.gov
Fax: 202-273-0191
[COR NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

Micah Prieb Stoltzfus Jost
Direct: 202-273-0264
Email: micah.jost@nlrb.gov
[COR NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

Kira Dellinger Vol
Direct: 202-273-0656
Email: kira.vol@nlrb.gov
[COR NTC Gvt US Agency]
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
Firm: 202-273-2960
1015 Half Street, SE
Washington, DC 20570

| | |
|---|---|
| v. | |
| Xcel Protective Services, Inc.<br>Respondent | Kevin Michael Kraham, Attorney<br>Direct: 202-423-2404<br>Email: kkraham@littler.com<br>Fax: 866-207-8485<br>[COR NTC Retained]<br>Littler Mendelson PC<br>Firm: 202-842-3400<br>815 Connecticut Avenue, NW<br>Suite 400<br>Washington, DC 20006<br><br>Jason Robert Stanevich, Esquire<br>Direct: 203-974-8716<br>Email: jstanevich@littler.com<br>Fax: 203-654-7243<br>[COR NTC Retained]<br>Littler Mendelson PC<br>Firm: 203-974-8700<br>265 Church Street<br>Suite 300<br>New Haven, CT 06510 |

National Labor Relations Board,

                    Petitioner

          v.

Xcel Protective Services, Inc.,

                    Respondent

| | | |
|---|---|---|
| 11/18/2022 | | CROSS-APPLICATION FOR ENFORCEMENT CASE docketed. [22-1295] [Entered: 11/22/2022 02:32 PM] |
| 11/18/2022 | 54 pg, 689.75 KB | CROSS-APPLICATION FOR ENFORCEMENT [1974764] of a decision by federal agency filed by NLRB [Service Date: 11/18/2022 ] [22-1295] [Entered: 11/22/2022 02:33 PM] |
| 11/22/2022 | 1 pg, 38.15 KB | CLERK'S ORDER [1974769] filed consolidating cases 22-1295 (Cross-appeal started 11/22/2022) with 22-1264 [22-1264, 22-1295] [Entered: 11/22/2022 02:35 PM] |
| 11/28/2022 | 5 pg, 180.03 KB | CERTIFIED INDEX TO RECORD [1975090] filed by NLRB in 22-1264, 22-1295 [Service Date: 11/28/2022 ] [22-1264, 22-1295] (Burdick, Ruth) [Entered: 11/28/2022 11:14 AM] |
| 11/28/2022 | 1 pg, 39.58 KB | CERTIFIED COPY [1975170] of Petition for Review sent to respondent [1974764-2] [22-1295] [Entered: 11/28/2022 01:58 PM] |
| 12/01/2022 | 3 pg, 79.74 KB | CLERK'S ORDER [1975728] filed setting briefing schedule: PETITIONER Brief due 01/10/2023. RESPONDENT Brief due on 02/09/2023. PETITIONER Reply Brief due 03/02/2023. DEFERRED APPENDIX due 03/09/2023. Final Briefs due 03/23/2023. [22-1264, 22-1295] [Entered: 12/01/2022 12:04 PM] |
| 01/10/2023 | 52 pg, 549.15 KB | PETITIONER BRIEF [1980932] filed by Xcel Protective Services, Inc. [Service Date: 01/10/2023 ] Length of Brief: 52 pages. [22-1264] (Stanevich, Jason) [Entered: 01/10/2023 03:42 PM] |
| 01/11/2023 | 53 pg, 538.54 KB | PETITIONER BRIEF [1981037] filed by Xcel Protective Services, Inc. [Service Date: 01/11/2023 ] Length of Brief: 53 pages. [22-1264] (Stanevich, Jason) [Entered: 01/11/2023 11:27 AM] |
| 01/24/2023 | 4 pg, 119.51 KB | UNOPPOSED MOTION [1982928] to extend time to file brief to 02/23/2023 filed by NLRB in 22-1264, 22-1295 [Service Date: 01/24/2023 ] Length Certification: 289 words. [22-1264, 22-1295] (Burdick, Ruth) [Entered: 01/24/2023 04:12 PM] |
| 01/26/2023 | 1 pg, 39.93 KB | CLERK'S ORDER [1983214] filed granting respondent's unopposed motion to extend time [1982928-2], The following revised briefing schedule will now apply: RESPONDENT Brief due on 02/23/2023. PETITIONER Reply Brief due 03/16/2023. DEFERRED APPENDIX due 03/23/2023. Final Briefs due 04/06/2023. [22-1264, 22-1295] [Entered: 01/26/2023 09:28 AM] |
| 02/23/2023 | 76 pg, 453.31 KB | RESPONDENT BRIEF [1987208] filed by NLRB in 22-1264 [Service Date: 02/23/2023 ] Length of Brief: 12,861 words. [22-1264, 22-1295] (Burdick, Ruth) [Entered: 02/23/2023 11:40 AM] |
| 02/23/2023 | 59 pg, 427.24 KB | MOTION [1987216] to lodge brief in support of exceptions filed by NLRB in 22-1264, 22-1295 (Service Date: 02/23/2023 by CM/ECF NDA) Length Certification: 292 words. [22-1264, 22-1295] (Burdick, Ruth) [Entered: 02/23/2023 11:57 AM] |
| 03/10/2023 | 1 pg, 41.94 KB | CLERK'S ORDER [1989675] filed scheduling oral argument on Monday, 05/08/2023. [22-1264, 22-1295] [Entered: 03/10/2023 03:41 PM] |
| 03/16/2023 | 22 pg, 266.44 KB | PETITIONER REPLY BRIEF [1990523] filed by Xcel Protective Services, Inc. in 22-1264 [Service Date: 03/16/2023 ] Length of Brief: 3,765 words. [22-1264, 22-1295] (Stanevich, Jason) [Entered: 03/16/2023 05:43 PM] |
| 03/17/2023 | 4 pg, 111.7 KB | NOTICE [1990625] concerning oral argument format filed by NLRB in 22-1264, 22-1295 [Service Date: 03/17/2023 ] [22-1264, 22-1295] (Burdick, Ruth) [Entered: 03/17/2023 12:47 PM] |
| 03/20/2023 | 1 pg, 39.9 KB | CLERK'S ORDER [1990789] filed that the request to appear remotely for oral argument on May 8, 2023, be granted. The Court will conduct a hybrid argument with counsel for the respondent appearing remotely and all other participants in the courtroom. [22-1264, 22-1295] [Entered: 03/20/2023 10:42 AM] |

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**SAN FRANCISCO BRANCH OFFICE**

**XCEL PROTECTIVE SERVICES, INC.**

**and**

**19–CA–232786**
**19–CA–233141**
**19–CA–234438**
**19–CA–237861**

**INTERNATIONAL UNION, SECURITY, POLICE, AND FIRE PROFESSIONALS OF AMERICA, LOCAL 5**

*Carolyn A. McConnell, Esq.,*
for the General Counsel.

*Jason R. Stanevich, Esq.* and
*Maura A. Mastrony, Esq.*
*(Littler Mendleson, P.C),*
for the Respondent.

*Richard M. Olszewski, Esq.*
*(Gregory, Moore, Jeakle & Brooks P.C.),*
for the Charging Party.

DECISION

STATEMENT OF THE CASE

JOHN T. GIANNOPOULOS, Administrative Law Judge. As the first line of defense to guard one of our Nation's most important naval facilities, the United States Navy uses private contractors. This case involves claims that contractors used to guard Naval Magazine Indian Island could not shoot straight. It was tried before me in Seattle, Washington over 6 days in September and November 2019. Based on charges filed by the International Union, Security, Police, and Fire Professionals of America, Local 5 (Union), an Order Further Consolidating Cases, Consolidated Complaint and Notice of Hearing (Complaint) issued on July 31, 2019, alleging that Xcel Protective Services, Inc. (Respondent or Xcel) violated Sections 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act) by: interrogating employees, prohibiting employees from discussing wages, constructively discharging employees, and refusing to provide the Union with information. Respondent denies the unfair labor practice allegations.

Based upon the entire record, including my observation of witness demeanor, and after considering the briefs filed by all the parties, I make the following findings of fact and conclusions of law.[1]

I. JURISDICTION AND LABOR ORGANIZATION

Respondent is a New Mexico Corporation that provides contract security services to the United States Government. At all times relevant herein, Respondent provided contract security services to the United States Navy, in connection with the national defense of the United States, at Naval Magazine Indian Island. While performing these services for the United States Navy, Respondent purchased and received goods and materials valued in excess of $50,000 directly from points outside the State of Washington. Based upon the foregoing, Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the International Union, Security, Police, and Fire Professionals of America, Local 5 (Union) is a labor organization within the meaning of Section 2(5) of the Act.[2] (GC. 1(bbb), 1(ddd)) Accordingly, I find that this dispute affects commerce and the National Labor Relations Board has jurisdiction pursuant to Section 10(a) of the Act. *Old Dominion Security*, 289 NLRB 81 (1988) (Board asserts jurisdiction over employer that provides contract security services for the U.S. Navy).

II. FACTS INVOLVING THE 8(a)(1) AND (3) ALLEGATIONS

*A. Background*

Naval Magazine Indian Island (Indian Island) is the United States Navy's only deep-water ammunitions port on the West Coast. It supports the largest Navy and commercial vessels afloat, including air craft carriers, guided missile destroyers, submarines, ammunition ships, supply ships, container ships, patrol boats, and commercial barges all of which stop at Indian Island throughout the year.[3] The naval base encompasses the entire island, approximately 2,700 square acres, and is located in the Puget Sound, across the bay from Port Townsend, Washington. Various types of munitions are stored at Indian Island in underground bunkers; the port facility is used to off-load the ordinance for storage or to load them onto ships for military use. (Tr. 46, 532, 641; R. 22, p. 3)

Because Indian Island is the Department of Defense's largest conventional ordinance storage site on the West Coast, access to the facility is tightly regulated. The Navy relies on

---

[1] Testimony contrary to my findings has been specifically considered and discredited. Witness demeanor was the primary consideration used in making all credibility resolutions.

[2] Transcript citations are denoted by "Tr." with the appropriate page number. Citations to the General Counsel, Respondent, and Joint exhibits are denoted by "GC," "R," and "JX" respectively. Transcript and exhibit citations are intended as an aid only. Factual findings are based upon the entire record and may include parts of the record that are not specifically cited.

[3] I take administrative notice of the information provided by the United States Navy about Indian Island. See https://www.cnic.navy.mil/regions/cnrnw/installations/naval_magazine_indian_island.html (last visited on November 30, 2020); *Phillips v. Spencer*, 390 F.Supp.3d. 136, 149 fn. 7 (DDC 2019) (Court takes judicial notice of report located on Navy's website); Fed.R.Evid. 201(b)(2).

private contractors as "the primary security source" to provide armed security services at the base. (R. 22, p. 3) These security contractors staff key checkpoints on the island, ensuring only authorized personnel are allowed to enter and that commercial vehicles entering the base do not contain any unauthorized items. They also conduct roving patrols using vehicles to drive around the island to various checkpoints. There are two roving patrols–North Patrol and South Patrol. During these roving patrols guards check the various buildings, facilities, and fence lines, along with the beaches around the perimeter of the island. (Tr. 48, 79–81, 217, 473, 748; R. 44)

At the time the Complaint in this matter issued, Respondent had been providing contract security services for the Navy at Indian Island for 20 years, under a series of 5-year contracts. Originally, Respondent provided these services under the name "Basic Contracting Services, Inc.," or "BCSI." (Tr. 41, 980) In about 2015 Respondent changed its name to Xcel. Xcel's most recent 5-year contract with the Navy expired on September 30, 2019. Although Xcel submitted a bid for the contract's renewal in July 2018, the Navy chose another contractor. Xcel no longer provides security services for the Navy at Indian Island. (Tr. 41, 874, 980–994, 1007; R. 43–44; GC. 1(v))

Navy civilian employees manage the various contracts the Navy has with private companies on government installations (referred to as the "Navy Contracting Office"). At Indian Island Melissa Burris (Burris), who had the title of Contracting Officer, was responsible for overseeing the contract between Xcel and the Navy. The Contracting Officer is the individual responsible for signing the contract between the Navy and Xcel and is ultimately the responsible party on the government's behalf for the contract. In this capacity Burris also had the authority to require that a contractor remove individual employees from working on the contract. That being said, while Burris could request employees be removed from the contract, she did not have the authority to require that Xcel fire anyone. (Tr. 531, 545–551, 558–559, 571)

Richard Rake (Rake) worked directly under Burris in the hierarchy of the Navy civilian employees overseeing the Xcel contract; his office was located at the Navy submarine base in Bangor, Washington. Rake, who had worked as a Navy civilian employee since 2002, oversaw multiple contracts for the Navy including the one with Xcel. In this capacity he held various job titles, including Senior Performance Assessment Representative and Contracting Officer Representative. (Tr. 162, 526–531, 546, 556, 994–995)

Along with supervising subordinates on each of his individual contracts, Rake also responded to "customer complaints" regarding the contracts themselves. (Tr. 531) Rake testified that these complaints could come from anybody including contractors, visitors, government employees, Navy personnel, or Navy employees. Rake said that his job was to make sure the government and the contractor abided by the contract. On the Xcel contract, Rake supervised Steve Manson (Manson), who was responsible for performing monthly assessments of the contract. Manson had the title of Performance Assessment Representative. (Tr. 531, 534)

*B. Respondent's Operations at Indian Island*

Respondent's security guards who worked at Indian Island were covered by a collective-bargaining agreement (CBA) between Respondent and the Union. Approximately 50 of guards

worked at the base over three different shifts: day shift (5:45 a.m.–2;15 p.m.); swing shift (1:45 p.m.–10:15 p.m.); and graveyard or night shift: (9:45 p.m.–6:15 a.m.).[4] (Tr. 233, 444, 873–874; R. 7, R. 32; JX. 15–16)

Xcel conducted its operations at Indian Island out of a building shared with the Navy referred to as "Building 848." (Tr. 198, 912, 660) Respondent's offices, training room, employee locker room, and armory were located on one side of the building, while the Navy's used the other side. Respondent's training room was a type of all-purpose room used daily for employee briefings. Guards also used the training room, which contained computers, as a type of break and lunchroom. Because Respondent's guards were armed, it was not uncommon for them to be in the training room with their weapons. (Tr. 431–432, 911–912)

John Morgan was Respondent's Chief Executive Officer until September 2018, when he was replaced by Michael Filibeck (Filibeck). Filibeck was a member of Xcel's Board of Directors, and also held the title of Senior Vice President. Filibeck was new to Xcel, having started with the company on September 3, 2018.[5] He fully assumed all of Morgan's former duties around October 12. Neither Morgan nor Filibeck were physically located at Indian Island; Filibeck's office was in Albuquerque, New Mexico. (Tr. 39, 60, 74, 980–982, 987–988)

Respondent assigned military-style titles to its managers and supervisors working at Indian Island. Michael Terry (Terry) was in charge of all of the company's operations at Indian Island and held the title of "Captain." Terry had worked for Respondent in various capacities since 2005 and assumed his duties as Xcel's Captain at Indian Island in February 2015. Terry reported directly to Morgan and then to Filibeck when Morgan was replaced. Respondent's shift-supervisors were given the title of "Lieutenant." Respondent had between three to four full-time Lieutenants who reported directly to Terry. Because a supervisor was required to be working at all times, Respondent had four guards who worked as "acting" or "alternate" Lieutenants. These were bargaining unit employees who worked as acting Lieutenants when needed.[6] (Tr. 73–77, 156–157, 278, 869–874, 909, 987)

Some of Xcel's full-time Lieutenants had specific assignments. One such Lieutenant was Gerald Powless (Powless), who worked was Respondent's training officer. As part of his duties as training officer, Powless was the shooting range instructor and in charge of performing Respondent's firearm qualifications. Powless had been performing this assignment for years and was designated as Respondent's "range master." (Tr. 456, 888, 969) As the range master, Powless would complete, and sign, the Navy's official shooting-range qualification forms ("Form 3591.1"), which would be completed whenever a qualification shoot occurred.[7] Form 3591.1 showed the name of the guard qualifying, the location of the shooting range where the

[4] The relevant unit is defined in the CBA as: "all federal contract security officers employed by the Company at the Indian Island Naval Magazine in the State of Washington. Excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act." (JX. 16)

[5] All dates refer to 2018 unless otherwise indicated.

[6] The full-time lieutenants were not part of the bargaining unit, and in its Answer Respondent admitted that the full-time Lieutenants, including Gerald Powless, Doug Lux, and Armando del Rosario, were statutory supervisors and/or agents of Respondent within Sections 2(11) and 2(13) of the Act. (GC. 1(bbb); GC. 1(eee))

[7] Xcel Lieutenant John Armstrong was also authorized to sign these forms. (JX. 4 #1233, JX. 5 #1304)

qualification occurred, the date of the shooting range, the weapon(s) and the range course used, the shooter's score, and whether the individual did or did not qualify with a particular weapon. A copy of Form 3591.1 would go into each guard's file to show that they had properly qualified for each particular weapon. (Tr. 147, 278, 509, 560, 882–883, 902, 987, 1015, 1045–46; R. 42)

### *C. Weapon Assignments and Shooting Qualification Tests*

#### 1. Weapon assignments

Respondent's guards were assigned various weapons to use during their workday; everyone carried a Beretta M9 nine-millimeter pistol as their standard weapon. A Mossberg M500 12-gage pump-action shotgun, and an M-4 assault rifle were also assigned to guards, depending upon the post they were working on any given day. Guards started their shift with a daily briefing. After the briefing they would go directly to the "armory" or "cage" to check out their weapons for the day.[8] Each guard who qualified for a particular weapon was given a yellow weapons card. At the cage, the guard turned in a weapons card for each specific weapon he/she was assigned to carry that day, depending upon their post. A Lieutenant or acting Lieutenant then issued the guard their weapon(s) and ammunition. At the end of the day, the process was repeated, but in reverse. Weapons and ammunition were returned to the armory, and the guards received their weapons card in return. (Tr. 78, 217–218, 233, 265, 448, 454, 456, 533, 654–655, 891, 1074)

The weapons the guards carried at work and the ammunition for those weapons belonged to the Navy. Xcel employees were not allowed to leave Indian Island with any of these weapons, unless the weapons were going to be used for an official qualification at a shooting range. And then, the weapons were transported to the shooting range under strict procedures in locked cases. (Tr. 52–53, 132–133, 233–234, 444–445, 511, 533, 654, 667)

#### 2. Shooting qualification tests

Guards at Indian Island were obligated to pass shooting tests every 6 months to show that they were properly qualified to carry each type of Navy issued weapon. The Navy required that these tests occurred at specific shooting ranges approved by the Navy, using only government-owned weapons, and ammunition provided by the Navy. The Navy also provided the targets to be used for qualifications. (Tr. 53–54, 105, 514, 533, 891, 893, 895; R. 43 pp. 22–23)

The Navy had approved two shooting ranges for guards at Indian Island to use for weapons qualifications. The official shooting range was located at Naval Base Kitsap, a submarine base in Bangor, Washington, about 30 miles south of Indian Island. The Navy had also approved the Port Townsend shooting range for use during special circumstances or when the Bangor range was closed. (Tr. 53–54, 447, 511, 612–613, 656, 995, 1071; R. 2)

---

[8] According to Rake, the correct name for this location was the "ready for issue room," as the main armory at Indian Island was technically located in another area. (Tr. 539, 552–553). Nevertheless, in this decision the area where the guards received their weapons on a daily basis is referred to as the "armory" or the "cage" which is consistent with the testimony of the various witnesses. (Tr. 78, 218, 264–266, 445, 510, 655, 672, 709, 715, 939; JX. 5 #1281)

For the shooting qualification tests, the Navy set the specific standards for each test. However, the tests themselves were administered an Xcel employee. As the range master, Powless was the person generally responsible for overseeing the ranges and completing the corresponding paperwork. Other Xcel employees also assisted at the range, serving as safety officers or line coaches. When Xcel guards were qualifying at the Bangor range, nobody from the Navy was present to keep a list of who was shooting that day. However, the guards would sign-in on a weapons training roster form that Respondent would maintain. Powless would also sign the form as the instructor, certifying that the weapons training requirements were completed. (Tr. 110, 121, 133–134, 235, 446, 495–496, 508–510, 656, 905, 969, 1046; R. 14; JX. 4 #1235, JX. 5 #1305, #1307)

The shooting qualification tests occurred twice a year. Every guard was required to pass a primary firearms qualification annually, and then a sustainment test 6 months later. Shooting range days were considered workdays and guards would be paid during weapons qualifications. During these tests, guards need to achieve a certain score, based upon their shooting accuracy, to qualify. (Tr. 103–104, 656, 807, 891, 893)

The annual qualification test consists of two M9 pistol courses, a regular course firing 50 rounds, and a low-light shoot. There was also a shotgun qualification course, where guards were required to shoot at three different targets with the M500. Finally, the M4 rifle course consisted of shooting the rifle in a prone, kneeling, and standing position at three different yardages. For the M4, guards also needed to pass a separate low-light shooting test. The 6-month sustainment test was a scaled down version of the annual qualification. Guards only needed to qualify with the M9 pistol and the M4 rifle, and they used larger targets. There was no M500 shotgun course during the sustainment shoot; guards only had to show a familiarization with the weapon. (Tr. 104, 446, 805–806, 891–893, 901)

Guards received two opportunities to pass their qualification tests. If a guard failed, they had 60 days to complete their second test to qualify. If a guard did not qualify after their second try, the guard was supposed to be removed from the contract. That being said, it appears Xcel's general practice was that, if a guard passed their pistol qualification, but failed the rifle/shotgun qualification twice, the guard was allowed to continue working at posts that only required an M9 pistol until the guard was eventually able to qualify with the M4 rifle and M500 shotgun. (Tr. 67–68, 566, 657–658, 733–734, 807–808)

*D. Respondent's Use of Alternate Sites for Weapon Qualifications*

Terry admitted during his testimony that, prior to July 2018 when a group of Respondent's guards complained to the base commander, Respondent sometimes used areas other than the official Navy designated ranges at Bangor or Port Townsend to qualify guards on their weapons.[9] Sometimes they used the backyard of a guard's house for weapons qualifications, "or anywhere [they] needed to," in order to qualify their guards. (Tr. 894–896, 962–968) Terry testified that, in these circumstances, rather than using official Navy issued weapons, Respondent would provide its own weapons for the shooting range, which he said were

[9] Terry testified that this practice may still have been occurring as late as July 2018. (Tr. 978)

comparable to Navy weapons: a 9 millimeter pistol, a 12-guage shotgun, and an AR-15 or something similar to the M-4 rifle.[10] (Tr. 894–896, 978)

Terry said that, while Xcel had been doing "this for years," (Tr. 894) these alternate site shooting ranges would only occur after a guard did not qualify initially at the official Navy designated shooting range, or if a guard had to do a "make-up shoot." (Tr. 895) Terry testified that both Rake and Manson were aware of Respondent's practice, including the fact that Respondent had been using someone's backyard for weapons qualifications.[11] According to Terry, neither Rake nor Manson had objected to this practice.[12] Terry said that Respondent believed it was working within the parameters of the Navy's instructions, because Xcel would set up the exact same shooting course, albeit at an alternate site and using non-Navy issued weapons/ammunition. (Tr. 894–896, 963)

During his testimony, Terry identified at least one weapons qualification Form 3591.1, that was signed by Powless, where the information in the document was incorrect. The form states that five guards, including a guard named Evan Schroder (Schroder), successfully completed the handgun qualification course, the rifle qualification course, and also qualified with the shotgun, at the Bangor range on July 7, 2017. Terry admitted that this qualification shoot did not occur at the Bangor range as the document states. Instead, it occurred at Schroder's house, in his backyard. According to Terry, having a sustainment qualification shoot occur in Schroder's backyard was consistent with Xcel's practice at the time. (Tr. 895–898, 900, 967–969; R. 42)

Terry testified that it was only after Xcel's guards complained to the base commander, and the subsequent investigation, that he learned Respondent could only use Navy approved shooting ranges for official weapons qualifications and that only Navy issued weapons and ammunition could be used during qualifications. As part of the investigation into the complaints lodged by Xcel employees in July 2018, Terry said that Respondent got their "hand slapped" by the Navy because these qualification tests were not occurring at authorized shooting ranges; Xcel then stopped the practice. (Tr. 963, 977–978)

### *E. Guards Complain about Xcel's Weapons Qualification Practices*

#### 1. Xcel guards Mark Salopek, Steve Mullen, and Daniel Lein

Mark Salopek (Salopek) worked for Xcel as a guard at Indian Island from May 2013 until he was fired on October 27, 2018. Previously, Salopek had worked for 22 years as a police

---

[10] The term "AR-15" is often used to refer to the semiautomatic version of M16 or M4 type rifles/carbines that may be purchased by civilians. See *Colt Def. LLC v. Bushmaster Firearms, Inc.*, No. CIV.04-240-P-S, 2005 WL 2293909, at *14 (D. Me. Sept. 20, 2005), subsequently affd. 486 F.3d 701 (1st Cir. 2007). The M16 and M4 used by the military are both derived from the original AR-15 developed by a company named Armalite. Id.

[11] Page 895, line 9 of the transcript reads "Port Townsend range or the Pier (phonetic) range." It should read "Port Townsend range or the Bangor range. Also, Page 895, line 13 reads "Steve Matts (phonetic) and Richard Rake." It should read "Steve Manson and Richard Rake."

[12] This testimony was originally elicited by Respondent's counsel, but without proper foundation as to how Manson and Rake knew these qualification ranges were occurring on unauthorized sites. (Tr. 895, 899) However, Terry later testified that he personally told both Rake and Manson about these practices. (Tr. 963) I credit Terry's testimony about this matter.

officer with various state or local jurisdictions in California and Nevada. He then moved to Washington State. (Tr. 943) Terry and Salopek were friends, having worked together in law enforcement, and Terry helped Salopek get a job as a guard with Xcel. After Terry took over as the Xcel Captain at Indian Island in early 2015, he promoted Salopek to acting Lieutenant. (Tr. 72–73, 324, 938–943)

While working for Xcel, Salopek was active in the Union. He was a steward in 2014, and his signature was on the most recent CBA, along with the predecessor agreement, as a member of the Union's bargaining committee. (Tr. 82–83, 258–259; JX. 15–16)

Before he was fired in October 2018, Salopek only had one prior discipline in his record, a three-day suspension that occurred in October 2015 which also resulted in his being demoted back to a regular guard. Regarding the incident, on October 3, 2015, Salopek was on duty and left various doors to the armory open and unattended. Rake was involved in reviewing what occurred and recommended to the Contracting Officer that Salopek be removed from the contract because the open and unattended armory contained 5,000 rounds of ammunition, along with M9 pistols, M4 rifles, M500 shotguns, and M240 belt-fed machine guns. Ultimately Salopek was not removed from the contract, as Terry intervened on his behalf. Instead of removing him from the contract, it was decided that Salopek would be suspended for 3 days and demoted back to a guard. (Tr. 204–206, 554, 939–942; JX. 5 #1280–1282)

Steve Mullen (Mullen) started working as a guard for Xcel in July 2011 and worked for Respondent until December 2016 when he left the company because he could not pass his Physical Readiness Test (PRT). Respondent's employees are required to pass a PRT every 6 months; for the test each guard is required to do a certain number of sit-ups, push-ups, and sitting toe-touches. Guards also have to complete a 1 ½ mile run within an allotted period of time. If a guard fails a PRT they get a 60-day waiver and then must retake the test. If they are again unable to pass the PRT a second time they are terminated. (Tr. 56–57, 215–218, 875–876)

According to Mullen, he failed the PRT in 2016 due to a knee injury caused by a blood disease. After he left the company, Mullen received treatment for the disease, was able to pass the PRT, and was rehired by Xcel in May 2017. After resuming his employment with Xcel in 2017, he continued working for the company until July 17, 2018, when he resigned claiming he was subjected to workplace harassment and an unsafe work atmosphere. At various times during his employment with Xcel, including from May 2017 through May 2018, Mullen worked as an acting Lieutenant. (Tr. 215–221, 457, 490, 874; JX. 4 #1225; Tr. 215–216)

Before working for Xcel, Mullen was employed as an armed security guard for another government contractor. He had also worked as a police officer with various local jurisdictions in California. Mullen is also a retired California Department of Corrections prison guard, having received a medical retirement in 1991. His medical retirement was due to a workplace injury that occurred when a steel door crushed his shoulder. Regarding this incident, Mullen testified that he had reported a coworker named Yolanda to his superiors for certain inappropriate statements. Yolanda then told Mullen that he "did not know what [he] had stepped in." (Tr. 228) A few days later, Mullen said that he and Yolanda were working the same shift; Mullen was counting prisoners while Yolanda was controlling the cell doors. As Mullen was walking

through the steel doors accessing the prisoner housing unit, Yolanda closed the door on him, crushing his arm/shoulder in the door and his back against the door jam. Mullen testified that yelled for Yolanda to open the door, but she replied saying "don't tell me what to do." (Tr. 228) Mullen implied that Yolanda purposely closed the door on him, saying that the only way the door could close was if Yolanda had removed her hand from a button which kept the door open. According to Mullen, after he was hired with Xcel, he told Terry about his injury and how it occurred. (Tr. 223–224, 228–232)

Daniel Lein ("Lein") started working for Xcel as a guard at Indian Island in April 2018. Lein had previously worked contract security at other military installations for over 9 years, including at the Navy submarine base in Bangor. Lein had a friend working at Xcel who told him good things about the company. Lein wanted a change of pace, so he applied to work for Xcel and was hired. Lein is also a retired Navy Chief Petty Officer, having spent twenty 20 years in the Navy. (Tr. 651–653, 728–729)

2. Salopek speaks to Morgan about weapon qualification issues

Salopek testified that, sometime around February 2018 he was serving as a line safety officer/line coach at the Bangor range and he witnessed three guards fail their M4 rifle qualifications twice. After they failed, he saw Powless alter their qualification targets by drawing a large black cross on each target with a marker so the shooters could better see the target; the center point of the cross intersected the center circle of each target. Apparently the guards were then allowed to re-shoot and they qualified using the altered targets. (Tr. 110–111, 778)

Salopek questioned whether it was proper to alter a qualification target; he had never seen anything like this before. Salopek believed that, as per Navy training documents, after two failed attempts a guard was supposed to be removed from the range, and evaluated or remediated before having another qualification attempt, as opposed to shooting with an altered target. He was concerned the guards were being denied this training and was worried about their ability to shoot accurately. In a real-life situation potential threats would not be approaching the base outlined with a large cross, and there was a public park near the base with cars driving by all the time. Salopek spoke to some of his coworkers, including Mullen, about Xcel using altered targets. Mullen had also witnessed the use of altered targets and did not think that a guard's shooting qualifications were valid if they qualified using an altered target. (Tr. 112–115, 778)

Along with the use of altered targets, Salopek heard from some of his coworkers that Respondent had been using alternative sites, not authorized by the Navy, for weapon qualifications. According to Salopek, he had heard about coworkers qualifying at a gravel pit going as far back as 2016.[13] Salopek testified that, in 2016 a coworker named Jacob Schryver (Schryver) said he was asked to take a guard named Tom Cunningham (Cunningham), who had failed his shotgun qualification, to a gravel pit or forested area to teach him shotgun

[13] The term "gravel pit range" was used throughout the hearing. As used herein the term refers to weapon qualification shooting ranges occurring at locations not authorized by the Navy.

fundamentals.[14] Schryver did so, and afterwards saw Cunningham standing post with a shotgun. According to Salopek, Schryver was upset. Schryver believed Xcel counted the remedial training he did with Cunningham as an official qualification since Cunningham thereafter was allowed to stand post using a shotgun. Also, Salopek testified that, in July 2017 Powless told him that he was taking five guards to qualify using a shooting range at Schroder's house. Salopek's coworkers also told him about the qualification shoot at Schroder's house, the personal weapons that were used, and Terry told him about ammunition he had purchased at Walmart to use at Schroder's house.[15] (Tr. 106–109, 151–152, 277–283, 286–288, 416)

Salopek therefore decided to speak with Morgan, Xcel's the CEO. Salopek telephoned Morgan on March 9, 2018 and told him about the gravel pit ranges and the use of altered targets. Morgan asked whether Powless was doing these things on his own initiative, without Terry's consent, and Salopek said that Terry was aware of what was happening. Morgan told Salopek that he would call Terry and resolve the matter. A few days later, Salopek testified that he received a call from Morgan who said that he had instructed Terry to follow all the proper policies and procedures regarding range operations. (Tr. 115–116, 120, 290)

3. Powless schedules Lein to qualify at a gravel pit range

After Lein was hired, his initial weapons qualification shoot was scheduled for May 9 at the Bangor range. Along with Lein, other Xcel guards were shooting that, including another newly hired guard named Emily Coler (Coler). Mullen was also at the range that day, as was Salopek who was serving as a safety officer/line coach. Lein passed his pistol and shotgun tests but failed his M4 rifle qualification. Coler passed her M9 pistol test but failed her M4 rifle test and her M500 shotgun test. (Tr. 122–126, 454, 657–658, 454, 732–733; R. 4; R. 14)

Lein was still a probationary employee at the time,[16] and based upon his experience working with other government contractors, Lein thought he would be fired because he could not pass the rifle test. Therefore, Lein asked Powless when he would be able to qualify again. Powless said that he would speak to Terry and get back with him. Powless also told Lein that, since he had passed the pistol and shotgun tests, he could continue working at posts that only required an M9 pistol and/or an M500 shotgun; he could not work on any post however that required an M4 rifle. While this practice did not conform with his past experiences, Lein continued working for Xcel standing posts that only required a pistol and/or shotgun. (Tr. 657–660, 733, 739, 760)

---

[14] At various points Salopek mistakenly referred to Jacob Schryver as "Jacob Schroeder" during his testimony. (Tr. 106, 114, 121, 142) Schroeder's first name is Evan. (R. 7, Tr. 447–449) Salopek was not the only person who confused the two names during the hearing. Another guard confused the two first names, as did Respondent's counsel. (Tr. 987, 990, 1080) It was clear that whenever Salopek testified about "Jacob Schroeder" he was referring to Schryver. Schryver's written statement to Rake discusses the same incident that Salopek attributed to "Jacob Schroeder," other guards testified they discussed Xcel's practice of using gravel pit ranges with Salopek/Schryver and Schryver was specifically mentioned in Salopek's June 28, 2018 email to Morgan. (Tr. 458–459, 679; GC. 3)

[15] Mullen testified that he had also heard from his coworkers about the range at Schroder's house in July 2017, and that the guards qualified using non-Navy issued weapons and ammunition. (Tr. 447–449, 504)

[16] Respondent's employees have a 180-day probationary period, pursuant to their union contract. And any discipline or discharge issued during the probationary period is not subject to the contract's grievance and arbitration provision. (Tr. 760, 965; JX. 16, Art. #6)

A few days later, Lein asked Powless if there was any news from Terry about when the next qualification range would occur. Powless had not heard back from Terry. After 2 or 3 days had passed, Lein and Powless were standing outside the armory. Powless told Lein that he was going to take both Lein and Coler to "get you guys qualified." (Tr.661) However, Powless did not explain when or where the qualification range would occur. A few weeks later, Powless told Lein that he and Coler were to meet him at a U-Haul facility on May 27; from there they would ride with Powless to a gravel pit/rock slab for a qualification shoot. Lein asked Powless if the gravel pit shoot was for practice or qualification, and Powless said the shoot was to qualify Lein with the M4. But, instead of shooting an M4, Powless said that Lein would be shooting an AR-15 owned by a coworker named Robert Armstrong (Armstrong). Lein thought this was strange, as he had never experienced anything like this while working as a security contractor. Therefore, Lein spoke with some of his coworkers, including Salopek and Mullen, and asked whether shooting at a gravel pit was standard practice at Xcel. When Salopek heard about the scheduled gravel pit range he became angry. Salopek told Lein that gravel pit ranges had occurred in the past, but they were not allowed and needed to stop. (Tr. 126, 455, 660–665, R. 2 p. 16)

Before the scheduled gravel pit range, both Mullen and Lein overheard Powless speaking with Armstrong about an getting an AR-15 for use at the range. And, Salopek testified that Powless specifically told him that he had borrowed an AR-15 from Armstrong for use at the gravel pit range. According to Salopek, Powless was excited because the rifle had multiple attachments. (Tr. 127–128, 456–457, 667–668)

After speaking with Salopek, Lein decided that he would not attend the gravel pit range but would instead wait for the next official range to occur at Bangor. On the day he was supposed to meet Powless and Coler, Lein called Powless and said he was not comfortable shooting at a gravel pit. Powless did not object. During their conversation, Lein asked Powless whether the gravel pit range was going to be "a legal shoot." (Tr. 671) Powless said yes and told Lein that Armstrong had seen something in writing that this was authorized by the Navy. Lein then asked Powless if the guards were going to be paid for this shoot, and Powless said no, it was going to be unpaid. Lein believed that qualifying at a gravel pit was not authorized by the Navy; it was not an authorized location and employees were not being paid. He also thought it strange that Powless, who was a Lieutenant, was asking Armstrong about whether qualifying at a gravel pit was authorized. (Tr. 666, 670–671)

A few days after May 27, Lein was returning his weapon and saw Powless at the armory. He asked Powless how Coler did at the shoot, and Powless said that Coler passed. Lein then asked Powless how Coler scored with the rifle, and Powless said that she shot a 141, one point over the passing mark of 140. Lein walked away; he thought that there was no way Coler could have passed. (Tr. 672–673)

On about May 31, Lein testified that he was working when he saw Coler loading her bag into one of the patrol trucks. He said to Coler "hey I heard you passed your quals." (Tr. 674) Coler replied saying that she was happy about passing and this was her first day working South Patrol, which required a shotgun. After his conversation, Lein saw that Coler was on the work schedule assigned to different posts that required a shotgun. Mullen testified that on June 12, he

was scheduled to relieve Coler and saw that she had been issued an M4 rifle along with her M9 pistol. (Tr. 458, 673–675)

Lein eventually qualified with the M4 on June 20, at the Bangor range, with a score of 157. Originally, the qualification shoot was scheduled to occur on June 13, and both Lein and Coler were listed on the email delineating the guards scheduled to shoot. However, the range was cancelled and rescheduled for June 20; again both Lein and Coler were on the list of people scheduled to qualify. While Lein qualified at the Bangor range on June 20, Coler was not at the range that day. Lein thought the entire episode did not make sense. If the May 27 gravel pit range was an authorized shoot, as stated by Powless, and Coler qualified with her shotgun and rifle, he questioned why would Coler's name appeared on the list for both the June 13 and June 20 qualifications at Bangor. Lein thought this was especially odd since Coler was already working posts that required her to have a shotgun and/or rifle. (Tr. 675–678, 733; R. 2, p. 17)

4. Mullen and Salopek speak with an Xcel Lieutenant about weapon qualifications

On June 25, Salopek, Mullen, and another guard were at the armory turning in their weapons. An Xcel Lieutenant named Doug Lux (Lux) was present and asked the guards if they had any concerns or complaints. Mullen brought up the issue of Respondent using a gravel pit for weapon qualifications. Salopek and the other guard confirmed that this practice was, in fact, occurring. Lux said he would look into it. Later that evening, Salopek testified that Lux called him at home and said he had spoken with Morgan who confirmed that guards cannot be qualified at a gravel pit range. Lux then said that Morgan asked whether Salopek would be willing to help with the company's training program; Salopek agreed to help. (Tr. 137–39, 459–461)

The next day, Salopek was scheduled to work with Coler; the assignment required Coler to carry a shotgun. At the start of their shift, the Lieutenant in charge switched their positions. Salopek was assigned the shotgun instead of Coler. Salopek testified that, as they drove to their post, Coler told him that she was angry because she had spent 5 hours at the gravel pit without getting paid, and now she had to get requalified. (Tr. 139–140)

After finishing his shift with Coler, Salopek went to Lux's office and asked about training program they had spoken about the previous day. Lux told Salopek that things had changed. Salopek was to bring whatever issues he had directly to Lux instead of to Morgan. Lux then said that Powless should have known better than to take people to qualify at a gravel pit based upon something another guard had told him. Salopek told Lux that Powless was not the only person involved, and the practice was being condoned by Terry and others. Lux again said that Powless should have known better. Salopek told Lux "you're going to dump this whole thing on Gerald [Powless], aren't you?" (Tr. 141–142) Lux did not answer. Salopek then told Lux that he was going to write a memo to Morgan regarding the entire matter. (Tr. 141–142)

5. Salopek drafts a letter to Morgan

From the time Lein first learned about the gravel pit range in May, through the end of June, Lein, Salopek, Mullen, and Schryver, at various times had discussed amongst themselves what was happening with respect to Xcel using unauthorized locations, including a gravel pit, for

weapon qualifications. They felt it was unsafe and wrong; these were not approved shooting ranges and guards were not being paid. They did not know who was acting as a safety officer at the unauthorized range sites, and no medical personnel or safety equipment was available if something occurred. Moreover, at these unauthorized range sites, guards were shooting civilian weapons, which were different than the actual weapons assigned by the Navy. They decided that something had to be done. So after speaking with Lux, Salopek drafted a letter to Morgan and emailed it to him on June 28, 2018. (Tr. 129, 142, 458–459, 678–679)

Before finalizing the letter, Salopek testified that he spoke with Mullen and Schryver who looked at the letter for content, and also provided him with information to include in the document. (Tr. 142) Salopek's June 28 email to Morgan reads as follows: "I know you are very busy. And I know rather long memos take up your time. But a few of us are asking for you to take a few minutes and review this with our concerns. We are hoping you will understand once you read it and understand our concerns." (GC. 4)

Attached to the email was a five-page, single spaced, letter. The letter is, at times, rambling and discusses a multitude of issues. The letter starts with a recitation of various conversations between Salopek, Morgan, and Lux. It goes on to discuss instances when qualifications occurred at gravel pit ranges, along with a timeline claiming the practice started when Terry was an acting Lieutenant, that it had stopped for some time, but then restarted again. The letter describes the incident involving Schryver familiarizing Cunningham with the shotgun, claiming it resulted with Cunningham's qualification, and Terry saying that the practice was allowed by the Navy. (Tr. 143–46; GC. 3)

Salopek's letter also discusses the shooting range at Schroder's house, where personal weapons were used to qualify, and the ammunition was purchased by Terry. The letter names three "senior guards" who could not pass their rifle and/or shotgun qualifications at Bangor on May 8, saying that Powless then drew a large cross on the rifle targets, and another Lieutenant put a white piece of paper on a the shotgun silhouette target, to enhance the visibility of the targets, resulting in the guards then passing 4 out of 5 of their shooting tests. (GC. 3)

The letter discussed Coler and Lein failing their respective qualifications and Powless wanting to take them to a gravel pit, on their own time, to qualify with a personal weapon provided by another guard. Regarding Coler, Salopek wrote that after the gravel pit range Respondent considered her qualified on all weapons and she was allowed to work all posts. When Coler found out she had to requalify, she was upset because she spent 5 hours at the gravel pit without being paid. In the letter Salopek states that a coworker, who was a recently retired from the Navy where he served as a range safety officer, said that qualifying guards at a gravel pit was against the law, because Respondent would have had to complete and submit qualification forms containing false information. (GC. 3)

In conclusion, Salopek wrote that there were seven reasons why they were bringing the issue of unsanctioned ranges/bad range practices to Morgan's attention: (1) someone could get hurt and the company could potentially be liable; (2) guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base; (3) the practices violated the Navy's "OPNAV" safety and operating procedures and ethics; (4) if

discovered by the Navy, or an Inspector General complaint was made, the consequences could be "catastrophic" for the company and tarnish the company's name as well the names of Respondent's guards; (5) Xcel's rating with the government could be affected; (6) criminal actions may have occurred; and (7) violations of State law may have happened which could jeopardize the company's ability to conduct business and the Navy's reputation. (GC. 3)

Morgan replied to Salopek by email on June 29. The email reads as follows:

> I read the first part of your letter. So much was misinterpreted that I don't know where to begin. I will work with Michael [Terry] to see what we need to do. It's unfortunate the message was confused, it was our intent to include your talent I [sic] training especially compliance but it seems there is a major disconnect between your [sic] and your Captain. I don't know if you realize it but that man has stepped up for you on many occasions just as you have for this company. We need to fix this relationship. I will be in touch.

Salopek testified that he was concerned about Morgan's response. Morgan was discussing Salopek's relationship with Terry, while Salopek was concerned about stopping dangerous practices from occurring. Salopek replied to Morgan by email dated June 30, expressing his concerns. Salopek also spoke about the issue with Lein and Mullen. They discussed whether it was time to make an official report and decided they needed to see the base commander who was going to be in his office on July 8. (Tr. 153, 159–160, 462, 679; GC. 4; GC. 5)

6. Salopek, Mullen, and Lein complain to the base commander

On Sunday July 8, at about 3:00 p.m. Mullen, Salopek, and Lein went to see the base commander. It was Salopek's day off and Lein had just finished his shift. Mullen was on duty that day and assigned South Patrol, which involved patrolling the south side of the base, an area of about a 5–6 square miles. (Tr. 80, 159, 164, 462, 680–681, 746–747)

The guard on South Patrol drives a patrol truck and has a checklist with items that need to be reviewed during the shift, and the specific times the checks need to occur. These include checking certain buildings and ammunition magazines to make sure they are locked, and monitoring beaches and fence lines. The guard on South Patrol enters the exact time each item on the checklist is reviewed. Because there are not very many items that need to be checked during a shift, the guard on South Patrol sometimes gives bathroom breaks for other guards on post, or is "just killing time" by either parking somewhere on the island to save on fuel, or parking on a beach to watch for boats. (Tr. 750) Other times they are backtracking to double check items that they have already checked. Also, about a half hour before their shift ends, many times the guard on South Patrol will wash the patrol truck because it gets dusty. Guards on South Patrol do not need to call-in for relief when they take a bathroom break or eat lunch. So long as they have their radio and pistol with them, they can take these breaks anytime they want. Because the base commander's office is located within South Patrol, and is inside one of the buildings that Mullen needed to check, he did not call for anyone to relieve him when he went to

see the base commander with Salopek and Lein. (Tr. 462–464, 688, 701–702, 734–736, 746–752)

The Navy's commanding officer at Indian Island was Commander Rocky Pulley ("Cdr. Pulley"). Mullen, Lein, and Salopek met outside the administration building and then went to Pulley's office, asking if they could speak with him about a safety concern. The guards told Cdr. Pully they had a safety issue and were trying to get direction on how to resolve the matter but were vague regarding the exact issue. After a few minutes of going back and forth with generalities, Cdr. Pulley demanded they tell him exactly what was going on. The guards told him about the gravel pit ranges using nonmilitary weapons and personal ammunition for qualification shoots. Cdr. Pulley asked if they had reported the issue up their chain of command, and they said yes. Cdr. Pulley then asked if they had spoken with Mike Jones, a Naval officer who was designated as the Installation Security Officer at Indian Island (ISO Jones or Jones). The guards had not informed ISO Jones, so Cdr. Pulley said that they needed to immediately send an email to Jones advising him of the issues.[17] Pulley also asked that they needed to inform Terry before contacting ISO Jones. (Tr. 163) During the discussion, Salopek mentioned the possibly of going to the Navy's Office of the Inspector General (OIG) and asked about whistleblower protections. Cdr. Pulley said that all three of the guards were protected under the whistleblower program. The meeting with Cdr. Pulley lasted between 15–30 minutes. Mullen did not miss any of his scheduled checks on South Patrol during the time that he was meeting with Cdr. Pulley. (Tr. 160–165, 334–335, 463–464, 562, 647, 684–688, 734)

After the meeting with Cdr. Pulley, Salopek, Lein, and Mullen went outside and discussed their next step; someone needed to contact Jones as per Cdr. Pulley's instructions. Lein and Salopek were scheduled to work on day shift the next day. Because Mullen was not scheduled to work until the swing shift, it was decided that he would draft and send the email to ISO Jones. (Tr. 464–465; R. 1)

### *F. The Events of July 9*

#### 1. Mullen emails ISO Jones

As instructed by Cdr. Pulley, on July 9 Mullen sent an email to ISO Jones saying that himself, Salopek, Lein, and Schryver were coming forward with a safety issue regarding weapon qualifications and using a gravel pit range on several occasions to qualify guards.[18] Before he sent the email, Mullen waited for Salopek to call Terry and notify him that a complaint was forthcoming. (Tr. 165, 465–466, 736–737; R. 1)

The morning of July 9, Salopek was at the Bangor range with a group of Respondent's guards including Coler, who was requalifying with the M4 rifle. Salopek said that he saw the Mullen's email to Jones before it was sent, but only briefly. At about 9:00 a.m. Salopek called Terry. Salopek testified he told Terry that guards were coming forward with a complaint about

[17] Transcript page 687, line 11 should read "None of us had spoken to Mike Jones" instead of "One of us had spoke to Mike Jones."

[18] Although Schryver's name is in the email, and he had discussed these issues with Mullen, Salopek, and Lein, it does not appear that he was actively involved in the complaint to either Pulley or Jones. (Tr. 294–296, 516–17)

his range practices, and that he owed it to Terry to tell him that a complaint was forthcoming. According to Salopek, Terry replied by saying that he already knew. (Tr. 165–166, 301, 885–886, 924–25; R. 22, p. 22)

Terry testified that he received two telephone calls at about 9:00 a.m. on the morning of July 9, one from ISO Jones and one from Salopek. Jones called to give Terry a "heads up" that Cdr. Pulley received a "walk-in" complaint that some of Xcel's guards were not properly qualified with their assigned weapons. (Tr. 878) As part of his job duties Terry worked closely with ISO Jones and they would generally meet once a week to resolve any problems that might be occurring on base. During this call, Jones also told Terry that he wanted to look at Respondent's weapons training records. After getting the call from ISO Jones, Terry called Morgan to tell him what was happening and ask him for direction moving forward. As for his call with Salopek, Terry testified that Salopek told him somebody had turned Xcel into Cdr. Pulley. Terry said he told Salopek that he would deal with the matter. (Tr. 879–890)

At 10:00 a.m. on July 9 Mullen sent the email to ISO Jones. The email is, for the most part, a condensed version of the letter that Salopek sent to Morgan on June 28. In the email, Mullen states that himself, Salopek, Lein, and Schryver were coming forward with a safety issue concerning weapon qualifications and Respondent's use gravel pit ranges to qualify guards. Mullen's email describes the incident where Schryver took Cunningham to a gravel pit to shoot using Schryver's shotgun with ammunition provided by Terry. While Schryver thought the shoot was a "familiarization," Respondent considered it a qualification shoot even though Schryver was not certified to qualify anyone. And, when it was brought to his attention, Terry said that the practice was allowed by the Navy. The email also discusses Powless asking Schryver to qualify guards at a gravel pit, and a coworker saying that he brought personal weapons to work for use at a range occurring at another guard's house. (Tr. 297–298, 465; R. 1)

The email discusses a range at Bangor on May 9, where Powless altered the rifle targets for Cunningham, Terry Lauritzen (Lauritzen), and Kevin David (David) with a large black cross, while Cunningham's shotgun target was altered by another Lieutenant with a white piece of paper. While Cunningham could still not pass his rifle test, the other guards qualified using the altered targets. (R. 1)

The email also discusses, in detail, the qualification shoot involving Lein and Coler, with Powless telling Lein that he would go to a gravel pit with Coler to qualify, but they would not be paid for their time. While Lein did not go to the gravel pit, Coler did and was qualified using a personal shotgun and an AR-15 supplied by a coworker; she was then allowed to stand posts that required being qualified with an M4 rifle and/or M500 shotgun. The email ends by saying that Morgan has been informed about these practices, and that it seemed Respondent was trying to cover up what had occurred. Therefore, Mullen wrote, "[w]e feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents . . . We cannot continue to let this go on without reporting it to you." (R. 1)

At about 11:30 a.m. on July 9, Terry received an email from ISO Jones asking for Respondent's training records for five guards: Lauritzen, Cunningham, Lein, Coler, and David. In the email, Jones asked that the five guards be removed from their post responsibilities and that

their gun cards will be pulled until further notice. After receiving the email, Terry did not remove the guards. Instead, spoke with Jones and asked if he could have more time to sort things out and provide Jones with the proper records; Jones agreed. Terry then called Powless, who was at the range with Salopek, and told him what was occurring. He also contacted Lieutenant Armando Del Rosario (Del Rosario), who was the shift Lieutenant that day. Terry told Del Rosario about Jones' email, saying there was an allegation that Lauritzen and Cunningham, who were currently on duty at the main gate, were not qualified, and told Del Rosario to let them know that they may be pulled off their post. He also told Del Rosario to make the appropriate arrangements to find replacements to cover these posts if needed. (Tr. 882–885, 890) (R. 8; JX. 9)

After ISO Jones received Mullen's email, he forwarded it to Rake. At about the same time he received the email from Jones, Rake testified that he got a call from Cdr. Pulley. Cdr. Pulley told Rake that he wanted all of Respondent's guards taken off their posts until it could be proven that they had met all the necessary requirements to sand post. Rake said that he then called Jones to find out more about the complaint. Rake also called Terry and left him a voicemail saying that he would be at Indian Island the next morning to meet with him. Rake testified that he called Terry because, whenever he gets a complaint he will "partner" with his contractors to find out about the complaint and work through the matter. (Tr. 537) Just before 2:00 p.m. on July 9, Rake forwarded Mullen's email to Terry. At some point that evening Terry left Rake a voicemail saying that he was looking into the complaint and would see Rake the next day. (Tr. 534–539; R. 1)

Terry read Mullen's email immediately after he received it from Rake. He then forwarded it to Morgan. Terry testified that he was surprised with the allegations in the email. Terry said that Powless had been in charge of Respondent's firearms qualifications for years and had done nothing that would lead Terry to question his integrity. As for Mullen, he never received a reply to the email he sent to ISO Jones, nor did he ever hear back from anybody at the Navy about the complaint. (Tr. 476–477, 887–890, 918)

Lein was working the morning shift on July 9, at the vehicle inspection post. At about 1:00 p.m. that day Cunningham arrived at Lein's post "armed up" and was calling everybody fucking rats. (Tr. 691) Then, at some point Lein received a telephone call from Terry, who was angry. Terry asked Lein if he had spoken with Cdr. Pulley, and Lein said yes. Terry then asked Lein "who did you go with" and Lein said that he went with Salopek and Mullen. (Tr. 725) Terry told Lein that he was pulling him off his post and off the contract. Terry also said that Lein had made a big mistake and then hung up the phone. After speaking with Terry, Lein called Mullen and relayed the conversation to him. Mullen, then called Salopek and told him about the conversation between Lein and Terry. (Tr. 166–167, 724–725, 737, 762–763, 931–932; R. 32)

2. Shotgun incident involving Mullen and Cunningham

Mullen worked the swing shift on July 9; the swing shift goes from 1:45 to 10:15 p.m. He arrived at work around 1:00 p.m. and went straight to the training room, which is located across about 8–10 feet across from Terry's office. Terry's office door was open. While Mullen was in the training room he could hear Terry on the speakerphone with Morgan talking about the

three guards who went to Cdr. Pulley's office the previous day. Mullen heard Morgan say that one of the guards was on probation and was easy to get rid of. He also heard Morgan say that the other two officers "are a cancer." (Tr. 467, 797–798) At the time, Lein was still a probationary employee. (Tr. 466–467, 759–760; R. 32)

As Mullen was waiting for his shift to begin, he eventually sat in a chair in the corner if the training room. Mullen testified that, as he was sitting in the chair, Cunningham came into the room and started yelling at him, demanding an apology. Cunningham, who was still on duty at the time, was armed with an M9 pistol and carrying an M500 shotgun. According to Mullen, Cunningham was yelling "you're a fucking rat. You're a fucking skell."[19] Mullen did not know the meaning of the word "skell" but knew it was being used in a derogatory manner as Cunningham was once a dockworker in New York.[20] Mullen testified that Cunningham stood over him while holding the shotgun, was yelling and demanding an apology, and while he was doing so the shotgun barrel was moving across Mullen's legs and thighs. Mullen told Cunningham to point the gun elsewhere and said he was not going to get an apology. According to Mullen, Cunningham replied saying that the gun was pointed at the ground; Cunningham then left. (Tr. 474, 467–468, 476)

Mullen testified that he felt threatened during the exchange with Cunningham. Cunningham's weapons were loaded, and Mullen did not believe that Cunningham had any work-related reason to be in the training room with his shotgun. Instead, Mullen believed that Cunningham came into the room just to yell at him. With Mullen sitting in the corner of the room, and Cunningham standing over him yelling, Mullen said that he felt as if he had "nowhere to go" and described the situation as "very uncomfortable and very threatening." (Tr. 473–474)

Regarding the incident, Cunningham testified that he wanted an apology from Mullen because he had learned Mullen was one of the guards who had implicated him in the weapon qualifications complaint. During his testimony, Cunningham refused to say who told him about the complaint and Mullen's involvement, claiming he could not remember. Instead, Cunningham said that he had heard it through the "rumor mill." (Tr. 1057–1058) Even though he claimed that he could not remember where he learned this information, Cunningham insisted that nobody from Xcel management told him about. Cunningham claimed that the only thing Respondent told him was that he needed to meet with Rake and Manson so they could hear his "side of these so-called rumors and accusations." (Tr. 1060–61)

As for the incident itself, Cunningham testified that, after he spoke with Rake and Manson, he was getting off his shift at about 2:00 p.m. and went into the training room where he saw Mullin sitting. According to Cunningham, he went over to Mullen and said to him "very simple [sic], I'd like an apology." (Tr. 1061) Cunningham claimed that Mullen then went on the offensive, raised his voice, and said that he was not going to give Cunningham an apology.

---

[19] Transcript pages 406 line 8, and 468 line 3, should read "skell" instead of "scale."
[20] "Skell" is defined as a homeless person or derelict. *Collins Dictionary Online*, https://www.collinsdictionary.com/us/dictionary/english/skell (last visited November 30, 2020). The word is also used as slang, particularly among the New York City police, to mean dirtbag or perp. See *Urban Dictionary*, https://www.urbandictionary.com/define.php?term=SKELL (last visited November 30, 2020). *Lucas v. Tempe Union High Sch. Dist.*, No. CV-17-02302-PHX-JAT, 2019 WL 3083010, at *8, fn. 12 (D. Ariz. 2019) (noting that the "Ninth Circuit periodically uses the website 'Urban Dictionary' to provide additional context for slang terms.").

Cunningham again asked for an apology, but Mullen raised his voice once more saying that he was not going to get one. According to Cunningham, he turned around and as he started to walk out of the room, Mullen said, "don't be pointing your weapon at me." (Tr. 1061) Cunningham testified the whole interaction lasted about 30 seconds. Cunningham denied pointing his shotgun at Mullen or sweeping him with the barrel. Instead, Cunningham said that when he walked into the training room he was holding his shotgun in a "low-ready position," which involves holding the barrel at a 45-degree angle pointing towards the ground. According to Cunningham, he was in the training room because that is where he signs his timecard when he finishes his shift. (Tr. 1061–1062, 1076, 1086)

3. Terry meets with Mullen and Lein

After the incident with Cunningham, Mullen dressed for work but was then summoned into Terry's office. Terry told Mullen that Morgan was on the speaker phone. Morgan asked Mullen if he was one of the three guards who went to see Cdr. Pulley. Mullen replied saying that himself, Salopek, and Lein did, in fact, meet with Cdr. Pulley. Morgan told Mullen that he could possibly be facing disciplinary action and asked whether Mullen wanted a union representative. Mullen said yes, and Morgan ended the conversation. Mullen did not tell Morgan or Terry about the incident with Cunningham that had just occurred. Mullen testified that he did not say anything because he wanted to try and let the matter with Cunningham diffuse. Mullen then left Terry's office and went back to the training room as it was time for him to arm-up and get ready to start his shift. (Tr. 474–476, 764, 781)

After Lein finished his shift on July 9, he went to Terry's office; Terry was again speaking with Morgan on the speakerphone. Terry told Lein that Morgan wanted to ask him some questions, Lein and Morgan then started talking. Morgan told Lein that he was mad because Lein broke the chain of command by reporting weapons issues to Cdr. Pulley. Morgan brought up the fact that Lein was a retired chief petty officer and asked how Lein would feel if somebody bypassed him in the chain of command. Lein said he always told his sailors that, if they had a problem, he would like the courtesy of knowing what was happening, but they could always speak to someone else in a higher rank instead of him. Lein told Morgan that, because he had already told Powless, who was his direct superior, he did not feel comfortable qualifying at a gravel pit, he did not believe he jumped the chain of command by going to Cdr. Pulley. (Tr. 725–727)

During their conversation, Morgan told Lein that the names of the guards listed in the memo could possibly lose their jobs and asked whether Lein had qualified with the M4 rifle. Lein said that he had done so. Morgan then asked if Lein had qualified at a gravel pit. Lein said no, that he qualified at the Bangor range. Morgan then said in a smug tone "so we accommodated you." (Tr. 728) Lein told Morgan that his waiting until the next official range at Bangor to qualify was not an accommodation. Lein told Morgan that he appreciated the job opportunity; he did not know anything about Xcel before joining the company, but a friend who worked for Respondent had nothing but good things about the company. Morgan then thanked Lein for his service in the Navy and the conversation ended. Lein thought that he was being fired, based upon what Terry had told him the previous day, so when he finished talking with

Morgan he asked Terry "what's next?" (Tr. 729) Terry asked if Lein was working the next day, and Lein said yes. Terry then said, "I'll see you on post."[21] (Tr. 728–729, 738–739)

*G. Mullen's Harassment Complaint and Respondent's Investigation*

1. Mullen receives a text message from Kevin David

Mullen was not scheduled to work from July 10–July 12; his next scheduled workday was on July 13. On July 10, at about 6:20 p.m., Mullen received a text message from David, who was one of the guards named in the July 9 email to Jones as having his M4 target altered with a large black cross. David's text message to Mullen reads as follows:

> So I'm on your little fucking list, you're a fucking idiot & don't know what you have stepped in. Better call your butt buddy Mark
>
> Slander with no proof dumb ass
>
> Stupid leading stupider

Mullen viewed David's text messages as a threat. And he immediately thought back to his experience working as a prison guard when a coworker who he had crossed closed the prison cell door on him, crushing his shoulder. (Tr. 223, 480; GC. 6; R. 32)

After receiving the text message, Mullen called Salopek, as his name was also mentioned in the text. He also called Manson and Lux. Mullen testified that he called Manson because he wanted a third-party, somebody outside of Xcel, to know about the threat. Manson did not answer so Mullen left him a message. In the voicemail Mullen read David's text message and said that he had been threatened and something needed to be done. (Tr. 480–484; GC. 14)

Regarding his call to Lux, Mullen testified that the two of them played "phone tag" but eventually spoke that night around 8:00 p.m. Mullen told Lux about David's text message, and Lux replied saying that he was already aware of it. (Tr. 482) Lux further said that "administration" had advised Lux to tell Mullen to call local law enforcement. Terry testified that the instruction to have Mullen call law enforcement came from him. Terry said that he learned about David's text message from Lux, and Terry told Lux that, if the conduct was not occurring in the workplace, Mullen needed to call local law enforcement if he felt threatened. (Tr. 482, 484, 482, 790, 908–909; GC. 14)

Mullen called 911 after speaking with Lux. About 10 minutes later, a deputy called him from the Kitsap County Sheriff's department. Mullen read David's text message to the deputy, who told Mullen there was not much he could do because it was a veiled threat, as opposed to a

[21] In his testimony, Terry acknowledged that Lein spoke with Morgan that day in Terry's office but said that he did not really remember what was discussed. (Tr. 891) He said that he remembered Lein asked for Union representation, "[a]nd I think that was about the end of it." (Tr. 891) However, it was Mullen who had asked for union representation during his call with Morgan earlier that day and it appears that Terry confused the two. (Tr. 475–476) I credit Lein's testimony as to what occurred during his conversation with Terry and Morgan on July 9.

direct threat of physical harm. But Mullen received an incident number from the deputy for future reference. (Tr. 485–489, 790–791; GC. 14)

Regarding the text message exchange, David testified he heard rumors that Mullen, Salopek, and a couple others had complained that some of the guards should not be carrying weapons on post because they were not properly qualified and he was implicated in the complaint. Like Cunningham, during his testimony David refused to identify from whom he had heard these rumors, claiming that he could not recall who told him. Despite his lack of memory regarding these rumors, David, who was visibly nervous and evasive while testifying about his text message to Mullen, was adamant that nobody from Xcel management told him that Salopek or Mullen had made the complaint. (Tr. 1036–1038, 1044–1049)

According to David, he was angry that his name was implicated with the weapons qualification complaint because he had passed his rifle, pistol, and shotgun qualifications on February 21. David believed that Salopek was the one who had initiated the complaint, but because he did not have Salopek's phone number, he sent the text message to Mullen instead. David testified that he did not intend to threaten Mullen and described the incident as "a goofy text message" where he "made no threats to [Mullen] whatsoever." (Tr. 1038) David said that within minutes after he sent the text to Mullen, he received a phone call from Lux telling him to stop sending Mullen text messages and to not contact him anymore. David testified that he then received calls from two other Lieutenants telling him the same thing. David did not contact Mullen any further. (Tr. 1037–1043; R. 47)

2. Mullen files a complaint with OSHA, calls out sick and emails Terry

On July 11, Mullen contacted the United States Department of Labor, Occupational Safety and Health Administration (OSHA) and filed a complaint. The Complaint alleged that, after Respondent learned about Mullen's safety complaints regarding weapon qualifications, certain employees threatened him and Respondent called him a "cancer." The threats referred to David's text message and the training room incident with Cunningham.[22] (R. 12; Tr. 491–492)

Mullen's next scheduled workday was July 13. He had not heard back from Lux or anyone at Xcel regarding his complaint about David's text message, so he called Powless and told him that he would not be coming into work until the issue of the threats and harassment against him was addressed. Powless replied, "okay" and the phone call ended. Mullen was also scheduled to work on July 14 and 15. Because he had not heard anything further from Xcel, Mullen sent Terry an email on Saturday morning, July 14. (Tr. 489, 782; JX. 7 #1454; R. 32)

In his email, Mullen explained what occurred during the July 9 training room incident with Cunningham. The email states that Cunningham called Mullen and Salopek "pieces of shit" and said they wrote lies about his range qualifications. Mullen wrote that Cunningham's shotgun barrel "swept" his left thigh, while Cunningham stood in front of Mullen yelling. Mullen's email identified a coworker named Norm Simons (Simons) as a witness and said Cunningham was so

[22] Mullen's OSHA complaint was dismissed in July 2019. Mullen appealed the decision, and the dismissal was affirmed in August 2019. (R. 29)

agitated that it did not appear he was thinking about safely controlling his shotgun.[23] Mullen's email next discussed David's text; Mullen pasted the text message into the email. Mullen ended the email by asking Terry to look into the matter saying both incidents had caused him a great deal of stress, to the point that the has not been able to return to work. (JX. 7 #1454–1455)

After receiving Mullen's email, Terry called Morgan and also forward the email to him. During their phone call the two discussed how to proceed. Terry testified that Morgan told him to thoroughly investigate the complaint as soon as possible. While David and Mullen were scheduled to work that weekend, Cunningham was not. Terry, who was working from home that weekend, waited until he returned to Indian Island on Monday July 16 to start his investigation. (Tr. 907, 910) During their phone call, Morgan also recommended that Terry post Xcel's hostile work environment policy in the training room and require everyone to read the policy and sign an acknowledgment that they had done so. (Tr. 910, 919–920, 964–65; R. 32; JX. 4 #1454)

While Mullen testified that he believed he was scheduled to work on Monday, July 16, the work schedule shows that he was not scheduled to work on either July 16 or 17. His next scheduled workday was July 18. As for Terry, on Monday July 16 he was back at Indian Island and he took written statements from both Cunningham and Simons. Simons, who gave his written statement at 1:30 p.m., wrote that he was checking the weather on his cell phone when he saw Mullen engaged in some sort of discussion with Cunningham about an apology. Simons further wrote that Cunningham was speaking in a raised and angry voice, and when Simons looked up, he heard Mullen say in a normal but direct tone, that Cunningham was not getting an apology and "don't sweep me with the shotgun." According to Simons, when he looked up Cunningham's shotgun was pointed at the floor and he did not see or hear any communication of a threat by either party. (Tr. 910; R. 5)

Cunningham gave his written statement right after Simons. In his statement, Cunningham stated that he asked Mullen for an apology involving the remarks Mullen made about Cunningham's range qualifications; Mullen would not give him one. Cunningham wrote that he asked for an apology a second time, but Mullen again refused and said that they were done. According to Cunningham's statement, at some point during their conversation, Mullen said that Cunningham was pointing his gun at him. However, Cunningham denied doing so, saying that his gun was pointed at the floor. (R. 6)

On July 16 Respondent posted in the training room its workplace standards of conduct, along with a sign-in sheet for employees to affirm that they had read and understood the policies. Employees were told to read the policies and sign the signature sheet. However, they were not told anything else such as why the policies were being posted. (Tr. 919–20, 1050–1052, 1064)

[23] In January 2019, Mullen asked Simon to write a statement about what occurred to support his OSHA complaint. However, Simon texted Mullen saying that "[a]fter a lot of reflection" he decided not to write a statement as the "only thing that it will show is Tim [Cunningham]'s temper. Which is already well known." (R. 48) In his text, Simon further wrote that he did not see Cunningham "laser" Mullen with the shotgun or hear/see Cunningham threaten Mullen. (Tr. 788–89; R. 48)

3.  Mullen emails Terry his resignation

By July 17, a week had passed and Mullen had still not heard anything from Respondent regarding his threat and harassment complaints.  Mullen believed that Terry heard Cunningham yelling at him on July 9, and Terry had not replied to Mullen's July 14 email.  Therefore, Mullen believed that Xcel was not going to do anything about his complaints.  Accordingly, Mullen decided that he needed to resign because he did not think it was safe for him to return to work because of the threats and harassment.  So, Mullen drafted the following email which he sent to Terry on Tuesday, July 17:

> I am separating my employment with Xcel protective service (BCSI) effective immediately.  The reason is for workplace harassment and threats.  I will send my uniforms with a fellow employee.  CAC card and region badge will be dropped off at Bangor pass and ID.

Terry testified that after receiving Mullen's email, he called Morgan, who told him not to contact Mullen going forward.  Therefore, Terry replied to Mullen by email on July 18 by simply saying that Mullen needed to destroy the corporate credit card information he used for training and to sign a security debriefing.  (Tr. 490, 790, 794, 934; JX. 4 #1225)

Terry never spoke with Mullen about his complaints involving the threats from Cunningham and David.  When asked why he did not do so, Terry said that it was because Mullen "was on days off."  (Tr. 922)  Terry claimed that he was going to interview Mullen when he came back to work but that Mullen resigned.  For his part, Mullen testified that, had he known Respondent was investigating his threat allegations involving Cunningham and David, he would not have resigned.  (Tr. 791–792, 921–922, 927)

As for Cunningham and David, Terry decided not to discipline either of them.  According to Terry, after reviewing the written statements, he decided that Cunningham had not done anything wrong.  Regarding David, Terry said that David was not disciplined because his text message occurred outside of the workplace.  Moreover, Terry said he did not view the text as threatening.  Instead, Terry thought that David was just "venting his frustration" about the allegations in Mullen's complaint to ISO Jones.  (Tr. 935)  Also, during his testimony Terry offered his own reason as to why Mullen resigned.  Terry believed Mullen actually resigned because he had failed his PRT, and he was scheduled to retake the test towards the end of July.  If Mullen had failed again, he would have been fired.  (Tr. 934–936)

*H.  Rake's Investigation into the Guards' Complaints*

1.  Rake and Manson review documents and set up interviews

Rake and Manson conducted an investigation into the complaints Salopek, Mullen, and Lein made to Cdr. Pulley, as further set forth in Mullen's July 9 email to Jones, and they issued a report on July 25 with their findings.  Despite the fact that virtually everyone who testified at trial referred to the review as an "investigation," Rake was emphatic during his testimony that what he and Manson did not conduct an "investigation."  (Tr. 589)  According to Rake, only the

NCIS (Naval Criminal Intelligence Service) or law enforcement can conduct an "investigation," as can an individual directed to do so in writing by the commanding officer. (Tr. 553) Instead, Rake said that what he and Manson did was conduct a review of a "customer complaint." (Tr. 589) Rake said that whenever he gets a customer complaint, he partners with the contractor to find out more about the complaint and work through the incident. And, regarding this matter, Rake said that his "original customer complaint" was that Mullen, Lein, and Salopek met with Cdr. Pulley. (Tr. 589) According to Rake, when he heard the customer complaint, he spoke with Burris and told her that if anybody left their post he would be requesting that they be removed from the contract for violating a general order to stand post until properly relieved. (Tr. 537, 589–590; R. 2)

Rake testified that Cdr. Pulley wanted to pull all the guards off their posts after he spoke with Salopek, Mullen, and Lein and he relayed this information to Terry, telling him how important the situation was and saying they needed to jump on it quickly. Rake went to Indian Island on July 10, and reviewed the training records with Manson, Terry, Powless, and Mitch Vancura (Vancura), another Xcel Lieutenant. Rake said they reviewed the records of the guards who were currently standing post, and then looked at the guards scheduled for the next shift "to get our feet on the ground." (Tr. 538) Rake reviewed the watch bills and determined that Mullen was working the day the he met with Cdr. Pulley; Rake believed Mullen had left his post to speak with Cdr. Pulley without permission from his shift lieutenant, Kristen Kirkpatrick (Kirkpatrick). (Tr. 538–539, 563, 590–591)

The initial review of documents also showed that Cunningham, Lauritzen and David were not at the Bangor range on May 9, as alleged in the complaint regarding the date that their targets were altered. Salopek testified that the May 9 date was an error, and the incident involving the altered targets actually occurred sometime January or February. According to Salopek, he told this to Manson and Rake when they interviewed him on July 19. As for when his gun qualification shoot occurred in 2018, Cunningham testified that it happened in January. However, Rake's report says that the range qualifications for Cunningham, Lauritzen, and David happened on February 21, but Cunningham did not pass all his tests and shot again on March 9 when he qualified. For his part, Cunningham admitted that he sometimes struggled with his qualifications because of the lighting at the range. And, regarding the time he went shooting with Schryver, Cunningham said it occurred on his own time, as a refresher course because of the problems he was having on the range. While Cunningham claimed that he had already requalified when he went shooting with Schryver, Rake's report states that Cunningham reported that he went shooting in the woods with Schryver to become proficient for his qualification reshoot. Finally, Cunningham testified that he had heard of people qualifying at a gravel pit, but he did not know the exact location and had never been there to shoot. (Tr. 38–39, 905, 1067–1071, ; R. 1, R. 2, p. 2–3, R. 14)

Along with reviewing documents, Rake testified that he and Manson worked with Terry and Xcel to schedule interviews with various guards. According to Rake, he needed to go through Xcel to schedule these interviews, because he cannot require that a contractor's employees submit to an interview. Rake said that, on all his contracts, he works through the company's "chain of command," so with Xcel there was "a chain of command working to get a hold of each guard." (Tr. 539–541)

Rake and Manson personally interviewed various guards and supervisors, and took written statements from: Lein, Salopek, Schryver, Lauritzen, Coler, Cunningham, David, Kirkpatrick, and Powless. Rake and Manson also conducted phone interviews with Vancura, Terry, Lux, Lein, Coler, and two other guards named David Everson (Everson) and Ben Gentry. They did not interview Schroder, the guard who had a shooting range in his backyard, or another guard named Joab Eades (Eades) noting that they were on leave at the time. And, they never interviewed Mullen. (R. 2)

Regarding Mullen, Rake testified that he tried to schedule appointments with him for an interview three times but was unsuccessful because Mullen had called in sick. However, Rake's report says that Mullen could not be interviewed because he resigned the day before his interview. For his part, Mullen testified that he never heard from either Rake or Manson. Mullen said that he knew the interviews were occurring and assumed someone would reach out to him, but nobody ever did. (Tr. 501–502, 540, 784; R. 2)

2. The interviews with Xcel employees

The interviews with Xcel employees started on July 10. (R. 2) Rake testified that he had a list of questions he asked each guard. One question was "do you know your chain of command" within Xcel. (Tr. 583) According to Rake, it was important to ask each guard whether they knew their "chain of command" because he did not normally "have contractors go straight to the CO [Cdr. Pulley] or to a security officer [ISO Jones] without going usually through . . . their company chain of command, or coming to Steve [Manson] and myself, who . . . were out there all the time asking everybody how things were going." (Tr. 585) When asked if following the "chain of command" was a mandate, or just his preference, Rake said that the Navy Contracting Office follows the contractors' rules and that in all three of the contracts he administers the company/contractor has provided its employees with documents saying "here's who your chain of command is." (Tr. 585) Respondent's employee handbook says that the company encourages employees to take their complaints to their immediate leadership team but following such a process is not mandatory. (GC. 2; R. 2; R. 7, p. 3–4)

Rake testified that, after each interview, employees were provided with a form and asked to complete a written statement. Nine Xcel employees completed written statements which were attached to the final report. (Tr. 634; R. 2)

*a. Employee written statements*

**<u>Daniel Lein</u>**. Lein's written statement is dated July 10. In his statement Lein says that, during his initial M4 rifle qualification he failed by 5 points. Later, Powless told Lein that he and Emily Coler would meet Powless on May 27 at a gravel pit to qualify. Lein asked if the gravel pit shoot was a practice or a qualification, and Powless said that it was to qualify with the M4. But, Powless told him that instead of shooting an actual M4 rifle, Lein would be shooting an AR-15 owned by Armstrong. On the day of the gravel pit shoot, Lein called Powless saying he did not feel comfortable, was tired as he was coming off of a 12-hour shift and would wait until the next scheduled range at Bangor; Powless said that was fine. Out of curiosity Lein again

asked Powless if the gravel pit shoot was for a qualification, and Powless said yes. Lein then asked if guards would be paid for their time at the shoot, and Powless said they would not be paid. Lein ended his statement by saying that he qualified with the M4 at Bangor on June 20, 2018 with a score of 157. (R. 2, p. 16)

**Emily Coler**. Coler's written statement is dated July 10. In her statement Coler wrote that, during her weapon qualifications at Bangor, on or about May 9, she did not pass. She had never previously fired an M4 rifle and received very little training. A few weeks later she was told that she could shoot again, this time at a gravel pit with just herself and one other person who also needed to shoot. The gravel pit shoot was much more successful as Coler received one-on-one time to become familiar with both weapons. Coler wrote that she did not think about the "legality" of the shoot because she had heard from others that it had been done before. Coler spent about 5 hours at the gravel pit and felt much more comfortable shooting. After the shoot, Coler was told that she could now stand post and was excited because it led to the opportunity for more on the job training "OJT." Coler further stated that, at the shooting range on July 9 she qualified on the M4 but did not qualify with the shotgun. Coler ended her statement by writing: "Post: I only stood posts that required the M9. If I was on patrol with someone for example, they had the weapons that they were qualified for, I never had possession of them." (R. 2, p. 22)

**Thomas Cunningham**. Cunningham's written statement is dated July 11. Cunningham wrote that in January 2018 he qualified at the Bangor range on the M9 pistol and Mossberg M500 shotgun. He remembers 10 other guards at the range that day, including Schryver, David, Salopek, Mullen, and Lauritzen, and that a Lieutenant named John Armstrong was in charge of the range. Cunningham stated that he did not know of anyone falsifying gun records. He further wrote that, in February he qualified at Bangor with the M4 rifle shooting a score of 153. Powless was in charge of the range that day and John Armstrong was his line coach. Cunningham identified two other people who were also shooting in February and said that nobody falsified any gun records. (R. 2, p. 21)

**Terrence Lauritzen**. In his written statement, dated July 11, Lauritzen wrote that he was being interviewed for statements made against him regarding weapon qualifications on February 21. Lauritzen said that he witnessed no violations of safety at any time on the range, nor has he witnessed any kind of target, document, or forged scoring at any time. Lauritzen ended his statement by saying that he had never qualified shooting anywhere other than at the Bangor range. (R. 2, p. 23)

**Jacob Schryver**. Schryver's statement is dated July 11. Schryver wrote that, in reference to the statement that he qualified Cunningham at a gravel pit, he never used the words "he's qualified." He and Cunningham did not use an approved course or approved weapons when they shot, as it was a "familiarization," and he was not certified to qualify anyone. Schryver wrote that he could not give the dates and times of the shoot with Cunningham, as it was not documented, and that he had no personal knowledge as to whether Cunningham subsequently qualified after they shot together. Schryver also wrote that, all the complaints he made regarding the range were brought to Powless, as the company's primary range safety officer "RSO." Schryver ended his statement by saying that he was not personally aware of any falsified documents. (R. 2, p. 24)

**Mark Salopek**.  Rake's report contains two written statements from Salopek, both of which were dated July 19.  In his first statement Salopek writes that he saw targets being altered on or about January 31, 2018.  Salopek further stated that, around June 26–28 (and possibly sooner) Powless told him that Coler and Eades were going to a gravel pit range, but after a complaint was made Eades and Coler had to requalify; Eades told Salopek he had to requalify and that Coler was upset.  Salopek stated that he thought he saw Coler standing post armed with a shotgun after the gravel pit range.  Salopek also wrote that he saw the Bangor range score sheet for July 7, 2017 and was told by a guard who was present that they did not shoot at Bangor but were at another guard's house, referring to it as "range at Schroder's house."  Powless told Salopek that the "range" at Schroder's house was "fun."  Salopek also stated that there was a female guard who was pregnant and could not shoot at an indoor range but she continued working nonetheless.  Salopek ended his first statement saying that he had never seen anyone leave their post.  (R. 2, p. 13)

Salopek's second statement is similar to the first but provides a bit more detail.  He confirmed seeing targets being altered on January 31, 2018 at Bangor.  And, he wrote that Powles told him about obtaining an AR-15 to use for "range at the gravel pit."  After the gravel pit range, Salopek wrote that Coler told him she was glad she could now serve on other posts, and he saw Coler holding a shotgun after the range occurred.  After a verbal complaint was made, Lux told Salopek that he called "Everson to determine if it was allowed," referring to a gravel pit range, and was told that it was not.[24]  Salopek stated that Coler was told she had to requalify sometime between June 26–28.  Salopek wrote that he needed to check dates and confirm when the gravel pit range occurred.  Salopek next discussed the range on July 7, 2017 where coworkers told him they participated at a range at Schroder's house.  Salopek wrote that Armstrong told him he had an AR-15 and a 9mm for use at the range, and that Terry said he was buying ammunition for the range at Schroder's house.  Salopek stated that he saw the Bangor range sheet dated July 7, 2017, and a female officer named Owens was listed on the sheet.  Salopek further stated that Owens was pregnant, and he believed that she was not allowed to qualify at an indoor range, but nonetheless worked until November or December.  Salopek ended this second statement by again saying that he did not know of anyone leaving a post without notifying their supervisor.  (R. 2, p. 14)

**Kristen Kirkpatrick**.  Kirkpatrick's statement is dated July 22.  Kirkpatrick wrote that she was the shift Lieutenant on July 7, 2018 and at no time did anyone ask her for permission to leave their post, or to enter Building 69 to talk to the commanding officer.[25]  Kirkpatrick also wrote that she was unaware of any falsification of government documents by Xcel employees and was not aware of government weapons being used anywhere other than at authorized ranges.  (R. 2, p. 18)

---

[24] Along with being an acting Lieutenant, Everson was also a firearms instructor. (Tr. 155)

[25] Apparently, this was in reference to Mullen speaking to Cdr. Pulley while he was still on duty, as Rake testified that he checked with Kirkpatrick and she did not give Mullen permission to speak with Cdr. Pulley.  (Tr. 590) However, Mullen spoke with Cdr. Pulley on July 8, not July 7 which is the date in Kirkpatrick's written statement. (Tr. 160, 329, 462, 679, 734) (See also Resp't Br., at 16, 56–58, 64).

**Kevin David**. In his statement, dated July 22, David stated that he was not aware of any wrongdoing at the range, nor had he witnessed a range at either a gravel pit or at Port Townsend. David wrote that had to re-shoot to qualify on occasion but was unaware of government weapons being used at a gravel pit or open area. He was also unaware of any falsification of government documents. (R. 2, p. 19)

**Gerald Powless**. Powless' statement is dated July 23. Powless wrote that the validity of Owens's sustainment shoot during the summer of 2017 was brought to his attention. Powless said that Owens was not allowed to shoot indoors at the time because she was pregnant, and the small arms training center was closed during that period because of lead exposure. Also, the "MILO Range Training System" was inoperative at Indian Island. Therefore, Powless stated that, because Owens could not shoot at either place, she "was familiarized and fired at a private range." Powless wrote that no government weapons or ammunition were used at this private range nor have they ever been outside of the Bangor or Port Townsend ranges. Powless further stated that "to my recollection, Lisa Owens did her sustainment shoot at the Port Townsend range, which we were using during the closure of the Bangor" range. Regarding Coler qualifying at a gravel pit, Powless wrote that this was "a familiarization fire with a personal AR-15 rifle and a personal M500 shotgun, with locally purchased ammunition." Again, Powless stated that no government weapons/ammunition were used and "Coler's shotgun and rifle familiarization that day did not count for qualifications." Powless wrote that Coler "was later brought to the Bangor" range where she qualified with the M4 rifle and M500 shotgun. Finally, regarding the alteration of M4 rifle range targets at the Bangor range, Powless wrote that a couple of guards were having trouble focusing on the target due to the gloomy lighting at the range so he drew a cross on the target with a black marker so the shooters could better focus on the target. To his knowledge, Powless said, he was not violating any regulations by doing so. (R. 2, p. 20)

*b. Testimony about employee interviews with Rake and Manson*

Four guards testified at trial about their interviews with Rake and Manson. David testified that Rake asked him if he attended a range on May 9, and David replied saying that he did not keep track of the dates. Rake then told him that, according to their records, he was not even there that day. Cunningham testified that he first learned that his name was involved in the "rumors" that some guards had not properly qualified during his interview with Rake and Manson. Cunningham said that, during his interview he learned that the people who were accusing him "of not qualifying were my witnesses at the range in Bangor." (Tr. 1059–1060) According to Cunningham, he told Rake and Manson that "the inmates are running the asylum," and they "thought it was a laugh." (Tr. 1059–1060, 1068) Regarding his interview, Lein only said that he met with them on July 10 and provided a statement. (Tr. 690–691, 1043–1044)

Both Salopek and Rake testified at some length about Salopek's interview. According to Rake, he spoke with Salopek twice and both sessions took quite some time. In the first interview he said that they went through the standard list of questions, including whether Salopek knew who the safety officer was. Rake thought it was important that Xcel's guards had a clear reporting scheme and knew the identity of their safety officer. Rake described Salopek's demeanor during the interview as "arrogant." (Tr. 608) When asked why he thought Salopek

was arrogant, Rake gave a number of reasons. He testified that, on his own accord, Salopek brought up the 2015 armory door incident, saying it had been blown out of proportion and was not a big deal. Rake further said that during their interview Salopek expressed his dislike for Terry, and assumed Terry was the one who had demoted him. Rake testified he told Salopek that Terry was the one who persuaded Rake to talk the Contracting Officer into keeping Salopek on the contract as a guard instead of firing him. Finally, Rake testified that Salopek told them that, when he was a police officer, judges would say Salopek was an expert witness, had proven himself over and over, and whatever Salopek said was the truth; thus whatever Salopek was telling them during the interview should be taken as the truth. (Tr. 607–609, 621–622)

Rake said that Salopek also raised another incident during their interview, without explanation, involving a 2015 OIG audit of security boats and Salopek said the OIG misunderstood the comments he made during the audit.[26] Rake said he was not even aware of the incident and had to call the OIG for clarification.[27] Rake also testified that Salopek brought up other topics during his interview that perplexed both himself and Manson. According to Rake, one such topic involved Kirkpatrick, with Salopek claiming she was once a dog groomer, was now a shift Lieutenant, and said that it was unfair women were being treated differently, implying that Kirkpatrick was promoted because she was a woman. Rake said he told Salopek that was he and Manson were the ones who approve shift Lieutenants, with Burris' consent. Rake further said Salopek suggested during his interview that women were problems as security officers, complaining that they are allowed to switch shifts whenever they wanted, and saying that a pregnant woman was allowed to shoot at Port Townsend but should not have been allowed to shoot because of her pregnancy. Regarding the allegation that targets were altered on May 9 for certain individuals, Rake denied that anyone told him that the May 9 date was a mistake, or that anyone gave him a different date for the incident. (Tr. 610–613, 617–618)

As for his interview with Rake and Manson, Salopek testified that Rake and Manson took a confrontational tone during the interview, with pointed questions; he described the interview as "controlled and directed." (Tr. 177–178) Salopek said they discussed targets being altered at the range and further said that he told them the May 9 date in the complaint was wrong; Rake replied saying "you're correct." (Tr. 388–389; 381–382) Salopek testified that he only spoke with them once, and not twice as Rake had said. Salopek denied that the incident involving the 2015 OIG audit was ever discussed. He also denied raising the 2015 armory door incident. Instead, he testified that, at one point during his interview, Manson said to him "you know, we had one incident with you already." (Tr. 427) Once Salopek realized he was referring to the 2015 armory door incident, Salopek said, "yes, you did. You did have one problem with me." (Tr. 427–429) Salopek testified that he never said female officers were a problem, he denied complaining about female guards changing shifts, and further denied saying anything about Kirkpatrick being a dog groomer. In fact, Salopek said he was friends with Kirkpatrick, that she was never a dog groomer, and he had recommended her for Lieutenant. (Tr. 421–423, 1106)

As for the statement attributed to Salopek about being a former police officer, Salopek testified that, what he said during the interview was that he was a police officer for 22 years,

---

[26] Salopek testified that, regarding this incident, the OIG had asked him about the guards' job knowledge, and Salopek said that the guards were not trained in their zones/areas of protection. (Tr. 207–208)

[27] During his testimony regarding this incident, Rake mistakenly referred to Salopek as "Mr. Mullen." (Tr. 610)

testified in court, and had never found a reason to lie. Salopek told Rake and Manson that he would not lie and jeopardize his past and present, so what he was going to tell them during the interview was the truth. (Tr. 424)

Regarding his two written statements, Salopek said that he drafted the first statement, but was not satisfied with the it. So, he crumpled it up, placed it on the table in front of him, and asked for more paper to draft another one. When he finished the interview, Salopek said he picked up the first draft from the table in order to shred it. According to Salopek, Rake asked for the first statement, saying he did not want it to end up in wrong hands and that he would shred it for him. Three days after his interview, Salopek emailed Manson a four-page, single spaced typewritten statement. The statement contained more of the same type of information that was already set forth in Mullen's July 9 email to ISO Jones but provided further detail. In the email, Salopek wrote that the purpose of the statement was to show a chronological progression of events and give a solid track for follow-up. (Tr. 179–181, 307, 1100, 1104–1105; GC. 8)

*I. Rake's Written Report*

Once the review was completed, Rake drafted his report with Manson's help, and sent it to Burris and Cdr. Pulley.[28] He also sent a copy to an OSHA investigator named Brian Morgan who was investigating Mullen's OSHA complaint.[29] Rake testified that, his normal procedure on a customer complaint would be to only send the report to Burris. Then, after Burris gave him permission, he would also send it to the contractor. But here, because of the nature of the complaint, Rake also sent his report to Cdr. Pulley. And, because OSHA had contacted the Navy Contracting Office, Burris put a "hold" on releasing the report to Xcel; it was not released to Respondent until a later date. Filibeck testified he received the report in December from OSHA. (Tr. 546–548, 554–555, 622–623, 631–632, 1023–1024, 1029–1030)

Rake's report is dated July 25, 2018 and is titled Memorandum for Contracting Officer, Naval Facilities North West for Indian Island; Commanding Officer Naval Magazine Indian Island. The report is, at times, disjointed. It says that the purpose of the review was to evaluate the July 9 email regarding weapon qualifications at Bangor and to establish if Xcel violated Navy policy and bypassed minimum weapons qualifying requirements. In the report Rake cut and pasted statements from the July 9 email to Jones, titled these statements as "issues" and then proceeded to set forth his findings and recommendations on each issue. There are 12 "issues" total, with the last "issue" having multiple sub-issues relating directly to Salopek. (R. 1, R. 2; Tr. 542–543)

<u>Issue 1</u>: The first item deals with the statement in the July 9 email that Mullen, Salopek, Lein, and Schryver were coming forward with safety issues regarding a gravel pit being used for weapon qualifications. The report states that all qualification forms were reviewed for

---

[28] Rake testified that he and Manson spent 400 hours reviewing the allegations in the July 9 complaint. However, it appears that this includes time spent after the report issued, speaking with lawyers, the OIG, and others. (Tr. 543) Notwithstanding, Rake testified that performing these activities were simply of his job. (Tr. 630)

[29] Rake testified that he sent the report to Morgan, 3 days after he finished it, because Salopek and Mullen had filed a whistleblower complaint with OSHA. (Tr. 546–547). However, the documentary evidence shows that only Mullen had filed an OSHA complaint at the time the report was issued. (R. 12) The OSHA Case Activity Worksheet shows that Salopek filed his complaint with the agency on November 5, 2018. (R. 26)

authenticity, that qualification shooting was conducted at either Bangor or Port Townsend, and no guard had produced any documents to show that a Form 3591.1 was falsified or that the shoot did not occur at the proper range. Instead, the report says it was "he said, she said, I heard, no names," and that nobody "could produce any documents to prove the accusations." Also, the report states that Xcel "did hold remedial training to allow personnel extra training to pass qualifications" which did not violate "any contract or instructions." Accordingly, the report recommended no action be taken on this issue.

Issue 2: The second issue the report addressed involved the claim that Cunningham failed his shotgun qualification, was brought to a gravel pit by Schryver who supplied his personal shotgun, that Cunningham was then deemed "qualified," and when it was brought to Terry's attention he said that it was allowed by the Navy. The report states that Cunningham's Form 3591.1 were reviewed, along with ammunition logs, and that Cunningham did a "qualifications reshoot" on March 9, which was "within the time allotted for reshooting." The report further states that Cunningham said he went to an open area with Schryver and practiced with a shotgun on his own time and was never told that the event counted as his official qualification shoot. As for Schryver, the report says Schryver asserted that he had never taken anyone to qualify at any location other than Port Townsend or Bangor, but that he had taken several people out to open areas to provide extra training. Finally, the document says that Terry denied making the comment that this was a qualification shoot, and instead said that it was for remedial training. The report recommended no action be taken, saying that contractors are permitted to take personal weapons to shoot offsite.

Issue 3: Issue three involved the same situation as Issue 2 but focuses on: the claim that Terry gave Schryver ammunition for the shoot; Schryver saying that he was not certified to qualify anyone; and the assertion that the event stood as a qualification. The report noted that "this whole paragraph was denied by . . . Schryver and . . . Terry." It also says that Terry provided ammunition for remedial training only, and Schryver never said to anyone that the shoot counted as a "qualification." The report recommended no action be taken.

Issue 4: This section of the report discusses the allegations that Powless asked Schryver to qualify guards at a gravel pit and Schryver telling Powless that he was not comfortable doing so. The report states that Schryver denied the entire paragraph as worded and says that Schryver was never asked to qualify anyone; instead he was asked to provide remedial training to personnel needing extra time. The report further says that Powless denied ever asking anyone to qualify with a Form 3591.1 at any area other than Bangor or Port Townsend, and that a review of the paperwork, sign in sheets, and ammunition draws, concur with this statement. The report notes that Powless has been the training officer since about 2012, spanning two contracts and numerous inspections, without incident. The report recommends no action be taken.

Issue 5: Issue five involves the claim that, on July 7, 2017 Armstrong told Terry that he had an AR-15 and 9mm, and that Armstrong told Salopek he was bringing the weapons for the range at Schroder's house. In the report, Rake recommends no action be taken, and states: "Not sure what this paragraph means, Officer Mullen resigned the day before his interview, I did not have a chance to ask what this paragraph meant. The entire email reads as though the information was cut and pasted from a larger document. Third person information which cannot

be verified. Captain Terry, Officer Armstrong believe he was talking about a time when they went shooting over at Officer Schroder's house."

Issue 6: This issue relates to the claim that, on May 9 Lauritzen and David could not pass their rifle test, Cunningham could not pass both his rifle and shotgun test and his ability to handle weapons was questioned. The report states that Lauritzen, Cunningham, and David were not present at the range on May 9. Instead they shot on February 21, with Lauritzen and David qualifying. Cunningham did not qualify and shot again at Bangor on March 9. The report also says that the line coaches did not notice any problems with Cunningham's ability to handle his weapons. No action was recommended regarding this allegation.

Issue 7: Issue seven involves the claim of using altered targets to qualify Lauritzen, David, and Cunningham; Powless altered targets by superimposing a large black cross on the target, and Vancura put a white piece of paper at the 6 o'clock position so guards could better see the silhouette when shooting. The report finds that the operating manual "does not state anywhere in the document that prevents the use of white dots, black cross marks or altering the target by enhancing the view with markers or dots." The report also states that the Federal Law Enforcement Training Center and Center for Security Forces were contacted, and both use the same practice to assist officers through their qualifications. Finally, the report also says that nobody they interviewed "had actually read the instructions pertaining to altering the targets" except Powless and Terry.[30] The report recommends no action be taken.

Issue 8: Issue eight discusses the allegation that Coler struggled handling her shotgun and rifle, that she failed her rifle and shotgun qualifications, and that Salopek said she should be taken off the range because she handled her shotgun unsafely. The report states that Schryver, who was Coler's line coach on May 9, said that he did not see any unsafe weapons handling, nor did anyone bring this to his attention. The report goes on to say that guards do not always pass their qualifications and that is why they are allowed to retake the shooting course again to qualify. No action was recommended on this claim.

Issue 9: This concerns Cunningham's requalifying with the M4 using altered targets. The report notes that this matter was addressed in Issue 7 and recommends no action be taken.

Issue 10. Issue 10 involves the claim Powless told Lein and Coler that they were going to qualify with weapons at a gravel pit, that the guards would not be paid for the shoot, that Lein was uncomfortable with the plan, did not go, and instead qualified at the next properly scheduled range. The report says that, during his interview, Lein said "he was never told that it was going to be a qualification shoot but remedial training to allow more time with a rifle." And, because he was not getting paid, he decided to "take his chances" at the next range. The report also says that "Coler also stated she was never told that going to the 'gravel pit' was to qualify but for

[30] Issue 7 refers to Navy operating manual "OPNAV 5191.1F." However, no such manual exists. See https://www.secnav.navy.mil/doni/opnav.aspx (listing all Department of Navy OPNAV Instructions) (last accessed on November 30, 2020). The correct operating manual is "OPNAV 3591.1F," which is discussed elsewhere in the report. The manual neither discusses the alteration of targets nor has instructions about the issue. The manual does have, as attachments, specific targets, none of which are superimposed with large crosses or white dots. See https://www.secnav.navy.mil/doni/Directives/03000%20Naval%20Operations%20and%20Readiness/03-500%20Training%20and%20Readiness%20Services/3591.1F.pdf (last accessed on November 30, 2020).

remedial training to allow her to qualify." Rake and Manson recommended that no action be taken.

Issue 11. Issue 11 involves the allegation that: at the gravel pit range Coler used her own personal shotgun and an AR-15 supplied by a coworker; after the gravel pit range she was considered qualified on both the rifle and shotgun; Coler was then allowed to work all posts on the base possessing all weapons. The report states that Coler's gun card showed she was only qualified with the M-9 pistol. Notwithstanding, a review of armory records showed that Coler was issued an M500 shotgun by four different shift Lieutenants on the following dates: June 5, June 12, June 19, and June 23. And, she was issued an M4 rifle on June 12. The report says that, upon discussion with the shift Lieutenants, they "discovered the loop holes" that allowed Coler to be issued weapons for which she was not properly qualified, and says they suggested recommendations immediately. The report further states that Manson "checked back thru records and found this was the only incident that allowed a person to be issued weapons." The report notes that, while Coler was issued the weapons in question, she was assigned at a post with a guard who was qualified to use the weapon. The report recommended the following three corrections be taken and says the issues "were resolved during the review:" (1) Nobody "is allowed to stand post until 100% weapons qualifications are completed;" (2) Require a guard's yellow gun card "be placed as a place holder when a weapon is removed to show the weapon was issued;" and (3) "Shared communication from the training officer to the" scheduler "to know who is 100% qualified." The report also states that, when Coler failed the M500 and M4 qualifications, Powless went on a 2-week leave and did not schedule Coler to requalify for the weapons. Instead, the "back up trainer" scheduled Coler at the Bangor Range on July 9, 2018.

Issue 12. Issue 12 involves the final statement in the July 9 email to Jones which states "[w]e feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents," and accused Xcel of a cover up. In reply to this statement, the report says that no falsification of any federal documents were found, including Forms 3591.1. And that nobody they "interviewed could provide any documents that GOV records were falsified, only comment was 'that was what I heard.'" Accordingly, the report recommended no action be taken.

The report then goes on to address the issues raised in Salopek's July 22 email, which expounded upon the allegations in the July 9 complaint. At the end of his July 22 email, Salopek wrote that there was an issue regarding the July 7, 2017 range, and recommended Rake and Manson review ammunition records for the ranges scheduled at Bangor. In addressing this claim, the report says the Bangor range was closed on July 7, 2017, "so Officer Owens shot at the Port Townsend Rifle Range to qualify (this is an alternate range approved by the GOV)."[31] (R. 2, p. 9) The report recommended no action be taken an any of the issues raised in Salopek's July 22 email.

The last section of the report is titled "Comments and Responses" and states that each person interviewed was asked if they knew the proper company chain of command to make complaints. The report says that most guards identified their shift Lieutenant, Terry, or Powless and knew that Morgan had an open-door policy.

---

[31] Terry testified that the July 7, 2017 range occurred at Schroder's house, in his backyard; Owens is listed as having qualified on the July 7, 2017 Form 3591.1. (R. 42; Tr. 895–898, 967–969)

Having addressed the issues raised in the July 9 complaint to Jones, which was the objective of his review, Rake went on to state that "[w]hile I could not prove the following I had the feeling Officer Salopek was trying to get back at the company for some incidents that occurred with him since he brought up the following two incidents in our interview without any prodding by us which had nothing to do with the issues at hand, these incidents occurred in 2015." One incident involved the 2015 OIG audit. The report claims Salopek was unable to articulate three protection zones and said that, while he was authorized to fire on a boat as a practical matter he might not do so. The second incident involved Salopek leaving the armory door when he was an acting Lieutenant in 2015.

The report ends with Rake recommending that Salopek be removed from the contract for the following reasons: (1) Despite claiming that he had a high level of integrity and had been called upon by the court as an expert witness, Salopek did not bring facts but third party hearsay, was not able to provide a single document supporting the allegations, "letting the GOV waste time in running around to verify the hearsay comments;" (2) Salopek's disregard for Navy policy regarding his statements during the 2015 OIG audit, his leaving the armory door open in 2015, and the fact he believed these to be minor issues caused by someone else, which led Rake to believe that Salopek could not be trusted to stand post; (3) Salopek's statement that he was well known with judges and any information he provided must be true because of his integrity was the opposite of what the report found, in that his integrity was questioned as he did not have the facts needed by an expert witness in a legal proceeding who would have known the importance of facts as opposed to third party hearsay. Therefore, Rake wrote "I believe [Salopek] is the center to all the third party accusations to meet a hidden agenda of his own." (R. 2)

*J. Salopek and Lein File a Complaint with the OIG*

On August 15, Salopek and Lein filed a complaint with the OIG using a special email address they set up just for this purpose. The complaint was rejected for insufficient information 2 days later. About a week later Salopek re-filed the complaint, and included a 17-page, single spaced, rambling memorandum regarding Respondent's range practices and complaining about Rake and Manson's investigation. Salopek had a telephone interview and met personally with OIG representatives; during these discussions Salopek told them, in part, that he believed the investigation by Rake and Manson may have been biased. (Tr. 185–191, 307–310; GC. 9)

Rake testified that, during the OIG inquiry of Salopek's complaint, his personal LinkedIn page came to the OIG's attention. Along with a narrative of his background, Salopek had posted on his LinkedIn page some pictures of Navy Harbor Security Boats (HSBs) that are used to patrol the water surrounding Indian Island. Xcel guards, including Salopek, used to patrol these waters using HSBs until that duty was taken over by the Navy. Salopek had four pictures on his LinkedIn page of the HSBs. Two pictures showed the inside of the boat, with personnel sitting in front of a control panel, and two pictures showed the outside of the boat. According to Rake, the OIG wanted to know how the pictures were taken, since cameras are not allowed on Indian Island absent specific permission. (Tr. 77, 103, 207–208, 436, 596, 643–644; R. 13)

Regarding these pictures, Salopek said that he took them in 2016, and had permission to do so from the commanding officer at the time who told him there was nothing classified on the boats. According to Rake, the OIG asked him to contact the Respondent to have them ask Salopek to remove the pictures. Rake described the pictures as depicting "FOUO" (for official use only) information.[32] Rake reached out to Terry and sent him an email on September 7, with a copy to Morgan, saying that, during a routine social media review, the OIG found that pictures of HSBs were on Salopek's site, with a tag noting that the crew was using an on-board "FLIR" (Forward Looking Infrared), which is a thermal imaging device. Rake's email states that Salopek's LinkedIn page shows the electronic monitoring capabilities of on board HSBs and tells Xcel to ask Salopek to remove the information from his LinkedIn page, or anywhere else they were posted, by September 12. The email further says that, if Salopek "says 'no,' just let me know, do not push or keep asking him. It is OK to tell him that IG is performing inquiries and found this information." (R. 13) (Tr. 434, 436, 596)

Salopek testified that, sometime in September, Powless told him that the OIG wanted the pictures removed, and he immediately complied. At some point Salopek started a marine security services company called "Mjolnir," and similar pictures appeared on the company's website when the website became active on January 1, 2019. There is no evidence that the OIG, or any government security official, had any concerns about the fact Salopek reposted the pictures on his company website in 2019. And, nobody from the OIG's office, or Xcel, has contacted Salopek about the pictures since. (Tr. 313–318, 322–323, 596–597, 1100)

On September 11, 2018, Salopek received an email from the OIG saying his case was not appropriate for an OIG investigation. However, the email goes on to say that, without divulging any identifying information, the OIG had referred various facts in the complaint to the Navy for their review and response and the OIG would ensure that appropriate leadership was aware of any concerns that may exist. (Tr. 189, 311; GC. 9, p. 13)

Rake testified that he cooperated fully with the OIG during its investigation into Salopek's complaint. Rake said that he sent the OIG his report, all witness statements, and any other documents that he collected for his report. (Tr. 646) According to Rake, once the OIG "found out my abundance of documentation they, the asked for specific questions and specific documents." (Tr. 646)

Indeed, on September 17, 2018, the OIG sent an email to Rake's superiors. The email says that a complaint was lodged about Xcel's weapon qualifications, the use of unauthorized firing ranges (gravel pit) for official qualifications, using personal weapons to qualify, falsifying weapon qualifications, and the use of altered targets. The email also says that the complaint alleges Rake and Manson failed to interview important witnesses, and discover pertinent supporting documents, during their inquiry. (R. 45, p. 4–5) Therefore, the OIG asked that

[32] "FOUO" is not a security classification level, but instead is a Freedom of Information Act (FOIA) designation for unclassified information which the Department of Defense is authorized to withhold from a public FOIA request. Julia P. Eckart, *The Freedom of Information Act–the Historical and Current Status of Walking the Tight Rope Between Public Access to Government Records and Protecting National Security Interests*, 41 SETON HALL LEGIS. J. 241, 255 (2017); see also, Chief of Naval Operations Security Regulations Manual (OPNAV-M) 5510.1 Ch. 4, (August 25, 2017) https://www.secnav.navy.mil/doni/SECNAV%20Manuals1/5510.1%20(OPNAV).PDF. (last November 30, 2020)

Rake's superiors answer five specific questions related to the inquiry: (1) what percentage of Xcel employee weapons-issuance records were reviewed, and for what time period; (2) were all posts properly armed with the required weapons; (3) were any guards issued weapons for which they were not qualified at the time; (4) what specific actions has Xcel taken to resolve the problems identified in Rake's report; and (5) will there be a follow-up to "validate that the fix actions were effective." (R. 45, p. 4–5)

The questions were forwarded to Rake through his chain of command. Rake answered the questions and sent them back up through his supervisors who used Rake's responses to answer the OIG's questions. (Tr. 648–649) Rake answered the five questions as follows, citing to his July 25 report when necessary: (1) "100% of the staff" were reviewed from September 2017–August 2018, and this was verified again by Mason on September 18; (2) personnel were qualified/armed correctly, with the exception of the findings already set forth in the July 25 report; (3) Coler was issued weapons for which she was not qualified; this occurred because the training officer left on vacation and did not communicate Coler's status to the scheduler; (4) Xcel has "instructed their scheduler and training officer to communicate that no one will stand post with a weapon that is not 100% qualified;" and (5) Xcel was told verbally and then in writing that the company will be assessed on taking corrective measures; the first follow-up occurred on August 30. (R. 45)

In his response to the OIG questions, Rake also stated that everyone who Mullen and Salopek "mentioned to us" as being "mentioned/connected" to the matter was interviewed, and some were interviewed twice. Rake further stated that Salopek was asked "for any documentation of any records that he knew were falsified or dates we could look at and he didn't have anything, other than 'from what I heard,' or words to that effect." Finally, Rake noted that neither Salopek nor anyone else could tell them where the gravel pit was located. (R. 45, p. 2–3)

### *K. Salopek's Discharge*

#### 1. Filibeck meets with Rake and Burris

In late October 2018, Filibeck met with Rake and Burris at the offices of the Navy Contracting Office located on the Naval submarine base in Bangor, Washington. Rake testified that this meeting occurred on October 25, while Filibeck said it happened on October 26. (Tr. 555–556, 571, 624, 989–995)

According to Rake, Xcel requested this meeting in order to introduce the company's new management team to the Navy Contracting Office officials including Manson, Rake, and Burris. Filibeck, on the other hand, said that the meeting occurred at Rake's suggestion. Filibeck testified that sometime in mid-October he called the Navy Contracting Office and left a message. Rake returned his call around October 23. During this call Filibeck said he told Rake that he was taking over for Morgan. In turn, Rake told Filibeck that he may want to have a discussion with Burris at his earliest convenience. Filibeck then emailed and spoke with Burris on the telephone, saying that Rake had recommended he come out to meet everyone and discuss some pending issues. (Tr.555, 992–994)

Present at the Bangor meeting was Rake, Burris, Filibeck, his assistant, and two of Respondent's owners/board members. Both Rake and Filibeck described the purpose of the meeting as a "meet and greet." (Tr. 555, 994) According to Rake, towards the end of the meeting Filibeck asked whether there were any issues or concerns regarding the contract. (Tr. 555) At this point, Rake said he looked at Burris, asked if he could tell Xcel about his report, and after she agreed, he told them "we have a safety issue." (Tr. 625) Rake said he then "briefly went over a lot of the information in the report" including his recommendation to remove Salopek. (Tr. 555–556) The Xcel officials then asked Rake about the report, the extent of his investigation, if everyone was interviewed, whether there was anything else they needed to know about, or something they could do to help fix things. Rake told them about the research his team conducted, the amount of time spent on the matter, and the extent of their investigation. Rake also told them that Terry had already implemented all of the report's recommendations. Regarding his recommendation to remove Salopek, Rake testified that Burris did not say anything, either for or against his proposal. In fact, Rake testified that Burris did not say more than 10 words during the entire meeting. While he recommended that Salopek be removed from the contract, Rake testified that neither he nor Burris made any recommendation whatsoever as to whether Xcel should terminate Salopek. In fact, Rake said that "it's drilled into use; we cannot . . . fire a contractor." (Tr. 558) (Tr. 555–559, 625–627, 995, 981)

Regarding what occurred during this meeting, Filibeck testified that, after the initial pleasantries, he told Rake and Burris that Xcel was there to serve and asked what he could do to either perform better on the contract or make their lives easier. According to Filibeck, Rake then asked if he was aware of the issues occurring at Indian Island. Filibeck said that he thought everything was running about as well could be expected. Rake then asked Burris if he could bring everyone up to speed on a few things and Burris nodded her head yes. After Burris agreed, Filibeck testified that Rake first discussed Mullen, saying he had abandoned his post for a couple of hours to go on a "junket" with a couple other guards, and that "they were less than pleased about that." (Tr. 997) The "junket" was Mullen, Salopek, and Lein going to speak with Cdr. Pulley. According to Filibeck, Rake then said Xcel was having a lot of performance issues, that the Navy had just completed a significant investigation on alleged complaints which, with few exceptions, had no basis in reality, wasted between 400–500 hours of their time, and they did not appreciate it. (Tr. 996–998, 1002–1003)

While Filibeck was not given a copy of the report, he testified that Rake read 85% percent of the report to him during the meeting, and told him that an employee had filed false complaints with no "basis in reality," resulting in an investigation that cost the Navy a lot of time, effort, and money resulting in them "chasing their tails." (Tr. 999) Filibeck said that Rake detailed the false complaints, saying five guards listed in the complaint were not at the shooting range on the date in question, and that those guards had previously passed their qualifications anyway. Also, Rake said that Coler was qualified on the M9 and the M500 shotgun, but not qualified on the M4 rifle. While she was stationed at a post which required one of the guards carry an M4 rifle, Rake told the Xcel officials that Coler was always stationed at the front post talking to drivers, and the front post only required an M9 pistol. (Tr. 999–1000, 1023–1030)

Filibeck testified that, during the meeting, Rake said, "[w]e strongly recommended [Salopek's] immediate removal from the contract," because he is dishonest, and cannot be

trusted. (Tr. 1002) Filibeck further testified that Rake said he had lost all confidence in Salopek's ability to fulfill his duties at the jobsite, saying "we don't want him, get rid of him." (Tr. 1002) By the end of the meeting, Filibeck said he knew the Navy Contracting Office had done a thorough job and Rake was serious about wanting Salopek off the contract. That being said, nobody from the Navy ever requested Salopek's removal from the contract in writing, which would have been the standard practice if the Navy wanted him removed. Filibeck, who has worked in government contracting for over 27 years, testified that, when the government directs a contractor to remove an employee from a contract, notification is usually provided in writing. And, although Rake recommended Salopek's removal from the contract, Filibeck acknowledged that neither Rake nor anyone from the Navy ever asked that Salopek be fired. (Tr. 1002) At the end of the meeting Filibeck said that they "discussed remedies" and Filibeck told Rake and Burris that he was going to meet with Salopek, and "would let them know in very short order" how he was going to take care of the matter. (Tr. 1014) (Tr. 980, 1000–1003, 1029)

After the meeting ended, Filibeck contacted Terry and Powless to discuss Rake's report. Filibeck said he discussed the report with Terry and Powless because he felt blindsided; he needed to know how this happened and if, in fact, Xcel had training issues he did not know about, or something that the Navy did not uncover. Regarding these discussions, Filibeck testified that Powless was a "fountain of information regarding Salopek." (Tr. 1015) Despite his discussion with Terry and Powless about training issues, Filibeck claimed that it was not until April or May 2019 that he learned Respondent had actually been using someone's backyard as a shooting range to qualify its guards. (Tr. 1015, 1020)

2. Filibeck fires Salopek on October 27

On October 27, Salopek and Lein were working the morning shift, assigned to the commercial vehicle inspection (CVIS) post; Powless was the shift supervisor. During the morning briefing, Powless told the guards to make sure their uniforms were in order and shoes shined as some company "bigwigs" were coming. (Tr. 196, 699) After the briefing, Salopek and Lein went to their post. (Tr. 195–197, 699–700)

Respondent informed the Union that Salopek was going to be fired, so Union business agent Scott Harger (Harger) called Salopek that morning and told him the news before it happened. Salopek testified that, during this call, Harger told him both he and Lein would be fired. At some point Powless and Vancura drove to the CVIS post and relieved Salopek of his duties. (Tr. 198) Vancura assumed Salopek's position while Powless and Salopek drove back to the Xcel offices in Building 848. When they arrived, Powless told Salopek that he needed to take his weapon. Salopek surrendered his pistol and the two went into the Lieutenant's office. (Tr. 198–199, 699, 812–813)

After speaking with his union representative, Salopek was then taken to the training room. Present was Filibeck and one of Xcel's owners/Board members; Salopek did not know either individual. According to Salopek, after everyone introduced themselves Filibeck said that Salopek could either resign or he would be fired. Salopek refused to resign and asked why he was being terminated. Salopek testified that Filibeck told him he was being fired for dishonesty, violation of the chain of command, and lack of candor to a supervisor. However, in a written

statement drafted on October 28, Salopek wrote that Filibeck told him he was being fired for dishonesty, affecting the morale of the workplace, and "something regarding candor with supervisors." (R. 52) This written statement comported with an affidavit Salopek's provided to the NLRB during the underlying investigation; neither document mentions a violation of the chain of command. (Tr. 202, 270–271, 338–339, 351–352, 357; R. 52)

Salopek testified that he asked Filibeck during this meeting for the specific charges against him; Filibeck said there were a litany of items and he would send them to Salopek. Filibeck then told Salopek he needed to sign various paperwork in Terry's office and turn in his Common Access Card ("CAC card") and badge.[33] Salopek complied. When Salopek went to Terry's office, Terry told him that there was nothing in his employee file except the vault incident in 1995 and that "this is all Rake." (Tr. 355) Salopek said Terry then told him that the Xcel officials met with Rake and afterwards called Terry saying Salopek and possibly Lein were going to be fired. Regarding this phone call, Terry testified that he received a call from Filibeck on October 26. Filibeck told Terry that he had just finished meeting with the Navy regarding Salopek, and they "basically wanted him gone" because Salopek was the person responsible for the months-long investigation over weapon qualifications. (Tr. 945) As for his conversation with Salopek on October 27, Terry said he told Salopek that this was out of Xcel's hands and was what the Navy had requested. (Tr. 203, 344, 353–358, 946; R. 52)

Regarding his meeting with Salopek on October 27, Filibeck testified he told Salopek that he had just met with the Navy, and while Salopek had worked for Xcel for some time, the Navy directed him to remove Salopek from the contract. Filibeck said he told Salopek the reasons for his removal were dishonesty, falsifying reports, and lack of candor during the Navy investigation which resulted in hundreds of hours of investigative time, causing the Navy to "chase[ ] their tail." (Tr. 1016) According to Filibeck, he then told Salopek that he had not done Xcel any favors and asked if he wanted to resign. Salopek would not resign, so Filibeck told Salopek that he was terminated effective immediately. (Tr. 1015–1016)

Salopek never received anything in writing from Xcel explaining why he was terminated, or the charges that were levied against him. On October 30, an automatically generated email was issued stating that Salopek's CAC card had been revoked. According to Rake, this is standard practice; once Xcel notifies Rake that someone is no longer employed by the company, the former employee's CAC card is revoked since that person is no longer working on the contract. (Tr. 203–204, 359, 571–573; GC. 10–11; (JX. 5 #1678)

3. Respondent's stated reasons for firing Salopek

After Salopek was fired, Terry completed a company "change of status" form which states that Salopek was fired on October 27 and was not eligible for rehire. The form further says that Salopek was terminated for "chain of command violation and dishonesty." (JX. 5 #1285) Filibeck instructed Terry to write down these two specific reasons for Salopek's discharge on the form. (Tr. 947–949)

[33] A CAC card is an identification card containing biometric information issued to government employees, members of the military, and contractors. It allows them access to the base. (Tr. 209–210, 573–579)

Filibeck denied using the term "chain of command" during his October 27 meeting with Salopek, but admitted that this was one of his concerns. (Tr. 1016) Also, when asked if a guard was prohibited from going to anyone at the United States Navy about employee complaints, Filibeck testified that "[i]t is definitely a violation of the rules and regulations for sure." (Tr. 1017) However, there is no evidence that any such "rules or regulations" exist, and nothing in Respondent's employee handbook precludes a guard from contacting anyone at the Navy directly, either civilian employees or military personnel, about their complaints. (GC. 2)

According to Filibeck, as a contractor Xcel follows the military's chain of command whenever an issue arises. Thus, when an issue is brought to the company's attention, Xcel takes the matter to Manson, Rake, or Burris. Then, if Xcel does not believe the issue is receiving the attention it deserves from the Navy's Contracting Office, Xcel can turn the matter over to the OIG which would conduct its own independent investigation. Only if the OIG finds merit to the matter, would a commanding officer, like Cdr. Pulley, become involved as the OIG would go through the military chain of command with its findings. Filibeck testified, "[w]e don't jump that." (Tr. 1016) Thus, Filibeck said, "we just don't get the option to . . . leave our post and . . . barge into the commanding officer's offices. It reflects very badly on the employees and on the company as a whole." (Tr. 1022) Filibeck further said that when someone does not operate inside of the confines of the military's rigid structure, the result is what occurred with Xcel involving the complaint lodged by Mullen, Salopek, and Lein, "[t]hey will tell somebody something that turned out to be completely unfounded allegations for the most part, there's a knee jerk reaction to problems." (Tr. 1017) (Tr. 1016–1017, 1022)

When asked how Salopek was dishonest, Filibeck referred to the guards that were alleged to have falsified training records and failed their qualifications. According to Filibeck, he told Salopek that he was dishonest because the allegations that several guards falsified training records and failed their qualifications were false. Regarding Salopek's dishonesty, Filibeck further said that, if an employee on a federal contract makes an allegation it better be correct because there are repercussions. And, Filibeck said that Salopek should have brought the complaints through the appropriate military chain of command so Xcel could have reported the problem appropriately to the government. As for Salopek's alleged lack of candor, Filibeck testified that, according to Rake, Salopek was not forthcoming with them, in that Rake and Manson had to go back looking for things. Filibeck said that he had an opportunity to review the training records at Indian Island before he "clipped" Salopek, and that as per the Navy investigation, Salopek's allegations were completely false.[34] (Tr. 1018–1019) In fact, Filibeck said that Salopek's allegations were "not even close, and he got us in a lot of trouble with the Navy for filing those false allegations." (Tr. 1019) (Tr. 1018–1022)

Filibeck testified that he believed Rake had conducted a very thorough investigation involving extremely serious allegations. And he was facing a situation where Rake, who Filibeck described as "basically our direct boss" was recommending Salopek's immediate removal from the contract, and Burris was not saying anything. (Tr. 1004) Filibeck said that the Navy has the right, under the contract, to request anybody be removed; Filibeck wanted to keep the contract at Indian Island and "keep the customer happy." (Tr. 1004) Therefore, Filibeck decided to remove Salopek from the contract. As for why Salopek was discharged, as opposed

[34] Filibeck referred to his firing Salopek as having "clipped" him. (Tr. 1018–1019)

to being transferred to another Xcel contract, Filibeck testified that the allegations against Salopek were very serious, and Xcel's next closest contract was with the United States Army Corps of Engineers at a series of dams on the lower Columbia River which was "10,080 miles away." (Tr. 41, 981, 1005) Also, Filibeck said that there were a couple of issues with transferring Salopek to another contract. The first issue was "if this guy is going to do this kind of activity here, he's going to do it there." (Tr. 1005) (Tr. 1003–1007)

Also, Filibeck said that, at the time of his testimony, he believed there was currently "an active investigation regarding those classified photos that are still up" on Salopek's website, referring to the photographs Salopek took of the HSB console. (Tr. 1005–1006.) Therefore, because Salopek posted classified photographs on his own personal website for another company, Filibeck said that he "could never employ him." (Tr. 1006.) However, no evidence was introduced that there was, in fact, any such current investigation into Salopek's pictures. Finally, Filibeck claimed that Salopek would not be able to receive a CAC card if he had been transferred to another one of Xcel's contracts. However, Filibeck later admitted that the reason Salopek's CAC card was cancelled was because Xcel had fired him for cause, and if Salopek had been transferred to another Xcel contract, as opposed to being fired for cause, there would not have been any problems with Salopek's CAC card. Rake confirmed the Navy's ability to transfer CAC card authorizations from one contract to another, when the employee is "not in trouble," and said that the Navy Contracting Office "do[es] that a lot." (Tr. 575–576.) (Tr. 1005–1006.)

4. Lein's conversation with Powless on October 27

Lein testified that October 27 was a strange day. That morning, he was pulled off the CVIS post to wash a vehicle, which was not a typical assignment for a guard standing post. Then, instead of resuming his post, Powless had him load boxes of old files into a van with two other guards and drive them to a building for storage. Moving boxes of paperwork was also not part of Lein's normal duties. He eventually returned to the CVIS post sometime around noon. At some point that day, Salopek told Lein about the conversation he had with Harger. Lein then witnessed Powless and Vancura relieve Salopek of his duties, and he saw Salopek leave with Powless. Based upon what had been occurring that day, Lein assumed he was going to be fired as well. (Tr. 700–705.)

When Lein finished his post, he went to Building 848 and turned in his weapon. Someone at the armory told Lein that Powless wanted to speak with him, so Lein walked over to Powless who was standing nearby. Powless invited Lein into Terry's office. At this point Lein testified that he was upset. He asked Powless "am I fired," and further told Powless that he was not going to sit there and have a conversation if he was being fired. (Tr. 706.) Powless replied saying "they were going to fire you" but decided that, since it was Lein's first time "jumping the chain of command," he would get a second chance. (Tr. 706–707.) Powless then told Lein that the two of them had not talked since July, when the violations were reported to Cdr. Pully. Powless told Lein that he was "ticked off" at Lein for not letting Powless know that he was doing something wrong. Lein testified that could not believe what Powless was saying, as he had been expecting an apology from Powless; the two spoke briefly and Lein left. Lein was never disciplined. (704–708, 743–744.)

*L. Lein's Issue Involving Guard Mount/Arm-up Pay*

Article 12 of the parties' CBA states that guards are to receive an extra 30 minutes of paid time for each shift they work; this is referred to in the contract as "guard mount pay." (JX. 15–16.) The document says nothing about whether this extra time is to be pro-rated depending upon the length of the shift. In practice, the extra 30 minutes is broken down into two 15-minute increments. At the start of a shift guards are given 15 minutes to arm-up, receive briefings, and get to their post, and they get 15 minutes at the end of a shift to bet back to Building 848, pass on briefings, and arm-down. A standard shift for a guard is therefore 8.50 hours. (Tr. 708–710, 950–951; JX. 15–16.)

Terry testified that, depending upon their weapons and guard assignments, it only takes about 5 minutes to complete the entire arm-up/arm-down process; it is "a very fast process." (Tr. 958.) And, he said that traditionally, if a guard has armed-down before the full 15 minutes allotted, Respondent allows them to go home early. (Tr. 952.)

Sometime around Christmas 2018, Lein volunteered to work a 4-hour shift. Lein went to work, and at the start of his shift put down 4.50 hours on his timesheet to account for his 4-hour shift and the extra half hour for guard mount pay. When Lein finished his shift, he checked his timesheet and someone had whited-out the 4.50 hours and replaced it with 4.25 hours. Lein approached the part-time Lieutenant on duty and asked why his timesheet had been changed. The Lieutenant told Lein that he was working a 4-hour shift and therefore only entitled to an extra 15 minutes for guard mount. Lein disagreed, and the Lieutenant told him to bring it up with Terry if he had a problem. (Tr. 709–712, 740.)

The next morning Lein testified that he went to Terry's office to get clarification on the matter. He told Terry what had happened and also said that he did not appreciate the Lieutenant changing his timesheet; instead the Lieutenant should have first discussed the matter with Lein. Terry told him to put down 4.50 hours. Lein felt that Terry was just appeasing him and wanting to get Lein out of his office. Nevertheless, Lein was paid for 4.50 hours. (Tr. 713, 740–742.)

In about early to mid-January 2019, Lein was assigned to work 4-hour shift and had another issue regarding guard mount time. He arrived to work at 1:30 a.m. along with another guard for a 2–6 a.m. shift. The two guards went to the armory at 1:45 a.m. where Lieutenant Lux was on duty. Lux refused to let them arm-up until 2 a.m. Lein told to Lux that the CBA provided 30 minutes for guard mount and explained his discussion with Terry a few weeks earlier. However, Lux would not allow them to arm-up until 2 a.m. This resulted in Lein and his coworker being late to relieve the other guards on post. (Tr. 714–716, 743; R. 46)

The next day, Lein testified that he was assigned to work the dayshift and he went to the training room for the shift-briefing. However, there were only a couple people present. Eventually Powless arrived and said that the briefing would occur in the Lieutenant's office. Lein testified that, when he walked into the Lieutenant's office everyone was there, including half of the night-shift guards and the night-shift Lieutenant. According to Lein, it was unusual to have other shifts present during the dayshift briefing; once he walked into the office he knew

something was wrong as everyone was looking at him. After they entered, Powless told the group that somebody had complained about the arm-up time and Terry had directed that nobody would be going home early anymore. (Tr. 717–718, 742; R. 46.)

Lein was mad, so after the meeting he followed Powless to the armory and told him "if you're going to put this crap out at guard mount" at least have the whole story and the facts before "you put me out there like that. Because everybody knew they were talking about me." (Tr. 719.) Lein testified that Powless "got pissed off," turned his back to Lein and then turned around and said, "oh, are you going to right me up?" Lein believed that Powless was referring to the complaint that Lein, Salopek, and Mullen made to Cdr. Pulley and thought Powless was still mad at Lein for making the complaint. (Tr. 720.)

After speaking with Powless, Lein armed-up and walked to his duty van along with Everson who was his partner for the day. When they arrived at their van, an Xcel Lieutenant named Paul Wilson was standing there and told Everson "hey, you need to get this guy straightened out" in reference to Lein; there was no reply and Lein went to his duty post with Everson. (Tr. 721.) Lein testified that throughout the day Everson and another guard kept telling him that he: needed to apologize to Terry; was messing up the Company's spreadsheet; was the only one that had complained; was not a team player; and ruined everyone's life because the guards could no longer go home early. Lein replied by telling his coworkers that he did not care about the Company's spreadsheet, they needed to read the CBA, and that Respondent was obligated to pay him what the contract dictated. (Tr. 721–722; R. 46.)

Terry was working that day, and he had to drive past Lein's post to enter the base. When Terry drove to the guard shack Lein testified that he walked up to Terry's car and told him what Powless had said at the guard mount briefing that morning; Lein was angry. Lein told Terry that the guards had been verbally assaulting him in the guard shack because of what Powless said at the briefing and that he should not have to come to work and be harassed because he asked for clarification about guard mount pay. According to Lein, Terry said that the guards should be mad at him and not Lein; Terry then drove off. (Tr. 722–723, 742)

Before his shift ended that day, Lein needed to go to Building 848 to reset his email. According to Lein, he sat at a computer next to Powless to fix his email and told Powless that the guards had been harassing him all day. Lein testified that, at one point, Powless told him that if he had any issues or concerns maybe next time he should bring them up to his peers. Right before the shift ended, Powless told Lein that he had communicated with Terry and the guards were no longer prohibited from leaving early after they finished arming down. (Tr. 742)

The issue involving guard mount pay was not the first time Lein brought a problem regarding his pay to Terry's attention. In September 2018, Lein complained to Terry about the amount of pay he received during his first 2 weeks of employment with Respondent, which he referred to as his "in-hire" period; this consisted primarily of time spent training and with weapon qualifications. According to Lein, he was only paid $11 per hour during this time, and he had $38 taken out for union dues. Lein said he discussed the matter with his coworkers, and with the Harger, and learned that the minimum wage at the time was $11.50 per hour. Also, one of his coworkers said that he had been payed his regular salary of about $27 per hour during his

in-hire period. Harger also told Lein that too much money had been deducted for union dues during his first 2 weeks. Harger then emailed Terry on September 26 asking for a copy of Lein's dues authorization card. Lein said that a few days later he was summoned to Terry's office. According to Lein, Terry told him that, if he had any pay issues, he needed to speak to Terry about it and not the Union. Lein replied saying that he had the right to speak with the Union. During this meeting Lein said he also told Terry that the minimum wage was $11.50 per hour, and that every guard hired after January 1 should be reimbursed an extra $40. (Tr. 695–699, 826; GC. 17.)

Terry acknowledged that Lein came to him with a question about guard mount pay involving a 4-hour shift but could not remember when it occurred. He first guessed that it happened in November 2018 and then said that he thought it happened when Lein was still in his probationary period. Terry testified that, during their conversation he told Lein that he would be paid a full half-hour. Respondent's counsel asked Terry whether, during this conversation, he told Lein to only come to him about issues like pay as opposed to going to the Union. Terry said that he did not recall any such conversation but did remember telling Lein that if he has any issues with his pay, uniforms, or whatever, to please let him know so Terry could see if he could solve the problem. (Tr. 955–956.)

## III. ANALYSIS OF THE 8(a)(1) AND (3) ALLEGATIONS

### *A. Mullen, Salopek and Lein Engaged in Protected Concerted Activities*

The protections afforded under Section 7 of the Act extend "to employee efforts to improve their terms and conditions of employment or otherwise improve their lot as employees through channels outside of the immediate employee-employer relationship." *Valley Hospital Medical Center*, 351 NLRB 1250, 1252 (2007) (citing *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978)) This includes the right of employees to take their complaints to their employer's clients or customers. *Kinder-Care Learning Centers*, 299 NLRB 1171, 1172 (1990) (citing *Greenwood Trucking, Inc.*, 283 NLRB 789 (1987)); *Paragon Systems, Inc.*, 362 NLRB 1561, 1564, 1576 (2015) (contract security guard who delivered strike notice to Army Colonel at client agency was engaged in union activity protected by Sec. 7 of the Act); *M.V.M., Inc.*, 352 NLRB 1165, 1172–1175 (2008) (letter from Federal courthouse security guards who worked for private contractor, sent to the United States Marshals Service, complaining about working conditions constituted protected concerted activity for mutual aid and protection).[35] And, employees engage in concerted activity protected by Section 7 when they complain about issues involving safety, training, and equipment used in the workplace. *G4S Regulated Security Solutions*, 359 NLRB 947, 951 (2013), affd. 362 NLRB 1072 (2015), enfd. mem. 670 Fed.Appx. 697 (11th Cir. 2016) (security guards were engaged in protected concerted activity by complaining about, among other things, having lanyards on their weapons and wearing vests); *North West Rural Electric Cooperative*, 366 NLRB No. 132, slip op. at 1 fn. 1, 14 (2018) (employee was engaged in concerted activity for mutual aid and protection by posting comments about safety and the lack of safety training on Facebook forum regardless of whether coworkers agreed with his comments or if the comments on safety practices and accident prevention actually had merit); *Mitchell*

[35] *M.V.M., Inc.*, 352 NLRB 1165, 1172–1175 (2008) is not binding precedent, as it is a two-member Board decision. It is cited for its persuasive value only.

*Manuals, Inc.*, 280 NLRB 230, 231 (1986) (employee letter sent to chairman of employer's parent corporation addressing employee concerns about wages, education, and training, was concerted activity for mutual aid and protection); *Dreis & Krump Manufacturing*, 221 NLRB 309, 310, 314 (1975), enfd. 544 F.2d 320 (7th Cir. 1976) (protesting the quality of supervision as it relates to training and safety falls within the scope of the mutual aid or protection clause).

Here, Mullen, Salopek, and Lein were concerned about safety issues surrounding Respondent's practice of organizing and conducting weapon qualifications at unauthorized locations, using non-government weapons with non-government ammunition. They were also concerned about the propriety of Respondent's Lieutenants altering targets to assist guards who were having trouble qualifying. By taking these concerns to Cdr. Pulley and ISO Jones, the three guards were engaged in concerted activity for mutual aid and protection. *Valley Hospital Medical Center*, 351 NLRB at 1252; *Kinder-Care Learning Centers*, 299 NLRB at 1172. However, this does not end the inquiry, as "[o]therwise protected communications with third parties may be so disloyal, reckless, or maliciously untrue as to lose the Act's protections." *Valley Hospital Medical Center*, 351 NLRB at 1252.

"Statements have been found to be unprotected as disloyal where they are made 'at a critical time in the initiation of the Company's' business and where they constitute 'a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income.'" Id. (quoting *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464,472 (1953). However, the "Board is careful . . . to distinguish between disparagement of an employer's product and the airing of what may be highly sensitive issues." Id. (internal quotation omitted). For employee criticism to be considered so disloyal to lose the Act's protection there must be evidence of a "malicious motive." Id.

Statements that are "maliciously untrue, i.e., if they are made with knowledge of their falsity or with reckless disregard for their truth or falsity," are also unprotected. Id. That being said, "the mere fact that statements are false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue." Id. When "an employee relays in good faith what he or she has been told by another employee, reasonably believing the report to be true, the fact that the report may have been inaccurate does not remove the relayed remark from the protection of the Act." Id. (citing *KBO, Inc.*, 315 NLRB 570, 571 (1994), enfd. mem. 96 F.3d 1448 (6th Cir. 1996)).

Here, the complaints made to Cdr. Pulley and ISO Jones related directly to the guards' working conditions and nothing in those complaints were disloyal or disparaging so as to lose the protection of the Act. There is no evidence the statements were made "at a critical time in the initiation of" Xcel's business. *Jefferson Standard*, 346 U.S. at 472. Indeed, Xcel had been the contractor at Indian Island for 20 years. And, although the statements were critical of Respondent's weapons training/qualification practices, they were not made "in a manner reasonably calculated to harm the [Respondent's] reputation and reduce its income." Id. In context, it is clear that the three guards did not intend to "disparage or harm Respondent" but wanted "to pressure Respondent to" change its weapons qualification practices to comport with Navy regulations, thereby improving safety by ensuring that all guards were properly qualified to

use the weapons and ammunition they are required to carry while patrolling at Indian Island. See *Valley Hospital Medical Center*, 351 NLRB at 1253 (citing *Mount Desert Island Hospital*, 259 NLRB 589, 593 (1981), enfd. in relevant part 695 F.2d 634 (1st. Cir. 1982)

Also, there is no evidence that the statements made in the complaints to Cdr. Pulley and ISO Jones were maliciously false. Instead, the evidence shows that the core issues raised in complaints were, in fact, true. Both Coler and Lein failed their initial weapon qualifications in early May and were told they would have the chance to shoot again at a gravel pit to qualify. Coler stated in her written statement to Rake that she shot at the gravel pit range, did not think about the "legality" of the qualification because she had heard it had been done before, and was then told that she could now stand post. (R. 2 p. 22.) After her gravel pit qualification Mullen saw Coler standing post with an M4 rifle and Rake's report confirmed that she was issued an M500 shotgun or M4 rifle on multiple occasions before she passed her subsequent qualification test at the Bangor range on July 9. Lein's written statement to Rake discusses how Powless had arranged for him to qualify at the same gravel pit as Coler, and that Powless told him that he would be qualifying with an AR-15 provided by another guard instead of using an M4 rifle. (R. 2, p. 16.) Lein's testimony also confirms that Respondent considered Coler's gravel pit rang an official qualification shoot, as Powless told him the shoot was for qualifying and that Coler passed her rifle test shooting a score of 141. Indeed, Terry admitted that, until the Navy's Contracting Office started investigating the complaints lodged by the three guards, Respondent had a longstanding practice of using unauthorized locations to qualify guards, including the backyard of a someone's house, or anywhere else they could find, and they used non-government issued weapons for these qualifications. Terry further admitted that this practice had been going on for years, and it was only when Respondent got its "hand slapped" as part of the investigation that Xcel stopped this practice. (Tr. 963, 978)

Also, the evidence shows that at least one weapons qualification Form 3591.1 contained false information. The Form 3591.1 signed by Powless for the July 7, 2017 qualification states that it occurred at the Bangor range. However, the qualification shoot actually occurred in Schroder's backyard. (R. 42; Tr. 895–898, 967–969.) Indeed, according to Rake's report the Bangor range was closed on July 7, 2017. (R. 2, p. 9.) Also, regarding the complaint that Respondent was using altered targets, Powless admitted doing so. Powless' written statement admits to altering targets with a large cross because a couple guards were having trouble focusing on the targets do to the "gloomy lighting" at the range. (R. 2 p. 20.) Cunningham admitted that he sometimes struggled with weapon qualifications because of the poor lighting.[36] (Tr. 1071.) While Rake claimed that the practice of altering targets was not prohibited, it does not take away from the legitimacy of the concern expressed by Mullen, Salopek, and Lein. Guards on post could hardly expect criminals, terrorists, or other wrongdoers to be walking around outlined with a large black cross to help their coworkers focus on the potential threat. And, nobody claims that a guard's ability to shoot accurately in all types of weather conditions and lighting is not a vital job duty.

While Mullen's email to Jones, and Salopek's email to Morgan, states that the incident with the altered targets occurred in May, which is incorrect, I credit Salopek's testimony that he

[36] Notwithstanding Cunningham's claim that he passed all his qualifications in January, Rake's report found that was not the case as he had to reshoot his qualifications on March 9. (R. 2, p. 2.)

told Rake that the date was a mistake. Indeed, in his second written statement to Rake, Salopek stated that he saw targets altered at the Bangor range on or about January 31. (R. 2, 14.) Moreover, the mere fact that any statement in the complaints were "false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue." *Valley Hospital Medical Center*, 351 NLRB at 1253. Ultimately, Respondent bears the burden of proof to show that an employee's statements are maliciously untrue. *Three D, LLC*, 361 NLRB 308, 312 (2014), enfd. 629 Fed.Appx. 33 (2d. Cir. 2015). And here, Respondent has not even shown that the primary allegations in the complaints were false, let alone that they were made with malicious intent. Accordingly, the complaints made by Mullen, Salopek, and Lein did not lose the protection of the Act.

Similarly, I find that Mullen did not lose the protection of the Act when he accompanied Salopek and Lein to Cdr. Pulley's office while he was on duty. At various times during their testimony, Rake and Filibeck claimed that Mullen improperly left his post when he went to speak with Cdr. Pulley, with Filibeck saying that Rake called Mullen's actions a "junket." (Tr. 589–590, 996–997.) And, Rake testified that, had Mullen not resigned, he was going to recommend Mullen be removed from the contract for abandoning his post. (592–593) However, the evidence shows that Mullen did not abandon his post. Instead, Mullen was within his patrolling area of South Patrol at all times that day, as Cdr. Pulley's office is located within South Patrol. Also, Mullen did not miss any of his required security checks that day, nor is there any evidence that Mullen had abandoned his radio and pistol when he met with Cdr. Pulley. Given the fact that guards are allowed to take breaks whenever they want, without calling in for relief, and that guards on South Patrol spend a lot of their day "just killing time" because of the minimum number of security checks to be performed, it can hardly be said that Mullen abandoned his post when he spoke with Cdr. Pulley. This is especially true considering the fact that it was not uncommon for guards on South Patrol to spend 30 minutes at the end of their shift each day washing their work truck. Meeting with the base commander involving an important security issue is surely more important that washing a work truck or parking somewhere "killing time." Accordingly, I find that Mullen did not abandon his post, and his actions that day did not lose the protection of the Act.

*B. Mullen's Resignation/Constructive Discharge*

The General Counsel alleges that Xcel constructively discharged Mullen, arguing that Respondent imposed intolerable working conditions upon him in retaliation for his protected concerted activities, and should have reasonably foreseen that, if Mullen did not receive assurances that the threatening behavior against him would be addressed and stopped, he would quit. (GC Br., at 36–38) "Two elements must be proven to establish a 'traditional' constructive discharge: 'First, the burden imposed on the employee must cause, or be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign. Second, it must be shown that those burdens were imposed because of the employee's union [or protected] activities.'"[37] *Chartwells, Compass Group, USA, Inc.*, 342 NLRB 1155, 1170 (2004) (quoting

[37] A constructive discharge can also occur where the evidence shows that the employee faced a "Hobson's Choice" between continued employment and abandoning his or her statutory rights. *Sara Lee Bakery Group, Inc. v. NLRB*, 296 F.3d 292, 300 (4th Cir. 2002). Here, neither the General Counsel nor the Union advance a "Hobson's Choice" argument regarding Mullen, nor does the evidence support such a claim.

*Crystal Princeton Refining Co.*, 222 NLRB 1068, 1069 (1976)); see also *American Licorice Co.*, 299 NLRB 145, 148 (1990) (whether employer specifically intended that the employee quit is not dispositive, as a constructive discharge can occur in circumstances where "the employer should have reasonably foreseen that its action would have that result."). The test as to whether working conditions were so difficult or unpleasant so as to force an employee to resign is an "objective one." *Chartwells*, 222 NLRB at 1069; *Quanta*, 355 NLRB 1312, 1314 fn. 4 (2010); see also, *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) ("The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances."). If the General Counsel proves a prima facie case of constructive discharge, the burden shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its actions. *Grand Canyon Mining Co.*, 318 NLRB 748, 760 (1995).

Regarding Mullen, I believe that, given the circumstances, the evidence supports a finding that a reasonable person would view the text message from David as threatening. The message calls Mullen a "fucking idiot," calls Salopek Mullen's "butt buddy" and says that Mullen "don't know what you have stepped in." (GC 6.) Regarding the incident with Cunningham in the training room, although I generally did not view Cunningham to be a credible witness, I find that the evidence does not show that Cunningham actually "swept" Mullen with his shotgun, or purposely pointed the gun at him. Instead, the evidence shows that, during the altercation, Mullen was sitting down and Cunningham was standing over him holding his shotgun at a 45-degree angle, pointing towards the ground. Because Mullen was sitting down, and Cunningham was standing up, it is easy to understand why Mullen would think that Cunningham's shotgun was pointed towards him, when in reality it was pointed at an angle towards the ground. That being said, the credited evidence shows that Cunningham was mad when he confronted Mullen. He was yelling at Mullen, calling him a "fucking rat" and "fucking skell," while demanding an apology. Indeed, Simon, who was present when the incident occurred, said that a written statement from him would only show Cunningham's temper, which was already well known. Given these circumstances, I find that, although Cunningham was not purposely pointing his shotgun at Mullen, it was not unreasonable for Mullen to view the interaction as threatening.

Accordingly, I find that Mullen reasonably viewed both incidents as threatening, and therefore his reporting them to Respondent and asking that they be addressed before returning to work was rational. However, I do not believe the evidence supports a finding that Respondent's actions/inactions imposed a situation that was so difficult or unpleasant that it forced Mullen to resign, or that Respondent should have foreseen Mullen would have resigned because Xcel did not immediately inform him of the company's investigation into his allegations.

Regarding the text message from David, after Mullen reported it, Respondent immediately addressed the issue. Shortly after he sent the text message, David received calls from three different Xcel Lieutenants telling him to stop texting Mullen and cease all contact with him. While Respondent never informed Mullen that David was directed to stop contacting him, David complied with the directive and there is no evidence that Mullen heard from David again. In these circumstances, where David ceased all contact with Mullen once the incident was reported to Respondent, I do not believe that a reasonable employee would have found

conditions so difficult or unpleasant so as to be forced to resign. Cf. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 332 (5th Cir. 2004) (prompt remedial action was fatal to Title VII constructive discharge claim); *Young v. Temple University Hospital*, 359 Fed.Appx. 304, 309 (3d Cir. 2009) (same).

As for the incident with Cunningham on July 9, Mullen did not report the altercation to anyone until July 14. Mullen had an opportunity to tell both Terry and Morgan about the situation with Cunningham shortly after the incident occurred, when he was called into Terry's office on July 9 to speak with Morgan on the telephone, but chose not to say anything. He also had the opportunity to tell Powless about the incident on July 13 when he called to say that he was not coming into work. However, instead of specifically telling Powless about what occurred with Cunningham, Mullen only said that he would not be coming into work "until these situations" or "these threats, and harassment" was addressed. (Tr. 489, 782.) Powless told Mullen "okay." (Tr. 489.) And, despite the fact Mullen was scheduled to work on July 13, 14, and 15, Respondent never demanded, or even asked, that Mullen return to work. (R. 32) He was allowed to stay home without repercussions. While Terry waited 2 days before starting his investigation, he received Mullen's email over the weekend while he was working from home. When he returned to Indian Island on Monday July 16, he immediately took statements from Cunningham and Simons and on the same day Respondent also posted its workplace standards of conduct in the training room, requiring every guard sign a document affirming that they had read and understood the policies. And, Mullen resigned on July 17, even though he was not scheduled to work until the next day. (R. 32.)

Like the issue with David's text message, I do not believe the General Counsel has established a prima facie case that Terry's inaction for 2 days before he started investigating the Cunningham incident, or his failure to inform Mullen of the investigation, created working conditions so difficult or unpleasant that Mullen was forced to resign. First, I find it significant that that Mullen himself waited 5 days before he even reported the incident to Respondent, although he had at least two opportunities to do so. And when he did report the incident, he waited until the weekend. Under these circumstances, where Terry was working from home, I do not believe that it was unreasonable for him to have waited until he returned to Indian Island on July 16 to begin his investigation and post Respondent's workplace guidelines. As for the fact that Mullen did not hear anything back from Terry, generally courts allow an employer sufficient time to remedy the intolerable working conditions. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation."). Had Respondent directed Mullen to return to work immediately, or risk discipline, the situation may have been different. See *Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781, 790 (7th Cir. 2007) (Court noting that "[i]f continued employment would compromise an employee's personal safety . . . we do not expect an employee to remain on the job while the employer tries to remedy the problem."). However, after Mullen told Powless that he would not return to work until the threats and harassment were addressed, he was allowed to stay home, without threat of discipline or discharge. Under these circumstances, where Terry was actively investigating Mullen's complaint against Cunningham, and Respondent was not requiring Mullen to return to work while it was sorting through the various allegations, I do not believe the evidence warrants a finding that Mullen's working conditions were so difficult or unpleasant that a reasonable

employee would have been forced to resign. Accordingly, I recommend that this allegation be dismissed.

*C . Respondent violated Section 8(a)(1) of the Act by Discharging Salopek*

1. Res gestae

The credited evidence shows that Filibeck fired Salopek for violating the chain of command and for dishonesty. These are the two reasons Filibeck told Terry to put on Respondent's internal termination document. *Paragon Systems, Inc.*, 362 NLRB at 1566 (Board finds no merit in employer's claim that it lawfully disciplined employee for parking violation and talking to coworkers as these reasons were not listed in disciplinary form or notice). While Filibeck denied using the term "chain of command" in his conversation with Salopek, he admitted that Salopek's violating the chain of command was a concern for Respondent. Also, Powless, who had met with Filibeck and Terry to discuss Salopek and Rake's report, told Lein that Xcel was going to fire him as well, but decided against it since it was the first time Lein had jumped the chain of command. Under these circumstances, there is no doubt that Salopek's jumping the chain of command, by joining his coworkers to meet with Cdr. Pulley and complaining to ISO Jones, was a motivating reason for Salopek's discharge. As for how Salopek was dishonest, Filibeck said that Salopek's allegation that several guards falsified training records and failed their weapon qualifications was false. Both of these allegations were contained in the complaints lodged by Salopek to Morgan and in the email Mullen sent to Jones. In short, both reasons stated by Respondent for Salopek's termination, as documented in his change of status form, were part and parcel of Salopek's protected concerted activities.

"Where a case turns on the alleged misconduct that is part of the res gestae of activity protected by Section 7 of the Act, the proper inquiry is whether the employee lost the Act's protections in the course of that activity." *ADT, LLC.*, 369 NLRB No. 23, slip op. at 8 (2020) (citing *Desert Cab, Inc.*, 367 NLRB No.87, slip op. at 1 fn. 1 (2019)). I believe that this is the proper standard through which to analyze Salopek's discharge.

As set forth above, Salopek did not lose the Act's protections in the course of his protected concerted activity. Mullen, Salopek, and Lein had a protected right to take their complaints about working conditions directly to Cdr. Pulley and ISO Jones. *Paragon Systems, Inc.*, 362 NLRB at 1564, 1576; *Valley Hospital Medical Center*, 351 NLRB at 1252. While Xcel may have preferred that the three guards used another forum to publicize their concerted complaints, like going to the OIG instead of Cdr. Pulley or Jones, "an employer may not interfere with an employee's right to engage in Section 7 activity by requiring that the employee take all work-related concerns through" a specific channel. *Valley Hospital Medical Center*, 351 NLRB at 1254 (citing *Kinder-Care Learning Centers*, 299 NLRB at 1171–1172); see also *M.V.M., Inc.*, 352 NLRB at 1175. And, while Filibeck claimed that Mullen, and by extension Salopek, violated rules and regulations by going to the United States Navy about employee complaints, there is no evidence that any such regulations exist.[38] (Tr. 1017.) Moreover, even if they did exist, "so long as protected concerted activity is not unlawful, violent, in breach of

[38] Nor is there credible evidence that Respondent was required to follow some specific military chain of command that prohibited the three guards from speaking with Cdr. Pulley, who seemed to welcome their complaints.

contract, or disloyal, employees engaged in such activity generally do not lose the protection of the Act simply because their activity contravenes an employer's rule or policies." *Valley Hospital Medical Center*, 351 NLRB at 1254 (citing *Communication Workers Local 9509*, 303 NLRB 264, 272 (1991)). Because neither Salopek, Mullen, nor Lein lost the protection of the Act when they engaged in protected concerted activities, Respondent violated Section 8(a)(1) of the Act when it terminated Salopek for alleged misconduct that was part of the res gestae of his protected concerted activities. *ADT, LLC.*, 369 NLRB No. 23, slip op. at 9 (2020).

2. *Wright Line*

The same conclusion is warranted even when applying the burden shifting framework set forth in *Wright Line*. *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983); see also, *NLRB v. Main St. Terrace Care Center*, 218 F.3d 531, 540–541 (6th Cir. 2000) (applying *Wright Line* to 8(a)(1) allegations involving employee concerted activity). Under this framework, the General Counsel must prove by a preponderance of the evidence that employee protected activity was a motivating factor for the employer's actions. To support such a showing, the elements of protected activity, knowledge of that activity, and animus on the part of the employer are required. *Consolidated Bus Transit*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009); see also *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 8 (2019) (noting that evidence of animus must be sufficient to establish a causal relationship between the employee's protected activity and the employer's action against the employee). If the General Counsel makes this initial showing, the burden of persuasion shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even if the employee had not engaged in protected activity. *Consolidated Bus Transit*, 350 NLRB at 1066; see also *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1550 (10th Cir. 1996) (by shifting the burden the employer's justification becomes an affirmative defense). An employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity. *Rhino Northwest, LLC*, 369 NLRB No. 25, slip op. at 3 (2020) (internal quotations and citations omitted). Where an employer's explanation is "pretextual, that determination constitutes a finding that the reasons advanced by the employer either did not exist or were not in fact relied upon." *Limestone Apparel Corp.,* 255 NLRB 722, 722 (1981), enfd. 705 F.2d 799 (6th Cir. 1982). Also, where the "proffered non-discriminatory motivational explanation is false even in the absence of direct motivation the trier of fact may infer unlawful motivation." *Roadway Express*, 327 NLRB 25, 26 (1998).

Here, the first two elements are easily proven. Salopek was engaged in protected concerted activity and Respondent, including Filibeck, knew about this activity. The evidence also supports a finding of animus on behalf or Respondent generally and Filibeck in particular. Filibeck's testimony clearly showed that he looked upon the actions of the three guards, in taking their complaints to Cdr. Pulley and then to ISO Jones, with disfavor and believed it was done in violation of the chain of command. This is sufficient to establish animus that can be considered in determining the motive for Salopek's discharge. Cf. *Crossroads Furniture*, 301 NLRB 520, 520 fn. 1 (1991) (remarks made by store manager showing Respondent looked with disfavor on employees perceived to be actively involved in the exercise of protected concerted activity

establishes animus that the Board can consider in determining the motive for employee's discharge). Further animus is shown by Filibeck's fictional explanation regarding one of the reasons why Salopek could not be transferred to another Xcel contract. Filibeck testified that one of the reasons Salopek could not be transferred was because Respondent's next closest contract was 10,080 miles away, with the Army Corps of Engineers on a series of dams on the lower Columbia River. (Tr. 981, 1005) The dams in question were the Bonneville, Dales, and John Day dams which were located on the border with Washington and Oregon. (Tr. 41, 981) See also *National Wildlife Federation v. National Marine Fisheries Service*, 422 F.3d 782, 788 fn. 1 (9th Cir. 2005). These dams are between 245 and 330 miles away from Indian Island–not 10,080 miles away as Filibeck testified.[39] I find that Filibeck's wildly exaggerated claim that Salopek could not be transferred because these dams were located 10,080 miles away is further evidence of animus. *Grane Healthcare Co.*, 357 NLRB 1412, 1433 (2011), enfd. 712 F.3d 145 (3d Cir. 2013) (employer's fabricated explanation for the decision not to hire employee supports the inference of antiunion animus). Finally, there were multiple statements by Respondent's officials that further establish the company's animus against the fact that the three guards engaged in protected concerted activity by complaining directly to Cdr. Pulley and ISO Jones including: Powless telling Lein that Respondent was going to fire him for "jumping the chain of command" but since it was his first time he would get a second chance; Morgan saying that Lein was easy to get rid of because he was on probation and that Salopek and Mullen are a cancer; Morgan asking Mullen if he met with Cdr. Pulley and saying that Mullen could possibly face disciplinary action; Terry asking Lein whether he met with Cdr. Pully, inquiring who accompanied him to the meeting, and saying that Lein made a big mistake and was going to be pulled off post and off the contract; and Morgan telling Lein that he was mad because he broke the chain of command.

Accordingly, having presented a prima facie case that Salopek's discharge was discriminatorily motivated, the burden shifts to Respondent to show, by a preponderance of the evidence, that it would have discharged Salopek notwithstanding his protected concerted activities. Respondent has not done so.

When asked why Salopek was not transferred to another contract, instead of being fired, Filibeck specifically testified that he did not want to transfer Salopek because "if this guy is going to do this kind of activity here, he's going to do it there." (Tr. 1005) It was clear Filibeck did not want to employ someone who, like Salopek, might violate the chain of command and go directly to the head of a client agency with concerted complaints about working conditions. Filibeck next said that Salopek could not get a CAC card because he was removed for cause and that he believed there was a current ongoing investigation into "classified photos" that were on Salopek's website. However, further inquiry shows these excuses are pretext. Filibeck admitted that, if he had transferred Salopek, instead of firing him, there would have been no issue with his CAC card, and this was confirmed by Rake. And, no evidence was presented of any ongoing investigation into any of photographs on Salopek's company website. Indeed, the photographs, which both Rake and Filibeck said were designated "FOUO" (for official use only), are not classified. Instead, FOUO is simply a Freedom of Information Act designation specifically used

---

[39] I take judicial/administrative notice of the locations of these dams and the associated mileage calculations. See *United States v. Perea-Rey*, 680 F.3d 1179, 1182 (9th Cir. 2012) (Court takes judicial notice of Google map and satellite images); *Pahls v. Thomas*, 718 F.3d 1210, 1216 fn. 1 (10th Cir. 2013) (same); Fed. R. Evid. 201(b).

for unclassified material.[40] Also, Respondent cannot rely upon statements Salopek made to the Navy Contracting Office, which Filibeck designated as showing dishonesty or lack of candor to support its termination decision. As discussed above, Salopek's statements did not lose the protection of the Act. Moreover, misconduct discovered during an investigation undertaken because of an employee's protected concerted activity cannot make the resulting discharge lawful. *Kidde, Inc.*, 294 NLRB 840, 840 fn. 3 (1989). Such is the case here, as Rake testified that the original customer complaint, which prompted his investigation, was the fact that Mullen, Salopek, and Lein met with Cdr. Pulley. (Tr. 589)

Finally, Respondent cannot rely upon Rake's recommendation to remove Salopek from the contract to escape liability. The General Counsel does not allege Salopek's removal from the contract to be a violation. Instead, it is Salopek's termination that is alleged to be unlawful. Rake was resolute that the Navy cannot ask that a contractor discharge a specific employee, and everyone agrees that nobody from the Navy ever asked Xcel to discharge Salopek. Moreover, "[i]t is well settled that an employer violates the Act when it follows the direction of another employer with whom it has business dealings to discharge its employees because of their [protected concerted] activities." *Paragon Systems, Inc.*, 362 NLRB 1561, 1565 fn. 14 (2015). "The fact that the direction comes from a Government actor does not alter [the] analysis." Id.

Here, it is clear that Rake was motivated by animus against the fact that Mullen, Salopek, and Lein complained directly to Cdr. Pulley and Jones, instead of coming first to Rake or Manson, when he recommended that Salopek be removed from the contract. This was evident by the fact that Rake asked every guard he interviewed whether they knew their chain of command. It was further evident by his statement that the guards' speaking directly with Cdr. Pulley was not normal since he and Manson were at Indian Island "all the time." (Tr. 585) By going to Cdr. Pulley with their complaints about weapon qualifications, Rake and the entire Navy Contracting Office was caught in an embarrassing situation. I credit Terry's testimony that both Rake and Manson knew these unauthorized weapon qualifications were occurring, and that Rake/Manson had approved of them for years. Had the three guards complained to Rake or Manson directly, they could have handled the situation quietly and not be exposed.

It was clear that Cdr. Pulley did not know about the unauthorized range practices, nor did he approve of them. Instead, Cdr. Pulley wanted all of Respondent's guards removed from their posts until Xcel could prove that they were properly qualified with their weapons. I find it telling that, nowhere in Rake's report or in his responses to his superiors regarding the OIG inquiry, does he acknowledge that the complaints lodged by Salopek, Mullen, and Lein, about unauthorized weapon qualifications were true. Instead, Rake downplayed the accusations, and used Mullen and Salopek as scapegoats, claiming that Mullen abandoned his post and that Salopek was at "the center to all the third part [sic] accusations to meet a hidden agenda of his own." (R. 2, p. 11) Rake's statement about Salopek is evidence that Rake harbored animus

[40] OPNAVINST 3432.1A, which applies only to Navy personnel and contractors, prohibits the posting of FOUO information on public websites. However, Salopek immediately removed the pictures when it was brought to his attention in September 2018 and he did not repost the pictures until 2019, after his discharge. Because he had been terminated and was no longer working on a Navy contract in 2019, he was not covered by OPNAVINST 3432.1A. See https://www.secnav.navy.mil/doni/Directives/03000%20Naval%20Operations%20and%20Readiness/03-400%20Nuclear,%20Biological%20and%20Chemical%20Program%20Support/3432.1A.pdf (last accessed on November 30, 2020).

against his involvement in the concerted complaints. *Paragon Systems, Inc.*, 362 NLRB at 1565 (statement in report from contracting officers' representative accusing contract guards who delivered strike notice to Army Colonel of "having their own agenda" and "handling their own personal grievances," was evidence of animus).

Further evidence Rake's animus is shown by the mischaracterizations in his report, and in his email to his superiors, which were specifically contradicted by the written statements of the various guards and by the trial evidence. For example, in his report, Rake states that Coler was improperly issued weapons for which she was not qualified because of "loop holes" due to a lack of communication. Similarly, the report says Coler was never told that "gong to the 'gravel pit' was to qualify" but that instead it was for remedial training. However, in her written statement, Coler stated that after her gravel pit range she was told that she was now able to stand post. And the evidence shows that after the gravel pit range Coler was treated as if she had qualified. The report also says that, after Coler failed her rifle and shotgun qualifications Powless went on leave for two weeks and therefore did not reschedule her to qualify. However, the evidence shows that Coler failed her initial qualifications on May 9 and shot at the gravel pit range with Powless on May 27. Also, the evidence shows that Powless was not on leave during this period, as the report claims, as he had multiple conversations with Lein at work about requalifying.

Rake's report also states that Lein was never told that going to the gravel pit range would be a qualification shoot, but that he was instead told it was for remedial training. But, Lein's written statement to Rake specifically states that that Powless told him that the gravel pit range was for qualifications. His written statement was bolstered by his credible trial testimony where Lein said that Powless told him that the gravel pit range was for a qualification, and that Coler qualified with a score of 141.

In Salopek's written statement he stated that the range at Schroder's house occurred on July 7, 2017, and that he saw a "Bangor range sheet" for that date. (R. 2, p. 15) However, in his report, Rake said that none of the guards interviewed could provide any facts or documents showing falsified qualification forms. And in his answers to the OIG questions, which he sent to his superiors, Rake stated that, when Salopek was asked for any dates he and Manson could look at regarding falsified records, "he didn't have anything." While Salopek did not have access to the actual qualification forms, his written statement provided Rake and Manson with the exact date to look at for falsified records–July 7, 2017. And, neither in his report nor in his answer to the OIG questions does Rake mention the fact that, on July 7, 2017, a qualification shoot occurred at Schroder's house and that the official Form 3591.1 falsely states that it occurred at Bangor. Indeed, neither Schroder nor Mullen were even interviewed, notwithstanding the fact that in his answers to the OIG questions Rake specifically stated that everyone Mullen and Salopek mentioned were interviewed.

Additionally, at trial Rake testified that no qualifications occurred at any "gravel pit range" but instead Respondent's guards went to "an open field" or to an "individual's house who has a range on his house" to practice. (Tr. 564) Rake knew, as was confirmed by Terry, that Respondent had been using unauthorized ranges to qualify its employees for years, but he refused to acknowledge this during his testimony. All of this leads me to the inescapable conclusion that Rake harbored animus against the fact that the three guards went directly do Cdr.

Pulley and to ISO Jones, and he sought to have both Mullen and Salopek removed from the contract and used as scapegoats to obscure the fact that the Navy's Contracting Office knew of, and had been condoning for years, Respondent's practice of using unauthorized ranges and personal weapons for their qualifications. Cf. *Grane Healthcare Co.*, 357 NLRB 1412, 1433 (2011), enfd. 712 F.3d 145 (3d Cir. 2013) (employer's fabricated explanation for the decision not to hire employee supports the inference of antiunion animus); *Saginaw Control & Engineering, Inc.*, 339 NLRB 541, 574 fn. 117 (2003) (supervisor's fabricated testimony supports a finding that he evaluated employee with animus against the union and its supporters in mind); *Andujar v. Nortel Networks, Inc.*, 400 F.Supp.2d 306, 331 (D. Mass. 2005) (in employment discrimination case, if a jury believes testimony that management officials fabricated events in response to claims of discrimination, it may infer discriminatory animus). Also, I credit Terry's testimony that he received a call from Filibeck on October 26 and that Filibeck said he had just finished meeting with the Navy and they wanted Salopek "gone" because he was the person responsible for the months-long investigation over weapon qualifications. (Tr. 945) This shows both Rake's animus, and the fact that Filibeck knew Rake wanted Salopek "gone" because he was involved in the concerted complaints which resulted in the Navy's investigation.

Finally, I do not credit Filibeck's testimony that he did not learn that Respondent had been using unauthorized ranges, including someone's backyard, to qualify guards until April or May 2019. Generally, I did not find Filibeck to credible as he seemed conceited during his testimony, particularly while testifying about Salopek, and was flippant about Salopek's discharge. "The demeanor of a witness may satisfy the tribunal, not only that the witnesses' testimony is not true, but that the truth is the opposite of his story." *Gissel Packing Co.*, 157 NLRB 1065, 1066–1067 (1966) (internal quotation omitted). Such is the case here regarding Filibeck's knowledge of Respondent's weapons qualification practices. After he met with Rake and Burris, Filibeck discussed Rake's report with Terry and Powless, wanting to know what had happened and whether Xcel in fact had training issues he did not know about or that the Navy did not uncover. It strains credulity to think that, during his meeting with Terry and Powless, the two individuals responsible for the unauthorized ranges, they did not inform Filibeck of what had been was occurring. This is especially true since Terry believed that the Navy had, in the past, authorized these practices. I therefore find that Filibeck learned about these practices during his meeting with Terry and Powless, before he fired Salopek.

In short, Xcel was not privileged to fire Salopek based upon Rake's recommendation that he be removed from the contract. The Navy was not authorized to fire Salopek, and did not recommend that he be terminated. Moreover, the recommendation that Salopek be removed from the contract was based upon Rake's animus against his concerted activities, and Filibeck knew this. *Paragon Systems, Inc.*, 362 NLRB at 1565 ("an employer's interest in maintaining a contract is not a legitimate business reason where, as here, a contractor requires the employer to discriminate against employees on the basis of their Section 7 activity."). Accordingly, by terminating Salopek's employment, Respondent violated Section 8(a)(1) of the Act.

*D. Guard Mount Pay*

Paragraph 8 of the Complaint alleges that, in December 2018 and January 2019 Lein concertedly complained about guard mount pay, which is mandated by the CBA, and

Respondent violated Section 8(a)(1) and (3) of the Act when Powless announced that, because someone had complained about guard mount pay, nobody would be allowed to go home early. The CBA between the Union and Xcel contains a provision providing for 30 minutes of paid time each shift to allow guards to arm-up at the beginning of the day, and arm-down at the end of the day. In practice, this extra time was broken down to 15 minutes at the start of the shift and 15 minutes at the end of the shift. The credited evidence shows that, it usually does not take guards the full 15 minutes to arm-down at the end of a shift, and historically Respondent has allowed guards to leave early if when they finished arming down.

In December 2018 Lein volunteered to work a 4-hour shift, and put down 4.5 hours on his timesheet to account for the extra half-hour allowed for in the CBA. When the shift Lieutenant changed his timesheet to 4.25 hours, Lein complained to Terry and was paid 4.5 hours for the shift. Lein had the same issue occur in mid-January 2019 when Lieutenant Lux prohibited Lein and another guard from "arming up" until their shift started, notwithstanding the fact the CBA provided for a full 30 minutes. Lein told Lux about the CBA provision and his earlier discussion with Terry involving this same issue. Notwithstanding, Lux would not let the guards arm-up until the start of their shift.

The next day, Lein was assigned to work the day shift. Instead of having their shift briefing in the training room as usual, Powless brought Lein into the Lieutenant's office where the other guards had congregated, including half of the night-shift. Powless told the guards that somebody had complained about the arm-up time and therefore Terry directed that nobody would be allowed to go home early anymore. Later that day, right before Lein's shift ended, Powless told Lein that he had spoken with Terry and that guards were no longer prohibited from leaving early after they finished arming down.

The General Counsel asserts that, because Lein was invoking a contractual right, he was engaged in union activity and Xcel's prohibition against leaving early violated Section 8(a)(1) and (3) of the Act because it was based on animus against Lein's invoking the contract. Had the General Counsel presented evidence that Lein, or any other guard, did not leave early before the prohibition was revoked, then a violation may have occurred. However, no such evidence was presented. The record contains no evidence that any guard had finished arming down, but was prohibited from going home early, before Respondent reinstated its established practice. Indeed, Lein's own testimony shows that the prohibition was revoked before the day shift ended. Under these circumstances, where there is no evidence that any employee was adversely affected, I recommend the 8(a)(3) allegation be dismissed.[41] See *Simmons Co.*, 314 NLRB 717, 725 (1994) ("There is no evidence of any adverse action taken by the employer . . . and thus no prima facie

[41] As for the allegation in Complaint Paragraph 6, the credited evidence shows that in late September 2018 Lean was summoned to Terry's office. Terry asked why Lein did not first come to him, before contacting the Union with his pay issues, so Terry could try to solve the problem. Lein replied saying he had the right to speak with his Union representative. Under these circumstances, where Respondent and the Union had a long-standing bargaining relationship, I find that Terry's statement does not constitute a violation. Accordingly, I recommend that Complaint Paragraph 6 be dismissed. Compare *Frank Mashuda Co., Inc.*, 221 NLRB 233, 234 fn. 5 (1975) (no violation where unionized employer expressed its desire that employees bring their complaints to the employer first before going to the union), with *Campbell "66" Express, Inc.*, 238 NLRB 953, 962 (1978) enf. denied on other grounds 609 F.2d 312 (7th Cir. 1979) (violation where employee was threatened with discharge unless he withdrew his grievance and manager admonished him "if you got any more problems you come to me. Don't go to the Union.").

case."); *Choctaw Maid Farms, Inc.*, 308 NLRB 521, 528 (1992) (no violation where the record evidence does not show that anyone was adversely affected by remark made by human resources director). However, I find that Powless' statement to employees that they would no longer be allowed to go home early because somebody had complained about guard mount pay was coercive and a violation of Section 8(a)(1) of the Act. *Shamrock Foods Co.*,369 NLRB No. 5, slip. op. 1 fn. 2, 14 (2020) (manager's statement that employee could no longer leave early because union flyers were distributed constituted a violation of Section 8(a)(1) of the Act).

## IV. ANALYSIS OF THE INFORMATION REQUEST ALLEGATIONS

### 1. Facts

The Complaint alleges that, between October 2018 and May 2019 the Union made four separate information requests, seeking over 21 different items of information, that Respondent either did not provide, or failed to provide in a timely manner. The evidence shows that on October 30, 2018, the Union filed a grievance over Salopek's discharge along with a request for information supporting the grievance. On January 21, 2019, the Union emailed another information request to Respondent. A third information request was emailed to Respondent on February 28, 2019, and a fourth and final information request was emailed to Xcel on May 8, 2019. (JX. 1, JX. 2, JX. 6, JX. 11, JX. 12)

Regarding the specific unfair labor practice allegations, regarding the October 30 information request, Complaint paragraphs 9(a) and 9(f)–9(h) allege that Respondent either did not provide, or failed to provide for a period of 3 months, the following information regarding Salopek: "(i) His personnel file; (ii) A copy of the rule(s), procedure, policy, or requirement that he was accused of violating; (iii) Any document(s) signed by him during the investigation and processing of his discharge; (iv) Copy of any document(s) given him by Respondent relating to his discharge; (v) Any written or taped witness statement(s), including copies of any email communications, related to his discharge; (vi) The written investigation or other record (including but not limited to video evidence) made by or provided to Respondent relating to his discharge from any source, including but not limited to United States government employees and/or representatives; (vii) Any list of witnesses compiled for his discharge; (viii) Record of any prior disciplinary warnings or notifications given to him; and (ix) Anything else especially relevant to his discharge, including communications between Respondent, its managers, employees, and/or U.S. government employees, agencies, and/or contractors regarding his discharge." (GC. 1(bbb)) The General Counsel asserts that the information requested in subparagraphs ii, iii, iv, v, vii, and ix were never provided, and that Respondent delayed providing the information sought in subparagraphs i, vi, and viii for 3 months. (GC. 1(bbb))

As for the information request made on January 21, 2019, Complaint paragraph 9(b) alleges that Respondent failed to provide the following information requested by the Union relating to Salopek: "(i) Any and all documents, including witness statements and/or investigatory reports supporting Respondents stated reason for terminating Salopek's employment: chain of command violation and dishonesty; (ii) Any and all documents, including without limitation, post orders and company policies, defining chain of command violations; (iii) From 2009 to present, any and all documents relating to discipline imposed against employees

other than Salopek for alleged dishonesty and/or chain of command violations and/or weapons mishandling allegations, including without limitation an incident in or around 2013 where Cody Owens allegedly handled a shotgun in an unsafe manner; and (iv) Any and all documents relating to any request by the Government client to Respondent to remove Salopek from the contract and/or a revocation of his clearance/site access." Paragraph 9(c) of the Complaint alleges that, since about February 28, 2019, Respondent failed to provide Respondent with the following information: "Whether, at any time prior to Salopek's discharge in October 2018, the Government client required Xcel to remove Salopek from the contract and/or revoked his clearance or site access." (GC. 1(bbb))

Finally, Complaint paragraph 9(d) alleges that, since May 8, 2019, Respondent has not provided the Union with the following information it requested: (i) "All documents relating to Respondents assertion in its Amended Answer to the Consolidated Complaint and Notice of Hearing that 'Employee Salopek had his security clearance revoked by the Navy, and hence was not, and is not qualified to work at XCEL or for rehire'; (ii) The date and reason(s) stated by the Navy for the alleged revocation in the item above; (iii) The names of Navy personnel having allegedly revoked Salopek's security clearance; (iv) Whether, since Salopek's complaints to the Navy in about July 2018, Respondent has changed its procedures for qualifying officers on range, including without limitation whether the Navy permits Respondent to alter targets with black X's to permit officers to more easily qualify; (v) Whether, from June 2018 to present, Respondent permits its employees to man a rifle post where they lack a valid rifle range qualification; (vi) Any and all documents from Navy personnel Rake and Manson to Respondent from July 2018 to present regarding range qualifications procedures, including without limitation, any documents stating that where an officer lacks a range qualification for a given firearm, the officer is not permitted to work posts that require use of the firearm for which the officer lacks the qualification; (vii) All documents relating to complaints made in or around March 2019 by Officers Kitchen and Coler to Commanding Officer Pulley concerning investigations against Lt. Commander McCright regarding his alleged stalking and other misconduct toward former supervisees; (viii) Whether Officers Kitchen and Coler made the complaints in the paragraph 9(d)(vii) above to Respondent before making them to the Navy; (ix) Whether Officers Kitchen and/or Coler were disciplined for their complaints in paragraphs 9(d)(vii) and/or (viii) above; and (x) Supporting documents, if any, for paragraph 9(d)(ix)."

2. Analysis

The majority of the information request allegations can be dispensed with in short order, as they were made either after the charges were filed in this matter, or after the initial unfair labor practice complaint had issued. It is well established that the Board's procedures do not include pretrial discovery and therefore the Board will generally not find an information request violation when the information sought relates to a pending charge alleging unlawful discrimination. *Saginaw Control & Engineering, Inc.*, 339 NLRB 541, 543–544 (2003); *Pepsi-Cola Bottling Co. of Fayetteville, Inc.*, 315 NLRB 882, 882 (1994). The original charge alleging that Salopek was illegally discharged because of his protected concerted activities was filed on December 12, 2018. (GC. 1(a)) And it is clear that the information sought by the Union in their January 21, 2019 and February 28, 2019 information requests relate directly to the unfair labor practice charge regarding Salopek's discharge which was still pending at the time. And, the

Union's May 8, 2019 information request was made after the initial unfair labor practice complaint had issued alleging Salopek's discharge violated the Act. Indeed, in the May 8, 2019 request the Union asks for documents that would further support the unfair labor practice complaint allegations, or that dealt with Respondent's potential defenses to the allegations. Because the Board does not allow pretrial discovery, I recommend that the allegations contained in paragraphs 9(b), 9(c), and 9(d) of the Complaint be dismissed.

The duty to collectively bargain under Section 8(a)(5) of the Act includes the obligation to supply a union with information that will enable it to perform its duties as the employees' collective-bargaining representative. *Teachers College, Columbia University*, 365 NLRB No. 86, slip op. at 4 (2007), enfd. 902 F.3d 296, 302 (D.C. Cir. 2018) This includes information the union needs to process grievances. Id. Regarding the Union's October 30, 2018 request, the information sought was presumptively relevant as it involved information related to the processing of the grievance involving Salopek's discharge and sought the type of information that the Board generally requires an employer to provide. *Fleming Companies, Inc.*, 332 NLRB 1086, 1086 (2000) (personnel file of discharged employee and work rules); *Public Service Company of New Mexico*, 364 NLRB No. 86, slip. op. at 3 (2016) (employer's memorandum and notes recommending discipline); *HTH Corp.*, 361 NLRB 709, 755 (2014) (prior disciplinary actions); *Stephens Media, LLC*, 356 NLRB 661, 683–684 (2011) (copies of policies employee allegedly violated); *Teamsters Local 89*, 365 NLRB No. 115, slip op. at 11, fn. 11 (2017) (statements); *NTN Bower Corp.*, 356 NLRB 1072, 1139 (2011) (video/audio tapes). Finally, all of the information the Union requested should have been readily available to the Respondent. See, *McCarthy Construction Co.*, 355 NLRB 50, 50 fn. 2 (2010), affd. 355 NLRB 365 (2010) (Violation for 3-month delay in providing union with relevant information as the documents sought should have been readily available to the company). Accordingly, by failing to provide the Union with the information sought in its October 30, 2018 information request, or delaying in providing that information for a period of 3 months, I find that Respondent violated Section 8(a)(1) and (5) of the Act.

## CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The International Union, Security, Police, and Fire Professionals of America, Local 5 (Union) is a labor organization within the meaning of Section 2(5) of the Act.

3. The following employees constitute an appropriate unit for purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All federal contract security officers employed by the Respondent at the Indian Island Naval Magazine in the State of Washington. Excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act.

4. By telling employees they will no longer be allowed to go home early because someone complained about guard mount pay Respondent has violated Section 8(a)(1) of the Act.

5. By discriminating against Mark Salopek because he engaged in protected concerted activities Respondent has violated Section 8(a)(1) of the Act.

6. By failing and refusing to provide the Union with the information it requested, that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of its employees, Respondent has been engaged in unfair labor practices within the meaning of Section 8(a)(5) and 8(a)(1) of the Act.

7. By unreasonably delaying, for a period of three months, in providing the Union with the information it requested, that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of its employees, Respondent has been engaged in unfair labor practices within the meaning of Section 8(a)(5) and 8(a)(1) of the Act.

8. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

## REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative actions designed to effectuate the policies of the Act. Specifically, having found that Respondent violated Section 8(a)(1) of the Act by discharging Mark Salopek, I shall order Respondent to reinstate him and make him whole for any loss of earnings and other benefits suffered as a result of the discrimination against him. If Respondent no longer employs security guards at Indian Island, then it shall offer Salopek reinstatement to a substantially similar position at one of Respondent's next closest locations/job sites.

Respondent shall compensate Mark Salopek for any adverse tax consequences of receiving a lump–sum backpay award in accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas,* 361 NLRB 101 (2014). Respondent shall also compensate him for his search–for–work and interim employment expenses regardless of whether those expenses exceed interim earnings. *King Soopers, Inc.,* 364 NLRB No. 93 (2016). Backpay, search–for–work, and interim employment expenses, shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

In accordance with *AdvoServ of New Jersey, Inc.,* 363 NLRB No. 143 (2016), Respondent shall file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar years. The Regional Director will then assume responsibility for transmission of the report to the Social Security Administration. Additionally, Respondent is ordered to preserve and provide, at a reasonable place designated by the Board or its agents, all payroll records and other relevant records, including an electronic copy of such records if stored

in electronic form, necessary to analyze the amount of backpay due under the terms of the Order, in accordance with *Ferguson Electric Co.*, 335 NLRB 142 (2001).

The Respondent shall be required to expunge from its files any references to the unlawful discharge issued to Mark Salopek, and notify him and the Regional Director of Region 19, in writing, that this has been done and that this unlawful employment action will not be used against him in any way. The Respondent shall also post the attached notice in accordance with *J. Picini Flooring*, 356 NLRB 11 (2010) and *Durham School Services*, 360 NLRB 694 (2014). If Respondent is unable to post the attached notice because it no longer employs security guards at Indian Island, Respondent is also ordered to mail the Notice to all current and former employees who were employed at Indian Island at any time between October 27, 2018 and September 30, 2019. Finally, Respondent is ordered to provide the Union with the relevant information it requested, as outlined herein, that is necessary to the Union's performance of its duties and responsibilities as the exclusive collective-bargaining representative of Respondent's employees.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[42]

ORDER

Respondent Xcel Protective Services, Inc., its officers, agents, successors, and assigns, shall:

1. Cease and desist from

(a) Threatening employees with reprisals because they engaged in activities protected by the Act.

(b) Discharging employees because they engaged in protected, concerted activities.

(c) Refusing to bargain collectively with the Union by refusing or delaying to provide it with requested information that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of Respondent's employees.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act

(a) Promptly provide the Union with all the relevant information it requested relating to Mark Salopek's discharge, including but not limited to: a copy of the rules, procedures, policies, or requirements that he was accused of violating; any documents signed by

---

[42] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

him during the investigation and processing of his discharge; a copy of any documents given him by Respondent relating to his discharge; any written or taped witness statements, including copies of any email communications, related to his discharge; any list of witnesses compiled for his discharge; records of any prior disciplinary warnings or notifications given to him; and anything else especially relevant to his discharge, including communications between Respondent, its managers, employees, and/or U.S. government employees, agencies, and/or contractors regarding his discharge.

(b) Within 14 days from the date of the Board's Order, offer Mark Salopek full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed. If Respondent no longer employs security guards at Indian Island, then it shall offer Salopek reinstatement to a substantially similar position at one of Respondent's next closest locations/job sites.

(c) Make Mark Salopek whole for any loss of earnings and other benefits suffered as a result of the discrimination against him in the manner set forth in the remedy section of this decision.

(d) Compensate Mark Salopek for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

(e) Within 14 days from the date of the Board's Order, remove from its files any reference to the unlawful discharge of Mark Salopek, and within 3 days thereafter, notify him in writing that this has been done and that the unlawful employment action will not be used against him in any way.

(f) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, Social Security payment records, timecards, personnel records and reports, and all other records, including electronic copies of such records if stored in electronic form, necessary to analyze the amount of back pay due under the terms of the Board's Order.

(g) Within 14 days after service by the Region, post at its facility at Indian Island, Washington facility copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 19, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.[43] In addition to physical posting of paper notices, notices shall be distributed

[43] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notices may not be

electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business, closed the facility involved in this proceeding, or no longer employs security guards at Indian Island, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at Indian Island at any time between October 27, 2018 and September 30, 2019..

(h) Within 21 days after service by the Region, file with the Regional Director for Region 19 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply with this order.

Dated, Washington, D.C. December 7, 2020

John T. Giannopoulos
Administrative Law Judge

---

posted until a substantial complement of employees have returned to work. Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if the Respondent customarily communicates with its employees by electronic means, and to the reading of the notice to employees. If this Order is enforced by a judgment of a United States Court of Appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

**APPENDIX**

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE NATIONAL LABOR RELATIONS BOARD
AN AGENCY OF THE UNITED STATES GOVERNMENT

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose a representative to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** tell you that you can no longer leave work early because an employee complained that we were not providing you with a benefit guaranteed by the collective-bargaining agreement.

**WE WILL NOT** discharge or otherwise discriminate against you because you have engaged in protected concerted activities, by complaining with your coworkers about your working conditions, including weapon qualifications, and speaking with third parties about these issues.

**WE WILL NOT** refuse to bargain collectively with the International Union, Security, Police, and Fire Professionals of America, Local 5 ("Union"), by refusing or delaying to provide it with requested information that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of our employees.

**WE WILL NOT** in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

**WE WILL** promptly provide the Union with all the relevant information it requested relating to Mark Salopek's discharge.

**WE WILL,** within 14 days from the date of the Board's Order, offer Mark Salopek full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed. If we no longer employ security guards at Indian Island, then **WE WILL** offer Mark Salopek reinstatement to a substantially similar position at one of our next closest locations/job sites.

**WE WILL** make Mark Salopek whole for any loss of earnings and other benefits resulting from the discrimination against him, less any net interim earnings, plus interest, and **WE WILL** also make him whole for reasonable search-for-work and interim employment expenses, plus interest.

**WE WILL** compensate Mark Salopek for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and we will file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

**WE WILL**, within 14 days from the date of the Board's Order, remove from our files any references to the unlawful discharge issued to Mark Salopek, and **WE WILL**, within 3 days thereafter, notify him in writing that this has been done and that this unlawful employment action will not be used against him in any way.

Xcel Protective Services, Inc.
(Employer)

Dated ____________________ By ______________________________________
(Representative) (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov

915 2nd Avenue, Room 2948; Seattle WA 98714-1078
(206) 220-6300, Hours: 8:15 a.m. to 4:45 p.m.

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/19-CA-232786 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER (206) 220-6340.

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Xcel Protective Services, Inc. *and* International Union, Security, Police, and Fire Professionals of America, Local 5.** Cases 19–CA–232786, 19–CA–233141, 19–CA–234438, and 19–CA–237861

September 8, 2022

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS RING AND WILCOX

On December 7, 2020, Administrative Law Judge John T. Giannopoulos issued the attached decision. The Respondent filed exceptions and a supporting brief, and the Acting General Counsel and the Charging Party filed answering briefs. The Charging Party filed cross-exceptions and a supporting brief, and the Respondent filed an answering brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions and to adopt the recommended Order as modified and set forth in full below.[2]

The case before us includes allegations that the Respondent, a military contractor, violated Section 8(a)(1) of the National Labor Relations Act by retaliating against two of its security officer employees, Mark Salopek and Steve Mullen, for raising safety concerns about the Respondent's refusal to follow the Navy's weapons-qualification practices. We adopt the judge's finding, for the reasons stated in his decision, that the Respondent did not unlawfully constructively discharge Mullen. As discussed below, and contrary to our dissenting colleague, we also adopt the judge's finding that the Respondent unlawfully discharged Salopek.

I. FACTS RELEVANT TO SALOPEK'S DISCHARGE

Until September 2019, the Respondent was a contractor for the United States Navy providing armed security services at Naval Magazine Indian Island, a naval base, port, and munitions storage facility in Puget Sound near Seattle, Washington. The base is the largest of its kind on the West Coast, and access is tightly regulated. The Union represented a unit of about 50 of the Respondent's security officers, armed personnel tasked with staffing and monitoring key checkpoints around the base.

Security officers on patrol carried a Navy-issued pistol and, depending on their shift assignment, a shotgun or assault rifle. As a condition of employment, the Navy required the security officers to pass a shooting test for each type of weapon every 6 months at a Navy-approved shooting range using weapons, ammunition, and targets provided by the Navy. Security officers on guard duty were prohibited from carrying the weapon(s) for which they failed to qualify. The Navy relied on the Respondent's managers to properly administer the tests and certify their successful completion. However, in spite of Navy requirements, the Respondent at times allowed security officers to qualify on unapproved ranges with unapproved weapons and ammunition. On at least one weapons-qualification form, the Respondent incorrectly certified that it had conformed to the Navy's testing requirements.

Salopek began working for the Respondent as a security officer in 2013. In 2016–2017, he learned that the Respondent was conducting shooting tests at unapproved ranges, including gravel pits and the backyard of one security officer's house. While serving as a line safety officer/line coach monitoring shooting tests at an approved shooting range around February 2018, Salopek saw three security officers fail multiple shooting tests. Gerald Powless, the Respondent's shooting instructor, then altered the targets to make them easier to see, and the security officers passed their tests. Salopek was concerned that such potential breaches of protocol could compromise safety at

[1] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

There are no exceptions to the judge's findings that the Respondent violated Sec. 8(a)(1) of the Act by telling employees that they would no longer be allowed to go home early because someone complained about guard mount pay, and Sec. 8(a)(5) and (1) by failing to provide the Union with information it requested on October 30, 2018, or delaying in providing that information for 3 months. There are also no exceptions to the judge's dismissal of allegations that the Respondent violated Sec. 8(a)(3) and (1) by retaliating against employee Daniel Lein because he complained about guard mount pay, and Sec. 8(a)(5) and (1) by failing to provide information requested by the Union on January 21, February 28, and May 8, 2019.

[2] We shall modify the judge's recommended Order in accordance with our decision in *Cascades Containerboard Packaging–Niagara*, 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021), and to conform to the Board's standard remedial language for the violations found. Because the uncontradicted record evidence shows that the Respondent no longer provides contract services at the facility involved in these proceedings, we shall order it to mail copies of the notice to unit employees employed by the Respondent at any time from October 27, 2018, until the date the notices are mailed. See, e.g., *Strategic Resources, Inc.*, 364 NLRB No. 42, slip op. at 2 (2016); *Bergensons Property Services*, 338 NLRB 883, 883 (2003). We shall substitute a new notice to conform to the Order as modified.

the base and spoke about it to coworkers, including Mullen, who shared his concerns.

On March 9, 2018,[3] Salopek informed John Morgan, the Respondent's CEO, of the Respondent's use of unapproved ranges and altered targets. Several days later, Morgan told Salopek that he had instructed the Respondent's operations manager to follow all proper range policies and procedures. However, in mid-May, probationary employee Daniel Lein failed one of his shooting tests, and Powless proposed that Lein retake the test later that month at an unapproved range using an unapproved weapon. Lein asked coworkers, including Salopek and Mullen, whether this was the Respondent's standard practice. Salopek shared his concerns about the Respondent's weapons-qualification practices with Lein, who ultimately declined Powless' offer based on his belief that the Navy had not authorized tests under those conditions.

After speaking with Mullen and another employee, Jacob Schryver, Salopek emailed a letter to Morgan on June 28. In the letter, Salopek recounted several examples of the Respondent failing to follow shooting test protocols and offered several reasons why he was contacting Morgan directly, starting with the following (emphasis in original):

> 1. First and foremost someone could have gotten hurt from a ricochet, or a twisted ankle, or tripping and accidental discharge. Secondly any number [of] things could place this company in civil liability.
>
> 2. We believe we <u>may</u> have [security] officers that *may* be unable to safely fire their weapons accurately and handle them properly in the event we have a critical incident on the base, especially at the ECP (Entry Control Point).

Morgan replied the next day, stating that

> I read the first part of your letter. So much was misinterpreted that I don't know where to begin. I will work with [operations manager Michael Terry] to see what we need to do. It's unfortunate the message was confused, it was our intent to include your talent [in] training especially compliance but it seems there is a major disconnect between you[] and your Captain. I don't know if you realize it but that man has stepped up for you on many occasions just as you have for this company. We need to fix this relationship. I will be in touch.

Salopek was dissatisfied with Morgan's response, and he, Mullen, and Lein resolved to raise their concerns to the base commanding officer, Rocky Pulley.

On July 8, Salopek, Mullen, and Lein informed Commander Pulley of the Respondent's use of unapproved shooting ranges and ammunition, as well as their safety concerns. Commander Pulley asked them to notify the Navy's installation security officer, Mike Jones. The next day, Mullen emailed Jones on behalf of himself, Salopek, Lein, and another security officer, stating that they were "coming forward with a safety [i]ssue concerning Weapons qualifications." The email mentioned several incidents in which the Respondent used unapproved ranges, weapons, and altered targets to help security officers pass their shooting tests. On one test day, according to the email, a security officer's "ability to effectively handle, and manipulate [an assault rifle and a shotgun] came into question," and the security officer could not qualify on the assault rifle even after Powless altered the target. That same day, according to Salopek, another security officer "struggled horribly," "should be taken off the range because of unsafe handling with the shotgun," and failed assault rifle and shotgun tests. The email further alleged that these security officers passed rescheduled shooting tests shortly thereafter using altered targets or unauthorized ranges and were allowed to continue their security patrols at the base. The email concluded that "[w]e feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents," noting that "[t]his is an abridged version of what is going on." Jones forwarded the email to Richard Rake, a Navy civilian employee who helped oversee the Respondent's contract. Rake forwarded the email to operations manager Terry, who then forwarded it to CEO Morgan. Neither Jones nor any other Navy representative responded to the email.

Rake and Steve Manson, the Navy's performance assessment representative, investigated and ultimately found no merit to these allegations. They recommended in a July 25 report that the Respondent remove Salopek from his position. In response to what he perceived to be bias in Rake and Manson's investigation, Salopek filed a complaint with the Navy's Office of the Inspector General (OIG) on August 15. He attached a letter to the complaint in which he discussed the Respondent's unauthorized range practices and expressed his concerns. He "doubted [one security officer's] ability to defend herself; her coworkers and especially with the risk of a public park directly across the street from the Main Gate [of the base]." He maintained that the Respondent's use of gravel pits for shooting tests "is unsafe [due to the possibility] of ricochets, it's against [Navy] Policy, accidents from an unimproved range like tripping and falling, and no medical [personnel] present," noting one security officer's

[3] The following dates are in 2018.

admission that a ricochet had struck him in the chest at a gravel pit shooting range. Salopek also recounted a conversation he had with Rake and Manson as part of the investigation, asserting that one security officer "was never given the eight hours of safety and familiarization, and that she has a right to defend herself, we have a right to be confident she can defend us, and the public has a right to be safe." Salopek mentioned that he told Rake and Manson that "gravel pits are dangerous," and Rake "agreed immediately and stated he would never shoot at a gravel pit because of . . . 'ricochets.'" In a September 11 email, the OIG acknowledged Salopek's "concerns regarding [the Respondent's] weapons qualification methods, documentation, and processes" but "determined this case is not appropriate for an IG investigation." The OIG further stated that it had referred Salopek's allegations to Navy leadership at the Indian Island base, including the commanding officer.

As discussed at length in the judge's decision, the Respondent and Navy leadership both reacted unfavorably to Salopek's allegations. In late October, Rake again recommended that the Respondent remove Salopek from his position based on Rake's view that the allegations were false. The Respondent discharged Salopek on October 27, citing his alleged dishonesty, violation of the Navy chain of command, and lack of candor in response to the investigation of his actions.

## II. ANALYSIS

The judge found, and we agree, that Salopek's discharge was unlawful under *Wright Line*.[4] Under *Wright Line*, the General Counsel has the initial burden of establishing that an employee's union or other protected concerted activity was a motivating factor in the employer's adverse employment action against the employee. The General Counsel sustains this burden by proving that (1) the employee engaged in union or other protected concerted activity, (2) the employer had knowledge of that activity, and (3) the employer harbored animus against union or other protected concerted activity.[5] Id. at 1089. Once the General Counsel sustains her initial burden, the burden shifts to the employer to demonstrate that it would have taken the same action even in the absence of the union or other protected concerted activity. Id.

We agree with the judge that the General Counsel sustained her initial burden under *Wright Line*, and that the Respondent failed to sustain its defense burden. The judge found, and the Respondent does not dispute, that Salopek engaged in protected concerted activity by raising safety concerns about the Respondent's weapons-qualification practices to Navy leadership and that the Respondent had knowledge of that activity. Further, we agree with the judge, for the reasons stated in his decision, that the Respondent acted with significant animus against Salopek's protected concerted activity, and we find that the Respondent's exceptions to the judge's animus findings are without merit. We likewise find no merit in the Respondent's exceptions to the judge's finding that the Respondent failed to establish that it would have discharged Salopek even absent his protected concerted activity based on his conduct during the investigation into his actions, his failure to follow the Navy's chain of command, and Rake's recommendation that the Respondent remove him from the contract. We therefore affirm the judge's finding that the Respondent violated Section 8(a)(1) by discharging Salopek.

Our dissenting colleague first suggests that Salopek did not engage in protected activity by raising group safety concerns with Navy leadership because, in his view, it is questionable whether the purpose of Salopek's communications was for "mutual aid or protection" within the meaning of Section 7.[6] Further, relying on *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464 (1953), and *Mountain Shadows Golf Resort*, 330 NLRB 1238 (2000),[7] our dissenting colleague argues that even assuming Salopek's communications were initially protected under Section 7, they did not retain the protection of the Act because Salopek failed to adequately apprise the Navy of the existence of an ongoing labor dispute related to employees' terms and conditions of

[4] We note that all parties agree that this allegation should be considered under *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399–403 (1983), and we therefore find that standard appropriate here.

Member Wilcox further notes that because any such analysis would not warrant a different result, she finds it unnecessary to consider whether *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964), should apply to the factual circumstances presented here.

[5] In *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 1, 6 (2019), the Board stated the view that "the evidence of animus must support finding that a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee." Chairman McFerran adheres to her views expressed in *Tschiggfrie* that the "clarifications" that decision purported to make to the General Counsel's initial *Wright Line* burden were unnecessary, as the relevant "clarifying" concepts were already embedded in the *Wright Line* framework and reflected in the Board's body of *Wright Line* cases. As noted in prior decisions, Member Wilcox agrees with the Chairman's concurring opinion in *Tschiggfrie*.

[6] Our dissenting colleague does not dispute that Salopek engaged in concerted activity.

[7] As stated in *Mountain Shadows*, "the Board has held that employee communications to third parties in an effort to obtain their support are protected where the communication indicated it is related to an ongoing dispute between the employees and the employers and the communication is not so disloyal, reckless or maliciously untrue as to lose the Act's protection." Id. at 1240.

employment. We disagree with our colleague's arguments, as they are procedurally improper, disregard facts supporting the judge's finding, and take an overly narrow view of Section 7's "mutual aid or protection" clause and the manner in which an employee must disclose the existence of a labor dispute when appealing to a third party for support.

To begin, unlike our dissenting colleague, the Respondent makes no argument in its exceptions or supporting brief that Salopek's communications with Navy leadership were not for the purpose of mutual aid or protection or that Salopek lost the protection of the Act by failing to disclose the existence of an ongoing labor dispute between security officers and the Respondent.[8] Under Section 102.46(a)(1)(ii) and (f) of the Board's Rules and Regulations, "[a]ny exception to a ruling, finding, conclusion, or recommendation which is not specifically urged will be deemed to have been waived" and "[m]atters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding." Thus, our dissenting colleague's argument is not properly before the Board.[9] See, e.g., *Lou's Transport, Inc. v. NLRB*, 644 Fed.Appx. 690, 694-695 (6th Cir. 2016) (finding that employer's failure to except to judge's finding that employee did not engage in protected concerted activity waived argument); *MEI-GSR Holdings, LLC d/b/a Grand Sierra Resort & Casino/HG Staffing, LLC*, 365 NLRB No. 76, slip op. at 2 (2017) (finding respondent waived argument raised by dissenting Board member, where party failed to raise argument on exception).

Moreover, even assuming the Respondent had properly raised these arguments, we would find that they lack merit. First, Salopek's communications with Navy leadership were for the purpose of "mutual aid or protection" because they concerned the security officers' safety in their workplace. Salopek did not merely criticize the Respondent's weapons-qualification practices or raise concerns regarding potential consequences the Respondent might face because of those practices, as the dissent contends. Rather, as set forth above, in a series of communications, Salopek directly and explicitly informed Navy leadership—which prescribed the security officers' weapons-qualification requirements and had significant authority over these particular terms and conditions of employment—that he and other security officers believed that the Respondent had failed to comply with the Navy contract, and that this compromised their safety both at the range and while on guard duty. It required no inferential leap for Navy leadership to understand that Salopek's references to weapons-qualification practices and other security officers' inability to operate certain weapons, particularly in the event of a base emergency, pertained to concerns about the risk of workplace injuries by, for example, improperly-qualified coworkers misfiring their weapons or failing to neutralize a threat. On this record, it is clear that Salopek requested the Navy's assistance in changing what he and others perceived to be unsafe working conditions at the base. See, e.g., *North West Rural Electric Cooperative*, 366 NLRB No. 132, slip op. at 12-13, 17 (2018) (public Facebook posts criticizing employer's safety practices and training and advocating for better accident prevention were protected because their purpose was to "seek and provide mutual support toward group action" encouraging the employer and others to improve working conditions); *Riverboat Services of Indiana, Inc.*, 345 NLRB 1286, 1294 (2005) (entreaties for Coast Guard to upgrade licensing requirements for riverboat engineers were protected in part due to object of ensuring employee and passenger safety).

We also find misplaced the dissent's reliance on the fact that Salopek presented Navy leadership with certain concerns that were not directly related to employees' terms and conditions of employment. Contrary to the dissent, Salopek's isolated references to a public park across the street from the base's main gate do not detract from the clear concerns about employee safety he communicated. Likewise, they certainly do not diminish the Act's protection of those concerns. See, e.g., *Springfield Air Center*, 311 NLRB 1151, 1155 (1993) (employees "acted together for a protected purpose concerning both their conditions and terms of employment and for the protection of [t]he public over a perceived unlawful and unsafe violation of [federal] regulations"). For that reason, *Five Star Transportation, Inc.*, 349 NLRB 42, 45 (2007), enfd. 522 F.3d 46 (1st Cir. 2008), cited by our colleague, is readily

[8] The Respondent instead argues that Salopek lost the protection of the Act by making statements with reckless disregard for their truth or falsity. As explained above, because we adopt the judge's finding that the core issues Salopek raised with Navy leadership were true, we find no merit in the Respondent's arguments to the contrary. We further note that our dissenting colleague does not contend that Salopek's statements were maliciously false.

[9] We reject our colleague's apparent suggestion that it is an appropriate exercise of his discretion to freely rely on legal theories not raised by the Respondent. Such discretion should be based upon a party having properly raised the underlying issue, which the Respondent failed to do here. Indeed, the decisions our colleague relies on recognize that resolving an issue on a theory different from that raised by a party is limited to situations where the party properly raises the issue to the adjudicating body. See *Kamen v. Kemper Financial Services*, 500 U.S. 90, 99 (1991) ("*When an issue or claim is properly before the court*, the court is not limited to the particular legal theories advanced by the parties . . . . (emphasis added)); *Electrical Workers IBEW Local 58 (Paramount Industries.)*, 365 NLRB No. 30, slip op. at 4 fn. 17 (2017) (finding violation on legal theory different from that of judge or General Counsel where issue was properly raised in complaint allegations).

distinguishable. There, the Board found that employees' letters to a client were not protected because they raised only nonspecific safety concerns on behalf of the general public with no apparent relationship to employees' terms and conditions of employment. Id. at 44-45. Here, as discussed, Salopek and other security officers raised specific employee safety concerns with the Navy that directly affected their terms and conditions of employment.[10] We accordingly reject our colleague's suggestion that Salopek's communications were not for mutual aid or protection.

We similarly reject our dissenting colleague's argument that, under the first prong of *Mountain Shadows*, supra, Salopek needed to provide Navy leadership additional information to establish a nexus between his concerns about the Respondent's weapons-qualification practices and an ongoing labor dispute.[11] As described above, Salopek put Navy leadership on sufficient notice of the security officers' ongoing labor dispute with the Respondent by describing the negative effect the Respondent's weapons-qualification practices had on the officers' safety on the job. In arguing that Salopek's communications with Navy leadership failed to establish the necessary nexus to employees' labor dispute with the Respondent, our dissenting colleague notes that the judge found that Salopek's initial communication with Commander Pulley included vague concerns about a "safety issue," and that Salopek did not tell Commander Pulley that security officers had already raised their concerns to the Respondent. However, the dissent's limited reliance on Salopek's initial conversation with Commander Pulley is misplaced, as Salopek's actions "must be viewed 'in [their] entirety and in context,' in order to determine whether there is a nexus to terms and conditions of employment." See *Five Star Transportation, Inc.*, supra at 45. To the extent the concerns expressed by Salopek in his initial conversation with Commander Pulley were vague, Salopek's subsequent communications with Navy leadership and the dissemination of that information to Commander Pulley and others cured any ambiguity and established a clear nexus to employees' terms and conditions of employment and their dispute with the Respondent. In addition, contrary to our colleague's argument, Salopek did not need to tell Commander Pulley that he and others had already taken their concerns to the Respondent for that conversation to be protected or to establish the existence of a labor dispute. See generally *Arlington Electric*, 332 NLRB 845, 846 (2000) (no requirement that employee first raise issue with employer to establish a labor dispute).[12] Accordingly, we find that Salopek's communications with the Navy satisfied the first prong of *Mountain Shadows*.[13]

In sum, we agree with the judge that Salopek engaged in protected concerted activity and retained the protection of the Act at all relevant times. We further find that Salopek's protected concerted activity was a motivating factor in his discharge, and the Respondent failed to establish that it would have discharged him in the absence of his protected concerted activity. The Respondent's exceptions are unavailing, and our dissenting colleague has otherwise presented no basis for reversal. For the foregoing reasons, we affirm the judge's finding that the Respondent violated Section 8(a)(1) of the Act by discharging Salopek.

---

[10] For the same reason, our dissenting colleague's contention that Salopek was solely acting as a whistleblower is unfounded. While Salopek and his coworkers raised a range of concerns about the Respondent's weapons-qualification practices, they consistently emphasized their personal concerns about workplace safety, bringing their communications squarely within the ambit of Sec. 7.

[11] Because the Respondent did not raise any issue regarding whether Salopek sufficiently disclosed the existence of a labor dispute on exception, we limit our response here to the arguments raised by our dissenting colleague. In this regard, we note that our dissenting colleague does not argue that the General Counsel bears the burden of showing that an employee making an appeal to a third party indicated that there was an ongoing labor dispute. Like our dissenting colleague, we do not address this issue, which remains pending before the Board on remand. See *Oncor Electric Delivery Co. LLC v. NLRB*, 887 F.3d 488 (D.C. Cir. 2018).

[12] We find no merit in our dissenting colleague's apparent suggestion that the general principle for which we cite *Arlington Electric* was dependent upon the specific facts in that case.

[13] We agree with our dissenting colleague that, under the first prong of *Mountain Shadows*, employees must provide enough information about the existence of a labor dispute to allow third parties to "filter the information critically" when they appeal to those third parties for support. *Sierra Publishing Co. v. NLRB*, 889 F.2d 210, 217 (9th Cir. 1989). But we emphasize that this requirement is not onerous and does not require employees to use particular words or phrases. While our dissenting colleague acknowledges that Board law did not require Salopek to file a grievance or otherwise avail himself of the Union's assistance in pursuing his safety concerns, Board law similarly provides no support for our colleague's suggestion that Salopek's failure to reference the union contract or "the traditional apparatus of labor disputes" has any bearing on either the existence of a labor dispute or whether Salopek provided sufficient context regarding his dispute with the Respondent to apprise Navy leadership of that dispute. Our colleague's formalistic view of the first prong of *Mountain Shadows* runs the risk of impairing employees' ability to exercise their Sec. 7 rights, because if employees "are not permitted to address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers' undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision." Id. Here, Salopek and his coworkers provided sufficient context regarding their dispute with the Respondent for the Navy to filter their complaints critically.

We note again that neither the Respondent nor our dissenting colleague argues that the second prong of *Mountain Shadows* is not satisfied, and we affirm the judge's findings that Salopek's statements were not disloyal or recklessly or maliciously untrue.

ORDER

The National Labor Relations Board orders that the Respondent, Xcel Protective Services, Inc., Seattle, Washington, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Threatening employees with reprisals if they engage in protected concerted activities.

(b) Discharging employees because they engage in protected concerted activities.

(c) Refusing to bargain collectively with International Union, Security, Police, and Fire Professionals of America, Local 5 (the Union) by failing or refusing to furnish it with requested information, or unreasonably delaying in furnishing it with requested information, that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the employees in the following appropriate unit:

> All federal contract security officers employed by the Company at the Indian Island Naval Magazine in the State of Washington. Excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Provide to the Union in a timely manner the information requested by the Union on October 30, 2018, to the extent that it has not already done so.

(b) Within 14 days from the date of this Order, offer Mark Salopek full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(c) Make Mark Salopek whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, in the manner set forth in the remedy section of the judge's decision.

(d) Compensate Mark Salopek for any adverse tax consequences of receiving a lump-sum backpay award, and, within 21 days of the date the amount of backpay is fixed by agreement or Board order, file with the Regional Director for Region 19 a report allocating the backpay award to the appropriate calendar year(s).

(e) File with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Mark Salopek's corresponding W-2 form(s) reflecting the backpay award.

(f) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge of Mark Salopek, and within 3 days thereafter, notify him in writing that this has been done and that the discharge will not be used against him in any way.

(g) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h) Within 14 days after service by the Region, duplicate and mail, at the Respondent's own expense, a copy of the attached notice marked "Appendix"[14] to the Union and to all former bargaining unit employees employed by the Respondent at any time since October 27, 2018. The notice shall be mailed to the last known address of each of the employees after being signed by the Respondent's authorized representative. In addition to mailing paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, or other electronic means, if the Respondent customarily communicated with its former bargaining unit employees by such means.

(i) Within 21 days after service by the Region, file with the Regional Director for Region 19 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. September 8, 2022

Lauren McFerran, Chairman

Gwynne A. Wilcox, Member

[14] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Mailed by Order of the National Labor Relations Board" shall read "Mailed Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

(SEAL)        NATIONAL LABOR RELATIONS BOARD

MEMBER RING, dissenting in part.

Mark Salopek, a guard employed by Xcel Protective Services (Respondent or Xcel) at a United States Navy ammunitions installation, believed that the Respondent was violating Navy regulations by letting guards complete required weapons-qualification testing at unauthorized sites, using unauthorized weapons and ammunition, and shooting at improperly altered targets. He also believed that at least one report documenting weapons-qualification testing contained a false statement. Salopek was troubled by these practices, and he discussed his concerns with fellow guards and communicated them to the Respondent. Dissatisfied with the response he received, Salopek decided to present his concerns directly to the commanding officer at the Navy installation. During his interactions with the Navy, Salopek disparaged Xcel's weapons-qualification practices, broadly criticizing the Respondent for violating Navy regulations and accusing the Respondent of committing illegal conduct, falsifying records, and engaging in a cover up. Although Salopek also vaguely referred to safety concerns, he never indicated to the Navy that Xcel's weapons-qualification practices posed a threat to the guards' safety. The Respondent subsequently discharged Salopek for violating its chain of command by taking these disparaging criticisms to the Navy.

The National Labor Relations Act (the Act) gives employees the right, among others, to engage in concerted activities for the purpose of mutual aid or protection, and such activities can include appeals to third parties for support. The Act also recognizes employers' right to discharge employees "for cause," and disloyalty is one such cause. Both of these rights may be implicated when employees concertedly disparage their employer to a third party to gain support in an ongoing labor dispute, and the employer discharges the employees for disloyalty. The Supreme Court addressed this situation in *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464 (1952), and based on *Jefferson Standard*, the Board set forth a framework for dealing with these types of cases

in *Mountain Shadows Golf Resort*, 330 NLRB 1238 (2000). Under the *Mountain Shadows* framework, employees' otherwise-protected disparagement of their employer, directed to a third party, loses the Act's protection if the communication fails to indicate to the third party that it is related to an ongoing labor dispute between the employer and employees.[1]

The reason for this requirement is plain. As the Board and courts have emphasized, without such a disclosure the third party will not have the information it needs to critically filter the employees' seemingly disloyal conduct. To put it colloquially, the third party must be able to put the disparaging things the employees are saying about their employer in context, understanding that the employees have an axe to grind with their employer over the terms and conditions of their employment.

My colleagues adopt the judge's finding that Salopek was protected by the Act during his interactions with the Navy. On this basis, they agree with the judge that the Respondent violated the Act by discharging Salopek because of that activity. In my view, it is questionable whether those interactions, although concerted, were undertaken for the purpose of mutual aid or protection, and therefore whether Salopek was protected by Section 7 as a threshold matter. But even assuming he was, Salopek did not retain the Act's protection because his communications to the Navy did not indicate that the criticisms of the Respondent's weapons-qualification practices were related to an ongoing dispute with the Respondent over the guards' working conditions. Salopek lost the protection of the Act—if he ever had it to begin with—under the requirements of *Jefferson Standard* and *Mountain Shadows*. Accordingly, his discharge did not violate the Act, and I dissent from my colleagues' contrary conclusion.[2] Whether it might have violated a whistleblower law is another matter, and one over which the Board has no jurisdiction.

Facts and Background

The Respondent, a security services contractor, provided security at Naval Magazine Indian Island (Indian

---

[1] By "otherwise-protected disparagement," I mean that the threshold requirements for Sec. 7 protection are satisfied. That is, in disparaging their employer to a third party, the employee or employees doing so are engaged in either union activity or concerted activity for the purpose of mutual aid or protection. If the threshold requirements for protection are not satisfied, the employee or employees are unprotected regardless of whether the disparagement would retain protection under *Jefferson Standard* and *Mountain Shadows*. In those circumstances, there would be no Sec. 7 protection *to* retain.

[2] In all other respects, I join my colleagues' decision.

The majority observes that the Respondent has not advanced the arguments I rely on and therefore has waived them. Be that as it may, the Respondent's theory of the case does not constrain me. An appellate

court, and by extension an appellate-court-like administrative agency such as the NLRB, "is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Financial Services*, 500 U.S. 90, 99 (1991). Moreover, "[t]he Board, with court approval, has repeatedly found violations for different reasons and on different *theories* from those of administrative law judges or the General Counsel, even in the absence of exceptions . . . ." *Electrical Workers IBEW Local 58 (Paramount Industries)*, 365 NLRB No. 30, slip op. at 4 fn. 17 (2017) (collecting cases) (emphasis in original). By parity of reasoning, and consistent with *Kamen*, the Board should be able to dismiss alleged violations for different reasons and on different theories from those advanced by respondents.

Island), the only deep-water naval ammunitions port on the West Coast. The Respondent's guards, who patrolled Indian Island and manned security checkpoints, were armed with weapons and ammunition provided by the United States Navy. Under Navy regulations, guards were required to qualify every 6 months on several different firearms at Navy-approved shooting ranges, using Navy-authorized targets, weapons, and ammunition.[3] Two failed weapons-qualification tests resulted in a guard's removal from the contract. Xcel Lieutenant Gerald Powless was responsible for administering weapons-qualification tests and certifying guards' successful completion.

Mark Salopek worked for the Respondent as a guard at Indian Island from May 2013 until his discharge in October 2018. Salopek testified that beginning around February 2018, he observed Powless altering targets after guards failed a weapons-qualification test, and the guards then passing the test using the altered targets. Salopek further testified that Powless qualified guards using privately-owned, unauthorized weapons at unauthorized shooting ranges, including gravel pits. Salopek testified that he believed these practices were unsafe and contrary to Navy regulations. Salopek discussed the Respondent's weapons-qualification practices with coworkers, including guard Steve Mullen. On March 9, 2018, Salopek reported these practices to the Respondent's Chief Executive Officer John Morgan, who promised to address them. Guard Daniel Lein testified that in May 2018, he and another newly-hired guard failed their weapons-qualification tests, but then qualified a few weeks later at an unauthorized range with unauthorized weapons. Lein testified that he discussed this with Salopek and other guards.

On June 28, 2018, Salopek sent an email to Morgan about the Respondent's weapons-qualification practices. The judge found that in this email, Salopek raised seven concerns:

> (1) someone could get hurt and the company could potentially be liable; (2) guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base; (3) the practices violated the Navy's "OPNAV" safety and operating procedures and ethics; (4) if discovered by the Navy, or an Inspector General complaint was made, the consequences could be "catastrophic" for the company and tarnish the company's name as well the names of Respondent's guards; (5) Xcel's rating with the government could be affected; (6) criminal actions may have occurred; and (7) violations of State law may have happened which could jeopardize the company's ability to conduct business and the Navy's reputation.

Morgan responded to the email, but Salopek was dissatisfied with his response. Although the Respondent's employees were represented by a union and covered by a collective-bargaining agreement at the time, nothing in the record indicates that Salopek consulted with the Union or filed a grievance over the weapons-qualification practices.

Instead, on July 8, Salopek, Mullen, and Lein took their complaint to Commander Rocky Pulley, the Navy's commanding officer at Indian Island. No party disputes the judge's brief findings concerning this meeting. The three guards told Pulley they had a "safety issue," but they were "vague regarding the exact issue." After a few minutes "going back and forth with generalities," the guards told Pulley "about the gravel pit ranges using nonmilitary weapons and personal ammunition for qualification shoots."

The testimony of Salopek, Mullen, and Lein concerning the meeting with Pulley supplements the judge's terse findings. Salopek testified that the three advised Pulley that they "were planning on coming forward with a concern of safety to the Inspector General." Salopek explained that they told Pulley the concern "involved alternate sites ranges [and] the alteration of targets," and they also told him that "the July 7th . . . range sheet is falsified. They weren't at Bangor.[4] They were at a gravel pit." Mullen similarly testified that the three told Pulley they "had a safety concern," but he conceded that "[w]e were vague on what [it] was . . . [w]e were just, you know, wanting to get some advice, you know, how to . . . pursue this." Mullen explained that they "told [Pulley] about the gravel pit ranges with – with non-military weapons, non-military ammunition." Lein testified that Salopek told Pulley "we have a big safety issue" and that Salopek "was trying to get direction on how to go about fixing it." Lein further testified that Salopek explained to Pulley that "we've had unauthorized weapon shoots. We have people that are not qualified that are standing post. And we have a public park across the street, which is a big concern." Pulley instructed the guards to email Navy Installation Security Officer Mike Jones.

On July 9, Mullen sent an email to Jones stating that several guards, including Salopek, were "coming forward with a safety [i]ssue concerning [w]eapons' qualifications." Salopek reviewed Mullen's email before it was sent. The email outlined specific instances of the Respondent's weapons-qualification practices, including the

[3] The guards had to qualify on the Beretta nine-millimeter pistol, the Mossberg M500 12-gauge pump-action shotgun, and the M-4 assault rifle.

[4] One of the approved shooting ranges for weapons-qualification testing was at Naval Base Kitsap in Bangor, Washington, about 30 miles south of Indian Island.

use of unauthorized ranges and weapons, altered targets, and guards failing weapons-qualification tests. Mullen reported that Salopek contacted CEO Morgan, who promised "everything would be conducted according to procedure." Mullen concluded: "We feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents. Mr. Morgan [t]he CEO of Xcel has been given a detailed memo of these practices. Now it seems that they are trying to cover this up."

On October 27, 2018, the Respondent discharged Salopek for dishonesty and violation of the chain of command by taking his criticisms to the Navy instead of exhausting internal channels. The Respondent asserted that Salopek's criticisms were false and could get it into a "lot of trouble."

Applying *Jefferson Standard*, the judge pertinently found that Salopek's complaints made to Pulley and (via Mullen) to Jones "related directly to the guards' working conditions," and nothing in those complaints was so disloyal as to lose the protection of the Act. The judge found that in complaining to the Navy, Salopek wanted to pressure the Respondent to change its weapons-qualification practices to comport with Navy regulations, thereby improving guard safety. The judge further found that the core issues raised by Salopek to the Respondent and the Navy were in fact true, a finding that was contrary to the conclusions the Navy reached based on an internal investigation of the matter.

Excepting, the Respondent asserts that Salopek was not protected by the Act in his interactions with the Navy. For the following reasons, I agree with the Respondent.

Analysis

1. The legal framework

Under Section 7 of the Act, employees have a protected right to engage in "concerted activities for the purpose of . . . mutual aid or protection." Concerted activity is undertaken for the purpose of mutual aid or protection where employees are seeking to "improve terms and conditions of employment or otherwise improve their lot as employees." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). And as the Court held in *Eastex*, employees exercise their right to engage in concerted activity for mutual aid or protection when they concertedly seek to "improve their lot as employees through channels outside the immediate employee-employer relationship." Id.

Where employees disparage their employer to a third party, however, the foregoing principles are necessary but not sufficient to the analysis. Even if employees, when disparaging their employer to a third party, are acting concertedly and for mutual aid or protection, they may still be unprotected by the Act. The leading case in this area is, of course, the Supreme Court's decision in *Jefferson Standard*, supra. Under Section 10(c) of the Act, the Court explained, the Board may not require an employer to reinstate an employee who has been "suspended or discharged for cause," and "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer." The Act, said the Court, "seeks to strengthen, rather than weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise." 346 U.S. at 472.

*Jefferson Standard* arose from a union's efforts to secure an existing, favorable arbitration provision in a successor collective-bargaining agreement with a television station. 346 U.S. at 466–467. Without controversy, the union first picketed outside the station, displaying placards and distributing handbills that named the union as the representative of the station's employees, charged the employer with unfairness, and emphasized the employer's refusal to renew the arbitration provision. Id. at 467. Later, however, the union distributed new handbills, which "made no reference to the union, a labor controversy or to collective bargaining." Id. at 468. Instead, these new handbills launched "a sharp, public, disparaging attack upon the quality of the company's reputation and its business policies." Id. at 472.[5] The station discharged the employees associated with the new handbills, and the Board found the discharges lawful on the basis that the employees' conduct lost them the protection of the Act. Id. at 472, 477–478.[6]

The Court upheld the Board's decision. It emphasized that the "fortuity of the coexistence of a labor dispute afforded [the employees] no substantial defense" because the new handbill "related itself to no labor practice of the

[5] The new handbills chastised the station for failing to "purchase the needed equipment to bring [viewers] the same type of programs enjoyed by other leading American cities" and questioned whether the station "consider[ed] Charlotte a second-class community." Id. at 468.

[6] The Board explained:

> In short, the employees in this case deliberately undertook to alienate their employer's customers by impugning the technical quality of his product. . . . [T]hey did not misrepresent, at least wilfully, the facts they cited to support their disparaging report. And their ultimate purpose—to extract a concession from the employer with respect to the terms of their employment—was lawful. *That purpose, however, was undisclosed*; the employees purported to speak as experts, in the interest of consumers and the public at large. They did not indicate that they sought to secure any benefit for themselves, as employees, by casting discredit upon their employer.

Id. at 472–473 (quoting *Jefferson Standard Broadcasting Co.*, 94 NLRB 1507, 1511 (1951) (emphasis added)).

company. It made no reference to wages, hours or working conditions." Id. at 476. "The attack asked for no public sympathy or support," the Court observed, and the "policies attacked were those of finance and public relations for which management, not [employees] must be responsible." Id. Far from disclosing the existence of a labor dispute, the handbills "diverted attention away from the labor controversy [by] attack[ing] public policies of the company which had no discernible relation to that controversy." Id. at 472. The Court concluded that the employees had demonstrated "such detrimental disloyalty as to provide 'cause'" for discharge. Id. at 476.

Consistent with the teachings of *Jefferson Standard*, the Board formulated a two-prong test for determining whether employees' otherwise-protected disparagement of their employer, directed to a third party, retains or loses the protection of the Act. Under this test, such a communication is protected only if (1) it indicates to the third party that it is related to an ongoing labor dispute between the employer and employees, and (2) it is not so disloyal, reckless, or maliciously untrue as to lose the Act's protection. *Mountain Shadows Golf Resort*, 330 NLRB at 1240.

Two points warrant emphasis. First, the standard is conjunctive. Both prongs must be met; protection is lost if either prong is not met. Whether the second step of this test has been met is more often at issue in the Board's cases, but both steps must be met to retain protection, and the first step is equally important. See *Sierra Publishing Co. v. NLRB*, 889 F.2d 210, 217 (9th Cir. 1989) (whether employee appeals to third parties disclose that they are related to a labor dispute was "central to the Supreme Court's reasoning in *Jefferson Standard*"). Second, the first prong of the *Mountain Shadows* test is analytically distinct from whether employees otherwise would be protected by Section 7. As a threshold matter, when employees criticize their employer to a third party, that criticism must constitute union or protected concerted activity to enjoy the Act's protection. But even where these threshold requirements are met, the Board in *Mountain Shadows*, implementing the Court's teaching in *Jefferson Standard*, held that employees leveling such criticism will *not* enjoy the Act's protection if they fail to disclose to the third party that their communication is related to an ongoing labor dispute.[7]

The Board later clarified that to satisfy the first prong of its *Mountain Shadows* test, employee communications to a third party that criticize the employee's employer must disclose a connection or nexus with terms and conditions of employment such that the third party "can grasp the connection." *Endicott Interconnect Technologies, Inc.*, 345 NLRB 448, 451 (2005), enf. denied on other grounds 453 F.3d 532 (D.C. Cir. 2006). It is imperative that an employee's third-party appeal establish this nexus because "[t]he purpose of the first [prong of the *Mountain Shadows* standard] . . . is of course to enable the recipients to evaluate the statements in a fuller context, applying what the listener or reader regards as a suitable discount or enhancement." *Oncor Electric Delivery Co. v. NLRB*, 887 F.3d at 492.[8] Otherwise stated, where an employee's appeal to a third party disparages the employer and thus appears disloyal, the employee must make the third party "aware [that the appeal] is generated out of" a "pursuit of better working conditions" so that the party can "filter [the appeal] critically." *Sierra Publishing*, 889 F.2d at 217.

Application of *Mountain Shadows*' first prong is illustrated in *Mountain Shadows* itself. There, a maintenance

[7] And under the second prong of the *Mountain Shadows* test, even if disparagement of an employer directed to a third party is otherwise protected and the employees disclose to the third party that the disparagement is related to an ongoing labor dispute, the employees will be vulnerable to lawful discipline or discharge if what they communicate to the third party is so disloyal, reckless, or maliciously untrue as to lose the Act's protection.

In *Oncor Electric Delivery Co. LLC v. NLRB*, 887 F.3d 488 (D.C. Cir. 2018), the United States Court of Appeals for the District of Columbia Circuit drew attention to an unsettled burden-of-proof issue related to the first prong of the *Mountain Shadows* test: "whether the Board's General Counsel bears the burden to show that a third-party appeal has 'indicated' its connection to an ongoing labor controversy, or whether the absence of any such indication serves as a defense for the employer where an appeal to third parties would otherwise be protected under § 7." Id. at 495. The court left that issue for the Board to address on remand. Because the *Oncor Electric* case remains pending before the Board on remand, I take no position at present on the burden-of-proof issue.

[8] The D.C. Circuit's decision in *Oncor Electric* points up the fact that a failure to satisfy the first prong of the *Mountain Shadows* standard is independently sufficient to deprive an employee of the Act's protection. At issue in *Oncor* was whether employee Bobby Reed's discharge for statements he made to a committee of the Texas Senate, in which he asserted that Oncor's smart meters at customers' homes posed a fire hazard, violated the Act. In the underlying decision, the Board concluded that Reed's discharge did violate the Act, finding that Reed was engaged in protected concerted activity when making the statements, and his statements were not maliciously false and therefore Reed did not lose the Act's protection. (Oncor Electric did not contend that Reed's statements were unprotected as disloyal.) See *Oncor Electric Delivery Co. LLC*, 364 NLRB 677, 677-681 (2016). On review, the D.C. Circuit upheld both of these findings. See *Oncor Electric*, 887 F.3d at 494 (rejecting Oncor's contention that Reed did not have a purpose of mutual aid or protection), id. at 499 (finding that substantial evidence supported Board's finding that Reed's statements were not maliciously false). If being otherwise protected and not so disloyal, reckless, or maliciously untrue as to lose the Act's protection ended the analysis, it would have made no difference that the Board failed to address whether Reed, in making his statements to the Texas Senate, disclosed that they were related to an ongoing labor dispute. But the court made clear that it did make a difference, and the court remanded the case to the Board to address the first prong of the *Jefferson Standard/Mountain Shadows* framework—and, in doing so, to resolve the burden-of-proof issue discussed above in footnote 7. See id. at 498.

employee employed by the respondent, a company that managed a public golf course, complained to city officials about the slow progress of negotiations for a collective-bargaining agreement and the impact of the respondent's practices on the availability of maintenance work. 330 NLRB at 1238. These communications disclosed their "nexus with terms and conditions of employment . . . and were protected under Section 7 of the Act," but one handbill distributed by this employee did not. Id. at 1238, 1241. That handbill "did not mention the problems the employees' union was having with negotiating with the [r]espondent," but instead "related solely to the impact of the company's capital investment and other business practices on the quality of the service provided to the customers." Id. at 1241. Although the handbill referred to the respondent ignoring proper maintenance practices, "an issue with an actual nexus to the employment concerns of the maintenance workers," it suggested that the city address this problem not by supporting the employees in their labor dispute with the respondent, but by turning over management of the golf course to a different company. Id. The Board found the employee's distribution of the handbill "was 'not part of an appeal for support in the pending dispute' but rather was a 'separable attack purporting to be made in the interest of the public rather than in that of the employees.'" Id. (quoting *Jefferson Standard*, 346 U.S. at 477).

2. Application of the legal framework to the facts of this case

Turning to the instant case, the threshold issue is whether Salopek's conduct was "otherwise protected" as that term is used herein—i.e., whether, in his communications with the Navy, Salopek engaged in concerted activity for the purpose of mutual aid or protection. Because Salopek acted with fellow guards Mullen and Lein, there is no question that his activities were concerted.[9] Less clear—much less clear—is whether he engaged in *protected* concerted activity.

Again, concerted activity has a purpose of mutual aid or protection where employees seek to "improve terms and conditions of employment or otherwise improve their lot as employees." *Eastex, Inc. v. NLRB*, 437 U.S. at 565. Judging from Salopek's email to Morgan, the Respondent's CEO, one would be hard pressed to find that Salopek was seeking to improve a term or condition of employment or the guards' lot as employees. Of the seven concerns Salopek raised in that email, the only one that had any bearing on conditions of employment was the first one, where he asserted that "someone could have gotten hurt" as a result of weapons-qualification shoots being conducted at a gravel pit, where guards might trip or twist an ankle or a bullet might ricochet off a piece of gravel. Salopek raised no comparable employee safety concerns, however, related to the use of unauthorized weapons and ammunition and the alteration of targets, and he immediately segued to the *Respondent's* concerns, stating that "any number [of] things could place this company in civil liability." Indeed, the concerns mentioned in Salopek's email to Morgan chiefly focused on Xcel's interests, and to a lesser extent, the Navy's. As summarized by the judge, Salopek warned that "the consequences could be 'catastrophic' for the company" if the Navy found out what it was doing, "Xcel's rating with the government could be affected," and "violations of State law may have happened which could jeopardize the company's ability to conduct business and the Navy's reputation." Salopek also observed that Xcel's practices might have made the base vulnerable to a successful attack: "guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base." The email did express concern about potential harm to the guards' reputations, but protection against reputational injury is not a term or condition of employment. Perhaps Salopek was contemplating his prospects for employment with a successor security contractor if Xcel's violations of Navy regulations ended up costing Xcel the Indian Island contract. If so, he did not make the point explicitly (for obvious reasons), and in any event, expressing concerns about getting hired by the *next* security contractor would not have been aimed at improving the guards' terms and conditions of employment *with Xcel*.

The evidence also fails to establish that Salopek was seeking to improve the guards' lot as employees when he, Mullen, and Lein met with Commander Pulley. The evidence shows that although Salopek referred vaguely to safety during that meeting, he never specified that it was the *guards'* safety that prompted him to turn to the Navy for support. To the contrary, when Salopek did particularize the safety concern, he linked it to the safety of visitors to the park across the street from the naval base—*public* safety, not the guards' safety. In sum, I believe there is simply insufficient evidence upon which to base a

[9] "In general," for activity to be concerted, it must "be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." *Meyers Industries*, 268 NLRB 493, 497 (1984) (*Meyers I*), review granted and remanded sub nom. *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), on remand *Meyers Industries*, 281 NLRB 882 (1986) (*Meyers II*), affd. sub nom. *Prill v. NLRB,* 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988). Salopek contacted Commander Pulley with other employees, and the email to Security Officer Jones represented that several employees were coming forward to express their concerns.

reasonable finding that in communicating with the Navy, Salopek was protected by the Act as a threshold matter. While he certainly engaged in concerted activity, the evidence fails to establish that he engaged in *protected* concerted activity, i.e., concerted activity for the purpose of mutual aid or protection.

But even assuming that Salopek's fleeting references to injuries that might result from conducting qualifying shoots at gravel pits were sufficient to render his communications with the Navy otherwise protected, they were unprotected under the first prong of the *Mountain Shadows* test. Salopek took his criticisms of the Respondent's weapons-qualification practices to a third party, the United States Navy. During his conversation with Commander Pulley, Salopek accused the Respondent of violating Navy regulations by using unauthorized weapons-qualification sites, altering targets, and falsifying records. In the guards' letter to Navy Officer Jones, Salopek and his co-workers again accused the Respondent of "falsifying federal documents," and they ratcheted up their attack by accusing the Respondent of engaging in a cover up. Arguably, these statements were sufficiently disloyal to lose Salopek the Act's protection under *Jefferson Standard* and the second prong of the *Mountain Shadows* test. But setting that aside, the Navy needed to understand the fuller context of Salopek's disparaging statements to critically filter them, and Salopek failed to provide that necessary context.

Salopek's communications with the Navy did not establish the necessary nexus between his criticisms and a dispute with Xcel over the working conditions of its guard employees. To begin with, the evidence fails to show that in what was said to Commander Pulley, either Salopek, Mullen, or Lein disclosed *any* ongoing dispute with Xcel, let alone an ongoing labor dispute. The guards reported to Pulley weapons-qualification practices that violated Navy regulations, but there is no evidence they told Pulley that they had taken their concerns about those practices *to Xcel* before coming to him.[10]

But regardless whether Salopek disclosed to the Navy the existence of an ongoing dispute between the guards and Xcel, the evidence fails to show that he disclosed to the Navy the existence of an ongoing *labor* dispute, i.e., a dispute with Xcel over the impact of its weapons-qualification practices on the guards' on-the-job safety. Salopek's purpose in communicating with the Navy might have been to pressure the Respondent to stop practices that could have impacted the guards' safety, but if so, "[t]hat purpose . . . was undisclosed." *Jefferson Standard*, 346 U.S. at 472. The judge found that Salopek presented Pulley with "generalities" about a "vague" concern involving a "safety issue." This opaque reference to "safety" was unprotected because it addressed "general safety concerns and did not indicate that [Salopek's] concerns were related to the safety of the [guards]." *Five Star Transportation, Inc.*, 349 NLRB 42, 44 (2007), enfd. 522 F.3d 46 (1st Cir. 2008). Salopek also advised Pulley that the guards' concern "involved alternate sites ranges [and] the alteration of targets," and he told Pulley that "the July 7th . . . range sheet [was] falsified." Nothing in this additional disclosure made clear that these practices were being brought to Pulley's attention because they threatened the guards' safety. Indeed, the only specific connection Salopek articulated between safety and the Respondent's weapons-qualification practices involved the safety of members of the public, not the Respondent's guards. Salopek told Pulley that the Respondent's practices created a "big concern" because "we have a public park across the street." Salopek was also unprotected in stating this concern because it "was not part of an appeal for support in [any] pending dispute" between the guards and Xcel but rather was a "separable attack purporting to be made in the interest of the public rather than in that of the employees." *Jefferson Standard*, 346 U.S. at 477. Moreover, as evident in the email to Jones, the guards' purpose was to blow the whistle on Xcel's violations of Navy regulations and federal law, "not . . . to change labor practices at [Indian Island]." *Mountain Shadows*, 330 NLRB at 1241. In that email, guard Mullen—on behalf of Salopek among others—asserted that the Respondent's practices were "against Navy policy, and illegal, by falsifying federal documents," and he accused the Respondent of "trying to cover this up." Even assuming Salopek's interaction with the Navy constituted protected concerted activity—I believe it did not, as explained above—his disparagement of Xcel's weapons-qualification practices lost the Act's

[10] The subsequent email to Officer Jones did disclose that "Mr. Morgan [t]he CEO of Xcel has been given a detailed memo of these practices," but nothing in that email made clear that the guards had a *labor* dispute with Xcel—i.e., a dispute with Xcel over the impact of its weapons-qualification practices on the guards' on-the-job safety—as opposed to concerns that Xcel was violating naval regulations and over Xcel's potential exposure to liability, the port's lack of preparedness in case of attack, and so forth.

My colleagues say that Salopek did not have to disclose to the Navy the existence of an ongoing dispute with Xcel, citing *Arlington Electric*, 332 NLRB 845, 846 (2000). The respondent in *Arlington Electric* was a subcontractor on a construction project at a hospital. An employee of the respondent distributed flyers to members of the public, urging them not to use the hospital because the respondent did not provide paid family health care. *Arlington Hospital* is distinguishable from this case because recipients of those flyers would have inferred the existence of a labor dispute between the employee and the respondent from the face of the flyer itself.

protection because it "related itself to no labor practice of the company. It made no reference to wages, hours or working conditions." *Jefferson Standard*, 346 U.S. at 476.[11]

Conclusion

As a threshold matter, an employee's statements to a third party must constitute either union activity or concerted activity for the purpose of mutual aid or protection for the employee to be protected by Section 7 of the Act when making those statements. But even if this threshold requirement is met, *Jefferson Standard* made clear that employees' disparaging statements about their employers, made to a third party, do not retain the Act's protection if employees fail to relate such statements to an ongoing dispute with their employer over their terms and conditions of employment. Salopek's communications to the Navy were unprotected on both counts. The evidence fails to demonstrate a purpose of mutual aid or protection, and even assuming otherwise, at best Salopek conveyed to the Navy only vague, generalized safety concerns, without linking those concerns to the guards' on-the-job safety or any other working conditions. Indeed, when he spoke with Commander Pulley, Salopek evidently did not disclose the existence of *any* ongoing dispute with Xcel over its weapons-qualification practices, let alone an ongoing *labor* dispute. Simply put, Salopek brought a whistleblower complaint to the Navy—and as a former member of the Board correctly observed, "the National Labor Relations Act is not a general whistleblowers' statute." *Waters of Orchard Park*, 341 NLRB 642, 645 (2004) (Member Meisburg, concurring). I would find that Salopek's conduct was not protected by Section 7 of the Act, and I would dismiss the allegation that the Respondent violated Section 8(a)(1) by discharging Salopek for that conduct. Accordingly, in relevant part, I respectfully dissent.

Dated, Washington, D.C. September 8, 2022

John F. Ring, Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
MAILED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to mail and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT threaten you with reprisals if you engage in protected concerted activities.

WE WILL NOT discharge any of you for engaging in protected concerted activities.

WE WILL NOT refuse to bargain collectively with International Union, Security, Police, and Fire Professionals of America, Local 5 (the Union) by failing or refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of our employees in the following appropriate unit:

> All federal contract security officers employed by the Company at the Indian Island Naval Magazine in the State of Washington. Excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL provide to the Union in a timely manner the information requested by the Union on October 30, 2018, to the extent that we have not already done so.

WE WILL, within 14 days from the date of the Board's Order, offer Mark Salopek full reinstatement to his former

[11] Although Board precedent does not require represented employees to engage with their union or to file a grievance for their concerted conduct to be protected, it is notable that Salopek made no reference to the union representing the Respondent's guards while meeting with Commander Pulley. Even a brief mention of the Union, the union contract, or the requirements of the union contract likely would have put Commander Pulley and the Navy on notice that Salopek's complaints related to a labor dispute and established the nexus required to satisfy *Jefferson Standard* and the *Mountain Shadows* test. The absence of any reference to the traditional apparatus of labor disputes, while not dispositive, cannot be overlooked, and it bolsters the conclusion that Salopek failed to disclose that his complaints related to a labor dispute.

job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

WE WILL make Mark Salopek whole for any loss of earnings and other benefits resulting from his discharge, less any net interim earnings, plus interest, and WE WILL also make him whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Mark Salopek for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Mark Salopek's corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge of Mark Salopek, and WE WILL, within 3 days thereafter, notify him in writing that this has been done and that the discharge will not be used against him in any way.

XCEL PROTECTIVE SERVICES, INC.

The Board's decision can be found at www.nlrb.gov/case/19-CA-232786 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

*Carolyn A. McConnell, Esq.,* for the General Counsel.
*Jason R. Stanevich, Esq.* and *Maura A. Mastrony, Esq. (Littler Mendleson, P.C),* for the Respondent.
*Richard M. Olszewski, Esq. (Gregory, Moore, Jeakle & Brooks P.C.),* for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

JOHN T. GIANNOPOULOS, Administrative Law Judge. As the first line of defense to guard one of our Nation's most important naval facilities, the United States Navy uses private contractors. This case involves claims that contractors used to guard Naval Magazine Indian Island could not shoot straight. It was tried before me in Seattle, Washington, over 6 days in September and November 2019. Based on charges filed by the International Union, Security, Police, and Fire Professionals of America, Local 5 (Union), an Order Further Consolidating Cases, Consolidated Complaint and Notice of Hearing (Complaint) issued on July 31, 2019, alleging that Xcel Protective Services, Inc. (Respondent or Xcel) violated Section 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act) by: interrogating employees, prohibiting employees from discussing wages, constructively discharging employees, and refusing to provide the Union with information. Respondent denies the unfair labor practice allegations.

Based upon the entire record, including my observation of witness demeanor, and after considering the briefs filed by all the parties, I make the following findings of fact and conclusions of law.[1]

### I. JURISDICTION AND LABOR ORGANIZATION

Respondent is a New Mexico Corporation that provides contract security services to the United States Government. At all times relevant herein, Respondent provided contract security services to the United States Navy, in connection with the national defense of the United States, at Naval Magazine Indian Island. While performing these services for the United States Navy, Respondent purchased and received goods and materials valued in excess of $50,000 directly from points outside the State of Washington. Based upon the foregoing, Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the International Union, Security, Police, and Fire Professionals of America, Local 5 (Union) is a labor organization within the meaning of Section 2(5) of the Act.[2] (GC 1(bbb), 1(ddd).) Accordingly, I find that this dispute affects commerce and the National Labor Relations Board has jurisdiction pursuant to Section 10(a) of the Act. *Old Dominion Security*, 289 NLRB 81 (1988) (Board asserts jurisdiction over employer that provides contract security services for the U.S. Navy).

[1] Testimony contrary to my findings has been specifically considered and discredited. Witness demeanor was the primary consideration used in making all credibility resolutions.

[2] Transcript citations are denoted by "Tr." with the appropriate page number. Citations to the General Counsel, Respondent, and Joint exhibits are denoted by "GC," "R," and "JX" respectively. Transcript and exhibit citations are intended as an aid only. Factual findings are based upon the entire record and may include parts of the record that are not specifically cited.

II. FACTS INVOLVING THE 8(A)(1) AND (3) ALLEGATIONS

*A. Background*

Naval Magazine Indian Island (Indian Island) is the United States Navy's only deep-water ammunitions port on the West Coast. It supports the largest Navy and commercial vessels afloat, including aircraft carriers, guided missile destroyers, submarines, ammunition ships, supply ships, container ships, patrol boats, and commercial barges all of which stop at Indian Island throughout the year.[3] The naval base encompasses the entire island, approximately 2,700 square acres, and is located in the Puget Sound, across the bay from Port Townsend, Washington. Various types of munitions are stored at Indian Island in underground bunkers; the port facility is used to off-load the ordnance for storage or to load them onto ships for military use. (Tr. 46, 532, 641; R. 22, p. 3.)

Because Indian Island is the Department of Defense's largest conventional ordnance storage site on the West Coast, access to the facility is tightly regulated. The Navy relies on private contractors as "the primary security source" to provide armed security services at the base. (R. 22, p. 3.) These security contractors staff key checkpoints on the island, ensuring only authorized personnel are allowed to enter and that commercial vehicles entering the base do not contain any unauthorized items. They also conduct roving patrols using vehicles to drive around the island to various checkpoints. There are two roving patrols–North Patrol and South Patrol. During these roving patrols guards check the various buildings, facilities, and fence lines, along with the beaches around the perimeter of the island. (Tr. 48, 79–81, 217, 473, 748; R 44.)

At the time the Complaint in this matter issued, Respondent had been providing contract security services for the Navy at Indian Island for 20 years, under a series of 5-year contracts. Originally, Respondent provided these services under the name "Basic Contracting Services, Inc.," or "BCSI." (Tr. 41, 980.) In about 2015 Respondent changed its name to Xcel. Xcel's most recent 5-year contract with the Navy expired on September 30, 2019. Although Xcel submitted a bid for the contract's renewal in July 2018, the Navy chose another contractor. Xcel no longer provides security services for the Navy at Indian Island. (Tr. 41, 874, 980–994, 1007; R 43–44; GC 1(v).)

Navy civilian employees manage the various contracts the Navy has with private companies on government installations (referred to as the "Navy Contracting Office"). At Indian Island Melissa Burris (Burris), who had the title of Contracting Officer, was responsible for overseeing the contract between Xcel and the Navy. The Contracting Officer is the individual responsible for signing the contract between the Navy and Xcel and is ultimately the responsible party on the government's behalf for the contract. In this capacity Burris also had the authority to require that a contractor remove individual employees from working on the contract. That being said, while Burris could request employees be removed from the contract, she did not have the authority to require that Xcel fire anyone. (Tr. 531, 545–551, 558–559, 571.)

Richard Rake (Rake) worked directly under Burris in the hierarchy of the Navy civilian employees overseeing the Xcel contract; his office was located at the Navy submarine base in Bangor, Washington. Rake, who had worked as a Navy civilian employee since 2002, oversaw multiple contracts for the Navy including the one with Xcel. In this capacity he held various job titles, including Senior Performance Assessment Representative and Contracting Officer Representative. (Tr. 162, 526–531, 546, 556, 994–995.)

Along with supervising subordinates on each of his individual contracts, Rake also responded to "customer complaints" regarding the contracts themselves. (Tr. 531.) Rake testified that these complaints could come from anybody including contractors, visitors, government employees, Navy personnel, or Navy employees. Rake said that his job was to make sure the government and the contractor abided by the contract. On the Xcel contract, Rake supervised Steve Manson (Manson), who was responsible for performing monthly assessments of the contract. Manson had the title of Performance Assessment Representative. (Tr. 531, 534.)

*B. Respondent's Operations at Indian Island*

Respondent's security guards who worked at Indian Island were covered by a collective-bargaining agreement (CBA) between Respondent and the Union. Approximately 50 of the guards worked at the base over three different shifts: day shift (5:45 a.m.–2;15 p.m.); swing shift (1:45 p.m.–10:15 p.m.); and graveyard or night shift: (9:45 p.m.–6:15 a.m.).[4] (Tr. 233, 444, 873–874; R 7, R 32; JX 15–16.)

Xcel conducted its operations at Indian Island out of a building shared with the Navy referred to as "Building 848." (Tr. 198, 912, 660.) Respondent's offices, training room, employee locker room, and armory were located on one side of the building, while the Navy's used the other side. Respondent's training room was a type of all-purpose room used daily for employee briefings. Guards also used the training room, which contained computers, as a type of break and lunchroom. Because Respondent's guards were armed, it was not uncommon for them to be in the training room with their weapons. (Tr. 431–432, 911–912.)

John Morgan was Respondent's Chief Executive Officer until September 2018, when he was replaced by Michael Filibeck (Filibeck). Filibeck was a member of Xcel's Board of Directors, and also held the title of Senior Vice President. Filibeck was new to Xcel, having started with the company on September 3, 2018.[5] He fully assumed all of Morgan's former duties around October 12. Neither Morgan nor Filibeck were physically located at

[3] I take administrative notice of the information provided by the United States Navy about Indian Island. See https://www.cnic.navy.mil/regions/cnrnw/installations/naval_magazine_indian_island.html (last visited on November 30, 2020); *Phillips v. Spencer*, 390 F.Supp.3d. 136, 149 fn. 7 (DDC 2019) (Court takes judicial notice of report located on Navy's website); Fed.R.Evid. 201(b)(2).

[4] The relevant unit is defined in the CBA as: "all federal contract security officers employed by the Company at the Indian Island Naval Magazine in the State of Washington. Excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act." (JX 16.)

[5] All dates refer to 2018 unless otherwise indicated.

Indian Island; Filibeck's office was in Albuquerque, New Mexico. (Tr. 39, 60, 74, 980–982, 987–988.)

Respondent assigned military-style titles to its managers and supervisors working at Indian Island. Michael Terry (Terry) was in charge of all of the company's operations at Indian Island and held the title of "Captain." Terry had worked for Respondent in various capacities since 2005 and assumed his duties as Xcel's Captain at Indian Island in February 2015. Terry reported directly to Morgan and then to Filibeck when Morgan was replaced. Respondent's shift-supervisors were given the title of "Lieutenant." Respondent had between three to four full-time Lieutenants who reported directly to Terry. Because a supervisor was required to be working at all times, Respondent had four guards who worked as "acting" or "alternate" Lieutenants. These were bargaining unit employees who worked as acting Lieutenants when needed.[6] (Tr. 73–77, 156–157, 278, 869–874, 909, 987.)

Some of Xcel's full-time Lieutenants had specific assignments. One such Lieutenant was Gerald Powless (Powless), who worked was Respondent's training officer. As part of his duties as training officer, Powless was the shooting range instructor and in charge of performing Respondent's firearm qualifications. Powless had been performing this assignment for years and was designated as Respondent's "range master." (Tr. 456, 888, 969.) As the range master, Powless would complete, and sign, the Navy's official shooting-range qualification forms ("Form 3591.1"), which would be completed whenever a qualification shoot occurred.[7] Form 3591.1 showed the name of the guard qualifying, the location of the shooting range where the qualification occurred, the date of the shooting range, the weapon(s) and the range course used, the shooter's score, and whether the individual did or did not qualify with a particular weapon. A copy of Form 3591.1 would go into each guard's file to show that they had properly qualified for each particular weapon. (Tr. 147, 278, 509, 560, 882–883, 902, 987, 1015, 1045–46; R. 42.)

*C. Weapon Assignments and Shooting Qualification Tests*

1. Weapon assignments

Respondent's guards were assigned various weapons to use during their workday; everyone carried a Beretta M9 nine-millimeter pistol as their standard weapon. A Mossberg M500 12-gage pump-action shotgun, and an M-4 assault rifle were also assigned to guards, depending upon the post they were working on any given day. Guards started their shift with a daily briefing. After the briefing they would go directly to the "armory" or "cage" to check out their weapons for the day.[8] Each guard who qualified for a particular weapon was given a yellow weapons card. At the cage, the guard turned in a weapons card for each specific weapon he/she was assigned to carry that day, depending upon their post. A Lieutenant or acting Lieutenant then issued the guard their weapon(s) and ammunition. At the end of the day, the process was repeated, but in reverse. Weapons and ammunition were returned to the armory, and the guards received their weapons card in return. (Tr. 78, 217–218, 233, 265, 448, 454, 456, 533, 654–655, 891, 1074.)

The weapons the guards carried at work and the ammunition for those weapons belonged to the Navy. Xcel employees were not allowed to leave Indian Island with any of these weapons, unless the weapons were going to be used for an official qualification at a shooting range. And then, the weapons were transported to the shooting range under strict procedures in locked cases. (Tr. 52–53, 132–133, 233–234, 444–445, 511, 533, 654, 667.)

2. Shooting qualification tests

Guards at Indian Island were obligated to pass shooting tests every 6 months to show that they were properly qualified to carry each type of Navy issued weapon. The Navy required that these tests occurred at specific shooting ranges approved by the Navy, using only government-owned weapons, and ammunition provided by the Navy. The Navy also provided the targets to be used for qualifications. (Tr. 53–54, 105, 514, 533, 891, 893, 895; R. 43 pp. 22–23.)

The Navy had approved two shooting ranges for guards at Indian Island to use for weapons qualifications. The official shooting range was located at Naval Base Kitsap, a submarine base in Bangor, Washington, about 30 miles south of Indian Island. The Navy had also approved the Port Townsend shooting range for use during special circumstances or when the Bangor range was closed. (Tr. 53–54, 447, 511, 612–613, 656, 995, 1071; R. 2.)

For the shooting qualification tests, the Navy set the specific standards for each test. However, the tests themselves were administered an Xcel employee. As the range master, Powless was the person generally responsible for overseeing the ranges and completing the corresponding paperwork. Other Xcel employees also assisted at the range, serving as safety officers or line coaches. When Xcel guards were qualifying at the Bangor range, nobody from the Navy was present to keep a list of who was shooting that day. However, the guards would sign-in on a weapons training roster form that Respondent would maintain. Powless would also sign the form as the instructor, certifying that the weapons training requirements were completed. (Tr. 110, 121, 133–134, 235, 446, 495–496, 508–510, 656, 905, 969, 1046; R. 14; JX. 4 #1235, JX. 5 #1305, #1307.)

The shooting qualification tests occurred twice a year. Every guard was required to pass a primary firearms qualification annually, and then a sustainment test 6 months later. Shooting range days were considered workdays and guards would be paid during weapons qualifications. During these tests, guards need to achieve a certain score, based upon their shooting accuracy, to qualify. (Tr. 103–104, 656, 807, 891, 893.)

[6] The full-time lieutenants were not part of the bargaining unit, and in its Answer Respondent admitted that the full-time Lieutenants, including Gerald Powless, Doug Lux, and Armando del Rosario, were statutory supervisors and/or agents of Respondent within Sections 2(11) and 2(13) of the Act. (GC. 1(bbb); GC. 1(eee))

[7] Xcel Lieutenant John Armstrong was also authorized to sign these forms. (JX. 4 #1233, JX. 5 #1304)

[8] According to Rake, the correct name for this location was the "ready for issue room," as the main armory at Indian Island was technically located in another area. (Tr. 539, 552–553.) Nevertheless, in this decision the area where the guards received their weapons on a daily basis is referred to as the "armory" or the "cage" which is consistent with the testimony of the various witnesses. (Tr. 78, 218, 264–266, 445, 510, 655, 672, 709, 715, 939; JX. 5 #1281)

The annual qualification test consists of two M9 pistol courses, a regular course firing 50 rounds, and a low-light shoot. There was also a shotgun qualification course, where guards were required to shoot at three different targets with the M500. Finally, the M4 rifle course consisted of shooting the rifle in a prone, kneeling, and standing position at three different yardages. For the M4, guards also needed to pass a separate low-light shooting test. The 6-month sustainment test was a scaled down version of the annual qualification. Guards only needed to qualify with the M9 pistol and the M4 rifle, and they used larger targets. There was no M500 shotgun course during the sustainment shoot; guards only had to show a familiarization with the weapon. (Tr. 104, 446, 805–806, 891–893, 901.)

Guards received two opportunities to pass their qualification tests. If a guard failed, they had 60 days to complete their second test to qualify. If a guard did not qualify after their second try, the guard was supposed to be removed from the contract. That being said, it appears Xcel's general practice was that, if a guard passed their pistol qualification, but failed the rifle/shotgun qualification twice, the guard was allowed to continue working at posts that only required an M9 pistol until the guard was eventually able to qualify with the M4 rifle and M500 shotgun. (Tr. 67–68, 566, 657–658, 733–734, 807–808.)

*D. Respondent's Use of Alternate Sites for Weapon Qualifications*

Terry admitted during his testimony that, prior to July 2018 when a group of Respondent's guards complained to the base commander, Respondent sometimes used areas other than the official Navy designated ranges at Bangor or Port Townsend to qualify guards on their weapons.[9] Sometimes they used the backyard of a guard's house for weapons qualifications, "or anywhere [they] needed to," in order to qualify their guards. (Tr. 894–896, 962–968.) Terry testified that, in these circumstances, rather than using official Navy issued weapons, Respondent would provide its own weapons for the shooting range, which he said were comparable to Navy weapons: a 9-millimeter pistol, a 12-guage shotgun, and an AR-15 or something similar to the M-4 rifle.[10] (Tr. 894–896, 978.)

Terry said that, while Xcel had been doing "this for years," (Tr. 894) these alternate site shooting ranges would only occur after a guard did not qualify initially at the official Navy designated shooting range, or if a guard had to do a "make-up shoot." (Tr. 895) Terry testified that both Rake and Manson were aware of Respondent's practice, including the fact that Respondent had been using someone's backyard for weapons qualifications.[11] According to Terry, neither Rake nor Manson had objected to this practice.[12] Terry said that Respondent believed it was working within the parameters of the Navy's instructions, because Xcel would set up the exact same shooting course, albeit at an alternate site and using non-Navy issued weapons/ammunition. (Tr. 894–896, 963.)

During his testimony, Terry identified at least one weapons qualification Form 3591.1, that was signed by Powless, where the information in the document was incorrect. The form states that five guards, including a guard named Evan Schroder (Schroder), successfully completed the handgun qualification course, the rifle qualification course, and also qualified with the shotgun, at the Bangor range on July 7, 2017. Terry admitted that this qualification shoot did not occur at the Bangor range as the document states. Instead, it occurred at Schroder's house, in his backyard. According to Terry, having a sustainment qualification shoot occur in Schroder's backyard was consistent with Xcel's practice at the time. (Tr. 895–898, 900, 967–969; R. 42.)

Terry testified that it was only after Xcel's guards complained to the base commander, and the subsequent investigation, that he learned Respondent could only use Navy approved shooting ranges for official weapons qualifications and that only Navy issued weapons and ammunition could be used during qualifications. As part of the investigation into the complaints lodged by Xcel employees in July 2018, Terry said that Respondent got their "hand slapped" by the Navy because these qualification tests were not occurring at authorized shooting ranges; Xcel then stopped the practice. (Tr. 963, 977–978.)

*E. Guards Complain about Xcel's Weapons Qualification Practices*

1. Xcel guards Mark Salopek, Steve Mullen, and Daniel Lein

Mark Salopek (Salopek) worked for Xcel as a guard at Indian Island from May 2013 until he was fired on October 27, 2018. Previously, Salopek had worked for 22 years as a police officer with various state or local jurisdictions in California and Nevada. He then moved to Washington State. (Tr. 943) Terry and Salopek were friends, having worked together in law enforcement, and Terry helped Salopek get a job as a guard with Xcel. After Terry took over as the Xcel Captain at Indian Island in early 2015, he promoted Salopek to acting Lieutenant. (Tr. 72–73, 324, 938–943.)

While working for Xcel, Salopek was active in the Union. He was a steward in 2014, and his signature was on the most recent CBA, along with the predecessor agreement, as a member of the Union's bargaining committee. (Tr. 82–83, 258–259; JX 15–16.)

Before he was fired in October 2018, Salopek only had one prior discipline in his record, a three-day suspension that occurred in October 2015 which also resulted in his being demoted

[9] Terry testified that this practice may still have been occurring as late as July 2018. (Tr. 978.)

[10] The term "AR-15" is often used to refer to the semiautomatic version of M16 or M4 type rifles/carbines that may be purchased by civilians. See *Colt Def. LLC v. Bushmaster Firearms, Inc.*, No. CIV.04-240-P-S, 2005 WL 2293909, at *14 (D. Me. Sept. 20, 2005), subsequently affd. 486 F.3d 701 (1st Cir. 2007). The M16 and M4 used by the military are both derived from the original AR-15 developed by a company named Armalite. Id.

[11] P. 895, line 9 of the transcript reads "Port Townsend range or the Pier (phonetic) range." It should read "Port Townsend range or the Bangor range. Also, Page 895, line 13 reads "Steve Matts (phonetic) and Richard Rake." It should read "Steve Manson and Richard Rake."

[12] This testimony was originally elicited by Respondent's counsel, but without proper foundation as to how Manson and Rake knew these qualification ranges were occurring on unauthorized sites. (Tr. 895, 899.) However, Terry later testified that he personally told both Rake and Manson about these practices. (Tr. 963.) I credit Terry's testimony about this matter.

back to a regular guard. Regarding the incident, on October 3, 2015, Salopek was on duty and left various doors to the armory open and unattended. Rake was involved in reviewing what occurred and recommended to the Contracting Officer that Salopek be removed from the contract because the open and unattended armory contained 5,000 rounds of ammunition, along with M9 pistols, M4 rifles, M500 shotguns, and M240 belt-fed machine guns. Ultimately Salopek was not removed from the contract, as Terry intervened on his behalf. Instead of removing him from the contract, it was decided that Salopek would be suspended for 3 days and demoted back to a guard. (Tr. 204–206, 554, 939–942; JX. 5 #1280–1282.)

Steve Mullen (Mullen) started working as a guard for Xcel in July 2011 and worked for Respondent until December 2016 when he left the company because he could not pass his Physical Readiness Test (PRT). Respondent's employees are required to pass a PRT every 6 months; for the test each guard is required to do a certain number of sit-ups, push-ups, and sitting toe-touches. Guards also have to complete a 1 ½ mile run within an allotted period of time. If a guard fails a PRT they get a 60-day waiver and then must retake the test. If they are again unable to pass the PRT a second time they are terminated. (Tr. 56–57, 215–218, 875–876.)

According to Mullen, he failed the PRT in 2016 due to a knee injury caused by a blood disease. After he left the company, Mullen received treatment for the disease, was able to pass the PRT, and was rehired by Xcel in May 2017. After resuming his employment with Xcel in 2017, he continued working for the company until July 17, 2018, when he resigned claiming he was subjected to workplace harassment and an unsafe work atmosphere. At various times during his employment with Xcel, including from May 2017 through May 2018, Mullen worked as an acting Lieutenant. (Tr. 215–221, 457, 490, 874; JX 4 #1225; Tr. 215–216.)

Before working for Xcel, Mullen was employed as an armed security guard for another government contractor. He had also worked as a police officer with various local jurisdictions in California. Mullen is also a retired California Department of Corrections prison guard, having received a medical retirement in 1991. His medical retirement was due to a workplace injury that occurred when a steel door crushed his shoulder. Regarding this incident, Mullen testified that he had reported a coworker named Yolanda to his superiors for certain inappropriate statements. Yolanda then told Mullen that he "did not know what [he] had stepped in." (Tr. 228.) A few days later, Mullen said that he and Yolanda were working the same shift; Mullen was counting prisoners while Yolanda was controlling the cell doors. As Mullen was walking through the steel doors accessing the prisoner housing unit, Yolanda closed the door on him, crushing his arm/shoulder in the door and his back against the door jam. Mullen testified that yelled for Yolanda to open the door, but she replied saying "don't tell me what to do." (Tr. 228) Mullen implied that Yolanda purposely closed the door on him, saying that the only way the door could close was if Yolanda had removed her hand from a button which kept the door open. According to Mullen, after he was hired with Xcel, he told Terry about his injury and how it occurred. (Tr. 223–224, 228–232.)

Daniel Lein ("Lein") started working for Xcel as a guard at Indian Island in April 2018. Lein had previously worked contract security at other military installations for over 9 years, including at the Navy submarine base in Bangor. Lein had a friend working at Xcel who told him good things about the company. Lein wanted a change of pace, so he applied to work for Xcel and was hired. Lein is also a retired Navy Chief Petty Officer, having spent 20 years in the Navy. (Tr. 651–653, 728–729.)

2. Salopek speaks to Morgan about weapon qualification issues

Salopek testified that, sometime around February 2018 he was serving as a line safety officer/line coach at the Bangor range and he witnessed three guards fail their M4 rifle qualifications twice. After they failed, he saw Powless alter their qualification targets by drawing a large black cross on each target with a marker so the shooters could better see the target; the center point of the cross intersected the center circle of each target. Apparently the guards were then allowed to re-shoot and they qualified using the altered targets. (Tr. 110–111, 778.)

Salopek questioned whether it was proper to alter a qualification target; he had never seen anything like this before. Salopek believed that, as per Navy training documents, after two failed attempts a guard was supposed to be removed from the range, and evaluated or remediated before having another qualification attempt, as opposed to shooting with an altered target. He was concerned the guards were being denied this training and was worried about their ability to shoot accurately. In a real-life situation potential threats would not be approaching the base outlined with a large cross, and there was a public park near the base with cars driving by all the time. Salopek spoke to some of his coworkers, including Mullen, about Xcel using altered targets. Mullen had also witnessed the use of altered targets and did not think that a guard's shooting qualifications were valid if they qualified using an altered target. (Tr. 112–115, 778.)

Along with the use of altered targets, Salopek heard from some of his coworkers that Respondent had been using alternative sites, not authorized by the Navy, for weapon qualifications. According to Salopek, he had heard about coworkers qualifying at a gravel pit going as far back as 2016.[13] Salopek testified that, in 2016 a coworker named Jacob Schryver (Schryver) said he was asked to take a guard named Tom Cunningham (Cunningham), who had failed his shotgun qualification, to a gravel pit or forested area to teach him shotgun fundamentals.[14] Schryver did

[13] The term "gravel pit range" was used throughout the hearing. As used herein the term refers to weapon qualification shooting ranges occurring at locations not authorized by the Navy.

[14] At various points Salopek mistakenly referred to Jacob Schryver as "Jacob Schroeder" during his testimony. (Tr. 106, 114, 121, 142.) Schroeder's first name is Evan. (R 7, Tr. 447–449.) Salopek was not the only person who confused the two names during the hearing. Another guard confused the two first names, as did Respondent's counsel. (Tr. 987, 990, 1080.) It was clear that whenever Salopek testified about "Jacob Schroeder" he was referring to Schryver. Schryver's written statement to Rake discusses the same incident that Salopek attributed to "Jacob Schroeder," other guards testified they discussed Xcel's practice of using gravel pit ranges with Salopek/Schryver and Schryver was specifically mentioned in Salopek's June 28, 2018 email to Morgan. (Tr. 458–459, 679; GC 3.)

so, and afterwards saw Cunningham standing post with a shotgun. According to Salopek, Schryver was upset. Schryver believed Xcel counted the remedial training he did with Cunningham as an official qualification since Cunningham thereafter was allowed to stand post using a shotgun. Also, Salopek testified that, in July 2017 Powless told him that he was taking five guards to qualify using a shooting range at Schroder's house. Salopek's coworkers also told him about the qualification shoot at Schroder's house, the personal weapons that were used, and Terry told him about ammunition he had purchased at Walmart to use at Schroder's house.[15] (Tr. 106–109, 151–152, 277–283, 286–288, 416.)

Salopek therefore decided to speak with Morgan, Xcel's CEO. Salopek telephoned Morgan on March 9, 2018 and told him about the gravel pit ranges and the use of altered targets. Morgan asked whether Powless was doing these things on his own initiative, without Terry's consent, and Salopek said that Terry was aware of what was happening. Morgan told Salopek that he would call Terry and resolve the matter. A few days later, Salopek testified that he received a call from Morgan who said that he had instructed Terry to follow all the proper policies and procedures regarding range operations. (Tr. 115–116, 120, 290.)

3. Powless schedules Lein to qualify at a gravel pit range

After Lein was hired, his initial weapons qualification shoot was scheduled for May 9 at the Bangor range. Along with Lein, other Xcel guards were shooting, including another newly hired guard named Emily Coler (Coler). Mullen was also at the range that day, as was Salopek who was serving as a safety officer/line coach. Lein passed his pistol and shotgun tests but failed his M4 rifle qualification. Coler passed her M9 pistol test but failed her M4 rifle test and her M500 shotgun test. (Tr. 122–126, 454, 657–658, 454, 732–733; R 4; R 14.)

Lein was still a probationary employee at the time,[16] and based upon his experience working with other government contractors, Lein thought he would be fired because he could not pass the rifle test. Therefore, Lein asked Powless when he would be able to qualify again. Powless said that he would speak to Terry and get back with him. Powless also told Lein that, since he had passed the pistol and shotgun tests, he could continue working at posts that only required an M9 pistol and/or an M500 shotgun; he could not work on any post however that required an M4 rifle. While this practice did not conform with his past experiences, Lein continued working for Xcel standing posts that only required a pistol and/or shotgun. (Tr. 657–660, 733, 739, 760.)

A few days later, Lein asked Powless if there was any news from Terry about when the next qualification range would occur. Powless had not heard back from Terry. After 2 or 3 days had passed, Lein and Powless were standing outside the armory. Powless told Lein that he was going to take both Lein and Coler to "get you guys qualified." (Tr. 661.) However, Powless did not explain when or where the qualification range would occur. A few weeks later, Powless told Lein that he and Coler were to meet him at a U-Haul facility on May 27; from there they would ride with Powless to a gravel pit/rock slab for a qualification shoot. Lein asked Powless if the gravel pit shoot was for practice or qualification, and Powless said the shoot was to qualify Lein with the M4. But, instead of shooting an M4, Powless said that Lein would be shooting an AR-15 owned by a coworker named Robert Armstrong (Armstrong). Lein thought this was strange, as he had never experienced anything like this while working as a security contractor. Therefore, Lein spoke with some of his coworkers, including Salopek and Mullen, and asked whether shooting at a gravel pit was standard practice at Xcel. When Salopek heard about the scheduled gravel pit range he became angry. Salopek told Lein that gravel pit ranges had occurred in the past, but they were not allowed and needed to stop. (Tr. 126, 455, 660–665, R 2 p. 16.)

Before the scheduled gravel pit range, both Mullen and Lein overheard Powless speaking with Armstrong about an getting an AR-15 for use at the range. And, Salopek testified that Powless specifically told him that he had borrowed an AR-15 from Armstrong for use at the gravel pit range. According to Salopek, Powless was excited because the rifle had multiple attachments. (Tr. 127–128, 456–457, 667–668.)

After speaking with Salopek, Lein decided that he would not attend the gravel pit range but would instead wait for the next official range to occur at Bangor. On the day he was supposed to meet Powless and Coler, Lein called Powless and said he was not comfortable shooting at a gravel pit. Powless did not object. During their conversation, Lein asked Powless whether the gravel pit range was going to be "a legal shoot." (Tr. 671.) Powless said yes and told Lein that Armstrong had seen something in writing that this was authorized by the Navy. Lein then asked Powless if the guards were going to be paid for this shoot, and Powless said no, it was going to be unpaid. Lein believed that qualifying at a gravel pit was not authorized by the Navy; it was not an authorized location and employees were not being paid. He also thought it strange that Powless, who was a Lieutenant, was asking Armstrong about whether qualifying at a gravel pit was authorized. (Tr. 666, 670–671.)

A few days after May 27, Lein was returning his weapon and saw Powless at the armory. He asked Powless how Coler did at the shoot, and Powless said that Coler passed. Lein then asked Powless how Coler scored with the rifle, and Powless said that she shot a 141, one point over the passing mark of 140. Lein walked away; he thought that there was no way Coler could have passed. (Tr. 672–673.)

On about May 31, Lein testified that he was working when he saw Coler loading her bag into one of the patrol trucks. He said to Coler "hey I heard you passed your quals." (Tr. 674.) Coler replied saying that she was happy about passing and this was her first day working South Patrol, which required a shotgun. After his conversation, Lein saw that Coler was on the work schedule assigned to different posts that required a shotgun. Mullen testified that on June 12, he was scheduled to relieve Coler and saw that she had been issued an M4 rifle along with her M9 pistol.

[15] Mullen testified that he had also heard from his coworkers about the range at Schroder's house in July 2017, and that the guards qualified using non-Navy issued weapons and ammunition. (Tr. 447–449, 504.)

[16] Respondent's employees have a 180-day probationary period, pursuant to their union contract. And any discipline or discharge issued during the probationary period is not subject to the contract's grievance and arbitration provision. (Tr. 760, 965; JX 16, Art. #6.)

(Tr. 458, 673–675.)

Lein eventually qualified with the M4 on June 20, at the Bangor range, with a score of 157. Originally, the qualification shoot was scheduled to occur on June 13, and both Lein and Coler were listed on the email delineating the guards scheduled to shoot. However, the range was cancelled and rescheduled for June 20; again both Lein and Coler were on the list of people scheduled to qualify. While Lein qualified at the Bangor range on June 20, Coler was not at the range that day. Lein thought the entire episode did not make sense. If the May 27 gravel pit range was an authorized shoot, as stated by Powless, and Coler qualified with her shotgun and rifle, he questioned why would Coler's name appear on the list for both the June 13 and 20 qualifications at Bangor. Lein thought this was especially odd since Coler was already working posts that required her to have a shotgun and/or rifle. (Tr. 675–678, 733; R 2, p. 17.)

4. Mullen and Salopek speak with an Xcel Lieutenant about weapon qualifications

On June 25, Salopek, Mullen, and another guard were at the armory turning in their weapons. An Xcel Lieutenant named Doug Lux (Lux) was present and asked the guards if they had any concerns or complaints. Mullen brought up the issue of Respondent using a gravel pit for weapon qualifications. Salopek and the other guard confirmed that this practice was, in fact, occurring. Lux said he would look into it. Later that evening, Salopek testified that Lux called him at home and said he had spoken with Morgan who confirmed that guards cannot be qualified at a gravel pit range. Lux then said that Morgan asked whether Salopek would be willing to help with the company's training program; Salopek agreed to help. (Tr. 137–39, 459–461.)

The next day, Salopek was scheduled to work with Coler; the assignment required Coler to carry a shotgun. At the start of their shift, the Lieutenant in charge switched their positions. Salopek was assigned the shotgun instead of Coler. Salopek testified that, as they drove to their post, Coler told him that she was angry because she had spent 5 hours at the gravel pit without getting paid, and now she had to get requalified. (Tr. 139–140.)

After finishing his shift with Coler, Salopek went to Lux's office and asked about the training program they had spoken about the previous day. Lux told Salopek that things had changed. Salopek was to bring whatever issues he had directly to Lux instead of to Morgan. Lux then said that Powless should have known better than to take people to qualify at a gravel pit based upon something another guard had told him. Salopek told Lux that Powless was not the only person involved, and the practice was being condoned by Terry and others. Lux again said that Powless should have known better. Salopek told Lux, "you're going to dump this whole thing on Gerald [Powless], aren't you?" (Tr. 141–142.) Lux did not answer. Salopek then told Lux that he was going to write a memo to Morgan regarding the entire matter. (Tr. 141–142.)

5. Salopek drafts a letter to Morgan

From the time Lein first learned about the gravel pit range in May, through the end of June, Lein, Salopek, Mullen, and Schryver, at various times had discussed amongst themselves what was happening with respect to Xcel using unauthorized locations, including a gravel pit, for weapon qualifications. They felt it was unsafe and wrong; these were not approved shooting ranges and guards were not being paid. They did not know who was acting as a safety officer at the unauthorized range sites, and no medical personnel or safety equipment was available if something occurred. Moreover, at these unauthorized range sites, guards were shooting civilian weapons, which were different than the actual weapons assigned by the Navy. They decided that something had to be done. So after speaking with Lux, Salopek drafted a letter to Morgan and emailed it to him on June 28, 2018. (Tr. 129, 142, 458–459, 678–679.)

Before finalizing the letter, Salopek testified that he spoke with Mullen and Schryver who looked at the letter for content, and also provided him with information to include in the document. (Tr. 142.) Salopek's June 28 email to Morgan reads as follows: "I know you are very busy. And I know rather long memos take up your time. But a few of us are asking for you to take a few minutes and review this with our concerns. We are hoping you will understand once you read it and understand our concerns." (GC 4.)

Attached to the email was a five-page, single spaced, letter. The letter is, at times, rambling and discusses a multitude of issues. The letter starts with a recitation of various conversations between Salopek, Morgan, and Lux. It goes on to discuss instances when qualifications occurred at gravel pit ranges, along with a timeline claiming the practice started when Terry was an acting Lieutenant, that it had stopped for some time, but then restarted again. The letter describes the incident involving Schryver familiarizing Cunningham with the shotgun, claiming it resulted with Cunningham's qualification, and Terry saying that the practice was allowed by the Navy. (Tr. 143–46; GC 3.)

Salopek's letter also discusses the shooting range at Schroder's house, where personal weapons were used to qualify, and the ammunition was purchased by Terry. The letter names three "senior guards" who could not pass their rifle and/or shotgun qualifications at Bangor on May 8, saying that Powless then drew a large cross on the rifle targets, and another Lieutenant put a white piece of paper on a the shotgun silhouette target, to enhance the visibility of the targets, resulting in the guards then passing 4 out of 5 of their shooting tests. (GC 3)

The letter discussed Coler and Lein failing their respective qualifications and Powless wanting to take them to a gravel pit, on their own time, to qualify with a personal weapon provided by another guard. Regarding Coler, Salopek wrote that after the gravel pit range Respondent considered her qualified on all weapons and she was allowed to work all posts. When Coler found out she had to requalify, she was upset because she spent 5 hours at the gravel pit without being paid. In the letter Salopek states that a coworker, who was recently retired from the Navy where he served as a range safety officer, said that qualifying guards at a gravel pit was against the law, because Respondent would have had to complete and submit qualification forms containing false information. (GC 3.)

In conclusion, Salopek wrote that there were seven reasons why they were bringing the issue of unsanctioned ranges/bad range practices to Morgan's attention: (1) someone could get hurt and the company could potentially be liable; (2) guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base; (3) the

practices violated the Navy's "OPNAV" safety and operating procedures and ethics; (4) if discovered by the Navy, or an Inspector General complaint was made, the consequences could be "catastrophic" for the company and tarnish the company's name as well the names of Respondent's guards; (5) Xcel's rating with the government could be affected; (6) criminal actions may have occurred; and (7) violations of State law may have happened which could jeopardize the company's ability to conduct business and the Navy's reputation. (GC 3.)

Morgan replied to Salopek by email on June 29. The email reads as follows:

> I read the first part of your letter. So much was misinterpreted that I don't know where to begin. I will work with Michael [Terry] to see what we need to do. It's unfortunate the message was confused, it was our intent to include your talent I [sic] training especially compliance but it seems there is a major disconnect between your [sic] and your Captain. I don't know if you realize it but that man has stepped up for you on many occasions just as you have for this company. We need to fix this relationship. I will be in touch.

Salopek testified that he was concerned about Morgan's response. Morgan was discussing Salopek's relationship with Terry, while Salopek was concerned about stopping dangerous practices from occurring. Salopek replied to Morgan by email dated June 30, expressing his concerns. Salopek also spoke about the issue with Lein and Mullen. They discussed whether it was time to make an official report and decided they needed to see the base commander who was going to be in his office on July 8. (Tr. 153, 159–160, 462, 679; GC 4; GC 5.)

6. Salopek, Mullen, and Lein complain to the base commander

On Sunday July 8, at about 3 p.m. Mullen, Salopek, and Lein went to see the base commander. It was Salopek's day off and Lein had just finished his shift. Mullen was on duty that day and assigned South Patrol, which involved patrolling the south side of the base, an area of about 5–6 square miles. (Tr. 80, 159, 164, 462, 680–681, 746–747.)

The guard on South Patrol drives a patrol truck and has a checklist with items that need to be reviewed during the shift, and the specific times the checks need to occur. These include checking certain buildings and ammunition magazines to make sure they are locked, and monitoring beaches and fence lines. The guard on South Patrol enters the exact time each item on the checklist is reviewed. Because there are not very many items that need to be checked during a shift, the guard on South Patrol sometimes gives bathroom breaks for other guards on post, or is "just killing time" by either parking somewhere on the island to save on fuel, or parking on a beach to watch for boats. (Tr. 750.) Other times they are backtracking to double check items that they have already checked. Also, about a half hour before their shift ends, many times the guard on South Patrol will wash the patrol truck because it gets dusty. Guards on South Patrol do not need to call-in for relief when they take a bathroom break or eat lunch. So long as they have their radio and pistol with them, they can take these breaks anytime they want. Because the base commander's office is located within South Patrol, and is inside one of the buildings that Mullen needed to check, he did not call for anyone to relieve him when he went to see the base commander with Salopek and Lein. (Tr. 462–464, 688, 701–702, 734–736, 746–752.)

The Navy's commanding officer at Indian Island was Commander Rocky Pulley ("Cdr. Pulley"). Mullen, Lein, and Salopek met outside the administration building and then went to Pulley's office, asking if they could speak with him about a safety concern. The guards told Cdr. Pully they had a safety issue and were trying to get direction on how to resolve the matter but were vague regarding the exact issue. After a few minutes of going back and forth with generalities, Cdr. Pulley demanded they tell him exactly what was going on. The guards told him about the gravel pit ranges using nonmilitary weapons and personal ammunition for qualification shoots. Cdr. Pulley asked if they had reported the issue up their chain of command, and they said yes. Cdr. Pulley then asked if they had spoken with Mike Jones, a Naval officer who was designated as the Installation Security Officer at Indian Island (ISO Jones or Jones). The guards had not informed ISO Jones, so Cdr. Pulley said that they needed to immediately send an email to Jones advising him of the issues.[17] Pulley also asked that they needed to inform Terry before contacting ISO Jones. (Tr. 163.) During the discussion, Salopek mentioned the possibly of going to the Navy's Office of the Inspector General (OIG) and asked about whistleblower protections. Cdr. Pulley said that all three of the guards were protected under the whistleblower program. The meeting with Cdr. Pulley lasted between 15–30 minutes. Mullen did not miss any of his scheduled checks on South Patrol during the time that he was meeting with Cdr. Pulley. (Tr. 160–165, 334–335, 463–464, 562, 647, 684–688, 734.)

After the meeting with Cdr. Pulley, Salopek, Lein, and Mullen went outside and discussed their next step; someone needed to contact Jones as per Cdr. Pulley's instructions. Lein and Salopek were scheduled to work on day shift the next day. Because Mullen was not scheduled to work until the swing shift, it was decided that he would draft and send the email to ISO Jones. (Tr. 464–465; R 1.)

*F. The Events of July 9*

1. Mullen emails ISO Jones

As instructed by Cdr. Pulley, on July 9 Mullen sent an email to ISO Jones saying that himself, Salopek, Lein, and Schryver were coming forward with a safety issue regarding weapon qualifications and using a gravel pit range on several occasions to qualify guards.[18] Before he sent the email, Mullen waited for Salopek to call Terry and notify him that a complaint was forthcoming. (Tr. 165, 465–466, 736–737; R 1.)

The morning of July 9, Salopek was at the Bangor range with a group of Respondent's guards including Coler, who was

[17] Transcript page 687, line 11 should read "None of us had spoken to Mike Jones" instead of "One of us had spoke to Mike Jones."

[18] Although Schryver's name is in the email, and he had discussed these issues with Mullen, Salopek, and Lein, it does not appear that he was actively involved in the complaint to either Pulley or Jones. (Tr. 294–296, 516–517.)

requalifying with the M4 rifle. Salopek said that he saw Mullen's email to Jones before it was sent, but only briefly. At about 9:00 a.m. Salopek called Terry. Salopek testified he told Terry that guards were coming forward with a complaint about his range practices, and that he owed it to Terry to tell him that a complaint was forthcoming. According to Salopek, Terry replied by saying that he already knew. (Tr. 165–166, 301, 885–886, 924–925; R 22, p. 22.)

Terry testified that he received two telephone calls at about 9:00 a.m. on the morning of July 9, one from ISO Jones and one from Salopek. Jones called to give Terry a "heads up" that Cdr. Pulley received a "walk-in" complaint that some of Xcel's guards were not properly qualified with their assigned weapons. (Tr. 878.) As part of his job duties Terry worked closely with ISO Jones and they would generally meet once a week to resolve any problems that might be occurring on base. During this call, Jones also told Terry that he wanted to look at Respondent's weapons training records. After getting the call from ISO Jones, Terry called Morgan to tell him what was happening and ask him for direction moving forward. As for his call with Salopek, Terry testified that Salopek told him somebody had turned Xcel into Cdr. Pulley. Terry said he told Salopek that he would deal with the matter. (Tr. 879–890.)

At 10 a.m. on July 9 Mullen sent the email to ISO Jones. The email is, for the most part, a condensed version of the letter that Salopek sent to Morgan on June 28. In the email, Mullen states that himself, Salopek, Lein, and Schryver were coming forward with a safety issue concerning weapon qualifications and Respondent's use of gravel pit ranges to qualify guards. Mullen's email describes the incident where Schryver took Cunningham to a gravel pit to shoot using Schryver's shotgun with ammunition provided by Terry. While Schryver thought the shoot was a "familiarization," Respondent considered it a qualification shoot even though Schryver was not certified to qualify anyone. And, when it was brought to his attention, Terry said that the practice was allowed by the Navy. The email also discusses Powless asking Schryver to qualify guards at a gravel pit, and a coworker saying that he brought personal weapons to work for use at a range occurring at another guard's house. (Tr. 297–298, 465; R. 1.)

The email discusses a range at Bangor on May 9, where Powless altered the rifle targets for Cunningham, Terry Lauritzen (Lauritzen), and Kevin David (David) with a large black cross, while Cunningham's shotgun target was altered by another Lieutenant with a white piece of paper. While Cunningham could still not pass his rifle test, the other guards qualified using the altered targets. (R 1.)

The email also discusses, in detail, the qualification shoot involving Lein and Coler, with Powless telling Lein that he would go to a gravel pit with Coler to qualify, but they would not be paid for their time. While Lein did not go to the gravel pit, Coler did and was qualified using a personal shotgun and an AR-15 supplied by a coworker; she was then allowed to stand posts that required being qualified with an M4 rifle and/or M500 shotgun. The email ends by saying that Morgan has been informed about these practices, and that it seemed Respondent was trying to cover up what had occurred. Therefore, Mullen wrote, "[w]e feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents . . . We cannot continue to let this go on without reporting it to you." (R 1.)

At about 11:30 a.m. on July 9, Terry received an email from ISO Jones asking for Respondent's training records for five guards: Lauritzen, Cunningham, Lein, Coler, and David. In the email, Jones asked that the five guards be removed from their post responsibilities and that their gun cards will be pulled until further notice. After receiving the email, Terry did not remove the guards. Instead, spoke with Jones and asked if he could have more time to sort things out and provide Jones with the proper records; Jones agreed. Terry then called Powless, who was at the range with Salopek, and told him what was occurring. He also contacted Lieutenant Armando Del Rosario (Del Rosario), who was the shift Lieutenant that day. Terry told Del Rosario about Jones' email, saying there was an allegation that Lauritzen and Cunningham, who were currently on duty at the main gate, were not qualified, and told Del Rosario to let them know that they may be pulled off their post. He also told Del Rosario to make the appropriate arrangements to find replacements to cover these posts if needed. (Tr. 882–885, 890.) (R. 8; JX 9.)

After ISO Jones received Mullen's email, he forwarded it to Rake. At about the same time he received the email from Jones, Rake testified that he got a call from Cdr. Pulley. Cdr. Pulley told Rake that he wanted all of Respondent's guards taken off their posts until it could be proven that they had met all the necessary requirements to stand post. Rake said that he then called Jones to find out more about the complaint. Rake also called Terry and left him a voicemail saying that he would be at Indian Island the next morning to meet with him. Rake testified that he called Terry because, whenever he gets a complaint he will "partner" with his contractors to find out about the complaint and work through the matter. (Tr. 537.) Just before 2 p.m. on July 9, Rake forwarded Mullen's email to Terry. At some point that evening Terry left Rake a voicemail saying that he was looking into the complaint and would see Rake the next day. (Tr. 534–539; R 1.)

Terry read Mullen's email immediately after he received it from Rake. He then forwarded it to Morgan. Terry testified that he was surprised with the allegations in the email. Terry said that Powless had been in charge of Respondent's firearms qualifications for years and had done nothing that would lead Terry to question his integrity. As for Mullen, he never received a reply to the email he sent to ISO Jones, nor did he ever hear back from anybody at the Navy about the complaint. (Tr. 476–477, 887–890, 918.)

Lein was working the morning shift on July 9, at the vehicle inspection post. At about 1 p.m. that day Cunningham arrived at Lein's post "armed up" and was calling everybody fucking rats. (Tr. 691.) Then, at some point Lein received a telephone call from Terry, who was angry. Terry asked Lein if he had spoken with Cdr. Pulley, and Lein said yes. Terry then asked Lein "who did you go with" and Lein said that he went with Salopek and Mullen. (Tr. 725.) Terry told Lein that he was pulling him off his post and off the contract. Terry also said that Lein had made a big mistake and then hung up the phone. After speaking with Terry, Lein called Mullen and relayed the conversation to him. Mullen, then called Salopek and told him about the conversation between Lein and Terry. (Tr. 166–167, 724–725, 737, 762–763,

931–932; R 32.)

2. Shotgun incident involving Mullen and Cunningham

Mullen worked the swing shift on July 9; the swing shift goes from 1:45 to 10:15 p.m. He arrived at work around 1 p.m. and went straight to the training room, which is located about 8–10 feet across from Terry's office. Terry's office door was open. While Mullen was in the training room he could hear Terry on the speakerphone with Morgan talking about the three guards who went to Cdr. Pulley's office the previous day. Mullen heard Morgan say that one of the guards was on probation and was easy to get rid of. He also heard Morgan say that the other two officers "are a cancer." (Tr. 467, 797–798.) At the time, Lein was still a probationary employee. (Tr. 466–467, 759–760; R 32.)

As Mullen was waiting for his shift to begin, he eventually sat in a chair in the corner if the training room. Mullen testified that, as he was sitting in the chair, Cunningham came into the room and started yelling at him, demanding an apology. Cunningham, who was still on duty at the time, was armed with an M9 pistol and carrying an M500 shotgun. According to Mullen, Cunningham was yelling "you're a fucking rat. You're a fucking skell."[19] Mullen did not know the meaning of the word "skell" but knew it was being used in a derogatory manner as Cunningham was once a dockworker in New York.[20] Mullen testified that Cunningham stood over him while holding the shotgun, was yelling and demanding an apology, and while he was doing so the shotgun barrel was moving across Mullen's legs and thighs. Mullen told Cunningham to point the gun elsewhere and said he was not going to get an apology. According to Mullen, Cunningham replied saying that the gun was pointed at the ground; Cunningham then left. (Tr. 474, 467–468, 476.)

Mullen testified that he felt threatened during the exchange with Cunningham. Cunningham's weapons were loaded, and Mullen did not believe that Cunningham had any work-related reason to be in the training room with his shotgun. Instead, Mullen believed that Cunningham came into the room just to yell at him. With Mullen sitting in the corner of the room, and Cunningham standing over him yelling, Mullen said that he felt as if he had "nowhere to go" and described the situation as "very uncomfortable and very threatening." (Tr. 473–474.)

Regarding the incident, Cunningham testified that he wanted an apology from Mullen because he had learned Mullen was one of the guards who had implicated him in the weapon qualifications complaint. During his testimony, Cunningham refused to say who told him about the complaint and Mullen's involvement, claiming he could not remember. Instead, Cunningham said that he had heard it through the "rumor mill." (Tr. 1057–1058.) Even though he claimed that he could not remember where he learned this information, Cunningham insisted that nobody from Xcel management told him about. Cunningham claimed that the only thing Respondent told him was that he needed to meet with Rake and Manson so they could hear his "side of these so-called rumors and accusations." (Tr. 1060–1061.)

As for the incident itself, Cunningham testified that, after he spoke with Rake and Manson, he was getting off his shift at about 2:00 p.m. and went into the training room where he saw Mullin sitting. According to Cunningham, he went over to Mullen and said to him "very simple [sic], I'd like an apology." (Tr. 1061.) Cunningham claimed that Mullen then went on the offensive, raised his voice, and said that he was not going to give Cunningham an apology. Cunningham again asked for an apology, but Mullen raised his voice once more saying that he was not going to get one. According to Cunningham, he turned around and as he started to walk out of the room, Mullen said, "don't be pointing your weapon at me." (Tr. 1061.) Cunningham testified the whole interaction lasted about 30 seconds. Cunningham denied pointing his shotgun at Mullen or sweeping him with the barrel. Instead, Cunningham said that when he walked into the training room he was holding his shotgun in a "low-ready position," which involves holding the barrel at a 45-degree angle pointing towards the ground. According to Cunningham, he was in the training room because that is where he signs his timecard when he finishes his shift. (Tr. 1061–1062, 1076, 1086)

3. Terry meets with Mullen and Lein

After the incident with Cunningham, Mullen dressed for work but was then summoned into Terry's office. Terry told Mullen that Morgan was on the speaker phone. Morgan asked Mullen if he was one of the three guards who went to see Cdr. Pulley. Mullen replied saying that himself, Salopek, and Lein did, in fact, meet with Cdr. Pulley. Morgan told Mullen that he could possibly be facing disciplinary action and asked whether Mullen wanted a union representative. Mullen said yes, and Morgan ended the conversation. Mullen did not tell Morgan or Terry about the incident with Cunningham that had just occurred. Mullen testified that he did not say anything because he wanted to try and let the matter with Cunningham diffuse. Mullen then left Terry's office and went back to the training room as it was time for him to arm-up and get ready to start his shift. (Tr. 474–476, 764, 781.)

After Lein finished his shift on July 9, he went to Terry's office; Terry was again speaking with Morgan on the speakerphone. Terry told Lein that Morgan wanted to ask him some questions, Lein and Morgan then started talking. Morgan told Lein that he was mad because Lein broke the chain of command by reporting weapons issues to Cdr. Pulley. Morgan brought up the fact that Lein was a retired chief petty officer and asked how Lein would feel if somebody bypassed him in the chain of command. Lein said he always told his sailors that, if they had a problem, he would like the courtesy of knowing what was happening, but they could always speak to someone else in a higher rank instead of him. Lein told Morgan that, because he had already told Powless, who was his direct superior, he did not feel

[19] Transcript pages 406 line 8, and 468 line 3, should read "skell" instead of "scale."

[20] "Skell" is defined as a homeless person or derelict. *Collins Dictionary Online*, https://www.collinsdictionary.com/us/dictionary/english/skell (last visited November 30, 2020). The word is also used as slang, particularly among the New York City police, to mean dirtbag or perp. See *Urban Dictionary*, https://www.urbandictionary.com/define.php?term=SKELL (last visited November 30, 2020). *Lucas v. Tempe Union High Sch. Dist.*, No. CV-17-02302-PHX-JAT, 2019 WL 3083010, at *8, fn. 12 (D. Ariz. 2019) (noting that the "Ninth Circuit periodically uses the website 'Urban Dictionary' to provide additional context for slang terms.").

comfortable qualifying at a gravel pit, he did not believe he jumped the chain of command by going to Cdr. Pulley. (Tr. 725–727.)

During their conversation, Morgan told Lein that the names of the guards listed in the memo could possibly lose their jobs and asked whether Lein had qualified with the M4 rifle. Lein said that he had done so. Morgan then asked if Lein had qualified at a gravel pit. Lein said no, that he qualified at the Bangor range. Morgan then said in a smug tone "so we accommodated you." (Tr. 728) Lein told Morgan that his waiting until the next official range at Bangor to qualify was not an accommodation. Lein told Morgan that he appreciated the job opportunity; he did not know anything about Xcel before joining the company, but a friend who worked for Respondent had nothing but good things about the company. Morgan then thanked Lein for his service in the Navy and the conversation ended. Lein thought that he was being fired, based upon what Terry had told him the previous day, so when he finished talking with Morgan he asked Terry "what's next?" (Tr. 729.) Terry asked if Lein was working the next day, and Lein said yes. Terry then said, "I'll see you on post." [21] (Tr. 728–729, 738–739.)

### *G. Mullen's Harassment Complaint and Respondent's Investigation*

#### 1. Mullen receives a text message from Kevin David

Mullen was not scheduled to work from July 10–July 12; his next scheduled workday was on July 13. On July 10, at about 6:20 p.m., Mullen received a text message from David, who was one of the guards named in the July 9 email to Jones as having his M4 target altered with a large black cross. David's text message to Mullen reads as follows:

> So I'm on your little fucking list, you're a fucking idiot & don't know what you have stepped in. Better call your butt buddy MarkSlander with no proof dumb ass Stupid leading stupider

Mullen viewed David's text messages as a threat. And he immediately thought back to his experience working as a prison guard when a coworker who he had crossed closed the prison cell door on him, crushing his shoulder. (Tr. 223, 480; GC 6; R 32.)

After receiving the text message, Mullen called Salopek, as his name was also mentioned in the text. He also called Manson and Lux. Mullen testified that he called Manson because he wanted a third-party, somebody outside of Xcel, to know about the threat. Manson did not answer so Mullen left him a message. In the voicemail Mullen read David's text message and said that he had been threatened and something needed to be done. (Tr. 480–484; GC 14.)

Regarding his call to Lux, Mullen testified that the two of them played "phone tag" but eventually spoke that night around 8 p.m. Mullen told Lux about David's text message, and Lux replied saying that he was already aware of it. (Tr. 482.) Lux further said that "administration" had advised Lux to tell Mullen to call local law enforcement. Terry testified that the instruction to have Mullen call law enforcement came from him. Terry said that he learned about David's text message from Lux, and Terry told Lux that, if the conduct was not occurring in the workplace, Mullen needed to call local law enforcement if he felt threatened. (Tr. 482, 484, 482, 790, 908–909; GC 14.)

Mullen called 911 after speaking with Lux. About 10 minutes later, a deputy called him from the Kitsap County Sheriff's department. Mullen read David's text message to the deputy, who told Mullen there was not much he could do because it was a veiled threat, as opposed to a direct threat of physical harm. But Mullen received an incident number from the deputy for future reference. (Tr. 485–489, 790–791; GC 14.)

Regarding the text message exchange, David testified he heard rumors that Mullen, Salopek, and a couple others had complained that some of the guards should not be carrying weapons on post because they were not properly qualified and he was implicated in the complaint. Like Cunningham, during his testimony David refused to identify from whom he had heard these rumors, claiming that he could not recall who told him. Despite his lack of memory regarding these rumors, David, who was visibly nervous and evasive while testifying about his text message to Mullen, was adamant that nobody from Xcel management told him that Salopek or Mullen had made the complaint. (Tr. 1036–1038, 1044–1049.)

According to David, he was angry that his name was implicated with the weapons qualification complaint because he had passed his rifle, pistol, and shotgun qualifications on February 21. David believed that Salopek was the one who had initiated the complaint, but because he did not have Salopek's phone number, he sent the text message to Mullen instead. David testified that he did not intend to threaten Mullen and described the incident as "a goofy text message" where he "made no threats to [Mullen] whatsoever." (Tr. 1038.) David said that within minutes after he sent the text to Mullen, he received a phone call from Lux telling him to stop sending Mullen text messages and to not contact him anymore. David testified that he then received calls from two other Lieutenants telling him the same thing. David did not contact Mullen any further. (Tr. 1037–1043; R. 47.)

#### 2. Mullen files a complaint with OSHA, calls out sick and emails Terry

On July 11, Mullen contacted the United States Department of Labor, Occupational Safety and Health Administration (OSHA) and filed a complaint. The Complaint alleged that, after Respondent learned about Mullen's safety complaints regarding weapon qualifications, certain employees threatened him and Respondent called him a "cancer." The threats referred to David's text message and the training room incident with Cunningham.[22] (R 12; Tr. 491–492.)

[21] In his testimony, Terry acknowledged that Lein spoke with Morgan that day in Terry's office but said that he did not really remember what was discussed. (Tr. 891.) He said that he remembered Lein asked for Union representation, "[a]nd I think that was about the end of it." (Tr. 891.) However, it was Mullen who had asked for union representation during his call with Morgan earlier that day and it appears that Terry confused the two. (Tr. 475–476.) I credit Lein's testimony as to what occurred during his conversation with Terry and Morgan on July 9.

[22] Mullen's OSHA complaint was dismissed in July 2019. Mullen appealed the decision, and the dismissal was affirmed in August 2019. (R. 29.)

Mullen's next scheduled workday was July 13. He had not heard back from Lux or anyone at Xcel regarding his complaint about David's text message, so he called Powless and told him that he would not be coming into work until the issue of the threats and harassment against him was addressed. Powless replied, "okay" and the phone call ended. Mullen was also scheduled to work on July 14 and 15. Because he had not heard anything further from Xcel, Mullen sent Terry an email on Saturday morning, July 14. (Tr. 489, 782; JX 7 #1454; R 32.)

In his email, Mullen explained what occurred during the July 9 training room incident with Cunningham. The email states that Cunningham called Mullen and Salopek "pieces of shit" and said they wrote lies about his range qualifications. Mullen wrote that Cunningham's shotgun barrel "swept" his left thigh, while Cunningham stood in front of Mullen yelling. Mullen's email identified a coworker named Norm Simons (Simons) as a witness and said Cunningham was so agitated that it did not appear he was thinking about safely controlling his shotgun.[23] Mullen's email next discussed David's text; Mullen pasted the text message into the email. Mullen ended the email by asking Terry to look into the matter saying both incidents had caused him a great deal of stress, to the point that the has not been able to return to work. (JX. 7 #1454–1455.)

After receiving Mullen's email, Terry called Morgan and also forward the email to him. During their phone call the two discussed how to proceed. Terry testified that Morgan told him to thoroughly investigate the complaint as soon as possible. While David and Mullen were scheduled to work that weekend, Cunningham was not. Terry, who was working from home that weekend, waited until he returned to Indian Island on Monday July 16 to start his investigation. (Tr. 907, 910.) During their phone call, Morgan also recommended that Terry post Xcel's hostile work environment policy in the training room and require everyone to read the policy and sign an acknowledgment that they had done so. (Tr. 910, 919–920, 964–65; R 32; JX 4 #1454.)

While Mullen testified that he believed he was scheduled to work on Monday, July 16, the work schedule shows that he was not scheduled to work on either July 16 or 17. His next scheduled workday was July 18. As for Terry, on Monday July 16 he was back at Indian Island and he took written statements from both Cunningham and Simons. Simons, who gave his written statement at 1:30 p.m., wrote that he was checking the weather on his cell phone when he saw Mullen engaged in some sort of discussion with Cunningham about an apology. Simons further wrote that Cunningham was speaking in a raised and angry voice, and when Simons looked up, he heard Mullen say in a normal but direct tone, that Cunningham was not getting an apology and "don't sweep me with the shotgun." According to Simons, when he looked up Cunningham's shotgun was pointed at the floor and he did not see or hear any communication of a threat by either party. (Tr. 910; R 5.)

Cunningham gave his written statement right after Simons. In his statement, Cunningham stated that he asked Mullen for an apology involving the remarks Mullen made about Cunningham's range qualifications; Mullen would not give him one. Cunningham wrote that he asked for an apology a second time, but Mullen again refused and said that they were done. According to Cunningham's statement, at some point during their conversation, Mullen said that Cunningham was pointing his gun at him. However, Cunningham denied doing so, saying that his gun was pointed at the floor. (R 6.)

On July 16 Respondent posted in the training room its workplace standards of conduct, along with a sign-in sheet for employees to affirm that they had read and understood the policies. Employees were told to read the policies and sign the signature sheet. However, they were not told anything else such as why the policies were being posted. (Tr. 919–920, 1050–1052, 1064.)

3. Mullen emails Terry his resignation

By July 17, a week had passed and Mullen had still not heard anything from Respondent regarding his threat and harassment complaints. Mullen believed that Terry heard Cunningham yelling at him on July 9, and Terry had not replied to Mullen's July 14 email. Therefore, Mullen believed that Xcel was not going to do anything about his complaints. Accordingly, Mullen decided that he needed to resign because he did not think it was safe for him to return to work because of the threats and harassment. So, Mullen drafted the following email which he sent to Terry on Tuesday, July 17:

> I am separating my employment with Xcel protective service (BCSI) effective immediately. The reason is for workplace harassment and threats. I will send my uniforms with a fellow employee. CAC card and region badge will be dropped off at Bangor pass and ID.

Terry testified that after receiving Mullen's email, he called Morgan, who told him not to contact Mullen going forward. Therefore, Terry replied to Mullen by email on July 18 by simply saying that Mullen needed to destroy the corporate credit card information he used for training and to sign a security debriefing. (Tr. 490, 790, 794, 934; JX 4 #1225.)

Terry never spoke with Mullen about his complaints involving the threats from Cunningham and David. When asked why he did not do so, Terry said that it was because Mullen "was on days off." (Tr. 922.) Terry claimed that he was going to interview Mullen when he came back to work but that Mullen resigned. For his part, Mullen testified that, had he known Respondent was investigating his threat allegations involving Cunningham and David, he would not have resigned. (Tr. 791–792, 921–922, 927.)

As for Cunningham and David, Terry decided not to discipline either of them. According to Terry, after reviewing the written statements, he decided that Cunningham had not done anything wrong. Regarding David, Terry said that David was not disciplined because his text message occurred outside of the workplace. Moreover, Terry said he did not view the text as

[23] In January 2019, Mullen asked Simon to write a statement about what occurred to support his OSHA complaint. However, Simon texted Mullen saying that "[a]fter a lot of reflection" he decided not to write a statement as the "only thing that it will show is Tim [Cunningham]'s temper. Which is already well known." (R 48.) In his text, Simon further wrote that he did not see Cunningham "laser" Mullen with the shotgun or hear/see Cunningham threaten Mullen. (Tr. 788–789; R 48.)

threatening. Instead, Terry thought that David was just "venting his frustration" about the allegations in Mullen's complaint to ISO Jones. (Tr. 935.) Also, during his testimony Terry offered his own reason as to why Mullen resigned. Terry believed Mullen actually resigned because he had failed his PRT, and he was scheduled to retake the test towards the end of July. If Mullen had failed again, he would have been fired. (Tr. 934–936.)

*H. Rake's Investigation into the Guards' Complaints*

1. Rake and Manson review documents and set up interviews

Rake and Manson conducted an investigation into the complaints Salopek, Mullen, and Lein made to Cdr. Pulley, as further set forth in Mullen's July 9 email to Jones, and they issued a report on July 25 with their findings. Despite the fact that virtually everyone who testified at trial referred to the review as an "investigation," Rake was emphatic during his testimony that what he and Manson did is not conduct an "investigation." (Tr. 589.) According to Rake, only the NCIS (Naval Criminal Intelligence Service) or law enforcement can conduct an "investigation," as can an individual directed to do so in writing by the commanding officer. (Tr. 553.) Instead, Rake said that what he and Manson did was conduct a review of a "customer complaint." (Tr. 589.) Rake said that whenever he gets a customer complaint, he partners with the contractor to find out more about the complaint and work through the incident. And, regarding this matter, Rake said that his "original customer complaint" was that Mullen, Lein, and Salopek met with Cdr. Pulley. (Tr. 589.) According to Rake, when he heard the customer complaint, he spoke with Burris and told her that if anybody left their post he would be requesting that they be removed from the contract for violating a general order to stand post until properly relieved. (Tr. 537, 589–590; R 2.)

Rake testified that Cdr. Pulley wanted to pull all the guards off their posts after he spoke with Salopek, Mullen, and Lein and he relayed this information to Terry, telling him how important the situation was and saying they needed to jump on it quickly. Rake went to Indian Island on July 10, and reviewed the training records with Manson, Terry, Powless, and Mitch Vancura (Vancura), another Xcel Lieutenant. Rake said they reviewed the records of the guards who were currently standing post, and then looked at the guards scheduled for the next shift "to get our feet on the ground." (Tr. 538.) Rake reviewed the watch bills and determined that Mullen was working the day he met with Cdr. Pulley; Rake believed Mullen had left his post to speak with Cdr. Pulley without permission from his shift lieutenant, Kristen Kirkpatrick (Kirkpatrick). (Tr. 538–539, 563, 590–591.)

The initial review of documents also showed that Cunningham, Lauritzen and David were not at the Bangor range on May 9, as alleged in the complaint regarding the date that their targets were altered. Salopek testified that the May 9 date was an error, and the incident involving the altered targets actually occurred sometime January or February. According to Salopek, he told this to Manson and Rake when they interviewed him on July 19. As for when his gun qualification shoot occurred in 2018, Cunningham testified that it happened in January. However, Rake's report says that the range qualifications for Cunningham, Lauritzen, and David happened on February 21, but Cunningham did not pass all his tests and shot again on March 9 when he qualified. For his part, Cunningham admitted that he sometimes struggled with his qualifications because of the lighting at the range. And, regarding the time he went shooting with Schryver, Cunningham said it occurred on his own time, as a refresher course because of the problems he was having on the range. While Cunningham claimed that he had already requalified when he went shooting with Schryver, Rake's report states that Cunningham reported that he went shooting in the woods with Schryver to become proficient for his qualification reshoot. Finally, Cunningham testified that he had heard of people qualifying at a gravel pit, but he did not know the exact location and had never been there to shoot. (Tr. 38–39, 905, 1067–1071; R 1, R. 2, p. 2–3, R. 14.)

Along with reviewing documents, Rake testified that he and Manson worked with Terry and Xcel to schedule interviews with various guards. According to Rake, he needed to go through Xcel to schedule these interviews, because he cannot require that a contractor's employees submit to an interview. Rake said that, on all his contracts, he works through the company's "chain of command," so with Xcel there was "a chain of command working to get a hold of each guard." (Tr. 539–541)

Rake and Manson personally interviewed various guards and supervisors, and took written statements from: Lein, Salopek, Schryver, Lauritzen, Coler, Cunningham, David, Kirkpatrick, and Powless. Rake and Manson also conducted phone interviews with Vancura, Terry, Lux, Lein, Coler, and two other guards named David Everson (Everson) and Ben Gentry. They did not interview Schroder, the guard who had a shooting range in his backyard, or another guard named Joab Eades (Eades) noting that they were on leave at the time. And, they never interviewed Mullen. (R 2.)

Regarding Mullen, Rake testified that he tried to schedule appointments with him for an interview three times but was unsuccessful because Mullen had called in sick. However, Rake's report says that Mullen could not be interviewed because he resigned the day before his interview. For his part, Mullen testified that he never heard from either Rake or Manson. Mullen said that he knew the interviews were occurring and assumed someone would reach out to him, but nobody ever did. (Tr. 501–502, 540, 784; R 2.)

2. The interviews with Xcel employees

The interviews with Xcel employees started on July 10. (R. 2.) Rake testified that he had a list of questions he asked each guard. One question was "do you know your chain of command" within Xcel. (Tr. 583.) According to Rake, it was important to ask each guard whether they knew their "chain of command" because he did not normally "have contractors go straight to the CO [Cdr. Pulley] or to a security officer [ISO Jones] without going usually through . . . their company chain of command, or coming to Steve [Manson] and myself, who . . . were out there all the time asking everybody how things were going." (Tr. 585.) When asked if following the "chain of command" was a mandate, or just his preference, Rake said that the Navy Contracting Office follows the contractors' rules and that in all three of the contracts he administers the company/contractor has provided its employees with documents saying "here's who your chain of command is." (Tr. 585.) Respondent's employee handbook says

that the company encourages employees to take their complaints to their immediate leadership team but following such a process is not mandatory. (GC. 2; R 2; R 7, p. 3–4.)

Rake testified that, after each interview, employees were provided with a form and asked to complete a written statement. Nine Xcel employees completed written statements which were attached to the final report. (Tr. 634; R 2.)

*a. Employee written statements*

*Daniel Lein*. Lein's written statement is dated July 10. In his statement Lein says that, during his initial M4 rifle qualification he failed by 5 points. Later, Powless told Lein that he and Emily Coler would meet Powless on May 27 at a gravel pit to qualify. Lein asked if the gravel pit shoot was a practice or a qualification, and Powless said that it was to qualify with the M4. But, Powless told him that instead of shooting an actual M4 rifle, Lein would be shooting an AR-15 owned by Armstrong. On the day of the gravel pit shoot, Lein called Powless saying he did not feel comfortable, was tired as he was coming off of a 12-hour shift and would wait until the next scheduled range at Bangor; Powless said that was fine. Out of curiosity Lein again asked Powless if the gravel pit shoot was for a qualification, and Powless said yes. Lein then asked if guards would be paid for their time at the shoot, and Powless said they would not be paid. Lein ended his statement by saying that he qualified with the M4 at Bangor on June 20, 2018 with a score of 157. (R 2, p. 16.).

*Emily Coler*. Coler's written statement is dated July 10. In her statement Coler wrote that, during her weapon qualifications at Bangor, on or about May 9, she did not pass. She had never previously fired an M4 rifle and received very little training. A few weeks later she was told that she could shoot again, this time at a gravel pit with just herself and one other person who also needed to shoot. The gravel pit shoot was much more successful as Coler received one-on-one time to become familiar with both weapons. Coler wrote that she did not think about the "legality" of the shoot because she had heard from others that it had been done before. Coler spent about 5 hours at the gravel pit and felt much more comfortable shooting. After the shoot, Coler was told that she could now stand post and was excited because it led to the opportunity for more on the job training "OJT." Coler further stated that, at the shooting range on July 9 she qualified on the M4 but did not qualify with the shotgun. Coler ended her statement by writing: "Post: I only stood posts that required the M9. If I was on patrol with someone for example, they had the weapons that they were qualified for, I never had possession of them." (R 2, p. 22.)

*Thomas Cunningham.* Cunningham's written statement is dated July 11. Cunningham wrote that in January 2018 he qualified at the Bangor range on the M9 pistol and Mossberg M500 shotgun. He remembers 10 other guards at the range that day, including Schryver, David, Salopek, Mullen, and Lauritzen, and that a Lieutenant named John Armstrong was in charge of the range. Cunningham stated that he did not know of anyone falsifying gun records. He further wrote that, in February he qualified at Bangor with the M4 rifle shooting a score of 153. Powless was in charge of the range that day and John Armstrong was his line coach. Cunningham identified two other people who were also shooting in February and said that nobody falsified any gun records. (R 2, p. 21.)

*Terrence Lauritzen*. In his written statement, dated July 11, Lauritzen wrote that he was being interviewed for statements made against him regarding weapon qualifications on February 21. Lauritzen said that he witnessed no violations of safety at any time on the range, nor has he witnessed any kind of target, document, or forged scoring at any time. Lauritzen ended his statement by saying that he had never qualified shooting anywhere other than at the Bangor range. (R 2, p. 23.)

*Jacob Schryver*. Schryver's statement is dated July 11. Schryver wrote that, in reference to the statement that he qualified Cunningham at a gravel pit, he never used the words "he's qualified." He and Cunningham did not use an approved course or approved weapons when they shot, as it was a "familiarization," and he was not certified to qualify anyone. Schryver wrote that he could not give the dates and times of the shoot with Cunningham, as it was not documented, and that he had no personal knowledge as to whether Cunningham subsequently qualified after they shot together. Schryver also wrote that, all the complaints he made regarding the range were brought to Powless, as the company's primary range safety officer "RSO." Schryver ended his statement by saying that he was not personally aware of any falsified documents. (R 2, p. 24.)

*Mark Salopek*. Rake's report contains two written statements from Salopek, both of which were dated July 19. In his first statement Salopek writes that he saw targets being altered on or about January 31, 2018. Salopek further stated that, around June 26–28 (and possibly sooner) Powless told him that Coler and Eades were going to a gravel pit range, but after a complaint was made Eades and Coler had to requalify; Eades told Salopek he had to requalify and that Coler was upset. Salopek stated that he thought he saw Coler standing post armed with a shotgun after the gravel pit range. Salopek also wrote that he saw the Bangor range score sheet for July 7, 2017 and was told by a guard who was present that they did not shoot at Bangor but were at another guard's house, referring to it as "range at Schroder's house." Powless told Salopek that the "range" at Schroder's house was "fun." Salopek also stated that there was a female guard who was pregnant and could not shoot at an indoor range but she continued working nonetheless. Salopek ended his first statement saying that he had never seen anyone leave their post. (R 2, p. 13.)

Salopek's second statement is similar to the first but provides a bit more detail. He confirmed seeing targets being altered on January 31, 2018 at Bangor. And, he wrote that Powles told him about obtaining an AR-15 to use for "range at the gravel pit." After the gravel pit range, Salopek wrote that Coler told him she was glad she could now serve on other posts, and he saw Coler holding a shotgun after the range occurred. After a verbal complaint was made, Lux told Salopek that he called "Everson to determine if it was allowed," referring to a gravel pit range, and was told that it was not.[24] Salopek stated that Coler was told she had to requalify sometime between June 26–28. Salopek wrote

[24] Along with being an acting Lieutenant, Everson was also a firearms instructor. (Tr. 155.)

that he needed to check dates and confirm when the gravel pit range occurred. Salopek next discussed the range on July 7, 2017 where coworkers told him they participated at a range at Schroder's house. Salopek wrote that Armstrong told him he had an AR-15 and a 9mm for use at the range, and that Terry said he was buying ammunition for the range at Schroder's house. Salopek stated that he saw the Bangor range sheet dated July 7, 2017, and a female officer named Owens was listed on the sheet. Salopek further stated that Owens was pregnant, and he believed that she was not allowed to qualify at an indoor range, but nonetheless worked until November or December. Salopek ended this second statement by again saying that he did not know of anyone leaving a post without notifying their supervisor. (R 2, p. 14.)

*Kristen Kirkpatrick*. Kirkpatrick's statement is dated July 22. Kirkpatrick wrote that she was the shift Lieutenant on July 7, 2018 and at no time did anyone ask her for permission to leave their post, or to enter Building 69 to talk to the commanding officer.[25] Kirkpatrick also wrote that she was unaware of any falsification of government documents by Xcel employees and was not aware of government weapons being used anywhere other than at authorized ranges. (R 2, p. 18.)

*Kevin David*. In his statement, dated July 22, David stated that he was not aware of any wrongdoing at the range, nor had he witnessed a range at either a gravel pit or at Port Townsend. David wrote that had to re-shoot to qualify on occasion but was unaware of government weapons being used at a gravel pit or open area. He was also unaware of any falsification of government documents. (R. 2, p. 19.)

*Gerald Powless*. Powless' statement is dated July 23. Powless wrote that the validity of Owens's sustainment shoot during the summer of 2017 was brought to his attention. Powless said that Owens was not allowed to shoot indoors at the time because she was pregnant, and the small arms training center was closed during that period because of lead exposure. Also, the "MILO Range Training System" was inoperative at Indian Island. Therefore, Powless stated that, because Owens could not shoot at either place, she "was familiarized and fired at a private range." Powless wrote that no government weapons or ammunition were used at this private range nor have they ever been outside of the Bangor or Port Townsend ranges. Powless further stated that "to my recollection, Lisa Owens did her sustainment shoot at the Port Townsend range, which we were using during the closure of the Bangor" range. Regarding Coler qualifying at a gravel pit, Powless wrote that this was "a familiarization fire with a personal AR-15 rifle and a personal M500 shotgun, with locally purchased ammunition." Again, Powless stated that no government weapons/ammunition were used and "Coler's shotgun and rifle familiarization that day did not count for qualifications." Powless wrote that Coler "was later brought to the Bangor" range where she qualified with the M4 rifle and M500 shotgun. Finally, regarding the alteration of M4 rifle range targets at the Bangor range, Powless wrote that a couple of guards were having trouble focusing on the target due to the gloomy lighting at the range so he drew a cross on the target with a black marker so the shooters could better focus on the target. To his knowledge, Powless said, he was not violating any regulations by doing so. (R 2, p. 20.)

*b. Testimony about employee interviews with Rake and Manson*

Four guards testified at trial about their interviews with Rake and Manson. David testified that Rake asked him if he attended a range on May 9, and David replied saying that he did not keep track of the dates. Rake then told him that, according to their records, he was not even there that day. Cunningham testified that he first learned that his name was involved in the "rumors" that some guards had not properly qualified during his interview with Rake and Manson. Cunningham said that, during his interview he learned that the people who were accusing him "of not qualifying were my witnesses at the range in Bangor." (Tr. 1059–1060.) According to Cunningham, he told Rake and Manson that "the inmates are running the asylum," and they "thought it was a laugh." (Tr. 1059–1060, 1068.) Regarding his interview, Lein only said that he met with them on July 10 and provided a statement. (Tr. 690–691, 1043–1044.)

Both Salopek and Rake testified at some length about Salopek's interview. According to Rake, he spoke with Salopek twice and both sessions took quite some time. In the first interview he said that they went through the standard list of questions, including whether Salopek knew who the safety officer was. Rake thought it was important that Xcel's guards had a clear reporting scheme and knew the identity of their safety officer. Rake described Salopek's demeanor during the interview as "arrogant." (Tr. 608.) When asked why he thought Salopek was arrogant, Rake gave a number of reasons. He testified that, on his own accord, Salopek brought up the 2015 armory door incident, saying it had been blown out of proportion and was not a big deal. Rake further said that during their interview Salopek expressed his dislike for Terry, and assumed Terry was the one who had demoted him. Rake testified he told Salopek that Terry was the one who persuaded Rake to talk the Contracting Officer into keeping Salopek on the contract as a guard instead of firing him. Finally, Rake testified that Salopek told them that, when he was a police officer, judges would say Salopek was an expert witness, had proven himself over and over, and whatever Salopek said was the truth; thus whatever Salopek was telling them during the interview should be taken as the truth. (Tr. 607–609, 621–622.)

Rake said that Salopek also raised another incident during their interview, without explanation, involving a 2015 OIG audit of security boats and Salopek said the OIG misunderstood the comments he made during the audit.[26] Rake said he was not even

[25] Apparently, this was in reference to Mullen speaking to Cdr. Pulley while he was still on duty, as Rake testified that he checked with Kirkpatrick and she did not give Mullen permission to speak with Cdr. Pulley. (Tr. 590.) However, Mullen spoke with Cdr. Pulley on July 8, not July 7 which is the date in Kirkpatrick's written statement. (Tr. 160, 329, 462, 679, 734.) (See also R Br., at 16, 56–58, 64.)

[26] Salopek testified that, regarding this incident, the OIG had asked him about the guards' job knowledge, and Salopek said that the guards were not trained in their zones/areas of protection. (Tr. 207–208.)

aware of the incident and had to call the OIG for clarification.[27] Rake also testified that Salopek brought up other topics during his interview that perplexed both himself and Manson. According to Rake, one such topic involved Kirkpatrick, with Salopek claiming she was once a dog groomer, was now a shift Lieutenant, and said that it was unfair women were being treated differently, implying that Kirkpatrick was promoted because she was a woman. Rake said he told Salopek that was he and Manson were the ones who approve shift Lieutenants, with Burris' consent. Rake further said Salopek suggested during his interview that women were problems as security officers, complaining that they are allowed to switch shifts whenever they wanted, and saying that a pregnant woman was allowed to shoot at Port Townsend but should not have been allowed to shoot because of her pregnancy. Regarding the allegation that targets were altered on May 9 for certain individuals, Rake denied that anyone told him that the May 9 date was a mistake, or that anyone gave him a different date for the incident. (Tr. 610–613, 617–618.)

As for his interview with Rake and Manson, Salopek testified that Rake and Manson took a confrontational tone during the interview, with pointed questions; he described the interview as "controlled and directed." (Tr. 177–178.) Salopek said they discussed targets being altered at the range and further said that he told them the May 9 date in the complaint was wrong; Rake replied saying "you're correct." (Tr. 388–389; 381–382.) Salopek testified that he only spoke with them once, and not twice as Rake had said. Salopek denied that the incident involving the 2015 OIG audit was ever discussed. He also denied raising the 2015 armory door incident. Instead, he testified that, at one point during his interview, Manson said to him "you know, we had one incident with you already." (Tr. 427.) Once Salopek realized he was referring to the 2015 armory door incident, Salopek said, "yes, you did. You did have one problem with me." (Tr. 427–429.) Salopek testified that he never said female officers were a problem, he denied complaining about female guards changing shifts, and further denied saying anything about Kirkpatrick being a dog groomer. In fact, Salopek said he was friends with Kirkpatrick, that she was never a dog groomer, and he had recommended her for Lieutenant. (Tr. 421–423, 1106.)

As for the statement attributed to Salopek about being a former police officer, Salopek testified that, what he said during the interview was that he was a police officer for 22 years, testified in court, and had never found a reason to lie. Salopek told Rake and Manson that he would not lie and jeopardize his past and present, so what he was going to tell them during the interview was the truth. (Tr. 424.)

Regarding his two written statements, Salopek said that he drafted the first statement, but was not satisfied with the it. So, he crumpled it up, placed it on the table in front of him, and asked for more paper to draft another one. When he finished the interview, Salopek said he picked up the first draft from the table in order to shred it. According to Salopek, Rake asked for the first statement, saying he did not want it to end up in wrong hands and that he would shred it for him. Three days after his interview, Salopek emailed Manson a four-page, single spaced typewritten statement. The statement contained more of the same type of information that was already set forth in Mullen's July 9 email to ISO Jones but provided further detail. In the email, Salopek wrote that the purpose of the statement was to show a chronological progression of events and give a solid track for follow-up. (Tr. 179–181, 307, 1100, 1104–1105; GC 8.)

### I. RAKE'S WRITTEN REPORT

Once the review was completed, Rake drafted his report with Manson's help, and sent it to Burris and Cdr. Pulley.[28] He also sent a copy to an OSHA investigator named Brian Morgan who was investigating Mullen's OSHA complaint.[29] Rake testified that, his normal procedure on a customer complaint would be to only send the report to Burris. Then, after Burris gave him permission, he would also send it to the contractor. But here, because of the nature of the complaint, Rake also sent his report to Cdr. Pulley. And, because OSHA had contacted the Navy Contracting Office, Burris put a "hold" on releasing the report to Xcel; it was not released to Respondent until a later date. Filibeck testified he received the report in December from OSHA. (Tr. 546–548, 554–555, 622–623, 631–632, 1023–1024, 1029–1030.)

Rake's report is dated July 25, 2018 and is titled Memorandum for Contracting Officer, Naval Facilities North West for Indian Island; Commanding Officer Naval Magazine Indian Island. The report is, at times, disjointed. It says that the purpose of the review was to evaluate the July 9 email regarding weapon qualifications at Bangor and to establish if Xcel violated Navy policy and bypassed minimum weapons qualifying requirements. In the report Rake cut and pasted statements from the July 9 email to Jones, titled these statements as "issues" and then proceeded to set forth his findings and recommendations on each issue. There are 12 "issues" total, with the last "issue" having multiple sub-issues relating directly to Salopek. (R 1, R 2; Tr. 542–543.)

*Issue 1*: The first item deals with the statement in the July 9 email that Mullen, Salopek, Lein, and Schryver were coming forward with safety issues regarding a gravel pit being used for weapon qualifications. The report states that all qualification forms were reviewed for authenticity, that qualification shooting was conducted at either Bangor or Port Townsend, and no guard had produced any documents to show that a Form 3591.1 was falsified or that the shoot did not occur at the proper range. Instead, the report says it was "he said, she said, I heard, no names," and that nobody "could produce any documents to prove the accusations." Also, the report states that Xcel "did hold remedial training to allow personnel extra training to pass

[27] During his testimony regarding this incident, Rake mistakenly referred to Salopek as "Mr. Mullen." (Tr. 610.)

[28] Rake testified that he and Manson spent 400 hours reviewing the allegations in the July 9 complaint. However, it appears that this includes time spent after the report issued, speaking with lawyers, the OIG, and others. (Tr. 543.) Notwithstanding, Rake testified that performing these activities were simply of his job. (Tr. 630.)

[29] Rake testified that he sent the report to Morgan, 3 days after he finished it, because Salopek and Mullen had filed a whistleblower complaint with OSHA. (Tr. 546–547). However, the documentary evidence shows that only Mullen had filed an OSHA complaint at the time the report was issued. (R. 12) The OSHA Case Activity Worksheet shows that Salopek filed his complaint with the agency on November 5, 2018. (R 26.)

qualifications" which did not violate "any contract or instructions." Accordingly, the report recommended no action be taken on this issue.

*Issue 2*: The second issue the report addressed involved the claim that Cunningham failed his shotgun qualification, was brought to a gravel pit by Schryver who supplied his personal shotgun, that Cunningham was then deemed "qualified," and when it was brought to Terry's attention he said that it was allowed by the Navy. The report states that Cunningham's Form 3591.1 were reviewed, along with ammunition logs, and that Cunningham did a "qualifications reshoot" on March 9, which was "within the time allotted for reshooting." The report further states that Cunningham said he went to an open area with Schryver and practiced with a shotgun on his own time and was never told that the event counted as his official qualification shoot. As for Schryver, the report says Schryver asserted that he had never taken anyone to qualify at any location other than Port Townsend or Bangor, but that he had taken several people out to open areas to provide extra training. Finally, the document says that Terry denied making the comment that this was a qualification shoot, and instead said that it was for remedial training. The report recommended no action be taken, saying that contractors are permitted to take personal weapons to shoot offsite.

*Issue 3*: Issue three involved the same situation as Issue 2 but focuses on: the claim that Terry gave Schryver ammunition for the shoot; Schryver saying that he was not certified to qualify anyone; and the assertion that the event stood as a qualification. The report noted that "this whole paragraph was denied by . . . Schryver and . . . Terry." It also says that Terry provided ammunition for remedial training only, and Schryver never said to anyone that the shoot counted as a "qualification." The report recommended no action be taken.

*Issue 4*: This section of the report discusses the allegations that Powless asked Schryver to qualify guards at a gravel pit and Schryver telling Powless that he was not comfortable doing so. The report states that Schryver denied the entire paragraph as worded and says that Schryver was never asked to qualify anyone; instead he was asked to provide remedial training to personnel needing extra time. The report further says that Powless denied ever asking anyone to qualify with a Form 3591.1 at any area other than Bangor or Port Townsend, and that a review of the paperwork, sign in sheets, and ammunition draws, concur with this statement. The report notes that Powless has been the training officer since about 2012, spanning two contracts and numerous inspections, without incident. The report recommends no action be taken.

*Issue 5*: Issue five involves the claim that, on July 7, 2017 Armstrong told Terry that he had an AR-15 and 9mm, and that Armstrong told Salopek he was bringing the weapons for the range at Schroder's house. In the report, Rake recommends no action be taken, and states: "Not sure what this paragraph means, Officer Mullen resigned the day before his interview, I did not have a chance to ask what this paragraph meant. The entire email reads as though the information was cut and pasted from a larger document. Third person information which cannot be verified. Captain Terry, Officer Armstrong believe he was talking about a time when they went shooting over at Officer Schroder's house."

*Issue 6*: This issue relates to the claim that, on May 9 Lauritzen and David could not pass their rifle test, Cunningham could not pass both his rifle and shotgun test and his ability to handle weapons was questioned. The report states that Lauritzen, Cunningham, and David were not present at the range on May 9. Instead they shot on February 21, with Lauritzen and David qualifying. Cunningham did not qualify and shot again at Bangor on March 9. The report also says that the line coaches did not notice any problems with Cunningham's ability to handle his weapons. No action was recommended regarding this allegation.

*Issue 7*: Issue seven involves the claim of using altered targets to qualify Lauritzen, David, and Cunningham; Powless altered targets by superimposing a large black cross on the target, and Vancura put a white piece of paper at the 6 o'clock position so guards could better see the silhouette when shooting. The report finds that the operating manual "does not state anywhere in the document that prevents the use of white dots, black cross marks or altering the target by enhancing the view with markers or dots." The report also states that the Federal Law Enforcement Training Center and Center for Security Forces were contacted, and both use the same practice to assist officers through their qualifications. Finally, the report also says that nobody they interviewed "had actually read the instructions pertaining to altering the targets" except Powless and Terry.[30] The report recommends no action be taken.

*Issue 8*: Issue eight discusses the allegation that Coler struggled handling her shotgun and rifle, that she failed her rifle and shotgun qualifications, and that Salopek said she should be taken off the range because she handled her shotgun unsafely. The report states that Schryver, who was Coler's line coach on May 9, said that he did not see any unsafe weapons handling, nor did anyone bring this to his attention. The report goes on to say that guards do not always pass their qualifications and that is why they are allowed to retake the shooting course again to qualify. No action was recommended on this claim.

*Issue 9*: This concerns Cunningham's requalifying with the M4 using altered targets. The report notes that this matter was addressed in Issue 7 and recommends no action be taken.

*Issue 10*. Issue 10 involves the claim Powless told Lein and Coler that they were going to qualify with weapons at a gravel pit, that the guards would not be paid for the shoot, that Lein was uncomfortable with the plan, did not go, and instead qualified at the next properly scheduled range. The report says that, during his interview, Lein said "he was never told that it was going to

[30] Issue 7 refers to Navy operating exists. See https://www.secnav.avy.mil/doni/opnav.aspx (listing all Department of Navy OPNAV Instructions) (last accessed on November 30, 2020). The correct operating manual is "OPNAV 3591.1F," which is discussed elsewhere in the report. The manual neither discusses the alteration of targets nor has instructions about the issue. The manual does have, as attachments, specific targets, none of which are superimposed with large crosses or white dots. See https://www.secnav.navy.mil/doni/Directives03000%20Naval%20Operations%20and%20Readiness/03-500%20Training%20and%20Readiness%20Services/3591.1F.pdf (last accessed on November 30, 2020).

be a qualification shoot but remedial training to allow more time with a rifle." And, because he was not getting paid, he decided to "take his chances" at the next range. The report also says that "Coler also stated she was never told that going to the 'gravel pit' was to qualify but for remedial training to allow her to qualify." Rake and Manson recommended that no action be taken.

*Issue 11*. Issue 11 involves the allegation that: at the gravel pit range Coler used her own personal shotgun and an AR-15 supplied by a coworker; after the gravel pit range she was considered qualified on both the rifle and shotgun; Coler was then allowed to work all posts on the base possessing all weapons. The report states that Coler's gun card showed she was only qualified with the M-9 pistol. Notwithstanding, a review of armory records showed that Coler was issued an M500 shotgun by four different shift Lieutenants on the following dates: June 5, June 12, June 19, and June 23. And, she was issued an M4 rifle on June 12. The report says that, upon discussion with the shift Lieutenants, they "discovered the loop holes" that allowed Coler to be issued weapons for which she was not properly qualified, and says they suggested recommendations immediately. The report further states that Manson "checked back thru records and found this was the only incident that allowed a person to be issued weapons." The report notes that, while Coler was issued the weapons in question, she was assigned at a post with a guard who was qualified to use the weapon. The report recommended the following three corrections be taken and says the issues "were resolved during the review:" (1) Nobody "is allowed to stand post until 100% weapons qualifications are completed;" (2) Require a guard's yellow gun card "be placed as a place holder when a weapon is removed to show the weapon was issued;" and (3) "Shared communication from the training officer to the" scheduler "to know who is 100% qualified." The report also states that, when Coler failed the M500 and M4 qualifications, Powless went on a 2-week leave and did not schedule Coler to requalify for the weapons. Instead, the "back up trainer" scheduled Coler at the Bangor Range on July 9, 2018.

Issue 12. Issue 12 involves the final statement in the July 9 email to Jones which states "[w]e feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents," and accused Xcel of a cover up. In reply to this statement, the report says that no falsification of any federal documents were found, including Forms 3591.1. And that nobody they "interviewed could provide any documents that GOV records were falsified, only comment was 'that was what I heard.'" Accordingly, the report recommended no action be taken.

The report then goes on to address the issues raised in Salopek's July 22 email, which expounded upon the allegations in the July 9 complaint. At the end of his July 22 email, Salopek wrote that there was an issue regarding the July 7, 2017 range, and recommended Rake and Manson review ammunition records for the ranges scheduled at Bangor. In addressing this claim, the report says the Bangor range was closed on July 7, 2017, "so Officer Owens shot at the Port Townsend Rifle Range to qualify (this is an alternate range approved by the GOV)." [31] (R. 2, p. 9.) The report recommended no action be taken an any of the issues raised in Salopek's July 22 email.

The last section of the report is titled "Comments and Responses" and states that each person interviewed was asked if they knew the proper company chain of command to make complaints. The report says that most guards identified their shift Lieutenant, Terry, or Powless and knew that Morgan had an open-door policy.

Having addressed the issues raised in the July 9 complaint to Jones, which was the objective of his review, Rake went on to state that "[w]hile I could not prove the following I had the feeling Officer Salopek was trying to get back at the company for some incidents that occurred with him since he brought up the following two incidents in our interview without any prodding by us which had nothing to do with the issues at hand, these incidents occurred in 2015." One incident involved the 2015 OIG audit. The report claims Salopek was unable to articulate three protection zones and said that, while he was authorized to fire on a boat as a practical matter he might not do so. The second incident involved Salopek leaving the armory door when he was an acting Lieutenant in 2015.

The report ends with Rake recommending that Salopek be removed from the contract for the following reasons: (1) Despite claiming that he had a high level of integrity and had been called upon by the court as an expert witness, Salopek did not bring facts but third party hearsay, was not able to provide a single document supporting the allegations, "letting the GOV waste time in running around to verify the hearsay comments;" (2) Salopek's disregard for Navy policy regarding his statements during the 2015 OIG audit, his leaving the armory door open in 2015, and the fact he believed these to be minor issues caused by someone else, which led Rake to believe that Salopek could not be trusted to stand post; (3) Salopek's statement that he was well known with judges and any information he provided must be true because of his integrity was the opposite of what the report found, in that his integrity was questioned as he did not have the facts needed by an expert witness in a legal proceeding who would have known the importance of facts as opposed to third party hearsay. Therefore, Rake wrote "I believe [Salopek] is the center to all the third party accusations to meet a hidden agenda of his own." (R 2)

### *J. Salopek and Lein File a Complaint with the OIG*

On August 15, Salopek and Lein filed a complaint with the OIG using a special email address they set up just for this purpose. The complaint was rejected for insufficient information 2 days later. About a week later Salopek re-filed the complaint, and included a 17-page, single spaced, rambling memorandum regarding Respondent's range practices and complaining about Rake and Manson's investigation. Salopek had a telephone interview and met personally with OIG representatives; during these discussions Salopek told them, in part, that he believed the investigation by Rake and Manson may have been biased. (Tr. 185–191, 307–310; GC 9.)

[31] Terry testified that the July 7, 2017 range occurred at Schroder's house, in his backyard; Owens is listed as having qualified on the July 7, 2017 Form 3591.1. (R 42; Tr. 895–898, 967–969.)

Rake testified that, during the OIG inquiry of Salopek's complaint, his personal LinkedIn page came to the OIG's attention. Along with a narrative of his background, Salopek had posted on his LinkedIn page some pictures of Navy Harbor Security Boats (HSBs) that are used to patrol the water surrounding Indian Island. Xcel guards, including Salopek, used to patrol these waters using HSBs until that duty was taken over by the Navy. Salopek had four pictures on his LinkedIn page of the HSBs. Two pictures showed the inside of the boat, with personnel sitting in front of a control panel, and two pictures showed the outside of the boat. According to Rake, the OIG wanted to know how the pictures were taken, since cameras are not allowed on Indian Island absent specific permission. (Tr. 77, 103, 207–208, 436, 596, 643–644; R 13.)

Regarding these pictures, Salopek said that he took them in 2016, and had permission to do so from the commanding officer at the time who told him there was nothing classified on the boats. According to Rake, the OIG asked him to contact the Respondent to have them ask Salopek to remove the pictures. Rake described the pictures as depicting "FOUO" (for official use only) information.[32] Rake reached out to Terry and sent him an email on September 7, with a copy to Morgan, saying that, during a routine social media review, the OIG found that pictures of HSBs were on Salopek's site, with a tag noting that the crew was using an on-board "FLIR" (Forward Looking Infrared), which is a thermal imaging device. Rake's email states that Salopek's LinkedIn page shows the electronic monitoring capabilities of on board HSBs and tells Xcel to ask Salopek to remove the information from his LinkedIn page, or anywhere else they were posted, by September 12. The email further says that, if Salopek "says 'no,' just let me know, do not push or keep asking him. It is OK to tell him that IG is performing inquiries and found this information." (R 13) (Tr. 434, 436, 596.)

Salopek testified that, sometime in September, Powless told him that the OIG wanted the pictures removed, and he immediately complied. At some point Salopek started a marine security services company called "Mjolnir," and similar pictures appeared on the company's website when the website became active on January 1, 2019. There is no evidence that the OIG, or any government security official, had any concerns about the fact Salopek reposted the pictures on his company website in 2019. And, nobody from the OIG's office, or Xcel, has contacted Salopek about the pictures since. (Tr. 313–318, 322–323, 596–597, 1100.)

On September 11, 2018, Salopek received an email from the OIG saying his case was not appropriate for an OIG investigation. However, the email goes on to say that, without divulging any identifying information, the OIG had referred various facts in the complaint to the Navy for their review and response and the OIG would ensure that appropriate leadership was aware of any concerns that may exist. (Tr. 189, 311; GC 9, p. 13.)

Rake testified that he cooperated fully with the OIG during its investigation into Salopek's complaint. Rake said that he sent the OIG his report, all witness statements, and any other documents that he collected for his report. (Tr. 646.) According to Rake, once the OIG "found out my abundance of documentation they, the asked for specific questions and specific documents." (Tr. 646.)

Indeed, on September 17, 2018, the OIG sent an email to Rake's superiors. The email says that a complaint was lodged about Xcel's weapon qualifications, the use of unauthorized firing ranges (gravel pit) for official qualifications, using personal weapons to qualify, falsifying weapon qualifications, and the use of altered targets. The email also says that the complaint alleges Rake and Manson failed to interview important witnesses, and discover pertinent supporting documents, during their inquiry. (R 45, p. 4–5.) Therefore, the OIG asked that Rake's superiors answer five specific questions related to the inquiry: (1) what percentage of Xcel employee weapons-issuance records were reviewed, and for what time period; (2) were all posts properly armed with the required weapons; (3) were any guards issued weapons for which they were not qualified at the time; (4) what specific actions has Xcel taken to resolve the problems identified in Rake's report; and (5) will there be a follow-up to "validate that the fix actions were effective." (R 45, p. 4–5.)

The questions were forwarded to Rake through his chain of command. Rake answered the questions and sent them back up through his supervisors who used Rake's responses to answer the OIG's questions. (Tr. 648–649.) Rake answered the five questions as follows, citing to his July 25 report when necessary: (1) "100% of the staff" were reviewed from September 2017–August 2018, and this was verified again by Mason on September 18; (2) personnel were qualified/armed correctly, with the exception of the findings already set forth in the July 25 report; (3) Coler was issued weapons for which she was not qualified; this occurred because the training officer left on vacation and did not communicate Coler's status to the scheduler; (4) Xcel has "instructed their scheduler and training officer to communicate that no one will stand post with a weapon that is not 100% qualified;" and (5) Xcel was told verbally and then in writing that the company will be assessed on taking corrective measures; the first follow-up occurred on August 30. (R 45.)

In his response to the OIG questions, Rake also stated that everyone who Mullen and Salopek "mentioned to us" as being "mentioned/connected" to the matter was interviewed, and some were interviewed twice. Rake further stated that Salopek was asked "for any documentation of any records that he knew were falsified or dates we could look at and he didn't have anything, other than 'from what I heard,' or words to that effect." Finally, Rake noted that neither Salopek nor anyone else could tell them where the gravel pit was located. (R 45, p. 2–3.)

[32] "FOUO" is not a security classification level, but instead is a Freedom of Information Act (FOIA) designation for unclassified information which the Department of Defense is authorized to withhold from a public FOIA request. Julia P. Eckart, *The Freedom of Information Act–the Historical and Current Status of Walking the Tight Rope Between Public Access to Government Records and Protecting National Security Interests*, 41 SETON HALL LEGIS. J. 241, 255 (2017); see also, Chief of Naval Operations Security Regulations Manual (OPNAV-M) 5510.1 Ch. 4, (August 25, 2017) https://www.secnav.navy.mil/doni/SECNAV%20Manuals1/5510.1%20(OPNAV).PDF. (last November 30, 2020)

### *K. Salopek's Discharge*

#### 1. Filibeck meets with Rake and Burris

In late October 2018, Filibeck met with Rake and Burris at the offices of the Navy Contracting Office located on the Naval submarine base in Bangor, Washington. Rake testified that this meeting occurred on October 25, while Filibeck said it happened on October 26. (Tr. 555–556, 571, 624, 989–995.)

According to Rake, Xcel requested this meeting in order to introduce the company's new management team to the Navy Contracting Office officials including Manson, Rake, and Burris. Filibeck, on the other hand, said that the meeting occurred at Rake's suggestion. Filibeck testified that sometime in mid-October he called the Navy Contracting Office and left a message. Rake returned his call around October 23. During this call Filibeck said he told Rake that he was taking over for Morgan. In turn, Rake told Filibeck that he may want to have a discussion with Burris at his earliest convenience. Filibeck then emailed and spoke with Burris on the telephone, saying that Rake had recommended he come out to meet everyone and discuss some pending issues. (Tr.555, 992–994.)

Present at the Bangor meeting was Rake, Burris, Filibeck, his assistant, and two of Respondent's owners/board members. Both Rake and Filibeck described the purpose of the meeting as a "meet and greet." (Tr. 555, 994.) According to Rake, towards the end of the meeting Filibeck asked whether there were any issues or concerns regarding the contract. (Tr. 555.) At this point, Rake said he looked at Burris, asked if he could tell Xcel about his report, and after she agreed, he told them "we have a safety issue." (Tr. 625.) Rake said he then "briefly went over a lot of the information in the report" including his recommendation to remove Salopek. (Tr. 555–556.) The Xcel officials then asked Rake about the report, the extent of his investigation, if everyone was interviewed, whether there was anything else they needed to know about, or something they could do to help fix things. Rake told them about the research his team conducted, the amount of time spent on the matter, and the extent of their investigation. Rake also told them that Terry had already implemented all of the report's recommendations. Regarding his recommendation to remove Salopek, Rake testified that Burris did not say anything, either for or against his proposal. In fact, Rake testified that Burris did not say more than 10 words during the entire meeting. While he recommended that Salopek be removed from the contract, Rake testified that neither he nor Burris made any recommendation whatsoever as to whether Xcel should terminate Salopek. In fact, Rake said that "it's drilled into use; we cannot . . . fire a contractor." (Tr. 558) (Tr. 555–559, 625–627, 995, 981.)

Regarding what occurred during this meeting, Filibeck testified that, after the initial pleasantries, he told Rake and Burris that Xcel was there to serve and asked what he could do to either perform better on the contract or make their lives easier. According to Filibeck, Rake then asked if he was aware of the issues occurring at Indian Island. Filibeck said that he thought everything was running about as well could be expected. Rake then asked Burris if he could bring everyone up to speed on a few things and Burris nodded her head yes. After Burris agreed, Filibeck testified that Rake first discussed Mullen, saying he had abandoned his post for a couple of hours to go on a "junket" with a couple other guards, and that "they were less than pleased about that." (Tr. 997.) The "junket" was Mullen, Salopek, and Lein going to speak with Cdr. Pulley. According to Filibeck, Rake then said Xcel was having a lot of performance issues, that the Navy had just completed a significant investigation on alleged complaints which, with few exceptions, had no basis in reality, wasted between 400–500 hours of their time, and they did not appreciate it. (Tr. 996–998, 1002–1003)

While Filibeck was not given a copy of the report, he testified that Rake read 85 percent of the report to him during the meeting, and told him that an employee had filed false complaints with no "basis in reality," resulting in an investigation that cost the Navy a lot of time, effort, and money resulting in them "chasing their tails." (Tr. 999.) Filibeck said that Rake detailed the false complaints, saying five guards listed in the complaint were not at the shooting range on the date in question, and that those guards had previously passed their qualifications anyway. Also, Rake said that Coler was qualified on the M9 and the M500 shotgun, but not qualified on the M4 rifle. While she was stationed at a post which required one of the guards carry an M4 rifle, Rake told the Xcel officials that Coler was always stationed at the front post talking to drivers, and the front post only required an M9 pistol. (Tr. 999–1000, 1023–1030.)

Filibeck testified that, during the meeting, Rake said, "[w]e strongly recommended [Salopek's] immediate removal from the contract," because he is dishonest, and cannot be trusted. (Tr. 1002) Filibeck further testified that Rake said he had lost all confidence in Salopek's ability to fulfill his duties at the jobsite, saying "we don't want him, get rid of him." (Tr. 1002.) By the end of the meeting, Filibeck said he knew the Navy Contracting Office had done a thorough job and Rake was serious about wanting Salopek off the contract. That being said, nobody from the Navy ever requested Salopek's removal from the contract in writing, which would have been the standard practice if the Navy wanted him removed. Filibeck, who has worked in government contracting for over 27 years, testified that, when the government directs a contractor to remove an employee from a contract, notification is usually provided in writing. And, although Rake recommended Salopek's removal from the contract, Filibeck acknowledged that neither Rake nor anyone from the Navy ever asked that Salopek be fired. (Tr. 1002) At the end of the meeting Filibeck said that they "discussed remedies" and Filibeck told Rake and Burris that he was going to meet with Salopek, and "would let them know in very short order" how he was going to take care of the matter. (Tr. 1014.) (Tr. 980, 1000–1003, 1029.)

After the meeting ended, Filibeck contacted Terry and Powless to discuss Rake's report. Filibeck said he discussed the report with Terry and Powless because he felt blindsided; he needed to know how this happened and if, in fact, Xcel had training issues he did not know about, or something that the Navy did not uncover. Regarding these discussions, Filibeck testified that Powless was a "fountain of information regarding Salopek." (Tr. 1015.) Despite his discussion with Terry and Powless about training issues, Filibeck claimed that it was not until April or May 2019 that he learned Respondent had actually been using someone's backyard as a shooting range to qualify its guards. (Tr. 1015, 1020.)

2. Filibeck fires Salopek on October 27

On October 27, Salopek and Lein were working the morning shift, assigned to the commercial vehicle inspection (CVIS) post; Powless was the shift supervisor. During the morning briefing, Powless told the guards to make sure their uniforms were in order and shoes shined as some company "bigwigs" were coming. (Tr. 196, 699.) After the briefing, Salopek and Lein went to their post. (Tr. 195–197, 699–700.)

Respondent informed the Union that Salopek was going to be fired, so Union business agent Scott Harger (Harger) called Salopek that morning and told him the news before it happened. Salopek testified that, during this call, Harger told him both he and Lein would be fired. At some point Powless and Vancura drove to the CVIS post and relieved Salopek of his duties. (Tr. 198.) Vancura assumed Salopek's position while Powless and Salopek drove back to the Xcel offices in Building 848. When they arrived, Powless told Salopek that he needed to take his weapon. Salopek surrendered his pistol and the two went into the Lieutenant's office. (Tr. 198–199, 699, 812–813.)

After speaking with his union representative, Salopek was then taken to the training room. Present was Filibeck and one of Xcel's owners/Board members; Salopek did not know either individual. According to Salopek, after everyone introduced themselves Filibeck said that Salopek could either resign or he would be fired. Salopek refused to resign and asked why he was being terminated. Salopek testified that Filibeck told him he was being fired for dishonesty, violation of the chain of command, and lack of candor to a supervisor. However, in a written statement drafted on October 28, Salopek wrote that Filibeck told him he was being fired for dishonesty, affecting the morale of the workplace, and "something regarding candor with supervisors." (R. 52.) This written statement comported with an affidavit Salopek's provided to the NLRB during the underlying investigation; neither document mentions a violation of the chain of command. (Tr. 202, 270–271, 338–339, 351–352, 357; R 52.)

Salopek testified that he asked Filibeck during this meeting for the specific charges against him; Filibeck said there were a litany of items and he would send them to Salopek. Filibeck then told Salopek he needed to sign various paperwork in Terry's office and turn in his Common Access Card ("CAC card") and badge.[33] Salopek complied. When Salopek went to Terry's office, Terry told him that there was nothing in his employee file except the vault incident in 1995 and that "this is all Rake." (Tr. 355) Salopek said Terry then told him that the Xcel officials met with Rake and afterwards called Terry saying Salopek and possibly Lein were going to be fired. Regarding this phone call, Terry testified that he received a call from Filibeck on October 26. Filibeck told Terry that he had just finished meeting with the Navy regarding Salopek, and they "basically wanted him gone" because Salopek was the person responsible for the months-long investigation over weapon qualifications. (Tr. 945.) As for his conversation with Salopek on October 27, Terry said he told Salopek that this was out of Xcel's hands and was what the Navy had requested. (Tr. 203, 344, 353–358, 946; R 52.)

Regarding his meeting with Salopek on October 27, Filibeck testified he told Salopek that he had just met with the Navy, and while Salopek had worked for Xcel for some time, the Navy directed him to remove Salopek from the contract. Filibeck said he told Salopek the reasons for his removal were dishonesty, falsifying reports, and lack of candor during the Navy investigation which resulted in hundreds of hours of investigative time, causing the Navy to "chase[ ] their tail." (Tr. 1016.) According to Filibeck, he then told Salopek that he had not done Xcel any favors and asked if he wanted to resign. Salopek would not resign, so Filibeck told Salopek that he was terminated effective immediately. (Tr. 1015–1016.)

Salopek never received anything in writing from Xcel explaining why he was terminated, or the charges that were levied against him. On October 30, an automatically generated email was issued stating that Salopek's CAC card had been revoked. According to Rake, this is standard practice; once Xcel notifies Rake that someone is no longer employed by the company, the former employee's CAC card is revoked since that person is no longer working on the contract. (Tr. 203–204, 359, 571–573; GC 10–11; (JX 5 #1678.)

3. Respondent's stated reasons for firing Salopek

After Salopek was fired, Terry completed a company "change of status" form which states that Salopek was fired on October 27 and was not eligible for rehire. The form further says that Salopek was terminated for "chain of command violation and dishonesty." (JX 5 #1285.) Filibeck instructed Terry to write down these two specific reasons for Salopek's discharge on the form. (Tr. 947–949.)

Filibeck denied using the term "chain of command" during his October 27 meeting with Salopek, but admitted that this was one of his concerns. (Tr. 1016) Also, when asked if a guard was prohibited from going to anyone at the United States Navy about employee complaints, Filibeck testified that "[i]t is definitely a violation of the rules and regulations for sure." (Tr. 1017.) However, there is no evidence that any such "rules or regulations" exist, and nothing in Respondent's employee handbook precludes a guard from contacting anyone at the Navy directly, either civilian employees or military personnel, about their complaints. (GC 2.)

According to Filibeck, as a contractor Xcel follows the military's chain of command whenever an issue arises. Thus, when an issue is brought to the company's attention, Xcel takes the matter to Manson, Rake, or Burris. Then, if Xcel does not believe the issue is receiving the attention it deserves from the Navy's Contracting Office, Xcel can turn the matter over to the OIG which would conduct its own independent investigation. Only if the OIG finds merit to the matter, would a commanding officer, like Cdr. Pulley, become involved as the OIG would go through the military chain of command with its findings. Filibeck testified, "[w]e don't jump that." (Tr. 1016.) Thus, Filibeck said, "we just don't get the option to . . . leave our post and . . . barge into the commanding officer's offices. It reflects very badly on the employees and on the company as a whole." (Tr.

[33] A CAC card is an identification card containing biometric information issued to government employees, members of the military, and contractors. It allows them access to the base. (Tr. 209–210, 573–579.)

1022.) Filibeck further said that when someone does not operate inside of the confines of the military's rigid structure, the result is what occurred with Xcel involving the complaint lodged by Mullen, Salopek, and Lein, "[t]hey will tell somebody something that turned out to be completely unfounded allegations for the most part, there's a knee jerk reaction to problems." (Tr. 1017.) (Tr. 1016–1017, 102.)

When asked how Salopek was dishonest, Filibeck referred to the guards that were alleged to have falsified training records and failed their qualifications. According to Filibeck, he told Salopek that he was dishonest because the allegations that several guards falsified training records and failed their qualifications were false. Regarding Salopek's dishonesty, Filibeck further said that, if an employee on a federal contract makes an allegation it better be correct because there are repercussions. And, Filibeck said that Salopek should have brought the complaints through the appropriate military chain of command so Xcel could have reported the problem appropriately to the government. As for Salopek's alleged lack of candor, Filibeck testified that, according to Rake, Salopek was not forthcoming with them, in that Rake and Manson had to go back looking for things. Filibeck said that he had an opportunity to review the training records at Indian Island before he "clipped" Salopek, and that as per the Navy investigation, Salopek's allegations were completely false.[34] (Tr. 1018–1019.) In fact, Filibeck said that Salopek's allegations were "not even close, and he got us in a lot of trouble with the Navy for filing those false allegations." (Tr. 1019.) (Tr. 1018–1022.)

Filibeck testified that he believed Rake had conducted a very thorough investigation involving extremely serious allegations. And he was facing a situation where Rake, who Filibeck described as "basically our direct boss" was recommending Salopek's immediate removal from the contract, and Burris was not saying anything. (Tr. 1004.) Filibeck said that the Navy has the right, under the contract, to request anybody be removed; Filibeck wanted to keep the contract at Indian Island and "keep the customer happy." (Tr. 1004.) Therefore, Filibeck decided to remove Salopek from the contract. As for why Salopek was discharged, as opposed to being transferred to another Xcel contract, Filibeck testified that the allegations against Salopek were very serious, and Xcel's next closest contract was with the United States Army Corps of Engineers at a series of dams on the lower Columbia River which was "10,080 miles away." (Tr. 41, 981, 1005.) Also, Filibeck said that there were a couple of issues with transferring Salopek to another contract. The first issue was "if this guy is going to do this kind of activity here, he's going to do it there." (Tr. 1005.) (Tr. 1003–1007.)

Also, Filibeck said that, at the time of his testimony, he believed there was currently "an active investigation regarding those classified photos that are still up" on Salopek's website, referring to the photographs Salopek took of the HSB console. (Tr. 1005–1006.) Therefore, because Salopek posted classified photographs on his own personal website for another company, Filibeck said that he "could never employ him." (Tr. 1006.) However, no evidence was introduced that there was, in fact, any such current investigation into Salopek's pictures. Finally, Filibeck claimed that Salopek would not be able to receive a CAC card if he had been transferred to another one of Xcel's contracts. However, Filibeck later admitted that the reason Salopek's CAC card was cancelled was because Xcel had fired him for cause, and if Salopek had been transferred to another Xcel contract, as opposed to being fired for cause, there would not have been any problems with Salopek's CAC card. Rake confirmed the Navy's ability to transfer CAC card authorizations from one contract to another, when the employee is "not in trouble," and said that the Navy Contracting Office "do[es] that a lot." (Tr. 575–576.) (Tr. 1005–1006.)

4. Lein's conversation with Powless on October 27

Lein testified that October 27 was a strange day. That morning, he was pulled off the CVIS post to wash a vehicle, which was not a typical assignment for a guard standing post. Then, instead of resuming his post, Powless had him load boxes of old files into a van with two other guards and drive them to a building for storage. Moving boxes of paperwork was also not part of Lein's normal duties. He eventually returned to the CVIS post sometime around noon. At some point that day, Salopek told Lein about the conversation he had with Harger. Lein then witnessed Powless and Vancura relieve Salopek of his duties, and he saw Salopek leave with Powless. Based upon what had been occurring that day, Lein assumed he was going to be fired as well. (Tr. 700–705.)

When Lein finished his post, he went to Building 848 and turned in his weapon. Someone at the armory told Lein that Powless wanted to speak with him, so Lein walked over to Powless who was standing nearby. Powless invited Lein into Terry's office. At this point Lein testified that he was upset. He asked Powless "am I fired," and further told Powless that he was not going to sit there and have a conversation if he was being fired. (Tr. 706.) Powless replied saying "they were going to fire you" but decided that, since it was Lein's first time "jumping the chain of command," he would get a second chance. (Tr. 706–707.) Powless then told Lein that the two of them had not talked since July, when the violations were reported to Cdr. Pully. Powless told Lein that he was "ticked off" at Lein for not letting Powless know that he was doing something wrong. Lein testified that could not believe what Powless was saying, as he had been expecting an apology from Powless; the two spoke briefly and Lein left. Lein was never disciplined. (704–708, 743–744.)

*L. Lein's Issue Involving Guard Mount/Arm-up Pay*

Article 12 of the parties' CBA states that guards are to receive an extra 30 minutes of paid time for each shift they work; this is referred to in the contract as "guard mount pay." (JX 15–16.) The document says nothing about whether this extra time is to be pro-rated depending upon the length of the shift. In practice, the extra 30 minutes is broken down into two 15-minute increments. At the start of a shift guards are given 15 minutes to arm-up, receive briefings, and get to their post, and they get 15 minutes at the end of a shift to get back to Building 848, pass on briefings, and arm-down. A standard shift for a guard is

[34] Filibeck referred to his firing Salopek as having "clipped" him. (Tr. 1018–1019.)

therefore 8.50 hours. (Tr. 708–710, 950–951; JX 15–16.)

Terry testified that, depending upon their weapons and guard assignments, it only takes about 5 minutes to complete the entire arm-up/arm-down process; it is "a very fast process." (Tr. 958.) And, he said that traditionally, if a guard has armed-down before the full 15 minutes allotted, Respondent allows them to go home early. (Tr. 952.)

Sometime around Christmas 2018, Lein volunteered to work a 4-hour shift. Lein went to work, and at the start of his shift put down 4.50 hours on his timesheet to account for his 4-hour shift and the extra half hour for guard mount pay. When Lein finished his shift, he checked his timesheet and someone had whited-out the 4.50 hours and replaced it with 4.25 hours. Lein approached the part-time Lieutenant on duty and asked why his timesheet had been changed. The Lieutenant told Lein that he was working a 4-hour shift and therefore only entitled to an extra 15 minutes for guard mount. Lein disagreed, and the Lieutenant told him to bring it up with Terry if he had a problem. (Tr. 709–712, 740.)

The next morning Lein testified that he went to Terry's office to get clarification on the matter. He told Terry what had happened and also said that he did not appreciate the Lieutenant changing his timesheet; instead the Lieutenant should have first discussed the matter with Lein. Terry told him to put down 4.50 hours. Lein felt that Terry was just appeasing him and wanting to get Lein out of his office. Nevertheless, Lein was paid for 4.50 hours. (Tr. 713, 740–742.)

In about early to mid-January 2019, Lein was assigned to work 4-hour shift and had another issue regarding guard mount time. He arrived to work at 1:30 a.m. along with another guard for a 2–6 a.m. shift. The two guards went to the armory at 1:45 a.m. where Lieutenant Lux was on duty. Lux refused to let them arm-up until 2 a.m. Lein told to Lux that the CBA provided 30 minutes for guard mount and explained his discussion with Terry a few weeks earlier. However, Lux would not allow them to arm-up until 2 a.m. This resulted in Lein and his coworker being late to relieve the other guards on post. (Tr. 714–716, 743; R 46.)

The next day, Lein testified that he was assigned to work the dayshift and he went to the training room for the shift-briefing. However, there were only a couple people present. Eventually Powless arrived and said that the briefing would occur in the Lieutenant's office. Lein testified that, when he walked into the Lieutenant's office everyone was there, including half of the night-shift guards and the night-shift Lieutenant. According to Lein, it was unusual to have other shifts present during the day-shift briefing; once he walked into the office he knew something was wrong as everyone was looking at him. After they entered, Powless told the group that somebody had complained about the arm-up time and Terry had directed that nobody would be going home early anymore. (Tr. 717–718, 742; R 46.)

Lein was mad, so after the meeting he followed Powless to the armory and told him "if you're going to put this crap out at guard mount" at least have the whole story and the facts before "you put me out there like that. Because everybody knew they were talking about me." (Tr. 719.) Lein testified that Powless "got pissed off," turned his back to Lein and then turned around and said, "oh, are you going to write me up?" Lein believed that Powless was referring to the complaint that Lein, Salopek, and Mullen made to Cdr. Pulley and thought Powless was still mad at Lein for making the complaint. (Tr. 720.)

After speaking with Powless, Lein armed-up and walked to his duty van along with Everson who was his partner for the day. When they arrived at their van, an Xcel Lieutenant named Paul Wilson was standing there and told Everson "hey, you need to get this guy straightened out" in reference to Lein; there was no reply and Lein went to his duty post with Everson. (Tr. 721.) Lein testified that throughout the day Everson and another guard kept telling him that he: needed to apologize to Terry; was messing up the Company's spreadsheet; was the only one that had complained; was not a team player; and ruined everyone's life because the guards could no longer go home early. Lein replied by telling his coworkers that he did not care about the Company's spreadsheet, they needed to read the CBA, and that Respondent was obligated to pay him what the contract dictated. (Tr. 721–722; R 46.)

Terry was working that day, and he had to drive past Lein's post to enter the base. When Terry drove to the guard shack Lein testified that he walked up to Terry's car and told him what Powless had said at the guard mount briefing that morning; Lein was angry. Lein told Terry that the guards had been verbally assaulting him in the guard shack because of what Powless said at the briefing and that he should not have to come to work and be harassed because he asked for clarification about guard mount pay. According to Lein, Terry said that the guards should be mad at him and not Lein; Terry then drove off. (Tr. 722–723, 742.)

Before his shift ended that day, Lein needed to go to Building 848 to reset his email. According to Lein, he sat at a computer next to Powless to fix his email and told Powless that the guards had been harassing him all day. Lein testified that, at one point, Powless told him that if he had any issues or concerns maybe next time he should bring them up to his peers. Right before the shift ended, Powless told Lein that he had communicated with Terry and the guards were no longer prohibited from leaving early after they finished arming down. (Tr. 742.)

The issue involving guard mount pay was not the first time Lein brought a problem regarding his pay to Terry's attention. In September 2018, Lein complained to Terry about the amount of pay he received during his first 2 weeks of employment with Respondent, which he referred to as his "in-hire" period; this consisted primarily of time spent training and with weapon qualifications. According to Lein, he was only paid $11 per hour during this time, and he had $38 taken out for union dues. Lein said he discussed the matter with his coworkers, and with the Harger, and learned that the minimum wage at the time was $11.50 per hour. Also, one of his coworkers said that he had been paid his regular salary of about $27 per hour during his in-hire period. Harger also told Lein that too much money had been deducted for union dues during his first 2 weeks. Harger then emailed Terry on September 26 asking for a copy of Lein's dues authorization card. Lein said that a few days later he was summoned to Terry's office. According to Lein, Terry told him that, if he had any pay issues, he needed to speak to Terry about it and not the Union. Lein replied saying that he had the right to speak with the Union. During this meeting Lein said he also told Terry that the minimum wage was $11.50 per hour, and that every guard hired after January 1 should be reimbursed an extra $40.

(Tr. 695–699, 826; GC 17.)

Terry acknowledged that Lein came to him with a question about guard mount pay involving a 4-hour shift but could not remember when it occurred. He first guessed that it happened in November 2018 and then said that he thought it happened when Lein was still in his probationary period. Terry testified that, during their conversation he told Lein that he would be paid a full half-hour. Respondent's counsel asked Terry whether, during this conversation, he told Lein to only come to him about issues like pay as opposed to going to the Union. Terry said that he did not recall any such conversation but did remember telling Lein that if he has any issues with his pay, uniforms, or whatever, to please let him know so Terry could see if he could solve the problem. (Tr. 955–956.)

III. ANALYSIS OF THE 8(A)(1) AND (3) ALLEGATIONS

*A. Mullen, Salopek and Lein Engaged in Protected Concerted Activities*

The protections afforded under Section 7 of the Act extend "to employee efforts to improve their terms and conditions of employment or otherwise improve their lot as employees through channels outside of the immediate employee-employer relationship." *Valley Hospital Medical Center*, 351 NLRB 1250, 1252 (2007) (citing *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978)). This includes the right of employees to take their complaints to their employer's clients or customers. *Kinder-Care Learning Centers*, 299 NLRB 1171, 1172 (1990) (citing *Greenwood Trucking, Inc.*, 283 NLRB 789 (1987)); *Paragon Systems, Inc.*, 362 NLRB 1561, 1564, 1576 (2015) (contract security guard who delivered strike notice to Army Colonel at client agency was engaged in union activity protected by Sec. 7 of the Act); *M.V.M., Inc.*, 352 NLRB 1165, 1172–1175 (2008) (letter from Federal courthouse security guards who worked for private contractor, sent to the United States Marshals Service, complaining about working conditions constituted protected concerted activity for mutual aid and protection).[35] And, employees engage in concerted activity protected by Section 7 when they complain about issues involving safety, training, and equipment used in the workplace. *G4S Regulated Security Solutions*, 359 NLRB 947, 951 (2013), affd. 362 NLRB 1072 (2015), enfd. mem. 670 Fed.Appx. 697 (11th Cir. 2016) (security guards were engaged in protected concerted activity by complaining about, among other things, having lanyards on their weapons and wearing vests); *North West Rural Electric Cooperative*, 366 NLRB No. 132, slip op. at 1 fn. 1, 14 (2018) (employee was engaged in concerted activity for mutual aid and protection by posting comments about safety and the lack of safety training on Facebook forum regardless of whether coworkers agreed with his comments or if the comments on safety practices and accident prevention actually had merit); *Mitchell Manuals, Inc.*, 280 NLRB 230, 231 (1986) (employee letter sent to chairman of employer's parent corporation addressing employee concerns about wages, education, and training, was concerted activity for mutual aid and protection); *Dreis & Krump Manufacturing*, 221 NLRB 309, 310, 314 (1975), enfd. 544 F.2d 320 (7th Cir. 1976) (protesting the quality of supervision as it relates to training and safety falls within the scope of the mutual aid or protection clause).

Here, Mullen, Salopek, and Lein were concerned about safety issues surrounding Respondent's practice of organizing and conducting weapon qualifications at unauthorized locations, using non-government weapons with non-government ammunition. They were also concerned about the propriety of Respondent's Lieutenants altering targets to assist guards who were having trouble qualifying. By taking these concerns to Cdr. Pulley and ISO Jones, the three guards were engaged in concerted activity for mutual aid and protection. *Valley Hospital Medical Center*, 351 NLRB at 1252; *Kinder-Care Learning Centers*, 299 NLRB at 1172. However, this does not end the inquiry, as "[o]therwise protected communications with third parties may be so disloyal, reckless, or maliciously untrue as to lose the Act's protections." *Valley Hospital Medical Center*, 351 NLRB at 1252.

"Statements have been found to be unprotected as disloyal where they are made 'at a critical time in the initiation of the Company's' business and where they constitute 'a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income.'" Id. (quoting *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464,472 (1953). However, the "Board is careful . . . to distinguish between disparagement of an employer's product and the airing of what may be highly sensitive issues." Id. (internal quotation omitted). For employee criticism to be considered so disloyal to lose the Act's protection there must be evidence of a "malicious motive." Id.

Statements that are "maliciously untrue, i.e., if they are made with knowledge of their falsity or with reckless disregard for their truth or falsity," are also unprotected. Id. That being said, "the mere fact that statements are false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue." Id. When "an employee relays in good faith what he or she has been told by another employee, reasonably believing the report to be true, the fact that the report may have been inaccurate does not remove the relayed remark from the protection of the Act." Id. (citing *KBO, Inc.*, 315 NLRB 570, 571 (1994), enfd. mem. 96 F.3d 1448 (6th Cir. 1996)).

Here, the complaints made to Cdr. Pulley and ISO Jones related directly to the guards' working conditions and nothing in those complaints were disloyal or disparaging so as to lose the protection of the Act. There is no evidence the statements were made "at a critical time in the initiation of" Xcel's business. *Jefferson Standard*, 346 U.S. at 472. Indeed, Xcel had been the contractor at Indian Island for 20 years. And, although the statements were critical of Respondent's weapons training/qualification practices, they were not made "in a manner reasonably calculated to harm the [Respondent's] reputation and reduce its income." Id. In context, it is clear that the three guards did not intend to "disparage or harm Respondent" but wanted "to pressure Respondent to" change its weapons qualification practices

[35] *M.V.M., Inc.*, 352 NLRB 1165, 1172–1175 (2008), is not binding precedent, as it is a two-member Board decision. It is cited for its persuasive value only.

to comport with Navy regulations, thereby improving safety by ensuring that all guards were properly qualified to use the weapons and ammunition they are required to carry while patrolling at Indian Island. See *Valley Hospital Medical Center*, 351 NLRB at 1253 (citing *Mount Desert Island Hospital*, 259 NLRB 589, 593 (1981), enfd. in relevant part 695 F.2d 634 (1st. Cir. 1982.)

Also, there is no evidence that the statements made in the complaints to Cdr. Pulley and ISO Jones were maliciously false. Instead, the evidence shows that the core issues raised in complaints were, in fact, true. Both Coler and Lein failed their initial weapon qualifications in early May and were told they would have the chance to shoot again at a gravel pit to qualify. Coler stated in her written statement to Rake that she shot at the gravel pit range, did not think about the "legality" of the qualification because she had heard it had been done before, and was then told that she could now stand post. (R 2 p. 22.) After her gravel pit qualification Mullen saw Coler standing post with an M4 rifle and Rake's report confirmed that she was issued an M500 shotgun or M4 rifle on multiple occasions before she passed her subsequent qualification test at the Bangor range on July 9. Lein's written statement to Rake discusses how Powless had arranged for him to qualify at the same gravel pit as Coler, and that Powless told him that he would be qualifying with an AR-15 provided by another guard instead of using an M4 rifle. (R 2, p. 16.) Lein's testimony also confirms that Respondent considered Coler's gravel pit range an official qualification shoot, as Powless told him the shoot was for qualifying and that Coler passed her rifle test shooting a score of 141. Indeed, Terry admitted that, until the Navy's Contracting Office started investigating the complaints lodged by the three guards, Respondent had a longstanding practice of using unauthorized locations to qualify guards, including the backyard of a someone's house, or anywhere else they could find, and they used non-government issued weapons for these qualifications. Terry further admitted that this practice had been going on for years, and it was only when Respondent got its "hand slapped" as part of the investigation that Xcel stopped this practice. (Tr. 963, 978.)

Also, the evidence shows that at least one weapons qualification Form 3591.1 contained false information. The Form 3591.1 signed by Powless for the July 7, 2017 qualification states that it occurred at the Bangor range. However, the qualification shoot actually occurred in Schroder's backyard. (R. 42; Tr. 895–898, 967–969.) Indeed, according to Rake's report the Bangor range was closed on July 7, 2017. (R 2, p. 9.) Also, regarding the complaint that Respondent was using altered targets, Powless admitted doing so. Powless' written statement admits to altering targets with a large cross because a couple guards were having trouble focusing on the targets do to the "gloomy lighting" at the range. (R 2 p. 20.) Cunningham admitted that he sometimes struggled with weapon qualifications because of the poor lighting.[36] (Tr. 1071.) While Rake claimed that the practice of altering targets was not prohibited, it does not take away from the legitimacy of the concern expressed by Mullen, Salopek, and Lein. Guards on post could hardly expect criminals, terrorists, or other wrongdoers to be walking around outlined with a large black cross to help their coworkers focus on the potential threat. And, nobody claims that a guard's ability to shoot accurately in all types of weather conditions and lighting is not a vital job duty.

While Mullen's email to Jones, and Salopek's email to Morgan, states that the incident with the altered targets occurred in May, which is incorrect, I credit Salopek's testimony that he told Rake that the date was a mistake. Indeed, in his second written statement to Rake, Salopek stated that he saw targets altered at the Bangor range on or about January 31. (R 2, 14.) Moreover, the mere fact that any statement in the complaints were "false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue." *Valley Hospital Medical Center*, 351 NLRB at 1253. Ultimately, Respondent bears the burden of proof to show that an employee's statements are maliciously untrue. *Three D, LLC*, 361 NLRB 308, 312 (2014), enfd. 629 Fed.Appx. 33 (2d. Cir. 2015). And here, Respondent has not even shown that the primary allegations in the complaints were false, let alone that they were made with malicious intent. Accordingly, the complaints made by Mullen, Salopek, and Lein did not lose the protection of the Act.

Similarly, I find that Mullen did not lose the protection of the Act when he accompanied Salopek and Lein to Cdr. Pulley's office while he was on duty. At various times during their testimony, Rake and Filibeck claimed that Mullen improperly left his post when he went to speak with Cdr. Pulley, with Filibeck saying that Rake called Mullen's actions a "junket." (Tr. 589–590, 996–997.) And, Rake testified that, had Mullen not resigned, he was going to recommend Mullen be removed from the contract for abandoning his post. (592–593) However, the evidence shows that Mullen did not abandon his post. Instead, Mullen was within his patrolling area of South Patrol at all times that day, as Cdr. Pulley's office is located within South Patrol. Also, Mullen did not miss any of his required security checks that day, nor is there any evidence that Mullen had abandoned his radio and pistol when he met with Cdr. Pulley. Given the fact that guards are allowed to take breaks whenever they want, without calling in for relief, and that guards on South Patrol spend a lot of their day "just killing time" because of the minimum number of security checks to be performed, it can hardly be said that Mullen abandoned his post when he spoke with Cdr. Pulley. This is especially true considering the fact that it was not uncommon for guards on South Patrol to spend 30 minutes at the end of their shift each day washing their work truck. Meeting with the base commander involving an important security issue is surely more important that washing a work truck or parking somewhere "killing time." Accordingly, I find that Mullen did not abandon his post, and his actions that day did not lose the protection of the Act.

*B. Mullen's Resignation/Constructive Discharge*

The General Counsel alleges that Xcel constructively discharged Mullen, arguing that Respondent imposed intolerable

[36] Notwithstanding Cunningham's claim that he passed all his qualifications in January, Rake's report found that was not the case as he had to reshoot his qualifications on March 9. (R 2, p. 2.)

working conditions upon him in retaliation for his protected concerted activities, and should have reasonably foreseen that, if Mullen did not receive assurances that the threatening behavior against him would be addressed and stopped, he would quit. (GC Br., at 36–38.) "Two elements must be proven to establish a 'traditional' constructive discharge: 'First, the burden imposed on the employee must cause, or be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign. Second, it must be shown that those burdens were imposed because of the employee's union [or protected] activities.'"[37] *Chartwells, Compass Group, USA, Inc.*, 342 NLRB 1155, 1170 (2004) (quoting *Crystal Princeton Refining Co.*, 222 NLRB 1068, 1069 (1976)); see also *American Licorice Co.*, 299 NLRB 145, 148 (1990) (whether employer specifically intended that the employee quit is not dispositive, as a constructive discharge can occur in circumstances where "the employer should have reasonably foreseen that its action would have that result."). The test as to whether working conditions were so difficult or unpleasant so as to force an employee to resign is an "objective one." *Chartwells*, 222 NLRB at 1069; *Quanta*, 355 NLRB 1312, 1314 fn. 4 (2010); see also, *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) ("The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances."). If the General Counsel proves a prima facie case of constructive discharge, the burden shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its actions. *Grand Canyon Mining Co.*, 318 NLRB 748, 760 (1995).

Regarding Mullen, I believe that, given the circumstances, the evidence supports a finding that a reasonable person would view the text message from David as threatening. The message calls Mullen a "fucking idiot," calls Salopek Mullen's "butt buddy" and says that Mullen "don't know what you have stepped in." (GC 6.) Regarding the incident with Cunningham in the training room, although I generally did not view Cunningham to be a credible witness, I find that the evidence does not show that Cunningham actually "swept" Mullen with his shotgun, or purposely pointed the gun at him. Instead, the evidence shows that, during the altercation, Mullen was sitting down and Cunningham was standing over him holding his shotgun at a 45-degree angle, pointing towards the ground. Because Mullen was sitting down, and Cunningham was standing up, it is easy to understand why Mullen would think that Cunningham's shotgun was pointed towards him, when in reality it was pointed at an angle towards the ground. That being said, the credited evidence shows that Cunningham was mad when he confronted Mullen. He was yelling at Mullen, calling him a "fucking rat" and "fucking skell," while demanding an apology. Indeed, Simon, who was present when the incident occurred, said that a written statement from him would only show Cunningham's temper, which was already well known. Given these circumstances, I find that, although Cunningham was not purposely pointing his shotgun at Mullen, it was not unreasonable for Mullen to view the interaction as threatening.

Accordingly, I find that Mullen reasonably viewed both incidents as threatening, and therefore his reporting them to Respondent and asking that they be addressed before returning to work was rational. However, I do not believe the evidence supports a finding that Respondent's actions/inactions imposed a situation that was so difficult or unpleasant that it forced Mullen to resign, or that Respondent should have foreseen Mullen would have resigned because Xcel did not immediately inform him of the company's investigation into his allegations.

Regarding the text message from David, after Mullen reported it, Respondent immediately addressed the issue. Shortly after he sent the text message, David received calls from three different Xcel Lieutenants telling him to stop texting Mullen and cease all contact with him. While Respondent never informed Mullen that David was directed to stop contacting him, David complied with the directive and there is no evidence that Mullen heard from David again. In these circumstances, where David ceased all contact with Mullen once the incident was reported to Respondent, I do not believe that a reasonable employee would have found conditions so difficult or unpleasant so as to be forced to resign. Cf. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 332 (5th Cir. 2004) (prompt remedial action was fatal to Title VII constructive discharge claim); *Young v. Temple University Hospital*, 359 Fed.Appx. 304, 309 (3d Cir. 2009) (same).

As for the incident with Cunningham on July 9, Mullen did not report the altercation to anyone until July 14. Mullen had an opportunity to tell both Terry and Morgan about the situation with Cunningham shortly after the incident occurred, when he was called into Terry's office on July 9 to speak with Morgan on the telephone but chose not to say anything. He also had the opportunity to tell Powless about the incident on July 13 when he called to say that he was not coming into work. However, instead of specifically telling Powless about what occurred with Cunningham, Mullen only said that he would not be coming into work "until these situations" or "these threats, and harassment" was addressed. (Tr. 489, 782.) Powless told Mullen "okay." (Tr. 489.) And, despite the fact Mullen was scheduled to work on July 13, 14, and 15, Respondent never demanded, or even asked, that Mullen return to work. (R 32.) He was allowed to stay home without repercussions. While Terry waited 2 days before starting his investigation, he received Mullen's email over the weekend while he was working from home. When he returned to Indian Island on Monday July 16, he immediately took statements from Cunningham and Simons and on the same day Respondent also posted its workplace standards of conduct in the training room, requiring every guard sign a document affirming that they had read and understood the policies. And, Mullen resigned on July 17, even though he was not scheduled to work until the next day. (R 32.)

Like the issue with David's text message, I do not believe the General Counsel has established a prima facie case that Terry's inaction for 2 days before he started investigating the Cunningham incident, or his failure to inform Mullen of the investigation, created working conditions so difficult or unpleasant that Mullen

[37] A constructive discharge can also occur where the evidence shows that the employee faced a "Hobson's Choice" between continued employment and abandoning his or her statutory rights. *Sara Lee Bakery Group, Inc. v. NLRB*, 296 F.3d 292, 300 (4th Cir. 2002). Here, neither the General Counsel nor the Union advance a "Hobson's Choice" argument regarding Mullen, nor does the evidence support such a claim.

was forced to resign. First, I find it significant that that Mullen himself waited 5 days before he even reported the incident to Respondent, although he had at least two opportunities to do so. And when he did report the incident, he waited until the weekend. Under these circumstances, where Terry was working from home, I do not believe that it was unreasonable for him to have waited until he returned to Indian Island on July 16 to begin his investigation and post Respondent's workplace guidelines. As for the fact that Mullen did not hear anything back from Terry, generally courts allow an employer sufficient time to remedy the intolerable working conditions. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation."). Had Respondent directed Mullen to return to work immediately, or risk discipline, the situation may have been different. See *Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781, 790 (7th Cir. 2007) (Court noting that "[i]f continued employment would compromise an employee's personal safety . . . we do not expect an employee to remain on the job while the employer tries to remedy the problem."). However, after Mullen told Powless that he would not return to work until the threats and harassment were addressed, he was allowed to stay home, without threat of discipline or discharge. Under these circumstances, where Terry was actively investigating Mullen's complaint against Cunningham, and Respondent was not requiring Mullen to return to work while it was sorting through the various allegations, I do not believe the evidence warrants a finding that Mullen's working conditions were so difficult or unpleasant that a reasonable employee would have been forced to resign. Accordingly, I recommend that this allegation be dismissed.

### . *Respondent violated Section* 8(a)(1) *of the Act by Discharging Salopek*

#### 1. Res gestae

The credited evidence shows that Filibeck fired Salopek for violating the chain of command and for dishonesty. These are the two reasons Filibeck told Terry to put on Respondent's internal termination document. *Paragon Systems, Inc.*, 362 NLRB at 1566 (Board finds no merit in employer's claim that it lawfully disciplined employee for parking violation and talking to coworkers as these reasons were not listed in disciplinary form or notice). While Filibeck denied using the term "chain of command" in his conversation with Salopek, he admitted that Salopek's violating the chain of command was a concern for Respondent. Also, Powless, who had met with Filibeck and Terry to discuss Salopek and Rake's report, told Lein that Xcel was going to fire him as well, but decided against it since it was the first time Lein had jumped the chain of command. Under these circumstances, there is no doubt that Salopek's jumping the chain of command, by joining his coworkers to meet with Cdr. Pulley and complaining to ISO Jones, was a motivating reason for Salopek's discharge. As for how Salopek was dishonest, Filibeck said that Salopek's allegation that several guards falsified training records and failed their weapon qualifications was false. Both of these allegations were contained in the complaints lodged by Salopek to Morgan and in the email Mullen sent to Jones. In short, both reasons stated by Respondent for Salopek's termination, as documented in his change of status form, were part and parcel of Salopek's protected concerted activities.

"Where a case turns on the alleged misconduct that is part of the res gestae of activity protected by Section 7 of the Act, the proper inquiry is whether the employee lost the Act's protections in the course of that activity." *ADT, LLC.*, 369 NLRB No. 23, slip op. at 8 (2020) (citing *Desert Cab, Inc.*, 367 NLRB No. 87, slip op. at 1 fn. 1 (2019)). I believe that this is the proper standard through which to analyze Salopek's discharge.

As set forth above, Salopek did not lose the Act's protections in the course of his protected concerted activity. Mullen, Salopek, and Lein had a protected right to take their complaints about working conditions directly to Cdr. Pulley and ISO Jones. *Paragon Systems, Inc.*, 362 NLRB at 1564, 1576; *Valley Hospital Medical Center*, 351 NLRB at 1252. While Xcel may have preferred that the three guards used another forum to publicize their concerted complaints, like going to the OIG instead of Cdr. Pulley or Jones, "an employer may not interfere with an employee's right to engage in Section 7 activity by requiring that the employee take all work-related concerns through" a specific channel. *Valley Hospital Medical Center*, 351 NLRB at 1254 (citing *Kinder-Care Learning Centers*, 299 NLRB at 1171–1172); see also *M.V.M., Inc.*, 352 NLRB at 1175. And, while Filibeck claimed that Mullen, and by extension Salopek, violated rules and regulations by going to the United States Navy about employee complaints, there is no evidence that any such regulations exist.[38] (Tr. 1017.) Moreover, even if they did exist, "so long as protected concerted activity is not unlawful, violent, in breach of contract, or disloyal, employees engaged in such activity generally do not lose the protection of the Act simply because their activity contravenes an employer's rule or policies." *Valley Hospital Medical Center*, 351 NLRB at 1254 (citing *Communication Workers Local 9509*, 303 NLRB 264, 272 (1991)). Because neither Salopek, Mullen, nor Lein lost the protection of the Act when they engaged in protected concerted activities, Respondent violated Section 8(a)(1) of the Act when it terminated Salopek for alleged misconduct that was part of the res gestae of his protected concerted activities. *ADT, LLC.*, 369 NLRB No. 23, slip op. at 9 (2020).

#### 2. *Wright Line*

The same conclusion is warranted even when applying the burden shifting framework set forth in *Wright Line*. *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983); see also, *NLRB v. Main St. Terrace Care Center*, 218 F.3d 531, 540–541 (6th Cir. 2000) (applying *Wright Line* to 8(a)(1) allegations involving employee concerted activity). Under this framework, the General Counsel must prove by a preponderance of the evidence that employee protected activity was a motivating factor for the employer's actions. To support such a showing, the elements of

[38] Nor is there credible evidence that Respondent was required to follow some specific military chain of command that prohibited the three guards from speaking with Cdr. Pulley, who seemed to welcome their complaints.

protected activity, knowledge of that activity, and animus on the part of the employer are required. *Consolidated Bus Transit*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009); see also *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 8 (2019) (noting that evidence of animus must be sufficient to establish a causal relationship between the employee's protected activity and the employer's action against the employee). If the General Counsel makes this initial showing, the burden of persuasion shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even if the employee had not engaged in protected activity. *Consolidated Bus Transit*, 350 NLRB at 1066; see also *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1550 (10th Cir. 1996) (by shifting the burden the employer's justification becomes an affirmative defense). An employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity. *Rhino Northwest, LLC*, 369 NLRB No. 25, slip op. at 3 (2020) (internal quotations and citations omitted). Where an employer's explanation is "pretextual, that determination constitutes a finding that the reasons advanced by the employer either did not exist or were not in fact relied upon." *Limestone Apparel Corp.,* 255 NLRB 722, 722 (1981), enfd. 705 F.2d 799 (6th Cir. 1982). Also, where the "proffered non-discriminatory motivational explanation is false even in the absence of direct motivation the trier of fact may infer unlawful motivation." *Roadway Express*, 327 NLRB 25, 26 (1998).

Here, the first two elements are easily proven. Salopek was engaged in protected concerted activity and Respondent, including Filibeck, knew about this activity. The evidence also supports a finding of animus on behalf or Respondent generally and Filibeck in particular. Filibeck's testimony clearly showed that he looked upon the actions of the three guards, in taking their complaints to Cdr. Pulley and then to ISO Jones, with disfavor and believed it was done in violation of the chain of command. This is sufficient to establish animus that can be considered in determining the motive for Salopek's discharge. Cf. *Crossroads Furniture*, 301 NLRB 520, 520 fn. 1 (1991) (remarks made by store manager showing Respondent looked with disfavor on employees perceived to be actively involved in the exercise of protected concerted activity establishes animus that the Board can consider in determining the motive for employee's discharge). Further animus is shown by Filibeck's fictional explanation regarding one of the reasons why Salopek could not be transferred to another Xcel contract. Filibeck testified that one of the reasons Salopek could not be transferred was because Respondent's next closest contract was 10,080 miles away, with the Army Corps of Engineers on a series of dams on the lower Columbia River. (Tr. 981, 1005.) The dams in question were the Bonneville, Dales, and John Day dams which were located on the border with Washington and Oregon. (Tr. 41, 981) See also *National Wildlife Federation v. National Marine Fisheries Service*, 422 F.3d 782, 788 fn. 1 (9th Cir. 2005). These dams are between 245 and 330 miles away from Indian Island–not 10,080 miles away as Filibeck testified.[39] I find that Filibeck's wildly exaggerated claim that Salopek could not be transferred because these dams were located 10,080 miles away is further evidence of animus. *Grane Healthcare Co.*, 357 NLRB 1412, 1433 (2011), enfd. 712 F.3d 145 (3d Cir. 2013) (employer's fabricated explanation for the decision not to hire employee supports the inference of antiunion animus). Finally, there were multiple statements by Respondent's officials that further establish the company's animus against the fact that the three guards engaged in protected concerted activity by complaining directly to Cdr. Pulley and ISO Jones including: Powless telling Lein that Respondent was going to fire him for "jumping the chain of command" but since it was his first time he would get a second chance; Morgan saying that Lein was easy to get rid of because he was on probation and that Salopek and Mullen are a cancer; Morgan asking Mullen if he met with Cdr. Pulley and saying that Mullen could possibly face disciplinary action; Terry asking Lein whether he met with Cdr. Pully, inquiring who accompanied him to the meeting, and saying that Lein made a big mistake and was going to be pulled off post and off the contract; and Morgan telling Lein that he was mad because he broke the chain of command.

Accordingly, having presented a prima facie case that Salopek's discharge was discriminatorily motivated, the burden shifts to Respondent to show, by a preponderance of the evidence, that it would have discharged Salopek notwithstanding his protected concerted activities. Respondent has not done so.

When asked why Salopek was not transferred to another contract, instead of being fired, Filibeck specifically testified that he did not want to transfer Salopek because "if this guy is going to do this kind of activity here, he's going to do it there." (Tr. 1005.) It was clear Filibeck did not want to employ someone who, like Salopek, might violate the chain of command and go directly to the head of a client agency with concerted complaints about working conditions. Filibeck next said that Salopek could not get a CAC card because he was removed for cause and that he believed there was a current ongoing investigation into "classified photos" that were on Salopek's website. However, further inquiry shows these excuses are pretext. Filibeck admitted that, if he had transferred Salopek, instead of firing him, there would have been no issue with his CAC card, and this was confirmed by Rake. And, no evidence was presented of any ongoing investigation into any of the photographs on Salopek's company website. Indeed, the photographs, which both Rake and Filibeck said were designated "FOUO" (for official use only), are not classified. Instead, FOUO is simply a Freedom of Information Act designation specifically used for unclassified material.[40] Also,

---

[39] I take judicial/administrative notice of the locations of these dams and the associated mileage calculations. See *United States v. Perea-Rey*, 680 F.3d 1179, 1182 (9th Cir. 2012) (Court takes judicial notice of Google map and satellite images); *Pahls v. Thomas*, 718 F.3d 1210, 1216 fn. 1 (10th Cir. 2013) (same); Fed.R.Evid. 201(b).

[40] OPNAVINST 3432.1A, which applies only to Navy personnel and contractors, prohibits the posting of FOUO information on public websites. However, Salopek immediately removed the pictures when it was brought to his attention in September 2018 and he did not repost the pictures until 2019, after his discharge. Because he had been terminated and was no longer working on a Navy contract in 2019, he was not covered by OPNAVINST 3432.1A. See https://www.secnav.navy.mil

Respondent cannot rely upon statements Salopek made to the Navy Contracting Office, which Filibeck designated as showing dishonesty or lack of candor to support its termination decision. As discussed above, Salopek's statements did not lose the protection of the Act. Moreover, misconduct discovered during an investigation undertaken because of an employee's protected concerted activity cannot make the resulting discharge lawful. *Kidde, Inc.*, 294 NLRB 840, 840 fn. 3 (1989). Such is the case here, as Rake testified that the original customer complaint, which prompted his investigation, was the fact that Mullen, Salopek, and Lein met with Cdr. Pulley. (Tr. 589.)

Finally, Respondent cannot rely upon Rake's recommendation to remove Salopek from the contract to escape liability. The General Counsel does not allege Salopek's removal from the contract to be a violation. Instead, it is Salopek's termination that is alleged to be unlawful. Rake was resolute that the Navy cannot ask that a contractor discharge a specific employee, and everyone agrees that nobody from the Navy ever asked Xcel to discharge Salopek. Moreover, "[i]t is well settled that an employer violates the Act when it follows the direction of another employer with whom it has business dealings to discharge its employees because of their [protected concerted] activities." *Paragon Systems, Inc.*, 362 NLRB 1561, 1565 fn. 14 (2015). "The fact that the direction comes from a Government actor does not alter [the] analysis." Id.

Here, it is clear that Rake was motivated by animus against the fact that Mullen, Salopek, and Lein complained directly to Cdr. Pulley and Jones, instead of coming first to Rake or Manson, when he recommended that Salopek be removed from the contract. This was evident by the fact that Rake asked every guard he interviewed whether they knew their chain of command. It was further evident by his statement that the guards' speaking directly with Cdr. Pulley was not normal since he and Manson were at Indian Island "all the time." (Tr. 585.) By going to Cdr. Pulley with their complaints about weapon qualifications, Rake and the entire Navy Contracting Office was caught in an embarrassing situation. I credit Terry's testimony that both Rake and Manson knew these unauthorized weapon qualifications were occurring, and that Rake/Manson had approved of them for years. Had the three guards complained to Rake or Manson directly, they could have handled the situation quietly and not be exposed.

It was clear that Cdr. Pulley did not know about the unauthorized range practices, nor did he approve of them. Instead, Cdr. Pulley wanted all of Respondent's guards removed from their posts until Xcel could prove that they were properly qualified with their weapons. I find it telling that, nowhere in Rake's report or in his responses to his superiors regarding the OIG inquiry, does he acknowledge that the complaints lodged by Salopek, Mullen, and Lein, about unauthorized weapon qualifications were true. Instead, Rake downplayed the accusations, and used Mullen and Salopek as scapegoats, claiming that Mullen abandoned his post and that Salopek was at "the center to all the third part [sic] accusations to meet a hidden agenda of his own." (R 2, p. 11.) Rake's statement about Salopek is evidence that Rake harbored animus against his involvement in the concerted complaints. *Paragon Systems, Inc.*, 362 NLRB at 1565 (statement in report from contracting officers' representative accusing contract guards who delivered strike notice to Army Colonel of "having their own agenda" and "handling their own personal grievances," was evidence of animus).

Further evidence of Rake's animus is shown by the mischaracterizations in his report, and in his email to his superiors, which were specifically contradicted by the written statements of the various guards and by the trial evidence. For example, in his report, Rake states that Coler was improperly issued weapons for which she was not qualified because of "loop holes" due to a lack of communication. Similarly, the report says Coler was never told that "going to the 'gravel pit' was to qualify" but that instead it was for remedial training. However, in her written statement, Coler stated that after her gravel pit range she was told that she was now able to stand post. And the evidence shows that after the gravel pit range Coler was treated as if she had qualified. The report also says that, after Coler failed her rifle and shotgun qualifications Powless went on leave for two weeks and therefore did not reschedule her to qualify. However, the evidence shows that Coler failed her initial qualifications on May 9 and shot at the gravel pit range with Powless on May 27. Also, the evidence shows that Powless was not on leave during this period, as the report claims, as he had multiple conversations with Lein at work about requalifying.

Rake's report also states that Lein was never told that going to the gravel pit range would be a qualification shoot, but that he was instead told it was for remedial training. But, Lein's written statement to Rake specifically states that that Powless told him that the gravel pit range was for qualifications. His written statement was bolstered by his credible trial testimony where Lein said that Powless told him that the gravel pit range was for a qualification, and that Coler qualified with a score of 141.

In Salopek's written statement he stated that the range at Schroder's house occurred on July 7, 2017, and that he saw a "Bangor range sheet" for that date. (R 2, p. 15.) However, in his report, Rake said that none of the guards interviewed could provide any facts or documents showing falsified qualification forms. And in his answers to the OIG questions, which he sent to his superiors, Rake stated that, when Salopek was asked for any dates he and Manson could look at regarding falsified records, "he didn't have anything." While Salopek did not have access to the actual qualification forms, his written statement provided Rake and Manson with the exact date to look at for falsified records–July 7, 2017. And, neither in his report nor in his answer to the OIG questions does Rake mention the fact that, on July 7, 2017, a qualification shoot occurred at Schroder's house and that the official Form 3591.1 falsely states that it occurred at Bangor. Indeed, neither Schroder nor Mullen were even interviewed, notwithstanding the fact that in his answers to the OIG questions Rake specifically stated that everyone Mullen and Salopek mentioned were interviewed.

/doni/Directives/03000%20Naval%20Operations%20and%20Readiness/03-400%20Nuclear,%20Biological%20and%20Chemical%20Program%20Support/3432.1A.pdf (last accessed on November 30, 2020).

Additionally, at trial Rake testified that no qualifications occurred at any "gravel pit range" but instead Respondent's guards went to "an open field" or to an "individual's house who has a range on his house" to practice. (Tr. 564.) Rake knew, as was confirmed by Terry, that Respondent had been using unauthorized ranges to qualify its employees for years, but he refused to acknowledge this during his testimony. All of this leads me to the inescapable conclusion that Rake harbored animus against the fact that the three guards went directly do Cdr. Pulley and to ISO Jones, and he sought to have both Mullen and Salopek removed from the contract and used as scapegoats to obscure the fact that the Navy's Contracting Office knew of, and had been condoning for years, Respondent's practice of using unauthorized ranges and personal weapons for their qualifications. Cf. *Grane Healthcare Co.*, 357 NLRB 1412, 1433 (2011), enfd. 712 F.3d 145 (3d Cir. 2013) (employer's fabricated explanation for the decision not to hire employee supports the inference of antiunion animus); *Saginaw Control & Engineering, Inc.*, 339 NLRB 541, 574 fn. 117 (2003) (supervisor's fabricated testimony supports a finding that he evaluated employee with animus against the union and its supporters in mind); *Andujar v. Nortel Networks, Inc.*, 400 F.Supp.2d 306, 331 (D. Mass. 2005) (in employment discrimination case, if a jury believes testimony that management officials fabricated events in response to claims of discrimination, it may infer discriminatory animus). Also, I credit Terry's testimony that he received a call from Filibeck on October 26 and that Filibeck said he had just finished meeting with the Navy and they wanted Salopek "gone" because he was the person responsible for the months-long investigation over weapon qualifications. (Tr. 945.) This shows both Rake's animus, and the fact that Filibeck knew Rake wanted Salopek "gone" because he was involved in the concerted complaints which resulted in the Navy's investigation.

Finally, I do not credit Filibeck's testimony that he did not learn that Respondent had been using unauthorized ranges, including someone's backyard, to qualify guards until April or May 2019. Generally, I did not find Filibeck to credible as he seemed conceited during his testimony, particularly while testifying about Salopek, and was flippant about Salopek's discharge. "The demeanor of a witness may satisfy the tribunal, not only that the witnesses' testimony is not true, but that the truth is the opposite of his story." *Gissel Packing Co.*, 157 NLRB 1065, 1066–1067 (1966) (internal quotation omitted). Such is the case here regarding Filibeck's knowledge of Respondent's weapons qualification practices. After he met with Rake and Burris, Filibeck discussed Rake's report with Terry and Powless, wanting to know what had happened and whether Xcel in fact had training issues he did not know about or that the Navy did not uncover. It strains credulity to think that, during his meeting with Terry and Powless, the two individuals responsible for the unauthorized ranges, they did not inform Filibeck of what was occurring. This is especially true since Terry believed that the Navy had, in the past, authorized these practices. I therefore find that Filibeck learned about these practices during his meeting with Terry and Powless, before he fired Salopek.

In short, Xcel was not privileged to fire Salopek based upon Rake's recommendation that he be removed from the contract. The Navy was not authorized to fire Salopek, and did not recommend that he be terminated. Moreover, the recommendation that Salopek be removed from the contract was based upon Rake's animus against his concerted activities, and Filibeck knew this. *Paragon Systems, Inc.*, 362 NLRB at 1565 ("an employer's interest in maintaining a contract is not a legitimate business reason where, as here, a contractor requires the employer to discriminate against employees on the basis of their Section 7 activity."). Accordingly, by terminating Salopek's employment, Respondent violated Section 8(a)(1) of the Act.

*D. Guard Mount Pay*

Paragraph 8 of the Complaint alleges that, in December 2018 and January 2019 Lein concertedly complained about guard mount pay, which is mandated by the CBA, and Respondent violated Section 8(a)(1) and (3) of the Act when Powless announced that, because someone had complained about guard mount pay, nobody would be allowed to go home early. The CBA between the Union and Xcel contains a provision providing for 30 minutes of paid time each shift to allow guards to arm-up at the beginning of the day, and arm-down at the end of the day. In practice, this extra time was broken down to 15 minutes at the start of the shift and 15 minutes at the end of the shift. The credited evidence shows that, it usually does not take guards the full 15 minutes to arm-down at the end of a shift, and historically Respondent has allowed guards to leave early if when they finished arming down.

In December 2018 Lein volunteered to work a 4-hour shift and put down 4.5 hours on his timesheet to account for the extra half-hour allowed for in the CBA. When the shift Lieutenant changed his timesheet to 4.25 hours, Lein complained to Terry and was paid 4.5 hours for the shift. Lein had the same issue occur in mid-January 2019 when Lieutenant Lux prohibited Lein and another guard from "arming up" until their shift started, notwithstanding the fact the CBA provided for a full 30 minutes. Lein told Lux about the CBA provision and his earlier discussion with Terry involving this same issue. Notwithstanding, Lux would not let the guards arm-up until the start of their shift.

The next day, Lein was assigned to work the day shift. Instead of having their shift briefing in the training room as usual, Powless brought Lein into the Lieutenant's office where the other guards had congregated, including half of the night-shift. Powless told the guards that somebody had complained about the arm-up time and therefore Terry directed that nobody would be allowed to go home early anymore. Later that day, right before Lein's shift ended, Powless told Lein that he had spoken with Terry and that guards were no longer prohibited from leaving early after they finished arming down.

The General Counsel asserts that, because Lein was invoking a contractual right, he was engaged in union activity and Xcel's prohibition against leaving early violated Section 8(a)(1) and (3) of the Act because it was based on animus against Lein's invoking the contract. Had the General Counsel presented evidence that Lein, or any other guard, did not leave early before the prohibition was revoked, then a violation may have occurred. However, no such evidence was presented. The record contains no evidence that any guard had finished arming down, but was prohibited from going home early, before Respondent reinstated its established practice. Indeed, Lein's own testimony shows that

the prohibition was revoked before the day shift ended. Under these circumstances, where there is no evidence that any employee was adversely affected, I recommend the 8(a)(3) allegation be dismissed.[41] See *Simmons Co.*, 314 NLRB 717, 725 (1994) ("There is no evidence of any adverse action taken by the employer . . . and thus no prima facie case."); *Choctaw Maid Farms*, *Inc.*, 308 NLRB 521, 528 (1992) (no violation where the record evidence does not show that anyone was adversely affected by remark made by human resources director). However, I find that Powless' statement to employees that they would no longer be allowed to go home early because somebody had complained about guard mount pay was coercive and a violation of Section 8(a)(1) of the Act. *Shamrock Foods Co.*,369 NLRB No. 5, slip. op. 1 fn. 2, 14 (2020) (manager's statement that employee could no longer leave early because union flyers were distributed constituted a violation of Section 8(a)(1) of the Act).

## IV. ANALYSIS OF THE INFORMATION REQUEST ALLEGATIONS

### 1. Facts

The Complaint alleges that, between October 2018 and May 2019 the Union made four separate information requests, seeking over 21 different items of information, that Respondent either did not provide, or failed to provide in a timely manner. The evidence shows that on October 30, 2018, the Union filed a grievance over Salopek's discharge along with a request for information supporting the grievance. On January 21, 2019, the Union emailed another information request to Respondent. A third information request was emailed to Respondent on February 28, 2019, and a fourth and final information request was emailed to Xcel on May 8, 2019. (JX 1, JX 2, JX 6, JX 11, JX 12.)

Regarding the specific unfair labor practice allegations, regarding the October 30 information request, Complaint paragraphs 9(a) and 9(f)–9(h) allege that Respondent either did not provide, or failed to provide for a period of 3 months, the following information regarding Salopek: "(i) His personnel file; (ii) A copy of the rule(s), procedure, policy, or requirement that he was accused of violating; (iii) Any document(s) signed by him during the investigation and processing of his discharge; (iv) Copy of any document(s) given him by Respondent relating to his discharge; (v) Any written or taped witness statement(s), including copies of any email communications, related to his discharge; (vi) The written investigation or other record (including but not limited to video evidence) made by or provided to Respondent relating to his discharge from any source, including but not limited to United States government employees and/or representatives; (vii) Any list of witnesses compiled for his discharge; (viii) Record of any prior disciplinary warnings or notifications given to him; and (ix) Anything else especially relevant to his discharge, including communications between Respondent, its managers, employees, and/or U.S. government employees, agencies, and/or contractors regarding his discharge." (GC. 1(bbb).) The General Counsel asserts that the information requested in subparagraphs ii, iii, iv, v, vii, and ix were never provided, and that Respondent delayed providing the information sought in subparagraphs i, vi, and viii for 3 months. (GC. 1(bbb).)

As for the information request made on January 21, 2019, Complaint paragraph 9(b) alleges that Respondent failed to provide the following information requested by the Union relating to Salopek: "(i) Any and all documents, including witness statements and/or investigatory reports supporting Respondents stated reason for terminating Salopek's employment: chain of command violation and dishonesty; (ii) Any and all documents, including without limitation, post orders and company policies, defining chain of command violations; (iii) From 2009 to present, any and all documents relating to discipline imposed against employees other than Salopek for alleged dishonesty and/or chain of command violations and/or weapons mishandling allegations, including without limitation an incident in or around 2013 where Cody Owens allegedly handled a shotgun in an unsafe manner; and (iv) Any and all documents relating to any request by the Government client to Respondent to remove Salopek from the contract and/or a revocation of his clearance/site access." Paragraph 9(c) of the Complaint alleges that, since about February 28, 2019, Respondent failed to provide Respondent with the following information: "Whether, at any time prior to Salopek's discharge in October 2018, the Government client required Xcel to remove Salopek from the contract and/or revoked his clearance or site access." (GC 1(bbb))

Finally, Complaint paragraph 9(d) alleges that, since May 8, 2019, Respondent has not provided the Union with the following information it requested: (i) "All documents relating to Respondents assertion in its Amended Answer to the Consolidated Complaint and Notice of Hearing that 'Employee Salopek had his security clearance revoked by the Navy, and hence was not, and is not qualified to work at XCEL or for rehire'; (ii) The date and reason(s) stated by the Navy for the alleged revocation in the item above; (iii) The names of Navy personnel having allegedly revoked Salopek's security clearance; (iv) Whether, since Salopek's complaints to the Navy in about July 2018, Respondent has changed its procedures for qualifying officers on range, including without limitation whether the Navy permits Respondent to alter targets with black X's to permit officers to more easily qualify; (v) Whether, from June 2018 to present, Respondent permits its employees to man a rifle post where they lack a valid rifle range qualification; (vi) Any and all documents from Navy personnel Rake and Manson to Respondent from July 2018 to present regarding range qualifications procedures, including

[41] As for the allegation in complaint par. 6, the credited evidence shows that in late September 2018 Lein was summoned to Terry's office. Terry asked why Lein did not first come to him, before contacting the Union with his pay issues, so Terry could try to solve the problem. Lein replied saying he had the right to speak with his Union representative. Under these circumstances, where Respondent and the Union had a longstanding bargaining relationship, I find that Terry's statement does not constitute a violation. Accordingly, I recommend that complaint par. 6 be dismissed. Compare *Frank Mashuda Co.*, 221 NLRB 233, 234 fn. 5 (1975) (no violation where unionized employer expressed its desire that employees bring their complaints to the employer first before going to the union), with *Campbell "66" Express, Inc.*, 238 NLRB 953, 962 (1978), enf. denied on other grounds 609 F.2d 312 (7th Cir. 1979) (violation where employee was threatened with discharge unless he withdrew his grievance and manager admonished him "if you got any more problems you come to me. Don't go to the Union.").

without limitation, any documents stating that where an officer lacks a range qualification for a given firearm, the officer is not permitted to work posts that require use of the firearm for which the officer lacks the qualification; (vii) All documents relating to complaints made in or around March 2019 by Officers Kitchen and Coler to Commanding Officer Pulley concerning investigations against Lt. Commander McCright regarding his alleged stalking and other misconduct toward former supervisees; (viii) Whether Officers Kitchen and Coler made the complaints in the paragraph 9(d)(vii) above to Respondent before making them to the Navy; (ix) Whether Officers Kitchen and/or Coler were disciplined for their complaints in paragraphs 9(d)(vii) and/or (viii) above; and (x) Supporting documents, if any, for paragraph 9(d)(ix)."

2. Analysis

The majority of the information request allegations can be dispensed with in short order, as they were made either after the charges were filed in this matter, or after the initial unfair labor practice complaint had issued. It is well established that the Board's procedures do not include pretrial discovery and therefore the Board will generally not find an information request violation when the information sought relates to a pending charge alleging unlawful discrimination. *Saginaw Control & Engineering, Inc.*, 339 NLRB 541, 543–544 (2003); *Pepsi-Cola Bottling Co. of Fayetteville, Inc.*, 315 NLRB 882, 882 (1994). The original charge alleging that Salopek was illegally discharged because of his protected concerted activities was filed on December 12, 2018. (GC 1(a).) And it is clear that the information sought by the Union in their January 21, 2019 and February 28, 2019 information requests relate directly to the unfair labor practice charge regarding Salopek's discharge which was still pending at the time. And, the Union's May 8, 2019 information request was made after the initial unfair labor practice complaint had issued alleging Salopek's discharge violated the Act. Indeed, in the May 8, 2019 request the Union asks for documents that would further support the unfair labor practice complaint allegations, or that dealt with Respondent's potential defenses to the allegations. Because the Board does not allow pretrial discovery, I recommend that the allegations contained in paragraphs 9(b), 9(c), and 9(d) of the Complaint be dismissed.

The duty to collectively bargain under Section 8(a)(5) of the Act includes the obligation to supply a union with information that will enable it to perform its duties as the employees' collective-bargaining representative. *Teachers College, Columbia University*, 365 NLRB No. 86, slip op. at 4 (2007), enfd. 902 F.3d 296, 302 (DC Cir. 2018.) This includes information the union needs to process grievances. Id. Regarding the Union's October 30, 2018 request, the information sought was presumptively relevant as it involved information related to the processing of the grievance involving Salopek's discharge and sought the type of information that the Board generally requires an employer to provide. *Fleming Companies*, 332 NLRB 1086, 1086 (2000) (personnel file of discharged employee and work rules); *Public Service Co. of New Mexico*, 364 NLRB 1017, 1019 (2016) (employer's memorandum and notes recommending discipline); *HTH Corp.*, 361 NLRB 709, 755 (2014) (prior disciplinary actions); *Stephens Media, LLC*, 356 NLRB 661, 683–684 (2011) (copies of policies employee allegedly violated); *Teamsters Local 89*, 365 NLRB No. 115, slip op. at 11 fn. 11 (2017) (statements); *NTN Bower Corp.*, 356 NLRB 1072, 1139 (2011) (video/audio tapes). Finally, all of the information the Union requested should have been readily available to the Respondent. See, *McCarthy Construction Co.*, 355 NLRB 50, 50 fn. 2 (2010), affd. 355 NLRB 365 (2010) (Violation for 3-month delay in providing union with relevant information as the documents sought should have been readily available to the Company). Accordingly, by failing to provide the Union with the information sought in its October 30, 2018 information request, or delaying in providing that information for a period of 3 months, I find that Respondent violated Section 8(a)(1) and (5) of the Act.

CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.
2. The International Union, Security, Police, and Fire Professionals of America, Local 5 (Union) is a labor organization within the meaning of Section 2(5) of the Act.
3. The following employees constitute an appropriate unit for purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All federal contract security officers employed by the Respondent at the Indian Island Naval Magazine in the State of Washington. Excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act.

4. By telling employees they will no longer be allowed to go home early because someone complained about guard mount pay Respondent has violated Section 8(a)(1) of the Act.
5. By discriminating against Mark Salopek because he engaged in protected concerted activities Respondent has violated Section 8(a)(1) of the Act.
6. By failing and refusing to provide the Union with the information it requested, that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of its employees, Respondent has been engaged in unfair labor practices within the meaning of Section 8(a)(5) and 8(a)(1) of the Act.
7. By unreasonably delaying, for a period of three months, in providing the Union with the information it requested, that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of its employees, Respondent has been engaged in unfair labor practices within the meaning of Section 8(a)(5) and 8(a)(1) of the Act.
8. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative actions designed to effectuate the policies of the Act. Specifically, having found that Respondent violated Section 8(a)(1) of the Act by discharging Mark Salopek, I shall order Respondent to reinstate him and make him whole for any loss of earnings and other benefits suffered as a result of

the discrimination against him. If Respondent no longer employs security guards at Indian Island, then it shall offer Salopek reinstatement to a substantially similar position at one of Respondent's next closest locations/jobsites.

Respondent shall compensate Mark Salopek for any adverse tax consequences of receiving a lump–sum backpay award in accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas,* 361 NLRB 101 (2014). Respondent shall also compensate him for his search–for–work and interim employment expenses regardless of whether those expenses exceed interim earnings. *King Soopers, Inc.,* 364 NLRB 1153 (2016). Backpay, search–for–work, and interim employment expenses, shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

In accordance with *AdvoServ of New Jersey, Inc.,* 363 NLRB 1324 (2016), Respondent shall file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar years. The Regional Director will then assume responsibility for transmission of the report to the Social Security Administration. Additionally, Respondent is ordered to preserve and provide, at a reasonable place designated by the Board or its agents, all payroll records and other relevant records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of the Order, in accordance with *Ferguson Electric Co.*, 335 NLRB 142 (2001).

The Respondent shall be required to expunge from its files any references to the unlawful discharge issued to Mark Salopek, and notify him and the Regional Director of Region 19, in writing, that this has been done and that this unlawful employment action will not be used against him in any way. The Respondent shall also post the attached notice in accordance with *J. Picini Flooring*, 356 NLRB 11 (2010) and *Durham School Services*, 360 NLRB 694 (2014). If Respondent is unable to post the attached notice because it no longer employs security guards at Indian Island, Respondent is also ordered to mail the Notice to all current and former employees who were employed at Indian Island at any time between October 27, 2018 and September 30, 2019. Finally, Respondent is ordered to provide the Union with the relevant information it requested, as outlined herein, that is necessary to the Union's performance of its duties and responsibilities as the exclusive collective-bargaining representative of Respondent's employees.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[42]

ORDER

Respondent Xcel Protective Services, Inc., its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Threatening employees with reprisals because they engaged in activities protected by the Act.

(b) Discharging employees because they engaged in protected, concerted activities.

(c) Refusing to bargain collectively with the Union by refusing or delaying to provide it with requested information that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of Respondent's employees.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Promptly provide the Union with all the relevant information it requested relating to Mark Salopek's discharge, including but not limited to: a copy of the rules, procedures, policies, or requirements that he was accused of violating; any documents signed by him during the investigation and processing of his discharge; a copy of any documents given him by Respondent relating to his discharge; any written or taped witness statements, including copies of any email communications, related to his discharge; any list of witnesses compiled for his discharge; records of any prior disciplinary warnings or notifications given to him; and anything else especially relevant to his discharge, including communications between Respondent, its managers, employees, and/or U.S. government employees, agencies, and/or contractors regarding his discharge.

(b) Within 14 days from the date of the Board's Order, offer Mark Salopek full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed. If Respondent no longer employs security guards at Indian Island, then it shall offer Salopek reinstatement to a substantially similar position at one of Respondent's next closest locations/job sites.

(c) Make Mark Salopek whole for any loss of earnings and other benefits suffered as a result of the discrimination against him in the manner set forth in the remedy section of this decision.

(d) Compensate Mark Salopek for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

(e) Within 14 days from the date of the Board's Order, remove from its files any reference to the unlawful discharge of Mark Salopek, and within 3 days thereafter, notify him in writing that this has been done and that the unlawful employment action will not be used against him in any way.

(f) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, Social Security payment records, timecards, personnel records and reports, and all other records, including electronic copies of such records if stored in electronic form, necessary to analyze the amount of back pay due under the

[42] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

terms of the Board's Order.

(g) Within 14 days after service by the Region, post at its facility at Indian Island, Washington facility copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 19, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.[43] In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business, closed the facility involved in this proceeding, or no longer employs security guards at Indian Island, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at Indian Island at any time between October 27, 2018 and September 30, 2019.

(h) Within 21 days after service by the Region, file with the Regional Director for Region 19 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply with this order.

Dated, Washington, D.C. December 7, 2020

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose a representative to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT tell you that you can no longer leave work early because an employee complained that we were not providing you with a benefit guaranteed by the collective-bargaining agreement.

WE WILL NOT discharge or otherwise discriminate against you because you have engaged in protected concerted activities, by complaining with your coworkers about your working conditions, including weapon qualifications, and speaking with third parties about these issues.

WE WILL NOT refuse to bargain collectively with the International Union, Security, Police, and Fire Professionals of America, Local 5 ("Union"), by refusing or delaying to provide it with requested information that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of our employees.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL promptly provide the Union with all the relevant information it requested relating to Mark Salopek's discharge.

WE WILL, within 14 days from the date of the Board's Order, offer Mark Salopek full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed. If we no longer employ security guards at Indian Island, then WE WILL offer Mark Salopek reinstatement to a substantially similar position at one of our next closest locations/job sites.

WE WILL make Mark Salopek whole for any loss of earnings and other benefits resulting from the discrimination against him, less any net interim earnings, plus interest, and WE WILL also make him whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Mark Salopek for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and we will file with the Regional Director for Region 19, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any references to the unlawful discharge issued to Mark Salopek, and WE WILL, within 3 days thereafter, notify him in writing that this has been done and that this unlawful employment action will not be used against him in any way.

XCEL PROTECTIVE SERVICES, INC.

[43] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notices may not be posted until a substantial complement of employees have returned to work. Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if the Respondent customarily communicates with its employees by electronic means, and to the reading of the notice to employees. If this Order is enforced by a judgment of a United States Court of Appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 19**

| | | |
|---|---|---|
| In the matter of: | : | |
| | : | |
| XCEL PROTECTIVE SERVICES, INC. | : | CASE NOS. 19-CA-232786 |
| | : | 19-CA-233141 |
| Respondent | : | 19-CA-234438 |
| | : | 19-CA-234438 |
| and | : | 19-CA-237861 |
| | : | 19-CA-241689 |
| INTERNATIONAL UNION, SECURITY, POLICE, and FIRE PROFESSIONALS OF AMERICA, LOCAL 5 | : | |
| | : | January 19, 2021 |
| Charging Party | | |

**RESPONDENT'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION**

Pursuant to Section 102.46(a) of the National Labor Relations Board's Rules and Regulations, Respondent Xcel Protective Services, Inc. ("Xcel") respectfully files the following Exceptions to the Administrative Law Judge's ("ALJ") decision in this matter ("Decision") issued on December 7, 2020. The rationale and legal authority supporting Xcel's Exceptions are set forth in Xcel's supporting memorandum of law, filed simultaneously herewith.

## I. Xcel Excepts to the Following Findings of Fact and Conclusions of Law

1. Xcel excepts to the ALJ's finding that, "there is no evidence that the statements made in the complaints to Cdr. Pulley and ISO Jones were maliciously false." Decision, p. 46. Xcel excepts to this finding, as it submits that the statements made in the complaints were maliciously false, in that they were made either with knowledge of their falsity, or with reckless disregard as to their truth or falsity.

2. Xcel excepts to the ALJ's finding that, "the evidence shows that the core issues raised in complaints were, in fact, true." Decision, p. 46. Xcel excepts to this finding, as it

submits that most of the issues raised in the complaints were either unsubstantiated or proven false.

3. Xcel excepts to the ALJ's finding that "Respondent has not even shown that the primary allegations in the complaints were false, let alone that they were made with malicious intent." Decision, p. 47. Xcel excepts to this finding because it submits that it has proven that most of the allegations in the complaints were false and/or made with malicious intent.

4. Xcel excepts to the conclusion that, "the complaints made by Mullen, Salopek, and Lein did not lose the protection of the Act." Decision, p. 47; *see* also Decision, p. 50. Xcel excepts to this conclusion because it submits that, because the statements were maliciously untrue, they lost the protection of the Act.

5. Xcel excepts to the conclusion that, "[t]he credited evidence shows that Filibeck fired Salopek for violating the chain of command and for dishonesty." Decision, p. 50. Xcel excepts to this conclusion because it submits that Filibeck terminated Salopek for dishonesty in making his complaints, as well as his conduct, demeanor and statements made during the investigation.

6. Xcel excepts to the finding that, "there is no doubt that Salopek's jumping the chain of command, by joining his coworkers to meet with Cdr. Pulley and complaining to ISO Jones, was a motivating reason for Salopek's discharge." Decision, p. 50. Xcel excepts to this conclusion because it submits that Filibeck terminated Salopek for dishonesty in making his complaints, as well as his conduct, demeanor and statements made during the investigation.

7. Xcel excepts to the following conclusion: "'Where a case turns on the alleged misconduct that is part of the res gestae of activity protected by Section 7 of the Act, the proper inquiry is whether the employee lost the Act's protections in the course of that activity.' . . . I believe that this is the proper standard through which to analyze Salopek's discharge." Decision, p. 50. Xcel excepts to this conclusion because it submits that this case does not turn solely on the complaints made by Salopek. Instead, Xcel submits that Filibeck terminated Salopek for dishonesty in making his complaints, as well as his conduct, demeanor and statements made during the investigation.

8. Xcel excepts to the conclusion that, "[b]ecause neither Salopek, Mullen, nor Lein lost the protection of the Act when they engaged in protected concerted activities, Respondent violated Section 8(a)(1) of the Act when it terminated Salopek for alleged misconduct that was part of the res gestae of his protected concerted activities." Decision, p. 51. Xcel excepts to this conclusion because (a) it submits that Salopek lost the protection of the Act when he submitted complaints to the Commanding Officer and ISO Jones; and (b) Xcel submits that it did not terminate Salopek solely for misconduct that was part of the res gestae of his protected concerted activities.

9. Xcel excepts to the conclusion that, "[t]he same conclusion is warranted even when applying the burden shifting framework set forth in *Wright Line*." Decision, p. 51. Xcel excepts to this conclusion because not only did the General Counsel fail to show animus on the part of Filibeck in his termination of Salopek, but Xcel also demonstrated that it would have terminated Salopek even absent his protected, concerted activities.

10. Xcel excepts to the finding that, "[t]he evidence also supports a finding of animus on behalf [of] Respondent generally and Filibeck in particular." Decision, p. 51. Xcel

excepts to this finding because it submits that the evidence did not support a finding of animus on the part of Xcel and/or Filibeck.

11.    Xcel excepts to the finding that, "Filibeck's testimony clearly showed that he looked upon the actions of the three guards, in taking their complaints to Cdr. Pulley and then to ISO Jones, with disfavor and believed it was done in violation of the chain of command. This is sufficient to establish animus that can be considered in determining the motive for Salopek's discharge." Decision, p. 51. Xcel excepts to this finding because it submits that the evidence showed that Filibeck took issue with the three guards violating the *military* chain of command, and, moreover, that was not the reason for Salopek's termination.

12.    Xcel excepts to the finding that, "[f]urther animus is shown by Filibeck's fictional explanation regarding one of the reasons why Salopek could not be transferred to another Xcel contract. Filibeck testified that one of the reasons Salopek could not be transferred was because Respondent's next closest contract was 10,080 miles away, with the Army Corps of Engineers on a series of dams on the lower Columbia River." Decision, p. 52. Xcel excepts to this finding because it submits that Filibeck did not actually state "10,080 miles away," and that that number was simply either an obvious typo or an error in translation. Thus, Xcel submits that this testimony cannot form the basis for a finding of animus, particularly as Filibeck listed the specific locations where Xcel had other government contracts.

13.    Xcel excepts to the finding that, "there were multiple statements by Respondent's officials that further establish the company's animus against the fact that the three guards engaged in protected concerted activity by complaining directly to Cdr. Pulley

and ISO Jones including: Powless telling Lein that Respondent was going to fire him for 'jumping the chain of command' but since it was his first time he would get a second chance; Morgan saying that Lein was easy to get rid of because he was on probation and that Salopek and Mullen are a cancer; Morgan asking Mullen if he met with Cdr. Pulley and saying that Mullen could possibly face disciplinary action; Terry asking Lein whether he met with Cdr. Pulley, inquiring who accompanied him to the meeting, and saying that Lein made a big mistake and was going to be pulled off post and off the contract; and Morgan telling Lein that he was mad because he broke the chain of command." Decision, p. 52. Xcel excepts to this finding, as it submits that these statements, which were made by individuals not involved in the decision to terminate Salopek and related, for the most part, to individuals other than Salopek—do not establish that Filibeck's decision to terminate Salopek was motivated by discriminatory animus.

14. Xcel excepts to the conclusion that the General Counsel "presented a prima facie case that Salopek's discharge was discriminatorily motivated." Decision, p. 52. Xcel excepts to this conclusion because it submits that the General Counsel failed to show that Salopek's discharge was discriminatorily motivated.

15. Xcel excepts to the finding that, "[i]t was clear Filibeck did not want to employ someone who, like Salopek, might violate the chain of command and go directly to the head of a client agency with concerted complaints about working conditions." Decision, p. 52. Xcel excepts to this finding based on the fact that it submits that this finding is not supported by the evidence.

16. Xcel excepts to the conclusion that, "Respondent cannot rely upon Rake's recommendation to remove Salopek from the contract to escape liability." Decision, p. 53. Xcel excepts to this conclusion, as Xcel submits that it can rely on Rake's recommendation to justify its termination of Salopek.

17. Xcel excepts to the finding that, "it is clear that Rake was motivated by animus against the fact that Mullen, Salopek and Lein complained directly to Cdr. Pulley and Jones, instead of coming first to Rake or Manson, when he recommended that Salopek be removed from the contract." Decision, p. 53. Xcel excepts to this finding, as it submits that the evidence did not support that Rake was motivated by animus against the three guards.

18. Xcel excepts to the finding that, "[f]urther evidence [of] Rake's animus is shown by the mischaracterizations in his report, and in his email to his supervisors, which were specifically contradicted by the written statement of the various guards and by the trial evidence." Decision, p. 54. Xcel excepts to this finding based on the fact that it submits that Rake did not mischaracterize the evidence he gathered during his investigation in completing his report.

19. Xcel excepts to the conclusion that, "[a]ll of this leads me to the inescapable conclusion that Rake harbored animus against the fact that the three guards went directly to Cdr. Pulley and to ISO Jones, and he sought to have both Mullen and Salopek removed from the contract and used as scapegoats to obscure the fact that the Navy's Contracting Office knew of, and had been condoning for years, Respondent's practice of using unauthorized ranges and personal weapons for their qualifications." Decision, p. 55. Xcel excepts to this conclusion because the evidence does not support this finding.

20. Xcel excepts to the finding that, "I credit Terry's testimony that he received a call from Filibeck on October 26 and that Filibeck said he had just finished meeting with the Navy and that they wanted Salopek "gone" because he was the person responsible for the months-long investigation over weapons qualifications. This shows both Rake's animus, and the fact that Filibeck knew Rake wanted Salopek 'gone' because he was involved in the concerted complaints which resulted in the Navy's investigation." Decision, p. 55. Xcel excepts to this finding, as it mischaracterizes Terry's testimony.

21. Xcel excepts to the conclusion that, "the recommendation that Salopek be removed from the contract was based upon Rake's animus against his concerted activities, and Filibeck knew this." Decision, p. 55. Excel excepts to this conclusion, as it submits that the recommendation that Salopek be removed from the contract was not based on Rake's animus, and the record does not demonstrate that Filibeck was aware of any alleged animus at any rate.

## II. Conclusion

For the reasons set forth above and in the supporting brief, Xcel respectfully requests that the Board sustain Xcel's Exceptions and overturn the Decision.

XCEL PROTECTIVE SERVICE, INC.,

*/s/ Jason R. Stanevich*

Jason R. Stanevich
Maura A. Mastrony
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT 06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
jstanevich@littler.com
mmastrony@littler.com

**CERTIFICATION**

This is to certify that a copy of the foregoing document has been delivered, via e-mail,, on this 19th day of January 2021, via e-mail to all counsel and *pro se* parties of record as follows:

Richard M. Olszewski, Esq.
Krakow, Souris & Landry, LLC
rich@unionlaw.net

Attorney Carolyn McConnell
Field Attorney, National Labor Relations Board, Region 19
Carolyn.McConnell@nlrb.gov

Joint Ex. 1

**Xcel Protective Services, Inc.,**

**Cases 19-CA-232786, 19-CA-233141, 19-CA-234438, 19-CA-237861, and 19-CA-241689**

**Stipulations of the Parties Regarding Facts**

1. International Union, Security, Police, and Fire Professionals of America, Local 5 ("Union"), through Scott Harger filed a grievance with Xcel Protective Services, Inc. ("Respondent") regarding Mark Salopek's termination and made a related request for information to Respondent on October 30, 2018. Joint Exhibit 2.

2. The parties, through Scott Harger, Michael Terry, and Mike Filibeck, exchanged e-mails regarding the information request described above in paragraph 1 between October 30, 2018, and December 20, 2018, during which time Respondent did not provide the requested information. Joint Exhibit 3.

3. On January 18, 2019, Respondent, by Jason Bowles, e-mailed the Union with Stephen Mullen's personnel file and training records. Joint Exhibit 4.

4. On January 21, 2019, Respondent, by Jason Bowles, e-mailed the Union with Mark Salopek's personnel file. Joint Exhibit 5.

5. On January 21, 2019, the Union, by Rich Olszewski, made a second request for information related to Mr. Salopek's termination. Joint Exhibit 6.

6. On January 22, 2018 [handwritten correction: 9], Respondent, by Jason Bowles, e-mailed the Union with additional documents, including additional personnel file information regarding Mr. Mullen. Joint Exhibit 7.

7. On January 23, 2019, Respondent, by Jason Bowles, e-mailed the Union with additional documents. The documents included additional copies of personnel file information regarding Mr. Mullen previously sent on January 18 and 22, 2019 (Joint Exhibits 4 and 7) and regarding Mr. Salopek previously sent on January 21, 2019 (Joint Exhibit 5), but also new documents regarding Mr. Mullen and Mr. Salopek. Joint Exhibit 8.

8. Between January 21 and January 31, 2019, the parties, through Rich Olszewski and Jason Bowles, exchanged emails regarding the January 21, 2019, request. Joint Exhibit 9.

9. On January 24, 2019, Respondent, by Jason Bowles to Rich Olszewski, emailed the Union the report of U.S. Navy employee Richard Rake and Steve Manson, dated July 25, 2018. Joint Exhibit 10.

10. On February 28, 2019, the Union, by Rich Olszewski, made a third request for information related to Mr. Salopek's termination. Joint Exhibit 11.

11. On May 8, 2019, the Union, by Rich Olszewski, made a fourth request for information related to Mr. Salopek's termination. Joint Exhibit 12.

12. On May 14, 2019, Respondent, by Jason Bowles, provided the Union with additional information regarding Mr. Salopek. The documents included additional copies of personnel file information regarding Mr. Salopek previously sent on January 21, 2019 (Joint Exhibit 5), but also an e-mail from Michael Terry dated January 3, 2019, regarding Mr. Salopek's termination. Joint Exhibit 13.

13. On May 16, 2019, Respondent, by Jason Bowles, sent an e-mail to Rich Olszewski regarding the October 30, 2018, January 21, February 28, and May 8, 2019, requests for information, in which he stated that he had sent the Union all documents he had that were responsive to its requests for information. Joint Exhibit 14.

14. No additional documents responsive to the requests for information referenced herein were provided by Respondent to the Union other than those set forth in the exhibits referenced herein.

15. The parties have executed a collective bargaining agreement (CBA) covering the security guards at Naval Magazine Indian Island ("Unit"), effective October 1, 2018, to September 30, 2021. Joint Exhibit 15.

16. The previous CBA between the parties covering the Unit was effective October 1, 2015, to September 30, 2018. Joint Exhibit 16.

17. In response to charges filed by Mark Salopek and Stephen Mullen with the Occupational Safety and Health Administration ("OSHA"), Respondent provided to OSHA position statements dated August 9, 2018, and January 11, 2019. Joint Exhibits 17 and 18.

18. An OSHA investigator provided the Navy report dated July 25, 2018, referenced above in item 9, to Respondent on December 3, 2018.

19. The parties agree that there are discrepancies in some of the time stamps on the emails contained in the joint exhibits. This is due to the time zones in which the emails were printed. The dates on the emails are correct.

For the General Counsel:

9/23/19

Carolyn McConnell

For the Respondent:

9/23/19

Maura Mastrony

For the International Union of Security, Police and Fire Professionals of America:

9/23/19

Richard Olszewski

# Joint Exhibit 2

**From:** Spfpa Local 5
**To:** McConnell, Carolyn
**Cc:** spfpa5@aol.com
**Subject:** Fwd: SPFPA Local 5 Grievance Salopek
**Date:** Friday, September 6, 2019 6:04:09 AM
**Attachments:** image003.png

---

Terry reply
Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

Instagram | Twitter | Facebook | Youtube | LinkedIn

*Click on the above links to check out our social media networks!*

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

---

From: spfpa5@aol.com
To: michael.terry@xps-us.com
Sent: 10/30/2018 3:24:44 PM Pacific Standard Time
Subject: Re: SPFPA Local 5 Grievance Salopek

Thank you Mike

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 10/30/2018 3:14:59 PM Pacific Standard Time, michael.terry@xps-us.com writes:

Scott,

Received your email. Thanks

**Michael J. Terry**

Program Manager / Contract 10

**XCEL PROTECTIVE SERVICE**

E- mail: michael.terry@xcelprotective.com

Phone: 855-923-5732 Ext. 711

Fax: 855-923-5732

**Protective Services, Inc.**

**From:** Spfpa Local 5 [mailto:spfpa5@aol.com]
**Sent:** Tuesday, October 30, 2018 1:07 PM
**To:** Michael Terry
**Cc:** Michael Terry; spfpa5@aol.com
**Subject:** SPFPA Local 5 Grievance Salopek

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Terry,

Attached to this e mail is a grievance being filed regarding the termination of Mark Salopek and a letter requesting information in this matter.

I would appreciate your signing and dating your signature on the grievance form and returning your signed copy to me via e mail to : spfpa5@aol.com

doing so will provide me with documentation you have received the grievance.

Your cooperation is appreciated.

contact me should you have any question,

Sincerely,

Scott

Scott Harger

Business Agent, FST, SPFPA Rep

1109 S Bailey ST

Seattle, WA 98108

Office: 206-767-4202

Cell: 253-495-2818

Fax: 206-763-4369

E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. *If you are not the intended recipient, you are notified that any use,* dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.



SPFPA| Grievance

**International Union, Security, Police and Fire Professionals of America (SPFPA) and Local Union No. 5, SPFPA**

# GRIEVANCE

**Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018**

**Date: October 30, 2018**

**Company: XCEL PROTECTIVE SERVICES, INC.**

**Unit: Indian Island**

**This Grievance is filed pursuant to Article 9 of the Agreement between Xcel Protective Services Inc. and the International Union, SPFPA and Local Union No. 5 as follows:**

Basis for Grievance: On or about October 27, 2018, Xcel Employee Mark Salopek was informed by Xcel Protective Services Management, that Mr. Salopek's employment with Xcel Protective Services was being terminated. The Union does not believe the Employer, Xcel Protective Services, Inc. had just cause to terminate the employment of Mr. Salopek.

Contract Provisions Violated: Article # 3, Management's Retained Rights, Section 1, D: Discharge, discipline, or suspend for just cause;

ARTICLE #8, DISCHARGES "The Company shall have the right to discharge, discipline or suspend an employee for just cause only.

ARTICLE #9 GRIEVANCE AND ARBITRATION PROCEDURE: Step 1. 1. Discipline, suspension or discharge shall be for just cause only

Relief Requested: The Union demands Xcel Protective Services Inc. make Mr. Salopek whole and complete. That record of this matter be expunged from Mr. Salopek's record of employment/personnel file and Company records.

Grievant: Mark Salopek [signature] Date: 10/30/18

Grievance delivered via e Mail to: Michael Terry, Region Manager Date: ____

By: Scott Harger, Business Agent [signature] Date: 10/30/18

SUBMIT ORIGINAL TO COMPANY. AND RETAIN A COPY FOR THE UNION Rev. 06/2004



**Security Police Fire Professionals of America, Local 5**
1109 S. Bailey Seattle, WA. 98108
Phone 206-767-4202 ~ Fax 206-763-4369 ~
R. Scott Harger - Business Agent/Financial Secretary Tony Clapp - President

October 30, 2018

RE: Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018

To: Michael Terry, Region Manager, Xcel Protective Services, Indian Island

(Delivered via E Mail to: michael.terry@xps-us.com)

Dear Mr. Terry;

The Union is submitting Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018 as allowed in the agreement between our parties.

As such, the Union is requesting information and documentation under S8(a)(5) of the National Labor Relations Act, as amended, for information relevant to the grievance submitted as indicated:

1. Grievant's personnel file;
2. A copy of the rule (s), procedure, policy or requirement that the Grievant is accused of violating;
3. Any document(s) signed by the Grievant during the investigation and processing of the case;
4. Copy of any document(s) given to the Grievant by the Employer relating to this case;
5. Any written or taped witness statement(s) including copies of any e mail communications;
6. The written investigation or other record (including but not limited to video evidence) made by or provided to the Employer relating to this case from any source including but not limited to United States Government employees and or representatives;
7. Any list of witnesses compiled for this case;
8. Record of any prior disciplinary warnings or notifications given to the Grievant;
9. Anything else especially relevant in this case, including any communications (copies of e-mails etc.) between the Company, its managers, employees and or US Government employees, agencies and or contractors

The foregoing information and or documents are necessary and relevant for the Union to process Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018 and to administer the collective bargaining agreement.

Please provide the requested information within ten (10) days of this request. Contact me should you have any questions.

This request is not intended to be inclusive and the Union expressly reserves the right to request additional information as may be necessary and appropriate under the circumstances.

Thank you for your cooperation.

R. Scott Harger
Business Agent, F/S, SPFPA Rep
SPFPA Local 5
Office: 206-767-4202 Fax: 206-763-4369 Cell: 253-495-2818
E-mail: spfpa5@aol.com

# Joint Exhibit 3

APP 139

**From:** Spfpa Local 5
**To:** McConnell, Carolyn
**Cc:** spfpa5@aol.com
**Subject:** Fwd: SPFPA Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018
**Date:** Friday, September 6, 2019 6:09:01 AM
**Attachments:** image003.png

---

e mail sent to terry and filibeck includes request for information notice

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4869
E Mail: spfpa5@aol.com

Instagram | Twitter | Facebook | Youtube | LinkedIn

*Click on the above links to check out our social media networks!*

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

---

From: spfpa5@aol.com
To: Michael.Filibeck@xcelprotective.com, michael.terry@xcelprotective.com
Cc: spfpa5@aol.com, ryan@spfpa.org
Sent: 11/29/2018 2:26:46 PM Pacific Standard Time
Subject: SPFPA Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018

RE: Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck and Mr. Terry,

The Union, having not received a reply to the above referenced grievance in accordance with Article 9, Step 2 of the grievance procedure is providing this e mail as notice of the Union submitting Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018 to our International Union for review, as allowed under step 2. At the expiration of thirty (30) days from today's date, the Union will submit the grievance under step 3, request for Arbitration.

Please contact me to discuss and or schedule a meeting in this matter.

As a reminder, the Union is awaiting a reply to its submitted request for information.

Reply to this e mail is appreciated as an acknowledgment you have received it.

sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

**From:** Spfpa Local 5
**To:** McConnell, Carolyn
**Cc:** spfpa5@aol.com
**Subject:** Fwd: Local 5 SPFPA Request
**Date:** Friday, September 6, 2019 6:11:52 AM
**Attachments:** image003.png

---

email to filibeck regarding info request

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

Instagram | Twitter | Facebook | Youtube | LinkedIn

*Click on the above links to check out our social media networks!*

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

---

From: spfpa5@aol.com
To: Michael.Filibeck@xcelprotective.com
Cc: spfpa5@aol.com, ryan@spfpa.org
Sent: 12/5/2018 2:06:14 PM Pacific Standard Time
Subject: Re: Local 5 SPFPA Request

RE: Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck,

As we have discussed during our telephone conversation this past December 3, 2018, the Union has submitted a request for information regarding the grievance filed for the termination of xcel employee Mark Salopek. The Union has also submitted the grievance for a 30 day review prior to a demand for arbitration.

You had mentioned during our phone call you would send the requested information by

yesterday, December 4, 2018. I have not received the information to date.

If you would, please provide the requested information no later than this Friday, December 7, 2018 at close of the business day.

Should the Union not receive the requested information by the date requested, the union will pursue additional avenues available regarding this matter.

sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 11/13/2018 4:10:37 PM Pacific Standard Time, Michael.Filibeck@xcelprotective.com writes:

> Recieved!
>
> Let me review and get back to. You tomorrow!
>
> Mike
>
> Sent via the Samsung Galaxy S8+, an AT&T 4G LTE smartphone
>
> -------- Original message --------
> From: Spfpa Local 5 <spfpa5@aol.com>
> Date: 11/13/18 4:13 PM (GMT-07:00)
> To: Michael Filibeck <Michael.Filibeck@xcelprotective.com>
> Cc: spfpa5@aol.com
> Subject: Local 5 SPFPA
>
> RE: Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck,

Thank you for taking time to speak with me today via telephone. As we discussed, attached is the grievance and request for information filed at step 1 with Mr. Terry on October 30, 2018 regarding the termination of Mark Salopek.

As allowed in the agreement between our parties, the Union is submitting the grievance at step 2 to your attention. This email represents notice.

Please contact me to schedule a meeting in this matter.

I look forward to your reply and the requisite information.

A reply to this e mail acknowledging receipt is appreciated.

Sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

**From:** Spfpa Local 5
**To:** McConnell, Carolyn
**Cc:** spfpa5@aol.com
**Subject:** Fwd: Local 5 SPFPA
**Date:** Friday, September 6, 2019 10:40:16 AM
**Attachments:** Salopek Grievance and Information request Oct 30 2018 submitted to Xcel.pdf
image003.png

---

here is the Dec 20 2018 e mail to fillbeck

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

Instagram | Twitter | Facebook | Youtube | LinkedIn

*Click on the above links to check out our social media networks!*

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

---

> From: spfpa5@aol.com
> To: Michael.Filibeck@xcelprotective.com
> Cc: spfpa5@aol.com, rich@unionlaw.net, ryan@spfpa.org, michael.terry@xcelprotective.com, spfpa5@gmail.com
> Sent: 12/20/2018 11:09:09 AM Pacific Standard Time
> Subject: Re: Local 5 SPFPA
>
> December 20, 2018
>
> RE: Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018
>
> Dear Mr. Filibeck,

The Union has yet to receive a reply from you regarding the above referenced grievance and the Request for Information submitted at step 2 to you via E Mail on November 13, 2018.

You replied "received" and stated in your reply email " Let me review and get back to. You tomorrow!"

The Union would appreciate a reply.

I have attached the previously submitted Grievance and Request for Information to this email.

Sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 11/13/2018 4:10:37 PM Pacific Standard Time, Michael.Filibeck@xcelprotective.com writes:

> Recieved!
>
> Let me review and get back to. You tomorrow!
>
> Mike
>
> Sent via the Samsung Galaxy S8+, an AT&T 4G LTE smartphone
>
> -------- Original message --------
> From: Spfpa Local 5 <spfpa5@aol.com>
> Date: 11/13/18 4:13 PM (GMT-07:00)
> To: Michael Filibeck <Michael.Filibeck@xcelprotective.com>
> Cc: spfpa5@aol.com
> Subject: Local 5 SPFPA
>
> RE: Grievance No. SPFPAL5-XCEL-SALOPEK-OCT2018

# Joint Exhibit 5

**Weller, Diane**

**From:** Mastrony, Maura A.
**Sent:** Friday, September 13, 2019 1:53 PM
**To:** Weller, Diane
**Subject:** FW: Electronic Service of First Amended Charges in Case Nos. 19-CA-_____ (Lein/ Inquiry No. 1-2413400641); 19-CA-233141 (Mullen)
**Attachments:** Termination File Salopek-2.pdf; Training Records - Personnel File -Salopek - Contract 10.pdf

**From:** Melinda Zamora <melinda@bowles-lawfirm.com>
**Sent:** Friday, September 13, 2019 12:55 PM
**To:** Mastrony, Maura A. <MMastrony@littler.com>
**Subject:** FW: Electronic Service of First Amended Charges in Case Nos. 19-CA-______ (Lein/ Inquiry No. 1-2413400641); 19-CA-233141 (Mullen)

**[EXTERNAL E-MAIL]**

**From:** Melinda Zamora
**Sent:** Monday, January 21, 2019 9:17 AM
**To:** Rich Olszewski <rich@unionlaw.net>; Jason Bowles <jason@bowles-lawfirm.com>
**Subject:** RE: Electronic Service of First Amended Charges in Case Nos. 19-CA-______ (Lein/ Inquiry No. 1-2413400641); 19-CA-233141 (Mullen)

Mr. Olszewski,

Attached are the documents we have pertaining to Mr. Salopek's personnel file.

**From:** Rich Olszewski [mailto:rich@unionlaw.net]
**Sent:** Monday, January 21, 2019 9:07 AM
**To:** Jason Bowles <jason@bowles-lawfirm.com>
**Cc:** Melinda Zamora <melinda@bowles-lawfirm.com>
**Subject:** Re: Electronic Service of First Amended Charges in Case Nos. 19-CA-______ (Lein/ Inquiry No. 1-2413400641); 19-CA-233141 (Mullen)

OK. Mark may be mistaken, but I just double checked his email and it indeed says that he received the file this past Saturday from "Mr. Bowles."

Sent from my iPhone

On Jan 21, 2019, at 11:00 AM, Jason Bowles <jason@bowles-lawfirm.com> wrote:

**Michael Terry**

| | |
|---|---|
| **From:** | Spfpa Local 5 <spfpa5@aol.com> |
| **Sent:** | Thursday, December 20, 2018 11:09 AM |
| **To:** | Michael Filibeck |
| **Cc:** | spfpa5@aol.com; rich@unionlaw.net; ryan@spfpa.org; Michael Terry; spfpa5 @gmail.com |
| **Subject:** | Re: Local 5 SPFPA |
| **Attachments:** | Salopek Grievance and information request Oct 30 2018 submitted to Xcel.pdf |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

December 20, 2018

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck,

The Union has yet to receive a reply from you regarding the above referenced grievance and the Request for Information submitted at step 2 to you via E Mail on November 13, 2018.

You replied "received" and stated in your reply email " Let me review and get back to. You tomorrow!"

The Union would appreciate a reply.

I have attached the previously submitted Grievance and Request for Information to this email.

Sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 11/13/2018 4:10:37 PM Pacific Standard Time, Michael.Filibeck@xcelprotective.com writes:

> Recieved!
>
> Let me review and get back to. You tomorrow!

**Michael Terry**

**From:** Spfpa Local 5 <spfpa5@aol.com>
**Sent:** Thursday, December 20, 2018 11:22 AM
**To:** spfpa5@aol.com; Michael Filibeck
**Cc:** rich@unionlaw.net; ryan@spfpa.org; Michael Terry; spfpa5@gmail.com
**Subject:** Re: Local 5 SPFPA

December 20, 2018

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck,

The Union sets the date of December 30, 2018 for the Company to provide the requested information.

Sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 12/20/2018 11:09:15 AM Pacific Standard Time, spfpa5@aol.com writes:

> December 20, 2018
>
> RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018
>
> Dear Mr. Filibeck,
>
> The Union has yet to receive a reply from you regarding the above referenced grievance and the Request for Information submitted at step 2 to you via E Mail on November 13, 2018.
>
> You replied "received" and stated in your reply email " Let me review and get back to. You tomorrow!"
>
> The Union would appreciate a reply.
>
> I have attached the previously submitted Grievance and Request for Information to this email.
>
> Sincerely,
>
> Scott
>
> Scott Harger

Mike

Sent via the Samsung Galaxy S8+, an AT&T 4G LTE smartphone

-------- Original message --------
From: Spfpa Local 5 <spfpa5@aol.com>
Date: 11/13/18 4:13 PM (GMT-07:00)
To: Michael Filibeck <Michael.Filibeck@xcelprotective.com>
Cc: spfpa5@aol.com
Subject: Local 5 SPFPA

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck,

Thank you for taking time to speak with me today via telephone. As we discussed, attached is the grievance and request for information filed at step 1 with Mr. Terry on October 30, 2018 regarding the termination of Mark Salopek.

As allowed in the agreement between our parties, the Union is submitting the grievance at step 2 to your attention. This email represents notice.

Please contact me to schedule a meeting in this matter.

I look forward to your reply and the requisite information.

A reply to this e mail acknowledging receipt is appreciated.

Sincerely,

Scott

Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 11/13/2018 4:10:37 PM Pacific Standard Time, Michael.Filibeck@xcelprotective.com writes:

Recieved!

Let me review and get back to. You tomorrow!

Mike

Sent via the Samsung Galaxy S8+, an AT&T 4G LTE smartphone

-------- Original message --------
From: Spfpa Local 5 <spfpa5@aol.com>
Date: 11/13/18 4:13 PM (GMT-07:00)
To: Michael Filibeck <Michael.Filibeck@xcelprotective.com>
Cc: spfpa5@aol.com
Subject: Local 5 SPFPA

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck,

Thank you for taking time to speak with me today via telephone. As we discussed, attached is the grievance and request for information filed at step 1 with Mr. Terry on October 30, 2018 regarding the termination of Mark Salopek.

As allowed in the agreement between our parties, the Union is submitting the grievance at step 2 to your attention. This email represents notice.

Please contact me to schedule a meeting in this matter.

I look forward to your reply and the requisite information.

A reply to this e mail acknowledging receipt is appreciated.

Sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.



# SPFPA| Grievance

International Union, Security, Police and Fire Professionals of America (SPFPA) and Local Union No. 5, SPFPA

## GRIEVANCE

Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Date: October 30, 2018

Company: XCEL PROTECTIVE SERVICES, INC.

Unit: Indian Island

**This Grievance Is filed pursuant to Article 9 of the Agreement between Xcel Protective Services Inc. and the International Union, SPFPA and Local Union No. 5 as follows:**

Basis for Grievance: On or about October 27, 2018, Xcel Employee Mark Salopek was informed by Xcel Protective Services Management, that Mr. Salopek's employment with Xcel Protective Services was being terminated. The Union does not believe the Employer, Xcel Protective Services, Inc. had just cause to terminate the employment of Mr. Salopek.

Contract Provisions Violated: Article # 3, Management's Retained Rights, Section 1, D: Discharge, discipline, or suspend for just cause;

ARTICLE #8, DISCHARGES "The Company shall have the right to discharge, discipline or suspend an employee for just cause only.

ARTICLE #9 GRIEVANCE AND ARBITRATION PROCEDURE: Step 1. 1. Discipline, suspension or discharge shall be for just cause only

Relief Requested: The Union demands Xcel Protective Services Inc. make Mr. Salopek whole and complete. That record of this matter be expunged from Mr. Salopek's record of employment/personnel file and Company records.

Grievant: Mark Salopek [signature] Date: 10/30/18

Grievance delivered via e Mail to: Michael Terry, Region Manager Date: ____

By: Scott Harger, Business Agent [signature] Date: 10/30/18

SUBMIT ORIGINAL TO COMPANY, AND RETAIN A COPY FOR THE UNION Rev. 06/2004



**SPFPA**

**Security Police Fire Professionals of America, Local 5**
1109 S. Bailey Seattle, WA 98108
Phone 206-767-4202 ~ Fax 206-763-4369 ~

R. Scott Harger - Business Agent/Financial Secretary Tony Clapp - President

October 30, 2018

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

To: Michael Terry, Region Manager, Xcel Protective Services, Indian Island

(Delivered via E Mail to: michael.terry@xps-us.com)

Dear Mr. Terry;

The Union is submitting Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018 as allowed in the agreement between our parties.

As such, the Union is requesting information and documentation under S8(a)(5) of the National Labor Relations Act, as amended, for information relevant to the grievance submitted as indicated:

1. Grievant's personnel file;
2. A copy of the rule (s), procedure, policy or requirement that the Grievant is accused of violating;
3. Any document(s) signed by the Grievant during the investigation and processing of the case;
4. Copy of any document(s) given to the Grievant by the Employer relating to this case;
5. Any written or taped witness statement(s) including copies of any e mail communications;
6. The written investigation or other record (including but not limited to video evidence) made by or provided to the Employer relating to this case from any source including but not limited to United States Government employees and or representatives;
7. Any list of witnesses compiled for this case;
8. Record of any prior disciplinary warnings or notifications given to the Grievant;
9. Anything else especially relevant in this case, including any communications (copies of e-mails etc.) between the Company, its managers, employees and or US Government employees, agencies and or contractors .

The foregoing information and or documents are necessary and relevant for the Union to process Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018 and to administer the collective bargaining agreement.

Please provide the requested information within ten (10) days of this request. Contact me should you have any questions.

This request is not intended to be inclusive and the Union expressly reserves the right to request additional information as may be necessary and appropriate under the circumstances.

Thank you for your cooperation.

Scott Harger

R. Scott Harger
Business Agent, F/S, SPFPA Rep
SPFPA Local 5
Office: 206-767-4202 Fax: 206-763-4369 Cell: 253-495-2818
E-mail: spfpa5@aol.com

**Michael Terry**

---

| | |
|---|---|
| **From:** | Spfpa Local 5 <spfpa5@aol.com> |
| **Sent:** | Thursday, November 29, 2018 2:27 PM |
| **To:** | Michael Filibeck; Michael Terry |
| **Cc:** | spfpa5@aol.com; ryan@spfpa.org |
| **Subject:** | SPFPA Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Filibeck and Mr. Terry,

The Union, having not received a reply to the above referenced grievance in accordance with Article 9, Step 2 of the grievance procedure is providing this e mail as notice of the Union submitting Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018 to our International Union for review, as allowed under step 2. At the expiration of thirty (30) days from today's date, the Union will submit the grievance under step 3, request for Arbitration.

Please contact me to discuss and or schedule a meeting in this matter.

As a reminder, the Union is awaiting a reply to its submitted request for information.

Reply to this e mail is appreciated as an acknowledgment you have received it.

sincerely,

Scott

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

June 28, 2018

Statement of Peter Villarreal concerning

a boot order replacement

I was hired by Xcel at the Naval Magazine Indian Island on January 12, 2018.  Shortly after I started

working there, I was told by Mark Salopek that I would get new boots every 6 months and that it was

part of our contract.  He said that since it takes a couple of weeks for them to be ordered, shipped and

received, I should order them a couple of weeks before my 6 month anniversary date which is July 12,

2018.

On June 27, 2018, I filled out the uniform request sheet for a new pair of boots.  That day, my post was

the 8 position which is the contact officer at the CVIS (Commercial Vehicle Inspection Station).  LT

Delrosario was the shift LT that day and dropped off a new pair of boots at the CVIS around mid

morning.  This came as a surprise to me because I thought he would have to order them.

As I was leaving work that day, I was informed by Captain Michael Terry that this information was not

correct.  I offered to return the boots since I had them in my vehicle.  He told me to return the next day.

Later that afternoon, I received a phone call from LT Lux informing me to return the boots and to write a

statement about what had occurred.

This statement is true to the best of my knowledge.

SPO Peter Villarreal

**Michael Terry**

**From:** Terry, Michael J CTR NAVMAG Indian Is, N3AT <michael.j.terry.ctr@navy.mil>
**Sent:** Monday, July 09, 2018 1:56 PM
**To:** Michael Terry
**Subject:** FW: Contract Guard Weapons Qualifications

-----Original Message-----
From: Rake, Richard L CIV Navy Region NW, N3AT
Sent: Monday, July 09, 2018 1:50 PM
To: Terry, Michael J CTR NAVMAG Indian Is, N3AT
Cc: Manson, Steve A CIV Navy Region NW, N3AT
Subject: FW: Contract Guard Weapons Qualifications

-----Original Message-----
From: steve mullen [mailto:sdmullen97@yahoo.com]
Sent: Monday, July 09, 2018 10:00 AM
To: Jones, Michael C CIV NAVMAG Indian Is, N3AT <michael.c.jones1@navy.mil>
Subject: [Non-DoD Source] Weapons Qualifications

Mr. Jones
Myself and three other officers, Mark Salopek, Dan Lein, And Jake Schryver are coming forward with a safety issue concerning Weapons qualifications.
This is in regards to a gravel pit to "Qualify" This has happened on several occasions.

The incidents that I am aware of is when Officer Cunningham failed the range with the M500 Shotgun. Officer Cunningham was brought to either a gravel pit or other location by Officer Schryver who supplied his personally owned pistol grip shotgun to Officer Cunningham. Officer Cunningham came back "Qualified". It was brought Mr. Terry attention. Mr. Terry replied said that it was allowed by the Navy.

Officer Schryver said that he was asked to familiarize Officer Cunningham with the shotgun. He said Mr.Terry personally handed him shotgun rounds for this. When he returned to work he said he felt that Officer Cunningham did better. He said when he found out that they were considering that event a qualification, he said that he was not certified to qualify anyone, and that he thought that was just for familiarization with the weapon. The "qualification" status still stood according to Officer Schryver.

Officer Schryver said there was another time he was asked by Lt. Gerald Powless to bring officers to a gravel pit qualify them. Officer Schryver said that he was not comfortable with it. Lt. Powless said that they would just schedule a range at Bangor Naval Base.

The next incident occurred on July 7, 2017. Officer Salopek said he and Mr.Terry were at the small boat pie when Officer Armstrong drove up and stated to Mr. Terry, "Hey Mike, I got that AR15 and a 9mm".Officer Salopek asked What he was talking about?" Officer Armstrong said it was about bringing an AR15 and a 9mm for range at Schroeder's house". "Schroeder" is Officer Schroeder for Xcel.

On 5/9/2018 I attended range, at this range we had 13 people on the range. During this range three senior officers (in seniority) could not pass their rifle qualification. Those officers were officers Lauritzen, Cunningham, and David. Officer

Cunningham could not pass his shotgun either. Officer Cunningham's ability to effectively handle, and manipulate the two weapons came into question by me and a few others at the range especially when unslinging his weapons.

Lt. Gerald Powless altered their targets by putting a large black cross with a black felt pen on their targets with the intersection of the cross dead center. This was done so that they could see the target. Lt. Mitch Vancura helped Officer Cunningham with his shotgun shoot by alter the silhouette by putting a white piece of paper at the six O'clock position so that Officer Cunningham could effectively see and aim his shotgun at the target. They all passed except for Officer Cunningham who still could not pass his rifle.

We also had two newly hired officers on the range, Officers Daniel Lein, and Officer Emily Coler. Officer Lein was able to manipulate his rifle safely, but he struggle with getting use to the rifle. He did not pass the M4 rifle qualification, but only by a very small margin. Officer Coler struggled horribly with how to handle both the rifle and the shotgun, Officer Salopek said that she should be taken off the range because of unsafe handling with the shotgun. Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun.

Officer Salopek contacted Mr. John Morgan Xcel CEO about this problem. He said Mr. Terry would be completely transparent with employees regarding our concerns at the range, and that everything would be conducted according to procedure.

Two weeks later, Officer Cunningham was re-qualifying with the M4 Rifle. Officer Cunningham came back qualified with the rifle. Lt. Del Rosario who was at the range was asked if they had altered the targets for Officer Cunningham, said yes.

Officer Lein, a retired Navy Chief, has been working Government Contract Security for the last 10 years, said that he was told by Lt. Powless that he and Officer Emily Coler were going to be taken to a gravel pit to be qualified with the M4 Rifle. He told me he asked if he was going to be paid for it, and Lt. Powless said "no". Lein said that he was extremely uncomfortable with this plan and was not going to go. Officer Lein qualified at the next properly scheduled range.

After the "Gravel Pit Range", Emily Coler was allowed to work all posts with all weapons, as she had qualified with the rifle and the shotgun. The shotgun used was her own personally owned shotgun, the m4 was an ar15 supplied by an Xcel Officer.

We feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents. Mr. Morgan The CEO of Xcel has been given a detailed memo of these practices. Now it seems that they are trying to cover this up. We cannot continue to let this go on without reporting it to you. This is an abridged version of what is going on.

Thank You
Steve Mullen

**Michael Terry**

**From:** Jones, Michael C CIV NAVMAG Indian Is, N3AT <michael.c.jones1@navy.mil>
**Sent:** Monday, July 09, 2018 11:33 AM
**To:** Michael Terry; Terry, Michael J CTR NAVMAG Indian Is, N3AT
**Subject:** Firearms Qualifications

**Importance:** High

Michael, please provide me the following training records and I will be pulling the following Gun Cards until further notice. Please remove the following from Post responsibilities:

Guards:
Lauritzen
Cunningham
David
Lein
Coler

V/R
Michael Jones
Installation Security Officer
Security Department N3AT
Naval Magazine Indian Island
360-396-5293 Office
360-340-2016 Cell
360-396-7414 Fax
michael.c.jones1@navy.mil
michael.c.jones1@navy.smil.mil

FOR OFFICIAL USE ONLY

SOP # 401
03 April 2018

USE OF FORCE QUARTERLY ACKNOWLEDGEMENT

I certify that I have read and understood the attached articles (Use Of Force Policy) pertaining to the Use of Force and Safety procedures employed at Naval Magazine Indian Island, Navy Region Northwest.

NAME: MARK SALOPEK DoD ID# 1504204533

1st QTR DATE: 10-12-18 SIGNATURE: [signature]

2ND QTR DATE:________ SIGNATURE:________________

3RD QTR DATE:________ SIGNATURE:________________

4TH QTR DATE:________ SIGNATURE:________________

**ACKNOWLEDGEMENT OF CONTROL OVER ARMS, AMMUNITION, AND EXPLOSIVES REQUIREMENT (2001)**

I HAVE BEEN BRIEFED ON MY DUTIES AND RESPONSIBILITIES FOR THE SECURITY OF ARMS, AMMUNITION AND EXPLOSIVES (AA&E). "I UNDERSTAND THAT MY BEHAVIOR ON DUTY AS WELL AS OFF DUTY IS EXPECTED TO REFLECT MATURE STABLE JUDGMENT AND THAT I MAY BE REMOVED FROM MY DUTIES INVOLVING CONTROL OF ARMS, AMMUNITION, AND EXPLOSIVES, OR OTHER ADMINISTRATIVE ACTION TAKEN IF MY BEHAVIOR DOES NOT REFLECT HIGH STANDARDS. I FURTHER UNDERSTAND THAT SERIOUS HARM CAN COME FROM MY FAILURE TO PROPERLY CARRY OUT MY DUTIES. I AM AWARE THAT MY IMPROPER ACTIONS OR FAILURE TO CARRY OUT MY DUTIES MAY RESULT IN CRIMINAL PROSECUTION, FINES, AND IMPRISONMENT. I UNDERSTAND AND ACCEPT THE RESPONSIBILITY TO SAFEGUARD ARMS, AMMUNITION, AND/OR EXPLOSIVES."

| MARK SALOPEK | 10/12/18 | [signature] |
|---|---|---|
| PRINT FULL NAME | DATE | SIGNATURE |

This action is required by the Chief of Naval Operations (CNO) IAW OPNAVINST 5530.13C. Failure or refusal to sign this acknowledgement will result in denial to access AA&E, including weapons assigned for law enforcement, security, or investigative duties.

(Enclosure 1)



# DISCIPLINE OF RECORD

## PERSONNEL INFORMATION

**EMPLOYEE NAME:** Mark Salopek **DATE:** October 6, 2015

**CONTRACT:** 10-DOD Navy **JOB TITLE:** Armed Guard/Lieutenant

**MANAGER:** Michael Terry

## PROGRESSIVE DISCIPLINE

**VERBAL (DOCUMENTED)** ☐ **WRITTEN WARNING** ☐ **SUSPENSION** ☑

**DESCRIPTION OF INFRACTION:** On October 3, 2015 you neglected multiple duties at NavMag, Building 848, which could have resulted in a serious breach of security and threat to the site. You left multiple doors open (one which lead to an armory) and the garage bay door raised completely. You left the building unsecured while another officer arrived and waited until you returned. You were careless and inattentive which reflects very poorly on the company and our ability to provide the level of security contractually required by the Navy.

**PLAN FOR IMPROVEMENT:** As a Lieutenant, Xcel expects you to set the standard for performance with providing security to the Navy. With the severity of the incident, you are hereby removed of all Lieutenant duties and responsibilities.

## PREVIEWS DISCIPLINE RECEIVED (LAST 12 MONTHS)

**DATE:** ______ **DESCRIPTION:** ______

**DATE:** ______ **DESCRIPTION:** ______

*By signing this form, you acknowledge the information above in this warning. You also acknowledge you and your manager have discussed the warning and plan for improvement. Signing this form does not necessarily indicate you agree with this warning.*

**Employee Signature** [signature] **Date:** 10.11.15

**Manager Signature** [signature] **Date:** 10/12/15

**Witness Signature** (If employee refuses to sign) ______ **Date:** ______

**Union Representative (if requested)** ______ **Date:** ______



# Memorandum

October 5, 2015

This memorandum is in response to the administrative inquiry into me leaving the armory at building 848 unsecured for a determinate period of time.

I made a mindful error and mistakenly did not secure the armory before leaving the office. The only true and reasonable explanation was that I was very tired and fatigued that day because I had not slept well the night before, and thought it was secured before leaving. I was nearing the end of my shift.

I remember thinking that I only had two hours to finish post checks and check on CVIS and talk with Officer Mullen about the boat program. I customarily take one trip around the island so I can give a pass down to the on-coming Lieutenant as to the situation on the island. My best estimate is that the last time I left the office it was around 1535 hours. I do recall being in CVIS sometime around 1600. I believe I was in the area of Anderson Pond Gate around 1715.

When I returned to the office it was probably around 1725 give or take. Again, best estimate but I know I felt I was running late that day.

When I returned I entered through the garage and upon entering the office I immediately saw the armory gate open. I then immediately closed the "cage" door. At the same time I saw Officer Scott standing in the foyer of the office holding a PFD. He held it up and asked, "Do you care if I barrow this?", or something to that effect. He then quickly left the building with the PFD.

Lieutenant Jimmy Leigh walked into the Lieutenants office for shift. I immediately reported what I had done to him

He told me that he would have to report this to Michael Terry, and let Michael Terry handle it administratively. Lieutenant Leigh said that he would do an inventory of the vault.

This memorandum and the contents herein were written to the best of my recollection, at this time.

Respectfully,

Mark Solopek

DEPARTMENT OF THE NAVY

VOLUNTARY STATEMENT

1. PLACE B206 848 NAVMAG II

2. DATE 03 OCT 2015

I, SCOTT, BENJAMIN A, make the following free and voluntary statement to MIKE TERRY whom I know to be ECEL REGION MANAGER / CAPTAIN.

I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of UNSECURE BLDG. 848 AND ARMORY DOORS. AT 1542, ON 03 OCT 15, I ARRIVED AT BLDG. 848 TO PICK UP A FLOTATION LIFE VEST TO PLACE INSIDE THE PATROL VEHICLE. UPON ARRIVAL I OBSERVED THE RIGHT SIDE ENTRANCE DOOR BLOCKED OPEN LEFT SIDE GARAGE BAY DOOR RAISE COMPLETELY UP, MAIN DOOR TO THE ARMORY AND STEEL GAGE DOOR OPEN, WHEN I ENTERED ASKED "IS IT ALRIGHT IF I REMOVE A FLOTATION VEST OUT FROM SMALL BOAT LOCKER TO PUT IN MY VEHICLE?". WHEN I HEARD NO ANSWER I WALKED THE BLDG IN SEARCH OF LT SALOPEK AND REALIZED HE WAS GONE AFTER NOTICING THE PATROL SUPERVISORS VEHICLE WAS GONE. I IMMEDIATELY BEGAN TAKING PHOTO'S AND VIDEO OF THE INTERIOR AND EXTERIOR OF BLDG. 848. AT 1608, NESCOM CONDUCTED A RADIO CHECK, ALL UNITS INCLUDING LT SALOPEK RESPONDED. AT 1631, I LEFT A VOICEMAIL TO CAPT. TERRY INFORMING THE ARMORY DOOR HAD BEEN LEFT UNSECURE AND UNATTENDED. I REMAINED INSIDE AND OUTSIDE BLDG 848 UNTIL LT SALOPEK WOULD ARRIVE TO ENSURE THE AREA WAS WATCHED AND AN INVENTORY OF ALL WEAPONS AND CONTENTS WERE PRESENT. AT 1729, LT SALOPEK ARRIVED AT BLDG. 848, HE WALKED THROUGH THE GARAGE BAY DOOR, INTO THE LT'S OFFICE THROUGH THE REAR DOOR, WHEN HE NOTICED THE ARMORY GAGE DOOR WAS OPEN, HE STATED "HOLY SHIT!" AS HE SLAMMED IT SHUT. I ASKED HIM IF IT WOULD BE ALRIGHT TO PUT THE FLOTATION VEST INTO MY VEHICLE, WHEN I HE RESPONDED yes I DEPARTED THE BLDG. AND RESUMED MY PATROL. AT 1825 I RETURNED TO BLDG 848 ASKING LT LEIGH IF CAPT. TERRY HAD CALLED BACK UNAWARE AS TO WHY, I INFORMED LT LEIGH THE STATUS OF THE BLDG AND ARMORY UPON MY ARRIVAL, AND I HAD LEFT A VOICEMAIL WITH CAPTAIN TERRY.

END OF STATEMENT.

[signature]

OPNAV 5527/2 (DEC 1982)

procedure, the grievance will become null and void.

Arbitration

1. Whenever a timely request for arbitration has been made pursuant to this Article, the Company and the Union's representative shall meet for the purpose of selecting an impartial arbitrator.

2. If the parties are unable to agree upon an impartial arbitrator, the party requesting arbitration shall mail a written request for a list of five (5) arbitrators to the Federal

Mediation and Conciliation Service within ten (provided for in subparagraph 1 of this paragraph provided for in subparagraph 1 of this paragraph E.

3. The parties shall meet within ten (10) working days of the day of the receipt of said list for the purpose of attempting to select on said list. If they are unable to do so, the party, which filed the grievance, shall strike two (2) names. The other party shall then strike two (2) names. The individual whose name remains shall be selected as the impartial arbitrator.

4. The arbitrator's decision shall be final and binding on the parties and any affected employee whose job classification is covered by this Agreement. Said decision shall be issued in writing not more than thirty (30) days after the close of the arbitration or the filing of briefs, if any, whichever is later.

5. The arbitrator shall have no authority to amend, modify, change, add to, or subtract from any of the terms or conditions of the Agreement or to base a decision on any past practice, which is inconsistent with the provisions of the Agreement.

6. The parties shall split reasonable fees and expenses of the arbitrator. Remaining fees and or expenses, such as stenographic record, will be paid for by the requesting party.

7. Time limits set forth herein may be extended only by mutual agreement of the Union and the Company.

ARTICLE #10

DISCIPLINARY ACTION

A. Disciplinary action will consist of a verbal warning, written warning, and then suspension or termination. The Company retains the right to skip any part of the progressive discipline process for serious employee misconduct. Disciplinary action must be done within ten (10) working days after the Company's investigation of the said violation. Serious misconduct includes, but is not limited to:

- Sleeping on the job
- Insubordination
- Dishonesty
- Failure to meet and maintain minimum contractual requirements

B. Any time an employee is to be interviewed and disciplinary action may be taken; the employee shall have a Union representative present if requested. Both the employee and Union representative are entitled to know what the meeting is about and are entitled to consult prior to the interview. The representative will conduct themselves in accordance to the Weingarten Act. If Union representation is not immediately available, the employee reserves the right to chose suitable representation (without management approval or input) from among the unit members.

Should any United States Government authority deny access to the facility, or revoke clearance or access to the facility where bargaining unit members work, the employer agrees to furnish the union documentation of such government action. Removal by the government would preclude bargaining unit members right to pursue the matter through the grievance and arbitration procedure in Article 9. If documentation is available and permissible by the government, the company will provide it to the union. If no documentation is provided, then the grievance and arbitration procedure and just cause provision would be applicable.

## ARTICLE #11

## OVERTIME

A. Overtime pay is calculated at one and one-half (1 and 1/2) times the employee's base rate for all hours worked over forty (40) hours in one (1) workweek. Hours paid that are not worked, e.g. holidays, vacations and time spent conducting union business do not count as hours worked for overtime purposes.

B. It is recognized by both the Company and the Union that efficient management may require that there be some overtime scheduled and worked at various times. When changes or overtime are required, the Company shall notify the employee involved as far in advance as reasonably practical to do so. Overtime shall be scheduled in accordance with the protection force overtime policy.

C. Required overtime shall be divided as equitably as possible between employees qualified and available to do the work.

D. In the event of an emergency situation, no call/no shows, or the failure of employees to





XCEL Protective Services
2600 Network Blvd. Suite 420
Frisco, TX 75034
www.xcelprotective.com

## *Change of Status*

**Personnel Information**

Name Mark Salopek SSN Contract # 10 Employee # 10354

Mailing Address Same City ____ State ____ Zip ____

**Physical Address** 271 N. Bayview Dr. **City** Port Ludlow **State** WA **Zip** 98365

Date of Birth ____ Phone Number 360-821-9113 Cell Phone Same

**New Hire**

☐ New Hire ☐ Re-employment

Date ____ Contract # ____ Job Title ____ Pay Rate ____

**Benefits**

☐ Union Dues ☐ Health Insurance Deduction - Health Insurance ____

401k Elective Deferral (additional % of pay) ____

**Change of Current Employment**

☐ Promotion ☐ Transfer ☐ Pay Change ☐ Address Change ☐ Other

Effective Date ____ Pay Rate Change ____ Department ____

**Termination**

☒ Termination ☐ Resignation Effective Date 10/27/2018 Eligible for Rehire ☐ Yes ☒ No

Notes: Termination for Chain of Command Violation and Dishonesty

**Comments:**

Submitted by Michael J. Terry Date 10/29/18

Updated 9/2/14

**Michael Terry**

**From:** Spfpa Local 5 <spfpa5@aol.com>
**Sent:** Tuesday, October 30, 2018 1:07 PM
**To:** Michael Terry
**Cc:** Michael Terry; spfpa5@aol.com
**Subject:** SPFPA Local 5 Grievance Salopek
**Attachments:** Salopek Grievance and information request Oct 30 2018 submitted to Xcel.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Dear Mr. Terry,

Attached to this e mail is a grievance being filed regarding the termination of Mark Salopek and a letter requesting information in this matter.

I would appreciate your signing and dating your signature on the grievance form and returning your signed copy to me via e mail to : spfpa5@aol.com

doing so will provide me with documentation you have received the grievance.

Your cooperation is appreciated.

contact me should you have any question,

Sincerely,

Scott
Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.



**Security Police Fire Professionals of America, Local 5**
1109 S. Bailey Seattle, WA 98108
Phone 206-767-4202 ~ Fax 206-763-4369 ~
R. Scott Harger - Business Agent/Financial Secretary Tony Clapp - President

October 30, 2018

RE: Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

To: Michael Terry, Region Manager, Xcel Protective Services, Indian Island
(Delivered via E Mail to: michael.terry@xps-us.com)

Dear Mr. Terry;

The Union is submitting Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018 as allowed in the agreement between our parties.

As such, the Union is requesting information and documentation under S8(a)(5) of the National Labor Relations Act, as amended, for information relevant to the grievance submitted as indicated:

1. Grievant's personnel file;
2. A copy of the rule (s), procedure, policy or requirement that the Grievant is accused of violating;
3. Any document(s) signed by the Grievant during the investigation and processing of the case;
4. Copy of any document(s) given to the Grievant by the Employer relating to this case;
5. Any written or taped witness statement(s) including copies of any e mail communications;
6. The written investigation or other record (including but not limited to video evidence) made by or provided to the Employer relating to this case from any source including but not limited to United States Government employees and or representatives;
7. Any list of witnesses compiled for this case;
8. Record of any prior disciplinary warnings or notifications given to the Grievant;
9. Anything else especially relevant in this case, including any communications (copies of e-mails etc.) between the Company, its managers, employees and or US Government employees, agencies and or contractors .

The foregoing information and or documents are necessary and relevant for the Union to process Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018 and to administer the collective bargaining agreement.

Please provide the requested information within ten (10) days of this request. Contact me should you have any questions.

This request is not intended to be inclusive and the Union expressly reserves the right to request additional information as may be necessary and appropriate under the circumstances.

Thank you for your cooperation.

Scott Harger

R. Scott Harger
Business Agent, F/S, SPFPA Rep
SPFPA Local 5
Office: 206-767-4202 Fax: 206-763-4369 Cell: 253-495-2818
E-mail: spfpa5@aol.com



SPFPA| Grievance

**International Union, Security, Police and Fire Professionals of America (SPFPA) and Local Union No. 5 , SPFPA**

# GRIEVANCE

Grievance No.: SPFPAL5-XCEL-SALOPEK-OCT2018

Date: October 30, 2018

Company: XCEL PROTECTIVE SERVICES, INC.

Unit: Indian Island

**This Grievance is filed pursuant to Article 9 of the Agreement between Xcel Protective Services Inc. and the International Union, SPFPA and Local Union No. 5 as follows:**

Basis for Grievance: On or about October 27, 2018, Xcel Employee Mark Salopek was informed by Xcel Protective Services Management, that Mr. Salopek's employment with Xcel Protective Services was being terminated. The Union does not believe the Employer, Xcel Protective Services, Inc. had just cause to terminate the employment of Mr. Salopek.

Contract Provisions Violated: Article # 3, Management's Retained Rights, Section 1, D: Discharge, discipline, or suspend for just cause;

ARTICLE #8, DISCHARGES "The Company shall have the right to discharge, discipline or suspend an employee for just cause only.

ARTICLE #9 GRIEVANCE AND ARBITRATION PROCEDURE: Step 1, 1. Discipline, suspension or discharge shall be for just cause only

Relief Requested: The Union demands Xcel Protective Services Inc. make Mr. Salopek whole and complete. That record of this matter be expunged from Mr. Salopek's record of employment/personnel file and Company records.

Grievant: Mark Salopek [signature] Date: 10/30/18

Grievance delivered via e Mail to: Michael Terry, Region Manager Date: ______

By: Scott Harger, Business Agent [signature] Date: 10/30/18

SUBMIT ORIGINAL TO COMPANY, AND RETAIN A COPY FOR THE UNION Rev. 06/2004

**Powless, Gerald L CTR NAVMAG Indian Is, N3AT**

**From:** TASS.donotreply@dmdc.osd.mil
**Sent:** Tuesday, October 30, 2018 14:55
**To:** Powless, Gerald L CTR NAVMAG Indian Is, N3AT
**Cc:** Manson, Steve A CIV Navy Region NW, N3AT; Rake, Richard L CIV Navy Region NW, N3AT; Manson, Steve A CIV Navy Region NW, N3AT
**Subject:** Common Access Card - CAC Revoked

Dear Mark Joseph Salopek:

Your TASS application has been revoked by your Trusted Agent (TA), (Steve A Manson), through the Trusted Associate Sponsorship System (TASS) on 10/30/2018. As a result, the Defense Enrollment Eligibility Reporting System (DEERS) has been updated to reflect the change, which in turn will automatically terminate your government credential or Common Access Card (CAC).

IMPORTANT:
Your government credential or CAC is a controlled item and must be returned to your Government Representative (COR and/or Trusted Agent) within 48 hours for controlled accountability. Failure to comply can result in the initiation of an official report and sworn affidavit and financial withholding. Contact your TA if a requirement still exists to possess a government credential.

Please direct questions to your TA: steve.manson@navy.mil.

If your TA is unavailable, questions may be directed to the site TASM(s):

- Rake, Richard Lee - richard.rake@navy.mil
- Manson, Steve A - steve.manson@navy.mil TASS Web Site: https://tass.dmdc.osd.mil/tass/

XCEL PROTECTIVE SERVICES, INC. 10011

10011

XCEL PROTECTIVE SERVICES, INC.
6170 Research Rd, #217
Frisco, TX 75033

BANK OF ALBUQUERQUE
www.bankofalbuquerque.com
95-560/1070

Three thousand two dollars & 08/100

DATE October 27, 2018

AMOUNT $3,002.08

PAY TO THE ORDER OF Mark Salopek

AUTHORIZED SIGNATURE

Security features. Details on back.

XCEL PROTECTIVE SERVICES, INC. 10011

PRODUCT SSI M102 USE WITH 81500 ENVELOPE Deluxe Corporation 1-800-328-0304 or www.deluxe.com/shop PRINTED IN U.S.A.

CONFIDENTIAL

XCEL 01290



2600 Network Blvd. Suite 420
Frisco, TX 75034

(469) 579-3496

Date: 06/04/18.

Contract#: 10

Training Course: PFT.

Officer's Name: SALOPEK

You must:

- Resolve the non-compliant requirement within 60 days of the expiration date. This must be coordinated with the site supervisor to ensure the training received is within contractual guidelines and to allow Xcel and/or our client to observe any training attended.
- Resolve the non-compliant requirement at your own expense (if applicable).

Failure to comply with these requirements will result in the termination of your employment.

[signature] Officer's Signature — Date 6/6/18

[signature] Site Manager's Signature — Date 06/04/18.



2600 Network Blvd, Suite 420
Frisco, TX 75034

(469) 579-3496

Date: 04/04/17

Contract#: 10

Training Course: PFT

Officer's Name: MARK SALOPEK

You must:

- Resolve the non-compliant requirement within 60 days of the expiration date. This must be coordinated with the site supervisor to ensure the training received is within contractual guidelines and to allow Xcel and/or our client to observe any training attended.
- Resolve the non-compliant requirement at your own expense (If applicable).

Failure to comply with these requirements will result in the termination of your employment.

[signature] 4/4/17
Officer's Signature Date

[signature] 04/04/17
Site Manager's Signature Date



6170 Research Rd.
Suite 205
Frisco, TX 75033
Phone : (469) 579-3496
Fax : (888) 411-5790

To: Port Hadlock Medical Care
PO Box 1208
Port Hadlock, WA 98339
Phone : (360) 379-6737

**Medical Screening for Basic Contracting Services, Inc.**

Employee Name: Mark Salopek Date 5/30/13

TO: **Port Hadlock Medical Care**

The above employee has passed a complete drug screening examination.

The above listed employee has been given a physical and neurological exam and meets BCSi standards for employment:

- Has good near and distant vision
- Is able to distinguish basic colors
- Is able to hear the conversational voice
- Is able to successfully perform moderate to arduous physical work
- Other ______________________

[signature] May 30, 2013
Signature Date

Kenneth Brown, ARNP
Printed Name/Title

I attest that:

- I have never been diagnosed with a mental illness for which medication is necessary (DOD Requirement)
- I do not take mood altering drugs and/or narcotics, prescription or otherwise (DOD Requirement)

Mark Salopek 5/30/13
Patient Signature Date

***FAX RESULTS TO (888) 411-5790***



6170 Research Road #217
Frisco, TX 75033

469-579-3496
Fax 469-340-0021

Drug Test

Date Administered: 4-19-18

Employee Name: Salopek, Mark

___ Initial Employment

___ Random Testing

X Annual Testing

Results:

X Negative

___ Positive (requires evaluation at laboratory)

Administered by:

[signature] Print

[signature] Signature

By signing this document I am verifying that the above information is true and correct to the best of my knowledge.



6170 Research Road #217
Frisco, TX 75033

469-579-3496
Fax 469-340-0021

Drug Test

Date Administered: 21 APR 17

Employee Name: Salopek, Mark

___ Initial Employment

___ Random Testing

X Annual Testing

Results:

X Negative

___ Positive (requires evaluation at laboratory)

Administered by:

Powless, Gerald
Print

[signature]
Signature

By signing this document I am verifying that the above information is true and correct to the best of my knowledge.



2600 Network Blvd, Suite 420
Frisco, TX 75034

469-579-3496
Fax 888-411-5790

Drug Test

Date Administered: 5.14.16

Employee Name: Salopek, Mark

___ Initial Employment

___ Random Testing

X Annual Testing

Results:

___ Negative

___ Positive (requires evaluation at laboratory)

Administered by:

MVLLEN
Print

Signature

By signing this document I am verifying that the above information is true and correct to the best of my knowledge.



2600 Network Blvd, Suite 420
Frisco, TX 75034

469-579-3496
Fax 888-411-5790

Drug Test

Date Administered: 23 JAN 2016

Employee Name: Salopek, Mark

___ Initial Employment

___ Random Testing

X Annual Testing

Results:

X Negative

___ Positive (requires evaluation at laboratory)

Administered by:

MULLER, STEPHEN D
Print

Signature

By signing this document I am verifying that the above information is true and correct to the best of my knowledge.

**Partners in Well-Being, PC, Inc.**
**Bruce J. Tapper, Ph.D.**

Ψ

Clinical Psychologist, License # PY1976
281-A Lane De Chantal, Port Townsend, WA 98368
Tel: (360) 379-9492 Fax: (360) 379-8866 Email: Bruce@DrTapper.com

## RESULTS OF PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| PATIENT: | Mark Salopek |
| DOB: | |
| AGE: | 51 |
| DOE: | 5/31/2013 |
| EXAMINER: | Bruce J. Tapper, Ph.D.<br>Clinical Psychologist |
| TESTS ADMINISTERED: | Minnesota Multiphasic Personality Inventory 2 (MMPI 2)<br>California Psychological Inventory (Form 434) |

The following psychological evaluation is designed to meet the requirements set forth by the Department of the Navy in screening applicants for the position of armed security guard, according to Attachment J-0401060-06. The Department of the Navy has selected the Minnesota Multiphasic Personality Inventory (MMPI-2) and the California Psychological Inventory (CPI) as the instruments to be utilized for this screening process. The Department of the Navy has determined that these paper and pencil personality scale tests are valid, objective, and reliable instruments that determine whether the applicant has the psychological and behavioral elements required of a security guard.

The MMPI-2 uses non-gendered norms to comply with the Federal Civil Rights Act and the EEOC. The MMPI-2 is the most widely used and most widely researched test of adult psychopathology in use today. The Revised Adjustment Rating Report of the MMPI-2 is a computer-scored analysis based on research data from more than 18,000 personnel cases and has been designed to provide occupation-specific information to help agencies to confidently evaluate personality attributes that may contribute to unsafe, irresponsible, or ineffective on-the-job behavior. The Law Enforcement Adjustment Rating Report that has been specifically utilized in this evaluation is designed for both law enforcement officers and security personnel. It is based on research data from more than 9000 law-enforcement applicants. The authors of this Adjustment Rating Report state that the report is designed to serve as a useful guide for employment decisions in which personality adjustment is considered important for success on the job.

The CPI Form 434 is designed to comply with the Americans with Disabilities Act, Civil Rights Act, Title VII, and other privacy issues legislation. The author of the CPI states that the primary purpose is to furnish information from which a true-to-life and useful picture may be drawn of the person taking the test. The goal of the inventory is to assess individuals by means of variables and concepts that ordinary people use in their daily lives to understand,

classify, and predict their own behavior and that of others. All CPI reports are computer-generated by the CPP Scoring Center in Washington, DC.

The examiner hereby certifies that results of this evaluation have been derived solely from responses to these two paper and pencil tests and not on personal interview or personnel records. The examiner hereby certifies that all possible precautions were taken to guard the confidentiality of the respondent including direct-mail of answer sheets to the examiner, with no other party having access to the answer sheets other than the examiner himself. The examiner hereby certifies that he personally entered MMPI-2 data into the scoring program, and the CPI answer sheets were mailed to the CPP Scoring Center and results returned directly to him by FedEx. The examiner hereby certifies that the results of this evaluation were not in any way influenced by any communication with the employer, and are based solely on the respondent's answers to the test questions on the MMPI-2 and the CPI.

**SUMMARY AND RECOMMENDATION:**

According to the test results, Mark Salopek does not demonstrate any significant psychological problems at this time and he **does** meet the Department of the Navy criteria for employment as an armed security guard.

Bruce J. Tapper, Ph.D.
Clinical Psychologist, License #PY1976



# Privacy Act Data Cover Sheet

To be used on all documents containing personal information

## DOCUMENTS ENCLOSED ARE SUBJECT TO THE PRIVACY ACT OF 1974

Contents shall not be disclosed, discussed, or shared with individuals unless they have a direct need-to-know in the performance of their official duties. Deliver this/these document(s) directly to the intended recipient. **DO NOT** drop off with a third-party.

The enclosed document(s) may contain personal or privileged information and should be treated as "For Official Use Only." Unauthorized disclosure of this information may result in CIVIL and CRIMINAL penalties. If you are not the intended recipient or believe that you have received this document(s) in error, do not copy, disseminate or otherwise use the information and contact the owner/creator or your Privacy Act officer regarding the document(s).

**Privacy Act Data Cover Sheet**

DD FORM 2923, SEP 2010

# CLASSIFIED INFORMATION NONDISCLOSURE AGREEMENT

AN AGREEMENT BETWEEN MARK SALOPEK AND THE UNITED STATES
(Name of Individual - Printed or typed)

1. Intending to be legally bound, I hereby accept the obligations contained in this Agreement in consideration of my being granted access to classified information. As used in this Agreement, classified information is marked or unmarked classified information, including oral communications, that is classified under the standards of Executive Order 12958, or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and unclassified information that meets the standards for classification and is in the process of a classification determination as provided in Sections 1.2, 1.3, and 1.4(e) of Executive Order 12958, or under any other Executive order or statute that requires protection for such information in the interest of national security. I understand and accept that by being granted access to classified information, special confidence and trust shall be placed in me by the United States Government.

2. I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of classified information, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been approved for access to it, and that I understand these procedures.

3. I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation. I hereby agree that I will never divulge classified information to anyone unless: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of the information or last granting me a security clearance that such disclosure is permitted. I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person as provided in (a) or (b), above. I further understand that I am obligated to comply with laws and regulations that prohibit the unauthorized disclosure of classified information.

4. I have been advised that any breach of this Agreement may result in the termination of any security clearances I hold; removal from any position of special confidence and trust requiring such clearances; or the termination of my employment or other relationships with the Departments or Agencies that granted my security clearance or clearances. In addition, I have been advised that any unauthorized disclosure of classified information by me may constitute a violation, or violations, of United States criminal laws, including the provisions of Sections 641, 793, 794, 798, *952 and 1924, Title 18, United States Code, * the provisions of Section 783(b), Title 50, United States Code, and the provisions of the Intelligence Identities Protection Act of 1982. I recognize that nothing in this Agreement constitutes a waiver by the United States of the right to prosecute me for any statutory violation.

5. I hereby assign to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of this Agreement.

6. I understand that the United States Government may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement.

7. I understand that all classified information to which I have access or may obtain access by signing this Agreement is now and will remain the property of, or under the control of the United States Government unless and until otherwise determined by an authorized official or final ruling of a court of law. I agree that I shall return all classified materials which have, or may come into my possession or for which I am responsible because of such access: (a) upon demand by an authorized representative of the United States Government; (b) upon the conclusion of my employment or other relationship with the Department or Agency that last granted me a security clearance or that provided me access to classified information; or (c) upon the conclusion of my employment or other relationship that requires access to classified information. If I do not return such materials upon request, I understand that this may be a violation of Section 793 and/or 1924, Title 18, United States Code, a United States criminal law.

8. Unless and until I am released in writing by an authorized representative of the United States Government, I understand that all conditions and obligations imposed upon me by this Agreement apply during the time I am granted access to classified information, and at all times thereafter.

9. Each provision of this Agreement is severable. If a court should find any provision of this Agreement to be unenforceable, all other provisions of this Agreement shall remain in full force and effect.

(Continue on reverse.)

10. These restrictions are consistent with and do not supersede, conflict with or otherwise alter the employee obligations, rights or liabilities created by Executive Order 12958; Section 7211 of Title 5, United States Code (governing disclosures to Congress); Section 1034 of Title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); Section 2302(b)(8) of Title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that expose confidential Government agents), and the statutes which protect against disclosure that may compromise the national security, including Sections 641, 793, 794, 798, 952 and 1924 of Title 18, United States Code, and Section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. Section 783(b)). The definitions, requirements, obligations, rights, sanctions and liabilities created by said Executive Order and listed statutes are incorporated into this Agreement and are controlling.

11. I have read this Agreement carefully and my questions, if any, have been answered. I acknowledge that the briefing officer has made available to me the Executive Order and statutes referenced in this Agreement and its implementing regulation (32 CFR Section 2003.20) so that I may read them at this time, if I so choose.

| SIGNATURE | DATE | SOCIAL SECURITY NUMBER (See Notice below) |
|---|---|---|
| [signature] | 6·24·13 | |

ORGANIZATION (IF CONTRACTOR, LICENSEE, GRANTEE OR AGENT, PROVIDE: NAME, ADDRESS, AND, IF APPLICABLE, FEDERAL SUPPLY CODE NUMBER) (Type or print)

Basic Contracting Services Inc.
100 Indian Island Road
Port Hadlock, WA 98339

| WITNESS | | ACCEPTANCE | |
|---|---|---|---|
| THE EXECUTION OF THIS AGREEMENT WAS WITNESSED BY THE UNDERSIGNED. | | THE UNDERSIGNED ACCEPTED THIS AGREEMENT ON BEHALF OF THE UNITED STATES GOVERNMENT. | |
| SIGNATURE: [signature] | DATE: 06/24/13 | SIGNATURE: [signature] | DATE: 06/24/13 |
| NAME AND ADDRESS (Type or print): MITCHELL VANCURA<br>Basic Contracting Services Inc.<br>100 Indian Island Road<br>Port Hadlock, WA 98339 | | NAME AND ADDRESS (Type or print): MITCHELL VANCURA<br>Basic Contracting Services Inc.<br>100 Indian Island Road<br>Port Hadlock, WA 98339 | |

SECURITY DEBRIEFING ACKNOWLEDGEMENT

I reaffirm that the provisions of the espionage laws, other federal criminal laws and executive orders applicable to the safeguarding of classified information have been made available to me; that I have returned all classified information in my custody; that I will not communicate or transmit classified information to any unauthorized person or organization; that I will promptly report to the Federal Bureau of Investigation any attempt by an unauthorized person to solicit classified information, and that I (have) (have not) (strike out inappropriate word or words) received a security debriefing.

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
| [signature] | 10.27.18 |

| NAME OF WITNESS (Type or print) | SIGNATURE OF WITNESS |
|---|---|
| MICHAEL J. TERRY | [signature] 10/27/18 |

NOTICE: The Privacy Act, 5 U.S.C. 552a, requires that federal agencies inform individuals, at the time information is solicited from them, whether the disclosure is mandatory or voluntary, by what authority such information is solicited, and what uses will be made of the information. You are hereby advised that authority for soliciting your Social Security Account Number (SSN) is Executive Order 9397. Your SSN will be used to identify you precisely when it is necessary to 1) certify that you have access to the information indicated above or 2) determine that your access to the information indicated has terminated. Although disclosure of your SSN is not mandatory, your failure to do so may impede the processing of such certifications or determinations, or possibly result in the denial of your being granted access to classified information.

* NOT APPLICABLE TO NON-GOVERNMENT PERSONNEL SIGNING THIS AGREEMENT.

SOP # 401
20 September 2016

USE OF FORCE QUARTERLY ACKNOWLEDGEMENT

I certify that I have read and understood the attached articles (Use Of Force Policy) pertaining to the Use of Force and Safety procedures employed at Naval Magazine Indian Island, Navy Region Northwest.

**NAME:** Salopek, Mark **SSN:**________

1st QTR DATE: 11/24/17 SIGNATURE: Mark Salopek

2ND QTR DATE: 1/17/18 SIGNATURE: Mark Salopek

3RD QTR DATE:________ SIGNATURE:________________

4TH QTR DATE:________ SIGNATURE:________________

**ACKNOWLEDGEMENT OF CONTROL OVER ARMS, AMMUNITION, AND EXPLOSIVES REQUIREMENT (2001)**

"I understand that my behavior on-duty as well as off-duty is expected to reflect mature, stable judgment and that I may be removed from duties involving control of arms, ammunition, and/or explosives, or other administrative action taken, if my behavior does not reflect high standards. I further understand that serious harm can come from my failure to properly carry out my duties. I am aware that my improper actions or failure to carry out my duties may result in criminal prosecution, fines, and imprisonment. I understand and accept the responsibilities to safeguard arms, ammunition, and/or explosives."

Salopek, Mark — 11/24/17 — Mark Salopek
PRINT FULL NAME — DATE — SIGNATURE

This action is required by the Chief of Naval Operations (CNO) IAW OPNAVINST 5530.13C. Failure or refusal to sign this acknowledgement will result in denial to access AA&E, including weapons assigned for law enforcement, security, or investigative duties.

**(Enclosure 1)**

OPNAVINST 3591.1F

# SMALL ARMS QUALIFICATIONS RECORD

| SHIP OR STATION | DIVISION OR ACTIVITY | WEAPON (S) FIRED *SUSTAINMENT* | PAGE 1 OF 1 |
|---|---|---|---|
| Naval Magazine Indian Island | Xcel Protective Services | M-4, M-9, M-500 | |

NAVY HANDGUN QUALIFICATION COURSE = **NHQC**
HANDGUN PRACTICAL WEAPONS COURSE = **HPWC**
RIFLE QUALIFICATION COURSE = **RQC**
HANDGUN LOWLIGHT COURSE = **HLLC**
SHOTGUN PRACTICAL WEAPONS COURSE = **SPWC**
RIFLE LOWLIGHT COURSE = **RLLC**

| RANGE NAME/LOCATION | DATE OF FIRING | Marksmanship Award Code: | Qualification Codes: |
|---|---|---|---|
| Naval Base Kitsap, Bangor | 29 August 2018 | E = Expert<br>S = Sharpshooter<br>M = Marksmen | Q = Qualified<br>U = Unqualified |

| FULL NAME | SSN (Last four) | RANK/ RATE | NHQC Score & Award Code | | RQC Score & Award Code | | SPWC Score T1 | SPWC Score T2 | SPWC Score T3 | SPWC Q or U | HPWC Score T1 | HPWC Score T2 | HPWC Score T3 | HPWC Q or U | HLLC Numeric Score/ Q or U | | RLLC Numeric Score/ Q or U | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *SALOPEK MARK* | | *SPO* | *48* | *Q* | *39* | *Q* | | | | *Q* | | | | | | | | |

I CERTIFY THAT THE ABOVE RECORD QUALIFAICATION WAS CONDUCTED PER OPNAVINST 3591.1F

SIGNATURE & RATE OF RANGE SAFETY OFFICER

*Lt. ARMSTRONG JOHN* [signature]

DATE

29 August 2018

OPNAV 3591/1 (Rev 02/2007) DISTRIBUTION: ORIGINAL - COMMANDING OFFICER FOR SERVICE RECORD ENTRY

CONFIDENTIAL

 

# WEAPONS TRAINING ROSTER

Weapon(s) Subject Training: **(M-4, M-9, AND M-500)**

| Name: (Last, First MI) | Rate/Grade: | Signature: | Date: |
|---|---|---|---|
| Sardegna, Johathan | SPO | [signature] | 29 Aug 18 |
| Kitchen, Mandy | SPO | [signature] | 29 AUG 18 |
| Ridgway, Stephen | SPO | [signature] | 29 AUG 18 |
| Eu-Isan, David | LT | [signature] | 29 AUG 18 |
| [illegible], Mark | SPO | [signature] | 29 AUG 18 |
| Simons, Norman | SPO | [signature] | 29 Aug 18 |
| Romero, Damien | SPO | [signature] | 29 Aug 18 |
| Powless, Gerald | LT | [signature] | 29 Aug 18 |
| Armstrong, John | LT | [signature] | 29 AUG 18 |
| | | | |
| | | | |

I certify and verify that the following forms are current and completed for the personnel listed above:

- Report of Screening for Personnel Assigned Arms Ammunition and Explosives (AA&E) Security Related Duties, OPNAV 5530/1 (Rev 4/2015).
- Use of Force Quarterly Acknowledgement signed and up to date to include of reading and understanding of the Use of Force SOP.
- Current Qualification to Possess Firearms or Ammunition (DD FORM 2760, DEC 2002).
- Completed Personnel Qualification Standard (PQS). **N/A for contractors**
- In lieu of PQS, Verify contractor has completed and documented Equivalency weapons training during initial training.
- NKO Completion Certificates or proof thereof for the weapons employed. **N/A for contractors**
- **Contractor is required to complete Weapons Familiarization on weapons being fired on site prior to firing.**

I certify and verify that the weapons training requirements were completed for above weapon(s) subject per enclosure (3) for pistols; enclosure (4) for rifles; enclosure (5) for shotgun and/or enclosure (6) for light, medium and heavy machine gun of the current OPNAVINST 3591.1 series:

| Instructor Name: | Rate/Grade: | Signature: | Date: |
|---|---|---|---|
| Powless, Gerald | LT | [signature] | 29 Aug 18 |
| Armstrong, John | LT | [signature] | 29 Aug 18 |

**CONFIDENTIAL** **XCEL 01305**

OPNAVINST 3591.1F

## SMALL ARMS QUALIFICATIONS RECORD

| SHIP OR STATION | DIVISION OR ACTIVITY | WEAPON (S) FIRED | PAGE 1 OF 1 |
|---|---|---|---|
| Naval Magazine Indian Island | Xcel Protective Services | M-4, M-9, M-500 (Qualification) | |

NAVY HANDGUN QUALIFICATION COURSE = NHQC
HANDGUN PRACTICAL WEAPONS COURSE = HPWC
RIFLE QUALIFICATION COURSE = RQC
HANDGUN LOWLIGHT COURSE = HLLC
SHOTGUN PRACTICAL WEAPONS COURSE = SPWC
RIFLE LOWLIGHT COURSE = RLLC

| RANGE NAME/LOCATION | DATE OF FIRING | Marksmanship Award Code: | Qualification Codes: |
|---|---|---|---|
| Naval Base Kitsap, Bangor | 10 April 2018 | E = Expert<br>S = Sharpshooter<br>M = Marksmen | Q = Qualified<br>U = Unqualified |

| FULL NAME | SSN (Last four) | RANK/ RATE | NHQC Score & Award Code | | RQC Score & Award Code | | SPWC Score T1 | SPWC Score T2 | SPWC Score T3 | SPWC Q or U | HPWC Score T1 | HPWC Score T2 | HPWC Score T3 | HPWC Q or U | HLLC Numeric Score/ Q or U | | RLLC Numeric Score/ Q or U | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SALAPEK MARK | | SPO | 240 | E | 176 | E | 49 | 52 | 52 | Q | 6 | 6 | 6 | Q | 18 | Q | 20 | Q |

I CERTIFY THAT THE ABOVE RECORD QUALIFAICATION WAS CONDUCTED PER OPNAVINST 3591.1F

SIGNATURE & RATE OF RANGE SAFETY OFFICER: Lt. ARMSTRONG JOHN [signature]

DATE: 10 April 2018

OPNAV 3591/1 (Rev 02/2007)

DISTRIBUTION: ORIGINAL - COMMANDING OFFICER FOR SERVICE RECORD ENTRY

XCEL 01306
APP 188
CONFIDENTIAL



# WEAPONS TRAINING ROSTER

Weapon(s) Subject Training: M-4, M-9, M-500

| Name: (Last, First MI) | Rank/Grade: | Signature: | Annual or Sust (A/S): |
|---|---|---|---|
| Simons, Norman | SPO | [signature] | Annual |
| Salgek, Mark | SPO | [signature] | Annual |
| Romero, Damien | SPO | D. Romero [signature] | Annual |
| Sardegna, Johnathan | SPO | [signature] | Sustain |
| Kitchen, Mandy | SPO | [signature] | Sustain |
| Ridgway, Stephen | SPO | [signature] | Sustain |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I certify and verify that the following forms are current and completed for the personnel listed above:

- Report of Screening for Personnel Assigned Arms Ammunition and Explosives (AA&E) Security Related Duties, OPNAV 5530/1 (Rev 4/2015).
- Use of Force Quarterly Acknowledgement signed and up to date to include reading and understanding of Use of Force SOP.
- Current Qualification to Possess Firearms or Ammunition (DD FORM 2760, DEC 2002).
- Completed Personnel Qualification Standard (PQS). **N/A for contractors**
- In lieu of PQS, verify contractor has completed and documented Equivalent weapons training during initial training.
- NKO Completion Certificates or proof thereof for the weapons employed. **N/A for contractors**
- Contractor is required to complete weapons familiarization on weapons being fired on site day of firing.

I certify and verify that the weapons training requirements were completed for above weapon(s) subject per enclosure (3) for pistols; enclosure (4) for rifles; enclosure (5) for shotgun and/or enclosure (6) for light, medium and heavy machine gun of the current OPNAVINST 3591.1 series:

| Instructor Name: | Rate/Grade: | Signature: | Date: |
|---|---|---|---|
| Powless, Gerald | LT | [signature] | 10 APR 18 |

| NAME (Last, first, middle) | | | | | | TITLE |
|---|---|---|---|---|---|---|
| SALOPEK, MARK | | | | | | SPO |
| ACTIVITY ADDRESS | | | | | | |
| NAVAL MAGAZINE INDIAN ISLAND | | | | | | |
| RACE | SEX | WEIGHT | HEIGHT | AGE | COLOR OF EYES | COLOR OF HAIR |
| W | M | 185 | 6'1" | 57 | GREEN | BROWN |

| TYPE OF WEAPON | SERIAL | AUTHORIZATION: *The above identified is authorized in accordance with Title 10, Section 1585, U.S. Code and/or SECNAVINST 5500.33 to carry firearms while performing duties as:* |
|---|---|---|
| M-4, M-500, M-9 | VARIOUS | |
| DATE OF ISSUE | DATE OF EXPIRATION | SECURITY PROT. OFFICER |
| SUSTAIN 29 AUG 18 | 23 FEB 19 | |
| HOLDERS SIGNATURE | | APPROVED *(Signature, rank or title, and activity)* |
| | | *Jones, Michael C, LPO By Direction* NAVAL MAGAZINE INDIAN ISLAND |

AUTHORIZATIONS TO CARRY FIREARMS OPNAV 5512/2 (REV. 8-81) [illegible]

CONFIDENTIAL

# QUALIFICATION TO POSSESS FIREARMS OR AMMUNITION

## PRIVACY ACT STATEMENT

**AUTHORITY:** 18 U.S.C. 922(g)(9); E.O. 9397.

**PRINCIPAL PURPOSE(S):** To obtain information to determine if you have been convicted of a crime of domestic violence which would disqualify you from shipping, transporting, possessing or receiving either Government-issued or private firearms or ammunition and to determine if reassignment, reclassification, detail or other administrative action is warranted. Your Social Security Number is solicited solely for purposes of verifying your identity.

**ROUTINE USE(S):** To the Department of Justice so that such information can be included in the National Instant Criminal Background Check System which may be used by firearm licensees (importers, manufacturers or dealers) to determine whether individuals are qualified to receive or possess firearms and ammunition.

**DISCLOSURE:** Mandatory for all personnel who are required to certify. Failure to provide the information may result in (1) (military only) the imposition of criminal or administrative penalties for failing to obey a lawful order, and (2) (civilian only) the imposition of administrative penalties, to include removal from Federal service. However, neither your answers nor information or evidence gained by reason of your answers can be used against you in any criminal prosecution for a violation of Title 18, United States Code, Section 922(g)(9), including (military only) prosecutions under the Uniform Code of Military Justice, based on a violation of Section 922(g)(9), for conduct which occurred prior to the completion of this form. The answers you furnish and any information resulting therefrom, however, may be used against you in a criminal or administrative proceedings if you knowingly and willfully provide false statements or information.

## SECTION I - INSTRUCTIONS

An amendment to the Gun Control Act of 1968 (18 U.S.C. 922) makes it a felony for anyone who has been convicted of a misdemeanor crime of domestic violence to ship, transport, possess, or receive firearms or ammunition. It is also a felony for any person to sell or otherwise dispose of a firearm to any person so convicted.

The Department of Defense has, by policy, expanded the prohibitions contained in Title 18 Section 922(g)(9) to those military or civilian personnel who have felony convictions for crimes of domestic violence. Convictions of crimes of domestic violence do not include summary court-martial convictions, the imposition of nonjudicial punishment (Article 15, UCMJ), or deferred prosecutions (or similar alternative dispositions) in civilian courts. Furthermore, a person shall not be considered as having committed a "crime of domestic violence" for purposes of the firearms restriction of the Gun Control Act unless all of the following elements are present:

(1) the person was convicted of a crime;

(2) the offense has as its factual basis the use or attempted use of physical force, or threatened use of a deadly weapon;

(3) the convicted offender was at the time of the offense:
- (a) a current or former spouse, parent or guardian of the victim,
- (b) a person with whom the victim shared a child in common,
- (c) a person who was cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or
- (d) a person who was similarly situated to a spouse, parent, or guardian of the victim;

(4) the convicted offender was represented by counsel, or knowingly and intelligently waived the right to counsel;

(5) if entitled to have the case tried by jury, the case was actually tried by jury or the person knowingly and intelligently waived the right to have the case tried by jury;

(6) the conviction has not been expunged or set aside, or the convicted offender has not been pardoned for the offense or had civil rights restored, unless the pardon, expungement, or restoration of civil rights provides that the person may not ship, transport, possess or receive firearms.

If you have ever received a domestic violence conviction: (1) you may not possess any firearm or ammunition; and (2) you must return any Government-issued firearm or ammunition to your commander or immediate supervisor; and (3) you must take steps to relinquish possession of any privately owned firearms or ammunition. Furthermore, any previously issued authorization to possess a firearm or ammunition is revoked.

If you have any questions, or you are uncertain if you have such a conviction, you may wish to contact a legal assistance attorney, if eligible, or a private attorney, at your own expense.

## SECTION II - QUALIFICATION INQUIRY *(Complete and return to your commander or immediate supervisor within 10 days of receipt)*

**1. HAVE YOU EVER BEEN CONVICTED OF A CRIME OF DOMESTIC VIOLENCE AS DESCRIBED ABOVE:** *(Initial and date)*

YES | (NO) [initials] 20180410 | I DON'T KNOW *(Provide explanation on reverse)*

**2. IF YOU ANSWERED "YES" TO THE FIRST QUESTION, PROVIDE THE FOLLOWING INFORMATION WITH RESPECT TO THE CONVICTION:**

| a. COURT/JURISDICTION | b. DOCKET/CASE NUMBER |
|---|---|
| c. STATUTE/CHARGE | d. DATE SENTENCED *(YYYYMMDD)* |

**3. CERTIFICATION.** I hereby certify that, to the best of my information and belief, all of the information provided by me is true, correct, complete, and made in good faith. I understand that false or fraudulent information provided herein may be grounds for criminal and/or administrative proceedings, to include (if civilian) adverse action, up to and including removal, and (if military) disciplinary action under the Uniform Code of Military Justice. I further understand that I have a continuing obligation to inform my Commander or Supervisor should I be convicted of a crime of domestic violence in the future.

| a. NAME *(Last, First, Middle Initial)* | b. RANK/GRADE | c. SOCIAL SECURITY NUMBER |
|---|---|---|
| SALOPEK, MARK J | PSO | Leave Blank |
| **d. ORGANIZATION** | **f. SIGNATURE** | **e. DATE SIGNED** *(YYYYMMDD)* |
| Xcel Protective Services, Inc. | [signature] | 20180410 |

DD FORM 2760, JAN 2002 PREVIOUS EDITION IS OBSOLETE.

CONFIDENTIAL XCEL 01309

OPNAVINST 8023.24

## REPORT OF SCREENING FOR PERSONNEL ASSIGNED ARMS, AMMUNITION AND EXPLOSIVES (AA&E) SECURITY RELATED DUTIES

Per OPNAVINST 5530.13, before persons are assigned AA&E security related duties, whether full time or collateral, they will be screened to ensure they have maturity, good judgment, trustworthiness, and positive attitudes toward the DON and national security. Such screening will include Ordnance personnel and personnel authorized unescorted entry to AA&E spaces. A designated Officer will examine service records of those personnel being screened and discuss the duties to be assigned with the person or person's supervisor.

Salopek, Mark — SPO
NAME OF INDIVIDUAL BEING SCREENED — RATE — SSN *(Enter last four digits of SSN)*

Powless, Gerald — LT
NAME OF OFFICER PERFORMING SCREENING — RATE — SSN *(Enter last four digits of SSN)*

*I HAVE BEEN BRIEFED ON MY DUTIES AND RESPONSIBILITIES FOR THE SECURITY OF ARMS, AMMUNITION AND EXPLOSIVES (AA&E). "I UNDERSTAND THAT MY BEHAVIOR ON DUTY AS WELL AS OFF DUTY IS EXPECTED TO REFLECT MATURE STABLE JUDGMENT AND THAT I MAY BE REMOVED FROM MY DUTIES INVOLVING CONTROL OF ARMS, AMMUNITION, AND/OR EXPLOSIVES, OR OTHER ADMINISTRATIVE ACTION TAKEN IF MY BEHAVIOR DOES NOT REFLECT HIGH STANDARDS. I FURTHER UNDERSTAND THAT SERIOUS HARM CAN COME FROM MY FAILURE TO PROPERLY CARRY OUT MY DUTIES. I AM AWARE THAT MY IMPROPER ACTIONS OR FAILURE TO CARRY OUT MY DUTIES MAY RESULT IN CRIMINAL PROSECUTION, FINES, AND IMPRISONMENT. I UNDERSTAND AND ACCEPT THE RESPONSIBILITY TO SAFEGUARD ARMS, AMMUNITION, AND/OR EXPLOSIVES".*

[signature] — 20 APR 16
SIGNATURE OF MEMBER BEING SCREENED — DATE

[signature] — 20 APR 16
SIGNATURE OF SCREENING OFFICER — DATE

---

### ACKNOWLEDGMENT OF ANNUAL RESCREENING

[signature] — 4/18/2017
SIGNATURE OF MEMBER BEING SCREENED — DATE

[signature] — 4/18/17
SIGNATURE OF SCREENING OFFICER — DATE

Add a Section | Delete the Last Section

---

[signature] — 4/10/18
SIGNATURE OF MEMBER BEING SCREENED — DATE

[signature] — 4/10/18
SIGNATURE OF SCREENING OFFICER — DATE

# REFRESHER SECURITY BRIEFING CERTIFICATION

AME: Mark Salopek EMPLOYEE NUMBER 10354

TE ADDRESS: Xcel Protective Services , 100 Indian Island Road, Port Hadlock WA 98339

ıch employee with a government security clearance shall execute an initial security briefing certificate attesting to the llowing.

1. I have received a security briefing and understand my individual responsibilities. (You are not permitted to remove any classified documents from a military site. You are governed by the applicable security rules of that activity).
2. I will safeguard classified information in accordance with prescribed security standards.
3. The classified information to which I have been granted access will be used only for the purpose for which released.
4. I understand and accept that my Security Clearance may be suspended or revoked for violation of security regulations or improper use of classified information.
5. I understand that I may be subject to action under the espionage statutes of the U.S. with respect to classified information to which access is granted.
6. I understand that upon termination of the purpose for which I have been granted access, my responsibilities for safeguarding the classified information continues unabated until the security classification is removed by appropriate Government authority.

Mark Salopek 4/17/18 04/17/18

(Signature of Individual) (Date) (Signature of Briefer) (Date)

ANNEX A

# INITIAL SECURITY BRIEFING CERTIFICATION

NAME: MARK J SALOPEK EMPLOYEE NUMBER: 10354

SITE ADDRESS: BCSI, 100 Indian Island Road, Port Hadlock WA 98339

Each employee with a government security clearance shall execute an initial security briefing certificate attesting to the following.

1. I have received a security briefing and understand my individual responsibilities. (You are not permitted to remove any classified documents from a military site. You are governed by the applicable security rules of that activity).
2. I will safeguard classified information in accordance with prescribed security standards.
3. The classified information to which I have been granted access will be used only for the purpose for which released.
4. I understand and accept that my Security Clearance may be suspended or revoked for violation of security regulations or improper use of classified information.
5. I understand that I may be subject to action under the espionage statutes of the U.S. with respect to classified information to which access is granted.
6. I understand that upon termination of the purpose for which I have been granted access, my responsibilities for safeguarding the classified information continue unabated until the security classification is removed by appropriate Government authority.

# REFRESHER SECURITY BRIEFING CERTIFICATION

AME: Mark Salopek EMPLOYEE NUMBER 10354

ITE ADDRESS: Xcel Protective Services , 100 Indian Island Road, Port Hadlock WA 98339

ach employee with a government security clearance shall execute an initial security briefing certificate attesting to the ıllowing.

1. I have received a security briefing and understand my individual responsibilities. (You are not permitted to remove any classified documents from a military site. You are governed by the applicable security rules of that activity).
2. I will safeguard classified information in accordance with prescribed security standards.
3. The classified information to which I have been granted access will be used only for the purpose for which released.
4. I understand and accept that my Security Clearance may be suspended or revoked for violation of security regulations or improper use of classified information.
5. I understand that I may be subject to action under the espionage statutes of the U.S. with respect to classified information to which access is granted.
6. I understand that upon termination of the purpose for which I have been granted access, my responsibilities for safeguarding the classified information continue unabated until the security classification is removed by appropriate Government authority.

(Signature of Individual) 5/23/16 (Date) (Signature of Briefer) 05/23/16 (Date)



XCEL

# CERTIFICATE OF COMPLETION

*Awarded to:*
*SALOPEK, MARK*

*For completion of:*
*80 HOURS OF INITIAL TRAINING*

*19 JUNE 2013*

Employee Signature

Xcel Protective Services, Inc.
100 Indian Island Rd, #184
Nav Mag Indian Island,
Port Hadlock, WA 98339

Gerald Powless
Training Instructor

CONFIDENTIAL



XCEL
Protective Services

**NAVMAG EMPLOYEE INITIAL TRAINING**

| Last Name | SALOPEK |
|---|---|
| First Name | MARK |
| Middle Initial | J |
| Last 4 of SSN | |
| Date of Hire | 5·23·~~15~~ 13 MR |

| Course Title | Officer | Signature | Instructor | Signature | Date |
|---|---|---|---|---|---|
| Area Familiarization OJT | Salopek | Mark Salopek | Rowless | [signature] | 6·19·13 |
| FPCONS & Measures | Salopek | Mark Salopek | Rowless | [signature] | 6·11·13 |
| Forms & Reports/Report Writing | Salopek | Mark Salopek | Rowless | [signature] | 6·11·13 |
| NSF Duties & Functions | Salopek | Mark Salopek | Rowless | [signature] | 6·11·13 |
| Overview & Orientation | Salopek | Mark Salopek | Rowless | [signature] | 6·12·13 |
| Physical Security Safeguards | Salopek | Mark Salopek | Rowless | [signature] | 6·11·13 |
| Threat Spectrum | Salopek | Mark Salopek | Rowless | [signature] | 6·11·13 |
| Vehicle & Personnel Movement Control | Salopek | Mark Salopek | Rowless | [signature] | 6·11·13 |



ATTENTION:

Prior to 1/JUN/2015 basic training documents were electronically filed. Upon request any documents prior to that date can be obtained, printed, or shown from records or archives.

Prior to 1/Jan/2015 all hard copy and electronically filed records, whether current or archived, are referenced by Basic Contracting Services Inc. (BCSI), the former name for Xcel Protective Services.

Captain Michael Terry

12/04/15

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 203 of 658

# CERTIFICATE OF COMPLETION

*Awarded to:*
*SALOPEK, MARK*
*For completion of:*
*40 HOURS OF SUSTAINMENT TRAINING*

*19 APRIL 2018*

Employee Signature

Xcel Protective Services, Inc.
100 Indian Island Rd, #184
Nav Mag Indian Island,
Port Hadlock, WA 98339

Gerald Powless
Training Instructor

XCEL 01317
APP 199
CONFIDENTIAL



**NAVMAG EMPLOYEE SUSTAINMENT TRAINING**

**Page 1**

NAME Last Salopek First Mark Mid Initial J Last 4 of SSN:

DATE OF HIRE: 5/23/13

| Course Title | Officer | Signature | Instructor | Signature | Date complete |
|---|---|---|---|---|---|
| Standards of Conduct | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Changes in S.O.P., Post Orders, Etc. | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| AT Level One | SALOPEK | M.Salopek | Powless | [signature] | 4-17-18 |
| Jurisdiction and Authority | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Search and Seizure | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| UCMJ | SALOPEK | M.Salopek | Powless | [signature] | 4-17-18 |
| Self Incrimination/Admissions and Confessions | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Apprehension verses Arrest | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Legal Testimony | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Traffic Control | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Random Vehicle Inspection | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Crime Scene- Preservation of Evidence | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Watch Standing Procedures | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Sentry, ECP | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Vehicle /Pleasure Craft/Other vehicles | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Situational Awareness | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Incident Reporting | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Interpersonal Skills | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Information Gathering | SALOPEK | M.Salopek | Powless | [signature] | 4-18-18 |
| Tactical communications | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Mobile Patrol Procedures- Vehilce and Boat | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Illegal Drug Identification | SALOPEK | M.Salopek | Powless | [signature] | 4-17-18 |
| Vehicle Stops/Search of Vehicles | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Crowd Control | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Preplanned response Procedure (bomb thrt etc) | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Arms, Ammunition, and Explosives (AA&E) | SALOPEK | M.Salopek | Powless | [signature] | 10 APR 18 |
| Active Shooter | SALOPEK | M.Salopek | Powless | [signature] | 4-17-18 |
| Bloodborne Pathogens | SALOPEK | M.Salopek | Mullen | [signature] | 4-19-18 |
| Drugs of Abuse Identification | SALOPEK | M.Salopek | Powless | [signature] | 4-17-18 |
| Drug Screening | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Emergancy Vehicle Operation | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Hydraulic Barricade | SALOPEK | M.Salopek | Powless | [signature] | 4-19-18 |
| Security Clearance Briefing | SALOPEK | M.Salopek | Powless | [signature] | 4-17-18 |



**NAVMAG EMPLOYEE SUSTAINMENT TRAINING**

**Page 2**

NAME Last Salopek First Mark Mid Initial J Last 4 of SSN:

DATE OF HIRE: 5/23/13

| Course Title | Officer | Signature | Instructor | Signature | Date complete |
|---|---|---|---|---|---|
| SEMI-ANNUAL | | | | | |
| Weapons Qualification / Sustainment | SALOPEK | M. Salopek | Powless | [signature] | 4/10/18 |
| Non-Lethal Weapons Training (baton, OC, etc) | SALOPEK | M. Salopek | Powless | [signature] | 12/26/17 |
| Physical Fitness Test | SALOPEK | M. Salopek | Powless | [signature] | 12/4/17 |
| [illegible] | | | | | |
| Use of Force Continuum | SALOPEK | M. Salopek | Powless | [signature] | 3/16/18 |
| Deadly Force Certification | SALOPEK | M. Salopek | Powless | [signature] | 1/17/18 |
| Physical Control Techniques | SALOPEK | M. Salopek | Powless | [signature] | 3/16/18 |
| BI-ANNUAL | | | | | |
| Cardio-Pulmonary Resuscitation (CPR) | SALOPEK | M. Salopek | Mullen | [signature] | 1/17/17 |
| First Aid | SALOPEK | M. Salopek | Mullen | [signature] | 1/17/17 |

The below signed Instructor certifies that the subject listed above received 40 hour of sustainment training on the above subjects. Print: Powless, Gerald Sign: [signature] Date: 19 APR 18



[redacted] 50
sit ups 27
push ups 19
Run: 16:23
PASS
Shaver 50
Situps 27
push ups 19
Run: 16:00
PASS
Rite in the Rain

8/3/18





BBP
Bloodborne Pathogens
Student Name
MARK SALOPEK
Issue Date
10/24/18
Expiration Date
10/24/19
EMS SAFETY
(800) 215-9555 www.emssafety.com

(800) 215-9555 www.emssafety.com
99530
Card Number
Instructor Name
RYAN D. EARL
Instructor Number
WA555
Access Student Portal: www.emssafety.com/login

CONFIDENTIAL XCEL 01321
APP 203

Certificate of Completion
**Mark Salopek**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJA**

Scan code or visit:
redcross.org/confirm

Certificate of Completion
**Trever Thanem**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJB**

Scan code or visit:
redcross.org/confirm

Certificate of Completion
**William Aldrich**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJC**

Scan code or visit:
redcross.org/confirm

Certificate of Completion
**Benjiman Gentry**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJD**

Scan code or visit:
redcross.org/confirm

Certificate of Completion
**Brogan Lont**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJE**

Scan code or visit:
redcross.org/confirm

Certificate of Completion
**Damien Romero**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJF**

Scan code or visit:
redcross.org/confirm

Certificate of Completion
**Lisa Owens**
has completed the requirements for
**Adult and Pediatric First Aid/CPR/AED**
conducted by
**American Red Cross**
Date completed: **01/17/2017**
Validity period: **2 Years**
Certificate ID: **GU3AJG**

Scan code or visit:
redcross.org/confirm

XCEL

NAVMAG EMPLOYEE NMCI TRAINING

| NAME Last Salopek | First Mark | Mid Initial J | Last 4 of SSN: |
|---|---|---|---|
| DATE OF HIRE: 5/23/18 | | | |

| Course Title | Officer | Signature | Instructor | Signature | Date complete |
|---|---|---|---|---|---|
| Anti-Terrorism Level 1 | SALOPEK | M. Salopek | Powless | [signature] | 4.17.18 |
| Active Shooter | SALOPEK | M. Salopek | Powless | [signature] | 4.17.18 |
| DOD Cyber Awareness Challenge V5 or 2018 | SALOPEK | M. Salopek | Powless | [signature] | 4.17.18 |

QTR1: OCT-DEC
QTR2: JAN-MAR
QTR3: APR-JUN
QTR4: JUL-SEP

# ISO QUARTERLY RECORD VERIFICATION

FY: 17

| Quarter | Last, First MI | Signature | Date |
|---|---|---|---|
| 1ST | JONES, MICHAEL | [signature] | 10/14/2016 |
| 2ND | JONES, MICHAEL | [signature] | 01/10/2017 |
| 3RD | JONES, MICHAEL | [signature] | 5/23/2017 |
| 4TH | JONES, MICHAEL | [signature] | 8/3/17 |

FY: 18

| Quarter | Last, First MI | Signature | Date |
|---|---|---|---|
| 1ST | JONES, MICHAEL | [signature] | 11/30/17 |
| 2ND | JONES, MICHAEL | [signature] | 2/14/18 |
| 3RD | JONES, MICHAEL | [signature] | 5/31/18 |
| 4TH | JONES, MICHAEL | [signature] | 8/10/18 |

FY: 19

| Quarter | Last, First MI | Signature | Date |
|---|---|---|---|
| 1ST | | | |
| 2ND | | | |
| 3RD | | | |
| 4TH | | | |

FY: 20

| Quarter | Last, First MI | Signature | Date |
|---|---|---|---|
| 1ST | | | |
| 2ND | | | |
| 3RD | | | |
| 4TH | | | |

# Joint Exhibit 10

**Weller, Diane**

**From:** Melinda Zamora <melinda@bowles-lawfirm.com>
**Sent:** Friday, September 13, 2019 1:04 PM
**To:** Mastrony, Maura A.
**Subject:** FW: 6.1 USN Contract Complaint review report - Salopek.pdf
**Attachments:** 6.1 USN Contract Complaint review report - Salopek.pdf; ATT00001.txt

[EXTERNAL E-MAIL]

-----Original Message-----
From: Jason Bowles
Sent: Thursday, January 24, 2019 3:49 PM
To: rich@unionlaw.net; Melinda Zamora <melinda@bowles-lawfirm.com>
Subject: 6.1 USN Contract Complaint review report - Salopek.pdf

Rich - please see

RICHARD RAKE
SUPV SENIOR PERFORMANCE ASSESMENT REPRESENTATIVE CONTRACT
STEVE MANSON
PERFORMANCE ASSESMENT REPRESENTATIVE CONTRACT
N44255-14-D-9021
1103 HUNLEY ROAD
SILVERDALE, WA

July 25, 2018

MEMORANDUM FOR CONTRACTING OFFICER, NAVAL FACILITIES NORTH WEST FOR INDIAN ISLAND
COMMANDING OFFICER NAVAL MAGAZINE INDIAN ISLAND

**SUBJECT:** Evaluation of email from contractor personnel to Security Officer at Indian Island and final disposition dated 9 July 2018 1000 regarding weapon qualifications at the Bangor Small Arms Training Center (SATC).

**Objective:** The objective of our evaluation was to determine whether the email dated 9 July and interviews that were conducted from 10 – 23 July were relevant or not with current contract language and current instructions. We reviewed these submissions for the period from 1 October 2014 – 24 July 2018.

**Background:** To establish if the contractor violated Navy policy and bypassed the minimum requirements for individuals qualifying on the small arms training center per references OPNAV 3591.1F Small Arms Training and Qualifications and OPNAVINST 5530.13C Department of the Navy Physical Security Instruction for Conventional Arms, Ammunition, and Explosives (AA&E). We conducted this evaluation in accordance with the requirements set forth in the Indian Island Contract N44255-14-D-9021. Richard Rake and Steve Manson conducted interviews and Steve Manson conducted the research in the documents.

**Issue 1:** "Myself and three others officers, Mark Salopek, Dan Lein and Jake Schriver are coming forward with a safety issue concerning weapons qualifications. This is in regards to a gravel pit to qualify. This has happened on several occasions."

**Finding 1:** All 3591.1 qualifications forms were reviewed for authenticity that the actual qualifications shooting was conducted at the Bangor or at the alternate range at Port Townsend when government notifications to the contractor that the Bangor range was not available as designated in the contract. Specific long term dates the range at Bangor was not available: 3 Nov 2016 – 23 Jan 2017 (ventilation issues) and 1 Aug 2017 – 30 Sep 2017 (unburned explosive powder residue). During the ten interviews of contract personnel including Officer Salopek/Lein on the email complaint, no one but the training officer and contract manger were aware of those dates (proper personnel to know so scheduling could be conducted). When Officer Salopek was asked employee since 5/23/2013 if he was aware of dates when the Bangor SATC was down he was not aware of any of the dates. Officer Dan Lein employee since 4/18/2018 was not around during those times. No officer has come forth with any documentation to show any falsifying of

the actual qualifications of the 3591.1 form (small arms qualification record) did not occur at the proper range (he said, she said, I heard, no names), no one could produce any documents to prove the accusations. Contractor did hold remedial training to allow personnel extra training to pass qualifications at the range; this in no way violated any contract language or instructions.

**Recommendation:** We recommend no action on this issue.

**Issue 2:** "The incidents that I am aware of is when Officer Cunningham failed the range with the M500 Shotgun. Officer Cunningham was brought to either a gravel pit or other location by Officer Schryver who supplied his personally owned pistol grip shotgun to Officer Cunningham. Officer Cunningham came back "Qualified". It was brought Mr. Terry attention. Mr. Terry replied said that it was allowed by the Navy."

**Finding 2:** Reviewed Officer Cunningham's 3591.1 and ammo log, he shot with three other officers for his qualifications reshoot on 9 March 2018 within the time allotted for reshooting per instruction at the Bangor SATC which his 3591.1 form and gun card show. Officer Cunningham did state to us that he did go to an open area in the woods with Officer Schryver and did some practicing with a shotgun on his own time so he can become proficient at his reshoot since he doesn't shoot shotguns that often. Officer Cunningham stated he was never told this would count as his official qualifications shoot for the 3591.1 form. Officer Schryver was asked in his interview if he took Officer Cunningham out as a qualification shoot in an open area and stated he has never taken anyone out to qualify at any location except at the Port Townsend range or Bangor range. He has taken several people out to open areas to provide extra training to allow them to qualify at the range. Captain Terry denied the comment this was allowed for qualification with the 3591.1 form but was allowed for remedial training.

**Recommendation:** We recommend no action on this issue. Contractor or staff are permitted to take personal weapons and shoot offsite as much as they want which does not violate any contractual or GOV instructions.

**Issue 3:** "Officer Schryver said that he was asked to familiarize Officer Cunningham with the shotgun. He said Mr.Terry personally handed him shotgun rounds for this. When he returned to work he said he felt that Officer Cunningham did better. He said when he found out that they were considering that event a qualification, he said that he was not certified to qualify anyone, and that he thought that was just for familiarization with the weapon. The "qualification" status still stood according to Officer Schryver."

**Finding 3:** Verified Officer Cunningham's qualification shoot in Issue 2 above. Officer Schryver stated that he never said to anyone that this was to count as a "qualification" status. Officer Cunningham would pass his qualification round at the next date at the SATC. This whole paragraph was denied by Officer Schryver and Michael Terry (project manager). Captain Terry provided shot gun rounds for remedial training to assist in getting fully qualified at the range the next time.

**Recommendation:** We recommend no action on this issue.

**Issue 4:** "Officer Schryver said there was another time he was asked by Lt. Gerald Powless to bring officers to a gravel pit qualify them. Officer Schryver said that he was not comfortable with it. Lt. Powless said that they would just schedule a range at Bangor Naval Base."

**Finding 4:** Officer Schryver denied the entire paragraph as worded, he would never take anyone to a gravel pit to shoot ("this could lead to accidents due to ricochets and I know better"). He was never asked to qualify anyone but to provide remedial training to personnel who needed the extra time. LT Powless stated he has never asked anyone to become qualified with the 3591.1 form at any area other than those at the SATC or Port Townsend public range (paperwork and ammo draw, sign in sheets concur with this statement by LT Powless). Lt Powless became the training officer around 2012 spanning over two contracts and numerous inspection teams without incident.

**Recommendation:** We recommend no action on this issue.

**Issue 5:** " The next incident occurred on July 7, 2017. Officer Salopek said he and Mr.Terry were at the small boat pie when Officer Armstrong drove up and stated to Mr. Terry, "Hey Mike, I got that AR15 and a 9mm".Officer Salopek asked What he was talking about?" Officer Armstrong said it was about bringing an AR15 and a 9mm for range at Schroeder's house". "Schroeder" is Officer Schroeder for Xcel."

**Finding 5:** Not sure what this paragraph means, Officer Mullen resigned the day before his interview, I did not have a chance to ask what this paragraph meant. The entire email reads as though the information was cut and pasted from a larger document. Third person information which cannot be verified. Captain Terry, Officer Armstrong believe he was talking about a time when they went shooting over at Officer Schroeder 's house.

**Recommendation:** We recommend no action on this issue.

**Issue 6:** "On 5/9/2018 I attended range, at this range we had 13 people on the range. During this range three senior officers (in seniority) could not pass their rifle qualification. Those officers were officers Lauritzen, Cunningham, and David. Officer Cunningham could not pass his shotgun either. Officer Cunningham's ability to effectively handle, and manipulate the two weapons came into question by me and a few others at the range especially when unslinging his weapons."

**Finding 6:** On 9 May 2018 only 11 people shot, Lauritzen, Cunningham, and David were not shooting on the range on this date; Lauritzen was Post 2 (Main Gate), Cunningham was Post 1 (Reaction Force) and David was on a regular scheduled day off. Actual dates all three shot on the range was 21 February 2018; Officers Lauritzen and David qualified on 21 Feb but Cunningham did not pass all qualifications and shot again to pass his qualifications on 9 March 2018. On 9 May 2018 the SATC Range RSO Armstrong, Line coaches, Officer Schryver, Lux, LT Powless stated that Lauritzen, Cunningham, and David were not on the range to shoot this day. On 21 February 2018 RSO Armstrong, Line coaches, Officer Schryver, Lux, Powless did not notice any problems or issues with Cunningham's ability to effectively handle, and manipulate the two

weapons. Officer Schryver stated as the line coach for Cunningham if any safety issues would have arisen he would have called out to stop the shoot.

**Recommendation:** We recommend no action on this issue.

**Issue 7:** "Lt. Gerald Powless altered their targets by putting a large black cross with a black felt pen on their targets with the intersection of the cross dead center. This was done so that they could see the target. Lt. Mitch Vancura helped Officer Cunningham with his shotgun shoot by alter the silhouette by putting a white piece of paper at the six O'clock position so that Officer Cunningham could effectively see and aim his shotgun at the target. They all passed except for Officer Cunningham who still could not pass his rifle."

**Finding 7:** OPNAV 5191.1F does not state anywhere in the document that prevents the use of adding white dots, black cross marks or altering the target by enhancing the view with markers or dots. When Federal Law Enforcement Training Center (FLETC) and Center for Security forces (CENSECFOR) was contacted they also use this same practice to assist officers through the qualifications. CENSECFOR also stated they put pictures on the targets to assist members. They must use the required targets in the instruction and distances that are regulated. When asked if any of the Officers including Salopek/Lein had actually read the instruction pertaining to altering the targets none of them had except the RSO's/training officer LT Powless and project manager which would have been the valid personnel on this contract to know and follow the document.

**Recommendation:** We recommend no action on this issue.

**Issue 8:** "Officer Coler struggled horribly with how to handle both the rifle and the shotgun, Officer Salopek said that she should be taken off the range because of unsafe handling with the shotgun. Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun."

**Finding 8:** Interviewed line coach for officer Coler on the day of the shoot 9 May 2018 and Officer Schryver stated he did not see any unsafe handling conditions with the shotgun or rifle nor did anyone bring to his attention any such issue. He would have stopped the shoot if any unsafe handling with the shotgun presented themselves as a safety issue. Not sure the point of the last sentence "Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun." Personnel do not pass qualifications all the time and that is why they are allowed by instruction to retake the course again to qualify.

**Recommendation:** We recommend no action on this issue.

**Issue 9:** "Two weeks later, Officer Cunningham was re-qualifying with the M4 Rifle. Officer Cunningham came back qualified with the rifle. Lt. Del Rosario who was at the range was asked if they had altered the targets for Officer Cunningham, said yes."

**Finding 9:** The sentence structure is confusing, this issue with altering targets was answered in issue/finding 7.

**Recommendation:** We recommend no action on this issue.

**Issue 10:** "Officer Lein, a retired Navy Chief, has been working Government Contract Security for the last 10 years. said that he was told by Lt. Powless that he and Officer Emily Coler were going to be taken to a gravel pit to be qualified with the M4 Rifle. He told me he asked if he was going to be paid for it, and Lt. Powless said "no". Lein said that he was extremely uncomfortable with this plan and was not going to go. Officer Lein qualified at the next properly scheduled range."

**Finding 10:** In the interview with Officer Lein he stated he was never told that it was going to be a qualification shoot but remedial training to allow more time with a rifle. He stated since he wasn't going to be paid he would take his chances at the range the next time. Officer Coler also stated she was never told that going to the "gravel pit" was to qualify but for remedial training to allow her to qualify.

**Recommendation:** We recommend no action on this issue.

**Issue 11:** "After the "Gravel Pit Range", Emily Coler was allowed to work all posts with all weapons, as she had qualified with the rifle and the shotgun. The shotgun used was her own personally owned shotgun, the m4 was an ar15 supplied by an Xcel Officer."

**Finding 11:** Officer Coler's gun card that was issued only showed she was qualified with the M-9 weapon. She did not qualify with the M-500 or M-4. Upon review on weapons issued by the armory we found that officer Coler was issued an M-500 on the following dates by four different shift Lieutenants: 5 June 2018 (1230-1815), 12 June 2018 (1330-2015), 19 June 2018 (1400-2000), 23 June 2018 (1315-2200) and a M-4 0n 12 June 2018 (0140-1415). On discussion with the different shift Lieutenants we discovered the loop holes that allowed officer Coler to be issued weapons she was not qualified on and suggested the following recommendations immediately. Steve checked back thru records and found this incident to the only one that allowed a person to be issued weapons. The communication between the trainer and scheduler is critical and having the shift Lieutenants verify what is on the gun cards before issuance of weapons. Lt Lux stated that Officer Coler was issued the weapons but she was assigned with an officer that was qualified to use the weapon.

**Recommendation:** We recommended to the contractor several corrections that were resolved during the review:

1. No person is to be allowed to stand post until 100% weapons qualifications are completed.
2. Changed the process to for each yellow gun card to be placed as a place holder when a weapon is removed to show who the weapon was issued. This would alleviate a person getting a weapon even when assigned to stand a post with someone qualified to use that weapon.
3. Shared communication from the training officer to the person who is making the schedule to know who is 100% qualified. Found that when Officer Coler failed to qualify with other weapons (M500 and M4) the trainer LT. Powless went on a two week leave and

didn't get her scheduled to take her requalification test for M500 and M4, back up trainer scheduled Officer Coler at the Bangor Range Facility 9 July 2018.

**Actions taken:**

1. Company will not allow personnel to stand post until 100% qualified.
2. Gun cards are placed in each gun slot to show who the weapons were issued to.
3. Communication will be better between trainer and scheduler.

**Issue 12:** "We feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents. Mr. Morgan The CEO of Xcel has been given a detailed memo of these practices. Now it seems that they are trying to cover this up. We cannot continue to let this go on without reporting it to you. This is an abridged version of what is going on."

**Finding 12:** No falsifying of any federal documents were found in reviewing armory records, training jackets, 3591.1 forms, SATC records or ammo draw. No one interviewed could provide any documents that GOV records were falsified, only comment was "that was what I heard".

**Recommendation:** We recommend no action on this issue.

During our interviews we provided our email addresses so personnel interviewed could provide documents and additional information they didn't have during the interviews. Officer Salopek provided additional information on 22 July 2018 who was the only one that took the opportunity and sent an email with several other issues that we looked into and they are as follows:

**Salopek issue 1:** "May 29, 2018, Emily Coler worked Post 3 which is South Patrol on Swing Shift. During this shift her patrol vehicle reportedly experienced a flat tire and she received assistance to change the tire. The officers on that shift should be able to shine some light on whether she was alone on South Patrol or not."

**Salopek Finding 1:** Officer Coler was posted as a reaction patrol, only issued and M-9 per Ready for Issue (RFI) records. She was in a patrol vehicle with a person who was qualified with the shotgun which the weapon was issued to.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 2:** "June 11, 2018 Emily Coler worked Post 7 which is Pier Gate Cover Guard on Day Shift, which requires a shotgun."

**Salopek Finding 2:** Officer Coler was not cover guard at the CVIS, only weapon issued per RFI records was an M-9. No shot gun issued.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 3:** "On June 12, 2018 Emily Coler worked a 12 hour shift from 0200 to 1400 at Post 9 which is CVIS Cover Guard, which requires an M4 Rifle. I was told that on this shift, Officer Coler reportedly sent a text message to an officer indicating she had left the extra ammo

in the van and asked for it to be brought down. M9 extra ammo is always put in belt magazine holders at the armory, and M4 or shotgun extra ammo is transported within a carrying pouch to posts or in patrol vehicles by the individual it was issued to. On this shift Officer Coler would have worked with two different Post 8 Officers as the shifts changed. In addition there is talk that Officer Coler's M4 Rifle was found to be in Condition 1 rather than Condition 3, but this will have to be either confirmed or disproved."

**Salopek Finding 3:** This was found in our review of the RFI records in findings 11 and verified with other dates we found. We made recommendations to the company and this was fixed immediately to prevent incidents in the future. Found no foundation nor any statement from any person in regards to Condition 1 rather than Condition 3 for the weapon for officer Coler. Phone interview with officer Coler denied this statement. I did not find anyone that could collaborate "talk that Officer Coler's M4 Rifle was found to be in Condition 1 rather than Condition 3, but this will have to be either confirmed or disproved."

**Recommendation:** See recommendations under finding 11 above.

**Salopek issue 4:** "On June 13, 2018 Emily Coler worked Swing Shift Post 7 which is Pier Gate Cover Guard, which requires a Shotgun. She replaced me for Post 7."

**Salopek Finding 4:** This was found in our review of the RFI records in findings 11 and verified with other dates we found. We made recommendations to the company and was fixed immediately to prevent this issue in the future.

**Recommendation:** See recommendations under finding 11 above.

**Salopek issue 5:** "On June 20, 2018 Officer Emily Coler worked Post 9 which requires an M4 rifle from 1345 to 0200. Again she would have been exposed to two different Post 8 Officers."

**Salopek finding 5:** Officer Coler was not issued a M-4, only weapon issued per RFI records was an M-9.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 6:** "On June 25, 2018 at the end of my Day Shift I verbally complained to Lieutenant Doug Lux the Swing Shift Supervisor regarding the "Gravel Pit Range" involving Officer Coler, as did Officer Mullen who was standing there. Officer Gentry was standing there as well and heard the conversation. He had his own complaints."

**Salopek finding 6:** 6 August 2018 interview on the phone with Officer Gentry. He was not aware of anyone qualifying on the "Gravel Pit Range" for the GOV qualification nor any weapons or ammunition being used on non-authorized ranges. He was aware of personnel performing familization training being done but not at a gravel pit. 6 August 2018 interview on the phone with Lt Lux stated he asked for documentation or facts about this "Gravel Pit Range" qualification, he was aware that personnel go out and shoot for familization training to assist

them to qualify at the range. Officer Salopek never produced any document except third party hear say.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 7:** "Later that evening after I had been home for a while I received a telephone call from Lt. Lux. He told me he had called John Morgan regarding what I had said. He stated "Mr. Morgan said Mark is right". Lt Lux also told me that Officer Coler and Officer Eades were going to have to be "Re-Qualified". I later learned that Lt. Lux had called Officer Everson that evening before calling Mr. John Morgan, who additionally works over at the Bangor Range Facility as his full time job. Officer Everson reportedly told Lt. Lux that Gravel Pit Ranges were not allowed."

**Salopek finding 7:** 7 August interviewed on the phone with Officer Everson who does not work at the Bangor Range Facility; he is a contractor working at Trident Training Facility. Officer Everson was asked by LT Lux if qualifications were accepted if they were done at a "Gravel Pit Range" or other areas other than the approved ranges. His response was no, only at authorized areas to be accepted as weapons qualification for the GOV. Officer Everson was never present nor had a hand in any qualifications outside of approved ranges nor new anyone to qualify at any area other than authorized areas, he heard only comments from third parties but no actual proof this was happening.

6 August 2018 interview on the phone with LT Lux who stated the call to John Morgan actually took place a few days before this incident and it was about schedules nothing to do with qualifications since he was not aware of any of the issues at that time. When LT Lux did hear about issues he asked who, when and where these qualifications took place and no one could provide details. He was waiting on Officer Salopek to get back to him with the facts. LT Lux denied ever telling Officer Coler or Officer Eades they needed to be "Re-Qualified" for shooting at a "Gravel Pit Range" since this was not their qualifications shoot for the GOV. He did state that if they had more practice they should be able to pass their qualifications shoot without any problems.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 8:** "On June 26, 2018 I worked Post 7 with Officer Coler. I was originally scheduled to work Post 6, and Officer Coler was scheduled to work post 7. I had to work Post 7 due to her requirement to have to "re-qualify" with the shotgun. Officer Coler was very upset while driving to our post because she had to "re-qualify" with the M4 and the shotgun. I told her that since she qualified at the gravel pit, she should have no problem qualifying at the Bangor Range. She was silent after that.
While on Post she also told me that she had spent five hours at the gravel pit "qualifying" and was told she was not going to be paid for it. She was very upset about this because she is the only source of income for their family right now. Shortly after that she received a phone call from Mr. Michael Terry. She explained to Mr. Terry the issue about the five hours, and at the conclusion of the phone call she told me that Mr. Terry told her she would be paid for the 5 hours, and that

he had no idea why she was told by Lt. Powless she would not be paid. Officer Joab Eades would have also been paid if it was a qualification. I am suggesting payroll records may shed more light on this. In addition, there is another document that should be checked. There is a daily "Guard Mount Log" that the Lieutenants fill out every shift that lists every Guard and the post they are assigned. This document is sent to building 849. These documents may shed some light on this situation as well."

**Salopek Finding 8:** The use of the word "qualification" and "familiarize" has been muddled throughout this inquiry. Certain personnel thought if someone goes to shoot (practice) to become proficient to qualify this was used as the only final qualification necessary even though they still went to the range for the formal qualification for the GOV.

**Overtime issue:**
The GOV does not get involved in what the company does on their own time outside contract hours or if they pay personnel to practice to become proficient on weapons to qualify at the range, we did not ask the company if Officer Coler was paid for practicing or not since this is not a contractual item. Officer Coler stated in her interviews that we had with her twice that she was never told this remedial training was to be used as her final GOV qualification for weapons. In the issue of overtime for remedial practice the subject of pay should have been brought up with their union if they disagreed with management's decision not to pay them, not with the GOV.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 9:** "There is also another issue regarding the July 7, 2017 Range. The Armory at building 89 on Indian Island records all ammunition being issued for scheduled Bangor Ranges. Ammunition should have been logged out for that day."

**Salopek Finding 9:** This date is in reference to Officer Owens who was pregnant and her last final qualifications with weapons before she left the company for her pregnancy so she could stand post. Officer Owens had a doctor's note indicating she was not allowed to shoot at a closed indoor range due to the lead and powder residue. 7 July 2017 the Bangor range was closed for cleaning (unburned explosive powder residue), timing of both incidents occurred at the same time so Officer Owens shot at the Port Townsend Rifle Range to qualify (this is an alternate range approved by the GOV).

**Recommendation:** We recommend no action on this issue. In the interview we asked Officer Salopek if he was aware that personnel were able to shoot at the Port Townsend range and if he knew any of the dates that allowed the company due to SATC being closed. He was not aware of this nor did he know that Officer Owens did her qualifications shoot at this range.

**Comments and our Response:** During the interviews we asked each person if they had a problem/issue did they know the proper process to bring them up in their chain of command within their company, most of them stated they would bring up any issues or concerns they had

with their Shift Lieutenant, Project Manager (Michael Terry) and if any range issues with the Range Safety Officer Lieutenant Powless. We asked if they would bring up safety issues to their company safety officer, only some of the officers interviewed knew who that person was even though it was posted three different places on their Union/Safety board in the hallway. When the question was posed to each Officer interviewed if they had a problem with a shift Lieutenant or the Project Manager who would they go to, most of them were aware that the company CEO John Morgan has an open door policy for concerns or they could bring them to another shift Lieutenant. During the interviews no one could provide any facts except comments from third party he-said, she-said. While I could not prove the following I had the feeling Officer Salopek was trying to get back at the company for some incidents that occurred with him since he brought up the following two incidents in our interview without any prodding by us which had nothing to do with the issues at hand, these incidents occurred in 2015, see below.

**Incident 1:**
On 23 September 2015 during an IG investigation Mr. Salopek was asked to describe the escalation of force continuum for a waterborne threat. Mr. Salopek was unable to properly articulate the three protection zones promulgated in references Navy Tactics, Techniques and Procedures (NTTP) 3-20.6.29M, Tactical Boat Operations and NTTP 3-07.2.3, Law Enforcement and Physical Security, he did not know the distances involved, and stated that while he was authorized to fire upon a vessel, as a practical matter he might not do so. It was clear to the investigator that Mr. Salopek had limited knowledge of the escalation of force continuum for a CONUS installation waterfront.

**Incident 2:**
Officer Salopek on 5 October 2015 was a shift Lieutenant at that time. He had an inquiry into leaving the armory at building 848 unsecured for a determinate period of time. As a shift Lieutenant this position holds a great deal responsibility and trust which those duties include maintaining a locked armory when leaving the building. The GOV lost trust when he left the building with the armory unlocked and asked that he be removed as a shift Lieutenant. GOV could not allow this incident to happen again because the severity of this incident.

During our interviews with Officer Salopek he alluded that women were problems as security officers: Officer Owens gets pregnant and special treatment was provided to her to keep her job and to get her qualified incorrectly at a gravel pit (documents show she was qualified properly); LT/Officer Kirkpatrick was a dog groomer prior to working for the company and she is now a shift LT (she has been working for the company for eight years), this statement had no relevance to this case; Officer Coler was provided special treatment in getting qualified and rushed to put on post (she was mentioned 17 times in Officer Salopek's second statement); Officer Anglin and Officer Kitchen are provided special treatment when it comes to switching shifts (Captain Vancura on a phone interview verified that personnel can switch shifts with other officers after they submit the correct paperwork and if it doesn't cause any overtime, switching shifts does not require shift bidding per the union contract), this is a decision made between Officers and management.

While conducting the interview with Officer Salopek he told us that when he was a police officer he was called upon by the courts as an expert witness many times and became well

known with the judges that any information that he provided must be true since he has a high level of integrity and we didn't need to question his facts he provided to us.

**Recommendation:** I believe Officer Salopek should be removed from the contract for the following reasons: his own verbal statements provided to us stated called upon by the courts as an expert witness many times and became well known with the judges that any information that he provided must be true since he has a high level of integrity, as an expert witness he would have known that we would need facts to third party hearsay, he provided a common theme about third party comments without being able to provide a single document behind the allegations but letting the GOV waste time in running around to verify the hearsay comments. His disregard to Navy policy as discussed above with the Navy IG incident and the RFI incident with the fact he believed this to be minor incidents and was caused by someone else besides him, the facts state differently as provided in the interviews listed above for both incidents. The fact that he stated the RFI incident as minor leads me to believe he does take security seriously even with what is stored within the RFI. This has led me to believe that I cannot trust (total confidence in the integrity, ability, and good character of another, one in whom confidence is placed) Officer Salopek to stand post or instill confidence to the GOV while standing post as a security officer in what he is doing. His on statement to us in the interview about being well known with the judges that any information that he provided must be true since he has a high level of integrity and we didn't need to question his facts he provided to us. That is exactly what we had to do, question his integrity, he didn't have the facts and as an expert witness in legal proceedings he would have been aware of the importance of facts and not third party hearsay. Officer Salopek I believe is the center to all the third part accusations to meet a hidden agenda of his own.

**Information provided:** Information was gathered from written statements, verbal statements, record checks, OPNAV 5191.1 Weapons Qualifications form, personnel training jackets, North/South Patrol Post orders and Standard Operating Procedures, employee schedules, Range Facility Management Support System, Small Arms Training Center schedules, personnel training records, Ready For Issue logs, final personnel hard copies schedules, ammo allotment issues, and verbal over the phone interviews:

**Written interviews from the following:**
Officer Schryver
Officer Lein
LT/Officer Kirkpatrick
Officer Salopek
Officer David
LT Powless
Officer Cunningham
Officer Coler
Officer Lauritzen

**Phone interviews:**
Officer Gentry
Officer Everson
Second interview Officer Coler

Second interview Officer Lein
LT Lux
Captain Terry various times
Captain Vancura (sitting in for Captain Terry on leave)

**Could not interview:**
Officer Eades (on leave)
Officer Mullen (resigned the day before interview)
Officer Schroeder (on leave)

**Michael Terry**

**From:** Terry, Michael J CTR NAVMAG Indian Is, N3AT <michael.j.terry.ctr@navy.mil>
**Sent:** Monday, July 09, 2018 1:56 PM
**To:** Michael Terry
**Subject:** FW: Contract Guard Weapons Qualifications

-----Original Message-----
From: Rake, Richard L CIV Navy Region NW, N3AT
Sent: Monday, July 09, 2018 1:50 PM
To: Terry, Michael J CTR NAVMAG Indian Is, N3AT
Cc: Manson, Steve A CIV Navy Region NW, N3AT
Subject: FW: Contract Guard Weapons Qualifications

-----Original Message-----
From: steve mullen [mailto:sdmullen97@yahoo.com]
Sent: Monday, July 09, 2018 10:00 AM
To: Jones, Michael C CIV NAVMAG Indian Is, N3AT <michael.c.jones1@navy.mil>
Subject: [Non-DoD Source] Weapons Qualifications

Mr. Jones
Myself and three other officers, Mark Salopek, Dan Lein, And Jake Schryver are coming forward with a safety issue concerning Weapons qualifications.
This is in regards to a gravel pit to "Qualify" This has happened on several occasions.

The incidents that I am aware of is when Officer Cunningham failed the range with the M500 Shotgun. Officer Cunningham was brought to either a gravel pit or other location by Officer Schryver who supplied his personally owned pistol grip shotgun to Officer Cunningham. Officer Cunningham came back "Qualified". It was brought Mr. Terry attention. Mr. Terry replied said that it was allowed by the Navy.

Officer Schryver said that he was asked to familiarize Officer Cunningham with the shotgun. He said Mr.Terry personally handed him shotgun rounds for this. When he returned to work he said he felt that Officer Cunningham did better. He said when he found out that they were considering that event a qualification, he said that he was not certified to qualify anyone, and that he thought that was just for familiarization with the weapon. The "qualification" status still stood according to Officer Schryver.

Officer Schryver said there was another time he was asked by Lt. Gerald Powless to bring officers to a gravel pit qualify them. Officer Schryver said that he was not comfortable with it. Lt. Powless said that they would just schedule a range at Bangor Naval Base.

The next incident occurred on July 7, 2017. Officer Salopek said he and Mr.Terry were at the small boat pie when Officer Armstrong drove up and stated to Mr. Terry, "Hey Mike, I got that AR15 and a 9mm".Officer Salopek asked What he was talking about?" Officer Armstrong said it was about bringing an AR15 and a 9mm for range at Schroeder's house". "Schroeder" is Officer Schroeder for Xcel.

On 5/9/2018 I attended range, at this range we had 13 people on the range. During this range three senior officers (in ~~seniority) could~~ not pass their rifle qualification. Those officers were officers Lauritzen, Cunningham, and David. Officer

Cunningham could not pass his shotgun either. Officer Cunningham's ability to effectively handle, and manipulate the two weapons came into question by me and a few others at the range especially when unslinging his weapons.

Lt. Gerald Powless altered their targets by putting a large black cross with a black felt pen on their targets with the intersection of the cross dead center. This was done so that they could see the target. Lt. Mitch Vancura helped Officer Cunningham with his shotgun shoot by alter the silhouette by putting a white piece of paper at the six O'clock position so that Officer Cunningham could effectively see and aim his shotgun at the target. They all passed except for Officer Cunningham who still could not pass his rifle.

We also had two newly hired officers on the range, Officers Daniel Lein, and Officer Emily Coler. Officer Lein was able to manipulate his rifle safely, but he struggle with getting use to the rifle. He did not pass the M4 rifle qualification, but only by a very small margin. Officer Coler struggled horribly with how to handle both the rifle and the shotgun, Officer Salopek said that she should be taken off the range because of unsafe handling with the shotgun. Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun.

Officer Salopek contacted Mr. John Morgan Xcel CEO about this problem. He said Mr. Terry would be completely transparent with employees regarding our concerns at the range, and that everything would be conducted according to procedure.

Two weeks later, Officer Cunningham was re-qualifying with the M4 Rifle. Officer Cunningham came back qualified with the rifle. Lt. Del Rosario who was at the range was asked if they had altered the targets for Officer Cunningham, said yes.

Officer Lein, a retired Navy Chief, has been working Government Contract Security for the last 10 years. said that he was told by Lt. Powless that he and Officer Emily Coler were going to be taken to a gravel pit to be qualified with the M4 Rifle. He told me he asked if he was going to be paid for it, and Lt. Powless said "no". Lein said that he was extremely uncomfortable with this plan and was not going to go. Officer Lein qualified at the next properly scheduled range.

After the "Gravel Pit Range", Emily Coler was allowed to work all posts with all weapons, as she had qualified with the rifle and the shotgun. The shotgun used was her own personally owned shotgun, the m4 was an ar15 supplied by an Xcel Officer.

We feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents. Mr. Morgan The CEO of Xcel has been given a detailed memo of these practices. Now it seems that they are trying to cover this up. We cannot continue to let this go on without reporting it to you. This is an abridged version of what is going on.

Thank You
Steve Mullen

RICHARD RAKE
SUPV SENIOR PERFORMANCE ASSESMENT REPRESENTATIVE CONTRACT
STEVE MANSON
PERFORMANCE ASSESMENT REPRESENTATIVE CONTRACT
N44255-14-D-9021
1103 HUNLEY ROAD
SILVERDALE, WA

July 25, 2018

MEMORANDUM FOR CONTRACTING OFFICER, NAVAL FACILITIES NORTH WEST FOR INDIAN ISLAND
COMMANDING OFFICER NAVAL MAGAZINE INDIAN ISLAND

**SUBJECT:** Evaluation of email from contractor personnel to Security Officer at Indian Island and final disposition dated 9 July 2018 1000 regarding weapon qualifications at the Bangor Small Arms Training Center (SATC).

**Objective:** The objective of our evaluation was to determine whether the email dated 9 July and interviews that were conducted from 10 – 23 July were relevant or not with current contract language and current instructions. We reviewed these submissions for the period from 1 October 2014 – 24 July 2018.

**Background:** To establish if the contractor violated Navy policy and bypassed the minimum requirements for individuals qualifying on the small arms training center per references OPNAV 3591.1F Small Arms Training and Qualifications and OPNAVINST 5530.13C Department of the Navy Physical Security Instruction for Conventional Arms, Ammunition, and Explosives (AA&E). We conducted this evaluation in accordance with the requirements set forth in the Indian Island Contract N44255-14-D-9021. Richard Rake and Steve Manson conducted interviews and Steve Manson conducted the research in the documents.

**Issue 1:** "Myself and three others officers, Mark Salopek, Dan Lein and Jake Schriver are coming forward with a safety issue concerning weapons qualifications. This is in regards to a gravel pit to qualify. This has happened on several occasions."

**Finding 1:** All 3591.1 qualifications forms were reviewed for authenticity that the actual qualifications shooting was conducted at the Bangor or at the alternate range at Port Townsend when government notifications to the contractor that the Bangor range was not available as designated in the contract. Specific long term dates the range at Bangor was not available: 3 Nov 2016 – 23 Jan 2017 (ventilation issues) and 1 Aug 2017 – 30 Sep 2017 (unburned explosive powder residue). During the ten interviews of contract personnel including Officer Salopek/Lein on the email complaint, no one but the training officer and contract manger were aware of those dates (proper personnel to know so scheduling could be conducted). When Officer Salopek was asked employee since 5/23/2013 if he was aware of dates when the Bangor SATC was down he was not aware of any of the dates. Officer Dan Lein employee since 4/18/2018 was not around during those times. No officer has come forth with any documentation to show any falsifying of

R-2

the actual qualifications of the 3591.1 form (small arms qualification record) did not occur at the proper range (he said, she said, I heard, no names), no one could produce any documents to prove the accusations. Contractor did hold remedial training to allow personnel extra training to pass qualifications at the range; this in no way violated any contract language or instructions.

**Recommendation:** We recommend no action on this issue.

**Issue 2:** "The incidents that I am aware of is when Officer Cunningham failed the range with the M500 Shotgun. Officer Cunningham was brought to either a gravel pit or other location by Officer Schryver who supplied his personally owned pistol grip shotgun to Officer Cunningham. Officer Cunningham came back "Qualified". It was brought Mr. Terry attention. Mr. Terry replied said that it was allowed by the Navy."

**Finding 2:** Reviewed Officer Cunningham's 3591.1 and ammo log, he shot with three other officers for his qualifications reshoot on 9 March 2018 within the time allotted for reshooting per instruction at the Bangor SATC which his 3591.1 form and gun card show. Officer Cunningham did state to us that he did go to an open area in the woods with Officer Schryver and did some practicing with a shotgun on his own time so he can become proficient at his reshoot since he doesn't shoot shotguns that often. Officer Cunningham stated he was never told this would count as his official qualifications shoot for the 3591.1 form. Officer Schryver was asked in his interview if he took Officer Cunningham out as a qualification shoot in an open area and stated he has never taken anyone out to qualify at any location except at the Port Townsend range or Bangor range. He has taken several people out to open areas to provide extra training to allow them to qualify at the range. Captain Terry denied the comment this was allowed for qualification with the 3591.1 form but was allowed for remedial training.

**Recommendation:** We recommend no action on this issue. Contractor or staff are permitted to take personal weapons and shoot offsite as much as they want which does not violate any contractual or GOV instructions.

**Issue 3:** "Officer Schryver said that he was asked to familiarize Officer Cunningham with the shotgun. He said Mr.Terry personally handed him shotgun rounds for this. When he returned to work he said he felt that Officer Cunningham did better. He said when he found out that they were considering that event a qualification, he said that he was not certified to qualify anyone, and that he thought that was just for familiarization with the weapon. The "qualification" status still stood according to Officer Schryver."

**Finding 3:** Verified Officer Cunningham's qualification shoot in Issue 2 above. Officer Schryver stated that he never said to anyone that this was to count as a "qualification" status. Officer Cunningham would pass his qualification round at the next date at the SATC. This whole paragraph was denied by Officer Schryver and Michael Terry (project manager). Captain Terry provided shot gun rounds for remedial training to assist in getting fully qualified at the range the next time.

**Recommendation:** We recommend no action on this issue.

**Issue 4:** "Officer Schryver said there was another time he was asked by Lt. Gerald Powless  to bring officers to a gravel pit qualify them. Officer Schryver said that he was not comfortable with it. Lt. Powless said that they would just schedule a range at Bangor Naval Base."

**Finding 4:** Officer Schryver denied the entire paragraph as worded, he would never take anyone to a gravel pit to shoot ("this could lead to accidents due to ricochets and I know better"). He was never asked to qualify anyone but to provide remedial training to personnel who needed the extra time. LT Powless stated he has never asked anyone to become qualified with the 3591.1 form at any area other than those at the SATC or Port Townsend public range (paperwork and ammo draw, sign in sheets concur with this statement by LT Powless). Lt Powless became the training officer around 2012 spanning over two contracts and numerous inspection teams without incident.

**Recommendation:** We recommend no action on this issue.

**Issue 5:** " The next incident occurred on July 7, 2017. Officer Salopek said he and Mr.Terry were at the small boat pie when Officer Armstrong drove up and stated to Mr. Terry, "Hey Mike, I got that AR15 and a 9mm".Officer Salopek asked What he was talking about?" Officer Armstrong said it was about bringing an AR15 and a 9mm for range at Schroeder's house". "Schroeder" is Officer Schroeder for Xcel."

**Finding 5:** Not sure what this paragraph means, Officer Mullen resigned the day before his interview, I did not have a chance to ask what this paragraph meant. The entire email reads as though the information was cut and pasted from a larger document. Third person information which cannot be verified. Captain Terry, Officer Armstrong believe he was talking about a time when they went shooting over at Officer Schroeder 's house.

**Recommendation:** We recommend no action on this issue.

**Issue 6:** "On 5/9/2018 I attended range, at this range we had 13 people on the range. During this range three senior officers (in seniority) could not pass their rifle qualification. Those officers were officers Lauritzen, Cunningham, and David. Officer Cunningham could not pass his shotgun either. Officer Cunningham's ability to effectively handle, and manipulate the two weapons came into question by me and a few others at the range especially when unslinging his weapons."

**Finding 6:** On 9 May 2018 only 11 people shot, Lauritzen, Cunningham, and David were not shooting on the range on this date; Lauritzen was Post 2 (Main Gate), Cunningham was Post 1 (Reaction Force) and David was on a regular scheduled day off. Actual dates all three shot on the range was 21 February 2018; Officers Lauritzen and David qualified on 21 Feb but Cunningham did not pass all qualifications and shot again to pass his qualifications on 9 March 2018.  On 9 May 2018 the SATC Range RSO Armstrong, Line coaches, Officer Schryver, Lux, LT Powless stated that Lauritzen, Cunningham, and David were not on the range to shoot this day. On 21 February 2018 RSO Armstrong, Line coaches, Officer Schryver, Lux, Powless did not notice any problems or issues with Cunningham's ability to effectively handle, and manipulate the two

weapons. Officer Schryver stated as the line coach for Cunningham if any safety issues would have arisen he would have called out to stop the shoot.

**Recommendation:** We recommend no action on this issue.

**Issue 7:** "Lt. Gerald Powless altered their targets by putting a large black cross with a black felt pen on their targets with the intersection of the cross dead center. This was done so that they could see the target. Lt. Mitch Vancura helped Officer Cunningham with his shotgun shoot by alter the silhouette by putting a white piece of paper at the six O'clock position so that Officer Cunningham could effectively see and aim his shotgun at the target. They all passed except for Officer Cunningham who still could not pass his rifle."

**Finding 7:** OPNAV 5191.1F does not state anywhere in the document that prevents the use of adding white dots, black cross marks or altering the target by enhancing the view with markers or dots. When Federal Law Enforcement Training Center (FLETC) and Center for Security forces (CENSECFOR) was contacted they also use this same practice to assist officers through the qualifications. CENSECFOR also stated they put pictures on the targets to assist members. They must use the required targets in the instruction and distances that are regulated. When asked if any of the Officers including Salopek/Lein had actually read the instruction pertaining to altering the targets none of them had except the RSO's/training officer LT Powless and project manager which would have been the valid personnel on this contract to know and follow the document.

**Recommendation:** We recommend no action on this issue.

**Issue 8:** "Officer Coler struggled horribly with how to handle both the rifle and the shotgun, Officer Salopek said that she should be taken off the range because of unsafe handling with the shotgun. Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun."

**Finding 8:** Interviewed line coach for officer Coler on the day of the shoot 9 May 2018 and Officer Schryver stated he did not see any unsafe handling conditions with the shotgun or rifle nor did anyone bring to his attention any such issue. He would have stopped the shoot if any unsafe handling with the shotgun presented themselves as a safety issue. Not sure the point of the last sentence "Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun." Personnel do not pass qualifications all the time and that is why they are allowed by instruction to retake the course again to qualify.

**Recommendation:** We recommend no action on this issue.

**Issue 9:** "Two weeks later, Officer Cunningham was re-qualifying with the M4 Rifle. Officer Cunningham came back qualified with the rifle. Lt. Del Rosario who was at the range was asked if they had altered the targets for Officer Cunningham, said yes."

**Finding 9:** The sentence structure is confusing, this issue with altering targets was answered in issue/finding 7.

**Recommendation:** We recommend no action on this issue.

**Issue 10:** "Officer Lein, a retired Navy Chief, has been working Government Contract Security for the last 10 years. said that he was told by Lt. Powless that he and Officer Emily Coler were going to be taken to a gravel pit to be qualified with the M4 Rifle. He told me he asked if he was going to be paid for it, and Lt. Powless said "no". Lein said that he was extremely uncomfortable with this plan and was not going to go. Officer Lein qualified at the next properly scheduled range."

**Finding 10:** In the interview with Officer Lein he stated he was never told that it was going to be a qualification shoot but remedial training to allow more time with a rifle. He stated since he wasn't going to be paid he would take his chances at the range the next time. Officer Coler also stated she was never told that going to the "gravel pit" was to qualify but for remedial training to allow her to qualify.

**Recommendation:** We recommend no action on this issue.

**Issue 11:** "After the "Gravel Pit Range", Emily Coler was allowed to work all posts with all weapons, as she had qualified with the rifle and the shotgun. The shotgun used was her own personally owned shotgun, the m4 was an ar15 supplied by an Xcel Officer."

**Finding 11:** Officer Coler's gun card that was issued only showed she was qualified with the M-9 weapon. She did not qualify with the M-500 or M-4. Upon review on weapons issued by the armory we found that officer Coler was issued an M-500 on the following dates by four different shift Lieutenants: 5 June 2018 (1230-1815), 12 June 2018 (1330-2015), 19 June 2018 (1400-2000), 23 June 2018 (1315-2200) and a M-4 0n 12 June 2018 (0140-1415). On discussion with the different shift Lieutenants we discovered the loop holes that allowed officer Coler to be issued weapons she was not qualified on and suggested the following recommendations immediately. Steve checked back thru records and found this incident to the only one that allowed a person to be issued weapons. The communication between the trainer and scheduler is critical and having the shift Lieutenants verify what is on the gun cards before issuance of weapons. Lt Lux stated that Officer Coler was issued the weapons but she was assigned with an officer that was qualified to use the weapon.

**Recommendation:** We recommended to the contractor several corrections that were resolved during the review:
1. No person is to be allowed to stand post until 100% weapons qualifications are completed.
2. Changed the process to for each yellow gun card to be placed as a place holder when a weapon is removed to show who the weapon was issued. This would alleviate a person getting a weapon even when assigned to stand a post with someone qualified to use that weapon.
3. Shared communication from the training officer to the person who is making the schedule to know who is 100% qualified. Found that when Officer Coler failed to qualify with other weapons (M500 and M4) the trainer LT. Powless went on a two week leave and

didn't get her scheduled to take her requalification test for M500 and M4, back up trainer scheduled Officer Coler at the Bangor Range Facility 9 July 2018.

**Actions taken:**
1. Company will not allow personnel to stand post until 100% qualified.
2. Gun cards are placed in each gun slot to show who the weapons were issued to.
3. Communication will be better between trainer and scheduler.

**Issue 12:** "We feel this practice is unsafe, against Navy policy, and illegal, by falsifying federal documents. Mr. Morgan The CEO of Xcel has been given a detailed memo of these practices. Now it seems that they are trying to cover this up. We cannot continue to let this go on without reporting it to you. This is an abridged version of what is going on."

**Finding 12:** No falsifying of any federal documents were found in reviewing armory records, training jackets, 3591.1 forms, SATC records or ammo draw. No one interviewed could provide any documents that GOV records were falsified, only comment was "that was what I heard".

**Recommendation:** We recommend no action on this issue.

During our interviews we provided our email addresses so personnel interviewed could provide documents and additional information they didn't have during the interviews. Officer Salopek provided additional information on 22 July 2018 who was the only one that took the opportunity and sent an email with several other issues that we looked into and they are as follows:

**Salopek issue 1:** "May 29, 2018, Emily Coler worked Post 3 which is South Patrol on Swing Shift. During this shift her patrol vehicle reportedly experienced a flat tire and she received assistance to change the tire. The officers on that shift should be able to shine some light on whether she was alone on South Patrol or not."

**Salopek Finding 1:** Officer Coler was posted as a reaction patrol, only issued and M-9 per Ready for Issue (RFI) records. She was in a patrol vehicle with a person who was qualified with the shotgun which the weapon was issued to.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 2:** "June 11, 2018 Emily Coler worked Post 7 which is Pier Gate Cover Guard on Day Shift, which requires a shotgun."

**Salopek Finding 2:** Officer Coler was not cover guard at the CVIS, only weapon issued per RFI records was an M-9. No shot gun issued.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 3:** "On June 12, 2018 Emily Coler worked a 12 hour shift from 0200 to 1400 at Post 9 which is CVIS Cover Guard, which requires an M4 Rifle. I was told that on this shift, Officer Coler reportedly sent a text message to an officer indicating she had left the extra ammo

in the van and asked for it to be brought down. M9 extra ammo is always put in belt magazine holders at the armory, and M4 or shotgun extra ammo is transported within a carrying pouch to posts or in patrol vehicles by the individual it was issued to. On this shift Officer Coler would have worked with two different Post 8 Officers as the shifts changed. In addition there is talk that Officer Coler's M4 Rifle was found to be in Condition 1 rather than Condition 3, but this will have to be either confirmed or disproved."

**Salopek Finding 3:** This was found in our review of the RFI records in findings 11 and verified with other dates we found. We made recommendations to the company and this was fixed immediately to prevent incidents in the future. Found no foundation nor any statement from any person in regards to Condition 1 rather than Condition 3 for the weapon for officer Coler. Phone interview with officer Coler denied this statement. I did not find anyone that could collaborate "talk that Officer Coler's M4 Rifle was found to be in Condition 1 rather than Condition 3, but this will have to be either confirmed or disproved."

**Recommendation:** See recommendations under finding 11 above.

**Salopek issue 4:** "On June 13, 2018 Emily Coler worked Swing Shift Post 7 which is Pier Gate Cover Guard, which requires a Shotgun. She replaced me for Post 7."

**Salopek Finding 4:** This was found in our review of the RFI records in findings 11 and verified with other dates we found. We made recommendations to the company and was fixed immediately to prevent this issue in the future.

**Recommendation:** See recommendations under finding 11 above.

**Salopek issue 5:** "On June 20, 2018 Officer Emily Coler worked Post 9 which requires an M4 rifle from 1345 to 0200. Again she would have been exposed to two different Post 8 Officers."

**Salopek finding 5:** Officer Coler was not issued a M-4, only weapon issued per RFI records was an M-9.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 6:** "On June 25, 2018 at the end of my Day Shift I verbally complained to Lieutenant Doug Lux the Swing Shift Supervisor regarding the "Gravel Pit Range" involving Officer Coler, as did Officer Mullen who was standing there. Officer Gentry was standing there as well and heard the conversation. He had his own complaints."

**Salopek finding 6:** 6 August 2018 interview on the phone with Officer Gentry. He was not aware of anyone qualifying on the "Gravel Pit Range" for the GOV qualification nor any weapons or ammunition being used on non-authorized ranges. He was aware of personnel performing familization training being done but not at a gravel pit. 6 August 2018 interview on the phone with Lt Lux stated he asked for documentation or facts about this "Gravel Pit Range" qualification, he was aware that personnel go out and shoot for familization training to assist

them to qualify at the range. Officer Salopek never produced any document except third party hear say.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 7:** "Later that evening after I had been home for a while I received a telephone call from Lt. Lux. He told me he had called John Morgan regarding what I had said. He stated "Mr. Morgan said Mark is right". Lt Lux also told me that Officer Coler and Officer Eades were going to have to be "Re-Qualified". I later learned that Lt. Lux had called Officer Everson that evening before calling Mr. John Morgan, who additionally works over at the Bangor Range Facility as his full time job. Officer Everson reportedly told Lt. Lux that Gravel Pit Ranges were not allowed."

**Salopek finding 7:** 7 August interviewed on the phone with Officer Everson who does not work at the Bangor Range Facility; he is a contractor working at Trident Training Facility. Officer Everson was asked by LT Lux if qualifications were accepted if they were done at a "Gravel Pit Range" or other areas other than the approved ranges. His response was no, only at authorized areas to be accepted as weapons qualification for the GOV.   Officer Everson was never present nor had a hand in any qualifications outside of approved ranges nor new anyone to qualify at any area other than authorized areas, he heard only comments from third parties but no actual proof this was happening.

6 August 2018 interview on the phone with LT Lux who stated the call to John Morgan actually took place a few days before this incident and it was about schedules nothing to do with qualifications since he was not aware of any of the issues at that time. When LT Lux did hear about issues he asked who, when and where these qualifications took place and no one could provide details. He was waiting on Officer Salopek to get back to him with the facts. LT Lux denied ever telling Officer Coler or Officer Eades they needed to be "Re-Qualified" for shooting at a "Gravel Pit Range" since this was not their qualifications shoot for the GOV. He did state that if they had more practice they should be able to pass their qualifications shoot without any problems.

**Recommendation:** We recommend no action on this issue.

**Salopek issue 8:** "On June 26, 2018 I worked Post 7 with Officer Coler. I was originally scheduled to work Post 6, and Officer Coler was scheduled to work post 7. I had to work Post 7 due to her requirement to have to "re-qualify" with the shotgun. Officer Coler was very upset while driving to our post because she had to "re-qualify" with the M4 and the shotgun. I told her that since she qualified at the gravel pit, she should have no problem qualifying at the Bangor Range. She was silent after that.
While on Post she also told me that she had spent five hours at the gravel pit "qualifying" and was told she was not going to be paid for it. She was very upset about this because she is the only source of income for their family right now. Shortly after that she received a phone call from Mr. Michael Terry. She explained to Mr. Terry the issue about the five hours, and at the conclusion of the phone call she told me that Mr. Terry told her she would be paid for the 5 hours, and that

he had no idea why she was told by Lt. Powless she would not be paid. Officer Joab Eades would have also been paid if it was a qualification. I am suggesting payroll records may shed more light on this. In addition, there is another document that should be checked. There is a daily "Guard Mount Log" that the Lieutenants fill out every shift that lists every Guard and the post they are assigned. This document is sent to building 849. These documents may shed some light on this situation as well."

**Salopek Finding 8:** The use of the word "qualification" and "familiarize" has been muddled throughout this inquiry. Certain personnel thought if someone goes to shoot (practice) to become proficient to qualify this was used as the only final qualification necessary even though they still went to the range for the formal qualification for the GOV.

**Overtime issue:**
The GOV does not get involved in what the company does on their own time outside contract hours or if they pay personnel to practice to become proficient on weapons to qualify at the range, we did not ask the company if Officer Coler was paid for practicing or not since this is not a contractual item. Officer Coler stated in her interviews that we had with her twice that she was never told this remedial training was to be used as her final GOV qualification for weapons. In the issue of overtime for remedial practice the subject of pay should have been brought up with their union if they disagreed with management's decision not to pay them, not with the GOV.

 **Recommendation:** We recommend no action on this issue.

**Salopek issue 9:** "There is also another issue regarding the July 7, 2017 Range. The Armory at building 89 on Indian Island records all ammunition being issued for scheduled Bangor Ranges. Ammunition should have been logged out for that day."

**Salopek Finding 9:** This date is in reference to Officer Owens who was pregnant and her last final qualifications with weapons before she left the company for her pregnancy so she could stand post. Officer Owens had a doctor's note indicating she was not allowed to shoot at a closed indoor range due to the lead and powder residue. 7 July 2017 the Bangor range was closed for cleaning (unburned explosive powder residue), timing of both incidents occurred at the same time so Officer Owens shot at the Port Townsend Rifle Range to qualify (this is an alternate range approved by the GOV).

**Recommendation:** We recommend no action on this issue. In the interview we asked Officer Salopek if he was aware that personnel were able to shoot at the Port Townsend range and if he knew any of the dates that allowed the company due to SATC being closed. He was not aware of this nor did he know that Officer Owens did her qualifications shoot at this range.

**Comments and our Response:** During the interviews we asked each person if they had a problem/issue did they know the proper process to bring them up in their chain of command within their company, most of them stated they would bring up any issues or concerns they had

with their Shift Lieutenant, Project Manager (Michael Terry) and if any range issues with the Range Safety Officer Lieutenant Powless. We asked if they would bring up safety issues to their company safety officer, only some of the officers interviewed knew who that person was even though it was posted three different places on their Union/Safety board in the hallway. When the question was posed to each Officer interviewed if they had a problem with a shift Lieutenant or the Project Manager who would they go to, most of them were aware that the company CEO John Morgan has an open door policy for concerns or they could bring them to another shift Lieutenant. During the interviews no one could provide any facts except comments from third party he-said, she-said. While I could not prove the following I had the feeling Officer Salopek was trying to get back at the company for some incidents that occurred with him since he brought up the following two incidents in our interview without any prodding by us which had nothing to do with the issues at hand, these incidents occurred in 2015, see below.

**Incident 1:**
On 23 September 2015 during an IG investigation Mr. Salopek was asked to describe the escalation of force continuum for a waterborne threat. Mr. Salopek was unable to properly articulate the three protection zones promulgated in references Navy Tactics, Techniques and Procedures (NTTP) 3-20.6.29M, Tactical Boat Operations and NTTP 3-07.2.3, Law Enforcement and Physical Security, he did not know the distances involved, and stated that while he was authorized to fire upon a vessel, as a practical matter he might not do so. It was clear to the investigator that Mr. Salopek had limited knowledge of the escalation of force continuum for a CONUS installation waterfront.

**Incident 2:**
Officer Salopek on 5 October 2015 was a shift Lieutenant at that time. He had an inquiry into leaving the armory at building 848 unsecured for a determinate period of time. As a shift Lieutenant this position holds a great deal responsibility and trust which those duties include maintaining a locked armory when leaving the building. The GOV lost trust when he left the building with the armory unlocked and asked that he be removed as a shift Lieutenant. GOV could not allow this incident to happen again because the severity of this incident.

During our interviews with Officer Salopek he alluded that women were problems as security officers: Officer Owens gets pregnant and special treatment was provided to her to keep her job and to get her qualified incorrectly at a gravel pit (documents show she was qualified properly); LT/Officer Kirkpatrick was a dog groomer prior to working for the company and she is now a shift LT (she has been working for the company for eight years), this statement had no relevance to this case; Officer Coler was provided special treatment in getting qualified and rushed to put on post (she was mentioned 17 times in Officer Salopek's second statement); Officer Anglin and Officer Kitchen are provided special treatment when it comes to switching shifts (Captain Vancura on a phone interview verified that personnel can switch shifts with other officers after they submit the correct paperwork and if it doesn't cause any overtime, switching shifts does not require shift bidding per the union contract), this is a decision made between Officers and management.

While conducting the interview with Officer Salopek he told us that when he was a police officer he was called upon by the courts as an expert witness many times and became well

known with the judges that any information that he provided must be true since he has a high level of integrity and we didn't need to question his facts he provided to us.

**Recommendation:** I believe Officer Salopek should be removed from the contract for the following reasons: his own verbal statements provided to us stated called upon by the courts as an expert witness many times and became well known with the judges that any information that he provided must be true since he has a high level of integrity, as an expert witness he would have known that we would need facts to third party hearsay, he provided a common theme about third party comments without being able to provide a single document behind the allegations but letting the GOV waste time in running around to verify the hearsay comments. His disregard to Navy policy as discussed above with the Navy IG incident and the RFI incident with the fact he believed this to be minor incidents and was caused by someone else besides him, the facts state differently as provided in the interviews listed above for both incidents. The fact that he stated the RFI incident as minor leads me to believe he does take security seriously even with what is stored within the RFI. This has led me to believe that I cannot trust (total confidence in the integrity, ability, and good character of another, one in whom confidence is placed) Officer Salopek to stand post or instill confidence to the GOV while standing post as a security officer in what he is doing. His on statement to us in the interview about being well known with the judges that any information that he provided must be true since he has a high level of integrity and we didn't need to question his facts he provided to us. That is exactly what we had to do, question his integrity, he didn't have the facts and as an expert witness in legal proceedings he would have been aware of the importance of facts and not third party hearsay. Officer Salopek I believe is the center to all the third part accusations to meet a hidden agenda of his own.

**Information provided:** Information was gathered from written statements, verbal statements, record checks, OPNAV 5191.1 Weapons Qualifications form, personnel training jackets, North/South Patrol Post orders and Standard Operating Procedures, employee schedules, Range Facility Management Support System, Small Arms Training Center schedules, personnel training records, Ready For Issue logs, final personnel hard copies schedules, ammo allotment issues, and verbal over the phone interviews:

**Written interviews from the following:**
Officer Schryver
Officer Lein
LT/Officer Kirkpatrick
Officer Salopek
Officer David
LT Powless
Officer Cunningham
Officer Coler
Officer Lauritzen

**Phone interviews:**
Officer Gentry
Officer Everson
Second interview Officer Coler

Second interview Officer Lein
LT Lux
Captain Terry various times
Captain Vancura (sitting in for Captain Terry on leave)

**Could not interview:**
Officer Eades (on leave)
Officer Mullen (resigned the day before interview)
Officer Schroeder (on leave)

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. Place: NAV MAG II

2. Date/Time: 7.19.18

I, MARK SALOPEK, Address: ______ Phone: ______, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

ON 7.19.18 2018 I WAS INTERVIEWED REGARDING THIS FACT FINDING.

(1) I DID SEE TARGETS ALTERED ON OR ABOUT JAN 31st 2018.

(2) ON OR ABOUT & PRIOR TO JUNE 28-27-26 2018 (POSSIBLY SOONER) I WAS TOLD BY LT. POWLESS THE OFFICER EADES & COLER WERE GOING TO THE GRAVEL PIT "RANGE". AFTER A 'COMPLAINT', EADES AND COLER WERE REQUIRED TO "RE-QUALIFY." EMILY COLER WAS UPSET, AND OFFICER EADES TOLD ME HE HAS TO "RE-QUALIFY". strongly I BELIEVE I SAW COLER STANDING POST ARMED W/ A SHOTGUN IN PARTICULAR AFTER THE "GRAVEL SHOOT". I NEED TO CONFIRM W/ DOCUMENTS ON THAT. [redacted]

(3) (ON JULY 7, 2017) I HAVE SEEN A BANGOR RANGE SHEET FOR THAT DATE. I WAS TOLD BY OFFICER AT RANGE ON THAT DATE THAT THEY WERE AT AN OFFICERS HOUSE. THIS WAS REFERRED TO AS "RANGE AT SCHRODERS HOUSE". I WAS TOLD BY LT. POWLESS THAT "RANGE" WAS HELD AT SCHRODERS, AND "IT WAS FUN." A COXSWAIN LISA OWENS WAS PREGNANT AND COULD NOT SHOT AT AN INDOOR RANGE. SHE CONTINUED TO WORK AFTER THAT.

NO FURTHER

I have never seen anyone leave post

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by [signature]. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]
Signature

Date: 7/19/18 /Time: 1200 (Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY

**VOLUNTARY STATEMENT**

1. Place: NAVMAG II

2. Date/Time: 7.19.18

I, MARK SALOPEK, Address: ______
Phone: ______, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

ON 7.19.18 I WAS INTERVIEWED REGARDING THE FACT FINDING ISSUES BY,

(1) ON OR ABOUT JANUARY 31ST, 2018 I SAW TARGETS ALTERED AT BANGOR RANGE.

(2) REGARDING THE "GRAVEL PIT RANGE" SOMETIME ON OR ABOUT ~~[struck out]~~ LT. GERALD POWLESS TOLD ME ~~PRIOR~~ TO THE "RANGE" HE HAD OBTAINED AN AR-15 FOR "RANGE AT THE GRAVEL PIT". AFTER THE SAID "RANGE" EMILY COLER PERSONALLY TOLD ME SHE WAS GLAD SHE COULD NOW SERVE OTHER POSTS". I SAW OFFICER COLER HOLDING A SHOTGUN IN PARTICULAR AFTER THE SAID "RANGE". IN ADDITION WHEN OFFICER COLER WAS TOLD SHE HAD TO RE-QUALIFY ON OR ABOUT JUNE 26TH - 28TH, OFFICER EADES WHO WAS ALSO AT THE "GRAVEL PIT RANGE" CAME TO WORK AND SAID TO ME "I DON'T CARE IF I HAVE TO RE-QUALIFY". IN ADDITION. LT. LUX TOLD ME AFTER A VERBAL COMPLAINT WAS MADE REGARDING THIS, HE CALLED OFFICER EVERSON TO DETERMINE IF IT WAS ALLOWED. LT. LUX TOLD ME EVERSON SAID IT WAS NOT. TO MY KNOWLEDGE, HENCE COLD AND EADES HAD TO GO TO BANGOR. YOU NEED TO RE-INTERVIEW OFFICER LIEN REGARDING THE CONVERSATION HE HAD W/ MICHAEL TERRY & MR. MORGAN REPORTEDLY AS TO WHY HE DID NOT ATTEND THE GRAVEL PIT SHOOT WHEN THEY WERE GOING TO REMOVE HIM FROM THE CONTRACT.

I NEED TO CHECK DATES; AND CONFIRM WHEN THE ~~RANGE~~ AT THE "PIT" OCCURED I'M SORRY.

(3) THE NEXT INCIDENT I AM AWARE OF OCCURRED ON JULY 7TH 2017. OFFICERS TOLD ME THEY WENT TO A RANGE AT "SCHRODERS HOUSE". I AGREE THAT I WAS TOLD BY OFFICER ARMSTRONG HE HAD AN AR-15 AND A 9MM FOR "THE RANGE AT SCHRODERS HOUSE". I WAS TOLD BY MR. TERRY HE WAS BUYING AMMUNITION FOR THE

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 2 page(s) written/typed by [signature]. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

______
Signature

Date:______ /Time:______ (Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY
VOLUNTARY STATEMENT
(CONTINUATION)

PLACE: NAV MAG II
DATE: 7.19.18

RANGE AT SHRODERS HOUSE. I SAW A BANGOR RANGE SHEET DATED JULY 7th 2017 IN OR ABOUT WITH OFFICER NAMES INCLUDING AN OFFICER BY THE NAME OFF "LISA OWENS" WHO WAS PREGNANT, AND WE BELIEVE WAS NOT ALLOWED TO QUALIFY AT AN INDOOR RANGE AND WORKED UP AND UNTIL NOV. DEC. I BELIEVE, UNTIL SHE HAD TO LEAVE WORK.

(3) I HAVE NEVER HAD ANY KNOWLEDGE OF ANYONE LEAVING THIER POST WITHOUT NOTIFYING THEIR SUPERVISOR.

THIS WAS WRITTEN TO THE BEST OF MY KNOWLEDGE.

NO FURTHER ENTRIES

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 2 page(s) written/typed by MARK SALOPEK. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]
Signature

Date:__________/Time:__________

Name, rate:__________

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY
# VOLUNTARY STATEMENT

1. Place: NAVMAG INDIAN ISLAND
2. Date/Time: 10 JULY 18 1100

I, DANIEL F. LEIN, Address: 2166 NW CLINTON AVE POULSBO WA 98370
Phone: 619 609-8961, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

ON 18 APRIL 2018 I WAS HIRED BY XCEL PROTECTIVE SERVICES AS A GUARD II. ON MY INITIAL IN-HIRE 09MAY18 WEAPONS QUALIFICATION FOR THE M-9, M-500 AND M-4, I PASSED THE M-9 AND M-500, I FAILED THE M-4 BY 5 POINTS. ON A DATE THAT I CANNOT RECALL WHILE AT WORK I SPOKE TO LT BOWLESS AS TO WHEN WOULD BE THE NEXT RANGE OPENING TO QUALIFY ON THE M-4. LT BOWLESS SAID HE WILL LET ME KNOW. ON A DATE I CANNOT RECALL LT BOWLESS TOLD ME THAT MYSELF AND EMILY COLER WERE GOING TO MEET WITH HIM ON I BELIEVE TO BE 27MAY18 AND TO QUALIFY AT A GRAVEL PIT. I ASKED HIM IF IT WAS PRACTICE OR A QUALIFICATION. HE SAID IT IS TO QUALIFY WITH THE M-4. HE SAID I WOULD BE SHOOTING AN AR-15 OWNED BY ROBERT ARMSTRONG. ON THE DAY OF THE GRAVEL PIT SHOOT, I WAS ON A 12 HOUR POST AND I CALLED LT BOWLESS TO LET HIM KNOW THAT I DID NOT FEEL

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of ____page(s) written/typed by________________. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

Signature

Date:_______ /Time:_______(Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY
VOLUNTARY STATEMENT
(CONTINUATION)

PLACE: NAVMAG INDIAN ISLAND
DATE: 10 JULY 18

COMFORTABLE AND I WAS TIRED COMING OFF A TWELVE HOUR POST. I TOLD HIM THAT I WILL WAIT UNTIL THE NEXT SCHEDULED RANGE AT BANGOR SATC. HE SAID THAT WAS FINE. FOR CURIOSITY I ASKED LT [illegible] AGAIN IF THIS WAS FOR QUALIFICATIONS AND HE SAID YES. I ASKED HIM IF WE WERE GETTING PAID FOR OUR TIME AND HE SAID NO. I QUALIFIED AT SATC ON 20JUN18 WITH THE M-4 WITH A SCORE OF 157.

NFE Daniel [signature]

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of _____page(s) written/typed by________________________. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

______________________
Signature

Date:____________/Time:__________

Name, rate:____________________

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY

## VOLUNTARY STATEMENT

1. Place: Navmag Indian Island

2. Date/Time: 22 JUL 18 / 0625

I, Kristen Kirkpatrick, Address: ______________________
Phone: 360-477-1670, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

On the 7th of July 2018 I was the shift Lt. for Xcel protective services on Navmag Indian island. At no time was I asked permission, nor did I give permission to any individual to leave their post, or enter Building 69 to talk to our commanding officer. Furthermore, I am unaware of any falsification of government documents being made by any employee of Xcel protective services. I am also unaware of any government weapons being used at any location besides the authorized range on Bangor in Silverdale, WA.

No further comment.

K. Kirkpatrick

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of ____page(s) written/typed by ______________________. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

______________________
Signature

Date:________ /Time:________(Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. Place: NM 11

2. Date/Time: 22 JULY 2018 05:36

I, KEVIN DAVID, Address: 1390 CENTER Rd CHIMACUM WA 98325

Phone: __________, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

I AM NOT AWARE OF OR BEEN WITNESS TO ANY WRONG DOING AT THE RANGE.
I HAVE NOT ~~R~~ WITNESSED ANY SHOOT OR QUAL AT A PIT OR PORT TOWNSEND RANGE.
I HAVE HAD TO RESHOOT TO QUALIFY ON OCCASION
I AM NOT AWARE OF ANY USE OF GOVORMENT WEAPONS USED AT A PIT OR OPEN AREA
I AM NOT AWARE OF ANY FALSEAFYING OF GOVERNMENT DOCUMENTS

NO FURTER COMMENTS KEVIN E DAVID

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of _____ page(s) written/typed by __________. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]
Signature

Date: 7-22-18/Time: 0536 (Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. Place: Indian Island Navy Base

2. Date/Time: 7/23/2018 0700

I, LT Gerald Pawless, Address: 331 Bay View Street Sequim, WA 98383, Make the following free and voluntary statement

Phone: (360) 797-3944

to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

It was brought to my attention concerning the Validity of Lisa Owen's sustainment with weapons in the Summer of 2017. Lisa Owens was pregnant at the time and was not allowed to do weapons sustainment indoors. The Small Arms Training Center was closed for a few months during this time period ~~[illegible]~~ due to a lead over-exposure problem. Simultaneously, the MILO Range Training System was inoperative on Indian Island. Therefore, Lisa Owens could not shoot weapons sustainment at either place. Lisa Owens was familiarized and fired at a private range near Sequim, Washington. At this private range, no Government weapons or ammunition was used. Never have we ever used Government weapons or ammunition outside of the Bangor SATC range or the Port Townsend Gun Club Range. To my recollection, Lisa Owens did her sustainment shoot at the Port Townsend range, which we were using during the closure of the Bangor SATC and the broken MILO range system. Additionally, it was told that Emily Coler went through weapons qualification at a "gravel pit" near Sequim, Washington. Emily Coler went through a familiarization fire with a personal AR15 rifle and a personal M500 shotgun, with locally purchased ammunition. Again, Government weapons and ammunition were not used. Emily Coler's shotgun and rifle familiarization that day did not count for qualification. Emily Coler was later brought to the Bangor SATC where she successfuly qualified with the M-4 Rifle and the M500 shotgun. Lastly, It was said that I altered the targets at the SATC range to give an advantage to certain shooters while firing the M-4 rifle. At that particular range day, a couple of shooters were having trouble focusing on the target due to the gloomy lighting at the range. With a sharpy black marker, I drew a cross on the target so those particular shooters could better focus on the target. To my knowledge, I was not violating any regulations by doing so. End of statement GP

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by LT Gerald Pawless. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]

Signature

Date: 7/23/2018 Time: 0700 (Date)

OPNAV 5527/2(12-82)

| DEPARTMENT OF THE NAVY<br>**VOLUNTARY STATEMENT** | 1. Place:<br><br>2. Date/Time: 7-11-18 – 11:05 |
|---|---|

I, THOMAS J. CUNNINGHAM, Address: 1405 LANDES STREET - P.T. 98368
Phone: 360 - 774 - 6992, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

GUN QUALS, IN - JAN OF 2018 I QUALIFIED @ GUN RANGE ~~AT~~ - BANGOR - M9 - AND MOS 500 SHOTGUN. TC
GERALD POWERLESS + JOHN ARMSTRONG WERE IN CHARGE OF THE RANGE. MY LINE COACH WAS JAMES LEIGH FELLOW OFFICERS @ RANGE WERE 1. JACOB SCHRYVER - 2 KEVEN DAVID - 3 MARK SALOPEK - 4 GRADY JOHNSON - 5 RON FREDRICKSON - 6 BUTCH LAURITZEN. 7 STEPHE MULLEN - 8. MATTHEW TAYLOR - 9 - BEN GENTRY 10 BEN SCOTT THAT IS ALL I CAN REMEBER WHO WAS @ THE RANGE.
NO ONE FALSEFIDED ANY ~~[illegible]~~ GUN RECORDS THAT I KNOW OF!! TC

IN FEB. - I WENT BACK TO BANGOR GUN ~~RAGE~~ RANGE TO SHOOT M4 - I QUALIFIED SHOOTING A 153 SCORE. TC

GERALD POWERLESS + JOHN ARMSTONG WERE IN CHARGE OF THE RANGE - GERALD POWERLESS WAS MY LINE COACH ALSO - SHOOTING WAS LT. DEL ROSARIO - AND BROGAN LONT. TC

NO ONE FALSEFIDED AN GUN RECORDS!!

I HAVE BEEN WHIT BCSI AND EXCEL SECURITY SERVICES SINCE 8-5-2002 TC

No further information
Thomas J. Cunningham

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by THOMAS J. CUNNINGHAM I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

Thomas J. Cunningham
Signature

Date: 7-11-18 Time: 1128 (Date)

OPNAV 5527/2(12-82)

| DEPARTMENT OF THE NAVY<br>**VOLUNTARY STATEMENT** | 1. Place:<br><br>2. Date/Time: |
|---|---|

I, Emily Coler, Address: 3~~0~~2 Riverside Rd.

Phone: 360 912 3762, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

My time at the range (SATC Bangor) in early May (on or around 9 May 2018). I was given very little weapons training prior to this day and had never shot the M4 before. There were several people who tried to give me pointers (what worked for them, etc) but it was ineffective as I did not pass that day. I felt there were too many people there & that prevented me from getting adequate training. A few weeks later I was told that I could shoot again, this time at a gravel pit (slab camp) with myself and one other person who needed to shoot. This time was much more successful, I was given one on one time to get to know both weapons. I did not think about the "legality" because I heard it had been done before. We spent roughly 5 hours there and I felt much more comfortable. I was told I was able to stand posts which I was excited about because it led the opportunity for more OJT. On the range day yesterday (9 July) I qualified on the M4, and did not qualify on the shotgun. I was given another chance to shoot, ~~not~~ but there was less than 10 minutes until the range closed. I was given the order to cease fire when I still had 3 shells and was not told why.

Post: I only stood posts that required the M9. If I was on patrol with someone, for example, they had the weapons that they were ~~not~~ qualified for, I never had posession of them.

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by Emily Coler. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]

Signature

Date: 10 JULY /Time: ________ (Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. Place: NAVMAG II

2. Date/Time: July 11 2018

I, Terrence L. Lauritzen, Address: Box 166 Kaiser Place Sequim, WA, Phone: 360-681-3476, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative ______, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

I Terrence L. Lauritzen on this Date July 11 2018 At Time 1317 HRS. was Interview For Statement Made Against Me For Weapons Qual. For Feb. 21, 2018 For Armed Security Guard At NAVMAG II. I witnessed No Violations of Safety at Any Time on the Range at Any Time. I Have Never witness Any Kind of Target, Document, or Forgery Scoring at Any Time. And at any Time Ever Have I Qualified of the Bangor Range Everywhere. Ever.

No Further Info

[signature]

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by Terrence L. Lauritzen. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]
Signature

Date: July 11/2018 /Time: 1317 (Date)

OPNAV 5527/2(12-82)

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. Place: Nav Mag I I
2. Date/Time: 7/11/18 10:27

I, Jacob Schryver, Address: 13903 Center Rd. Quilcene WA 98376
Phone: (360) 731-4312, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

I was hired Jan 10 2010. In reference to the statement that I qualified Mr. Cunningham at a gravel pit I never said the words "He's qualified". We did not run an approved course with approved weapons as it was a familiarization. It is also known that I am not certified to qualify. I cannot provide the dates and times of the shoot as it is not ~~documenting~~ documented. If Mr. Cunningham was qualified after the events I have no personal knowledge of it. Any and all complaints referring to the range from myself were brought to Lt. Gerald Powless as he is the primary RSO for the company. I am not aware of falsified government documents personally.

NO Further Entries

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by Schryver, Jacob. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature] Signature

Date: 7/11/18 /Time: 10:27 (Date)

OPNAV 5527/2(12-82)

| DEPARTMENT OF THE NAVY<br>**VOLUNTARY STATEMENT** | 1. Place: NAUMAG II<br>2. Date/Time: July 11 2018 |
|---|---|

I, Terrence L. Lauritzen, Address: Box 166 Kaiser Place Sequim, WA, Phone: 360-681-3476, Make the following free and voluntary statement to Senior Performance Assessment Representative/Performance Assessment Representative, whom I know to be a GOV Representative. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

I Terrence L. Lauritzen on this Date July 11 2018 At Time 1317 HRS. was Interview for Statement made Against me For Weapons Qual. for Feb 21, 2018 For Armed Security Guard At NAUMAG II. I witnessed NO Violations of Safty At Any Time on the Range at Any Time. I Have Never witness Any Kind of Target, Document, or Forgery Scoring At Any Time. And at any Time Ever Have I Qualified of the Bangor Range Everywhere. Ever.

No Further Entries

[signature]

I swear that the above statement is true and correct to the best of my knowledge and belief. The above statement consists of 1 page(s) written/typed by Terrence L. Lauritzen. I've had the opportunity to make any changes and to correct and initial any and all errors and changes.

[signature]
Signature

Date: July 11/2018 /Time: 1317 (Date)

OPNAV 5527/2(12-82)

**From:** Rake, Richard L CIV Navy Region NW, N3AT <richard.rake@navy.mil>
**Sent:** Friday, September 7, 2018 4:26 PM
**To:** Terry, Michael J CTR NAVMAG Indian Is, N3AT; 'Michael Terry'
**Cc:** 'John Morgan'; Manson, Steve A CIV Navy Region NW, N3AT
**Subject:** Potential OPSEC Concern, NMII HSBs
**Attachments:** Mark Salopek LinkedIn profile.pdf

Michael,

Navy IG found during a routine social media review, that a NMII Xcel contract guard, Mark Salopek, posted on his LinkedIn profile photographs of the interior of a Navy Region Northwest HSB (excerpts attached). One tag states, "Boat crews utilize a number of electronic means to conduct Force Protection and Surveillance. Here the crew is utilizing on Board FLIR." COMNAVREGNWINST 3432.1 - divulges information in an open-source/social media website specifically, the implementation of particular electronic monitoring capabilities on board HSBs. NMII is not named (although Mr. Salopek lists his location as Port Ludlow, WA), but one of the excerpts clearly shows a NRNW HSB (HS-27).

Will you please ask Mr. Salopek to remove from his LinkedIn profile and any other websites he has posted pictures or information by 12 Sept 2018. If he says "no" just let me know, do not push or keep asking him. It is OK to tell him that IG is performing inquires and found this information.

Rich

R-13

Search

Free Upgrade to Premium

High Visibility Workwear - Stay in compliance with high visibility workwear at Working Person's Store. Ad ···

# Mark Salopek

Security / Marine Protection / Investigations/Training

Port Ludlow, Washington

Xcel Protection Services

American Marine Training Center

See contact info

24 connections

22 Years of Law Enforcement Experience: Local and State Law Enforcement; Law Enforcement Supervisor; Special Units; State Drug Enforcement; Detective Sergeant; State Criminal Investigator; Intelligence Gathering; Crime Scene Investigator (CSI); SWAT Certified, Sniper Certified, DEA Dynamic Entry Certified; Basic DEA School; Airborne Counter Drug Operations; Arial Spotter; Field Training Officer; Training Sergeant; Patrol Sergeant.

10 Years in Management with the second largest auto parts company in the United States. Customer Service / Relations; Team Building; Team Training; Received Human Resources Training, Scheduling, controllable costs; Interview / hiring; employee evaluations; goal setting; team motivating.

Currently working with a contract security company with government contracts. Armed Marine Force Protection/ Program Coordinator / SIMBBC; PQS Coxswain U.S. Navy patrol boats, observing for possible threats; Counter Terrorism; reporting and intervening to protect assets. Secret Clearance. Masters Captain License / Towing Endorsement. Annual, Quarterly and Weekly Training and Testing of Coxswains, Perimeter Security; CCTV Monitoring; Active Shooter Training; determining "Occupational Risks" and implementing occupational risk management preventative measures and policies.

Show less ︿

×

Get the LinkedIn app and see more profiles like Mark's anytime, anywhere

Or send me an SMS instead

Mark Salopek

Security / Marine

×

Control if other members will be able to see that you've visited their profile.

View settings

ism

Military Base; USA

Promoted

**Theory of Constraints**
The Roots of Lean with Toyota's Hayashi. 2-Day Conference Sept. 2 & 28

**Flame Resistant Workwear**
Stay in compliance with FR workwe from WorkingPerson.com.

**Cosco Fire Protection**
Full Service Fire Protection Contractor; Fire Alarm, Fire Sprinkl Ext..

People Also Viewed

Stephen Mullen
--

Maya Leonard
Real Estate Service Administrato CBRE

Barry Johnsrud
Principal, Jackson Lewis P.C.

Peter Greijn
Foreclosure Guru & REO Broker Referral Realty US LLC @ ReMax contact me phone/text : 919 422

Jeff Kuo
Area Manager at Apple Inc.

Amanda Leese
Director of Sales and Marketing Clarion Copper King Hotel & Convention Center

Jason Smith
Deputy Sector / Air Station Com at U.S. Coast Guard

David Everson
Weapons Based Anti-Terrorism Instructor

Dave Everson
Group Creative Director at Pinna Advertising

Glenn Morse
Corporate Security Supervisor at Ministries

Learn the skills Mark has

Learning Computer Forensics
Viewers: 16,517

Jeff Weiner on Establi

Previous Next

Monitoring with FLIR

Control if other members will be able to see that you've visited their profile.
View settings

Previous Next

Coming Alongside

Control if other members will be able to see that you've visited their profile.
View settings

9/6/2018 USCA Case #22-1264 Document #1991533 Mark Salopek | LinkedIn Filed: 03/23/2023 Page 256 of 658

Radar and GPS Assist visual Observation

Control if other members will be able to see that you've visited their profile.
View settings

https://www.linkedin.com/in/mark-salopek-29280b9a/detail/treasury/summary/?entityUrn=urn%3Ali%3Afs_treasuryMedia%3A(ACoAABUfC84BZIzStbj... 1/3
APP 252



Docking

Control if other members will be able to see that you've visited their profile.
View settings

**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
300 – Fifth Avenue, Suite 1280
Seattle, WA 98104
Tel: (206) 757-6700
Fax: (206) 757-6705

R-26

**VIA UPS**
November 29, 2018

XCEL Protective Services
6747 Academy Road NE
Suite A
Albuquerque, NM 87109-3374

| | |
|---|---|
| Complainant: | Mark Salopek |
| Respondent: | XCEL Protective Services |
| Case Number: | 0-1960-19-024 |
| Law/Statute: | Section 11(c) of the Occupational Safety and Health Act (OSHA), 29 U.S.C. §660 |
| Regulation: | 29 CFR Part 1977 |

Dear Sir/Madam:

This office has received a complaint filed by the above-named Complainant against the above-named Respondent. The complaint alleges retaliatory employment practices in violation of the Law/Statute cited above. A copy of the complaint allegation is enclosed.

The Occupational Safety and Health Administration (OSHA) is responsible for enforcing the anti-retaliation provisions of the law cited above and will conduct its investigation following the procedures outlined in the regulation cited above. You may obtain a copy of the law and regulation at: *www.whistleblowers.gov*. Upon request, a printed copy of these materials will be mailed to you.

Please provide within 20 days a written account of the facts and a statement of your position with respect to the allegation that you have retaliated against Complainant in violation of the law. Please note that a full and complete initial response, supported by appropriate documentation, may help to achieve early resolution of this matter. Your cooperation is critical so that all facts of the case may be considered.

***Per Presidential Memorandum – Managing Government Records, we request that any documents you submit to OSHA be submitted electronically, if possible, and sent to the assigned investigator's email address. Please send Complainant a copy of all documents that you submit to OSHA at the following address:***

Mark Salopek
271 N. Bayview Drive
Port Ludlow, WA 98365

R-26

If the information provided contains personal, identifiable information about individuals other than Complainant, or business sensitive information, please remove this information before sending it to Complainant.

You have the right to be represented in this matter. If you choose to have a lawyer or someone else represent you, please have that person complete and promptly return to the assigned investigator the enclosed Designation of Representative form. **Please note, all communications and submissions should be made to the assigned investigator, identified below.**

If you are interested in early resolution settlement discussions please fill out the enclosed Alternative Dispute Resolution (ADR) form or talk to the assigned investigator for more information.

Sincerely,

BRIAN MORGAN
Digitally signed by BRIAN
MORGAN
Date: 2018.11.29 13:09:01
-08'00'

For Tobias Kammer
Assistant Regional Administrator

ASSIGNED INVESTIGATOR:
Brian S. Morgan
Regional Investigator
U.S. Department of Labor, OSHA
300 Fifth Avenue, Suite 1280
Seattle, WA 98104
Phone: (206) 757-6674
Fax: (206) 757-6705
E-mail: Morgan.Brian.S@dol.gov

Enclosures:    (1) Copy of Complaint
               (2) Designation of Representative Form
               (3) ADR Request Form & Fact Sheet

Case Activity Worksheet

Run Date: 11/29/18

Occupational Safety and Health Administration

| Filed Date: | 11/05/18 | Local Case Number: | 0-1960-19-024 | Activity Number: | 30101547 | Reporting ID: | 1000000 |
|---|---|---|---|---|---|---|---|
| Case Type: | OSHA | Statutory Implication: | | | | | |
| Allegation: | M - Complaint with management | | | Investigator: | Morgan,Brian | Assigned Date: | 11/05/18 |
| Allegation Summary: | Complainant alleges that he reported to Respondent job site safety concerns, including falsified weapons qualification documents. These reports were made verbally and/or in writing on multiple dates from July of 2017 through July of 2018. Complainant contends that Respondent informed other employees of his complaints, which then created a hostile work environment. Complainant then participated in a related U.S. Navy OIG investigation. Respondent terminated Complainant October 27, 2018 in alleged retaliation for Complainant's prior safety complaints and/or participation in an investigation of safety concerns. Complainant contends Respondent violated his rights under Section 11(c) of the Occupational Safety & Health Act, 29 USC §660. | | | | | | |

| Respondent Information | Name: XCEL Protective Services | Phones: | | Emails: |
|---|---|---|---|---|
| Primary Address: | 6747 Academy Road NE Suite A | W | | |
| | Albuquerque NM 87109-3374 UNITED STATES | W | (855)923-5732 | |
| Alternate Address: | | | | |
| Complainant Information | Name: Mark Salopek | Phones: | | Emails: |
| Primary Address: | 271 N. Bayview Drive | H | (360)215-4117 | mjsalopek@outlook.com |
| | Port Ludlow WA 98365 UNITED STATES | C | (360)821-9113 | |

| Determination Date | Determination | Total Compensation | $0 | Reinstatement | |
|---|---|---|---|---|---|
| | | | | | |

I certify that the complaint was filed with me on(date): 11/05/2018

| Signature | Title | Date |
|---|---|---|
| BRIAN MORGAN Digitally signed by BRIAN MORGAN Date: 2018.11.29 13:22:00 -08'00' | Investigator | 11/29/2018 |

Note:This report contains sensitive information that may not be appropriate for distribution outside OSHA. Local offices should review the information BEFORE it is provided to outside requestor.

# DESIGNATION of REPRESENTATIVE FORM

**Please Complete The Information In The Boxes Below. Use Blue Or Black Ink.**
**Email This Form To The Assigned Investigator As Soon As Possible**
**Or Fax To: 206-757-6705**

**Re:** XCEL Protective Services / Mark Salopek / 0-1960-19-024

**The undersigned hereby enters his appearance as representative of the named party below in the above-captioned matter.**

| Party's Name (Type or print in the box below) | Representative's Name (Type or print in the box below) |
|---|---|
| | |
| **Representative's Signature (Sign below)** | **Street Address or P.O. Box (Type or print in the box below)** |
| | |
| **Date (Type or print in the box below)** | **City, State, ZIP (Type or print in the box below)** |
| | |
| **Telephone (Type or print in the box below)** | **FAX (Type or print in the box below)** |
| | |
| **E-mail Address (Type or print in the box below)** | |
| | |

**REQUEST FOR**
**ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**OSHA – REGION 10**

**Re:** XCEL Protective Services / Mark Salopek / 0-1960-19-024

ADR is a voluntary program that allows the parties to resolve a whistleblower retaliation complaint outside of the investigative process. The parties attempt to negotiate a settlement with the help of a neutral OSHA facilitator who is not involved in the investigation of the complaint.

Communications during the ADR process are kept confidential, to the extent permitted by law, and are not disclosed to anyone without the consent of the parties.

While the ADR process is ongoing, the investigation will be put on-hold.

If the complaint is not resolved during the ADR process, either party may share information and documents that it disclosed during the ADR process with the assigned investigator.

If you are interested in participating in early resolution, please email this form to the assigned investigator or fax this form to 206-757-6705.

______ I am interested in pursuing ADR as an alternative to OSHA's investigation.

Signature                Date

Print Full Name                Daytime Phone Number

Email address

**OSHA – REGION 10**
**Alternative Dispute Resolution (ADR)**
**Frequently Asked Questions**

***What is OSHA's ADR program?***
ADR is a voluntary program that allows the parties to resolve a whistleblower retaliation complaint outside of the investigative process. The parties attempt to negotiate a settlement with the help of a neutral OSHA facilitator who is not involved in the investigation of the complaint.

***What are the benefits of ADR?***
ADR allows the parties to reach a win-win resolution of the complaint on their own terms rather than let OSHA pick a winner and a loser. ADR is a faster method than an investigation, which can be lengthy and involve multiple appeals. ADR may also allow the parties to preserve/repair the employment relationship.

***Is ADR Confidential?***
Yes. Communications during ADR are kept confidential, to the extent permitted by law, and are not disclosed to anyone without the consent of the parties. If the complaint is not resolved during ADR, neither party may share with the assigned investigator any discussions that were made during ADR.

***What happens to the investigation during ADR?***
While the ADR process is ongoing, the investigation will be put on-hold.

***How do I sign up for ADR?***
If you would like to pursue ADR, please return the attached "Request for ADR" form within ten (10) business days of your receipt of this letter.

***What happens if I want to pursue ADR but the other party does not agree?***
ADR is voluntary. All parties must agree to participate. If either party does not wish to participate, OSHA will proceed with an investigation.

***What happens if both parties ask for ADR?***
If both parties request ADR, an OSHA official will contact each party separately to coordinate a mutually-agreed upon date, time, location and format for the ADR session. If the parties agree upon a framework, a neutral OSHA official will then facilitate the ADR session. If the parties reach a settlement during the ADR session, the OSHA official will draft or review a proposed settlement agreement following the procedures outlined in the Whistleblower Investigations Manual (available at *www.whistleblowers.gov*, Chapter 6, Remedies and Settlement Agreements.)

***Does attempting ADR delay the OSHA investigation?***
No. Respondent must provide its position statement within 20 days of receiving OSHA's opening letter unless the parties reach a signed settlement agreement prior to that date. Attempting ADR does not confer an extension of time in which Respondent may submit its position statement unless OSHA feels that such an extension would benefit the ADR process.

***What happens if ADR fails?***
If the parties decline to pursue ADR or if the parties fail to reach a settlement during ADR, the complaint will be referred for investigation.

***Is settlement possible outside ADR?***
Yes. The parties may enter into a settlement agreement at any time during the course of the investigation, but all settlements must be approved by OSHA before the case can be closed.

***How much does ADR cost?***
There is no charge to participate in ADR.

***How can I learn more about OSHA's ADR program?***
Please contact the assigned investigator identified in your opening letter.

EXHIBIT 3

**U.S. Department of Labor**

Occupational Safety and Health Administration
Washington, D.C. 20210

AUG 1 5 2019

BOWLES LAW FIRM
AUG 1 9 2019
RECEIVED

Mark Salopek
c/o Richard Olszewski
Gregory, Moore, Jeakle and Brooks, PC
65 Cadillac Square, Suite 3727
Detroit, MI 48226

RE: XCEL Protective Services / Mark Salopek / 0-1960-19-024

Dear Mr. Salopek:

This letter is in response to your July 25, 2019, request for review of the decision to dismiss your complaint against XCEL Protective Services (Respondent). In your letter you expressed concern with the investigation and request additional review.

The investigative records reflect that you filed a complaint against Respondent on November 5, 2018, alleging that Respondent terminated your employment in retaliation for engaging in protected activity, specifically alerting U.S. Navy personnel to safety issues and falsification of weapons qualification. The Seattle Regional Office conducted an investigation and determined that your protected activity was not the reason for the adverse action alleged. Consequently, your complaint was dismissed on July 15, 2019.

The Directorate of Whistleblower Protection Programs (DWPP) has completed a review of the investigative case file and has determined that there is insufficient evidence to support that Respondent violated Section 11(c) of the Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. §660(c). Rather, the evidence demonstrates that Respondent terminated your employment due to integrity issues and inappropriate statements to Navy investigators.

Please note that this is the final determination of the Secretary of Labor; your case is now closed.

Sincerely,

for Francis Yebesi
Acting Director
Directorate of Whistleblower Protection Programs

cc: Regional Office
Respondent

R-29

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 265 of 658

# SMALL ARMS QUALIFICATIONS RECORD

OPNAVINST 3591.1F

| SHIP OR STATION | DIVISION OR ACTIVITY | WEAPON (S) FIRED | PAGE |
|---|---|---|---|
| Naval Magazine Indian Island | Xcel Protective Services | M-4, M-9, M-500 | 1 OF 1 |

NAVY HANDGUN QUALIFICATION COURSE = NHQC
HANDGUN PRACTICAL WEAPONS COURSE = HPWC
RIFLE QUALIFICATION COURSE = RQC
HANDGUN LOWLIGHT COURSE = HLLC
SHOTGUN PRACTICAL WEAPONS COURSE = SPWC
RIFLE LOWLIGHT COURSE = RLLC

| RANGE NAME/LOCATION | DATE OF FIRING | Marksmanship Award Code: | Qualification Codes: |
|---|---|---|---|
| Naval Base Kitsap, Bangor | 7 July 2017 | E = Expert<br>S = Sharpshooter<br>M = Marksmen | Q = Qualified<br>U = Unqualified |

| FULL NAME | SSN (Last four) | RANK/ RATE | NHQC Score & Award Code | | RQC Score & Award Code | | SPWC Score T1 | SPWC Score T2 | SPWC Score T3 | SPWC Q or U | HPWC Score T1 | HPWC Score T2 | HPWC Score T3 | HPWC Q or U | HLLC Numeric Score/ Q or U | | RLLC Numeric Score/ Q or U | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nadon, Timothy | | SPO | 47 | Q | 40 | Q | | | | Q | | | | | | | | |
| Armstrong, Robert | | SPO | 48 | Q | 40 | Q | | | | Q | | | | | | | | |
| Schroder, Evan | | SPO | 47 | Q | 38 | Q | | | | Q | | | | | | | | |
| Simcoe, William | | SPO | 48 | Q | 40 | Q | | | | Q | | | | | | | | |
| Owens, Lisa | | SPO | 47 | Q | 38 | Q | | | | Q | | | | | | | | |

I CERTIFY THAT THE ABOVE RECORD QUALIFAICATION WAS CONDUCTED PER OPNAVINST 3591.1F

SIGNATURE & RATE OF RANGE SAFETY OFFICER

LT Powless, Gerald [signature]

DATE

7 July 2017

OPNAV 3591/1 (Rev 02/2007) DISTRIBUTION: ORIGINAL - COMMANDING OFFICER FOR SERVICE RECORD ENTRY

R-~~33~~ 42

OPNAVINST 3591.1F

# SMALL ARMS QUALIFICATIONS RECORD

| SHIP OR STATION | DIVISION OR ACTIVITY | WEAPON (S) FIRED | PAGE 1 OF 1 |
|---|---|---|---|
| Naval Magazine Indian Island | Xcel Protective Services | M-4, M-9, M-500 | |

NAVY HANDGUN QUALIFICATION COURSE = **NHQC**
HANDGUN PRACTICAL WEAPONS COURSE = **HPWC**
RIFLE QUALIFICATION COURSE = **RQC**
HANDGUN LOWLIGHT COURSE = **HLLC**
SHOTGUN PRACTICAL WEAPONS COURSE = **SPWC**
RIFLE LOWLIGHT COURSE = **RLLC**

| RANGE NAME/LOCATION | DATE OF FIRING | Marksmanship Award Code: | Qualification Codes: |
|---|---|---|---|
| Naval Base Kitsap, Bangor | 7 July 2017 | E = Expert<br>S = Sharpshooter<br>M = Marksmen | Q = Qualified<br>U = Unqualified |

| FULL NAME | SSN (Last four) | RANK/ RATE | NHQC Score & Award Code | | RQC Score & Award Code | | SPWC Score T1 | SPWC Score T2 | SPWC Score T3 | SPWC Q or U | HPWC Score T1 | HPWC Score T2 | HPWC Score T3 | HPWC Q or U | HLLC Numeric Score/ Q or U | | RLLC Numeric Score/ Q or U | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nadon, Timothy | | SPO | 47 | Q | 40 | Q | | | | Q | | | | | | | | |
| Armstrong, Robert | | SPO | 48 | Q | 40 | Q | | | | Q | | | | | | | | |
| Schroder, Evan | | SPO | 47 | Q | 38 | Q | | | | Q | | | | | | | | |
| Simcoe, William | | SPO | 48 | Q | 40 | Q | | | | Q | | | | | | | | |
| Owens, Liza | | SPO | 47 | Q | 38 | Q | | | | Q | | | | | | | | |

I CERTIFY THAT THE ABOVE RECORD QUALIFAICATION WAS CONDUCTED PER OPNAVINST 3591.1F

SIGNATURE & RATE OF RANGE SAFETY OFFICER

LT Powless, Gerald [signature]

DATE 7 July 2017

OPNAV 3591/1 (Rev 02/2007) DISTRIBUTION: ORIGINAL - COMMANDING OFFICER FOR SERVICE RECORD ENTRY

R-42

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 267 of 658

| 0100000 – General Information | | |
|---|---|---|
| Spec Item | Title | Description |
| 1 | General Information | |
| 1.1 | Outline of Services | Except where otherwise stated, the Contractor shall furnish all labor, supervision, management, tools, materials, equipment, facilities, transportation, and other items necessary to provide the services outlined below and described in this Performance Work Statement (PWS). The type of contract anticipated for this procurement is a combination firm-fixed price (FFP) and indefinite delivery-indefinite quantity (IDIQ). The PWS is organized into annexes and is numbered in accordance with the standard Navy format described in paragraph 1.8 Annex 0100000 is "General Information". Annex 0200000 contains the on-site project management and administration requirements. Annex 0401060 contains the technical requirements.<br><br>Annex 0100000 General Information<br>Annex 0200000 Management and Administration<br>Annex 0401060 Security Operations |
| 1.2 | Project Location | The work shall be performed at Naval Magazine Indian Island, Port Hadlock, WA. The Indian Island Complex encompasses 2,716 acres and is located approximately 46 miles northwest of Bremerton near Port Hadlock, Jefferson County. Indian Island Complex contains administration, security and a personnel support services and provides ordnance receipt, storage, issue, maintenance/overhaul, demilitarization, and disposal. A map of the contract performance area is provided in J-0401060-03. |
| 1.3 | Verification of Workload and Conditions | Workload data is generally referred to as being located in Section J. Section J provides data such as maps, floor plans, and tables to represent the type, quantity and location of services to be provided. However, offerors are encouraged to visit the project site and attend the site visit for offerors, as part of its due diligence to assess the nature of work and conditions under which work is to be performed. |
| 1.4 | Climate Patterns | Climate data is provided for Nordland, WA, which is approximately two miles east of Indian Island. The average monthly temperature ranges from 40° F to 62° F (extremes range from 0° F in the winter to 95° F in the summer). Average maximum temperature is 72° F and average minimum is 36° F. The average annual precipitation is 19.4 inches. Snowfall ranges from a trace to in excess of ten inches during the months of November through April, with an average annual snowfall of 4.7 inches. |
| 1.5 | Related Information | There are four types of Related Information that can be found in the Description and Related Information columns of the specification as follows:<br>Informational Notes as used throughout this PWS provides additional information to offerors to be used in developing a thorough understanding of the work to be performed in this contract. Any block of text marked "Informational Notes" is subject to this disclaimer. Offerors may not rely upon the "Informational Notes" as material representations of the Government. Information provided in "Informational Notes" does not create a contractual requirement on either party to this contract.<br>Clarifying Information describes client expectations in a more detailed manner than the Performance Objective and Performance standard alone.<br>Constraining Information describes limitations to the work performed to meet the Performance Objective and Performance Standard.<br>Requirement Information further describes client requirements associated with each Performance Objective. |

R-43

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 268 of 658

APP 264

| 0100000 – General Information | | |
|---|---|---|
| Spec Item | Title | Description |
| 1.6 | Navy Approach to Service Contracting | The Department of Navy (DoN) spends over $1 billion in annual obligations to meet global requirements for facility operations and maintenance provided through Facility Support Contracts (FSC) and additional billions to provide other base operations support services (OBOS). The Head of the Contracting Activity (HCA) of the Naval Facilities Engineering Command (NAVFAC) has focused increased attention on re-engineering FSC contracts in response to customer and industry feedback, budget constraints, and the impact of a variety of contracting, program management and financial management regulations. The Navy also supports the following principles: |
| 1.6.1 | Partnering Philosophy | The first principle is that the Navy views its contractors as partners and not just abstract service providers. The Navy wants its contractors to succeed because partners' success drives the Navy's successful mission completion. Within the bounds of acquisition policy the Navy intends to work to find solutions that will be beneficial to both the Government and its partners. |
| 1.6.2 | Contractor's Knowledge | The second principle is that the Navy will receive insightful management from its contractors. This management will include the knowledge, skills, authority and willingness to use contractor resources to find better ways of serving Navy clients' strategic and operational goals and objectives. The Navy's use of performance-based objectives evidences this principle. Although performance work statements will typically contain several levels of performance assessment, the Navy wants its contractors to exercise maximum discretion within bounds of prudent risk management to adjust processes and resources needed to reach specified objectives at the highest performance level. |
| 1.6.3 | Industry Best Practices | The third principle is that the Navy will adopt industry best commercial practices and maintain state-of-the-art service delivery. It is the Navy and contractor's responsibility as partners to reach this goal. To that end, the Navy's emphasis will be in evaluating performance objectives (end results). |
| 1.7 | Standard Template | Key to implementing a programmatic approach is using a standard template that ensures Navy-wide consistency yet affords appropriate tailoring to meet local needs. This contract conforms to the standard template and has been tailored for this solicitation. NAVFAC intends to use this template-based approach for future service contracts. Offerors should develop an understanding of the template as part of performing due diligence in reaching an understanding of the Navy's requirements and expectations. |
| 1.8 | Navy PBSC Approach | The Navy's approach to performance-based service contracting (PBSC) includes four component parts which are 1) performance outcomes, 2) measurable standards, 3) consideration of incentives, and 4) performance assessment plan. |
| 1.9 | Technical Proposal Certification | The contractor warrants that its proposal incorporated herein by reference including, but not limited to, proposed approaches, staffing, methodology, or work plans, will meet the performance objectives set forth in this contract during execution thereof. The contractor is not excused from meeting such performance objectives in the event such proposal proves inadequate as conceived or executed to meet such performance objectives. The contractor understands that it bears all of the cost and performance risk associated with adopting acceptable additional (and/or alternative) means or methods of meeting the performance objective. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 269 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| 2 | Management and Administration | |
| 2.1 | Definitions and Acronyms | See J-0200000-01 for Acronyms. |
| 2.1.1 | Contracting Officer (KO) | That individual with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer. |
| 2.1.2 | Contracting Officer Representative (COR) or Senior Performance Assessment Representative (SPAR) | Individuals designated by the Contracting Officer with administrative and performance assessment responsibilities for the subject contract. |
| 2.1.3 | Contractor | That entity or its representative responsible for the delivery of the services or materials specified in this contract, as designated by contract award. The term Contractor as used herein refers to both the prime Contractor and any subcontractors. The prime Contractor shall insure that subcontractors comply with the provision of this contract. |
| 2.1.4 | Contractor Representative | That individual appointed by the Contractor, either orally or in writing, who has been assigned responsibility for executing the requirements of this contract. |
| 2.1.5 | Direct Material Costs | Material includes, but is not limited to: supplies, parts, subassemblies, raw materials, and other components and end items utilized to accomplish work or services described in this specification. |
| 2.1.6 | Equipment | Property of a capital nature consisting of machine tools, test gear, furniture, vehicles, and accessory and auxiliary items, used or capable of use in the manufacture of supplies or in the performance of services for any administrative or general plant purpose. |
| 2.1.7 | Facility | A building or structure designed and created to serve a particular function. |
| 2.1.8 | Maintenance and Repair | The preservation or restoration of a piece of equipment, system, or facility to such condition that it may be effectively used for its designated purposes. Maintenance/repair may be adjustment, overhaul, reprocessing, or replacement of constituent parts or materials that are missing or have deteriorated by action of the elements or usage, or replacement of the entire unit or system if beyond economical repair. |
| 2.1.9 | Monthly Exposure Report | A compilation of all Contractor and subcontractor employee-hours involved in delivering contract services on a Government property. |
| 2.1.10 | Performance Assessment | A method used by the Government for assessing the Contractor's performance that will be used to provide Contractor feedback and update Contractor Performance Assessment Reporting System (CPARS). |
| 2.1.11 | Performance Assessment Representative (PAR) | That individual designated by the KO to be responsible for the monitoring of Contractor performance. |
| 2.1.12 | Quality Control (QC) | A method used by the Contractor to control the quality of goods and services produced. |
| 2.1.13 | Response Time | The time allowed the Contractor after initial notification of a work requirement to be physically on the premises at the work site with appropriate personnel, tools, equipment, and materials, ready to perform the work required. |

USCA Case #22-1264    Document #1991533    Filed: 03/23/2023    Page 270 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | |
| 2.1.14 | Unit Priced Labor (UPL) Hour | The unit price bid by the Contractor to perform one hour of work-in-place. With the exception of direct material and construction equipment costs, the unit price includes all indirect and direct costs associated with performing work. The price includes the Contractor's hourly composite trade wage, adjusted to allow for workforce productivity; costs for pre-expended bin materials, union agreements, crew sizes, hand tools, payroll burdens and fringes, job (field) overhead (including clerical support, supervision, inspection, fees, taxes, licenses, permits, and insurance), general and administrative (home office) overhead, and profit. Additionally, time for job preparation, safety standby personnel, and similar indirect labor elements are included. |
| 2.2 | General Information | |
| 2.2.1 | Government Regular Working Hours | The Government's normal working hours are between 0700-1600, five days per week, Monday through Friday, except observed Federal holidays. The Contractor is expected to adjust his work hours to the standards established at each base including any special stipulations implemented to relieve traffic congestion at shift changes. Exceptions to the regular hours of operation are detailed in subsequent sections of this PWS. Work in certain annexes or sub-annexes require Contractor continuous operations, 24 hours a day, every day of the year including holidays. The performance of other work requirements shall be accomplished within the Government's regular working hours unless the specific work requirement specified herein necessitates otherwise. Any other work outside Government regular working hours requires prior KO approval. |
| 2.2.1.1 | Observed Federal Holidays | The Government observes the following holidays: New Year's Day, Martin Luther King Jr.'s Birthday, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day. |
| 2.2.2 | Wage Rates/Determinations | The Service Contract Act (SCA) and Collective Bargaining Agreement (CBA) apply to the PWS. The Contractor is responsible to carefully review firm fixed price and Indefinite quantity-requirements and to pay the correct wage rate to its employees and subcontractors.<br><br>Refer to J-0200000-02 for the current Wage Determination/Collective Bargaining Agreement. When a wage determination covering the work being proposed is not included in the contract, the Contractor must request the current wage determination from the KO. |
| 2.3 | General Administrative Requirements | |
| 2.3.1 | Required Conferences and Meetings | The Contractor may be required to attend administrative and coordination meetings. The Contractor shall attend meetings as shown in J-0200000-06. |
| 2.3.2 | Partnering | To increase the likelihood of successful performance of this contract, the Government requires cohesive partnerships with its contractors and subcontractors. Key stakeholders, including the clients who will receive services, principal individuals from the NAVFAC Facilities Engineering Command (FEC) and from the Facility Engineering & Acquisition Division (FEAD) office, the performance assessment team, and representative(s) of the military installation(s) will be invited to participate in the partnering process. Key members of the prime and subcontractors teams, including senior |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 271 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | management personnel, must participate. The partnership will draw on the strength of each organization in an effort to achieve quality contract services done right the first time, within the contract price, as scheduled and without any safety mishaps.<br><br>Partnering Level C is required for this contract. This level of partnering discusses partnering concepts and benefits and should become a part of the pre-performance conference. The senior Government and Contractor stakeholders present will jointly host the partnering sessions. The partners will determine the frequency of the follow-on sessions. The partnering sessions should be held at locations agreed to by the partners.<br>The NAVFAC Partnering System instruction provides detailed guidelines for implementation of the partnering program. |
| 2.3.3 | Permits and Licenses | The Contractor shall obtain all required permits, licenses, and authorizations to perform work under this contract and comply with all the applicable federal, state and local laws and regulations. Provide evidence of such permits and licenses to the KO/SPAR/PAR 45 days after award and at other times as requested by the KO/SPAR/PARin accordance with Section F. All Contractor employees operating vehicles on a Government installation are required to possess a valid state motor vehicle operator's license. When operating the GOV supplied vehicles (HUMVEE) driver must have valid GOV license with HUMVEE endorsement. |
| 2.3.4 | Insurance | Within 15 days after award of this contract, the Contractor shall furnish the KO a certificate of insurance as evidence of the existence of the following insurance coverage in amounts not less than the amounts specified below in accordance with the FAR Clause 52.228-05, INSURANCE – WORK ON A GOVERNMENT INSTALLATION. This insurance must be maintained during the performance period. |
| 2.3.4.1 | Certificate of Insurance | The Certificate of Insurance shall provide for at least 30 days written notice to the KO by the insurance company prior to cancellation or material change in policy coverage. Other requirements and information are contained in the aforementioned insurance clause. |
| 2.3.4.2 | Minimum Insurance Amounts | Comprehensive General Liability: $500,000 per occurrence; Automobile Liability: $200,000 per person, $500,000 per occurrence, $20,000 per occurrence for property damage; Workmen's Compensation: As required by Federal and State worker's compensation and occupational disease statutes Employer's Liability coverage: $100,000, except in states where worker's compensation may not be written by private carriers - Other as required by State Law Longshore and Harbor worker's Insurance: As required by Federal law where applicable. |
| 2.3.5 | Protection of Government Property | During execution of the work, the Contractor shall protect Government property. The Contractor shall return areas damaged as a result of negligence under this contract to their original condition at no cost to the Government. |
| 2.3.6 | Navy Marine Corps Intranet (NMCI) | Additional information may be obtained at: http://h10131.www1.hp.com/public/nmci/. |
| 2.3.7 | Access to Work Areas | The Contractor shall make all arrangements through the appropriate office necessary to obtain access to buildings, facilities and other work areas, and when necessary, arrange for them to be opened and closed by the controlling authority. The Government may issue keys to the Contractor. The Contractor shall use due diligence and be responsible for compromised security systems to include replacement costs that result from its action or inaction. If the KO decides that a lock must be replaced due to the loss of a key by the Contractor's employee, the Contractor shall pay the cost of that replacement. Similarly, the Contractor shall pay the cost of changing a combination if the KO has reasonable cause to believe that the combination has been compromised. It shall be the Contractor's |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 272 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | responsibility, through the KO, to obtain access to buildings and facilities and arrange for them to be opened and closed. |
| 2.3.8 | References, Instructions, and Directives | Applicable Department of Defense (DoD), Secretary of the Navy (SECNAV), Chief of Naval Operations (OPNAV), and other directives, instructions, and references are listed in J-0401060-13. The Contractor shall comply with the most current version of directives, instructions, and references including versions published during the term of the contract. |
| 2.3.9 | Invoicing Procedures | Invoices for services rendered under this contract will be submitted electronically through Wide Area Work Flow (WAWF) -- Receipt and Acceptance. The vendor shall self-register at the website https://wawf.eb.mil Vendor training is available on the Internet at: https://wawftraining.eb.mil Additional support can be accessed by calling the NAVY WAWF Assistance Line: 1-800-559-WAWF (9293). Backup documentation (such as receipts, invoices and such) should be included and attached to the invoice in WAWF. Attachments created in any Microsoft Office products are attachable to the invoice in WAWF. A PDF copy of attachments and invoices monthly will be sent to the SPAR. |
| 2.3.10 | Forms | It is the intent of Government that all forms required for accomplishment of work in this PWS be accessed electronically. The Department of Defense Forms Program site at: http://www.dtic.mil/whs/directives/infomgt/forms/index.htm provides access to an inventory of DOD, Navy, GAO and GSA forms, frequently asked questions, and downloading instructions. It shall be the Contractor's responsibility to duplicate the required forms as necessary for accomplishment of the work. In the event that a form is unavailable electronically, an initial issue of the form will be supplied to the Contractor during the transition period, and it shall be the Contractor's responsibility to maintain working inventories of such forms during the term of the contract. See J-0200000-03 in Section J for all forms referenced in this Annex. |
| 2.4 | Government-Furnished Property, Materials and Services | In accordance with FAR Clause 52.245-1 "Government Property ALT I, NAVFAC Clause 5252.245-9300, GOVERNMENT-FURNISHED PROPERTY, MATERIALS AND SERVICES and the following paragraphs, the Government will furnish or make available to the Contractor certain Government-owned facilities, utilities, materials, and equipment for use in connection with this contract. The use of Government-furnished property and services for other purposes is prohibited. All such facilities, materials, and equipment will be provided in "as is" condition. The furnished property listing shall not be construed as being sufficient to meet the requirements of this specification. Government-furnished equipment shall be used only for the performance of work directly related to this contract. 60 days after award of the contract the Contractor shall submit their Property Control Plan per FAR Clause 52.245-1 to the KO for approval. The Government-Furnished Property, Materials and Services are listed in J-0200000-04.<br><br>Inventory And Property Control:<br>Within 30 calendar days after award of Contract, annually, and upon termination; the Contractor shall conduct a complete inventory, prepare documentation and sign receipt for those items listed in J-0200000-04. The exact quantity and nomenclature of facilities, equipment, materials, and supplies on-hand at start of work may vary from that listed in J-0200000-04. Any property listed in J-0200000-04 found not suitable for contract use by the Contractor, shall be handled per requirements for DISPOSITION OF GOVERNMENT FURNISHED PROPERTY specified below. The Contractor has 30 days to notify the KO/SPAR/PARof any shortages. The Government shall have the option of |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 273 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | providing the Contractor with comparable equipment or making an equitable adjustment to the contract price. During the initial inventory the Contractor shall at his expense affix a tag on each piece of Government Furnished Equipment stating "US Government Property." Government-furnished items shall not be removed from Government premises unless the KO provides written approval in advance or the items are used to perform authorized work under this solicitation.<br><br>Lost, stolen, damaged, or destroyed Government property shall be immediately reported to the KO/SPAR/PAR. Throughout the term of the contract, the Contractor shall report inventory discrepancies. The Contractor shall prepare the report and forward to the KO/SPAR/PAR along with complete written justification and explanation for loss, damage, or destruction of Government property within five working days of discovery or suspicion of discrepancy. The Government will conduct an investigation, determination of responsibility, and final disposition. The Contractor shall cooperate fully in any survey investigation. If necessary, reimbursement shall be made to the Government by the Contractor within 60 days of the inventory discrepancy.<br><br>**Maintenance And Certification Of Government Furnished Property:**<br>The Contractor is responsible for all preventive and corrective maintenance, servicing, and repair of Government Furnished Property necessary to ensure it is maintained in proper operating condition with the exception of harbor security craft which are maintained and serviced by the Government. Contractor will follow The Government's maintenance schedules for waterborne craft.<br><br>**Replacement Of Government-Furnished Property (GFP):**<br>The Contractor at no additional cost to the Government shall replace government-furnished property, including GFF, GFE, and GFV, which has been lost or irreparably damaged by the Contractor. Property that has become unserviceable through wear and tear or property that has become obsolete shall be returned to the Government and replaced by the Contractor at no additional cost to the Government. Excepted Government Furnished Equipment is listed in Attachment J-0200000-04 and is noted as replaceable by the Government. Refer to section I for Contractor's financial responsibilities for damages to Government property, facilities and vehicles (Clauses 5252-245-9300 and 52.245-1 respectively).<br><br>**Disposition Of Government Furnished Property:**<br>The Contractor shall identify, pack, prepare documentation and deliver to the nearest Defense Reutilization Material Office (DRMO), or other Government designated destination, all Government-owned equipment and materials, which become excess in the course of performance of this contract. The Contractor shall:<br>Obtain prior approval of the COR before transferring GFP outside of the Contractor organization.<br>Identify, pack, and deliver all Government-owned materials and repair parts, which become excess in the course of performance of the contract as determined by the usage/consumption rate and approved by the Government Property Administrator. Physically segregate inventory at the time it is determined to be excess.<br>Prepare any and all documentation required by the Government to identify, pack, deliver, and segregate excess inventory. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 274 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.4.1 | Government-Furnished Facilities (GFF) | The Government will furnish or make available to the Contractor, the facilities described in J-0200000-04. Some facilities shall be jointly occupied with the Government, and the Government may choose to utilize any facilities during the term of the contract. The Government reserves the right to reallocate and relocate assigned facilities during the term of the contract. Upon termination of this contract, assigned facilities shall be in a condition at least equal to that existing when the Contractor assumed responsibility of the facilities. The Contractor shall maintain such spaces to the same standards as similar areas occupied by the Government, and use such space only in connection with performance under this contract. The Contractor shall be responsible for the cost of any repairs caused by negligence or abuse. In the event insufficient (as determined by the KO) Government-furnished facilities are provided, the Government will make available to the Contractor land suitable for temporary buildings or trailers. Lay down areas, storage areas, etc., will be provided to the Contractor upon request and availability. The Contractor shall be responsible and accountable for such facilities and shall take adequate precautions to prevent fire hazards, safety hazards, odors, and vermin infestation. The Contractor shall appoint an individual responsible for reporting maintenance items to the KO. The Contractor shall maintain workspaces in a clean, safe and secure condition. The Contractor shall establish a key control program, which provides complete accountability and audit trail of all keys issued. Contractor alterations or improvements to assigned facilities shall be provided at the Contractor's expense. The Contractor shall not make any alterations to the space except with written permission from the KO. Any such alterations or improvements become the property of the Government; however, if the Government requires removal or dismantling of such improvements, it shall be accomplished at the Contractor's expense and the Contractor shall return facilities to a usable condition as determined by the KO. |
| 2.4.2 | Government-Furnished Utilities | The Government will provide all utilities for Government-furnished facilities assigned to the Contractor for the performance of services identified in this contract. The Contractor shall exercise all efforts to conserve energy as required by base energy conservation programs. The Contractor shall be required to reimburse the Government for installation and disconnection fees and utilities consumed in any Contractor-provided buildings. The contractor shall meter and report monthly the electrical and natural gas consumption for all facilities utilized solely by the contractor. The Contractor is financially responsible for all voice and data communications including long distance. Access to the Government telephone system will be made available to the Contractor, including tie-lines and DSN, for official Government business. |
| 2.4.3 | Government-Furnished Materials (GFM) | The Government will furnish to the Contractor, throughout the term of the contract, the material listed in Section J-0200000-04. The contractor will have the CO sign all gun cards before individuals handle weapons. The Contractor shall be held accountable for all materials supplied and shall be responsible for providing all other material and parts to fully perform all work or services required by or directed under this contract. Maintain GFM in a clean and safe condition and exercise reasonable care, security, and protection of same. Includes all cleaning (including laundering) necessary to ensure material is in ready-to-use condition. Government material includes ammunition for Government-furnished weapons. The Government operates Hazardous Material Minimization Centers (HAZMIN Centers) at each installation. No cost material may be available to support work performed under the requirements of this contract. The Contractor will not charge the Government for free issue material obtained from the HAZMIN Center. COMNAVREGNWINST 5090.6, Regional Hazardous Material Control and Management (HMC&M) Program provides process direction. Contractor will be allowed to utilize the Range at Bangor for gun shoots but must schedule with the Range at Bangor. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 275 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.4.4 | Government-Furnished Equipment (GFE) | The Government will make available to the Contractor for the performance of this PWS, Government-Furnished Equipment (GFE). A complete listing of GFE is provided in Section J-0200000-04. The use of this GFE for other purposes is prohibited. The Contractor shall replace this equipment at the Contractor's discretion and expense. At the termination of the contract, the Contractor shall return all 'non-replaced' GFE to the Government in the same or better condition than issued to the Contractor minus fair wear and tear. The Contractor retains title for equipment replaced by the Contractor. |
| 2.5 | Contractor-Furnished Items | Except for items identified as Government Furnished, the Contractor shall provide all equipment, materials, parts, supplies, components, and facilities to perform the requirements of this contract. Provide all security vehicles and other vehicles not otherwise provided by the Government. All security vehicles shall be marked per OPNAVINST 5530.14 series. The Contractor shall clearly mark all Contractors furnished items as Contractor owned to prevent Contractor furnished equipment from being confused or mistaken for GFE. All ballistic vests and helmets will meet the National Institute of Justice (NIJ) standard of a 3A ballistic threat level. Ballistic vests and helmets will be worn on duty at all times unless directed otherwise by the Security Officer. Equipment shall be in good working order and well maintained. Contractor furnished equipment shall be selected based on optimum energy efficiency and operational costs. The KO/SPAR/PAR/ISO may inspect Contractor-furnished items for adequacy and compliance with contract requirements. Inadequate or unsafe items shall be removed and replaced by the Contractor at no cost to the Government. Materials containing asbestos, lead, and PCB's shall not be brought on site. The KO/SPAR/PAR/ISO may at any time require samples, Material Safety Data Sheets (MSDS) and manufacturer's data cut sheets of materials used in this contract.<br><br>Contractor furnished HM must be approved by the Environmental Contracting Officer Representative (COR) prior to purchase. The Government will maintain an Authorized Use List (AUL) of materials that are approved for use by the Contractor in direct support of the requirements of this contract. The Contractor must obtain authorization from the Environmental office at the installation where the material will be used. The AUL is Work Site/Work Center/Product/MSDS specific; all requests for purchase of HM not already authorized must be accompanied by the manufactures' MSDS. |
| 2.6 | Management | The Contractor shall manage the total work effort associated with the services required herein to meet the performance objectives and standards. Such management includes but is not limited to planning, scheduling, cost accounting, report preparation, establishing and maintaining records, and quality control. The Contractor shall provide staff with the necessary management expertise to assure performance objectives and standards are met. To ensure compatibility with Government scheduling software, the Contractor shall use either MS Word or MS Excel for scheduling of work. |
| 2.6.1 | Work Control | All dealings with work control will be sent to the SPAR for action assessment. |
| 2.6.2 | Work Schedule | The Contractor's work shall not interfere with normal Government business. Coordinate work with all customers. The Contractor shall be flexible in accommodating schedule requirements which only allow for access outside regular work hours, "shut down" periods, etc.; access limitations, restrictions, or constraints imposed by the customers; employee work schedules; mission impact and schedules; and other conditions which may limit access to their areas. Unresolved scheduling conflicts shall be forwarded to the KO. In those cases where some interference is |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 276 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | unavoidable, the Contractor shall minimize the impact and effects of the interference. The Contractor shall provide advance access of all of its work schedules to the Government. The Contractor shall notify the KO of any difficulty in scheduling work due to Government controls. |
| 2.6.3 | Quality Management System (QMS) | The Contractor shall establish and maintain a complete Quality Control (QC) Program in accordance with the provisions specified herein. Thirty days after award of the contract the Contractor shall submit their Quality Control Plan to describe the QC Program in accordance with Section F. The Contractor's QC Program shall provide an effective and efficient means of identifying and correcting problems throughout the entire scope of operations. The Contractor's QC program shall address:<br>Accurate documentation of work processes, procedures, and output measures.<br>A systematic procedure for assessing compliance with performance objectives and standards.<br>Accurate documentation of quality inspections conducted throughout the execution of work.<br>Assessment-driven corrective actions and process adjustments as appropriate in a timely manner. Identify measures to prevent the recurrence of poor performance. |
| 2.6.3.1 | QC Inspection | The Contractor shall establish and maintain an inspection system in accordance with the FAR Clause 52.246-4, INSPECTION OF SERVICES-FIXED PRICE, to ensure that the work performed conforms to the contract requirements. The contractor shall maintain a file of all scheduled and performed QC inspections, inspections results, and dates and details of corrective and preventive actions. The file shall be the property of the Government and made available during the Governments' regular working hours. The file shall be turned over to the KO/SPAR/PAR within five calendar days of completion/termination of the contract. |
| 2.7 | Personnel Requirements | The Contractor shall comply with the personnel requirements stated below. |
| 2.7.1 | Key Personnel | Identify appropriate Key Personnel as outlined in spec item 0200000 2.7.1.1 and 2.7.1.2 below |
| 2.7.1.1 | Contract Security Manager (CSM) | The CSM must have relevant experience at a comparable level of responsibility in projects of similar size, scope and complexity. The CSM or alternate shall have full authority to act for the Contractor on all contract matters relating to this contract. The CSM or alternate shall be available by phone during Government regular working hours. The CSM or alternate shall be available to meet with Government representatives within one hour of notification during Government regular working hours. |
| 2.7.1.2 | Quality Control Manager (QCM) | The Contractor shall provide a QCM who shall have full authority and responsibility for assuring performance objectives and standards identified in this contract are met as per the QMS. The QCM and CSM positions may be filled by the same person. |
| 2.7.2 | Employee Requirements | The Contractor shall provide experienced, qualified, and capable personnel to perform the work in this contract. Personnel shall be fully knowledgeable of all safety and environmental requirements associated with the work they perform. Personnel shall speak, read, and comprehend English to the extent that they can read and understand printed regulations, detailed written orders, operating procedures, training instructions and materials. |
| 2.7.2.1 | Employee Appearance | The Contractor shall ensure that all employees present a professional appearance that is appropriate for their position. The KO/SPAR/PAR/ISO reserves the right to determine the acceptability of any clothing worn. All Contractor/subcontractor employees working under this contract shall be identified by a distinctive nameplate, emblem, or patch attached in a prominent place on an outer garment. Employee identification shall not be substituted for station required passes or badges. |
| 2.7.2.2 | Employee Conduct | Contractor employees shall conduct themselves in a proper, efficient, courteous and businesslike manner. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 277 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.7.2.3 | Removal of Employees | The Contractor shall remove from the site any individual whose continued employment is deemed by the KO to be contrary to the public interest, or inconsistent with the best interests of National Security, or not in accordance with the Standards of Conduct located in Attachment J-0401060-04. |
| 2.7.2.4 | Proof of Citizenship | No employee or representative of the Contractor will be admitted to the site of work unless satisfactory proof of United States citizenship is furnished. |
| 2.8 | Security Requirements | The Contractor shall comply with all federal, state, and local security statutes, regulations, and requirements. The Contractor shall become acquainted with and comply with all Government regulations as posted including but not limited to OPNAV 5530.14 series, or as requested by the KO/SPAR/PAR/ISO when required to enter a Government site. The Contractor shall ensure that all security/entrance clearances are obtained. Neither the Contractor nor any of its employees shall disclose or cause to be disseminated any information concerning the operations of the activity which could result in or increase the possibility of a breach of the activity's security or interrupt the continuity of its operations. Disclosure of information relating to the services hereunder to any person not entitled to receive it, or failure to safeguard any classified information that may come to the Contractor or any person under his control in connection with work under this contract, may subject the Contractor, his agents or employees, to criminal liability under 18 U.S.C., Sections 793 and 798. All inquiries, comments, or complaints arising from any matter observed, experienced, or learned as a result of or in connection with the performance of this contract, the resolution of which may require the dissemination of official information, will be directed to the activity Commanding Officer. Deviations from, or violations of, any of the provisions of this paragraph will, in addition to all other criminal and civil remedies provided by law, subject the Contractor to immediate termination for default and/or the individuals involved to a withdrawal of the Government's acceptance and approval of employment. |
| 2.8.1 | Employee Listing | The Contractor shall maintain and provide monthly a current listing of employees in accordance with Section F. This will include full name, aliases, home address, and telephone number. The Contractor shall provide to the SPAR/PAR/ISO the name or names of the responsible supervisory person or persons authorized to act for the Contractor monthly. |
| 2.8.2 | Vehicles | Contractor-furnished vehicles shall meet the following criteria:<br>The company logo and or initials shall be displayed on each of the Contractor's vehicles in a manner and size that is clearly visible. All vehicles shall display a valid state license plate that complies with Washington State Vehicle Code. Vehicles shall meet all other requirements of the Washington State Vehicle Code, such as safety standards, and shall carry proof of insurance and state registration. All security vehicles shall be marked with "Security". Also see 0401060 Spec Item 2.4. |
| 2.8.3 | Passes and Badges | All Contractor employees shall obtain the required employee and vehicle passes. Employee badges may be obtained either by visiting the Pass and ID Office daily to obtain a pass or utilizing the Navy Commercial Access Control System. The Contractor is responsible for filling out all forms and providing all information necessary to request passes and/or badges. Government personnel will not escort Contractor or subcontractor personnel onto or within installations.<br><br>Heightened security requirements may from time to time cause unexpected delays. The Contractor is responsible for requesting badges in a timely manner. Each employee shall wear the Government issued badge over the front of the outer clothing. When working on site, if wearing the badge would be a safety hazard, the individual may remove the |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 278 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | badge but must retain it in his/her possession to show if challenged. When an employee leaves the Contractor's or subcontractor's service, the employee's pass and/or badge shall be returned to the issuing office within three calendar days. Upon completion of the work, the Contractor shall return to the KO/SPAR/PAR/ISO all identification items issued to him during the course of the contract. |
| 2.8.3.1 | Navy Commercial Access Control System | Navy Commercial Access Control System is an operational application of Navy security and law enforcement policy. It operates on the principle of driver, rather than cargo, verification with each access request. The system is designed to manage recurring vendors, contractors, subcontractors, suppliers, and other service providers coming aboard an installation who are not authorized a Common Access Card (CAC) Card. (Contractor personnel will not be issued a CAC until need arises for an electronic card to gain access to controlled areas or logical access to a DOD Network). Any contractor or vendor needing access to the base on a regular basis may utilize the Navy Commercial Access Control System. Additional information regarding NCACS may be obtained from the Pass and ID Office. |
| 2.8.3.2 | NCACS Program | NCACS is a voluntary program in which Contractor personnel who enroll, and are approved, are subsequently granted access to the installation for a period up to one year, or the length of the contract, whichever is less, and are not required to obtain a new pass from the Base Pass and Identification Office for each visit.<br>The Government performs background screening and credentialing. Throughout the year the Contractor employee must continue to meet background screening standards. Periodic background screenings are conducted to verify continued NCACS participation and installation access privileges. Under the NCACS program, no commercial vehicle inspection is required, other than for Random Anti-Terrorism Measures (RAM) or in the case of an elevation of Force Protection Conditions (FPCON). |
| 2.8.3.3 | One Day Passes | Participation in the NCACS is not mandatory, and if the Contractor chooses to not participate, the Contractor's personnel will have to obtain daily passes, be subject to daily mandatory vehicle inspection, and will have limited access to the installation. The Government will not be responsible for any cost or lost time associated with obtaining daily passes or added vehicle inspections incurred by non-participants in the NCACS |
| 2.8.4 | Access to Buildings | The Contractor shall monitor and control access into restricted areas under their responsibility, allowing only those individuals who have been properly cleared into restricted areas or other controlled access areas. The Contractor shall comply with security requirements, plus those imposed by the installation Commander at all times. Personnel with access to special areas will have the appropriate screening and/or security clearance, and personnel requiring routine access to restricted areas will wear special badges authorizing access for those areas. Contractor personnel shall not enter restricted or controlled areas or installation facilities unless specifically authorized in performance of their duties. The Contractor shall secure all buildings and facilities entered during non-duty hours and will secure all building and facilities under the Contractor's cognizance at the end of each work day or shift period. |
| 2.8.5 | Access Arrangements | The Contractor shall make all arrangements necessary to obtain access to buildings, facilities and other work areas, and when necessary, arrange for them to be opened and closed by the controlling authority. |
| 2.8.6 | Security Clearances | Portions of the work under the contract are performed in secure areas and all persons requiring access to a secure area shall possess the minimum security clearance required for access to that area. or, in most cases, will be escorted by activity or Government personnel. In the case of escort, 48 hours advance notice to the activity will be required except in emergency or urgent work. Contractor employees must be free of felony convictions, and prior |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 279 of 658

APP 275

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | military service members must have had an honorable discharge. The Contractor shall ensure that personnel who handle classified material are properly cleared and submit a list of personnel with security clearances in accordance with Section F. DD Form 254; Contract Security Classification Specification prescribes security access requirements for services performed under this contract. The Contractor shall ensure that a list of all personnel with Security Clearances/FADs is maintained current, including clearances/FADs that are pending. Contractor management personnel and security personnel shall have and maintain a SECRET clearance. Employees that do not require a security clearance will be subject to a satisfactory Facility Access Determination (FAD) as a condition of employment. The Contractor shall submit all documentation necessary to process the employee's background investigation or FAD to Office of Personnel Management (OPM) prior to commencement of work by the employee. All contractor employees must be U.S. Citizens. |
| 2.9 | Contractor Safety Program | The Contractor shall develop and maintain a safety program in compliance with Public Law 91-596 Occupational Safety and Health Act, 29 CFR Parts 1910 and 1926. Contractor personnel shall work in a safe manner and comply with all applicable safety regulations. The Contractor shall submit their Safety Plan for performance of work under this contract to the KO within 30 days of contract award in accordance with Section F. The Contractor shall be subject to safety inspections of its work sites by the Government. Contractor safety records shall be available upon request by the KO. |
| 2.9.1 | Accident Reporting | The Contractor shall report to the KO and the SPAR or PAR, in the manner and on the forms prescribed by the Government, exposure data and all accidents that occur on or related to Government property. All accidents must be verbally reported to the KO and the SPAR or PAR within 24 hours of their occurrence. For vehicular accidents, complete form SF-91 in accordance with all applicable requirements. The Contractor shall comply with OSHA for record keeping and reporting of all accidents resulting in death, injury, occupational disease, or adverse environmental impact. Whenever an accident involving personal injury occurs, the Contractor shall provide to the KO and the SPAR or PAR an oral report within four hours and a completed typed report within five calendar days of each occurrence. |
| 2.9.2 | Damage Reporting | The Contractor shall submit to the KO and the SPAR or PAR in the manner and on the forms prescribed by the Government all damage to Government property by Contractor employees. Complete DD-200 form Financial Liability Investigation of Property Loss, in accordance with all applicable requirements within five days of each occurrence. |
| 2.9.3 | Fire Protection | The Government will provide 24-hour fire protection services. Current emergency telephone numbers will be provided to the Contractor prior to contract start. The Contractor shall ensure that his employees know how, and when, to turn in a fire alarm. The Contractor shall know where fire alarms are located and how to activate them. Contractor employees operating critical equipment shall be trained to properly respond during a fire alarm or fire in accordance with all applicable instructions The Contractor shall handle and store all combustible supplies, materials, waste and trash in a manner that prevents fire or hazards to persons, facilities, and materials. Notify the Puget Sound Federal Fire Department and follow prescribed preventative requirements before conducting outdoor operations that may be potentially spark emitting during fire season. |
| 2.9.3.1 | Alcohol and Drug Abuse Prevention Plan | The contractor shall develop a plan to explain how it will satisfy the drug-free work force requirement as stated in DFARS Subpart 252.223-7004. |
| 2.9.3.2 | Emergency Response Plan | A written plan delivered by the Contractor to explain how it will ensure safe evacuation of people during emergencies, before the hazard or natural disaster is imminent, and to minimize the consequences of accidents during evacuation. See Section 01E of Army Corps of Engineers Safety & Health Requirements Manual (EM 385-1-1). |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 280 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.10 | Environmental Protection | The Contractor shall comply with all applicable federal, state, and local laws and regulations as well as site-specific environmental instructions. Representatives of the Base Environmental Office may inspect facilities operated by the Contractor at any time without notice during Government regular working hours. In the event that a regulatory agency assesses a monetary fine against the Government for violations caused by Contractor negligence, the Contractor shall reimburse the Government for the amount of the fine and other related costs. The Contractor shall comply with the instructions of the cognizant Navy Medical Department with respect to avoidance of conditions which create a nuisance or which may be hazardous to the health of military or civilian personnel at their own expense. |
| 2.10.1 | Disposal | |
| 2.10.2 | Non Hazardous Waste | The Contractor shall dispose of debris and rubbish resulting from work under this contract. |
| 2.10.3 | Hazardous Waste | The Government is the generator for all Regulated Waste produced by the Contractor on its property during the execution of the contract. Although the government has responsibility for the RW, the Contractor shall reimburse the Government for regulated waste disposal costs associated with a) un-used regulated material ordered by the Contractor and turned in for disposal; b) spent cleaning supplies, such as contaminated rags, cleaning absorbents, solvents from cleaning machines, and degreasers; and, c) Regulated Waste from Contractor spills and the spent materials and supplies used to clean the spill. |
| 2.10.4 | Wastewater and Storm water Permit Compliance | The Contractor shall comply with applicable wastewater and storm water permit requirements including industrial wastewater discharge permits, wastewater National Pollutant Discharge Elimination System (NPDES) permits (such as State Waste Discharge Permits), and storm water NPDES permits. Storm water permit compliance includes following the best management practices and other provisions of base Storm water Pollution Prevention Plans. |
| 2.10.5 | Wastewater | The Contractor shall ensure that waste identification documentation has been provided to the Base Environmental Office (BEO) for each unique type of wastewater. Do not allow anything to drain into any storm or sanitary sewer system without the express permission of the BEO. |
| 2.10.6 | Spill Prevention, Containment, and Clean-up | The Contractor shall store and handle hazardous materials and petroleum products in compliance with applicable fire, safety, and environmental standards and regulations. Procedures used for the storage and handling of Hazardous Materials and petroleum shall be those that minimize the risks of spills and leaks. At most locations, storage and handling of petroleum in containers of 55 gallons or more capacity must be conducted in accordance with the base Oil Spill Prevention, Control, and Countermeasure (SPCC) Plan. Personnel involved in the storage and handling of petroleum products shall receive such training as is required by the base SPCC plan. The Contractor shall contain, clean up, and report all spills and/or releases resulting from its operations on Government property, or during transport, in a manner that complies with applicable federal, state, and local laws and regulations. |
| 2.10.7 | Hazardous Material (HM) Use | The Contractor shall manage hazardous materials pursuant to FAR Clause 52.223-3, Hazardous Material Identification and Material Safety Data. The Contractor shall manage Hazardous Materials consistent with the Consolidated Hazardous Material Reutilization and Inventory Management Program (CHRIMP) and COMNAVREGNWINST 5090.6. At the end of each CY (no later than 30 Jan), the Contractor shall report quantities of all HM stored and used within the boundaries of each base in accordance with Section F. The report shall include all data required to meet EPCRA reporting requirements including list by chemical name, CAS Number, formula percentage of HM included in the EPCRA Consolidated List of Chemicals. Additionally, the Contractor shall produce for the Environmental COR within 3-days of request, a listing of all HM stored and used by the Contractor within the boundaries of the base. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 281 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | The Government operates Hazardous Minimization (HAZMIN) Centers at each installation; these HAZMIN Centers are designed to provide HM container tracking and data management of HM inventories confined to the installation. The Contractor can partially meet the requirements of this item by participating as a customer of the HAZMIN Centers at each installation. The Contractor is authorized to utilize the services of the HAZMIN Center for HM container and inventory tracking at no cost to the Contractor. |
| 2.10.8 | Protection of Archaeological, Historical, and Natural Resources | The Contractor shall not disturb fish and wildlife. The Contractor shall carefully protect in-place and report immediately to the Contracting Officer endangered and threatened species discovered in the course of work. Avoid all closure areas (e.g., fish migration period windows and avian nesting areas), and sensitive habitats. Do not alter water flows or otherwise significantly disturb the native habitat critical to the survival of fish and wildlife, except as indicated or specified. Report to the Contracting Officer any injured, sick, and/or dead fish or wildlife species found on the site. For any migratory birds or nests found in the course of work, prepare and submit a report in accordance with Section F.<br><br>Carefully protect in-place and report immediately to the Contracting Officer historical and archaeological items (such as fire cracked rock, midden material, and artifacts) or bones discovered in the course of work. The Government retains ownership and control over historical and archaeological resources. |
| 2.10.9 | Noise Control | The Contractor shall comply with all applicable federal, state and local laws, ordinances, and regulations relative to noise control. Make the maximum use of low-noise emission products, as certified by the EPA. Blasting or use of explosives will not be permitted without written permission from the Contracting Officer, and then only during the designated times. Full compliance with WAC-173-60 is required. |
| 2.10.10 | Salvage | All material and equipment removed or disconnected that is sound and of value shall remain the property of Government. The Contractor shall deliver this material and equipment at the Contractors expense to the SPAR. |
| 2.10.11 | Clean Air | The Contractor shall comply with all applicable federal, state and local laws and regulations, and permits, including those of the Northwest Air Pollution Authority, the Olympic Region Clean Air Agency, and the Puget Sound Clean Air Agency. |
| 2.11 | Disaster Preparedness | The Contractor shall comply with individual base Contingency Plans and Base Mobilization Plans. The Government has contingency plans for mobilization and disaster preparedness operations that may impact upon the Contractor's operations. Various functions performed by the Contractor require additional attention in the Base Mobilization Plan and the Disaster Preparedness Plan NAVMAGIIINST 3440.17. The Contractor shall become familiar with these plans and his requirements addressed therein. All Contractor personnel who review the Base Mobilization Plan shall possess necessary security clearances. When required by contingency operations, the KO may, under Section I clause "FAR 52.243.1 CHANGES - FIXED PRICE (AUG 1987), ALTERNATE II (APR 1984)," unilaterally direct the Contractor to provide services that increase the workload. In the event that unusual conditions, as specified below, develop, the Contractor shall continue, and expand performance if necessary. In the event that a national emergency or natural disaster occurs and results in an increase of work directed by the KO, and an increase in cost of performance, such increase shall be subject to the General Provisions in Section I. Examples of such events include, but are not limited to, the following: a sudden build-up of military forces that increases contract requirements; a natural disaster that impacts upon the Contractor's ability to perform; a strike by Contractor personnel, work stoppage or disruption that impacts upon the Contractor's ability to perform; or special circumstances identified by the KO. In |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 282 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| | | all cases, the Contractor shall assume that the Navy cannot provide any supplemental forces and continues to need the same or additional performance under contract, which the Contractor shall be required to meet.<br><br>The Contractor shall submit an initial mobilization and Contingency Plan for KO approval in accordance with Section F. A comprehensive plan shall be finalized prior to contract start, and updated as necessary thereafter. The plan must be approved, by the KO, prior to the start of work. The Contractor shall notify the KO of any change in the plan. |
| 2.12 | Energy Management | The Contractor shall comply with the activity's energy conservation program. Energy efficient operation and maintenance of real property will ultimately determine the success of the energy conservation program. Its essential to the Station and incumbent upon the Contractor to execute all work, regardless of complexity, with adequate consideration given to energy conservation measures. |
| 2.15.3 | FFP Exhibit Line Item Numbers (ELINs) | FFP ELINs are provided in Section J-0200000-05 Exhibits. |
| 2.16 | IDIQ Work | IDIQ work may be ordered by either issuing task orders or utilizing DoD EMALL. The order will specify the exact locations and type of work to be accomplished. The period of performance will be specified in each order. |
| 2.16.1 | Unit Priced Task Work (Non-Negotiated) | A Unit Priced Task (UPT) is defined as an IDIQ work item that includes all direct and indirect costs plus profit associated with the particular unit of work. All materials and equipment (rented or owned) required for the accomplishment of a UPT shall be included within the respective exhibit line item prices. The price for the task order is determined by multiplying the exhibit line item unit prices by the quantities ordered. The Contractor is not required to submit cost estimates for UPTs. |
| 2.16.1.1 | Acceptance and Performance | The Contractor shall possess the capability to accept and perform IDIQ work via an electronic medium with Clients utilizing their Government Purchase Card (GPC). |
| 2.16.1.2 | Invoicing and Receiving Payment | The Contractor shall submit one IDIQ invoice for each completed task order for IDIQ work completed during the preceding month. No partial or advance payments are provided. The Contractor shall accept orders placed by authorized GPC users. The GPC is a purchasing instrument issued through a commercial bank to a Government Agency to facilitate micro purchases. The Contractor processes micro purchases under the GPC program exactly as they would process a charge by an individual using a personal credit card. The Contractor shall offer Indefinite Quantity (IQ) line item services to authorized Government personnel when they are ordering the work directly via the Government Purchase Card Program. The Contractor is required to offer the pre-priced IQ line item services at the same prices identified in the Schedule of Prices in Section B. When receiving GPC orders against Section B, the Contractor shall provide the supplies and services at the offered price without additional markup or handling fee. The Contractor is responsible for tracking quantities and reporting totals used each month and year to date to the KO by the fifth day of each month. The Contractor shall offer Indefinite Quantity (IQ) line item services to authorized Government personnel. See Section G for Additional details. |
| 2.16.2.2 | Issuance of Task Order | The KO will order unit priced labor by issuing to the Contractor a task order with the final statement of work, in accordance with Section G. Task order completion date will be specified on each task order. The Government will accept completed and inspected indefinite quantity work only after all noted discrepancies have been corrected. Upon acceptance of work by the Government, the Contractor shall invoice the Government for payment in accordance with the "INVOICING INSTRUCTIONS" clause in Section G. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 283 of 658

| 0200000 - Management and Administration | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.16.3 | IDIQ ELINS | See J-0200000-05 for exhibits. |
| 2.17 | Phase-In | The services provided by this contract are vital to the Government's overall effort, and continuity must be maintained at a consistently high level without interruption. The Contractor is expected to meet full performance requirements from the start date of the contract. The phase-in period shall be approximately 30 calendar days prior to the start date of the base contract period. Office space will not be provided by the Government during the phase-in period. The Contractor may receive requests for proposal during the 30 days prior to the contract start date. Proposal preparation is subject to the "IDIQ Preparation of Proposals" requirement and negotiations may take place during the Phase-in period. The Contractor's phase-in plan shall be submitted within 10 days of contract award and shall include the following:<br>(1) A schedule for transferring (accepting) responsibilities for each division of work described in the contract.<br>(2) A training program, including a plan of action to ensure all personnel requirements (certifications, permits, medical requirements, etc.) are met.<br>(3) Provisions for inventories of all GFP, which shall be conducted prior to contract, start date.<br>(4) Plan of action for transfer of personnel resources from preceding contractor, or a schedule of employment of new personnel, including all necessary security checks, badging, clearances, etc.<br>(5) Provisions for proposal preparation, negotiation of IQ requirements prior to the Base Year |

| 0401060 - Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 1.1 | General Information | The Contractor shall provide labor, management, supervision, tools, material, and equipment, except that designated as Government-furnished, required to perform security services at Naval Magazine Indian Island. |
| 1.2 | Concept of Operations | This annex identifies the services required to provide a wide variety of security related services. Although the majority of the services defined in this annex are specified as watch standing requirements, the Contractor is responsible for ensuring that the integrity of the bases is not compromised at any time and that every effort is made to protect the base and the individuals working within the base confines. Authority to perform these security services is delegated by the Commanding Officer to the Contractor to exercise actions necessary to detect, deter, contain and mitigate security related situations. The majority of the functions defined in this annex are specified as armed security guard operational requirements. Such actions include access control, surveillance, screening, detaining and conducting preliminary investigations of real or potential violations of base orders and/or applicable regulations. The Contractor has no law enforcement responsibilities. The Contractor's personnel represent the Government and, as such, shall present a professional image at all times. Additional security forces that exist and interface with the Contractor on a regular basis provide law enforcement; Master at Arms, Explosive Ordnance Disposal, explosive handling, disarmament, disposal, etc.; Military Working Dogs (MWDs), assistance in drug investigations. |
| 1.3 | Limitations | Under the terms and conditions of this contract, the Contractor's authority to make arrests is limited to that of private citizens as defined by laws of the State of Washington. The use of deadly force, that which a person knows or should know would create a substantial risk of causing death or serious bodily harm, is justified only under conditions of extreme necessity and then only as a last resort when all lesser means have failed or cannot be reasonably used, as set forth in DOD Directive 5210.56 series, SECNAVINST 5500.29 series and OPNAVINST 5530.14 series. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 284 of 658

| 0401060 – Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 2 | Management and Administration | The Contractor shall manage the total work effort associated with the Security Services required herein to assure fully adequate and timely completion of these services. Included in this function will be a full range of management duties including, but not limited to, planning, scheduling, training, report preparation, establishing and maintaining records, and quality control. |
| 2.1 | Definitions and Acronyms | |
| 2.1.1 | Adjudication | A judicial decision rendered by a legal authority. |
| 2.1.2 | Area of Responsibility (AOR) | A defined area in which responsibility is specifically assigned to the commander of the area for the development and maintenance of installations, control of movement, and the conduct of tactical operations involving troops under the commander's control, along with parallel authority to exercise these functions. |
| 2.1.3 | Authority | The right and power to compel or demand obedience. |
| 2.1.4 | Bollard System | A hydraulic, electric, pneumatic or manually operated pop-up vehicle barrier system designed to prevent vehicle traffic from proceeding. |
| 2.1.5 | Security Officer | A military member or civilian government employee given oversight responsibilities for installation security and security forces by the Commanding Officer of the installation. |
| 2.1.5.1 | Civilian Law Enforcement Agencies | The following organizations are defined as local law enforcement agencies:<br>Washington State Patrol<br>Jefferson County Sheriff's Department |
| 2.1.6 | Controlled Access Areas | Any Federal enclaves under the jurisdiction of the Navy that require specific criteria to be met prior to accessing. Controlled access areas and criteria are defined in Post Orders – Attachment J-0401060-01. |
| 2.1.6.1 | Coxswain | Individual assigned the duties required to operate, navigate and support boat operations. |
| 2.1.7 | Deadly Force | The force, which a person uses with the purpose of causing, or which the person knows, or should know, would create substantial risk of causing death or serious bodily harm. This definition applies equally to personnel armed with firearms, nightsticks, or batons and any other law enforcement equipment which when applied, could cause death or serious bodily harm. This definition also extends to any defensive or offensive conduct including hand-to-hand combat. |
| 2.1.8 | Registered Vehicle Decal | A Department of Defense (DoD) sticker with a six-digit alpha-numeric serial number issued to a specific privately owned or commercial vehicle by a DoD installation in the vehicle registration process. The decal is the primary method of identifying vehicles authorized access to an installation. |
| 2.1.9 | Drug | Any controlled substance, or immediate precursor, included in schedule I, II, III, IV, or V as defined in Title 21 United States Code Section 812. The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986. |
| 2.1.10 | Emergency | An event that results in the need for immediate action to avert the threat of property damage, injury, or death. Emergencies include natural disasters and manmade incidents, e.g., earthquakes, floods, armed or physical attacks, explosions, or civil disturbances. |
| 2.1.11 | Entry Control Point (ECP) | A designated point of ingress and egress to a facility at which authorization of personnel, property, equipment, vessels, and vehicles for access is validated by a guard. |
| 2.1.12 | Facility | An installation, building, compound, pier, wharf, transit line, runway, airfield, or waterway zone. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 285 of 658

| 0401060 – Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.1.13 | Force Protection Condition (FPCON) | A method of identifying specific security requirements mandated to be implemented during times of increased terrorist threat. FPCONs are identified from lowest to highest threat level as "Alpha", "Bravo", "Charlie" and "Delta". |
| 2.1.14 | Foreign National (FN) | Any person not a United States Citizen. |
| 2.1.15 | Guard | A member of the security force responsible for enforcement of the security plan as defined in Post Orders. Also referred to as a security guard, sentry, patrol, guard force personnel (collectively). Guards include civilian personnel of the GS-0085 series, military personnel assigned to the security force, and Contractor personnel in Guard I and Guard II positions as defined in the Service Contract Act. |
| 2.1.16 | Guard Mount | A muster that includes a brief, equipment issue, and inspection of guards assuming duty at the beginning of a shift. |
| 2.1.17 | ID | Identification |
| 2.1.18 | Improvised Explosive Device (IED) | A homemade bomb or traditional ordnance that is modified, e.g., a vehicle bomb constructed using traditional ordnance attached to or concealed in a vehicle. |
| 2.1.19 | Inspection | An examination by an authorized party of a person, place, or thing for the purpose of ensuring compliance with existing laws, rules, regulations, instructions, and policy. |
| 2.1.20 | Lock-down | The process in which an Entry Control Point is secured and egress and ingress traffic is denied. |
| 2.1.21 | Post Orders | Special and general orders of a specific post that define the guard's duties and responsibilities. |
| 2.1.21.1 | Post | A station or task to which guards are assigned. |
| 2.1.22 | Restricted Area | Areas designated in writing that require special access control measures, e.g., piers, wharfs, transit lines, and runways. |
| 2.1.23 | Search | An examination of a person, place, or thing by authorized law enforcement personnel for the purpose of identifying and taking into custody items of evidence, contraband, and illegal or unauthorized property. |
| 2.1.24 | Standard Operating Procedures (SOP) | The Contractor shall develop and submit Standard Operating Procedures, per Section F, for each post/patrol and function. SOP's shall meet requirements of Security Force Orders in OPNAVINST 5530.14 series, with one SOP for each position. SOP's shall detail each post, patrol, and function in a brief, concise, specific, and current format, written in clear and simple language. The SOPs are intended to clarify the individual patrol requirements and are not intended to restrict or limit the Contractor's ability to ensure that security integrity is maintained. Approved SOPs shall be readily available to guards at each post. Administrative documents defining policy and routine practices pertaining to security operations. SOP's are provided in J-0401060-02. |
| 2.1.25 | Surveillance | The act of gathering information required to formulate, plan, stage, and execute an attack against a military installation or asset. |
| 2.2 | Authority | The Contractor's right and power to compel or demand obedience when enforcing rules, and regulations is delegated by the installation Commanding Officer via post orders and SOP. The Contractor has no arrest or law enforcement authority. The Contractor's authority is limited to detainment of personnel suspected of violating laws, rules, or regulations. While on duty, Contractor personnel invoking the right to make a citizen's arrest as defined by laws of the State of Washington is out of the scope of this contract. |
| 2.3 | Communication Equipment | The contractor shall use Government-furnished communications equipment operating on specified frequencies for performance of security operations. An inventory of GFE is provided in J-0200000-04.<br><br>In accordance with Commander, Navy Installations (CNI) guidance, radios will be furnished and maintained by the Government for all CNI installations. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 286 of 658

| 0401060 – Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.4 | Security Vehicles | The Contractor shall provide security vehicles for the performance of security operations. Vehicles shall be capable of operation on all terrain in assigned patrol areas. Contractor security vehicles shall be marked and equipped in accordance with state and local requirements. The Contractor shall outfit security vehicles with Government-furnished communications equipment. Absent of specific state or local guidance, Contractor-furnished vehicles shall meet the following criteria: The company logo and or initials shall be displayed on each of the Contractor's vehicles in a manner and size that is clearly visible at 25 feet. All vehicles shall display a valid state license plate that complies with State Vehicle Code. Vehicles shall meet all other requirement of the State Vehicle Code, such as safety standards, and shall carry proof of insurance and state registration. All security vehicles shall be identifiable as a security vehicle, clearly marked on both sides in block letters marked with "Security" at least four inches in height. Security vehicles may be equipped with interior or exterior safety lighting, color must be yellow or red or a combination of both. BLUE lights are for Law Enforcement ONLY! And will not be used in contractor security patrol vehicles.<br><br>The operation of security vehicles shall conform to installation, state, and local traffic laws. |
| 2.5 | Government Security Force and Law Enforcement Agency Interface | The Contractor shall interface with other Government Security Force personnel, consisting of military, civilian, or a combination thereof, and may be required to interface with Federal, state, and local law enforcement agencies. Other Government Security Force personnel perform a broad range of services, including law enforcement, Explosive Ordnance Disposal, and handling of Military Working Dogs (MWDs). |
| 2.6 | Jurisdiction | The Commanding Officer of an installation had defined Federal jurisdiction limitations. These limits refer to geographic areas in which law enforcement, investigative agency, court, or security force may exercise its authority. Jurisdiction limits and corresponding law enforcement agencies are identified for each geographic area shown in J-0401060-03. There are four types of jurisdiction as follows: |
| 2.6.1 | Exclusive Jurisdiction | Exists when the Government possesses, by whatever method acquired, all of the authority of the State and in which the State concerned has not reserved to itself the right to exercise any of the authority concurrently with the Government, except the right to service civil or criminal processes in the area. State Laws are enforced on the base only under the Assimilative Crimes Act 18USC13. |
| 2.6.2 | Concurrent Jurisdiction | Exists when, in granting to the Government authority, which would otherwise amount to exclusive jurisdiction over an area, the State reserves to itself the right to exercise, concurrently with the United States, all of the same authority. |
| 2.6.3 | Partial Jurisdiction | Exist when the Government has been granted authority over an area in the State, but where the State has reserved to itself the right to exercise by itself or concurrently with the Government other authority consulting more that merely the right to serve civil or criminal processes in the area; for example, the right to tax private property. |
| 2.6.4 | Proprietorial Interest Area | Exists when the United States has acquired an interest in, or title to, property but has no legislative jurisdiction over the property. Congress has not authorized federal prosecution for most ordinary crimes committed on such property. |
| 2.7 | Use of Deadly Force | The use of deadly force is justified only under conditions of extreme necessity and then only as a last resort when all lesser means have failed or cannot be reasonably used, as set forth in DoD Directive 5210.56 and SECNAVINST 5500.29. |
| 2.8 | Disclosure | The Contractor shall not disclose or cause to be disseminated any information concerning the operations of the installation which could result in or increase the likelihood of the possibility of a breach of the installation's security or interrupt the continuity of its operations. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 287 of 658

| 0401060 – Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.9 | Inspections and Searches | The Contractors authority to physically examine vehicles and other property is limited to conducting inspections. Appropriate law enforcement personnel shall be contacted when the need for a search arises as a result of the discovery of contraband during an inspection. The Contractor is prohibited from conducting a search. |
| 2.10 | General Orders of a Sentry | The Contractor's guard personnel shall comply with the following General Orders.<br>1. Take charge of this post and all government property in view.<br>2. Walk my post in a military manner, keeping always on the alert and observing everything that takes place within sight or hearing.<br>3. Report all violations of orders I am instructed to enforce.<br>4. Repeat all calls more distant from the guardhouse than my own.<br>5. Quit my post only when properly relieved.<br>6. Receive, obey, and pass on to the sentry that relieves me, all orders received from those authorized by this contract.<br>7. Talk to no one except in the line of duty.<br>8. Give the alarm in case of fire or disorder.<br>9. Notify the Shift Supervisor in any case not covered by instructions.<br>10. Be especially watchful at night and during the time for challenging, to challenge all persons on or near my post, and to allow no one to pass without proper authority. |
| 2.11 | Standards of Conduct | The Contractor shall maintain satisfactory standards of employee competency, conduct, appearance, and integrity, and for taking such disciplinary action as needed. The Contractor shall adhere to standards of conduct included in J-0401060-04. Contractor employees shall display a friendly, helpful attitude when dealing with the public. The KO or his/her representative reserves the right to direct the Contractor to remove an employee from the work site for failure to comply with the standards of conduct. The Contractor shall initiate immediate action to replace such an employee to maintain continuity of services at no additional cost to the Government. |
| 2.12 | Personnel Requirements | The Contractor shall provide personnel with the qualifications, proper security clearances, technical knowledge, experience and skills required for efficient provision of security services.<br>Additionally, Contractor shall provide personnel who are physically fit per the fitness standards established in the Physical Fitness Program. |
| 2.12.1 | Employment Suitability and Qualifications | All Contractor personnel assigned guard duties shall meet the suitability criteria included in J-0401060-05 Employees not assigned to guard duties are not required to meet the same criteria, but as a minimum shall satisfy the security requirements specified in Annex 2. |
| 2.12.2 | Psychological Testing Requirements | The Contractor shall provide psychological pre-employment testing to identify psychological conditions or patterns of behavior that are critical in determining occupational suitability. Psychological testing shall comply with the requirements listed in J-0401060-06 and be available to SPAR/PAR upon request. |
| 2.12.3 | Pre-Employment Medical Examination | All Contractor personnel assigned guard duties shall successfully complete a pre-employment physical examination performed by a licensed health care professional. The examination shall evaluate the applicant's ability to successfully perform moderate to arduous physical exertion. The following medical requirements apply to all applicants: good near and distant vision, ability to distinguish basic colors, and ability to hear the conversational voice. The Contractor shall provide supporting documentation of completed physical exams to the KO/SPAR/PAR upon request. |

| 0401060 – Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.12.4 | Physical Fitness Program | The Contractor shall develop and maintain a physical fitness program for all guards in accordance with Section J. At a minimum, the physical fitness program shall include a requirement to semi-annually test an employee's upper body strength, endurance and flexibility as described in J-0401060-07. Contractor physical fitness test records shall be available upon request by the KO/SPAR/PAR. |
| 2.12.5 | Uniforms | Guards shall wear a complete uniform while on duty so that a favorable public image is presented. Uniforms will be separate and distinctive from military and DON law enforcement entities. Security Guard contract uniforms to include jacket/coat and rain coat will conform to traditional private security guard community uniform, EXCEPT, the uniform color WILL NOT BE Black, LAPD Blue, Navy Blue, Dark Blue normally and/or traditionally that of a DoD Law Enforcement Officer, see CNICINST 5530.14 (Series) Chapter 6, Section 0614. Uniform Patches will be of similar design and size traditional private security guard community, with company name and logo. Two may be worn one on each sleeve of the outer garment, if one is worn, it must be on the left sleeve, only patch approved to be worn on the opposite sleeve is the American flag, or nothing else. Uniform Shield/Badge can be cloth or metal, must be similar to traditional private security guard community, may have traditional center logo or company emblem. With wording such as Security Guard, Sergeant, or Lieutenant. |
| 2.12.6 | Grooming Standards | Guards shall have a neatly groomed appearance while on duty. Grooming standards are based on several elements including neatness, cleanliness, safety, professional image, and appearance. Grooming requirements are described in J-0401060-09. |
| 2.12.7 | Security Clearance Requirements | See specification 0200000, 2.8.6 |
| 2.12.8 | Random Drug Screening Program | The Contractor shall establish a Random Drug Screening Program per Executive Order 12564 for all guard personnel and other sensitive positions identified per Civilian Personnel Instruction 792. Drug Screening shall comply with FAR 52.223-6, 21 CFR 1308.11-1308.15, OPNAVINST 5350.4C (series) and COMNAVREGNWINST 5355.2 series. |
| 2.12.9 | Training Requirements | The Contractor shall provide training to all personnel assigned guard duties in accordance with OPNAVINST 5530.14 series and site-specific requirements as listed in J-0401060-10. The Contractor shall develop and implement a training plan. The training plan shall be submitted within 10 working days after contract award to the KO/SPAR/ISO for review, see Section F for format. The Contractor may be required to revise and update the training plan during the contract period to accommodate changes in operational requirements. A Training Log shall be maintained for all personnel assigned guard duties that includes required courses and completion dates for both initial and recurring training. Included in this training log shall be a Firearms Qualification Certification as required in Section F. ISO will periodically review training records and report findings to SPAR. Guard Mount Training is in addition to Annual apprenticeship and sustainment training. Guard mount training is short and conducted during Guard Mount on a daily bases and can be located in CNICINST 5530.14 (Series) Appendix F. Guards will sign a Guard Mount training roster; rosters will be kept for at least 2 year and may be destroyed after the most current ESI inspection. |
| 2.13 | Firearms Licensing and Permits | The Contractor shall ensure each guard required to carry a firearm complies with all current state and local firearms licensing, and permit requirements. All guards shall meet the firearms licensing and permit requirements established by the state of Washington to include RCW 18.170. Appropriate state documentation shall be carried by each armed guard while performing on state land on duty. Copies shall be made available to the KO/SPAR/PAR upon request. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 289 of 658

| 0401060 – Security Operations | | |
|---|---|---|
| Spec Item | Title | Description |
| 2.14 | Safety Requirements | The Contractor shall comply with accepted industry safety standards, and applicable safety precautions and guidelines listed in J-0401060-11. Traffic Reflective Vests will be worn at all Entry Control Points/Pier gate at all times during sunset to sunrise, while engaged in traffic control and/or sentry duties. Traffic Vests will also be worn by patrols after hours when in the lanes of traffic/street. Traffic Vest will be bright ORANGE/LIME GREEN or a combination of both colors, with reflective properties that meet basic safety regulations such as ANSI 207-2006/Class II. Vest panels may be BLANK or the word SECURITYor GUARD. For uniformity all Vests issued will be the same type and color, |
| 2.15 | Weapons | The Contractor shall be accountable for the serviceability of Government Furnished weapons to include preventive maintenance, pre-fire and post-fire checks, and cleaning. The Contractor shall maintain accurate documentation of maintenance performed. Maintenance records shall be provided to the KO/SPAR/PAR/ISO upon request. All Government Owned Firearms issued to a contractor will be cleaned, lubricated, and perform safety checks on each weapon after being fired at the range. When issued, the firearm will be wiped down daily before storage to eliminate moisture to prevent rust. Any and all discrepancies will be reported to the security department armorer for repairs or replacement.<br><br>The Contractor shall maintain an accurate inventory list of all security operations equipment. Inventory lists shall be provided to the KO/SPAR/PAR/ISO upon request. |
| 2.16 | Records and Reports | Records and reports are listed in Section F. The Contractor shall submit accurate and complete documents within the required timeframes. |
| 2.17 | Management | The Contractor shall provide a Contract Security Manager (CSM) during core hours and a Shift Supervisor at all other times<br><br>The CSM shall have at least ten years experience in military police, security or law enforcement, and a minimum of three years of supervisory experience. The QCM may be the same person that fills the role of the Contract Security Manager listed in 0200000, 2.7.1.1. The contractor shall submit a resume for the Security Manager within five (5) working days after contract award per Section F.<br><br>The Shift Supervisor shall have at least five years experience in military police, security, or law enforcement, and a minimum of two years of supervisory experience. Will act as the contractor's management representative, to the government, during the non-regular government work hours. The Shift Supervisor may be the same person that fills the role of one of the motorized patrol guards listed in 0401060, 3.2.1 and listed in Attachment J-0401060-14. Contractor shall submit a resume for all Shift Supervisor's five (5) working days prior to the guard filling this position per Section F. |
| 2.18 | Standard Operating Procedures (SOP's) | See Attachment J-0401060-02 |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 290 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| 3 | FFP Work | The Contractor shall provide security operations to ensure security for personnel, property, facilities, and assets. | The Contractor shall comply with all Federal, state, and local statutes and regulations, and with DoD policies, instructions and guidance listed in J-0401060-13 as applicable.<br><br>Post manning summary, based on historical data, is provided in J-0401060-14. The Contractor shall submit a Post Manning Summary in accordance with Section F.<br><br>The Contractor shall provide armed security guards to man the posts as defined in the Post Manning Summary for each post assignment.<br><br>CVIS will be manned for inspection by the third security personnel with either a roving patrol contractor or DON patrol when directed by a GOV official.<br>The Contractor shall ensure that each security guard is armed per OPNAVINST 5530.14 series, familiar with pertinent post orders and current conditions, and maintains communications with the appropriate Dispatcher or Shift Supervisor, at all times.<br>The Contractor shall ensure that each on duty security guard is equipped with a ballistic vest (wears while on duty) and helmet (wears as directed by ISO) that meets the NIJ standard threat level 3A. Traffic Reflective Vests will be worn at all Entry Control Points/Pier gate at all times during sunset to sunrise, while engaged in traffic control and/or sentry duties. Traffic Vests will also be worn by patrols after hours when in the lanes of traffic/street. Traffic Vest will be bright ORANGE/LIME GREEN or a combination of both colors, with reflective properties that meet basic safety regulations such as ANSI 207-2006/Class II. Vest panels may be BLANK or the word SECURITYor GUARD. For uniformity all Vests issued will be the same type and color,<br>Contractor shall submit a Weapons Inventory, Firearm Discharge Report in accordance with Section F to the SPAR/PAR/ISO, | 100% positive security access control at times specified unless otherwise indicated<br><br>Security Operations are performed per SOPs and Post Orders and are in compliance with Federal, state, and local statutes, DoD regulations, and DoN instructions and directives.<br><br>Personnel, property, facilities, and assets are safe and secure.<br><br>Participate in drills in an appropriate manner. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 291 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| | | | Government reserves the right to adjust work shift or posts to include temporary elimination of some posts and patrols and reassignment of guards to other duties as necessary and in case of an emergency at no additional cost to the Government. Surge requirements, which cannot be accommodated by temporary reassignments, will be handled within the provisions of this contract.<br>The contractor in emergencies will provide the Site manager or Shift Supervisor to the Emergency Operations Center for drills or emergency response situations.<br>The Contractor shall in all emergency situations (fire calls, ambulance runs, local/state police in hot pursuit) ensure that the physical security force personnel allow civil emergency vehicles to pass without delay and shall immediately notify the roving patrol personnel to assist in the emergency.<br>Drills will be conducted by various commands for mass casualties, major facility or forest fires, earthquakes, oil/hazardous substance spills, explosions, aircraft accidents, intrusions, and nuclear incidents. The Contractor shall respond to all drills and exercises. Response to drills will be without lights and sirens and obeying all traffic regulations (if applicable).<br>Approximately fifteen drills are anticipated on average during any given year. All on base company training that requires a drill/exercise external to the classroom, the company will notify the Installation Security Officer and route a drill/exercise training package through the chain of command. Internal training IN-Classroom exercises will not be required. | |
| 3.1 | Entry Control Point Services | The Contractor shall provide armed security guards to insure unauthorized personnel, property, equipment, vessels, or vehicles are deterred and | The Contractor shall comply with Entry Control Point Post Orders and applicable SOPs. See J-0401060-01 and J-0401060-02. CVIS will be manned for inspection by the third security personnel with either a roving patrol contractor or DON patrol when directed by a GOV official.Contractor shall submit a Traffic Flow Report , all inbound vehicles, passengers, and pedestrians will be | Ingress and egress to facilities by unauthorized personnel, property, equipment, vessels, or vehicles as defined below. Vehicles arriving at the gate with authorized and proper identification will be processed within a minimum amount of time, at least 6 |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 292 of 658

APP 288

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| | | denied facility ingress and egress. | counted. This applies to ALL ECP's and Pier Gate. All counts will be placed on a supplied form as required in section F and sent to the Installation Security Officer monthly.,<br>Guards shall maintain communications with Regional Dispatcher at all times. The one cover Sentry at the Main Gate may be moved from the Main Gate to the Over watch position or other positions at the discretion of the Installation Security Officer. | seconds or less. No sentry will engage in small talk. |
| 3.1.1 | Identification Checks | The Contractor shall perform identification checks to ensure only authorized personnel and vehicles are allowed access to the facility. | Requirements for personnel ID and vehicle passes and decals are described in, NAVMAGIIINST 5530.14 series, OPNAVINST 5560.10 series and OPNAVINST 5530.14 series, CINIC 5530.14 series.<br>The Contractor shall conduct inspections of personnel and vehicle identification per Post Orders prior to granting or denying access to the facility. | Access by unauthorized personnel and vehicles shall not exceed zero in occurrences per year in controlled access areas.<br>Access by unauthorized personnel and vehicles shall not exceed zero in occurrence per year in restricted areas.<br>All fraudulent personnel and vehicle identification are detected and reported during exercises. |
| 3.1.2 | Commercial Vehicle Inspection | The Contractor shall perform inspections to ensure only authorized commercial vehicles and cargo are allowed access to the facility. | The Contractor shall conduct inspections of commercial vehicles per Post Orders and SOPs.<br><br>Authorized cargo includes property listed on a bill of lading or shipping documents, and tools, equipment, materials, or supplies used to provide services. Hand every visitor a copy of the NAVMAGII Safety/Security Brochure at the CVIS when they receive their temporary security badge. | Access by unauthorized commercial vehicles and cargo shall not exceed zero in occurrence per year. |
| 3.1.3 | Emergency ECP Closure | The Contractor shall execute emergency ECP closure procedures during emergencies to ensure all ingress and egress of personnel, property, equipment, vessels, or vehicles is denied. | The Contractor shall be responsible for deploying applicable ingress and egress control mechanisms as indicated in the Post Orders and in accordance with applicable SOPs during emergency situations or when instructed by the Installation Commanding Officer or Security officer. | Emergency ingress and egress denial procedures are executed within five minutes of time of incident or notification. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 293 of 658

APP 289

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| 3.2 | Roving Guard Services (Armed) | The Contractor shall provide roving guard services that monitor facilities to ensure security breaches and criminal or suspicious activities are detected and reported in a timely manner. | The Contractor shall comply with Roving Guard Post Orders and applicable SOPs.<br><br>Guards shall take intervention measures as appropriate within limits of authority.<br><br>Guards shall maintain communications with Dispatcher at all times. | All observed security breaches and criminal or suspicious activities are reported to dispatch within the specified time.<br><br>Security breaches not identified by the Contractor shall not exceed zero in occurrences per year. |
| 3.2.1 | Perimeter Patrol (Armed Motorized) | The Contractor shall monitor perimeters to ensure security breaches and criminal or suspicious activities are detected and reported in a timely manner. | The Contractor shall conduct perimeter patrols per Post Orders and SOPs. | Perimeters and interior patrol areas are checked as specified.<br><br>Patrols operate per the Post Orders and SOPs.<br><br>All observed security breaches and criminal or suspicious activities are reported to dispatch within two minutes of discovery.<br><br>Security breaches not identified by the Contractor shall not exceed zero in occurrences per year. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 294 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| 3.2.2 | Interior Patrol | The Contractor shall monitor interior patrol areas to ensure security breaches and criminal or suspicious activities are detected and reported in a timely manner. | The Contractor shall conduct interior patrols per Post Orders and SOPs. During patrols, street lights that are out will be reported to security for repairs to assist in security measures. This position at the discretionary of the Security Officer can be utilized to monitor CCTV AA&E cameras, and Electronic Harbor Security System EHSS. Report any and all discrepancies to the RDC, after initial dispatch will keep responding patrols advised of changes in location or description of violators. In cases where connectivity of Intrusion Detection System IDS fails to report to the RDC, this position will assume responsibility to monitor and report to the RDC any and all IDS Alarms for dispatch of patrols as appropriate until services are restored. To be a primary point of contact for ammunition shipments per the GBL Supervisor or designated official will issue firearms per SOP to Guards, Police Officers, and/or Naval Reserves performing security or law enforcement duties; and supervise loading and unloading of each weapon to prevent accidental discharge; using the posted load/unload procedure. All records will be maintained for at least 3 years or until the completion of an ESI Inspection with Security Officer approval before destruction. | Interior patrol areas are checked as specified.<br>All observed security breaches or suspicious activities are reported to dispatch within two minutes. All weapons issue paperwork will have zero occurrences on missing records. |
| 3.2.2.1 | Building Checks | The Contractor shall physically check designated buildings to ensure unsecured buildings are detected and reported in a timely manner. | The Contractor shall conduct scheduled and unscheduled physical and visual inspections of designated buildings per Post Orders and SOPs. Per OPNAVISNT 5530.13C, all Guard checks will be documented on a check sheet/maintained and destroyed after the most current ESI inspection. Check with the Installation Security Officer before destruction.<br><br>Building check sheets shall be submitted at the end of each shift per Post Orders and in accordance with Deliverables, Section F, 3.2.1.1. | Designated buildings are checked as specified.<br><br>Buildings found unsecured are reported to Regional Dispatch within five minutes of discovery. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 295 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| ~~3.2.2.2~~ | ~~Armed Waterborne Patrol~~ | ~~The Contractor shall patrol the waterside restricted zone to insure unauthorized personnel, property, equipment, or vessels are deterred and denied facility ingress and egress. Security breaches and criminal or suspicious activities are detected and reported in a timely manner.~~ | ~~The Contractor shall provide personnel to navigate and operate all craft Government Furnished Boats listed in J-0200000-04. Personnel assigned coxswain duties will be required to navigate and operate security craft.~~<br>~~The Contractor shall conduct waterborne patrols when a ship is at the pier and as required by OPNAVINST 5530.14 series, CNIC INST 5530.14 series, and CNIC 5530.5 series the Contractor's Post Manning Summary and in accordance with the Contractor's Post Orders and SOPs, as approved by the Government.~~<br>~~Coxswain will have received training by or equivalent to Coast Guard small craft operations, and CNIC 5530.5 series in boat operations and handling, and shall comply with all Federal, state and local laws, rules and regulations to include: 46 USC 526 Motor Boat Act, USCG Navigation Rules, and PL-92-500 Federal Water Pollution Control Act. The Coxswain shall also meet the training and certification requirements for performing guard services.~~<br>~~When the coxswain believes the seas are high and boats or crew are at risk; boat crews will report to pier tower and watch cameras and radar and take action as needed. When one boat is on the water they will be relieved as per OPNAVINST 5530.14 series.~~<br>~~Note: No Boarding of any water craft outside the Navy Restrictive Zone or inside the Restrictive zone unless authorized by ISO.~~ | ~~Patrol areas are checked as specified.~~<br><br>~~All observed security breaches and criminal or suspicious activities are reported to dispatch within two minutes of discovery.~~<br><br>~~Security breaches not identified by the Contractor shall not exceed zero in occurrence per year.~~ |
| 3.2.2.3 | Reaction Patrol | The Contractor shall insure unauthorized personnel, property, equipment, or vessels are deterred and denied facility ingress and egress. Security breaches and criminal or suspicious activities are detected and reported in a timely manner. | The Contractor shall comply with Roving Guard Post Orders and applicable SOPs.<br><br>Guards shall take intervention measures as appropriate within limits of authority.<br><br>Guards shall maintain communications with Dispatcher at all times. | Reaction patrol areas are checked as specified in current SOPs and Post Orders.<br>.All observed security breaches or suspicious activities are reported to dispatch within two minutes. All weapons issue paperwork will have zero occurrences on missing records |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 296 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| 3.3 | Miscellaneous. Services | | | |
| 3.3.1 | Key Control | The Contractor shall develop and implement a key control plan for keys in his possession. | Perform per NAVMAGIIINST 5530.14 and OPNAVINST 5530.14 series. Identify keys on hand, issued, dates, signatures, etc. | Maintain Key Control Logs and submit Key Control Plan on time per Section F. |
| 3.3.2 | Prohibited Property | The Contractor shall accept, receive, and secure prohibited items from/to visitors. | Under some circumstances certain private property will be allowed on station with Commanding Officer's permission.<br>The Contractor's SOP shall include procedures to notify visitors that prohibited items will not be allowed to be stored on base including delivery truck drivers, if found (firearms, ammunition and other weapons) the ISO will be notified immediately. | |
| 3.3.3 | Lost and Found | The Contractor shall provide for the acceptance of found property | The Contractor shall be fully responsible for items in their possession. | The property shall be secured and a list of such property maintained. Found property shall be turned over to the GOV security department at the earliest opportunity. |
| 3.3.4 | Property Passes | The Contractor shall inspect and ensure completeness and accuracy of all property being removed from the installation. | Acceptable property passes are NAVSUP Form 155, DD 1104, DD 1265, DD 1266, SF 1103, or SF 1131. Signatures shall be compared to the list of authorized signatures supplied by the Government. When discrepancies are found in the preparation of a property pass or the property being removed, the person with the property shall be detained, the CDO will be notified, and an investigation made to determine the situation. | |
| 3.3.5 | Weapons Maintenance | The Contractor shall perform weapons maintenance to ensure serviceability of arms, ammunition and explosives | The Contractor shall perform weapons maintenance per Post Orders and SOPs. Maintenance of firearms shall include preventive maintenance, pre-fire and post-fire checks, and cleaning. The Contractor shall maintain accurate documentation of maintenance performed. Maintenance records shall be provided to the SPAR/PAR/ISO upon request.Weapons are clean and serviceable. Preventive maintenance is completed as scheduled. All Government Owned Firearms issued to a contractor will be cleaned, lubricated, and perform safety checks on each weapon after being fired at the | Maintenance of records shall be provided to the SPAR upon request. Weapons are clean and serviceable. Preventive maintenance is completed as scheduled. |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 297 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| | | | range. When issued, the firearm will be wiped down daily before storage to eliminate moisture to prevent rust. Any and all discrepancies will be reported to the security department armorer for repairs or replacement. | |

USCA Case #22-1264 Document #1991533 Filed: 03/23/2023 Page 298 of 658

| 0401060 – Security Operations | | | | |
|---|---|---|---|---|
| Spec Item | Title | Performance Objective | Related Information | Performance Standard |
| 4 | IDIQ Work | IDIQ work shall be ordered utilizing DoD EMALL in accordance with Section H or on a task order in accordance with the PROCEDURES FOR ISSUING ORDERS clause in Section G. The order will specify the exact locations and types of work to be accomplished. The period of performance will be specified in each order. | Refer to IDIQ ELINs in J-0200000-05 for task listings, descriptions, and related requirements. All periods of performance are measured from issue date of order to completion of the work. Performance standards for IDIQ work will be the same as those in Spec Item 3 where applicable. | The Contractor shall ensure that each security guard is armed per OPNAVINST 5530.14 series, is familiar with pertinent post orders and current conditions, and maintains communications with the appropriate Dispatcher or Shift Supervisor at all times. |
| 4.1 | Provide Additional armed security guard at fixed post. | The Contractor shall provide an armed security guard at any location on the base. (Minimum of three (3) hours) | May include situations identified in attachment J-0401060 -14 Manning Summary or due to increased special conditions requiring security controls. The location and duties of applicable post requirements will be provided by Public Safety personnel authorized by the Contracting Officer. | Man posts within four (4) hours of notification. |
| 4.2 | Provide Additional armed motorized patrol. | The Contractor shall provide an additional armed motorized patrol. (Minimum of 3 hours) | May include situations identified in FFP Reference Section or due to special conditions requiring security controls. The location and duties will be provided by ISO. | Respond within four (4) hours of notification. |
| ~~4.3~~ | ~~Provide an Additional armed crew for harbor patrol.~~ | ~~The Contractor shall provide an additional armed boat crew for harbor patrol. (Minimum of 8 hours)~~ | ~~The Contractor shall have 48-hour notification to respond to increased harbor security requirements.~~ | ~~Respond within forty-eight (48) hours of notification.~~ |

**Gorman, Jennifer**

**From:** Rhodes, Dusty A CIV Navy Region NW, N3AT <dusty.rhodes1@navy.mil>
**Sent:** Friday, September 21, 2018 8:34 AM
**To:** Sontag, Charles R CIV Navy Region NW, N3AT
**Cc:** Rush, Peter B CIV Navy Region NW, N3; Rake, Richard L CIV Navy Region NW, N3AT; Manson, Steve A CIV Navy Region NW, N3AT
**Subject:** FW: Follow-On Clarification, Xcel Security Contractor Firearms Qualifications, NMII

**Importance:** High

Chuck,

Here's the amplifying information on the Excel Contractor issues we reviewed. I believe this will satisfy the Admiral's concerns. BLUF: After reviewing watchbills/training data over the past year, Excel contractors are standing watches with weapons they are qualified on and IAW the arming matrix on the posts for which they are responsible.

V/R
Dusty
**************************************************

1. During Mr. Rake's and Mr. Manson's July evaluation, what percentage f Excel employees' weapons-issuance records were reviewed (e.g., 100%? A sampling?) and for what period of time (One particular month? Over the past 12 months?)

Answer 100% of the staff were reviewed from September 2017 -August 2018. Steve Manson went up again on 18 SEP 18 to see if anything had been missed, only to determine that his original findings remain valid.

2. For all NMII watch bills completed since Mr. Rake and Mr. Manson's review, were all arming matrices properly fulfilled? In other words, if Post X requires weapons Y and Z, were they armed correctly?

Answer: Mr. Rake & Mr. Manson reviewed the final copies of the watch bills and shift attendance rosters and confirmed the arming matrices per the contract. Personnel were qualified/armed correctly, with the exception of findings already reported.

3. Based on that, since the SPAR/PAR's review were any contractors issued weapons for which they were not qualified at the time?

Answer: Yes, we found Officer Coler was issued weapons under findings 11 of the issue paper. We verified this though post validation and weapons issued om the RFI. Officer Coler's 3591 reflected only an M-9 qualification and er weapons carry card was only for an M-9. This led us to look at how she was issued other weapons and the process of issuance. We found the problem

R-45
APP 295

to be how M500 and M-4 were being issued and had the contractor add slots to put each weapon gen card in the slot. Second issue was how she added to the watch bill to stand post without being 100% qualified, which this led us to find that the training officer left on vacation and did not communicate the status of Officer Coler to the scheduler. The contractor took three actions immediately:

1. Company will not allow personnel to stand post until 100% qualified.
2. Gun cards are placed in each gun slot to show who the weapons were issued to.
3. Communication will be better between trainer and scheduler.

Action 2 was verified by Steve two days later and again on 30 August during his assessment. Action 1 and 3 will be followed up as they hire new personnel and personnel take their qualification and semi-annual shoots.

4. What SPECIFIC actions has the contractor taken to resolve the problems identified in Mr. Rake's and Mr. Manson's evaluation?

Answer: Under findings 11 actions taken, the contractor corrected action 2 immediately and have instructed their scheduler and training officer to communicate that no one will stand post with a weapon that is not 100% qualified.

5. Will there be a follow-up to validate that the fix actions were effective?

Answer: Yes, the contractor was told verbally and then in writing that he will be assessed on those findings. First follow up was on 30 August.

"Mr. Rake's and Mr. Manson's July administrative fact-finding inquiry failed to interview important witnesses or discover pertinent supporting documentation."

Answer: We interviewed everyone that was mentioned/connected in the fact finding and including additional as necessary. We interviewed everyone that Mr Mullen/Mr Salopek mentioned to us including interviewing personnel twice because Mr Salpoek said they had more to tell us.

In Richard Townsend's email of 7 September stated "He paused, agreed, then stated he will be getting fired by the contractor as Xcel's CEO had reviewed his LinkedIn page yesterday."

Answer: Mr. Rake called the CEO on 18 Sept to get clarification on the contractor being fired. John Morgan (CEO of EXCEL) stated that he hasn't spoken to Mr Salopek and did not know anything about his LinkedIn page. Only correspondence he has had with Mr Salopek was an email he sent to the CEO days before the meeting with the CO and email to the security officer.

"that Xcel contractors allegedly used an unauthorized firing range (a gravel pit") to officially "qualify"

Answer: During our interviews, we asked Mr Salopek for any documentation of

any records that he knew were falsified or dates we could look at and he didn't have anything, other than "from what I heard", or words to that effect. We also asked him where the "gravel pit was located" so we could visit the site and we were told by Mr Salopek he did not know and we needed .o ask Officer Shyver. Findings 3 -4 in the memorandum indicated Officer Shyver's response to the rock quarry issue. To date no one can tell us where this rock quarry can be found.

-----Original Message-----
From: Sontag, Charles R CIV Navy Region NW, N3AT
Sent: Tuesday, September 18, 2018 7:22 AM
To: Rhodes, Dusty A CIV Navy Region NW, N3AT <dusty.rhodes1@navy.mil>
Cc: Rush, Peter B CIV Navy Region NW, N3 <peter.b.rush1@navy.mil>; Rake, Richard L CIV Navy Region NW, N3AT <richard.rake@navy.mil>; Manson, Steve A CIV Navy Region NW, N3AT <steve.manson@navy.mil>
Subject: RE: Follow-On Clarification, Xcel Security Contractor Firearms Qualifications, NMII

Dusty,

ollowing up on our conversation from yesterday, the IG provides further insight below. Also in speaking with him on the phone, he mentioned that the Memorandum completed by Rich and Steve mentions that, "Steve checked back thru records and found this incident to the only one that allowed a person to be issued weapons." It does not indicate how far back his check went or what percentage of the contract guard records he looked at. This is the assessment that the REGCOM wants done by end of week: a 100% records check of all guard weapon qualifications/issuances and all post assignments to which the guards were assigned that required a particular weapon be carried. The REGCOM didn't say how long he wanted the check to go back. I recommend one year if that is possible within the time frame given.

The IG also states that, "The report does not offer details regarding specific fix actions taken, whether the actions corrected/will correct associated root cause(s), or whether there will be follow-up to validate that the fix actions were effective." Recommendations are provided for Finding 11 and three "Actions Taken" are listed, but it not clear that NMII has completed those actions, whether they will correct the problems identified or when NMII will be re-inspected.

V/R

harles R. Sontag
perations Director
CNRNW

(360) 315-5024

-----Original Message-----
From: Bobrowski, Joseph A CIV Navy Region NW, N00G
Sent: Monday, September 17, 2018 4:31 PM
To: Sontag, Charles R CIV Navy Region NW, N3AT <charles.r.sontag@navy.mil>; Rush, Peter B CIV Navy Region NW, N3 <peter.b.rush1@navy.mil>
Cc: Gray, Christopher S RDML Navy Region NW, N00 <christopher.gray1@navy.mil>; Verhofstadt, Albert P CIV Executive Director Navy Region NW, N01 <albert.verhofstadt@navy.mil>; Huffman, Gregory C CAPT Navy Region NW, N04 <gregory.c.huffman1@navy.mil>; Rhodes, Dusty A CIV Navy Region NW, N3AT <dusty.rhodes1@navy.mil>; Pulley, Rocky B CDR CO NAVMAG Indian Is, N00 <rocky.pulley@navy.mil>; Townsend, Richard J CIV Navy Region NW, N00G <richard.townsend@navy.mil>
Subject: Follow-On Clarification, Xcel Security Contractor Firearms Qualifications, NMII

Chuck/Pedro-

BACKGROUND: As you know, early last July some Xcel contract employees met with CDR Pulley and one wrote a letter to the NMII Security Office voicing concerns regarding Xcel weapons qualification procedures. Mr. Rake (SPAR) and Mr. Manson (PAR) conducted an evaluation and wrote a 25 Jul memorandum of their findings to Ms. Melissa Burris, NAVFAC NW Contracting Officer for NMII (attached).

Shortly thereafter, we received an IG complaint (from individuals not necessarily privy to Mr. Rake's and Mr. Manson's findings) expressing related allegations: i.e., that Xcel contractors allegedly used an unauthorized firing range (a "gravel pit") to officially "qualify"; used personal weapons to qualify; "falsified" weapons qualification documents; altered targets to help shooters qualify; etc. The complainants also stated Mr. Rake's and Mr. Manson's July administrative fact-finding inquiry failed to interview important witnesses or discover pertinent supporting documentation.

Mr. Rake's & Manson's evaluation found no merit to most of these alleged issues, but they did conclude that one Xcel contractor, Officer Coler, was issued weapons for which she was not qualified: an M-500 shotgun on four dates in Jun 2018, and an M-4 (full auto) once in June 2018. WRT contractor fix actions taken, the SPAR/PAR's report indicated that Xcel "will not allow

personnel to stand post until 100% qualified;" will now "[place] gun cards ... in each gun slot to show who the weapons were issued to;" and that "communication will be better between [firearms] trainer and scheduler." The report does not offer details regarding specific fix actions taken, whether the actions corrected/will correct associated root cause(s), or whether there will be follow-up to validate that the fix actions were effective.

We subsequently interviewed one of the complainants, and they added that no Xcel employees are qualified to operate crew-served weapons (CSW) and that this would be a critical shortcoming if/when NMII transitions to elevated FPCONs. CDR Pulley is examining whether NMII Civilian and Military manning and qualifications can support a change to elevated Force Protection conditions; specifically, if Xcel personnel are not CSW-qualified, are there sufficient qualified military & civilian personnel, weapons, ammo, etc. to do so (he estimates having additional information by the middle of this week).

QUESTIONS:

1. During Mr. Rake's and Mr. Manson's July evaluation, what percentage of Excel employees' weapons-issuance records were reviewed (e.g., 100%? A sampling?) and for what period of time (One particular month? Over the past 12 months?)

2. For all NMII watchbills completed since Mr. Rake and Mr. Manson's review, were all arming matrices properly fulfilled? In other words, if Post X requires weapons Y and Z, were they armed correctly?

3. Based on that, since the SPAR/PAR's review were any contractors issued weapons for which they were not qualified at the time?

4. What SPECIFIC actions has the contractor taken to resolve the problems identified in Mr. Rake's and Mr. Manson's evaluation?

5. Will there be a follow-up to validate that the fix actions were effective?

Please respond NLT 2 Oct - if you require additional time, please let me know.

R,

Joe

Joseph A. Bobrowski

Inspector General

Navy Region Northwest


joseph.a.bobrowski@navy.mil

Office: (360) 396-6179 (DSN: 744)

Subject: **Termination**
Date: 10/29/2018 11:48:20 AM Pacific Standard Time
From: mjsalopek@outlook.com
To: spfpa5@aol.com

Let me know if this is enough? Not enough? Etc.

Sent from Mail for Windows 10

R-50

Mr. Scott Harger
SPFPA5

October 29, 2018

Mr. Harger,

On October 27, 2018 I was terminated from my employment with Xcel Protective Services.

I was removed from my Post and brought to the job site office where I was informed that I was being terminated for dishonesty, effecting the morale in the work place with co-workers and supervisors, and something to do with candor with supervisors.

I was offered the opportunity to resign or to be terminated. I declined to resign.

I asked for specificity of charges against me and I was told they would be emailed to me.

Mark Salopek

Subject: **RE: Termination**
Date: 10/29/2018 12:36:10 PM Pacific Standard Time
From: mjsalopek@outlook.com
To: spfpa5@aol.com

Sent from Mail for Windows 10

---

**From:** Spfpa Local 5 <spfpa5@aol.com>
**Sent:** Monday, October 29, 2018 11:54:11 AM
**To:** mjsalopek@outlook.com
**Subject:** Re: Termination

I need the name of the person (s) who were at the meeting and specifically the name of the person and his position with Xcel who told you of the termination.

Thanks,

Scott Harger
Business Agent, FST, SPFPA Rep
1109 S Bailey ST
Seattle, WA 98108
Office: 206-767-4202
Cell: 253-495-2818
Fax: 206-763-4369
E Mail: spfpa5@aol.com

E Mail Disclaimer and Confidentiality notice: The contents of this e mail message and any attachments are intended solely for the addressee(s) and may contain confidential information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachment is strictly prohibited.

In a message dated 10/29/2018 11:48:20 AM Pacific Standard Time, mjsalopek@outlook.com writes:

> Let me know if this is enough? Not enough? Etc.
>
> Sent from Mail for Windows 10

R-51

Mr. Scott Harger
SPFPA5

October 29, 2018

Mr. Harger,


On October 27, 2018 I was terminated from my employment with Xcel Protective Services.

I was removed from my Post and brought to the job site office where I was informed that I was being terminated for dishonesty, effecting the morale in the work place with co-workers and supervisors, and something to do with candor with supervisors.

The two Xcel Company representatives provided me with business cards. The names where; John Kubiak, Chief Executive Officer and Michael Filibeck, Sr. Vice President. To the best of my recollection it was Mr. Michael Filibeck that handed me my final check and advised me that I was terminated.

I was offered the opportunity to resign or to be terminated. I declined to resign.

I asked for specificity of charges against me and I was told they would be emailed to me. I asked him if he wanted my email address and he replied he would find my email address and send it to me.


Mark Salopek

# Statement

I, MARK SALOPEK, am providing this written statement voluntarily in the matter that I was terminated from my employment with Xcel Protected Services at Naval Magazine Indian Island on October 27, 2018. The information contained in this statement is provided to the best of my knowledge, and attest that the contents of this memorandum are true and correct to the best of my knowledge.

On 10/27/2018 I worked my scheduled shift beginning at 0545 to 1415. During the briefing Lt. Powless told all of the guards that Xcel "Corporate Big Wigs" are coming in today and to make sure our boots were shined and our uniforms were proper. He said he did not know why they were coming.

While on post at CVIS we received a telephone call from Lt. Powless who told us the names of the individuals that were coming but he was unsure of the proper spelling. I looked on the facility access list and found no names on the list matching any spelling given. Lt. Powless told officer Lein that they were cleared for access to the base and to have South Patrol Escort them up to the Security Office.

I telephoned Officer Miller of the Department of Navy Police and asked him if we needed to VET the incoming Xcel Officials and he said that we are in control of Access Control, and I informed him that our Lieutenant had authorized them onto the base and he told me to proceed with that.

Later there was another call made to Lt. Powless and he was asked what type of badging they should be given and we were told to issue one day yellow badges to them.

Later sometime around 1000 Site Manager Michael Terry came onto the base. We had already been told to expect the corporate personnel at approximately 1100.

We received a telephone call from Lt. Powless who told us that the corporate personnel were going to be late.

Sometime close to 1200 the four corporate personnel arrive at CVIS. Their ID's were checked, their badges were issued, and they were escorted to the security office by South Patrol.

At approximately 1237 I received a text from Union Representative Scott Harger asking me to call him. I telephoned him and he told me that he had received a telephone call from Officer Amber Anglin who is the new Employee Union Representative. He told me that she had told him I was going to be fried and possibly another officer. He also said that Officer Anglin asked if she should go in with me or if I should request officer Lein since I have a friendship with him. I believe Mr. Harger told me he told her that it was my choice. Mr. Harger also said that CEO John Morgan was no longer the CEO of the contract. He said he didn't know if he had been removed, was sick or what.

Soon after that, Lt. Powless and Lt. Vancura arrived at CVIS and Lt. Vancura told me to grab my stuff and go with Lt. Powless. Lt. Powless drove me to the Security Office where he told me that he had to disarm me from my duty weapons. He acted uncomfortable and I assured him it was ok and understandable.

R-52

When we got into the office and I was disarmed I told him I wanted to talk with my Union Representative and asked where Officer Anglin was. Lt. Powless appeared to look confused and I asked him if I could speak with my union representative. He replied yes and I informed Lt. Powless that I was already aware of why I was there, and I knew before I was brought up to the office. Lt. Powless looked surprised.

Officer Anglin walked up to me and said she is the union rep. and that she had he notice up on the bulletin board in the training room but she took it down. I told her that Mr. Harger had told me that she had called him and told him that John Morgan was no longer the CEO and that I was going to be fired. She told me that she never called Mr. Harger. I asked her, "you never called Harger?" She replied no and she had no idea what he was talking about. After trying to find Mr. Harger's phone number through Officer Anglin I finally went out to my vehicle and got my phone. I sat in the Lieutenants office and used the phone. She then stated that she is the new Union Rep and she was new at it and this was kind of big and asked me what I wanted her to do. I told her to get a pad and pen. Sit with me in the room and take notes on everything they say. I told her she should not ask questions, just document everything that is said. Lt. Powless got her a yellow note pad.

I called Mr. Harger and I told him that Officer Anglin told me that she had never called him. He assured me that she had called him.

I then asked Lt. Powless where my union rep. was and he told me that she was in the training room talking with the company officials with the door closed. I asked, what was going on and that I needed to speak with my union rep.

Shortly after that Officer Anglin exited the Training Room and walked up to me. She told me that I was being charged with dishonesty and I had a choice to resign or be fired. I told her I was not going to resign. I sat in the Lieutenants office until Mr. Michael Terry came in. He shook my hand and said he was sorry. I was walked down the hall and into the training room. I tuned to look for Officer Anglin and she was gone.

I walked in and I shook the hands of two men who are identified by their business cards as Michael Filibeck; Sr. Vice President of Xcel Protective Services, and John Kubiak; Chief Executive Officer. The man who I believe was Michael Filibeck told me that he had not ever spoken in person to me before, but the company was terminating my employment with Xcel Protective Services for something regarding candor with supervisors; Dishonesty; and effecting the morale of the work place with co-workers and supervisors. He told me if I chose to resign this would all stop right here, or I can be terminated. I advised him I was not going to resign. I asked for "Specificity of Charges". He replied "what?" I asked him for specificity of charges again. I further explained that obviously there are persons who have come forth with accusations that I have been untruthful, and I have a right to respond to those accusations. He responded that he had a litany of incidents of my dishonesty. He also said he would email them to me. I asked him if he wanted my email address and he replied that he would find my email address.

I was then told to go into Michael Terry's Office where I needed to sign a non-disclosure form, and turn in my base access cards.

When I went into Mr. Michael Terry's Office, he immediately told me that there is nothing in my personnel file except one incident two years ago. He additionally told me that all of this is coming from "Richard Rake". He told me that the Company Officers went to see Richard Rake the day before at Bangor Naval Base and then he was called and told I was going to be terminated and possibly Officer Daniel Lein.

After I had signed all paperwork, I then spoke to Michael Terry man to man as two retired police officers. I stated to him, "What were you thinking Mike!" Remember the Code? Tell no lie! Remember the code we lived by? He lowered his head.

I told him how the report to Commander Pulley happened, and that we were compelled to tell him. He replied, "I believe that out of that guy". He told me that he had a stomach ache for four months wondering why I didn't come to him first. I told him there was no going back at that point, but eventually the report would have been made.

I then asked him what he was thinking using white out on official logs. He replied "well it was the old way of doing things." I replied "bullshit".

I then said, "and the Schroeder range?" "You held a range at Schroeder's house and then filled out a 3591 saying you're at Bangor?" He replied I think that was just a mistake by Powless." Again, I replied "bullshit".

Mike then asked me, "Why did you report to the Navy that we were issuing M240's to guards? I replied "I didn't". He said "The Navy says you did". I again replied "I didn't".

I partially emptied my locker and put them in my Jeep. Officer Jimmy Leigh met me at my Jeep and I was told he was escorting off the island.

I later called Officer Everson and asked him to get the rest of my stuff out of my locker that I had left. He told me that it had already been removed by Lt. Vancura.

This statement was to the best of my knowledge

[signature]
Signature

Date: 10/28/18

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>19-CA-232786 | Date Filed<br>12-12-2018 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer
Excel Protective Services, Inc.

b. Tel. No. (310) 498-9827

c. Cell No.

f. Fax No.

d. Address *(Street, city, state, and ZIP code)*
6170 Research Road
TX Frisco 75033-____

e. Employer Representative
Michael Filibeck
Chief Executive Officer

g. e-Mail
michael.filibeck@xcelprotective.com

h. Number of workers employed
45

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems & Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 5 of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
David Hickey Title:
International Union, Security, Police, and Fire Professionals of America and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
25510 Kelly Rd
MI Roseville 48066-____

4b. Tel. No. (586) 772-7250

4c. Cell No.

4d. Fax No.

4e. e-Mail
spfpapres@gmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By Richard Olszewski
*(signature of representative or person making charge)*

Title: Richard Olszewski
*(Print/type name and title or office, if any)*

Tel. No. (313) 396-4560

Office, if any, Cell No.

Fax No.

e-Mail
rich@unionlaw.net

Address 65 Cadillac Square Suite 3727
Detroit MI 48226-

12/12/2018 16:38:24
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**GC Exhibit: 1(a)**

## Basis of the Charge

**8(a)(1)**

Within the previous six months, the Employer discharged an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee discharged | Approximate date of discharge |
|---|---|
| Mark Salopek | October 27, 2018 |

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Mark Salopek | Threat of discipline | July 9, 2018 |

**8(a)(5)**

Within the previous six months, the Employer failed and refused to bargain in good faith with the union as the collective bargaining representative of its employees by failing to furnish information requested by the union.

| Date of request | Employer representative | List items requested | Date refused |
|---|---|---|---|
| October 30, 2018 | Michael Terry | Materials relating to Salopek discharge | |

FORM EXEMPT UNDER 44 U S C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

# FIRST AMENDED CHARGE AGAINST EMPLOYER

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case: 19-CA-232786<br>First Amended Charge | Date Filed 12-12-2018<br>AMD: 12-19-2018 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No
(855) 923-5732

c. Cell No. 213 810 4735

f. Fax No 323-796-0183

d. Address *(Street, city, state, and ZIP code)*
6747 Academy Road N/E Ste. A
NM Albuquerque 87109-3374

e. Employer Representative
Michael Filibeck

g. e-Mail
michael filibeck@xcelprotective com

h. Number of workers employed
45

i Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems and Services

j. Identify principal product or service
Security Guards

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* and (5) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

- See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Union, Security, Police and Fire Professionals of America (SPFPA) and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
Gregory, Moore, Jeakle & Brooks
65 Cadillac Sq., Ste. 3727
Detroit, MI, 48226

4b. Tel. No.
(313) 964-5600

4c. Cell No. (815) 272-1198

4d. Fax No.

4e. e-Mail
rich@unionlaw.net

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Union, Security, Police and Fire Professionals of America (SPFPA) and its Local 5

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By /s/ Richard M Olszewski
*(signature of representative or person making charge)*

Richard M. Olszewski, Esq.
*(Print/type name and title or office, if any)*

Tel. No.
313-964-5600

Office, if any, Cell No.

Fax No.
313-964-2125

e-Mail
rich@unionlaw.net

Address Gregory, Moore, Jeakle & Brooks, P.C., 65 Cadillac Sq., Ste. 3727, Detroit, MI 48226

12/19/2018
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg 74942-43 (Dec 13. 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however failure to supply the information will cause the NLRB to decline to invoke its processes

GC Exhibit: 1(d)

## Basis of the Charge

**8(a)(1)**

Within the previous six months, the Employer discharged an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee discharged | Approximate date of discharge |
|---|---|
| Mark Salopek | October 27, 2018 |

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Mark Salopek | Threat of discipline | July 9, 2018 |

**8(a)(5)**

Within the previous six months, the Employer failed and refused to bargain in good faith with the union as the collective bargaining representative of its employees by failing to furnish information requested by the union.

| Date of request | Employer representative | List items requested | Date refused |
|---|---|---|---|
| October 30, 2018 | Michael Terry | Materials relating to Salopek discharge | |

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

FORM EXEMPT UNDER 44 U.S.C 3512

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>19-CA-233141 | Date Filed<br>12/19/2018 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No. (855) 923-5732

c. Cell No.

f. Fax No.

d. Address *(Street, city, state, and ZIP code)*
6747 Academy Road N/E Ste. A
NM Albuquerque 87109-3374

e. Employer Representative
Michael Filibeck

g. e-Mail
michael.filibeck@xcelprotective.com

h. Number of workers employed
45

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems & Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
David Hickey Title:
International Union, Security, Police, and Fire Professionals of America and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
25510 Kelly Rd
MI Roseville 48066-4994

4b. Tel. No. (586) 772-7250

4c. Cell No.

4d. Fax No.

4e. e-Mail
spfpapres@spfpa.org

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By Richard M. Olszewski
*(signature of representative or person making charge)*

Title: Richard Olszewski
*(Print/type name and title or office, if any)*

Tel. No. (313) 964-5600

Office, if any, Cell No.

Fax No.

e-Mail
rich@unionlaw.net

Address 65 Cadillac Square Suite 3727
Detroit MI 48226-

12/19/2018 11:30:26
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**GC Exhibit: 1(f)**

## Basis of the Charge

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities:

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Stephen Mullen | Constructive Discharge | July 17, 2018 |

FORM EXEMPT UNDER 44 U S C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**FIRST AMENDED CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case: 19-CA-233141 | Date Filed 12-19-2018<br>1st AMD: 1-18-2019 |

INSTRUCTIONS:
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No. (855) 923-5732

c. Cell No.

f. Fax No.

d. Address (Street, city, state, and ZIP code)
6747 Academy Road N/E Ste. A
NM Albuquerque 87109-3374

e. Employer Representative
Michael Filibeck

g. e-Mail michael.filibeck@xcelprotective com

h. Number of workers employed
65

i. Type of Establishment (factory, mine, wholesaler, etc.)
Security Systems and Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) (3) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

--See additional page--

3. Full name of party filing charge (if labor organization, give full name, including local name and number)
International Union, Security, Police and Fire Professionals of America (SPFPA) and its Local 5

4a. Address (Street and number, city, state, and ZIP code)
Gregory, Moore, Jeakle & Brooks
65 Cadillac Sq., Ste. 3727
Detroit, MI, 48226

4b. Tel. No. (313) 964-5600

4c. Cell No. (815) 272-1198

4d. Fax No

4e. e-Mail rich@unionlaw.net

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)
International Union, Security, Police and Fire Professionals of America (SPFPA) and its Local 5

6 DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By /s/ Richard M. Olszewski
(signature of representative or person making charge)

Richard M. Olszewski, Esq.
(Print/type name and title or office, if any)

Tel. No. 313-964-5600

Office, if any, Cell No.

Fax No. 313-964-2125

e-Mail rich@unionlaw.net

Address Gregory, Moore, Jeakle & Brooks, P.C., 65 Cadillac Sq., Ste. 3727, Detroit, MI 48226

1/18/2019
(date)

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

GC Exhibit: 1(h)

**Basis of the Charge**

**8(a)(1) and (3)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Threat of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Stephen Mullen | Constructive discharge | July 9, 2018 |
| Stephen Mullen | Retaliatory negative employment references/blacklisting | Beginning on or around July 17, 2018 and continuing |

INTERNET
FORM NLRB-501
(2-08)

FORM EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

**SECOND AMENDED CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case: 19-CA-233141 | Date Filed 12-19-2018<br>1st AMD: 1-18-2019<br>2nd AMD: 3-26-2019 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No.
505-217-2680

c. Cell No.

d. Address *(Street, city, state, and ZIP code)*
Bowles Law Firm
500 Marquette, N.W.
Suite 1060
Albuquerque, NM 87125-5186

e. Employer Representative
Jason Bowles

f. Fax No. 323-796-0183

g. e-Mail
Jason@bowles-lawfirm.com

h. Number of workers employed
45

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems and Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the previous 6 months, the Employer constructively discharged Stephen Mullen because he engaged in protected concerted activities and in order to discourage employees from engaging in protected concerted activities.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Union, Security, Police and Fire Professionals of America, (SPFPA) and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
25510 Kelly Rd
MI Roseville 48066-4994

4b. Tel. No.
(586) 772-7250

4c. Cell No.

4d. Fax No.

4e. e-Mail
spfpapres@spfpa.org

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Union, Security, Police and Fire Professionals of America, (SPFPA) and its Local 5

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By /s/ Richard M. Olszewski
*(signature of representative or person making charge)*

Richard M. Olszewski, Esq.
*(Print/type name and title or office, if any)*

Tel. No.
313-964-5600

Office, if any, Cell No. (815) 272-1198

Fax No.
313-964-2125

e-Mail
rich@unionlaw.net

Address Gregory, Moore, Jeakle & Brooks, P.C., 65 Cadillac Sq., Ste. 3727, Detroit, MI 48226

3/26/2019
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use ... Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Regist... will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NL...

GC Exhibit: 1(j)

INTERNET FORM NLRB-501 (2-08)

FORM EXEMPT UNDER 44 U S C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

# CHARGE AGAINST EMPLOYER

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case: 19-CA-234438 | Date Filed 1-18-2019 |

INSTRUCTIONS:
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No.
(855) 923-5732

c. Cell No.

f. Fax No.

d. Address *(Street, city, state, and ZIP code)*
6747 Academy Road N/E Ste. A
NM Albuquerque 87109-3374

e. Employer Representative
Michael Filibeck

g. e-Mail
michael.filibeck@xcelprotective com

h. Number of workers employed
65

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems and Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* (3) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Union, Security, Police and Fire Professionals of America (SPFPA) and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
Gregory, Moore, Jeakle & Brooks
65 Cadillac Sq., Ste. 3727
Detroit, MI, 48226

4b. Tel. No.
(313) 964-5600

4c. Cell No. (815) 272-1198

4d. Fax No.

4e. e-Mail
rich@unionlaw net

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Union, Security, Police and Fire Professionals of America (SPFPA) and its Local 5

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By /s/ Richard M. Olszewski
*(signature of representative or person making charge)*

Richard M. Olszewski, Esq.
*(Print/type name and title or office, if any)*

Address Gregory, Moore, Jeakle & Brooks, P.C., 65 Cadillac Sq., Ste. 3727, Detroit, MI 48226

1/18/2019
*(date)*

Tel. No.
313-964-5600

Office, if any, Cell No.

Fax No.
313-964-2125

e-Mail
rich@unionlaw.net

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

GC Exhibit: 1(l)

## Basis of the Charge

**8(a)(3)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) joined or supported a labor organization and in order to discourage union activities and/or membership.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Daniel Lein | Attempted Reduction in Pay | January 1, 2019 |
| Daniel Lein | Threat of discharge | mid-July 2018 |
| Daniel Lein | Refusal to protect employee from harassment | January 1, 2019 |

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by interrogating employees about their union activities.

| Name of Employer's Agent/Representative who made the statement | Approximate date |
|---|---|
| Michael Terry | mid July 2018 |
| Michael Terry | September 2018 |

INTERNET FORM NLRB-501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

1st AMENDED

FORM EXEMPT UNDER 44 U.S.C. 3512

**DO NOT WRITE IN THIS SPACE**

Case: 19-CA-234438

Date Filed: 1-18-2019
1st AMD: 3-13-2019

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Xcel Protective Services, Inc.

b. Tel. No. 505-217-2680

c. Cell No.

f. Fax No

d. Address (Street, city, state, and ZIP code)
Bowles Law Firm
500 Marquette, N.W.
Suite 1060
Albuquerque, NM 87125-5186

e. Employer Representative
Jason Bowles

g. e-Mail
Jason@bowles-lawfirm.com

h. Number of workers employed
45

i. Type of Establishment (factory, mine, wholesaler, etc.)
security systems and services

j. Identify principal product or service
security guards

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) ______ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Within the previous 6 months, in about August or September 2018, the Employer, through Michael Terry, made coercive statements to employees regarding contacting the Union about pay issues and told the employees that they had to bring any pay issues to him.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)

International Union, Security, Police and Fire Professionals of America and its Local 5

4a. Address (Street and number, city, state, and ZIP code)
Gregory, Moore, Jeakle & Brooks
65 Cadillac Sq., Suite 3727
Detroit, MI 48226

4b. Tel. No. (313) 964-5600

4c. Cell No. (815) 272-1198

4d. Fax No. (313) 964-2125

4e. e-Mail rich@unionlaw.net

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization) International Union, Security, Police and Fire Professionals of America and its Local 5

6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By [signature] (signature of representative or person making charge)

Richard Olszewski, Esq. (Print/type name and title or office, if any)

Tel. No. (313) 964-5600

Office, if any, Cell No (815) 272-1198

Fax No. (313) 964-2125

e-Mail rich@unionlaw.net

Address 65 Cadillac Sq., Suite 3727, Detroit, MI 48226

3/13/19 (date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its proc-----

**GC Exhibit: 1(n)**

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

FORM EXEMPT UNDER 44 U.S.C 3512

**DO NOT WRITE IN THIS SPACE**

| Case | Date Filed |
|---|---|
| 19-CA-237861 | 3-13-2019 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Xcel Protective Services, Inc.

b. Tel. No. 505-217-2680

c. Cell No.

f. Fax No

d. Address (*Street, city, state, and ZIP code*)
Bowles Law Firm
500 Marquette, N.W.
Suite 1060
Albuquerque, NM 87125-5186

e. Employer Representative
Jason Bowles

g. e-Mail
Jason@bowles-lawfirm.com

h. Number of workers employed
45

i. Type of Establishment (*factory, mine, wholesaler, etc.*)
security systems and services

j. Identify principal product or service
security guards

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (*list subsections*) (3) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

Within the previous 6 months, on about January 12, 2019, the Employer, through Lt. Gerald Powless, retaliated against Daniel Lein for his Union or protected concerted activity by telling employees they could no longer go home early because someone had complained about arm-up time.

3. Full name of party filing charge (*if labor organization, give full name, including local name and number*)
International Union, Security, Police and Fire Professionals of America and its Local 5

4a. Address (*Street and number, city, state, and ZIP code*)
Gregory, Moore, Jeakle & Brooks
65 Cadillac Sq., Suite 3727
Detroit, MI 48226

4b. Tel. No. (313) 964-5600

4c. Cell No. (815) 272-1198

4d. Fax No. (313) 964-2125

4e. e-Mail
rich@unionlaw.net

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*) nternational Union, Security, Police and Fire Professionals of America and its Local 5

6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By [signature] (*signature of representative or person making charge*)

Richard Olszewski, Esq. (*Print/type name and title or office, if any*)

Tel. No. (313) 964-5600

Office, if any, Cell No. (815) 272-1198

Fax No. (313) 964-2125

e-Mail rich@unionlaw.net

Address 65 Cadillac Sq., Suite 3727, Detroit, MI 48226

3/13/19 (*date*)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**GC Exhibit: 1(p)**

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

FORM EXEMPT UNDER 44 U.S.C 3512

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 19-CA-241689 | 5-16-2019 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No. (505) 217-2680

c. Cell No.

f. Fax No. (323) 796-0183

d. Address *(Street, city, state, and ZIP code)*
500 Marquette, N.W. Suite 1060
NM Albuquerque 87125-5186

e. Employer Representative
Jason Bowles

g. e-Mail
Jason@bowles-lawfirm.com

h. Number of workers employed
45

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems & Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 5 of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
David Hickey Title:
International Union, Security, Police & Fire Professionals of America, (SPFPA) and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
25510 Kelly Road
MI Roseville 48066-____

4b. Tel. No. (586) 772-7250

4c. Cell No.

4d. Fax No.

4e. e-Mail
spfpapres@spfpa.org

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By Richard Olszewski
*(signature of representative or person making charge)*

Title: Richard Olszewski
*(Print/type name and title or office, if any)*

Tel. No. (313) 964-5600

Office, if any, Cell No. (815) 272-1198

Fax No.

e-Mail rich@unionlaw.net

Address Gregory, Moore, Brooks & Clark, PC, 65 Cadillac Square Suite 3727 Detroit MI 48226-____

05/16/2019 14:48:19
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**GC Exhibit: 1(r)**

## Basis of the Charge

**8(a)(5)**

Within the previous six months, the Employer failed and refused to bargain in good faith with the union as the collective bargaining representative of its employees by failing to furnish information requested by the union.

| Date of request | Employer representative | List items requested | Date refused |
|---|---|---|---|
| January 31, 2019 | | Information relating to Salopek discharge | |
| February 28, 2019 | | Information relating to Salopek discharge | |
| May 8, 2019 | | Information relating to Salopek discharge | |

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**FIRST AMENDED CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case: 19-CA-241689 First Amended Charge | Date Filed 7-31-2019 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

a. Name of Employer
Xcel Protective Services, Inc.

b. Tel. No. 505-217-2680

c. Cell No.

d. Address *(Street, city, state, and ZIP code)*
Bowles Law Firm
500 Marquette, N.W.
Suite 1060
Albuquerque, NM 87125-5186

e. Employer Representative
Jason Bowles

f. Fax No. 323-796-0183

g. e-Mail
Jason@bowles-lawfirm.com

h. Number of workers employed
45

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Security Systems and Services

j. Identify principal product or service

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* and (5) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Union, Security, Police and Fire Professionals of America, (SPFPA) and its Local 5

4a. Address *(Street and number, city, state, and ZIP code)*
25510 Kelly Rd
MI Roseville 48066-4994

4b. Tel. No.
(586) 772-7250

4c. Cell No.

4d. Fax No.

4e. e-Mail
spfpapres@spfpa.org

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Union, Security, Police and Fire Professionals of America, (SPFPA) and its Local 5

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By /s/ Richard M. Olszewski — *(signature of representative or person making charge)*

Richard M. Olszewski, Esq. — *(Print/type name and title or office, if any)*

Tel. No.
313-964-5600

Office, if any, Cell No. (815) 272-1198

Fax No.
313-964-2125

e-Mail
rich@unionlaw.net

Address: Gregory, Moore, Brooks & Clark, P.C., 65 Cadillac Sq., Ste. 3727, Detroit, MI 48226 — 7/31/2019 *(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

GC Exhibit: 1(t)

**Basis of the Charge**

8(a)(5)

Within the previous six months, the Employer failed and refused to bargain in good faith with the union as the collective bargaining representative of its employees by failing to furnish information requested by the union.

| Date of request | Employer representative | List items requested | Date refused |
|---|---|---|---|
| January 21, 2019 | | Information relating to Salopek discharge | |
| February 28, 2019 | | Information relating to Salopek discharge | |
| May 8, 2019 | | Information relating to Salopek discharge | |

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 19**

**XCEL PROTECTIVE SERVICES, INC.**

**and**

**INTERNATIONAL UNION, SECURITY, POLICE, AND FIRE PROFESSIONALS OF AMERICA, LOCAL 5**

**Cases 19-CA-232786**
**19-CA-233141**
**19-CA-234438**
**19-CA-237861**
**19-CA-241689**

## ORDER FURTHER CONSOLIDATING CASES, AMENDED CONSOLIDATED COMPLAINT, AND NOTICE OF HEARING

An Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Cases 19-CA-232786, 19-CA-233141, 19-CA-234438, and 19-CA-237861 issued on March 28, 2019, based on charges filed by International Union, Security, Police, and Fire Professionals of America, Local 5 (Charging Party) against Xcel Protective Services, Inc. (Respondent). Pursuant to § 102.33 of the Rules and Regulations of the National Labor Relations Board (the Board), and to avoid unnecessary costs or delay, IT IS ORDERED THAT Cases 19-CA-232786, 19-CA-233141, 19-CA-234438, 19-CA-237861 are further consolidated with Case 19-CA-241689, which is based on a charge filed by the Charging Party against Respondent.

This Order Further Consolidating Cases, Amended Consolidated Complaint, and Notice of Hearing, which is based on these charges, is issued pursuant to § 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 *et seq.*, and § 102.15 of the Board's Rules and Regulations, and alleges Respondent has violated the Act as described below.

**GC Exhibit: 1(bbb)**

1.

(a) The charge in 19-CA-232786 was filed by the Charging Party on December 12, 2018, and a copy was served on Respondent by U.S. mail on December 14, 2018.

(b) The first amended charge in 19-CA-232786 was filed by the Charging Party on December 19, 2018, and a copy was served on Respondent by U.S. mail on December 20, 2018.

(c) The charge in 19-CA-233141 was filed by the Charging Party on December 19, 2018, and a copy was served on Respondent by U.S. mail on December 21, 2018.

(d) The first amended charge in 19-CA-233141 was filed by the Charging Party on January 18, 2019, and a copy was served on Respondent by U.S. mail on January 22, 2019.

(e) The second amended charge in 19-CA-233141 was filed by the Charging Party on March 25, 2019, and a copy was served on Respondent by U.S. mail on March 26, 2019.

(f) The charge in 19-CA-234438 was filed by the Charging Party on January 18, 2019, and a copy was served on Respondent by U.S. mail on January 22, 2010.

(g) The first amended charge in 19-CA-234438 was filed by the Charging Party on March 13, 2019, and a copy was served on Respondent by U.S. mail on March 18, 2019.

(h) The charge in 19-CA-237861 was filed by the Charging Party on March 13, 2019, and a copy was served on Respondent by U.S. mail on March 18, 2019.

(i) The charge in 19-CA-241689 was filed by the Charging Party on May 16, 2019, and a copy was served on Respondent by U.S. mail on May 17, 2019.

2.

(a) At all material times, Respondent has been a New Mexico corporation with an office and place of business on Indian Island, Washington (facility), and has been engaged in providing security services to the United States Navy.

(b) In conducting its operations described above in paragraph 2(a) during the past calendar year, a representative period, Respondent has received at its facility products, goods, and materials valued in excess of $50,000 directly from points outside the State of Washington.

(c) Based on its operations described above in paragraph 2(a) during the past calendar year, a representative period, Respondent has a substantial impact on the national defense of the United States.

(d) At all material times, Respondent has been an employer engaged in commerce within the meaning of §§ 2(2), (6), and (7) of the Act.

3.

At all material times, the Charging Party has been a labor organization within the meaning of § 2(5) of the Act.

4.

At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of § 2(11) of the Act and/or agents of Respondent within the meaning of § 2(13) of the Act, acting on behalf of Respondent:

| | | |
|---|---|---|
| John Morgan | - | Chief Executive Officer |
| Michael Filibeck | - | Senior Vice President |
| Michael Terry | - | Site Manager |
| Doug Lux | - | Lieutenant |
| Gerald Powless | - | Lieutenant |
| Armando del Rosario | - | Lieutenant |
| Unnamed attorney | - | Legal Representative |

5.

(a) Since at least October 1, 2015, and at all material times, Respondent has recognized the Union as the exclusive collective-bargaining representative of the following employees (Unit):

> All federal contract security officers employed by Respondent at the Indian Island Magazine in the State of Washington, excluding all other employees, employed in any capacity such as Area Managers, Captains, Lieutenants, office or clerical employees, and professional employees as defined in the National Labor Relations Act.

(b) This recognition has been embodied in successive collective-bargaining agreements, the most recent of which is effective from October 1, 2018, through September 30, 2021.

(c) At all times since at least October 1, 2015, based on § 9(a) of the Act, the Union has been the exclusive collective-bargaining representative of the Unit.

6.

In about August or September 2018, on dates better known to Respondent, Respondent, by Michael Terry (Terry) in Terry's office at the facility, asked its employees why they raised pay issues with the Union and told them that if they had any pay issues they needed to bring those issues to Terry.

7.

(a) Since at least July 9, 2018, Respondent's employees Mark Salopek (Salopek) and Stephen Mullen (Mullen) concertedly complained to Respondent and to the United States Navy regarding the wages, hours, and working conditions of Respondent's employees by saying that Respondent was not following correct procedures for weapons qualifications.

(b) On about July 17, 2018, Respondent constructively discharged its employee Mullen.

(c) On about October 27, 2018, Respondent discharged its employee Salopek.

(d) Respondent engaged in the conduct described above in paragraphs 7(b) and 7(c) because its employees Mullen and Salopek engaged in the conduct described above in paragraph 7(a) and to discourage employees from engaging in these or other protected, concerted activities.

8.

(a) On about December 27, 2018, and January 11, 2019, Respondent's employee Daniel Lein (Lein) concertedly complained about pay for arm-up time for employees under the Union contract.

(b) On about January 12, 2019, Respondent, by Gerald Powless in the lieutenants' office, announced that, because someone had complained about arm-up time, no one would be allowed to go home early.

(c) Respondent engaged in the conduct described above in paragraph 8(b) because Lein engaged in the conduct described above in paragraph 8(a) and to

discourage employees from engaging in these or other Union or protected, concerted activities.

9.

(a) Since about October 30, 2018, the Union has requested that Respondent furnish the Union with the following information related to Respondent's employee Salopek:

i. His personnel file;

ii. A copy of the rule(s), procedure, policy, or requirement that he was accused of violating;

iii. Any document(s) signed by him during the investigation and processing of his discharge;

iv. Copy of any document(s) given him by Respondent relating to his discharge;

v. Any written or taped witness statement(s), including copies of any e-mail communications, related to his discharge;

vi. The written investigation or other record (including but not limited to video evidence) made by or provided to Respondent relating to his discharge from any source, including but not limited to United States government employees and/or representatives;

vii. Any list of witnesses compiled for his discharge;

viii. Record of any prior disciplinary warnings or notifications given to him; and

      ix.    Anything else especially relevant to his discharge, including communications between Respondent, its managers, employees, and/or U.S. government employees, agencies, and/or contractors regarding his discharge;

(b)    Since about January 21, 2019, the Union has requested that Respondent furnish the Union with the following information related to Respondent's employee Salopek:

      i.    Any and all documents, including witness statements and/or investigatory reports supporting Respondent's stated reason for terminating Salopek's employment: "chain of command violation and dishonesty;"

      ii.    Any and all documents, including without limitation, post orders and company policies, defining "chain of command violations;"

      iii.    From 2009 to present, any and all documents relating to discipline imposed against employees other than Salopek for alleged dishonesty and/or chain of command violations and/or weapons mishandling allegations, including without limitation an incident in or around 2013 where Cody Owens allegedly handled a shotgun in an unsafe manner; and

      iv.    Any and all documents relating to any request by the Government client to Respondent to remove Salopek from the contract and/or a revocation of his clearance/site access.

(c)      Since about February 28, 2019, the Union has requested that Respondent furnish the Union with the following information related to Respondent's employee Salopek: Whether, at any time prior to Salopek's discharge in October 2018, the Government client required Xcel to remove Salopek from the contract and/or revoked his clearance or site access.

(d)      Since about May 8, 2019, the Union has requested that Respondent furnish the Union with the following information related to Respondent's employee Salopek and other Unit employees:

     i.     All documents relating to Respondent's assertion in its Amended Answer to the Consolidated Complaint and Notice of Hearing that "Employee Salopek had his security clearance revoked by the Navy, and hence was not, and is not qualified to work at XCEL or for rehire";

     ii.     The date and reason(s) stated by the Navy for the alleged revocation in the item above;

     iii.     The names of Navy personnel having allegedly revoked Salopek's security clearance;

     iv.     Whether, since Salopek's complaints to the Navy in about July 2018, Respondent has changed its procedures for qualifying officers on range, including without limitation whether the Navy permits Respondent to alter targets with black x's to permit officers to more easily "qualify;"

v. Whether, from June 2018 to present, Respondent permits its employees to man a rifle post where they lack a valid rifle "range" qualification;

vi. Any and all documents from Navy personnel Rake and Manson to Respondent from July 2018 to present regarding range qualifications procedures, including without limitation, any documents stating that where an officer lacks a "range qualification" for a given firearm, the officer is not permitted to work posts that require use of the firearm for which the officer lacks the qualification;

vii. All documents relating to complaints made in or around March 2019 by Officers Kitchen and Coler to Commanding Officer Pulley concerning investigations against Lt. Commander McCright regarding his alleged stalking and other misconduct toward former supervisees;

viii. Whether Officers Kitchen and Coler made the complaints in the paragraph 9(d)(vii) above to Respondent before making them to the Navy;

ix. Whether Officers Kitchen and/or Coler were disciplined for their complaints in paragraphs 9(d)(vii) and/or (viii) above; and

x. Supporting documents, if any, for paragraph 9(d)(ix).

(e) The information requested by the Union, as described above in paragraphs 9(a)–9(d) inclusive, is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the Unit.

(f) From about October 30, 2018, to January 21, 2019, Respondent, by Michael Filibeck, failed and refused to furnish the Union with the information requested by it as described above in paragraphs 9(a)(i) and 9(a)(viii).

(g) From about October 30, 2018, to January 24, 2019, Respondent, by Michael Filibeck, failed and refused to furnish the Union with the information requested by it as described above in paragraph 9(a)(vi).

(h) Since about October 30, 2018, Respondent, by Michael Filibeck, has failed and refused to furnish the Union with the information requested by it as described above in paragraphs 9(a)(ii)–9(a)(v), 9(a)(vii), and 9(a)(ix).

(i) From about January 21 to May 16, 2019, Respondent, by its unnamed attorney, has failed and refused to furnish the Union with the information requested by it as described above in paragraphs 9(b)(i)-(iii).

(j) Since about January 21, 2019, Respondent, by its unnamed attorney, has failed and refused to furnish the Union with the information requested by it as described above in paragraph 9(b)(iv).

(k) Since about February 28, 2019, Respondent, by its unnamed attorney, has failed and refused to furnish the Union with the information requested by it as described above in paragraph 9(c).

(l) Since about May 8, 2019, Respondent, by its unnamed attorney, has failed and refused to furnish the Union with the information requested by it as described above in paragraph 9(d).

10.

By the conduct described above in paragraphs 6, 7, and 8, Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in § 7 of the Act in violation of § 8(a)(1) of the Act.

11.

By the conduct described above in paragraph 8, Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of §§ 8(a)(1) and (3) of the Act.

12.

By the conduct described above in paragraph 9, Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of §§ 8(a)(1) and (5) of the Act.

13.

The unfair labor practices of Respondent described above affect commerce within the meaning of § 2(6) and (7) of the Act.

**WHEREFORE,** as part of the remedy for the unfair labor practices alleged above in paragraph 7 the General Counsel seeks an Order requiring that the Respondent reimburse Mark Salopek and Stephen Mullen for all search-for-work and work-related expenses regardless of whether they received interim earnings in excess of these expenses, or at all, during any given quarter, or during the overall backpay period.

**WHEREFORE,** as part of the remedy for the unfair labor practices alleged above in paragraph 7, the General Counsel seeks an Order requiring Respondent to reimburse

Mark Salopek and Stephen Mullen for reasonable consequential damages incurred by them as a result of the Respondent's unlawful conduct.

**WHEREFORE,** the General Counsel requests that a notice posting to remedy the failure to provide information alleged in paragraph 9 be ordered even if the Board determines that some of the Union's requested information no longer is needed or needs to be produced.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

**ANSWER REQUIREMENT**

Respondent is notified that, pursuant to §§ 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the Amended Consolidated Complaint. The answer must be **received by this office on or before August 14, 2019, or postmarked on or before August 13, 2019**. Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other

reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. *See* § 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the Amended Consolidated Complaint are true.

**NOTICE OF HEARING**

PLEASE TAKE NOTICE THAT, at 9 a.m. on the **24th day of September 2019,** in the James C. Sand Hearing Room of the Jackson Federal Building, 915 Second Avenue, 29th Floor, Seattle, Washington, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this Amended

Consolidated Complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated at Seattle, Washington, this 31st day of July, 2019.

RK Hooks

RONALD K. HOOKS
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 19
915 2nd Ave., Ste. 2948
Seattle, WA 98174-1006

Attachments

FORM NLRB 4338
(6-90)

UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD

# NOTICE

Cases 19-CA-232786, et al.

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing. However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements ***will not be granted*** unless good and sufficient grounds are shown ***and*** the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in ***detail***;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

***CERTIFIED MAIL NO.***
***7018 0F360 0000 6458 1887***

MICHAEL FILIBECK
CHIEF EXECUTIVE OFFICER
XCEL PROTECTIVE SERVICES, INC.
6747 ACADEMY ROAD N/E SUITE A
ALBUQUERQUE, NM 87109

**FIRST CLASS MAIL**

JASON BOWLES, ATTORNEY
BOWLES LAW FIRM
500 MARQUETTE AVE NW
SUITE 1060
ALBUQUERQUE, NM 87125-5186

**FIRST CLASS MAIL**

JASON BOWLES, ATTORNEY
BOWLES LAW FIRM
P.O. BOX 25186
ALBUQUERQUE, NM 87125-5186

DAVID HICKEY
INTERNATIONAL UNION, SECURITY, POLICE, AND FIRE PROFESSIONALS OF AMERICA, LOCAL 5
25510 KELLY RD
ROSEVILLE, MI 48066

**FIRST CLASS MAIL**

RICHARD M. OLSZEWSKI, ATTORNEY
GREGORY, MOORE, BROOKS & CLARK, PC
65 CADILLAC SQUARE, SUITE 3727
DETROIT, MI 48226-2893

Mr. John Morgan, CEO
Xcel Protective Services
Nav. Mag. Indian Island, Contract 10

June 28, 2018

Re; Advisement by Lieutenant Doug Lux
On 6/25/2018 of open invitation from CEO
John Morgan to write statements to him regarding
work place issues.

Mr. Morgan,

Proceeding initially on the words of Lieutenant Lux, and after our conversation where you encouraged employees to contact you personally because it is "Our" Company regarding issues, because you cannot possibly know what is going at all of your contracts, I offer this memo.

On 6/25/2018 Lt. Doug Lux advised myself, Officer Ben Gentry, and Officer Steve Mullen that he had gone into Mr. Michael Terry's Officer and requested to address serious issues in the work place with you, the foremost being the work schedule, and the employee morale, and "everything". He then told us that "Morgan wants any officer who wants to write a memo regarding issues in the work place they can do so without any consequences".

I responded by addressing the holding of official qualifications at a gravel pit which is in violation of SECNAV, and OPNAV. Lt. Lux said he knew nothing about this, and Officer Mullen reaffirmed my statement by stating that is had just been done again with Officer Emily Coler.

After I had been home for a while I received a telephone call from Lt. Lux. He told me he had called you regarding what I had said. He stated "Mr. Morgan said Mark is right". He further told me that you asked if I would be willing to oversee all training sort of like an oversight, and while working in that capacity it would be paid at Lieutenants wage. I told him that I have always been there for the company and I am willing to help out now. Lieutenant Lux thanked me and said he would pass this on to you.

The following day after shift I sat down with Lt. Lux and asked for more details. Lt. Lux was rather vague regarding how it was going to work, and said it wouldn't start until around July 15th anyway. He then got into the issue of the range regarding Lt. Gerald Powless. Lt. Lux stated "Gerald should have known better to take the word of a person that it was OK to do this, he should have researched it himself". I asked him to the person was and he said, "A person". I replied, "You mean Robert Armstrong". He replied, "OK so you know who". This is the part of the conversation that was disconcerting to me along with the following paragraph which has spawned this detailed memo.

I responded to Lt. Lux, and I told him that Lt. Powless was not the only person involved in this, and that this issue was approved, sanctioned and authorized by Mr. Michael Terry from the beginning. Lt. Lux leaned back in his chair, took a deep breath and looked up and to the left, and then leaned forward and repeated, "Gerald should have known better". I then stated, "You know as well as I do that this was approved from the top, and ultimately the Manager is responsible.

GC Exhibit: 3

Lt. Lux repeated the same body language and repeated, "Gerald should have known better". I believe I then stated "You're going to throw this whole thing on Gerald aren't you?" Lt. Lux just looked at me.

The next thing pertinent to this memo is that Lt. Lux told me that all of the memos were now just going to go to him, and he was going to enact the changes immediately. I received that as you were not going to receive the comments and concerns of employees now. Whether right or wrong I felt by the situation that they possibly wanted this thing to go away now without a full disclosure. I then informed him that my memo was going to go directly to you. He had no response, and he left to go to a meeting.

A synopsis of Range Practices:

My first knowledge of Guards going to a gravel pit to "Qualify" started back when Mr. Michael Terry was a guard and part-time Lieutenant. Michael Terry would comment that a Guard by the name of "Laura" had failed range and he would buy ammunition and take her out and "Qualify" her. At one point I asked Mr. Terry if he thought this was a good idea. I offered that a person failing at an official range, and then disappearing to a remote location and magically passes and qualifies without witnesses could give the impression of impropriety. Eventually this stopped.

The second incident that I am aware of is when Officer Cunningham failed the range with the M500 Shotgun. Officer Cunningham was brought to either a gravel pit or other location by Officer Schryver who supplied his personally owned pistol grip shotgun to Officer Cunningham. Officer Cunningham came back "Qualified". I approached Mr. Michael Terry upon hearing this and again I shared my concerns with this practice and stated to the effect of that I could not imagine this would be sanctioned by the Navy under any circumstances, and that this could come back to bite him. Mr. Terry replied to me that it was allowed by the Navy.

Officer Schryver's recent account of the events were that he was asked what he thought was to familiarize Officer Cunningham with the shotgun. He said Mr. Michael Terry personally handed him shotgun rounds for this. When he returned for work he said he felt that Officer Cunningham did better. He said when he found out that they were considering that event a qualification, he rejected it by stating that he was not certified to qualify anyone, and that he thought that was just for familiarization with the weapon. The "qualification" status still stood according to Officer Schryver.

The next incident as explained to me by Officer Schryver recently was that he was again approached by Lt. Gerald Powless regarding an up-coming range. Lt. Powless reportedly suggested they bring officers to a gravel pit qualify them. Officer Schryver rejected the suggestion stating that he was not comfortable with it. Lt. Powless reportedly responded by stating they would just schedule a range at Bangor Naval Base.

The next incident occurred on July 7, 2017. I was standing near the Small Boat Pier at Contract 10, Indian Island. Mr. Michael Terry was there as well. Officer Armstrong drove up and stated to Mr. Terry, "Hey Mike, I got that AR15 and a 9mm". I looked over at Mr. Terry and he closed his eyes and lowered his head. I asked Officer Armstrong, "What are you talking about?" Officer Armstrong responded, "Oh, I'm bringing an AR15 and a 9mm for range at Schroeder's house". "Schroeder" is Officer Schroeder for Xcel Protection Services on Indian Island. I responded "Oh that's great, that's really great". I got in my car and drove away.

In the meantime Officer Schryver recently recalled to me that he was approached by Lt. Powless about this incident and Officer Schryver again stated he did not feel comfortable with this practice. Lt. Powless reportedly told Officer Schryver that Mr. Michael Terry told him that it was OK for them to do it and it was allowed.

Later before the range at Schroders house I was talking with Mr. Terry on the phone. During the conversation he told me he was at the store buying .223 ammo for the range at Schroeder's house.

After the range at Schroder's house Officers in general were not happy with what happened. Officer Nitsel (who is no longer with us) was a new employee, and recently retired from the Navy as a Master Chief. Nitsel was a CART Inspector, and took part in inspecting our training records during the CART Inspection. Officer Nitsel told me in person that that range was a deal breaker, and that the company could possibly lose the contract over this if it were reported. I went over OPNAV 3591.1f with him briefly which confirmed ranges that are not inspected and un-approved by the Navy were not allowed, and only Government owned and issued weapons and ammunition may be use. There was an exception indicating contractor provided ammunition may be used but it must be inspected and approved first.

I spoke with Officer Robert Armstrong a few days after the Schroeder house range. By that time I had reviewed SECNAV and OPNAV and told him this practice is forbidden and should not be done again for the aforementioned reasons.

On 5/9/2018 I attended range as a range safety officer. On this particular range we had 13 people on the range. During this range three senior officers (in seniority) could not pass their rifle qualification. Those officers were officers Lauritzen, Cunningham, and David. Officer Cunningham could not pass his shotgun either. Officer Cunningham's ability to effectively handle, and manipulate the two weapons came into question by me and a few others at the range especially when unslinging his weapons, but he was not unsafe.

The solution for this at the range was that Lt. Gerald Powless altered their targets by putting a large black cross with a black felt pen on their targets with the intersection of the cross dead center. This was done so that they could see the target. Acting Lt. Mitch Vancura assisted Officer Cunningham with his shotgun shoot by alter the silhouette by putting a white piece of paper at the six O'clock position so that Officer Cunningham could effectively see and aim his shotgun at the target. They all passed except for Officer Cunningham who still could not pass his rifle.

We also had two newly hired officers on the range, Officers Daniel Lein, and Officer Emily Coler. Officer Lein was able to manipulate his rifle safely, but he struggle with getting use to the rifle. He did not pass the M4 rifle qualification, but only by a very small margin. Officer Coler struggled horribly with how to handle both the rifle and the shotgun, and at times myself and others thought and stated that she should be taken off the range because of unsafe handling with the shotgun. Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun.

After this range is when I called you and advised you of the problems. As you stated on your call back Mr. Michael Terry said he would be completely transparent with employees regarding our concerns at the range, and that you impressed upon him to do everything according to procedure.

The next scheduled range after our telephone conversation was approximately two weeks later. Officer Cunningham was re-qualifying with the M4 Rifle. Officer Cunningham came back qualified with the rifle. I later asked Lt. Del Rosario who was at the range if they had altered the targets for Officer Cunningham, he nodded his head and said yes, and then shook his head.

Finally we are at this last range;

I was approached by a newly hired officer by the name of Daniel Lein. Officer Lein is a retired Navy Chief, and has been working Government Contract Security for the last 10 years. He told me that he was told by Lt. Powless that he and Officer Emily Coler were going to be taken to a gravel pit to be qualified with the M4 Rifle. He told me he asked if he was going to be paid for it, and Lt. Powless stated "no". Lein told me that he was extremely uncomfortable with this plan and was not going to go. I agreed with him.

During the time approaching the scheduled gravel pit range Robert Armstrong reportedly told Officer Mullen that he told Lt. Powless that having a range qualification at a gravel pit was strictly forbidden. We then heard that Powless was told by Robert Armstrong that it was allowed. At the same time Officer Robert Armstrong was making it well known that he was loaning his personal AR15 to Lt. Powless for the qualification. Lt. Powless even told me what a nice AR15 Robert Armstrong loaned him for the shoot.

After the "Gravel Pit Range" occurred, Emily Coler was allowed to work all posts with all weapons, and she had qualified with the rifle and the shotgun. The shotgun used was her own personally owned shotgun.

While working a post with Officer Ryan Earl (Recently retired Senior Chief from the Navy and a Navy RSO) and Daniel Lein, Officer Lein told Officer Earl what had happened. Officer Earl immediately stated, "They did what!" "I'm an RSO, that's what I did in the Navy and that is against the law!" "That means they have to fill out the forms and send them up with false information!" "You better be really glad you didn't go Bro!"

On 6/26/2018 I worked a Post with Emily Coler. She was very upset that she had to re-qualify with her weapons. I told her that since she qualified at the gravel pit, she should have no problem qualifying at the Bangor Range. She was silent.

She also told me that she had spent five hours at the gravel pit and was told she was not going to be paid for it. She was very upset about this because she is the only source of income for their family right now. While I was on post, she received a phone call from Mr. Michael Terry. She explained to Mr. Terry the issue about the five hours, and at the conclusion of the phone call she told me that Mr. Terry told her she would be paid for the 5 hours, and that he had no idea why she was told by Lt. Powless she would not be paid.

CONCLUSION:

Some people are asking in the work place why some of us are making such a big deal out of this, including reportedly Robert Armstrong.

Whether we are right or wrong, the reasons for us include but are not limited to these premises:

1. First and foremost someone could have gotten hurt from a ricochet, or a twisted ankle, or tripping and accidental discharge. Secondly any number things could place this company in civil liability.

2. We believe we <u>may</u> have officers that <u>may</u> be unable to safely fire their weapons accurately and handle them properly in the event we have a critical incident on the base, especially at the ECP (Entry Control Point).

3. It's against the US Navy OPNAV safety and operating procedures and ethics. Just simple ethics and professionalism.

4. If discovered by the Navy, and an Inspector General Complaint was made, the consequences could be catastrophic for our company as mentioned by Retired Master Chief Nitsel, and tarnish not only the Company's name, but all Officers employed by the Company.

5. It could possibly effect the Company's CPAR Rating

6. It is clear and evident that Criminal Actions <u>may</u> have occurred according to Officer Ryan Earl, who served 30 years in the Navy and is an expert on the subject.

7. Under Washington State Law 9.41.113 and 9.41.114 Officer Robert Armstrong violated the law by transferring a firearm to another individual, and then it was transferred to a third party without a back ground check which is a Gross Misdemeanor for the first offense. After once convicted it becomes a Class C Felony if convicted again. Since this occurred during the official practices of our company, its possible this company's Washington State Security License could be in jeopardy, as well as our ability to conduct business. It also jeopardizes our customer the United States Navy's reputation.

   If there had been an accident and Law Enforcement must respond to all firearms accidents and incidents, the serial number would definitely have been run and the owner determined.

**Re: CONFIDENTIAL**
John Morgan
**Sent:** Friday, June 29, 2018 12:02 AM
**To:** Mark Salopek

Mark,

I read the first part of your letter. So much was misinterpreted that I don't know where to begin. I will work with Michael to see what we need to do. It's unfortunate the message was confused, it was our intent to include your talent I training especially compliance but it seems there is a major disconnect between your and your Captain. I don't know if you realize it but that man has stepped up for you on many occasions just as you have for this company. We need to fix this relationship. I will be in touch.

***John Morgan***
**CEO**
**Xcel Protective Services, Inc.**
**Xcel Management Solutions, LLC**

(469) 579-3496 Office
(469) 331-0014 Direct
(469) 331-0014 Fax
John.Morgan@xps-us.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

On Jun 28, 2018, at 11:59 PM, Mark Salopek <Mark.Salopek@xps-us.com> wrote:

> Mr. Morgan,
>
> I know you are very busy. And I know rather long memos take up your time. But a few of us are asking for you to take a few minutes and review this with our concerns.
>
> We are hoping you will understand once you read it and understand our concerns.
>
> Sincerely,
>
> Officer Mark Salopek
>
> <Xcel Memo Work Issues.docx>

GC Exhibit: 4

●●●●○ AT&T LTE 15:07

Kevin

Tue, Jun 5, 21:07

When could i see the wood counter tops? My guy really wants to get the bar done

Tue, Jul 10, 18:19

So I'm on your little fucking list, your a fucking idiot & don't know what you have stepped in. Better call your butt buddy Mark

Slander with no proof dumb ass

Stupid leading stupider 



M Gmail Anonymous Anonymous <ig.request18@gmail.com>

# OSHA Letter From Xcel
8 messages

**Anonymous Anonymous** <ig.request18@gmail.com> Tue, Aug 21, 2018 at 1:06 AM
To: "Bobrowski, Joseph A CIV Navy Region NW, N00G" <joseph.a.bobrowski@navy.mil>

I think you will find some interesting contradictions

**3.2 XCEL John Morgan Statement of Position 2018-08-09-2.pdf**
107K

---

**Anonymous Anonymous** <ig.request18@gmail.com> Tue, Aug 21, 2018 at 9:28 AM
To: richard.townsend@navy.mil

[Quoted text hidden]

---

**Townsend, Richard J CIV Navy Region NW, N00G** <richard.townsend@navy.mil> Tue, Aug 21, 2018 at 9:38 AM
To: Anonymous Anonymous <ig.request18@gmail.com>

I have received a total of five emails. None contained any attachments.

R/,
Richard

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com>
Sent: Tuesday, August 21, 2018 9:28 AM
To: Townsend, Richard J CIV Navy Region NW, N00G <richard.townsend@navy.mil>
Subject: [Non-DoD Source] Re: OSHA Letter From Xcel
[Quoted text hidden]

---

**Townsend, Richard J CIV Navy Region NW, N00G** <richard.townsend@navy.mil> Tue, Aug 21, 2018 at 9:53 AM
To: Anonymous Anonymous <ig.request18@gmail.com>
Cc: "Bobrowski, Joseph A CIV Navy Region NW, N00G" <joseph.a.bobrowski@navy.mil>

Mr. Salopek,

I am now back at my desk. I have checked my spam folder also. I have received five emails from you since 0926 today. None contained any attachments, just a short introductory sentence.

R/,
Richard

Richard J. Townsend
Deputy Inspector General
Navy Region Northwest
Phone: (360) 396-6228

DSN: (312) 744-6228
Cell: (360) 340-4859
Fax: (360) 396-1951
Email: richard.townsend@navy.mil
SIPR: richard.townsend@navy.smil.mil
Address: 1100 Hunley Road, Room 109
Silverdale, WA 98315-1100

**FOR OFFICIAL USE ONLY-PRIVACY SENSITIVE** This e-mail, including any attachments, may contain information that requires protection from unauthorized disclosure. Do not disseminate this e-mail, or its contents, to anyone who does not have an official need for access. Any misuse or unauthorized disclosure can result in both civil and criminal penalties. If you are not an intended recipient of this e-mail, please delete it after notifying the sender of erroneous transmission.

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com>
Sent: Tuesday, August 21, 2018 9:28 AM
To: Townsend, Richard J CIV Navy Region NW, N00G <richard.townsend@navy.mil>
Subject: [Non-DoD Source] Re: OSHA Letter From Xcel

[Quoted text hidden]

---

**Anonymous Anonymous** <ig.request18@gmail.com> Tue, Aug 21, 2018 at 10:00 AM
To: "Townsend, Richard J CIV Navy Region NW, N00G" <richard.townsend@navy.mil>

I apologize. I tried to forward from my sent box. I will resend new docs.
[Quoted text hidden]

---

**Anonymous Anonymous** <ig.request18@gmail.com> Tue, Aug 21, 2018 at 11:22 AM
To: "Townsend, Richard J CIV Navy Region NW, N00G" <richard.townsend@navy.mil>

I'm hoping the documents went through. Please let me know if they did not. I don't use Gmail much and if you don't have them there's a problem with my ignorance of the system functions.

M. Salopek
[Quoted text hidden]

---

**Townsend, Richard J CIV Navy Region NW, N00G** <richard.townsend@navy.mil> Tue, Aug 21, 2018 at 3:01 PM
To: Anonymous Anonymous <ig.request18@gmail.com>
Cc: "Bobrowski, Joseph A CIV Navy Region NW, N00G" <joseph.a.bobrowski@navy.mil>

Mr. Salopek,

Thanks for the continued effort. Yes, I did receive an additional six emails between 1000 and 1015 with attachments.

We will conduct a review and determine a course of action over the next few days.

R/,
Richard

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com>

Sent: Tuesday, August 21, 2018 11:22 AM
To: Townsend, Richard J CIV Navy Region NW, N00G <richard.townsend@navy.mil>
Subject: Re: [Non-DoD Source] Re: OSHA Letter From Xcel

I'm hoping the documents went through. Please let me know if they did not. I don't use Gmail much and if you don't have them there's a problem with my ignorance of the system functions.

M. Salopek

On Tue, Aug 21, 2018 at 9:53 AM, Townsend, Richard J CIV Navy Region NW, N00G <richard.townsend@navy.mil <mailto:richard.townsend@navy.mil> > wrote:

Mr. Salopek,

I am now back at my desk. I have checked my spam folder also. I have received five emails from you since 0926 today. None contained any attachments, just a short introductory sentence.

R/,
Richard

Richard J. Townsend
Deputy Inspector General
Navy Region Northwest
Phone: (360) 396-6228
DSN: (312) 744-6228
Cell: (360) 340-4859
Fax: (360) 396-1951
Email: richard.townsend@navy.mil <mailto:richard.townsend@navy.mil>
SIPR: richard.townsend@navy.smil.mil <mailto:richard.townsend@navy.smil.mil>
Address: 1100 Hunley Road, Room 109
Silverdale, WA 98315-1100

**FOR OFFICIAL USE ONLY-PRIVACY SENSITIVE** This e-mail, including any attachments, may contain information that requires protection from unauthorized disclosure. Do not disseminate this e-mail, or its contents, to anyone who does not have an official need for access. Any misuse or unauthorized disclosure can result in both civil and criminal penalties. If you are not an intended recipient of this e-mail, please delete it after notifying the sender of erroneous transmission.

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com <mailto:ig.request18@gmail.com> >
Sent: Tuesday, August 21, 2018 9:28 AM
To: Townsend, Richard J CIV Navy Region NW, N00G <richard.townsend@navy.mil <mailto:richard.townsend@navy.mil> >
Subject: [Non-DoD Source] Re: OSHA Letter From Xcel

[Quoted text hidden]

---

**Anonymous Anonymous** <ig.request18@gmail.com> Tue, Aug 21, 2018 at 3:02 PM
To: "Townsend, Richard J CIV Navy Region NW, N00G" <richard.townsend@navy.mil>

Thank you sir. I appreciate it.

M Salopek

[Quoted text hidden]

Anonymous Anonymous <ig.request18@gmail.com>

## Indian Island Request

2 messages

**Anonymous Anonymous** <ig.request18@gmail.com> Tue, Aug 21, 2018 at 9:19 AM
To: richard.townsend@navy.mil

I received an automatic email response from Mr. Bobrowski stating he was out of the office until 8/27/2018. I sent him the documents he requested. The auto-reply said to please contact you for assistance. Since you were present during the telephone interview I wanted to make sure you received everything I sent, or if you needed it re-sent again to you.

*Mark Salopek*

**Townsend, Richard J CIV Navy Region NW, N00G** <richard.townsend@navy.mil> Tue, Aug 21, 2018 at 9:21 AM
To: Anonymous Anonymous <ig.request18@gmail.com>

Mr. Salopek,

I do not have access to Joe's email while he is on leave. Please forward the documentation to me so I may review.

Thanks,
Richard
[Quoted text hidden]

 **Anonymous Anonymous <ig.request18@gmail.com>**

## Automatic reply: [Non-DoD Source] Memorandum regarding request for investigation

1 message

**Bobrowski, Joseph A CIV Navy Region NW, N00G** <joseph.a.bobrowski@navy.mil> Mon, Aug 20, 2018 at 9:08 PM
To: Anonymous Anonymous <ig.request18@gmail.com>

I am out of the office until 27 Aug. If you need immediate COMNAVREG NW IG-related assistance, please contact Mr. Richard Townsend at richard.townsend@navy.mil, (360) 396-6228 or Ms. Brenna Folkman at brenna.folkman@navy.mil, (360) 396-4298.

 Anonymous Anonymous <ig.request18@gmail.com>

**Notification of Case Closure**
3 messages

**Bobrowski, Joseph A CIV Navy Region NW, N00G** <joseph.a.bobrowski@navy.mil> Fri, Aug 17, 2018 at 8:45 AM
To: Anonymous Anonymous <ig.request18@gmail.com>

Hello,

Unfortunately, your email to the CNRNW IG Hotline (below) does not provide sufficient information for my office to analyze the issues, determine who may be a wrongdoer(s), etc.

Therefore, the case is not appropriate for an IG investigation. We have closed your complaint in the Navy IG case tracking system, but please feel free to contact our office again in the future if you are able provide clarifying information - I would recommend you utilize the IG Action Request form I emailed you yesterday.

Thank you,

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil
Office: (360) 396-6179 (DSN: 744)

-----Original Message-----
From: Bobrowski, Joseph A CIV Navy Region NW, N00G
Sent: Thursday, August 16, 2018 7:05 AM
To: 'Anonymous Anonymous' <ig.request18@gmail.com>
Subject: RE: Request For Investigation

Hello,

To help clarify your concerns, alleged standards or policies violated, alleged wrongdoer(s), and so that we can then determine the proper and most efficient means of addressing any potential issues, please fill out and return the attached IG Action Request.

Thank you, and please let me know if you have any questions.

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil
Office: (360) 396-6179 (DSN: 744)

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com>
Sent: Wednesday, August 15, 2018 4:28 PM

To: CNRNW FLAG IG Hotline <IGHotline.cnrnw@navy.mil>
Subject: [Non-DoD Source] Request For Investigation

Location: Naval Magazine Indian Island, Port Hadlock

1. Contract Security Officers sought advice from base Commanding Officer after exhausting efforts within their own company chain of command regarding use of unauthorized range locations; use of unauthorized weapons; documents regarding weapons qualifications and falsification of documents relating to range qualifications.

2. Administrative Fact Finding Inquiry by Contract Monitors has reportedly concluded. Inquiry started on or about 7/11/18.

3. Important witnesses not interviewed

4. Contract Monitors stated they could not find any documentation supporting claim. Additional information provided. No known follow-up of additional information.

5. Official sign out logs reportedly whited out.

6. On 8/14/2018 an officer has stepped forward. By his words he was told to sign or re-sign a previous weapons sign-out log approximately 2 weeks ago. Under the circumstances that only he can explain believes this was wrong.

7. 4 Officers had the courage to step forward and report these very serious wrong doings. These Officers need professional; independent; un-biased investigators. If there is not a proper investigation there will never be another report of safety, ethics or criminal conduct again out of this contract because the inquiry caused employees to lose trust and hope in justice.

8. What the 4 officers reported actually happened and other officers know it happened as well.

9. Investigation is needed quickly so people do not forget what they saw and heard.

10. Factual Documents supporting claim are available.

11. Work place harassment has occurred.

Please help with these ethics and safety violations

Phone: (619) 609-8961
          (360) 821-9113

---

**Anonymous Anonymous** <ig.request18@gmail.com>                    Fri, Aug 17, 2018 at 1:52 PM
To: "Bobrowski, Joseph A CIV Navy Region NW, N00G" <joseph.a.bobrowski@navy.mil>

Dear sir,

We want to apologise for not getting the forms to you on time. We have absolutely no problem talking with you directly and actually prefer it.

But in the mean time will continue to organize what we have for you.

Would you be available for a telephone or in person discussion.

Sincerely
[Quoted text hidden]

---

**Bobrowski, Joseph A CIV Navy Region NW, N00G** <joseph.a.bobrowski@navy.mil> — Fri, Aug 17, 2018 at 2:06 PM
To: Anonymous Anonymous <ig.request18@gmail.com>

Absolutely - my telephone number is below. If I'm not in the office you can also speak to my Deputy, Mr. Richard Townsend, 360-396-6228.

If you would prefer to come to the CNRNW IG office in person, my staff and I are located at NBK-Bangor, Bldg 1100, Rm 109 (lower deck).

Thank you,

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil
Office: (360) 396-6179 (DSN: 744)

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com>
Sent: Friday, August 17, 2018 1:53 PM
To: Bobrowski, Joseph A CIV Navy Region NW, N00G <joseph.a.bobrowski@navy.mil>
Subject: [Non-DoD Source] Re: Notification of Case Closure

Dear sir,

We want to apologise for not getting the forms to you on time. We have absolutely no problem talking with you directly and actually prefer it.

But in the mean time will continue to organize what we have for you.

Would you be available for a telephone or in person discussion.

Sincerely

On Aug 17, 2018 8:45 AM, "Bobrowski, Joseph A CIV Navy Region NW, N00G" <joseph.a.bobrowski@navy.mil <mailto:joseph.a.bobrowski@navy.mil> > wrote:

> Hello,
>
> Unfortunately, your email to the CNRNW IG Hotline (below) does not provide sufficient information for my office to analyze the issues, determine who may be a wrongdoer(s), etc.
>
> Therefore, the case is not appropriate for an IG investigation. We have closed your complaint in the Navy IG case tracking system, but please feel free to contact our office again in the future if you are able provide clarifying information - I would recommend you utilize the IG Action Request form I emailed you yesterday.

Thank you,

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil <mailto:joseph.a.bobrowski@navy.mil>
Office: (360) 396-6179 (DSN: 744)

-----Original Message-----
From: Bobrowski, Joseph A CIV Navy Region NW, N00G
Sent: Thursday, August 16, 2018 7:05 AM
To: 'Anonymous Anonymous' <ig.request18@gmail.com
<mailto:ig.request18@gmail.com> >
Subject: RE: Request For Investigation

Hello,

To help clarify your concerns, alleged standards or policies violated, alleged wrongdoer(s), and so that we can then determine the proper and most efficient means of addressing any potential issues, please fill out and return the attached IG Action Request.

Thank you, and please let me know if you have any questions.

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil <mailto:joseph.a.bobrowski@navy.mil>
Office: (360) 396-6179 (DSN: 744)

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com
<mailto:ig.request18@gmail.com> >
Sent: Wednesday, August 15, 2018 4:28 PM
To: CNRNW FLAG IG Hotline <IGHotline.cnrnw@navy.mil
[Quoted text hidden]

Anonymous Anonymous <ig.request18@gmail.com>

## RE: Request For Investigation

1 message

**Bobrowski, Joseph A CIV Navy Region NW, N00G** <joseph.a.bobrowski@navy.mil> Thu, Aug 16, 2018 at 7:04 AM
To: Anonymous Anonymous <ig.request18@gmail.com>

Hello,

To help clarify your concerns, alleged standards or policies violated, alleged wrongdoer(s), and so that we can then determine the proper and most efficient means of addressing any potential issues, please fill out and return the attached IG Action Request.

Thank you, and please let me know if you have any questions.

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil
Office: (360) 396-6179 (DSN: 744)

-----Original Message-----
From: Anonymous Anonymous <ig.request18@gmail.com>
Sent: Wednesday, August 15, 2018 4:28 PM
To: CNRNW FLAG IG Hotline <IGHotline.cnrnw@navy.mil>
Subject: [Non-DoD Source] Request For Investigation

Location: Naval Magazine Indian Island, Port Hadlock

1. Contract Security Officers sought advice from base Commanding Officer after exhausting efforts within their own company chain of command regarding use of unauthorized range locations; use of unauthorized weapons; documents regarding weapons qualifications and falsification of documents relating to range qualifications.

2. Administrative Fact Finding Inquiry by Contract Monitors has reportedly concluded. Inquiry started on or about 7/11/18.

3. Important witnesses not interviewed

4. Contract Monitors stated they could not find any documentation supporting claim. Additional information provided. No known follow-up of additional information.

5. Official sign out logs reportedly whited out.

6. On 8/14/2018 an officer has stepped forward. By his words he was told to sign or re-sign a previous weapons sign-out log approximately 2 weeks ago. Under the circumstances that only he can explain believes this was wrong.

7. 4 Officers had the courage to step forward and report these very serious

wrong doings. These Officers need professional; independent; un-biased investigators. If there is not a proper investigation there will never be another report of safety, ethics or criminal conduct again out of this contract because the inquiry caused employees to lose trust and hope in justice.

8. What the 4 officers reported actually happened and other officers know it happened as well.

9. Investigation is needed quickly so people do not forget what they saw and heard.

10. Factual Documents supporting claim are available.

11. Work place harassment has occurred.

Please help with these ethics and safety violations

Phone: (619) 609-8961
(360) 821-9113

---

**IG Action Request.pdf**
42K

 Anonymous Anonymous <ig.request18@gmail.com>

## Notification of CNRNW IG Case Referral

1 message

**Bobrowski, Joseph A CIV Navy Region NW, N00G** <joseph.a.bobrowski@navy.mil> Tue, Sep 11, 2018 at 2:20 PM
To: Anonymous Anonymous <ig.request18@gmail.com>
Cc: "Townsend, Richard J CIV Navy Region NW, N00G" <richard.townsend@navy.mil>

Mr. Salopek and Mr. Lein--

This is in response to your 15 Aug 18 complaint (Case # 201803340) submitted to Navy Region Northwest, Office of the Inspector General, in which you expressed various concerns regarding Xcel contractor employees' weapons qualification methods, documentation, and processes, a related July 2018 review conducted by CNRNW N3 Performance Assessment Representatives, etc.

IAW SECNAVINST 5370.5B and NAVINSGEN Investigations Manual, we performed a detailed analysis of the issues and concerns outlined in the statements you provided, reviewed applicable regulations, guidance, etc., and determined this case is not appropriate for an IG investigation. However, without divulging your identifying information to anyone outside IG channels, I referred various facets to the Naval Magazine Indian Island commanding officer and CNRNW N3 for their review and response to my office; I will in turn ensure appropriate CNRNW leadership is aware of any potential areas of concern that may exist.

Please note that this is the last email you will receive from our office regarding this complaint.

Thank you for bringing these matters to our attention.

Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil
(360) 396-6179 (DSN: 744)

 Anonymous Anonymous <ig.request18@gmail.com>

## Update regarding request

2 messages

**Anonymous Anonymous** <ig.request18@gmail.com> Mon, Aug 27, 2018 at 12:19 PM
To: "Bobrowski, Joseph A CIV Navy Region NW, N00G" <joseph.a.bobrowski@navy.mil>

Mr. Bobrowski,

Since our last conversation, and the emails I sent you; with respect to the memorandum I sent you, and with attention given to page 3 and page 4 there are two corrections to be made.

This past week while researching to try and get you the most accurate information, on page 3 it states that on or about January 31, 2018 there was a range where targets were altered. We have determined that we were about 21 days off. That range according to a newly obtained previous schedule actually occurred on February 21, 2018 to the best of our knowledge, but it makes more sense now to me.

Furthermore, on page 4 the sequence of events are out of order regarding when I telephoned my CEO; ref paragraph 5. It was actually after the February 21, 2018 range (formerly Sept. 31 , 2018), and before the March 9, 2018 range. I am suspecting I added paragraphs while drafting the document and simply forgot to move it where it belongs. My apologies.

I want you to know there are more supporting documents regarding this issue which include but are not limited to emails in regard to planned range qualifications, copies of previous schedules, and my phone call records that I currently have relating to this issue. We are continuing to research so that we may hopefully provide you with the clearest picture as possible.

If there is anything else we can do please let us know.

Sincerely,

Mark Salopek
Daniel Lein

---

**Bobrowski, Joseph A CIV Navy Region NW, N00G** <joseph.a.bobrowski@navy.mil> Mon, Aug 27, 2018 at 12:24 PM
To: Anonymous Anonymous <ig.request18@gmail.com>
Cc: "Townsend, Richard J CIV Navy Region NW, N00G" <richard.townsend@navy.mil>

Mr. Salopek and Mr. Lein--

Thank you for the update.

VR,
Joseph A. Bobrowski
Inspector General
Navy Region Northwest

joseph.a.bobrowski@navy.mil
Office: (360) 396-6179 (DSN: 744)
[Quoted text hidden]

**PRIVACY ACT STATEMENT**
DATA REQUIRED BY THE PRIVACY ACT OF 1974

For Personal Information Taken During
Inspector General Interviews

**AUTHORITY**: Title 10 United States Code § 5014 and 5020

**PURPOSE**: To determine the facts and circumstances surroundings allegations or complaints against Naval personnel and/or Navy/Marine Corps activities. To present findings, conclusions and recommendations developed from investigations and inquiries to the Secretary of the Navy, CNO, CMC, or other appropriate Commanders. Disclosure of Social Security Account Number is voluntary, and if requested is used to further identify the individual providing the information.

**USERS**: Information is used for the purpose set forth above and may be:
a. Forwarded to federal, state, or local law enforcement agencies for their use;
b. Used as a basis for summaries, briefings, or responses to Members of Congress or other agencies in the Executive Branch of the Federal Government;
c. Provided to Congress or other federal, state, or local agencies, when determined necessary.

**MANDATORY OR VOLUNTARY DISCLOSURE AND EFFECT ON INDIVIDUAL NOT PROVIDING INFORMATION:**

**MILITARY PERSONNEL**: Disclosure of personal information is mandatory and failure to do so may subject the individual to disciplinary action.

**DEPARTMENT OF THE NAVY CIVILIAN PERSONNEL**: Failure to disclose personal information in relation to individual's position and responsibilities may subject the individual to adverse personnel action.

**ALL OTHER PERSONNEL**: Disclosure of personal information is voluntary and no adverse action can be taken against individuals for refusing to provide information about themselves.

**ACKNOWLEDGEMENT**

I understand the provisions of the Privacy Act of 1974 as related to me through the foregoing statement.

MARK J. SALOPEK
Name (Print)

Command/Code

CONTRACTOR/GUARD II
Position/Title

Rate/Rank/Grade

360 821-9113
Telephone Number/Extension

[signature] 9/4/2018
Signature Date

FOR OFFICIAL USE ONLY

**CONFIDENTIALITY STATEMENT**

In order to protect the confidentiality and rights, privacy, and reputation of all people involved in a Commander, Navy Installations Command (CNIC) Inspector General (IG) fact-finding consultation (inquiry, investigation, or Hotline) I may periodically be consulted by a CNIC IG investigator. I understand that I may not discuss or reveal any matters or aspect of the subject consultation(s) with anyone without permission of the CNIC IG. If someone attempts to gain information specific to my consultation with the investigating officer, I will notify the CNIC IG immediately.

I understand that my identity will be protected from disclosure to the extent possible, consistent with the fact-finding mission of an inquiry/investigation; however, that confidentiality cannot be guaranteed. I understand that disclosure of my identity may be made to competent authority and persons who have a need to know. Acknowledging that withholding consent may hinder the IG fact-finding process and may result in a lack of necessary information, I consent to the disclosure of my identity as necessary to produce a complete and impartial inquiry.

Therefore, I agree to keep confidential all information related to any inquiry/investigation which CNIC IG investigator may address with me. I also understand that this confidentiality agreement remains in effect until I am released from this responsibility by CNIC IG or other competent authority.

PRINT FULL NAME MARK JOSEPH SALOPEK

SIGNATURE [signature] DATE 9/4/2018

**Failure to adhere to the conditions of this document may result in being charged with a violation of Title 18 United States Code, Section 1512.**

**Importance of Presenting Truthful Testimony (Civilian)**

United States Code, Title 18 Section 1001 (18 USC § 1001) states,

(a) ., whoever, in any matter within the jurisdiction of the executive, legislative, judicial branch of the Government of the United States, knowingly and willfully:

(1) falsifies, conceals, or covers up by any trick scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement of entry;

Shall be fined under this title or imprisoned not more than 5 years, or both."

Failure to adhere to the conditions of this statement may result in being charged with a violation of 18 USC § 1001.

---

I acknowlege that I have read and understand the above information.

MARK JOSEPH SALOPEK
Print full name

[signature]
Signature

9/4/2018
Date

For Official Use Only – Privacy Sensitive
Any misuse or unauthorized disclosure may result in both civil and criminal penalties

APP 364

0017

Inspector General's Office
**Commander, Navy Region Northwest (COMNAVREG NW)**
**Inspector General Office (N00IG)**
**1100 Hunley Road**
**Silverdale, WA 98315-1100**
**Attention: Investigator Joseph Bobrowski**

This letter is a formal request to your office asking for assistance and an investigation into matters at Naval Magazine Indian Island, Port Hadlock WA.

These matters are directly related to OPNAVINST 3591.1F and 5530.14E with regard to safety and ethics for range qualification.

In an effort to provide you with some background and provide a history and sequence of events regarding the Range Qualification Practices of Xcel Protective Services who currently has the security contract at Naval Magazine Indian Island, and the steps we as officers took trying to stop the practices internally with our company prior to going to the Base Commanding Officer on July 8, 2018.

At this point we believe we need an independent investigation to come in based on the current course of events regarding the Administrative / Fact Finding inquiry by the Contract monitors.

As I told you on the phone, as employees we did not walk around with a little black book documenting things on our company. That would be unethical. We worked within the job site and within our company to fix what we saw as a very serious safety problem.

Trying to piece together dates and incidents has had its challenges and there may be flaws in our sequence of events, dates etc. but to the best of my knowledge I am offering this document in good faith. Any issues should be able to be cleared up if interviewed. I am sure we will remember more events or incidents that may have been left out of this memorandum, and we will certainly bring them to your attention. If there are any more new incidents that occur we will make you aware of them as well.

I want to thank you from all of us that you have taken the time to listen to us. At this point based on the letter sent by our company to OSHA we have been deemed to have brought "False" issues with no merit, and this simply cannot stand.

I apologize in advance for any grammatical errors and the like, but it's a big document.

A Synopsis of Range Practices:

The first knowledge of Guards going to a gravel pit to "Qualify" started back when Mr. Michael Terry was a guard and part-time Lieutenant. Michael Terry would comment that a Guard by the name of "Laura" had failed range and he would buy ammunition and take her out and "Qualify" her. He told me he would use his personal AR15. At one point I asked Mr. Terry if he thought this was a good idea. He told me that he had been ordered to do it. I offered that a person failing at an official range, and then disappearing to a remote location and magically passes and qualifies without witnesses could give the impression of impropriety. Eventually this stopped.

When I was relatively new with BCSI / Xcel I was posted with Officer Cunningham. Officer Cunningham stated to me that he knew Michael Terry was a friend of mine but Mike Terry taking his girlfriend out to a gravel pit to qualify her after failing range was bullshit. He also said he talked with one of the past contract managers by the name of Lou Allen about this practice. Cunningham claimed that Lou Allen said, "I would have fired Michael Terry for doing that".

The second incident I believe happened approximately one and a half years ago or so, but the actual date can be determined later possibly. There was an occasion when Officer Cunningham reportedly had failed the range with the M500 Shotgun. Officer Cunningham was brought to either a gravel pit or other location by Officer Schryver who supplied his personally owned pistol grip shotgun to Officer Cunningham. Officer Cunningham came back "Qualified" because he was reportedly allowed to stand posts with a shotgun. I approached Mr. Michael Terry upon hearing this and again I shared my concerns with this practice and stated to the effect of that I could not imagine this would be sanctioned by the Navy under any circumstances, and that this could come back to bite him. Mr. Terry replied to me that it was allowed by the Navy.

Officer Schryver's recent account of the events were that he was asked to what he thought was to familiarize Officer Cunningham with the shotgun. He said Mr. Michael Terry personally handed him shotgun rounds for this. When he returned for work he said he reported he felt that Officer Cunningham did better. He said when he found out that they were considering that event a "qualification", he rejected it by stating that he was not certified to qualify anyone, and that he thought that was just for familiarization with the weapon. The "qualification" status still stood according to Officer Schryver because Officer Cunningham was allowed to stand post with a shotgun.

The next incident as explained to me by Officer Schryver recently was that he was again approached by Lt. Gerald Powless regarding an up-coming range. Lt. Powless reportedly suggested they bring officers to a gravel pit to qualify them. Officer Schryver rejected the suggestion stating that he was not comfortable with it. Lt. Powless reportedly responded by stating they would just schedule a range at Bangor Naval Base.

The next incident occurred on or about July 7, 2017 according to a 3591.1f Bangor Range Form. I was standing near the Small Boat Pier at Contract 10, Indian Island. Mr. Michael Terry was there as well. Officer Armstrong drove up and stated to Mr. Terry, "Hey Mike, I got that AR15 and a 9mm". I looked over at Mr. Terry and he closed his eyes and lowered his head.

I asked Officer Armstrong, "What are you talking about?" Officer Armstrong responded, "Oh, I'm bringing an AR15 and a 9mm for range at Schroeder's house". "Schroeder" is Officer Schroeder for Xcel Protection Services on Indian Island. I responded in disagreement, "Oh that's great, that's really great!" I then got into the company vehicle and drove away.

In the meantime Officer Schryver recently recalled to me that he was approached by Lt. Powless about this incident and Officer Schryver again stated he did not feel comfortable with this practice. Lt. Powless reportedly told Officer Schryver that Mr. Michael Terry told him that it was OK for them to do it and it was allowed.

Later before the range at Schroders house I was talking with Mr. Terry on the phone. During the conversation he told me he was at the store buying ammunition for the range at Schroeder's house. (To the best of recollection he was at Wal-Mart)

After the range at Schroder's house Officers in general were not happy with what happened. Officer Nitsel (who is no longer with us) was a new employee, and recently retired from the Navy as a Master Chief I believe. Nitsel was a CART Inspector, and took part in inspecting our training records during the CART Inspection. Officer Aldridge had reportedly discussed this incident with him in disapproval and Nitsel reportedly stated it was a "deal breaker". Officer Nitsel told me as well later in person that the range at Schroeder's house was a deal breaker, and that the company could possibly lose the contract over this if it were reported. I went over OPNAV 3591.1f with him briefly which confirmed ranges that are not inspected and un-approved by the Navy were not allowed, and only Government owned and issued weapons and ammunition may be use. There was an exception indicating contractor provided ammunition may be used but it must be inspected and approved first as I recall.

I spoke with Officer Robert Armstrong after the Schroeder house range. By that time I had reviewed OPNAV 3591.1f a little more and told him this practice is forbidden and should not be done again for the aforementioned reasons.

I personally saw a Bangor Range 3591.1F form with the five officers that attended the range at Officer Schroeder's house. Those five officers were Timothy Nadon, Robert Armstrong, Evan Schroder, William Simcoe, and Lisa Owens. Lisa Owens was pregnant at the time, and I don't believe she was allowed on the Bangor indoor Range due to her pregnancy according to Navy Instructions that I have seen. Lt. Powless himself had told me that they had a lot of fun at range at Schroders house. The other officers also openly talked about the incident. They reportedly brought their personally owned AR-15's, and handguns in various calibers from what they said. Lisa Owens worked after that I believe up to November or December until she had to leave to have her baby.

On or about September 31, 2018 I attended range as a Range Line Coach-Safety Officer. On this particular range we had 13 people on the range. During this range three officers could not pass their rifle qualification. Those officers were officers Lauritzen, Cunningham, and David. Officer Cunningham could not pass his shotgun either.

Officer Cunningham's ability to effectively handle, and manipulate the two weapons came into question by me and a few others at the range especially when slinging and unslinging his weapons, but he was not unsafe.

The solution for this at the range was that Lt. Gerald Powless altered their targets by putting a large black cross with a black felt pen on their targets with the intersection of the cross dead center. This was done so that they could "see the target" as I heard Lt. Powless State. Acting Lt. Mitch Vancura assisted Officer Cunningham with his shotgun shoot by alter the silhouette by putting a white piece of paper at the six O'clock position so that Officer Cunningham could effectively see the contrast of the target and aim his shotgun at the target as I heard it explained to Officer Cunningham. They all passed except for Officer Cunningham who still could not pass his rifle.

On or about May 9, 2018 two newly hired officers were on the range, Officers Daniel Lein, and Officer Emily Coler. Officer Lein was able to manipulate his rifle safely, but he struggled somewhat with getting use to the rifle. He did not pass the M4 rifle qualification, but only by a very small margin.

Before range started, I saw that Officer Coler was having difficulty positioning the M4 Rifle and controlling it. I asked her Officer Coler if she had received any safety familiarization training before coming to range and she said she got about an hour and a half in the garage at Nav. Mag. Indian Island. I called to another Line coach who was responsible for her position and said she needed to be checked and worked with. I then left for my assigned area. Officer Coler struggled horribly with how to handle both the rifle and the shotgun when I observed her, and at times myself and others thought and stated that she should be taken off the range because of unsafe handling with the shotgun. At one point she was re-loading the shotgun with the muzzle pointed at the ground between her feet. At this time I was inside the booth and could not go out there to do it because the range was in use. Officer Coler failed her M4 Rifle and shotgun qualification and by a large margin with the shotgun. The Shotgun Passing score is a minimum of 30 00Buck pellets must be in each target. The targets that I saw, Officer Coler's targets were zero, zero and four. Her Rifle score was extremely low as well.

After this range is when I called Xcel CEO John Morgan and advised him of the problems sometime within the first two weeks of February. I started out with telling him that he had just dodged an IG investigation. I told him that Mr. Michael Terry was authorizing improper range practices. I then told him that an officer was told by Gerald Powless that they were going to go to a gravel pit for a qualification and that officer personally told me he was going to file a complaint with the Inspector General's Office. (The range was ultimately held at Bangor Range and the officer had no need to file a complaint. The officer's name is Dain Olsen, who has left our company and is now working for MFO on Indian Island.)

Mr. Morgan replied that he had dealt with IG Investigations before. I continued and explained the altering of targets, and the gravel pit ranges. Mr. Morgan quickly asked me, "How do you know Gerald Powless isn't doing this without Mikes' knowledge?" I told him because I am a witness as to his involvement. Mr. Morgan replied, "Well, Well what do you want done here", or something to that effect. I told him I don't want to hurt anyone I just want this problem brought under control.

Mr. Morgan told me he would call Michael Terry and talk with him about the issue and he would not use my name and just say that it was a concerned employee. He said he would get back to me.

Approximately two days later I received a telephone call from Mr. John Morgan. He told me that he had spoken to Michael Terry. He said he told Mr. Terry that an employee that does not want to hurt him called in concerned about the activities regarding range. Mr. Morgan told me that Mr. Terry had promised he would be extremely transparent with all of the employees and assure them that what they believed was going on was not, and that they would move forward. Mr. Morgan also said that he instructed Mr. Terry to follow all proper procedures regarding range qualification.

After that telephone conversation the employees were not addressed by Mr. Michael Terry in any way.

The next scheduled range after the telephone conversation was approximately two days later. Officer Cunningham was re-qualifying with the M4 Rifle. Officer Cunningham came back qualified with the rifle. I later asked Lt. Del Rosario who was at the range if they had altered the targets for Officer Cunningham, he nodded his head and said yes, and then shook his head in silent disagreement.

The next incident, I was approached by a newly hired officer by the name of Daniel Lein. Officer Lein is a retired Navy Chief, and has been working Government Contract Security for the last 10 years. He told me that he was told by Lt. Powless that he and Officer Emily Coler were going to be taken to a gravel pit to be qualified with the M4 Rifle. He told me he asked if he was going to be paid for it, and Lt. Powless stated "no". Lein told me that he was extremely uncomfortable with this plan and was not going to go. I agreed with him.

During the time approaching the scheduled gravel pit range Robert Armstrong reportedly told Officer Mullen that he told Lt. Powless that having a range qualification at a gravel pit was forbidden. We then heard that Powless was told by Robert Armstrong that it was allowed. At the same time Officer Robert Armstrong was making it well known that he was loaning his personal AR15 to Lt. Powless for the range qualification at the gravel pit. Lt. Powless even told me what a nice AR15 Robert Armstrong loaned him because it had a lot of attachments on it, and it was "really cool".

As for the loaning of an AR-15 by Officer Robert Armstrong I would like to add more detail to this issue. Robert Armstrong told me and others when he was given the AR-15 by a relative. Some of his statements varied such as; He took the optics off the rifle so that Officer Coler had to shoot with standard sights. When Lt. Powless told me Officer Armstrong had given him the rifle I asked Lt. Powless, "You mean he just handed it to you? While imitating hold a rifle by the barrel and pushing my hand forward, and Lt. Powless replies "yes". Basically they transferred a rifle to a party and then to two other persons at the gravel pit range without an FFL Transfer against Washington State Law according to what they described. (I-594 Passed).

On or about 5/27 or 28 2018 the "Gravel Pit Range" occurred based on statements. There were reportedly three people there. Lt. Powless was the RSO, and the two officers qualifying were Officer Coler, and Officer Eades. This was a full qualification to my understanding, especially for Officer Emily Coler.

Officer Lein relayed the following account: Between May 20th and 26th 2018, Lt. Gerald Powless told him and Officer Coler that the three of them would meet on either the 27th or the 28th of May at a U-Haul place and would go with him to a gravel pit to qualify on the weapons that he and officer Coler had failed at the Bangor Range on May 9th, 2018. On the day of the qualification Lein was on duty for 12 hours. Officer Coler was off duty. He thought about going to the gravel pit range the entire 12 hours, and arrived at the decision he did not feel comfortable going to the gravel pit and the position he was being placed in by the company. He said he knew it was wrong based on his 10 years of experience in Military Contract Security on three bases including Naval Base Bangor. He telephoned Lt. Powless and told him he did not feel comfortable or safe with the range at the gravel pit and Lt. Powless reportedly replied, "OK". Lein told Lt. Powless that he would wait for the next Bangor Range. Before he hung up the phone he reportedly asked Lt. Powless if "this was a legit qualification?" Lt. Powless reportedly responded, "Yes", and that Robert Armstrong had told him that he had seen it in writing and it was OK. Officer Lein also asked if the range was paid, and Lt. Powless stated it was not paid.

While working a post with Officer Ryan Earl (Recently retired Senior Chief from the Navy and a Navy RSO) and Daniel Lein, Officer Lein told Officer Earl what had happened regarding a Qualification Range at a gravel pit. Officer Earl immediately stated, "They did what!" "I'm an RSO, that's what I did in the Navy and that is against the law!" "That means they have to fill out the forms and send them up with false information!" "You better be really glad you didn't go Bro!"

Officer Daniel Lein told me that he spoke with Lt. Powless after the Gravel pit Range and Lt. Powless reportedly told Lein that Emily had passed her rifle qualification with a score of 141.

According to Schedules:

After the Gravel Pit Range Officer Emily Coler's first scheduled post was Post 3 on 5/29/2018. But according to the schedules she was already scheduled for Post 3, which requires a shotgun on the schedule dated 5/22/2018. That never changed through the schedule dated 6/15/2018. It has the appearance that Officer Coler was already expected to pass the "Gravel Pit Range".

The schedule also shows that Officer Ryan Earl was scheduled to be Post 9 for swing shift on 5/29/2018. He told both Officer Dan Lein and myself that Officer Coler worked South Patrol alone that day. He knew this because Officer Coler had a flat tire on her truck, and she came in CVIS. Officer Earl said he never saw Coler with a shotgun, but that post requires a shotgun.

Officer Daniel Lein talked with Officer Tatro regarding the flat tire incident. Officer Tatro was Post 4, and Officer Willhelm was the Post 1, which is an extra Officer. Tatro reportedly told Officer Lein that he and Willhelm drove to where Officer Coler was and helped her change the flat tire. Officer Lein asked Tatro if she was alone on patrol and Tatro replied, "Yes".

June 11, 2018 Emily Coler worked Post 7 which is Pier Gate Cover Guard on Day Shift according to the schedule, which requires a shotgun. The Pier Gate Post Log documents that Officer Coler was the "Cover Officer", as documented by Officer Simons the Contact Officer. If Officer Simons had the shotgun, Officer Coler would have filled out the Log.

On June 12, 2018 Emily Coler worked a 12 hour shift from 0200 to 1400 at Post 9 which is CVIS Cover Guard, which requires an M4 Rifle. I was told that on this shift, Officer Coler reportedly sent a text message to an officer indicating she had left the extra ammo in the van and asked for it to be brought down. M9 extra ammo is always put in belt magazine holders at the armory, and M4 or shotgun extra ammo is transported within a carrying pouch to posts or in patrol vehicles by the individual it was issued to. On this shift Officer Coler would have worked with two different Post 8 Officers as the shifts changed. The CVIS Post 8 Contact Officer from 0200 to 0600 was Officer Trimbur. The 0600 to 1400 Post 8 Contact Officer was Officer Gentry.

Note: On 8/1/2018 I served Post 5 at the ECP with Officer Gentry who was the Post 2. During that Shift Officer Gentry told me he clearly remembered Officer Coler serving Post 9 with an M4, because according to him she didn't know how to hold the rifle correctly.

(The CVIS Post Log has been replaced as of Date 7/14/2018 I believe. The Post Log probably ran out of pages and a new Log Book was put in its place. This Log Book should be located and examined regarding the Postings.)

On June 13, 2018 Emily Coler was scheduled to work a Swing Shift Post 7 which is Pier Gate Cover Guard, which requires a Shotgun. Her Contact Officer was scheduled to be Officer Willhelm. However apparently Officer Ryan Earl ended up working the Post 6 position because he filled out the Post Log and logged Officer Coler as the Cover Officer. I had been working the Post 7 on Day Shift, and Officer Coler relieved me.

On June 19, 2018 Officer Coler worked Post 7 at Pier Gate which requires a shotgun. Officer Aldrich was scheduled to be the Post 2 Contact Officer. The Post Log filled out by Officer Aldrich documents Officer Coler as the Cover Officer.

On June 20, 2018 as listed on the Officer Coler was scheduled as Post 9 at CVIS which requires an M4 Rifle. The Post Log is not available at this time. The Post 8 Contact Officer is listed on the schedule as Officer Dills.

On or about June 22, Officer Simcoe was scheduled as the Post 8 in CVIC. Officer Lein was working a 0200 to 1400 shift as Post 1 which is an extra, and he was in CVIS with Officer Simcoe who was the 2200 to 0600 Post 8 at CVIS. During this shift Officer Simcoe spontaneously stated to Officer Lein that Officer Coler's M4 Rifle had been found in condition one in CVIS. After the report was made to the Commanding Officer however, Lein approached Officer Simcoe again and asked him about it. According to Officer Lein Officer Simcoe changed his story by stating he "saw the bolt forward".

On 8/1/2018 Officer Gentry told me that he had heard Officer Coler's M4 rifle was reported to have been found at the clearing chamber with the dust cover closed, the bolt locked back with a loaded magazine. If this rifle had fallen or been jarred sufficiently, the rifle could have discharged if it was in the condition Officer Gentry described. This might be the reason why Officer Simcoe reportedly stated, "I saw the bolt forward".

On June 25, 2018 at the end of my Day Shift I again verbally complained to Lieutenant Doug Lux the Swing Shift Supervisor regarding the "Gravel Pit Range" involving Officer Coler, as did Officer Mullen who was standing there. Officer Gentry was standing there as well and heard the conversation. He had his own complaints. This was initiated by Lt. Lux who told us that he had gone into Mr. Michael Terry's Office and asked to speak to Mr. Morgan. Lt. Lux reportedly complained about how the work place was being managed. Lt. Lux told the three of us that if we had any complaints that we could bring them forward to him and it would not come back on us for doing it.

I reported the gravel pit range to Lt. Lux because I did not think that Officer Coler could safely handle or operate the M4 rifle or the M500 shotgun based on her performance at the Bangor Range and doubted her ability to defend herself; her co-workers and especially with the risk of a public park directly across the street from the Main Gate ECP.

Later that evening after I had been home for a while I received a telephone call from Lt. Lux at 1838 hrs. At first the answering machine picked up, and then I answered the phone. He told me he had called John Morgan regarding what I had said. He stated "Mr. Morgan said Mark is right". Lt Lux also told me that Officer Coler and Officer Eades were going to have to be "Re-Qualified". I later learned that Lt. Lux had called Officer Everson that evening before calling Mr. John Morgan, who additionally works over at the Bangor Range Facility as his full time job. Officer Everson reportedly told Lt. Lux that Gravel Pit Ranges were not allowed.

On June 26, 2018 I worked Post 7 with Officer Coler. I was originally scheduled to work Post 6, and Officer Coler was scheduled to work post 7. I had to work Post 7 due to her requirement to have to "re-qualify" with the shotgun. Officer Coler was very upset while driving to our post because she had to "re-qualify" with the M4 and the shotgun. I told her that since she qualified at the gravel pit, she should have no problem qualifying at the Bangor Range. She was silent after that.

While on Post she also told me that she had spent five hours at the gravel pit "qualifying" and was told she was not going to be paid for it. She was very upset about this because she is the only source of income for their family right now. Shortly after that she received a phone call from Mr. Michael Terry. She explained to Mr. Terry the issue about the five hours, and at the conclusion of the phone call she told me that Mr. Terry told her she would be paid for the 5 hours, and that he had no idea why she was told by Lt. Powless she would not be paid.

The Pier Gate Post Log for 6/26/2018 Day Shift shows that Officer Coler filled out the Post Log as the Post 6 Contact Officer even though she appeared on the schedule as the Post 7 Cover Officer. Whoever has the shotgun does not fill out the log even though the schedule showed me assigned as the Contact Officer. I had the shotgun because Officer Coler had been told she had to "Requalify" with the shotgun.

On 6/26/2018 after shift I sat down with Lt. Lux and asked for more details regarding training issues that Mr. Morgan had reportedly told Lt. Lux on 6/25/2018. Lt. Lux was rather vague regarding how it was going to work, and said it wouldn't start until around July 15th anyway. He then got into the issue of the range regarding Lt. Gerald Powless. Lt. Lux stated "Gerald should have known better to take the word of

a person that it was OK to do this, he should have researched it himself". I asked him who the person was and he replied, "A person". I replied, "You mean Robert Armstrong". He replied, "OK so you know who". This is the part of the conversation that was disconcerting to me. I responded to Lt. Lux, and I told him that Lt. Powless was not the only person involved in this, and that this issue was approved, sanctioned and authorized by Mr. Michael Terry from the beginning. Lt. Lux leaned back in his chair, took a deep breath and looked up and to the left, and then leaned forward and repeated, "Gerald should have known better". I then stated, "You know as well as I do that this was approved from the top, and ultimately the Manager is responsible. Lt. Lux repeated the same body language and repeated, "Gerald should have known better". I believe I then stated "You're going to throw this whole thing on Gerald aren't you?" Lt. Lux just looked at me in the eyes.

I then told Lt. Lux that I would be writing a memorandum directly to Mr. John Morgan regarding this whole issue. On June 28, 2018 I drafted a memorandum and emailed it to Mr. John Morgan. He responded to me on June 28, 2018, and then again on June 29, 2018. As for the contents of these emails I cannot disclose the content because there is a company disclaimer that forbids me to disclose it.

In the mean time I had spoken to Officer Everson who is a firearms instructor at Bangor Range and an employee with Xcel Protective Services. I told him about Officer Coler's situation and he volunteered to meet with Officer Coler to help familiarize her with the weapons which he did do. The lack of training she received was not her fault we concluded.

Based on what happened back in February where the problem of the Gravel Pit Ranges and target alterations did not change after advising my company, and what I did not see in Mr. Morgan's email responses I did not believe there would be changes.

Sometime shortly after 6/26/2018 Officer Eades who was the second officer at the gravel pit range drove into CVIS at Nav. Mag. Indian Island with his personal vehicle. I spoke with him there. He said "he didn't care if he had to requalify, it's just free bullets to him". He said he knew I was going to have a problem with this sooner or later. I then told him that it was actually Lt. Doug Lux that called CEO John Morgan, and he smiled.

After that at a time and Date I am unsure of, I was with Officer Eades in CVIS and he made a comment to me regarding Officer Coler. He said that Officer Coler was not going to pass her range because she "shoots like shit, especially with the shotgun". Officer Eades later stated that he did not understand why I had such a problem with ranges at gravel pits. I told him that it is unsafe from the perspective of ricochets, it's against OPNAVINST Policy, accidents from an unimproved range like tripping and falling, and no medical present. He responded by telling me that he had shot at gravel pits many times, but there was a time he did have a ricochet one time with a .22 caliber that ricocheted and hit him in the chest and stuck in his chest. I looked at him and said, "You just proved my point".

Three officers waited until July 8, 2018 to hear back from Mr. John Morgan, and after hearing nothing, the three officers jointly made the decision to go the a Governmental Office; the United States Navy and request guidance on making a report to the Inspector General. The three officers, Mullen, Salopek, and Lein went to the Base Commander of Naval Magazine, Indian Island. All three officers simply told the

commander that they wanted to give him the respect before going to the IG. The Commander asked what the report was about and the officers replied that it concerned safety and ethics problems with the weapons range practices. The Commander asked if anyone was in danger right then and they responded not at the moment. There was a discussion where the Commander said we could put an anonymous report in his suggestion box, but told the officers that they were absolutely free to go to the IG. He said if they reported it to him he was going to have to use names. One officer said that they should probably go the IG route anonymously. Another suggested they should tell the Commander, while the third agreed if should probably go to the IG because of the fear of reprisal from the employer, harassment and he could not afford to lose his job. The Commander then raised his voice and said, "Guys tell me what's going on!" Feeling compelled each officer spoke and added a piece of what was going on. The Commander then said there had to be an investigation. He said he wanted the officers to write an email to the ISO, who will then come to him, and then they will have to bring in the contract officers Stephen Manson and Richard Rake. He told the officers not to wait too long or he will have to take action. He also asked that we contact Mr. Michael Terry first before sending the email and the officers agreed. The Commander closed by stating, "Besides, you're covered by whistle blower".

On 7/ 9/2018 Officer Emily Coler attended the range at Bangor Naval Base. Officers Salopek and Schryver were line safety coaches. Officer Coler passed her M4 qualification with a score of 143. Minimum pass is 140. On her shotgun Officer Coler failed her first qualification attempt with a score on three targets of zero, three, thirteen 00Buck pellets. She needed a minimum of thirty, thirty, and thirty 00Buck pellets in each target. After her initial shoot Officer Schryver and I were in the control booth with Officer Coler. I asked Officer Coler if she was afraid that the shotgun butt stock was going to hit her in the face when she fired it. Officer Coler stated that she was afraid of the shotgun. On her second attempt to qualify with the shotgun, Officer Coler was disqualified from the course of fire by a Bangor Range Master who just happened to be standing in the control booth at the time according to Officer Schryver. She did not shoot again.

On 7/9 /2018 at approximately 1034 hrs. I first tried to call Mr. Michael Terry on his cell phone which he did not answer. I then called his office phone at Nav. Mag. Indian Island which he answered. I stated the following; "Mike this is Mark. Some officers are coming forward regarding the range practices. I owe you that." Mr. Terry responded, "I already know". I then called Mr. Stephen Mullen and told him I had notified Mr. Terry, and to send the email to Mr. Michael Jones.

Later on I received a call from Mr. Mullen who sounded very excited. He said, "Mark! Dan Just got fired", referring to Officer Daniel Lein. He additionally told me that Mr. Terry wanted to see me and Officer Jacob Schryver who was also at the range when we got back.

Officer Mullen also told me that he had been called into Mr. Michael Terry's Office. He said Mr. John Morgan the CEO of Xcel Protective Services was on the phone on speaker phone, and Mr. Michael Terry was seated at his desk. Mr. Morgan reportedly advised Officer Stephen Mullen that he was possibly facing disciplinary action and asked if he wanted Union representation. Officer Mullen stated yes, and the conversation was reportedly ended. Officer Mullen will have to provide the first person account.

When Officer Schryver and I returned to Nav. Mag Indian Island from the Bangor Range there was no one there to meet us. Officer Schryver had received a phone message from Mr. John Morgan and he played it for me. To the best of my recollection Mr. Morgan stated that he wanted to talk with him

regarding a matter that may result in disciplinary action, but wanted to get his take on a situation. Officer Schryver stated he was not going to call him back. I asked him to save the message, and he advised me that he had already deleted it. At that point we simply went home.

Later that evening I spoke with Officer Lein on the telephone. He described his conversation with Mr. Michael Terry and Mr. John Morgan who was on a speaker phone that he was facing disciplinary action. To highlight key points that Officer Lein relayed to me; Mr. Morgan asked why he did not go to Mr. Michael Terry and go to the Commanding Officer over Mr. Terry; Mr. Morgan asked Officer Lein why he did not attend the range at the gravel pit; that the company accommodated him by sending him to the Bangor Range approximately two weeks later;

Mr. Morgan reportedly stated that the Navy allows them to use alternate sights, and then Officer Lein replied, "Then why is Emily Coler re-qualifying at Bangor Range right now?" Mr. Morgan reportedly went silent. Officer Lein will provide a full and accurate statement regarding this.

The next day I was on a scheduled day off. I received a phone call from Officer Mullen who told me he had been confronted by another Officer by the name of Tom Cunningham. Officer Mullen told me he was seated in the Training / Briefing Room before his swing shift at approximately 1315 hrs. when Officer Cunningham came into the room holding an M500 shotgun and armed with a holstered M9 handgun, yelling at him about the memo demanding an apology from Officer Mullen and me. He also reportedly stated "You just wait until I see that Salopek". Officer Mullen described Officer Cunningham as standing in front of him yelling, and he was extremely angry, and as Cunningham was yelling he was not cognizant of the muzzle of the shotgun which was sweeping by his thigh. Officer Mullen reportedly told Officer Cunningham to point the shotgun away from him.

Officer Cunningham reportedly stated that the shotgun was pointed at the ground. Officer Mullen told him the issue was over at which time Officer Cunningham reportedly left the room. Officer Mullen will provided a first person account of this incident, as my account is to the best of my recollection.

Later that night I received another call from Officer Mullen. He told me he had received a text message from an Officer by the name of Kevin David. The text message read; "So I'm on your little fucking list, you're a fucking idiot & don't know what you have stepped in. Better call your butt buddy Mark, Slander with no proof dumb ass, stupid leading stupider". Officer Mullen was clearly upset and shaken. I tried to calm him and suggested he take a day off and to call it in to the on duty supervisor.

I called my union representative and we talked and I suggested that I mitigate the situation by calling off one day. He agreed.

I telephoned Lieutenant Doug Lux who already knew what had happened. I told him I was calling off for the next day and told him to get these officers under control because I was done with the nonsense. He indicated he understood.

At one point either the next day or on or about the 9th of July I was advised by an Officer that Mr. Michael Terry the site manager, had called into his office individuals who were mentioned in the email and allowed them to read it, including Officer Cunningham. My question was why? Mr. Terry served as a police Officer. He was a Sergeant and served as an Undersheriff for a short time. I know he knows that whenever there is going to be an administrative inquiry you say nothing. You keep the inquiry clean. In

my opinion Mr. Terry's reported actions if proven to be true, resulted in creating an immediate hostile work environment towards all three of us officers who had come forward.

Officer Lein was working on Post on 7/9/2018 at CVIS and observed Officer Cunningham walking around the ECP and at the door of CVIS area at main gate yelling "Fucking Rats!" "Those fucking rats!" Officer Cunningham was reportedly in uniform and armed up. Officer Lein Can provided what he saw and experienced.

In addition Officer Schryver told me that after 7/9/2018 possibly July 10, 2018 he was in the Xcel building #848 and Mr. Michael Terry came out of his office and asked Lt. De Rosario to read the memo that Officer Mullen had written to ISO Michael Jones. Lt. Del Rosario reportedly refused to read the memo. Why is Mr. Michael Terry passing this memo around?

To the best of my recollection, on or about July 11, 2018 Mr. Steve Manson and Mr. Richard Rake started interviewing Officers. Officer Lein was interviewed, and Officer Schryver were some of the first to be interviewed.

On or about July 13, 2018 at approximately 1900 hrs. I received a telephone call from Officer Mullen. He told me that he had received a phone call from Officer Romero. Officer Mullen and Romero are friends. Officer Mullen said Romero told him he had received a phone call from Officer Cunningham. As per Officer Mullen to me, Officer Cunningham reportedly stated to the effect of, "I know Richard Rake, Steve Manson and Harger. I'm not going to lose my job, but I know someone is going to lose their job. I can't say much right now".

Ultimately Officer Mullen for his own reasons of stress resigned from work on July 17, 2018. He told me he just couldn't go back any more.

On 7/19/2018 I was interviewed by Mr. Richard Rake and Mr. Steve Manson. Prior to being interviewed I saw Lt. Gerald Powless Drive on base. According to the schedule dated 7/12/2018 Lt. Powless was scheduled to be at Bangor Range and be the Swing Shift Lieutenant. At approximately 1200 hrs. I was told to go up to the security office to meet with Mr. Richard Rake and Mr. Steve Manson.

After sitting down at a table, Mr. Richard Rake first stated, "Whatever documents you have put them on the table now!" I had no documents at that time with me. Mr. Rake told me that he was there to conduct a fact finding inquiry. He said that what I give him and tell him will not be given to my employer, and in turn what they tell him and give him he will not provide them to me.

The order of the questions and discussions are not exact, but it's to the best of my recollection.

Mr. Rake told me he was in possession of an email sent to Mr. Michael Jones the ISO from Stephen Mullen. He told me that Mr. John Morgan told him he had received a six or eight page memo which was post marked July 3, 2018, but that Mr. Morgan was not willing to turn the memorandum over.

After a short discussion about "post marks" Mr. Manson stated that it might mean an email he received. I simply replied to them, "Oh I know about that memo".

Mr. Rake then asked me about whether I had ever seen anyone walk away from their post without being relieved, which was reportedly stated on one of the prior interviews, which I replied "no".

We moved to the issue of the alteration of official qualification targets at Bangor Range. Mr. Raked asked me what I believed "no alterations means?" I replied, "Do not add to, or do not take away from". He agreed that was correct. He told me that they had spoken to people regarding the alterations of the qualification targets. He told me the instruction does not say they can, but it also doesn't say they cannot. He said he spoke with people who said they have put Mickey Mouse ears on the center black dot and things like that, and that it was basically allowed to alter the targets. I then replied that the opportunity to have altered targets as an aid should have been provided to all of the officers and not just the three officers I observed. He then asked me who altered the targets and how were they altered? I told him I was standing not more than three feet away from Lt. Powless when he took a black felt pen and altered three officer's targets by putting a thick black line from top to bottom, and then from side to side intersecting the two lines in the middle of the center black dot. I then told them that when Lt. Powless was drawing the line he was smiling and stated "There, now you can see the target". Mr. Rake's eyes widened a bit. I concluded by saying something to the effect of, "you asked me, and that's what I saw".

Mr. Rake began talking about how the next contract that is coming will have a dedicated training coordinator, and that he had spoken to Officer Lein about the lack of training with our company and they were going to address that and fix it.

When it came to discussing Officer Emily Coler attending a "Gravel Pit Qualification" Mr. Rake leaned forward and stated "We have no documentation to show that Officer Coler ever served a post with a shotgun or a rifle. I responded "What are you talking about?", "that's not possible".

He repeated the statement and Mr. Manson then stated that if Officer Coler was allowed to work with someone who is qualified with the shotgun or rifle on a post that would be OK. I asked him for clarification; "Are you telling me that if there is an Officer who is qualified on a shotgun on post with Emily Coler, she can carry that shotgun?" He replied; "No! She is not even allowed to touch a weapon she is not qualified with". I then told him that I had seen her with a shotgun after the "gravel pit qualification". Again I was told that there was no documentation to show she served a post with a rifle or a shotgun. I then asked them, "What about the weapons sign out log?" Mr. Manson looked surprised and asked, "The what?" I told them that every officer has to sign for their weapons when they receive them. I asked him to go check the weapons sign out logs. Mr. Manson left the room and eventually returned without any logs.

Mr. Manson told me that the policy says a person only has two chances to pass qualification with weapons. He told me that Officer Coler had gone to the range that day and passed her shotgun. If I'm not mistaken he told me they had attended her range qualification that afternoon.

At some point I made the statement that this is a very serious issue involving deadly weapons, and with the location of a public park across the street.

I told them that Officer Coler was never given the eight hours of safety and familiarization, and that she has a right to defend herself, we have a right to be confident she can defend us, and the public has a right to be safe. Mr. Manson agreed it was a serious issue. I also said that gravel pits are dangerous. Mr. Rake agreed immediately and stated he would never shoot at a gravel pit because of, and we both said simultaneously "ricochets". I also told him that they are required to have medical equipment there and a person that knows how to use it.

Mr. Manson asked me if I knew anything about the falsification of documents. I said to him "it depends on what you consider falsification". I explained "if I for instance saw a Bangor Range Form that indicates people were at the Bangor Range on a certain date, and in fact they were not, would that be falsification?" Mr. Manson replied, "Yes it would". I told him he needs to go check the Range Book and look at a date of July 7, 2017. On that day the officers listed on that sheet were reportedly at an Officer's house qualifying on his property.

I additionally told him that on that list is an Officer by the name of Lisa Owens who was pregnant at the time and could not go the indoor range. I told him that the Officer who owned the house was Officer Schroeder.

Mr. Manson asked me how I knew there was officers at Schroeder's house. I replied that I cannot ethically say they were there as a fact because I was not there personally.

But based on the fact that Officer Schroeder told me they were there, and the other officers that were there openly talked about it after the range happened, and further that Mr. Michael Terry talked with me on the phone and told me that he was buying ammunition for the "Range" at Schroeder's house. These circumstances would lead a normal and prudent person to believe there was a range at Officer Schroeder's house, and that the officers listed on the Bangor Range Sheet attended range at an unauthorized range and not at Bangor Range as the sheet said.

Mr. Rake asked me to fill out a written statement regarding what we had talked about and both he and Mr. Manson left the room to go research the Range Book. I started my statement but then needed another statement form so I went out of the briefing room. I walked towards the Lieutenants Office where the door was closed. I briefly saw Mr. Rake and Mr. Manson seated in chairs with Mr. Michael Terry and Gerald Powless standing in front of them. I walked away because so as to not disturb them, and walked outside for a moment. Shortly after they came back and we met and I asked for more statement sheets. I filled out my statement form, and as we were going over it I asked Mr. Manson if he was going to get the weapons sign out logs. He said he would. I suggested to him that if left, logs can be altered or possibly disappear, (I was remembering that Mr. Rake said he had no documentation Officer Coler had ever served a post with a rifle or shotgun). Mr. Manson replied, "Oh they better not do that".

Note: There was an email sent by Lt. Powless sent on 7/19/2018 at 2105 hrs. that stated "It was made clear to me today that there will be no white out on any of our government paperwork. This includes the weapons, keys, and radio sign out logs, and radio sign out logs". If a mistake is made, put one line across the mistake and initial. Make correction on the same block.

At some point I told Mr. Manson and Mr. Rake that "these things happened!" as we have reported, and the officer's in this company know it happened as well. I asked "why would Officer Lein and I put ourselves out like this if it didn't happen?" "I wouldn't make any sense".

Mr. Manson told me that if there was anything else I could give them to follow up on to email them, and he gave e both of their email addresses.

When it came time to go we had spoken for about an hour and a half. Mr. Rake apologized for it taking so long, and I then had to return to my post to finish my shift. As we were leaving I did not see either of them holding the June 2018 Weapons Sign out Logs. I did hear Mr. Rake tell Lt. Gerald Powless that he wanted to talk to "her" supervisor and for him to have those documents for him.

After the interview I pondered the track that the interview took, and could not see that we accomplished anything. There was never the question of "tell me everything that happened from the beginning to the end". It seemed broken and segmented. I also began to suspect that schedules and or documents may be missing.

Based on what Mr. Rake had said I revisited work schedules and combined them with my own recollection of seeing Officer Coler with a shotgun at pier gate.

On or about 7/20/2018 I worked with Officer Joab Eades for a period of time. Officer Eades was also at the Gravel Pit Range. Officer Eades asked me why I would "shit in my own back yard?" and come forward and report these things.

I explained to him why four officers came forward. He seemed content with it and then proceeded to tell me that it was in fact a qualification otherwise he wouldn't have had to re-qualify. He told me that Officer Coler still struggled with the M4 Rifle. He said she didn't even know how to hold the hand grip properly. He said that towards the end of the day she got better though with both weapons. I told him that if everyone would just tell the truth, this thing would be over.

Eades additionally told me that when he went into Mr. Michael Terry's Office Mr. Terry said, "Why the fuck did Doug call Morgan? Meaning Lieutenant Doug Lux.

I prepared a letter to Mr. Steve Manson and emailed it to him on 7/22/ 2018 detailing the shifts Officer Coler had worked. I received a reply from Mr. Manson on 7/23/2018 which thanked me for the further information and he was passing it on to Mr. Rake.

On 7/26/2018 I was working Post 4, the North Patrol Post. Officer Eades was working Post 7 over watch with Officer Lauritzen. Eades made a comment to me while smiling and chuckling, "when am I going to get interviewed?" "I want to be interviewed".

On 7/26/2018 and 7/28/2018 I examined the Pier Gate Post Log. The Post log confirmed all of the shifts that Emily had worked as an Over Watch which must have a shotgun.

When it came to CVIS I found that a new log had been started and the old one had been archived. So I went to the people that would have worked the posts with her in CVIS where she was carrying an M4 Rifle. Officer Mullen confirmed she had relieved him around 0200 on June 12, 2018 and added that Emily Coler sent him a text stating that she had left her extra Ammunition in the van and asked for it to be brought down to her. Officer Gentry told me on 8/1/2018 that he clearly remembered her standing post with an M4 in CVIS on 6/12/2018

In the period between my interview on 7/19/2018, until now which is finishing the writing of this document on 8/20/2018 the following things have happened:

1. I still have not been re-interviewed by either Mr. Rake or Mr. Manson

2. Officer Emily Coler has made statements and innuendos to Officer Daniel Lein that she never worked a post with a rifle or a shotgun; that she only fired an M9 at the gravel Pit Range. Question: Why would she shoot a 9mm handgun when she had already qualified with it?

3. There is talk in general that Lt. Powless claimed the gravel pit range was practice only, but there is no hard evidence to prove or disprove this.

4. On what I believe was August 3, 2018 I was in the Office just getting off duty. I walked into the Lieutenants Office and I saw Lt. Powless, Emily Coler, and acting Captain Mitch Vancura were standing together in the corner of the office. Officer Scott came up to me and asked if I was spreading hate and discontent, and he was chuckling. I later spoke with him outside and he said he heard Lt. Powless state that he was sweating it there for a while, and he also heard someone say "One is gone, and there's one left". I explained briefly what was going on and he replied, "Oh yeah! The Schroder Range!" "I wish I could have gone out there and qualify with optics".

5. On Saturday August 4, 2018 Officer Shaver told me that Officer Kristen Kirkpatrick had relayed that Mr. Manson and Mr. Rake had questioned her regarding whether Officers Salopek, Lein and Mullen had asked her permission to go talk with the Base Commander. There was reportedly a heated point where Mr. Manson and Mr. Rake were disputing whether Officer Mullen was on South Patrol which encompasses The Base Administrative Office or not. Part Time Lieutenant Kirkpatrick reportedly stated that the officers did not need her permission to go to the Commanding Officer, and she argued that Officer Mullen was in fact in his patrol area. These were issues similar to what our employers brought up for possible disciplinary action. Why is an independent administrative inquiry asking questions that appear to serve an employer?

6. During the first week of August Officer Schryver said that he was questioned again by Mr. Rake on the phone and during the questioning Mr. Rake had reportedly stated he had received another email with information. Officer Schryver was agitated that Mr. Rake asked the same questions again and that Mr. Rake asked him if he had filled out a 3591.1f sheet for the range with Officer Cunningham when he went out with the shotgun. Officer Schryver said he raised his voice at him and stated he was not qualifying him, but he knew he stood post with a shotgun after that, and that everyone here knows what has been going on. The same week Officer Lein said he spoke with Mr. Rake on the phone as did Officer Coler. He said Officer Coler came out from the phone call smiling. He said Mr. Rake asked him if he had been threatened. Officer Lein commented that we are down to phone calls now, and I had still not been re-interviewed. Lein and I surmised that asking if he had been threatened may have something to do with the OSHA complaint Officer Mullen had filed, but who knew.

7. Officer Shaver told me on 8/4/2018 that Officer Eades told him several weeks back that if he was interviewed he would refuse to be interviewed.

8. During the week of August 5, 2018 I was informed by former Officer Mullen that OSHA told him that Mr. John Morgan said that his company had been investigated by the Navy and that the claims of the July range were deemed false and without merit, and their deficiencies had been corrected.

9. On August 12, 2018 Officer Lein was told by Lt. Armstrong to make sure his bolt was forward on his M4 rifle because they had another incident the day before of an officer with the bolt back with the magazine in.

10. On 8/14/2018 I spoke with Officer Ronald Fredrickson. He told me that approximately two weeks ago he was approached by Part Time Lieutenant Wilson who told him he needed to sign a previous weapons sign out log. He stated he was told to sign it so he did. He indicated he would be able to determine which one it was at a future date if asked to but was not aware of the date on the weapons sign out log. He felt this was wrong based on the circumstances.

witness under Rule 611(c) as someone identified with an opposing party.

JUDGE GIANNOPOULOS: Proceed.

Q BY MS. MCCONNELL: Respondent is a nationwide company, correct?

A Yes, ma'am.

Q It provide security services?

A Yes.

Q Including to the U.S. Military?

A Yes.

Q To various branches of the U.S. Military?

A Yes.

Q This includes the Navy?

A Yes.

Q And any others?

A Yes.

Q What others?

A United States Army, United States Air Force, United States Coast Guard.

Q Also to private companies as well?

A Not at this time.

Q At how many different sites -- so does Respondent employ guards as part of its security services?

A Yes.

Q At how many sites does it employ guards?

A Six.
Q How many sites in Washington State?
A One-and-a-half.
Q Could you explain what that half is?
A One of our contracts is a series of dams on the lower Columbia River. Half of the site is in Washington, the other half of the site is in Oregon.
Q Thank you for that clarification.
And the other -- the one is what? I think you were describing the half. What's the --
A The Naval --
Q -- one?
A -- Magazine on Indian Island.
Q Okay. And that's a Navy base, right?
A Yes.
Q Okay.
JUDGE GIANNOPOULOS: You said Indian Island?
THE WITNESS: Indian Island.
JUDGE GIANNOPOULOS: Okay.
Q BY MS. MCCONNELL: And Respondent used to be -- have a different name, right?
A I think it was about five, six years ago it was formerly known as Basic Contracting Services, Inc., or BCSI.
Q Okay. Respondent has a contract with the U.S. Navy for security services as Indian Island?



A Yes.
Q Okay. And this includes guard services?
A Yes.
Q Contracts with the U.S. Navy require your company to follow a lot of rules, right?
A That's correct.
Q And file a lot of paperwork?
A Yes.
Q Respondent follows the Navy's rules, right?
A Yes.
Q Respondent follows the Navy's policies, right?
A Yes.
Q How many guards does Respondent employ at Indian Island?
A Presently I believe about 68.
Q The guards, Respondents employees, at Indian Island are represented by a union?
A Yes.
Q And that Union is the Charging Party, Security, Police and Fire Professionals, Local 5?
A Yes.
Q When guards are first hired at Indian Island by Respondent, they have an in-hire period, right?
A Yes, they do.
Q And that's their first 80 hours; is that right?
A Could you re-ask that question? In period or probationary



through this training academy?
A Yes.
Q Regardless of their prior experience?
A Yes.
Q Okay.
A It's a Navy requirement.
Q The guards, Respondent employees, at Indian Island, some of their duties include controlling access to the base; is that right?
A Entry control postponement, yes, ma'am.
Q And for ensuring no one unauthorized enters?
A Right.
Q Or harms any assets --
A Correct.
Q -- on the base? Or removes anything on the base?
A Right.
Q And that's -- is the term for that protecting the assets? Is that right?
A That's a good term for it.
Q They are responsible for patrolling the base, right?
A Yes.
Q And the base, Indian Island, is it, in fact, an island?
A It is, in fact, an island.
Q Okay. How big is the base?
A The base itself, a couple thousand acres.



Q About how, you know -- but what are the dimensions?
A I couldn't tell you. I know I think I read something one time it encompassed like 2,462 square acres or something to that effect. I don't --
JUDGE GIANNOPOULOS: In relationship --
THE WITNESS: I couldn't tell you.
JUDGE GIANNOPOULOS: -- to Seattle, where exactly is it?
THE WITNESS: You take the ferry across to Bremerton, make a right turn, and it's way up at the northern tip.
JUDGE GIANNOPOULOS: All right.
THE WITNESS: That is Indian Island. Right next to port -- Port Townsend.
JUDGE GIANNOPOULOS: Okay.
Q BY MS. MCCONNELL: And the -- you mentioned that the guards are responsible for patrolling the base. And there are, in fact, two different patrol assignments, right?
A Yes, ma'am.
Q And what are those two different assignments?
A North patrol and south patrol.
Q When a guard is on patrol, the guard doesn't stand still in just one place, right?
A Well, it depends what they're doing. If they're observing something that's going on, if one of the trusted carriers has brought in some -- especially if they've brought in some category 1 weapons, they will hang around and observe to make



 A Yes.

Q That's one of the buildings the guards have to check as part of their patrols?

A In the evening hours, yes.

Q And it's actually -- it's part of south patrol, right?

A I'm not quite sure.

Q The guards don't cover their whole patrols by foot, right?

A No. By vehicle.

Q Indian Island is not far from Bangor Naval Base, right?

A About 33 miles away.

Q The guards at Indian Island carry weapons, right?

A Yes.

Q They always carry a pistol?

A Yes.

Q They -- for some assignments, they carry a shotgun?

A Yes.

Q And for some assignments, they carry a rifle, right?

A Correct.

Q I'm sure we're going to get lots of testimony about the specifics of these weapons, but for now, we'll just leave it at those generic terms.

While guards are driving the trucks you mentioned, they don't hold the weapons in their hands, right?

A No.



A That's correct.

Q And I think there's a term for this, and I'm not sure what it is. Is it RAM, random area -- or there's a -- is there a term that's about terrorism drills? Is there a term for that?

A Well, we -- we have a significant -- a significant number of antiterrorism drills. If there's specific vernacular at that location, I'm unfamiliar with it. But yeah, there's -- there are random antiterrorism drills.

Q Okay. But alarms don't go -- happen every shift; is that right?

A Generally speaking.

Q I'm sorry. Just -- I didn't ask --

JUDGE GIANNOPOULOS: They do or do not?

MS. MCCONNELL: Yeah.

THE WITNESS: They do.

JUDGE GIANNOPOULOS: Thank you.

THE WITNESS: Yeah.

Q BY MS. MCCONNELL: They do happen? Alarms happen every shift?

A Yes, ma'am.

Q We -- these weapons that we've been talking about that the guards carry, they belong to the Navy, correct?

A That is correct.

Q The guards don't get to take them home?

A They do not.



Q They check them out at the beginning of every shift?
A Yes.
Q And then check them back in at the end of the every shift?
A Yes.
Q The Navy requires the guards at Indian Island to pass tests to show they know how to use these weapons?
A Correct.
Q That includes a shooting test?
A Yes.
Q At a shooting range?
A Yes.
Q This test has to be done at a Navy approved range, correct?
A Not necessarily.
Q Okay. So what other ranges might be permissible non-Navy approved?
A Sure. Last year, the Bangor range was down for an extended period of time for ventilation and unexploded dust at the range. And it required extensive cleaning. The Navy designated the Port Townsend range -- I've never been there, but I know it's Port Townsend -- as the designated range until the Small Arms Training Center at Bangor was available for use again.
Q So the Port Townsend range was approved by the Navy for



this use for these shooting tests?
A Yes. Just during that specific time period.
Q But would it be permissible for the -- from the Navy to just go any old place to do these tests?
A No.
Q And --
JUDGE GIANNOPOULOS: Why don't you re-ask the -- you asked if it was permissible for the Navy to go to any range to do these tests.
I'm assuming if the Navy is running the show, it's permissible for them to go anywhere they want to go.
MS. MCCONNELL: Let me ask the --
JUDGE GIANNOPOULOS: So why don't you --
MS. MCCONNELL: -- question again, Your Honor.
JUDGE GIANNOPOULOS: -- re-ask that.
Q BY MS. MCCONNELL: Is it -- does the Navy allow Respondent to test its guards anywhere it chooses to?
A We can practice anywhere we choose to. But official Navy tests have to be done at the Small Arms Training Center in Bangor. And when that's not available, anywhere they designate. And as long as I've been aware, the place they designated was the Port Townsend range.
Q In the course of doing these shooting tests, the guards fire at a target, correct?
A Yes.



Q And the Navy sets the rules for what counts as passing these tests?
A That's correct.
Q And passing the testing means that -- getting a certain number of bullets into the target, correct?
A You have to achieve a certain score. So it's not just getting it into the target, but you have to hit in a certain area to make enough points.
Q And the guard --
A I -- if I answered that.
Q -- has to do this with the pistol?
A Yes.
Q As well as with the shotgun?
A Not exactly the shotgun.
Q What do they do --
A The pistol and --
Q -- shotgun?
A -- the rifle.
They have a target. And with that, they basically just have to hit the target.
Q And with the rifle, is the rifle the same as the shotgun or is that more like the --
A The rifle is like the pistol. They have -- there's a certain score they have to achieve.
Q Okay. The guard has to take the shooting test when a



guard is hired by Respondent?
A Yes.
Q And has to retake the shooting test every six months after that; is that right?
A That is correct.
Q The guards also have to take fitness tests to work for Respondent at Indian Island; is that right?
A Yes.
Q And that's also every six months?
A It was once per year. Coming up on October 1st, it will be twice a year.
Q This is another Navy requirement?
A Yes.
Q The fitness test includes doing a certain number of push-ups, right?
A Yes.
Q A certain number of sit-ups,
A Yes.
Q Running a certain distance?
A In a certain amount of time.
Q Guards cannot work for Xcel at Indian Island if they cannot pass the fitness test?
A That is correct.
Q So if a car -- guard doesn't pass the fitness test, the guard is terminated by Respondent, right?



A Not immediately. If they fail the test, they get put on a -- what's called a 60-day notice. And then they have 60 days to retake that test. And if they cannot re-pass that test in 60 days, then they are terminated.

Q A guard named Mark Salopek used to work for Respondent, right?

A Yes.

Q At Indian Island?

A Yes.

Q But Respondent fired him?

A Yes.

Q In fact, you fired him?

A Yes.

Q On October 27th, 2018, right?

A Yes.

Q In 2018, the Navy conducted an investigation into weapons qualifications of Respondent's guards at Indian Island, right?

A That's correct.

Q That investigation was triggered by complaints by guards, right?

A I believe that -- that was triggered by complaints, yes.

Q In fact, by three guards, right?

MR. STANEVICH: I'm going to object to the lack of foundation.

JUDGE GIANNOPOULOS: No. I think he said he believes it

opinion, that's pretty thorough.

Q And Respondent cooperate with the investigation?

A Well, I wasn't there. The report reflects. I have no reason to disbelieve that we did not cooperate fully.

JUDGE GIANNOPOULOS: All right. And just -- you may have said this earlier in your testimony, sir. But when exactly did you start with Xcel?

THE WITNESS: On or about the 3rd of September.

JUDGE GIANNOPOULOS: 2018?

THE WITNESS: 2018. And then I assumed the full duties from the former CEO on or about the 12th of October.

JUDGE GIANNOPOULOS: All right.

Q BY MS. MCCONNELL: I'm sorry. Can you say that first date again? The one you --

A September 3rd. What is Labor Day of 2018.

Q Well, you are here as custodian of records. And in that capacity, are you aware if the Navy asked Respondent to pull files, pull Respondent's files --

A Yes.

Q -- so that it could examine them?

A Yes. I was told that by our COR, Contracting Officer's Representative.

Q Okay. Mark Salopek also filed a complaint with the Navy's Inspector General, right?

A I am not aware if he did or not.



harassing texts?

JUDGE GIANNOPOULOS: Give me one second, General Counsel. Let me get to the -- the pages are stuck together for me.

Go ahead. All right. I'm there. So 1454, the email, July 14th.

Q BY MS. MCCONNELL: And it also shows --

A That -- that appears to be the case.

Q And it --

JUDGE GIANNOPOULOS: Do you -- who is Mr. Terry?

THE WITNESS: Michael Terry's the project manager.

JUDGE GIANNOPOULOS: Okay.

Q BY MS. MCCONNELL: And project manager, what's that position?

A He runs the contract for Xcel Protective Services at Indian Island.

Q Okay. So --

JUDGE GIANNOPOULOS: And where is he in relation to you in the hierarchy of the company?

THE WITNESS: He reports directly to me.

JUDGE GIANNOPOULOS: All right. Go ahead.

Q BY MS. MCCONNELL: Is he --

JUDGE GIANNOPOULOS: Go ahead, General Counsel.

Q BY MS. MCCONNELL: Is he the top-ranked official who's on-site at Indian Island?

A Yes, he is.



Q For Respondent?
A Yes.
Q Okay. And so this email was to him, right?
A Yes.
Q And he -- in fact, he forwarded it on July 14th as well?
A Yes. To John Morgan.
Q And who's John Morgan?
A The former CEO for Xcel.

JUDGE GIANNOPOULOS: And is that whose position you took?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Okay.

MS. MCCONNELL: I have no further questions at this time, Your Honor.

JUDGE GIANNOPOULOS: All right. From the Union?

MR. OLSZEWSKI: No questions.

JUDGE GIANNOPOULOS: All right. Respondent?

MR. STANEVICH: I have no questions at this time, but reserve the right to call Mr. Filibeck in the company's case in chief.

JUDGE GIANNOPOULOS: Absolutely.

All right. Mr. Filibeck, thank you, sir. You can step down. Please remember there's a sequestration order in place.

MS. MCCONNELL: Thank you.

JUDGE GIANNOPOULOS: All right. Let's go off the record for a second.



(Off the record at 11:33 a.m.)

JUDGE GIANNOPOULOS: Go ahead. What's your next -- let's go on the record.

All right. Go ahead, General Counsel, your next witness?

MS. MCCONNELL: Counsel for the General Counsel Calls Mark Salopek to the stand.

JUDGE GIANNOPOULOS: All right. Mr. Salopek, please step up here, sir. Just careful, there's right there on the floor. May I have you raise your right hand?

Whereupon,

**MARK SALOPEK**

having been duly sworn, was called as a witness herein and was examined and testified as follows:

JUDGE GIANNOPOULOS: All right. Have a seat, Mr. Salopek. All right. Please state your name and spell your full name for the record.

THE WITNESS: Mark Joseph Salopek, S as in Sam, A-L-O-P as in Paul, E-K.

JUDGE GIANNOPOULOS: All right. Thank you

Go ahead, General Counsel.

**DIRECT EXAMINATION**

Q BY MS. MCCONNELL: Mr. Salopek, have you worked for Xcel Protective Services?

A Yes.

Q When was that?



forms, and they also handle issuing weapons, logging those weapons, and post visits.

Q What are post visits?

A The lieutenants -- all lieutenants during a shift, visit each post to ensure that everything is done or being done properly, check-in with the guards.

Q How many full-time lieutenants are there?

A I believe there's three, ma'am.

Q Now, you described that they divide up the duties. Let start with you mentioned Mr. Del Rosario. What were his special duties?

A He was supply and requisition.

Q And what were the other two lieutenants' names?

A One is Gerald Powless and he is training. And the other one is Doug Lux, L-U-X.

Q And what does he do?

A I believe he did a lot of work in forms and administrative work.

Q Now, you mentioned that there are full-time lieutenants and there are part-time lieutenants?

A Yes, ma'am.

Q About how many part-time lieutenants are there?

A It varies, but there could be as many as four.

Q How do the duties of the part-time lieutenants compare to those of the full-time lieutenants?



A Part-time lieutenants would only do the post checks, hand out weapons, retrieve weapons, and fill out the logs.

Q Are the full-time lieutenants -- now, during the time that you were working at Xcel, were you represented by a union?

A Yes.

Q And do you recall what union that is?

A SPFPA number 5.

Q I realize it can be a challenging one to recall.

A It can be.

Q Yeah. SPFPA Local 5?

A Yes, ma'am.

Q Okay. And this was -- these are the guards for?

A Yes, ma'am.

Q Okay. And were the full-time lieutenants part of the Union?

A No.

Q How about the part-time lieutenants?

A They can. It depends. If they are working as a lieutenant, our understanding is they are not. If they are working as a guard, they are.

Q So when you say part -- explain to me what you mean by part-time lieutenants?

A A part-time lieutenant would be a guard. He's a union member, but they have elected to help out as a lieutenant from time to time in the schedule where they can come in and learn



and to train to be a lieutenant.

Q Okay. How many of the guards -- how many guards are there working for Xcel on Indian Island?

A It can vary anywhere in the 30s to the 40s.

Q How many of these guards are women?

A Five maybe.

Q Tell me about your duties. What were your duties as a security guard at Indian Island?

A The -- basically, it's to observe and report anything that's out of order. And that could be either at a fixed post or it could be in a mobile patrol or a boat. At one point, we were in boats.

Q All right. Tell me about a typical day at work.

JUDGE GIANNOPOULOS: Well, let me ask you, report to who? So observe and report. So say, I don't know, who would you report something out of order to?

THE WITNESS: We have a radio, sir. And so we would either by telephone, by cell phone, or by radio say, I see something unusual here. And that would normally go directly to our lieutenant first.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Or to the radio dispatch, which is the Navy.

JUDGE GIANNOPOULOS: Okay. All right.

Go ahead, General Counsel.

Q BY MS. MCCONNELL: Tell me about a typical day when you



THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. Why don't you tell me, you had worked there for quite a number of years it seemed like, at least four or five years. What goes on at Navy? What goes on at Indian Island, if you know?

THE WITNESS: Well, I signed a disclaimer, but I mean, it's basically munitions home.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: I can't tell you what's there, but --

JUDGE GIANNOPOULOS: But there's Navy munitions there?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. And that was, I'm assuming, what you were guarding?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right.

Go ahead, General Counsel.

Q BY MS. MCCONNELL: Okay. You had mentioned being represented by SPFPA Local 5. Were you involved with this Union?

A Yes, I was.

Q How so?

A I was a union, what you would call a stewards at one point.

Q At what point?

A It was 2014.



his six-month pair of boots and he was told that -- and he told them that I had told him that he gets a pair of boots every six months. And --

Q How, if at all, did you respond to -- when you were learning this from Pete Bilraio?

A Well, I kind of chuckled to be honest with you. I said, Pete, I never told you that. I said, it's not in the CBA, not in the contract.

Q Okay. Moving on from the Pete Bilraio conversation, you had mentioned weapons training?

A Yes, ma'am.

Q Do the security officers at Indian Island carry weapons as part of their job?

A Yes, ma'am.

Q What weapons are those?

A Every officer when he's on duty, carries an M9 9mm handgun, 45 rounds of ammo.

Q Any others?

A Depending upon the post you work, you may either carry a shotgun which is 12-gauge, Mossberg 500 or an M4 rifle.

Q And you said it depends on what -- did you say, on what post you're on?

A On what post you work.

Q Okay. So on which post -- you carry the handgun at all times. On which posts do you carry the shotgun?



A Shotgun is the second man in main gate, shotgun is the second guard in pier gate, and boat patrols carry shotguns.
Q Okay. And how about the rifle? On which post do you carry the rifle?
A The rifle is -- the lieutenants carry a rifle, the Post 9 which is the -- in CVIS, he is the cover officer. He carries one. And when we had the boats, the boat officer carried an M4.
Q Okay. Who provides these weapons?
A The United States Navy.
Q Okay. What sort of weapons training is provided to the guards at Indian Island?
A Twice a year they have to go to the range and qualify with their weapons.
Q Okay. So that --
A Well, actually that's not true. One is a qualification. Another one is a sustainment.
Q Okay. So what is a qualification?
A A qualification is where an employee fires their weapon at a target that measures either how close the rounds go to, which has a point value, and of course the closer all of the rounds are together, the more accurate you are. So you score higher. And that is rated with either -- you can get a maximum score but there is a minimum score that you must attain in order to qualify.



Q So qualification is a kind of testing?
A It is, ma'am.
Q Okay. And you mentioned something else besides qualification. I think it was sustainment?
A It's a sustainment.
Q So what's the difference between qualification and sustainment?
A It's easier. The target's bigger. The -- I'm trying to think of the word, the -- you just have to -- the target is much bigger and you just have to get it in the middle of the target.
Q Do you fire with all -- you mentioned the three weapons. Do you have to do a qualification on all three weapons?
A For qualification, yes.
Q How about for sustainment?
A Only rifle and handgun.
Q And how often is qualification?
A Once a year.
Q Okay. And how often is sustainment?
A Once a year. Broken up into six months apart.
Q Where does qualification happen?
A Bangor Naval Base.
Q And where does sustainment happen?
A Bangor Naval Base.
Q Who -- so you described qualification as a kind of test.



Who sets the rules for these tests?
A The Navy.
Q Who provides the targets for these tests?
A The Navy.
Q And are you aware of these qualifications occurring anywhere -- let me back up. You said that the Navy provides the rules. Are there other -- and who says where these qualifications are to occur?
A The Navy.
Q Okay. And are there other -- besides Bangor, are there any other places that the Navy says it's okay to do these qualifications, to your knowledge?
A Any place that the Navy engineers approve.
Q Okay. And what places are you aware of that the Navy engineers have approved?
A Port Townsend Rifleman's Association was one. And that's the only one I'm -- the only other one, I'm aware of.
Q You had mentioned raising weapons training concerns with management while you were a steward?
A Yes.
Q Now, during your time at Xcel, were there any other issues besides weapons training that you became aware of?
A Yes, ma'am.
Q Related to weapons?
A Yes, ma'am.



Q What were those issues?
A It was the use of alternate sites, other than approved ranges.
Q When did you first become aware of alternate sites?
A 2016.
Q Okay. And when you say alternate sites, what do you mean?
A Using another location, other than approved sites, by the Navy.
Q What did you learn in 2016, regarding alternate sites?
A I was approached by an officer by the name of the Jacob Schroeder. He was a line safety coach and he told me that he was asked to take an officer who had failed his shotgun, out to a gravel pit or a wooded area, and to -- what he thought was remediate him, teach him. And Jake said he was upset because after he got back, it was considered a qualification and he was allowed to stand post with that shotgun.
Q What was your feeling on hearing about this?
A I was concerned.
Q Did you speak to anyone from management about this concern?
A Yes.
Q Who was that?
A Mike Terry.
Q And when did that occur?



A Sometime soon after Jacob told me.
Q And I think you mentioned --
A Maybe -- easily within a week.
Q And this -- did you -- can you recall what year this was?
A Oh, it would be right at the same time.
Q So is that 2016? You testified earlier it was --
A Yeah, I'm pretty sure it was 2016.
Q Okay. And do you recall what was said -- what you said to Mr. Terry?
A Well, I sat down with Mike and I questioned the practice and I expressed to him my concerns for safety ricochets but most of all that it put our company in a bad position. I said, this is going to come back to bite us, in my opinion. And I recommended to him, I said, Mike, I think we need to stay away from this.
Q Do you recall if Mr. Terry made any response?
A He said that the Navy allows us to do it.
Q Okay. Did weapons safety come up again at work, after this conversation you've just testified with Mr. Terry?
A Yes.
Q When was that?
A February -- no. July 9th, 2017.
Q What happened on July 9th, 2017?
A There was another issue of an alternate site being used.
Q What did you learn about the alternate site in 2017?



A I was told by the RSO Gerald Powless, that --
Q What is RSO?
A RSO is a range safety officer. He told me that he was going to take five officers to Ofc. Schroder's house, who supposedly lives near forestry land and they were going to qualify at his house.
Q This conversation you described, this occurred on -- you were saying it was July 9th, 2017?
A No. That's when the range happened?
Q When you say, range, what do you mean?
A In other words, the range qualification that the officers qualified at that site.
Q Did you receive any further information about this particular range qualification you're talking about on July 9th, 2017?
A Yes.
Q What was that?
A Prior to talking to Gerald Powless, I had gotten off the patrol boat and was walking up the ramp where I met an officer by the name of Robert Armstrong and Michael Terry was standing to the right and they both were near their vehicles.
Q And what occurred when you saw them?
A I heard Robert Armstrong say, hey, Mike, I got that AR-15 and a 9mm for range. And I said, what are you talking about? And Robert said, oh, we're having range at Schroder's house.



And I looked over at Mike and Mike just lowered his head.
Q Did you -- do you recall if you said anything?
A Something to the effect of, that's just great.
Q So you mentioned a conversation with Mr. Powless about the same July 9th, event and you were describing witnessing this conversation with Armstrong and Terry. Did you ever speak to Mr. Terry about what you heard?
A Yes, I did.
Q When was that?
A Well, I had a conversation with him regarding it on the telephone.
Q Okay. And do you remember when this conversation was, in relation to this --
A We're talking days. I mean, this is close.
Q We're talking days from the conversation --
A Before.
Q -- from that conversation that occurred that you had overheard between Armstrong and --
A Yes.
Q Okay. And so you spoke to him on the phone. Do you recall what was said on the phone with Terry?
A Well, he was -- it started out as personal. And I said, what are you up to? And he says, I'm at Walmart buying ammunition for the range at Schroder's house.
Q How did you feel about what you heard from Mr. Terry?



A I -- to be honest with you, it just frustrated.
Q After this July 9th, 2017 range at Schroder's house that you heard of, did you -- did weapons safety ever come up again as an issue for you at work, after this?
A After when?
Q After July 2017?
A Yes.
Q When was that?
A It was February -- about February 21, 2018.
Q What happened in February of 2018?
A I was a line safety officer, line coach.
Q Explain what a line safety officer or line coach is?
A We are responsible to ensure that all safety procedures are applied -- are followed.
Q Followed where?
A And we are also to assist shooters on the range.
Q Okay. And this is the line safety officer at a range?
A At a range.
Q And what range was this?
A Bangor.
Q What did you witness when you were the line safety coach on the day you were describing?
A Three officers on one side of the range had not -- had failed their rifle qualification twice. And at that point, I saw Gerald Powless alter their qualification target with a



large black X.

Q And how was this -- explain this large black X. How was this large black X created?

A With a sharpie marker. And it was a thick black line that went from top to bottom and then side to side, centering on the center of the target.

Q And did you understand why he was doing this?

A Well, he said, there, you should be able to see the target now.

Q And what did you think about Gerald Powless putting this black X on the target?

A I had never seen it before and I questioned altering a qualification target.

JUDGE GIANNOPOULOS: So what did the target look like before? Just was it like a dart board target? Like if anyone's been a shooting range and you see like a round circle and a target?

THE WITNESS: Three circles basically.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: If I could remember -- yeah, it's three circles.

JUDGE GIANNOPOULOS: All right. So your testimony is that he then put a big X across?

THE WITNESS: A cross.

JUDGE GIANNOPOULOS: A cross. Okay. Not an X, a cross.



And you know, maybe a suggestion getting your eyes checked, like I had to have done.

Q Did you express these concerns to any supervisor?

A Not initially, no.

Q Okay. Were there any supervisors present at the range qualification you've just described at Bangor in February Of 2018?

A Yes.

Q Who?

A Gerald Powless.

Q Okay. Did you discuss these concerns you've just described about weapons qualifications with anyone?

A Yes.

Q Who?

A Jacob Schroeder and eventually, Stephen Mullen.

Q What was said in these conversations? Or let's start with, what did you say during these conversations?

A I approached Jake at the range when it was happening and I said, Jake, have you ever seen this before? He and I were both range -- you know, we're line coaches. And he said, I have never seen this here or in the military.

Q And so you described that you -- right the same day this is happening you spoke to Schroeder?

A Yes.

Q Do you recall when you spoke to Mr. Mullen? Was it that



same day?

A It may have been the same day. Steve was -- may have been there or it was after. But I know I spoke to him of it.

Q Okay. And what did you say to Mr. Mullen?

A Same thing, have you ever seen this before?

Q Did you -- and as a result of these conversations you had with Mullen and Schroeder and you had these concerns, and you said you didn't initially raise these concerns with any supervisor. Did you later?

A Yes.

Q Okay. Who with?

A Mr. John Morgan, the CEO.

Q Okay. How did you go about raising this concern?

A I had an open-door policy with John.

Q Did you?

A And -- Mr. Morgan, John Morgan. And I telephoned him.

Q And what was said -- and first of all, when was this call?

A March 9th.

Q Of what year?

A 2018.

Q What happened when you called him on March 9th, 2018?

A I told him about the gravel pit ranges and I told him about the alteration of targets.

Q How, if at all, did Mr. Morgan respond?



A His first question was, how do you know that Gerald Powless is not doing this without Michael Terry's consent? And I told him because I have knowledge that Michael Terry knows that it's going on.

Q Was anything further said during this conversation with Mr. Morgan?

A Yes.

Q What?

A I expressed to Mr. Morgan that I didn't want to get anybody in trouble. I said -- I expressed my concerns regarding liability and he said, well, what do you want? And I said, I'd like it to stop.

Q Anything further said, that you recall?

A Yes. He says, all right, Mark, I'm going to call Mike Terry and I am going to tell him that someone that cares about him, doesn't want to see him get in trouble, wants -- has concerns in these areas, and I will get it resolved for you. And I said, thank you very much.

Q Was it -- did you learn that in fact it was resolved?

A I got a call back a couple of days later from John Morgan.

Q And what happened in that call?

A John Morgan told me that he had spoken to Mike and that, again anonymously, that a friend or someone concerned didn't want to see him get in trouble and he said, Mike said that he



witness to leave. So go ahead. Re-ask.

MS. MCCONNELL: I'll do my best to ask it the same way.

JUDGE GIANNOPOULOS: Okay. That's all right.

MS. MCCONNELL: But I'll do my best.

Q BY MS. MCCONNELL: During this conversation with John Morgan on the phone when he called you back, do you recall what was said?

A Yes.

Q What was said?

A He told me that he had spoken to Michael Terry and Michael Terry assured him that he would be completely transparent and address all the officers at work that the things that they thought were happening, were in fact, not. And John Morgan said, he instructed Mike to follow all procedures and policies regarding range operation.

JUDGE GIANNOPOULOS: All right. So I'm going to overrule the objection. What Mr. Morgan said to the witness is not itself hearsay because Mr. Morgan's alleged complaint -- well, he's the CEO.

Go ahead.

So it's really party -- statement of the party.

Go ahead, General Counsel.

Q BY MS. MCCONNELL: After this conservation with Mr. Morgan, in which you heard there was going to be an announcement, did you speak to anyone else about this



conversation?

A I did.

Q Who?

A Jacob Schroeder and Stephen Mullen.

Q Was there in fact an announcement?

A There was not.

Q After this point, we've been talking about March of 2018, did weapons safety come up again after this at work?

A Yes.

Q What -- when was that?

JUDGE GIANNOPOULOS: Can I -- let me ask you a question. Let me interrupt you for a second. When you go to the range, when you go to qualify at the range, were there -- was there anyone from the Navy there, like, overseeing this?

THE WITNESS: No.

JUDGE GIANNOPOULOS: Right. So just company officials would oversee?

THE WITNESS: At times, sir, we would have range masters that are civilians that are hired by the Navy and they would drop in from time to time. But I don't recall ever seeing a Navy official come in --

JUDGE GIANNOPOULOS: I meant scoring the targets. I meant scoring the targets.

THE WITNESS: No, sir. That was all us.

JUDGE GIANNOPOULOS: Okay. Go ahead, General Counsel.



Q Was Ms. Coler taken off range?
A No, she wasn't.
Q Who has authority to take someone off range?
A Actually, the line safety coach can.
Q Why --
A But they can be overridden by the RSO which is Gerald Powless.
Q Why didn't you take Coler off range?
A I was not allowed to leave the booth.
JUDGE GIANNOPOULOS: Like by who?
THE WITNESS: It's against the range rules, Your Honor. When they're firing, there are two doors that prevent concussion from leaving the indoor range and once we are in that soundproof booth, if range is being conducted, we're not allowed to leave.
JUDGE GIANNOPOULOS: I see. Okay.
Q BY MS. MCCONNELL: What was the result of that range for Coler that day?
A She failed her shotgun and her rifle.
Q And you mentioned another guard who was new as well, Mr. Lein?
A Yes.
Q What was the result of the range that day for him?
A Mr. Lein failed his rifle.
Q How do you know -- first of all, this, how do you know



that Coler failed both rifle and shotgun?

A Well, I saw her targets and I was there.

Q And how about Mr. Lein?

A I saw his targets and I was there.

Q Okay. After this range, you've mentioned previously a number of conversations about weapons qualifications. After this range, did you speak to anyone about weapons qualifications?

A Yes.

Q Who was that?

A Daniel Lein.

Q When did this conversation you're describing occur?

A Approximately the next week.

Q Okay. What happened in this conversation?

A Daniel Lein had complained that he had not also received any fundamental training to me. And then he asked me about gravel pit ranges. He asked me if I knew anything about gravel pit ranges.

Q And what further, if anything, was said in this conversation?

A My question was, what, in disbelief. You know, that would be the tone of my voice.

Q Did he say anything in response?

A I told him; they are not allowed.

Q Okay. And did anything further happen in this



conversation that you recall?

A He told me that he was told by Gerald Powless that both he and Emily Coler were going to be doing their rifle and Emily would qualify with her shotgun at a gravel pit. And Dan asked if it was paid and Gerald said, no. And he said that he asked Gerald if it was authorized, if it was authorized by the Navy, and Gerald said, yes, according to Dan.

Q Okay. After this conversation, after you've had this range in May 2018, you've spoken to Mr. Lein, after that conversation, did you speak to any supervisors about what you'd heard and witnessed?

A Yes.

Q Who was that?

A Gerald Powless.

Q When was this?

A About the time leading up to it.

Q Leading up to what?

A Leading up to the next gravel pit range, the qualification at a gravel pit.

Q And when did you understand that this next gravel pit qualification was happening?

A It ultimately ended up either that on or about the 26th or 27th of May.

Q Of May 2018?

A Yes.



Q Did weapons qualifications issues come up at work again after this conversation?
A Yes.
Q With --
A Dan Lein.
Q Okay.
A And he said he was going to refuse to go.
Q Go where?
A Go to that gravel pit range. He felt it was unsafe, and he wasn't going to get paid to go and he said in 10 years of being a contractor, he had never seen anything and he says, I was a Navy chief and we're not doing this.
Q Where did this conversation occur, with Dan Lein?
A He was at work.
Q Do you recall if anyone else was present when you had this conversation with Dan Lein?
A No, not at this point. I don't remember.
Q All right. Moving forward and you mentioned that the -- you understood this gravel pit range was happening in late May of 2018?
A Yes.
Q Why did you believe that this was happening?
A It had happened before so I would not expect this to be incorrect and Gerald told me that they were going to do it. And this was confirmed by Dan Lein. Three sources.



to how many ammo -- you know, the green ammo boxes.

JUDGE GIANNOPOULOS: Yeah, okay.

THE WITNESS: We grab those, put them in the bin.

JUDGE GIANNOPOULOS: All right. Was there ever any ammunition left over?

THE WITNESS: Oh sure.

JUDGE GIANNOPOULOS: So what would you do now in flip side, taking it back?

THE WITNESS: Turn it back in.

JUDGE GIANNOPOULOS: All of it?

THE WITNESS: All of it.

JUDGE GIANNOPOULOS: All right. With respect to what you thought was going on at these gravel pits, okay, did, in your mind at least, were they using Navy weapons? The weapons that you would use every day to patrol or the Navy gives you?

THE WITNESS: They were not.

JUDGE GIANNOPOULOS: They were not. Okay. And in your mind, where was this -- where were these bullets coming from?

THE WITNESS: They were being purchased by, in one case as I testified, Michael Terry.

JUDGE GIANNOPOULOS: All right. And that's what you thought was going on?

THE WITNESS: Oh, yes, sir.

JUDGE GIANNOPOULOS: Okay. And then you thought they were using these gravel range tests or whatever to actually qualify



Gerald should have known better. And I said, you're going to dump this whole thing on Gerald, aren't you? And he just kind of stared at me, that feeling of, yeah. And that's what I perceived, that yeah, we are.

Q Okay. After this conversation with Lt. Lux at work, did you communicate with anything about these ranges, the gravel pit ranges?

A Yes. At that point, I told Lt. Doug Lux that I was going to be writing a memo to Mr. Morgan regarding this whole issue.

Q Did you in fact, write a memo?

A I did.

Q How did you go about writing this email?

A I emailed it to him

Q I'm sorry, preparing the memo. How did you go about preparing -- creating the memo?

A I typed it on a computer.

Q Okay. And did you have any input from any other -- any sources?

A Yes, I did.

Q What were those sources?

A Jacob Schroeder and Stephen Mullen, gave me some input onto that memo.

Q How did they contribute?

A For Steve Mullen, he gave me a date and he looked at the content as to what had happened. Jacob Schroeder the same



thing, that looks right, that looks right and that type of thing.

**(General Counsel Exhibit Number 3 Marked for Identification)**

Q BY MS. MCCONNELL: Okay. I'm showing you a document marked GC Exhibit 3. Take a look at this document. I'll wait for you to get your glasses on.

A Thank you.

Q Take a moment and then look up at me when you've had a chance to look at it.

A Yes, I do recognize it.

Q Okay. What is it?

A That's the memo that I wrote.

Q That you wrote to?

A To Mr. John Morgan.

Q okay. And did you send it?

A I did, ma'am.

Q Okay. How did you go about sending it?

A I attached it to an email and sent it to Mr. John Morgan's work email.

**(General Counsel Exhibit Number 4 Marked for Identification)**

Q BY MS. MCCONNELL: Okay. I'm going to be showing you a document marked GC Exhibit 4. Take a look at this document. Do you recognize this document?

A Yes, ma'am.

Q Okay. Now, let's start from the bottom of the page.



What's shown at the bottom where it says, June 28th, 2018?
A It's an introduction, requesting him to look at the memo.
Q Okay. So is this the email in which you -- and I see that there's sort of some arrows. It looks like Xcel memo work issues?
A Yes.
Q What was that?
A I'm not really quite sure.
Q Okay. Was this the email in which you attached your -- this June 28th memo, the GC Exhibit 3?
A Yes, ma'am.
Q Okay.
JUDGE GIANNOPOULOS: All right. So your testimony is that General Counsel's 3 was attached to the email, General Counsel's 4 that was sent to Mr. Morgan?
THE WITNESS: Yes, sir.
MS. MCCONNELL: Counsel for the General Counsel offers into evidence GC Exhibits 3 and 4.
JUDGE GIANNOPOULOS: All right. Well, first of all, why don't you ask him about the top --
MS. MCCONNELL: Sure. Yes.
JUDGE GIANNOPOULOS: -- of General Counsel's 4.
Q BY MS. MCCONNELL: So I asked you about the bottom. What's showing up at the top of the page, GC Exhibit 4?
A This was Mr. John Morgan's response to me.



Q Response to --

A To my request for him --

JUDGE GIANNOPOULOS: To your email?

THE WITNESS: To my -- thank you, sir.

JUDGE GIANNOPOULOS: All right.

So any objections? Respondent, for General Counsel Exhibit 3 and 4?

MR. STANEVICH: Just one moment, please?

JUDGE GIANNOPOULOS: Sure.

In fact, this is a good time to take a break, while I see Respondent's counsel is reading the actual memo in General Counsel's 3 and I haven't read it. So we're going to take a break. We've been on the record for about an hour and a quarter maybe. Let's take a break, a ten-minute break and it'll give everyone an opportunity -- the memo is quite -- it's single-spaced, maybe you know, four or five -- five pages. So we'll take a ten-minute break. Let's go off the record.

All right.

(Off the record at 2:38 p.m.)

JUDGE GIANNOPOULOS: All right. We're back on the record.

Respondent, any objections to General Counsel's 3?

MR. STANEVICH: No objection, Your Honor.

JUDGE GIANNOPOULOS: All right. 3 is admitted.

**(General Counsel Exhibit Number 3 Received into Evidence)**

JUDGE GIANNOPOULOS: Any objections to General Counsel's



A Navel Magazine Indian Island.

Q Okay. Is --

JUDGE GIANNOPOULOS: A Navy commander. Because we're talking about captains and lieutenants.

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: And there really aren't captains or lieutenants and commanders that are real commanders. This is a Naval commander?

THE WITNESS: Correct.

JUDGE GIANNOPOULOS: Okay. Go ahead, General Counsel.

Q BY MS. MCCONNELL: Okay. In all that, I want to make sure I get it correct. He's the commander of what?

A He is the Navy commander of Naval Magazine Indian Island.

Q So he's in charge of the base; is that right?

A The entire base, ma'am.

Q Okay. For the Navy? Okay. So you said that you were -- again, I may have missed this. Were you or were you not on duty on July 8th?

A I was not.

Q Okay. So what happened on July 8th?

A I met with Dan Lein and Steve Mullen on the base near the gym, which is next door to the Navy commander's office.

Q You met with them. What did you do when you met with them?

A We discussed again do we want to go in, but we went in



with the premise that we were only going to advise him that we were coming forward.

Q Okay. And go in where?

A Into the Navy commander's office.

Q And "him" is who?

JUDGE GIANNOPOULOS: The Navy commander.

THE WITNESS: The Navy commander.

Q Okay. I want to make sure I got all those pronouns right.

Okay. And do you recall what time of day it was when you went into the Navy commander's office?

A Ma'am, I don't.

Q Okay. What happened when you went into his office?

A We sat down with the commander, and based on a prior request from the commander, we advised him that we were going to be coming forward, we were planning on coming forward with a concern of safety to the Inspector General.

Q And what, if anything, do you recall occurring further in that conversation?

A Well, the commander started probing, asking, Is anybody in danger right now immediately? And we said no. And he said -- he started asking, well, is it equipment? Is it this? Is it that? And we said, Sir, no, we want to go forward to the IG. And he said, You know, you have some options here. You can put an anonymous note in my suggestion box, and he goes, But if you guys tell me about this personally, I have to give up your

names.

And I said, I want to go to the IG. And Dan Lein, sitting beside me, also said, I'm on probation, I'm concerned about retaliation, and I want to go to the IG anonymous.

And at one point the commander yelled at us and said, guys, just tell me what's going on here, which is an order.

Q So what happened next?

A Well, people started talking. To be honest with you, it just started. You know, one person starts and the rest of them, and it's, like, yeah, that's what's going on.

Q What was said about what was going on?

A We told him that it involved alternate site ranges, the alteration of targets, and the July 7th, 2017, 3591 range sheet is falsified. They weren't at Bangor. They were at a gravel pit.

And he said, well, there's got to have to be an investigation. And he said he's going to call Rake and Manson and have them come in and do an investigation. And he said --

Q Who are Rake and Manson?

A I'm sorry, Richard Rake and Steven Manson. They are contract officers that are civilian employees with the Navy.

Q What, if anything, further do you remember from this conversation with the commander in his office?

A He asked that, before 10:00, he wanted an email sent to Mr. Michael Jones, who is the -- the acronym is ISO, and it



means installation security officer, I believe -- advising him of what we told him. And he said if we didn't do that by 10:00, he was going to deal with the issue.

Q Anything else happen in this conversation?

A He did ask us to make sure -- he looked at me and said, Would you make sure that you tell Mike Terry before you do it? And I said, Of course I will. And then he said, Now, guys, listen. He said, Make sure you don't get interviewed without either a union rep or an attorney sitting with you and you are covered by whistleblower.

Q What happened next?

A We left.

Q Had you previously had any contact with the base commander?

A Yes.

Q In the course of your job, how would you have contact with him?

A Either in a meeting or just when we're working and we -- maybe we'll stop in, if we're working the right post, stop in to see him at his office.

Q What would be the right post?

A South patrol.

JUDGE GIANNOPOULOS: Doesn't he has to drive through the gate? How does he get there? Does the base commander ever drive in and out of the base?



A He was on post.

Q How do you mean?

A That's part of his patrol area.

Q So you testified that you were ordered by the commander that he needed to see -- that there needed to be an email --

A Yes.

Q -- to Michael Jones. Did that happen?

A Yes.

Q Who sent that?

A Mr. Stephen Mullen.

Q And did you see that email?

A Briefly. I was on the shooting range on the 9th, and I went over it real quick and I said, here's the thing, Steve. Are you comfortable with it? Yeah. I'll let you know when you can send it.

Q Okay. So you were saying you were on range. So this was -- when was this that the --

A On the 9th, ma'am.

Q Okay.

JUDGE GIANNOPOULOS: So you saw it before it was sent?

THE WITNESS: Sir, briefly. I was really busy and I just saw that there was a lot of writing.

JUDGE GIANNOPOULOS: I see. Okay.

Q BY MS. MCCONNELL: You also testified that you'd heard from the base commander that he wanted you to communicate with



that day?
A Stephen Mullen? Yes.
Q How did you speak to him?
A I got a phone call from him.
Q Okay. What occurred in that conversation, this first conversation you were having after you had communicated to him about this email to Michael Jones? So what happened in that conversation?
A He was very excited and he said, Dan Lein just got fired, Mark.
Q Did you hear anymore -- as you had that conversation with Mr. Mullen, did you hear from him again?
A He said -- I'm sorry.
Q That was a yes or no question.
A Yes.
Q So you heard from him again. How much later?
A Well, it was the same call.
Q Oh, I see. Okay. So what else happened during this call?
A He told me that Jacob Shriver and I had to report to Michael Terry's office as soon as we got back from the range.
Q Did you hear -- did you have any other phone calls with Mr. Mullen that day?
JUDGE GIANNOPOULOS: I'm sorry. And who is Dan Lein again, sir?
THE WITNESS: He's a guard, sir.



basis to know.

And I've never objected to a judge's question, and I don't really intend to start.

JUDGE GIANNOPOULOS: You -- I have. I'm not always right, you know. If I'm wrong, I'll admit it. I'll try to admit it at some point.

So okay, very well. So you didn't have other than his knowledge. But I just asked him if he knew.

I didn't want to cut you off, but I just wanted to state that. Just because I ask a question doesn't mean you can't object to it. And doesn't mean that I'm -- I'm always right. I think I'm always right, but that's not true.

All right. Go ahead, General Counsel, with your next question.

MS. MCCONNELL: I was trained that the judge is always right, Your Honor.

JUDGE GIANNOPOULOS: Well --

Q BY MS. MCCONNELL: You spoke -- you communicated with some other government representative. You said you spoke to the IG --

A Yes.

Q -- communicated with the IG? Okay. How did you go about doing that?

A First by email and then telephone.

Q When was that?



A It was around August -- on or about maybe the 17th, 21st of August.

**(General Counsel Exhibit Number 9 Marked for Identification)**

Q BY MS. MCCONNELL: I am going to show you a document that's marked GC-9.

MS. MCCONNELL: And, Your Honor, we will be relieved to know that this is internally tabulated.

JUDGE GIANNOPOULOS: All right, very good.

MS. MCCONNELL: It is a long document, but it is internally tabulated.

JUDGE GIANNOPOULOS: Very good, good work. All right.

Q BY MS. MCCONNELL: Mr. Salopek, do you recognize this document? And it's a long one, so take your time, go through it.

(Witness reviews document)

Q BY MS. MCCONNELL: Do you recognize this document?

A I do.

Q What is it?

A This is a series of emails that was exchanged with the IG and a document that I had sent to them.

Q Okay. So help us -- walk us through this document. I'm just seeing a name, Richard Townsend, kind of in the middle of the first page. Who's Richard Townsend?

A Richard Townsend is an IG investigator.

Q And how did you know that?



JUDGE GIANNOPOULOS: Okay. You attached it to an email to the IG?

THE WITNESS: Yes, ma'am.

JUDGE GIANNOPOULOS: And is this -- if you look at that, that font seems to go all the way from page 18 to pages -- well, it looks like --

MS. MCCONNELL: 33, Your Honor. Or 34, sorry.

JUDGE GIANNOPOULOS: -- 34. Is that all one document?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Okay. All right.

Q BY MS. MCCONNELL: And then it looks to me there is on page 13, turning to page 13.

JUDGE GIANNOPOULOS: Well, let me just ask a question to follow up on that. That document itself sir, that was in essence your IG complaint, the complaint to the IG?

THE WITNESS: It was information provided, yes.

JUDGE GIANNOPOULOS: Provided. And was -- who wrote that?

THE WITNESS: I did.

JUDGE GIANNOPOULOS: You wrote it?

THE WITNESS: Actually, Dan and I did it. We were both sitting as it was being written.

JUDGE GIANNOPOULOS: Together?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Okay. Very well. All right. Sorry, General Counsel. Go ahead, sir. Go ahead, ma'am. Sorry.



JUDGE GIANNOPOULOS: All right. Go ahead, General Counsel.

Maybe it was because you told her that they could kick you out. That's not true.

Go ahead, General Counsel.

Q BY MS. MCCONNELL: Well, once you got into the training room, what happened there?

A I sat down and two gentleman introduced themselves to me.

Q Who did they introduce themselves as?

A It was a Mr. Filibeck and Mr. Cundek (phonetic).

Q Did you learn their first names?

A Eventually.

Q How about Mr. Filibeck, what's his first name?

A Is it Michael?

JUDGE GIANNOPOULOS: It's the gentleman that's sitting in the courtroom over here?

THE WITNESS: It is, sir.

JUDGE GIANNOPOULOS: Okay. All right. That's fine.

Q BY MS. MCCONNELL: Okay. And the other person, did you ever learn his first name?

A Is it David?

JUDGE GIANNOPOULOS: No question. You're here to answer questions, not to ask questions.

THE WITNESS: Sorry.

JUDGE GIANNOPOULOS: If you don't know his first name, the



answer is no.

THE WITNESS: I don't know his first name.

Q BY MS. MCCONNELL: So what occurred with these two men in the training room?

A Mr. Filibeck did the talking, after everybody introducing themselves. And he said, Mr. Salopek, I don't know you and I have never talked to you. And he said, but this can all go away right now and you can resign, or you can be terminated or fired. I can't remember which term he said.

Q Did you respond?

A I told him, I'm not going to resign, sir.

Q What was said next?

A I asked him what I was being terminated for.

Q Did anyone respond?

A Mr. Filibeck did.

Q What did he say?

A He said, you're being terminated for dishonesty, violation of chain of command, and lack of candor, or something regarding candor with a supervisor.

Q Did you say anything further during this conversation?

A I asked him for specificity of charges.

Q What happened next?

A He asked, he said, you want what? And I said, I would like specificity of charges. And he didn't understand. I said, well obviously somebody has accused me of doing something



and I would like due process here. I would like to know who they are, what they said, and I would like an opportunity to respond.

Q What was said next?

A He said, I have a litany of things and then he asked me -- I asked him if I could get a copy of the reports. And --

Q Which reports?

A Whatever he had, you know, regarding, you know, the charges that are being levied against me. He said, I'll send them to you. And I said, would you like my email? And he says, no, I'll get your email from Michael Terry. And I said, okay. And he asked -- he told me to go ahead and at that point, since I wasn't going to resign, go into Michael Terry's office and turn in my CAC card, my region badge, and sign paperwork, my confidentiality for the base. And I did so.

Q And was that the end of your conversation with Mr. Filibeck and Mr. Cundek?

A Pretty much.

Q Did you get anything in writing that day saying why you were fired?

A No.

Q Did you ever get anything in writing --

A No.

Q -- saying why you were fired from Mr. Filibeck?

Now, going back to the time when you were working for



Xcel, before you were fired --

JUDGE GIANNOPOULOS: Let me -- did you ever get anything in writing that said you were fired?

THE WITNESS: No.

JUDGE GIANNOPOULOS: Go ahead, General Counsel.

Q BY MS. MCCONNELL: Okay. So going back in time, during your time working for Xcel, before you were fired, did you receive any discipline?

A Yes, ma'am. I did.

Q And what were you disciplined for?

A I left the weapons vault unattended and open.

Q What type of discipline did you receive?

A I was suspended for three days and I was demoted from lieutenant. It was a serious violation and I was lucky not to be fired.

Q Is Joint Exhibit 5 up in front of you?

JUDGE GIANNOPOULOS: I'm sorry. You can share mine, General Counsel. What page number?

MS. MCCONNELL: Taking a look at Joint Exhibit 5. Look at Bates number 1280 please.

JUDGE GIANNOPOULOS: All right, sir. It's right there.

Q BY MS. MCCONNELL: Do you recognize this document?

A Yes, ma'am.

Q What is this?

A This was my discipline record.



Q So you came back to work in May of 2017 and worked from then until when?
A Until July of 2018.
Q While you worked for Respondent, were you represented by a union?
A Yes, I was.
Q What union was that?
A That was the SPFPA.
Q Local 5?
A Local 5, yes.
Q Were you involved in the Union?
A Yes, I was. At one time I was the assistant union representative.
Q And anything else? Any other ways you were involved with your union?
A On the previous contract then the one they're on now, I was on the negotiating team.
Q Okay. Who was your supervisor at the facility?
A The site manager was Michael Terry.
Q Who did Michael Terry report to?
A The CEO, John Morgan.
Q And was there anyone lower in the hierarchy than Mr. Terry?
A Yes, we had our shift lieutenant.
Q What were your duties as a security guard at Indian



that we went through.

JUDGE GIANNOPOULOS: Okay. And who performs that training?

THE WITNESS: The shift lieutenants usually.

JUDGE GIANNOPOULOS: Okay. All right. And is that done at the base?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. And is that all in one 80 hours, that's basically two weeks?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Is that all in one sitting?

THE WITNESS: Yes. That -- before you can go on duty you have to complete the training.

JUDGE GIANNOPOULOS: All right. Go ahead, General Counsel.

Q BY MS. MCCONNELL: What are the shifts guards work at Indian Island?

A We work a graveyard shift which is from 9:45 to 6:15, day shift which is 5:45 to 2:15 and then swing shift which is 1:45 to 10:15.

Q What, if any, weapons do the security guards at Indian Island carry on the job?

A They carry an M9 Beretta 9mm pistol, a Mossberg M500 12-gauge shotgun, and an M4 556 rifle.

Q Where do these weapons come from?



A These are all Navy weapons. They're Navy-owned weapons.

Q What, if any, training do the guards receive on these weapons?

A We're supposed to receive eight hours of training prior to going to range to qualify.

Q And do you have -- is there testing to demonstrate --

JUDGE GIANNOPOULOS: Sorry. The witness said as he was trailing off, to qualify

THE WITNESS: To qualify.

JUDGE GIANNOPOULOS: All right.

MS. MCCONNELL: Sorry about that.

JUDGE GIANNOPOULOS: Sorry General Counsel. Go ahead.

Q BY MS. MCCONNELL: Do you -- when you say to qualify, what does to qualify mean?

A To qualify it's a test that you take to perform. You actually shoot the weapon. You have to get a certain score on your target before you're qualified.

Q And is this a certain score on all three of those weapons you've described?

A Yes, ma'am.

Q Okay. And if a guard cannot pass the shooting test on these weapons, what happens next?

A They're not allowed to carry that weapon.

Q Now, describe this shooting test, is you have to get -- describe what the shooting test consists of?



A For the handgun, you'll stand at the firing line, they'll tell you the course of fire, how many shots to fire, then they'll tell you the lines ready, fire, you know, guard your weapon, take it off safe, fire the weapon at the target and then re-holster the weapon.

Q Who sets these rules?

A The Navy sets the standards and the range master is the one who is in charge of the range.

Q And who's the range master? First up, is that an Xcel employee that you're talking about?

A Yes, ma'am.

JUDGE GIANNOPOULOS: All right. General Counsel, this seems to me to be a good time for us to break. Because I'd also had asked you get me a copy of some documents.

So sir, thank you for coming in and testifying. I know it was only maybe a half hour, 25 minutes or so. But there's a sequestration order in place so please don't discuss your testimony with anyone until this case is completed.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: And with that, we'll be off the record. Thank you. We're off the record.

**(Whereupon, the hearing in the above-entitled matter was recessed at 4:53 p.m., until Wednesday, September 25, 2019 at 9:00 a.m.)**



active?
A I have not, sir.
Q Okay. And this is just based upon what you've been told by certain individuals?
A Correct, sir.
Q And who have those individuals -- who are those individuals?
MS. MCCONNELL: Objection, Your Honor.
JUDGE GIANNOPOULOS: I don't think -- that's sustained. I don't think that's relevant.
Q BY MR. STANEVICH: Now, Mr. Salopek, while you were employed with Xcel, you were in -- you held a Union position?
A I did, sir.
Q Okay. And what position was that?
A It would be what you would refer to as steward -- shop steward.
Q Okay. And what particular periods of time were you the shop steward?
A I believe it was for the year of 2014, sir.
Q Okay. And any positions after 2014?
A I was on the negotiating team.
Q And I believe yesterday you said you were on the negotiating team for two different contracts?
A Yes, sir.
Q So would that be the current contract and the one prior to



A Yeah. Jacob Schryver.

Q Anyone else?

A -- or Schryver.

Q Anyone else other than Jacob?

A Not that I recall, sir.

Q Okay. And what do you recall Jacob telling you in 2016?

A That he had been asked to take an officer by the last name Cunningham, out to -- and it was either to a gravel pit or a -- or a forested area. I can't remember which. And give him fundamentals because he had failed his shotgun course. And when Jake came back, he was -- he saw that the officer was serving post with the shotgun, and was told that it would stand as a qualification, and Jake was upset about that.

JUDGE GIANNOPOULOS: Let me -- can I just ask a question? This is really only for my own personal curiosity in hearing some of this testimony. How on earth do you fail a shotgun course? I mean, I really -- I just can't imagine how someone could not hit a target with a shotgun. What happens during this shotgun training?

THE WITNESS: They're afraid of it.

JUDGE GIANNOPOULOS: They're just -- I mean, just explain to me what happens. Like, what? Like, where is the target, is it -- I mean, what kind of -- what do you shoot? What --

THE WITNESS: A silhouette.

JUDGE GIANNOPOULOS: Yeah. But you shoot a slug? Are you



provided a copy of this email before it was sent?
A No.
Q Okay. Was he provided a copy of this email after it was sent to the U.S. Navy?
A Not to my knowledge.
JUDGE GIANNOPOULOS: And when you said, Mr. Lein, you said, "He sent it to him." Did you mean that Mr. Mullen sent it to Mr. Lein?
THE WITNESS: I did, Your Honor.
JUDGE GIANNOPOULOS: Okay. All right.
Q BY MR. STANEVICH: Okay. And what's the reason why it wasn't shared with Mr. Schryver prior to being sent to the Navy?
A I didn't want Jake involved in this.
Q Okay.
A He has a disabled son.
Q And what's the reason you didn't share it with him after it was sent to the Navy?
A I really don't know.
Q Okay. and you would agree with me, in the very first line of the email, it says that there's several officers coming forward with this complaint, and Jake Schryver is listed. Why was a decision made to list Jake Schryver in this email?
MS. MCCONNELL: Objection, Your Honor. He didn't write the email.



JUDGE GIANNOPOULOS: Or it comes from other --
THE WITNESS: It comes from --
JUDGE GIANNOPOULOS: -- documents. I think that was --
THE WITNESS: -- another document.
JUDGE GIANNOPOULOS: -- the question you had asked him --
MR. STANEVICH: Okay.
JUDGE GIANNOPOULOS: -- to begin with.
Is that correct, sir, two-thirds comes from other documents that you had written?
THE WITNESS: The -- yes, it does.
JUDGE GIANNOPOULOS: Okay.
Q BY MR. STANEVICH: Okay. And the two-thirds of this document that came from other documents, what documents are you referring to?
A It would be the document that I sent John Morgan on August -- it would be June 26 -- June 28th, 2018.
Q Okay. And that June 28th, 2018 document, that's a document that you prepared?
A Yes, sir.
Q You typed that document?
A Yes.
Q So while you only had a quick moment or only briefly reviewed this document, you would agree that most of this -- the language in this email came from a document you prepared two weeks earlier?



additional documentation to the IG's office and to -- and after having the opportunity to meet with the IG's office, they still closed out your complaint, correct?

A They did, sir.

Q Okay. Did they explain why they closed the complaint, to you?

A Not really. It was rather vague.

JUDGE GIANNOPOULOS: Other than what was written. I've read the --

THE WITNESS: Yeah.

JUDGE GIANNOPOULOS: I've read the -- did you have any other --

THE WITNESS: No, sir.

JUDGE GIANNOPOULOS: Other than what was written that's already in the record?

THE WITNESS: No, sir.

JUDGE GIANNOPOULOS: Okay.

Q BY MR. STANEVICH: I know -- and you eventually received Rake's -- the report prepared by Rake and Manson, you said months later. Do you recall the date on that report?

MS. MCCONNELL: Objection, Your Honor. The document speaks for itself.

JUDGE GIANNOPOULOS: If you recall the date. There's so many -- there's so many, I mean, I --

MR. STANEVICH: The document speaks for itself.



A She is a lieutenant, sir.
Q And --
A Part-time -- part-time lieutenant.
Q Is she the former dog groomer?
A She was never a dog groomer.
Q Okay. Didn't you explain to Mr. Rake that you were concerned that one of the lieutenants was formerly a dog groomer?
A I never said that.
Q Never said that?
A No, sir.
Q Did you say that about any other lieutenant?
A No, sir.
Q And you reviewed Mr. Rake's report, correct?
A Oh, did I.
Q And did you see that reference in there?
A I most certainly did.
Q Okay. And he attributed that statement to you.
A Yes. He did.
Q Okay. And once you got a copy of that report, did you ever submit any kind of written submission to the Navy to say, I never made that statement?
A I didn't know how to proceed at that point.
Q So the answer is no?
A No.



A I didn't even know what that meant, and he did not.
Q Okay. And I believe it was your testimony that he also said he had a litany of other concerns; is that fair? I think that was your word yesterday --
A Yes, sir.
Q -- "litany"? Okay. And did he explain to you that he had just met with the contracting officer and the contracting officer's representative a few days before?
A No, sir.
Q Okay. Did you have any firsthand knowledge that he had met with the -- with those individuals shortly before your termination meeting?
A Before? No.
Q Okay. And in that session, you asked for -- you asked Mr. Filibeck for a specificity of the charges?
A Yes.
Q Okay. And you're familiar with the CBA, right?
A Yes, sir.
Q It contains a disciplinary process?
A It does.
Q And is there anything in the contract that requires the company to provide a specificity of charges?
A No, sir.
Q And that's something --
A Not that I'm aware of. You're talking about the Navy



correct?

A No, sir.

Q And to be clear, when I say "Mr. Morgan," it's John Morgan?

A Correct.

Q Okay. And so the only person who may have mentioned, according to your testimony, the term "chain of command" or "chain of command violation," that was Mr. Filibeck of Xcel Protective Services, correct?

A Correct, sir.

Q Okay. And other than the one document that you shared with the Union, do you have any other documents that you prepared that outline this allegation about a chain of command violation?

A No.

Q Okay, you were interviewed, and signed a confidential witness affidavit with the NLRB, correct?

JUDGE GIANNOPOULOS: During the investigation, did you meet with someone from the NLRB, and --

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: -- give an affidavit?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Yes. I did.

JUDGE GIANNOPOULOS: All right.



All right. Go ahead.

THE WITNESS: I got it.

Q BY MR. STANEVICH: Okay. And in this document, it outlines what you said to the investigator regarding Mr. Filibeck's reasons for terminations, correct?

A Correct.

Q And it references dishonesty?

A Uh-huh.

Q It references affecting morale of the workplace?

A Yes.

Q And candid with supervisors?

A Yes.

Q Okay. Do you see any reference at all in this document to a chain of command violation?

A No, sir.

Q And is there a particular reason you did not include that in -- that allegation when you provided this affidavit to Ms. McConnell?

A No, sir.

JUDGE GIANNOPOULOS: All right. So why don't you -- are we done with the affidavit?

MR. STANEVICH: For now. I may be -- come back to it later today.

JUDGE GIANNOPOULOS: Why don't you hand it over here to be stamped?



Q Okay. So this is not a discretionary request by the company?
A No.
Q Okay. And that card gives you, I believe you said yesterday, access to the base and access to certain computer systems?
A Yes.
Q Okay. And you were not surprised that you were asked to return the CAC card?
A Not at all, sir.
Q Okay. And so you did go -- you met with Terry and you returned the CAC card, correct?
A Yes, sir.
Q Did you have any conversation?
A I did.
Q Okay. And what did you say to Mr. Terry?
A Well, actually he spoke first.
Q And what did Mr. Terry say to you, sir?
A He says Mark, there's nothing in your file. He said, except the -- the vault incident. He said this is all Rake. He said they went down and talked to Rake and called me and said you're going to be fired.
Q Let me just make sure I understand that. You were told that there was nothing in your file?
A That's what he said.



Richard Rake?

A You know, sir, I was numb at that point. I -- I don't know. I wasn't surprised, nothing. This was a process that I was -- I was compartmentalizing. Let's get through this and deal with it later.

Q And I understand that, but to be fair I just want to confirm that Mr. Terry never said you're being terminated for filing a complaint with the Navy in this conversation?

A No.

Q And --

A Not that I recall.

Q And he never said you're being terminated because Mr. Morgan is upset you filed a complaint with the Navy?

A No.

Q Okay. And he never said Mr. Filibeck said you're being terminated because you're filing -- you filed a complaint with the Navy?

A No.

Q So the only vague explanation that Mr. Terry gave you at the time was that this is all Richard Rake?

A That's the only statement made.

JUDGE GIANNOPOULOS: And then, I just want to confirm again, you were never given anything in writing saying why you were fired?

THE WITNESS: No, sir.



and I believe it was on or about September 31st.

JUDGE GIANNOPOULOS: All right.

THE WITNESS: I'm sorry. I'm sorry. It was a -- I said I believe it was on or about January 31st.

Q BY MR. STANEVICH: January 31st. And so that's when you think the three senior officers failed on the range?

A Well, I now know it to be February 21st. But my -- my statement to them was to acknowledge I knew this date was wrong.

Q Okay. And when you submitted your letter to Mr. Morgan on June 28th --

A Uh-huh.

Q -- why did you include that May 9th date? Where did that come from?

A This information was gathered from three people and I got this date from Steve Mullen. We were all talking on the phone and I said, Steve, what was the date of that. And -- because I didn't have the records in front of me.

Q Okay.

A And he said May 9th. And I said, are you sure. And he -- this was actually put together by three people.

Q And you didn't do any independent verification at all to determine whether May 9th was correct or not?

A I trusted him and I knew it was just an internal memo between me and John.



A Okay.
Q Issue number 2.
A Yes, sir.
Q And here it states that,

"Ofc. Cunningham failed the range with a shotgun, and he was brought to either a gravel pit or another location by Mr. Schryver, who supplied his own shotgun. And Ofc. Cunningham came back qualified."

Now, that was an allegation that you testified to earlier in this proceeding, both yesterday and today, correct?
A Yes.
Q And if you'll look down to finding number 2, about halfway down, it states that,

"Ofc. Schryver was asked in his interview if he took Ofc. Cunningham out as a qualification to shoot in an open area, and stated he has never taken anyone out to qualify at any location except at the Port Townsend range or Bangor range."

A Correct.
Q And is it your testimony that Ofc. Schryver told you something different?
A No. Ofc. Schryver is trying to say in this report that his intent was never to go out and qualify anybody. He went out with the intent to merely familiarize himself, and that -- he's not qualified to qualify anyone.

that these three officers were not on post -- were not at the range that day, correct?

A Yes, sir.

Q And this is -- according to your testimony, this was just a mistake in the dates?

A It was, sir.

Q Okay. And the confusion is mine, but can you just let me know exactly when these three officers did fail on the range.

A February 21st.

Q And it was all three on that particular day?

A Yes, sir. According to 3591, they failed.

JUDGE GIANNOPOULOS: And 3591 is what?

THE WITNESS: It's the 2:01:57 SAC NAV operate -- operations that governs firearms training and qualification --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- through the Navy.

JUDGE GIANNOPOULOS: Got it.

Q BY MR. STANEVICH: Can you turn to the next page and look at issue number 8?

A Yes, sir.

Q And I believe we had some testimony from you yesterday about this, about how Ofc. Coler struggled at the range, and you had said that she should be taken off the range because of the unsafe handling with the shotgun?

A Yes, sir.



JUDGE GIANNOPOULOS: All right. So that's his answer. Go ahead.

Q BY MR. STANEVICH: And you also testified yesterday that, I believe, Ofc. Lein had -- was told that he was going to be brought to a gravel pit to be qualified. Do you --

A Yes, sir.

Q -- remember that testimony?

A Yes, sir.

Q Okay. And if you could take a look at issue 10, and finding 10 on the next page.

A Yes, sir.

Q You can see under finding it says,

"When Ofc. Lein was interviewed, he said he was never told it was going to a qualification but remedial training to allow more time with the rifle."

What's your response to that statement?

A It's not true.

Q So if Ofc. Lein told this to the Navy, he made an inaccurate statement?

A Yes, sir.

Q Now, can you turn to page 1673, please?

A I am there, sir.

Q Okay. In this report,

"Mr. Rake and Mr. Mullen state that they had the



feeling that Ofc. Salopek was trying to get back at the company for some incidents that occurred with him since he brought up the following two incidents in our review without any prodding by us, which had nothing to do with issues at hand. These incidents occurred in 2015 below."

Then there was an incident 1 and incident 2. Do you see that on that page?

A I see incident 1 and --

Q Okay.

A -- incident 2 yes.

Q Okay. And just take a moment and look at incident 1.

A Yes, sir.

Q Okay. And did you share this information with Mr. Rake and Mr. Manson?

A No, sir.

Q Here in the report it says that you shared it with them, and they didn't even have to ask you about it. So it's your testimony that you never shared this information during your interview?

A This incident never came up.

Q Okay.

JUDGE GIANNOPOULOS: Which one? There's two incidents.

MR. STANEVICH: Incident --

THE WITNESS: No. We're looking --



Q BY MR. STANEVICH: And just to be clear, this report dated July 25th -- you told us you were interviewed on July 19th. When's the first time you went to the IG, sir? I thought the testimony from earlier today that it was August, possibly as late as mid September.

JUDGE GIANNOPOULOS: I think the documents say August, if I remember correctly, the --

MR. STANEVICH: Yeah.

JUDGE GIANNOPOULOS: -- first email. And on these emails I think were September. I could be wrong.

Q BY MR. STANEVICH: So you just explained to us that in your conversation with Mr. Manson, you thought he was talking about the IG?

A Yes.

Q Why would you think that when you hadn't even gone to the IG yet?

A No. I'm talking about a prior incident, sir.

Q Okay. Now --

A In 2015.

Q And it's still your testimony that there's -- there was no discussion of this RFI issue at all when you were interviewed?

A Well, actually, yes, there was. I confused it. He was -- he was leaning towards there, but he didn't say the vault, the RFI. He just said, you know, we had one problem with you already. And I thought it was another incident. And I



A They are the Navy's weapons. They're kept in the armory in the security office.

Q What, if any, training do the guards receive on using these weapons?

A You're supposed to receive eight hours of training when you come on -- come to work for the company, and then you're supposed to receive eight hours of training prior to going to range.

Q Okay. So tell me about range. What's range?

A Range is where you go to test or to qualify with the weapons.

Q And where does range occur?

A Range occurs at the Bangor sub-base.

JUDGE GIANNOPOULOS: When you said eight hours of training, is it per weapon or for all the weapons?

THE WITNESS: I believe it's for all the weapons.

JUDGE GIANNOPOULOS: All right.

Q BY MS. MCCONNELL: What does the -- so going to range, what is the -- this going to range consist of?

A You go to range, you -- you enter the range. They'll assign the -- the range -- the range masters at the Bangor range that run the facility. They come in, ask a few questions. Have you had any alcohol or drugs? Is anybody under a restraining order or have been convicted of domestic violence? And then when you go to shoot, each weapon's done



separately. So they usually start with the M4 rifle. They issue -- they put up the targets, they issue the weapons, record the serial numbers for each weapon, and then they give you the course of fire.

Q Who is "they" in -- that you --

A The range master.

Q Okay.

A Which is an Xcel employee.

Q Who sets these -- it sounds like there's a lot of rules here. Who sets these rules?

A The Navy does.

Q Okay. And then so once they set up the target -- I kind of -- I interrupted you -- what happens next?

A Once they -- you've got the targets set up, on the M4 in particular, you go through a sight in. So they give you ten rounds to sight the weapon in, because it -- it's a sighted weapon for each person. Everybody has a different sight picture. So once a weapon is sighted in, then they run -- start running the qualification. You run the course of fire.

Q And so the course of fire is what?

A The course of fire will be like four rounds in the prone position. Then they'll -- four -- or maybe ten rounds, rapid fire in the prone position. And then they'll move to the kneeling position, then to the standing position.

Q You were describing this taking place at the Bangor range,



this range at Schroder's house?

A That is -- that's an improper range, it's unsafe. There's different weapons than the Navy's weapons.

Q How was it unsafe?

A Well, being that you're qualifying with similar but not the same weapon. You're -- you're -- when you go on duty, you're carrying a different weapon. It's not safe.

Q So you said that you -- your reaction was you were bothered by hearing this, did you raise your concern about this with management?

A I did later. Myself and Robert Armstrong who did attend the range at Evan Schroder's house went into Michael Terry's office, and I told him through Robert Armstrong. I talked through Robert Armstrong who was their union representative at the time.

Q Okay. So tell me, so you and Robert Armstrong went into Michael Terry's office?

A Yes.

Q Okay. And do you remember when this was that you went into his office?

A That I think a couple of weeks later. You know, as the time after the range. I don't remember a specific date.

Q And was anyone else on present besides you, Terry, and Armstrong?

A No, there wasn't.

A In particular Dan Lein, Mark Salopek, Jake Shriver, and there was other officers that we -- that -- a lot of officers were concerned about this practice.
Q When did you -- let's, you know, is there a particular conversation you can remember, and if so when?
A I remember conversations. I can't remember a date.
Q Okay. And where did these conversations happen?
A While on post.
Q Okay. And what was discussed during these conversations?
A We discussed, you know, how the weapons qualifications were handled. You know, they're in gravel pit range. You know, it's not an approved range. So we don't know the safety officers, the -- when you're at the Bangor range and the Port Townsend range you have safety equipment, first aid equipment, and medical personnel available in case there's a problem. At a gravel pit range you have none of that
Q Okay, and what if anything resulted from these conversations with Mr. Salopek and Mr. Shriver?
A And Mr. Lein, we decided that something needed to be done. And so Mark Salopek went in, and he talked to Michael Terry. I don't know if it was by -- I know he talked to by email to John Morgan in bringing this to their attention.
Q Did you speak with any supervisors about weapons qualifications in 2018?
A There was an occasion where Lt. Lux asked us if -- if we



Q Anything else that you told them?
A I don't recall.
Q Once you had conveyed this to Mr. Lux, did Mr. Lux -- did Lt. Lux respond?
A Yes, he -- he said this is happening, as in questioning this is really happening. I said yes, so he said he would, you know, take care of it or something -- he would look into this.
Q Okay, after this conversation with Lt. Lux, did you talk to anyone else anymore about this issue of weapons qualifications?
A Yes, I continued to talk about it with Mark Salopek and Jacob Schryver and Dan.
Q Okay, and with what if any result?
A Mark had sent email, and had talked to the CEO by email.
Q The CEO being whom?
A John Morgan.
Q Okay.
A Upon talking with Mark it was -- nothing was getting done. It wasn't going to be addressed.
Q So what if anything did you do after having these conversations where Mark said he seemed it was being addressed?
A We decided that we were going to go talk to the commanding officer, and see -- to ask him advice on what --



what do you we need to do.

Q The commanding officer of what?

A He's is the commander officer of the base. He is -- I believe he is a full commander. He's in charge of all of Indian island.

Q And this is a Navy officer?

A Yes.

Q Okay. And did you in fact go the commanding officer?

A Yes, we did.

Q Do you remember when his was?

A That was July 8th.

Q Okay, who went there?

A Myself, Mark Salopek, and Dan Lein.

Q Do you remember what time of day it was that you went there?

A About 3:00.

Q Were you working that day?

A Yes, I was.

Q What post were you assigned?

A I was south patrol.

Q Did you get somebody to relieve you from post when you went to go talk to the commander?

A No, I didn't.

Q Why was that?

A The commanders office is in south patrol's patrol area.



One of our checks is the administration office, where the commanding officers office is at.

Q What is the commander's name?

A Rocky Pulley.

Q So, Mark Salopek and Dan Lein went to his office, and what happened when you got to the commanders office?

A We asked if we could talk to him. We had a safety concern and he said sure, come on in the office. So we went into the office and were asking for advice about a safe -- how to handle a safety concern.

Q Okay, and what did you say about the safety concern?

A We were vague on what is was. We were just, you know, just wanting to get some advice, you know, how to we pursue this. And after talking to him for a few minutes he finally yelled at us and said, just tell me what it is.

Q So did somebody tell him?

A Yes, I don't remember which of us told him, but all three of us ended up telling him exactly what the concerns were.

Q What did you tell him?

A We told him about the gravel pit ranges with -- with non-military weapons, non-military ammunition.

Q And what if anything else happened during this conversation?

A He told us that we needed to go to the ISO, the installation security officer and to inform Mike Terry.



Q Okay, who was the installation security officer?

A Michael Jones at that time.

Q About how long do you recall you were in the commander's office?

A Maybe 20, 30 minutes.

Q Did you miss -- now, during when you were on a patrol, do you have like -- are there -- do you have to sort of have anything you specifically check during -- are there any checklists of things you have to check while you are own patrol?

A Yes, we have certain buildings that we have to check. Some of them being four hours, others being once in a shift. There was one building that he had to check every hour.

Q Okay, and did you miss any post checks during the time -- any of those checks during the time you were in the commanding officers office?

A No, I did not.

Q After the -- so after the conversation with the commanding officer ended, what did you do next?

A The three of us left, went outside and talked and said well, somebody needs to you know, write the -- contact the ISO. Mark was working the next day, day shift. Dan was working day shift the next day. I was on swing shift, so I wrote the email.

Q The email to whom?



A To Michael Jones, the ISO.
Q Okay.
A Excuse me.
Q I'm going to show you a document marked Respondent 1. Can I borrow somebody else's -- well, I'm going to show this to you, and then we'll -- Now setting aside the top of that email, down where it looks like it seems to say your name. is that right?
A Yes, it is.
Q Do you recognize this document?
A Yes, I do.
Q What is it?
A This is the email that I sent to Michael Jones, the ISO.
Q Okay. And you sent this on July 9th?
A Yes.
Q Okay. How did you happen to have Mr. Joneses email?
A I contacted CVIS the commercial vehicle inspection, and asked them for the -- his email address.
Q Okay. How did you go about creating this email Respondent's 1? I'm sorry, I took it away from you, but I think you probably remember it?
A I used emails from Mark Salopek. We kind of cut and pasted and put it together.
Q And I -- you testified that you were directed that somebody needed to contact Michael Terry?



A Yes.

Q The commanding officer said that. Was Michael Terry contacted to you knowledge?

A Yes, I waited to send the email until Mark had told me that he had given Mark or excuse me, Mike heads up.

Q That this complaint was coming forward?

A Yes.

Q Okay. On that day that you sent that email, the July 9th, 2018, did you work that day?

A Yes, I did.

Q What time did you arrive at work?

A I arrived at about 1:00.

Q Where did you go when you arrived at work?

A When I arrived at work, going to the training room, look at the board and see what's going on.

Q Okay, who was present in the training room?

A There was Norm Simons sitting on the couch in there. He was on duty.

Q And when you first got into the training room, tell me what did you see that -- of note?

A Nothing really of note. But, you know, there was a -- I could over hear conversation in Michael Terry's office.

Q Okay. So where is Michael Terry's office in relation to the training room that you were in?

A Its right across the foyer. It's a -- the entryway, eight



or ten feet wide.
Q Okay, are there doors in the way?
A Yes, there's a Michael Terry's has a door to his office. The training room has a door. They were both open.
Q Okay, so you overheard what?
A I could overhear Michael Terry on the phone with the CEO John Morgan.
Q How do you know that?
A One, Michael called him John or Mr. Morgan, I can't remember which. But I also recognized Mr. Morgan's voice.
Q Okay, so what did you hear between them?
A I could over hear them discussing three officers that went to the commanding officer's office on Sunday, the previous day.
Q Anything further that you heard?
A Yes, John Morgan said that the one officer is on probation, he's easy to get rid of. And that would have been Dan Lien, he's the only one on probation. He said the other two officers are a cancer.
Q What, if anything further happened while you were in the training room?
A One of the officers, Tom Cunningham who was mentioned in the email to Mr. Jones, came into the office. Or came into the training room. He was on duty and he was yelling at me, demanding an apology.



you're saying is, that you didn't think there was any reason for Mr. Cunningham to bring the shotgun in there with you -- with him when he was talking to you?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: All right.

Go ahead. Next question.

Q BY MS. MCCONNELL: You mentioned the word "skell," that he said the word, "skell." Do you know what that means?

A He's a dockworker from New York. I've heard this in movies. As far as I know, it's a derogatory or not very nice word to call somebody. I've never had a true definition of it.

Q Are the guns that the guards carry, are these loaded?

A Yes, they are.

Q How did you feel about this exchange with Mr. Cunningham?

A I felt threatened. He was standing over the top of me, I was in the corner of an office, of the training room, I had nowhere to go. There was a shotgun being pointed at me. It was very uncomfortable and very threatening.

Q After Mr. Cunningham left, what did you do next?

A I believe I was called in to Michael Terry's office.

Q And what happened when you got to Mr. Terry's office? Actually, did you go to Mr. Terry's office?

A Yes, I did.

Q And what happened when you got there?



A Michael Terry asked me -- he told me, John Morgan's on the phone, the CEO, John Morgan's on the phone. Mr. Morgan asked me if I was one of the three officers that went to the CO's office.

Q Okay. So I want to make sure I understand this. He was on the phone, he was on --

A Speaker phone.

Q Okay. So he asked you whether you were one of the three officers?

A Yes.

Q Who went to --

A To the CO's office.

Q Okay. And did you respond?

A Yes, I did. I said, yes, myself, Mark Salopek and Dan Lein.

Q And why did you mention them because if I heard you correctly, he said, were you one of the officers?

A Yes.

Q And --

A Why did I mention them?

Q Uh-huh.

A I could overhear him on the phone with Michael Terry just a few minutes earlier saying that the one was on probation. I know that's Dan and there's nobody else went to the CO's office that day.



Q Okay. Was anything further said?

A He asked me -- he told me that I would be possibly facing disciplinary action and he asked me if I wanted a union representative. And I said, yes.

Q And what was said after that?

A He said, this conversation is over.

Q Did you tell Mr. Terry or Mr. Morgan about the incident with Cunningham?

A No, I didn't. I was wanting the whole situation to be diffused.

Q Now, you had mentioned that you had heard -- you were sitting in the training room and you had heard Mr. Terry and Mr. Morgan?

A Yes.

Q Did you believe -- how loudly was Mr. Cunningham speaking?

A Mr. Cunningham was yelling. He was speaking very loudly.

Q After Mr. Terry said this -- or Mr. Morgan, I'm sorry, said this conversation is over. What did you do next?

A I went back into the training room. It was about time for me to get dressed and get ready to arm up.

Q So you testified that you sent this email on July 9th to Michael Jones of the Navy?

A Yes. I sent it about 11:00.

Q What did you hear from the Navy, in response to this



email?

A Nothing.

Q Did you ever hear from the Navy about your complaint?

A No, I did not.

Q Did you work the next day after you sent the email, so that would've been after the 9th? Were you working the next day?

A No, I wasn't. I was off the 10th, 11th, and 12th, I believe.

Q Okay. So tell me, did anything of note happen on July 10th?

A Yes.

Q What was that?

A I received a text message from Kevin David.

MS. MCCONNELL: I'm going to ask somebody for another -- thank you.

Q BY MS. MCCONNELL: I'm showing you a document marked GC Exhibit 6. Do you recognize this document?

A Yes, I do.

Q All right. What is it?

A This is a screenshot from my cell phone.

Q Of what?

A Of the three text messages that I received from Kevin David.

Q How did you know the message was -- the messages were from

Kevin David?
A I have him entered into my phone.
Q And I see -- and have you actually called him on your phone?
A Yes, I have.
Q Okay. And did you use the contacts that you'd entered in for Kevin David on your phone to do that?
A Yes, I did.
Q And when you did that who answered?
A Kevin David.
Q Okay. And how do you know that?
A Because I know Kevin's voice. I worked with him for several years.
Q Okay. And I see -- so there's a green message at the top and a grey -- some grey things below. The green is -- who sent the green?
A That is a text message from me.
Q Okay. And --
JUDGE GIANNOPOULOS: My copy is grey. Everything is grey and white. So --
MS. MCCONNELL: Oh, I have a --
JUDGE GIANNOPOULOS: I'm not sure what the court reporter has but when you say, green, I don't know what everyone else has.
MS. MCCONNELL: I'm sorry. I thought they were all in



color. I'm sorry about that.

JUDGE GIANNOPOULOS: That's all right.

MS. MCCONNELL: Well, never mind. Forget the color.

Q BY MS. MCCONNELL: Okay. So first message that you can see up there, that's from you?

A Yes, it is.

Q Okay.

JUDGE GIANNOPOULOS: It says, when could I see that, you sent that to Mr. David?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: All right.

Q BY MS. MCCONNELL: Okay. And you sent that on June 5th?

A Yes.

Q Okay. Was that in 2018 as well?

A Yes, it was.

Q Okay. And then the next -- I see it says, July 10th?

A Yes.

Q And who were those -- the email -- the texts following from?

A The grey messages are from Kevin David.

Q Okay. And I don't see a time stamp on the last two texts. Do you know why that is?

A I believe iPhone does that because it's sent around the same time. I think this shows up the next day, it gives another date.



Q Okay. So if you know, do you know when you received those last two texts?
A Shortly after the first one, probably within 15 to 20 minutes.
Q Okay. What did you believe about why Mr. David was sending these texts to you?
A He sent this because his name was mentioned in the email to the ISO, Michael Jones.
Q When you received these messages, what did you think about them?
A He was threatening me. This is right back to I'm thinking, here it goes again from when I was a correctional officer. Somebody's going to try to get me again.
Q Why did you think of that incident from so many years ago?
A Because it was the same words.
Q Which is the same words?
A So I'm on your -- you don't know what you stepped in.
Q And so when had you heard that phrase before?
A I heard that from Yolanda Harris several days before she crushed me in the door.
Q After you received these texts, what happened next?
A I called Mark Salopek; his name was mentioned in the text. After that, I called the contract officer, Steve Manson.
Q Okay. And why did you call Steve Manson?



A I called Steve Manson because I didn't -- I wanted a third party. I knew that there was an investigation going on from contact with the other officers, you know, telling me, hey, they're looking into this. I wanted somebody else other than the administration to know about the threat.
Q The administration of --
A Xcel.
Q When -- do you recall when it was that you called Mr. Manson?
A Probably 20 minutes after I received the text messages.
Q Okay. Did you -- how did you come to have Mr. Manson's contact information?
A I had his cell phone number. I also have a charter boat. I have my captain's license and I run charters and I take Mr. Manson and his wife on an anniversary charter. So I had his cell phone number from exchanging text messages when he's going to get there because it was a surprise for his wife.
Q Did you speak to Mr. Manson?
A I did not. I left him a message.
Q What did you say in your message?
A I advised him -- I read him the text message and told him, I've been threatened. Something needs to be done.
Q After leaving this message with Mr. Manson, did you communicate with anyone else about these text messages?
A Yes, I did. I called the on-duty lieutenant which would



have been Lt. Lux.

Q Okay. So did you speak to him?

A Yes, after some phone tag with the lieutenant's cell phone messing up and trying to get a hold of him at the lieutenant's office and the CVIS. We did speak on his personal cell phone.

Q Do you have the number at CVIS memorized?

A Yes. It is 360 396 5202.

Q Okay. And you don't by any chance have Mr. Lux's cell phone memorized?

A No, I don't.

Q All right. And okay. So you -- did you eventually speak to Mr. Lux?

A Yes, I did.

Q Okay. And do you remember what time it was when you spoke to him?

A 8:00-ish, I think. Somewhere -- it may have been a little earlier.

Q And what was said during this conversation?

A I advised him about the text message threat. He told me he was aware of it. That administration had told him to tell me to call local law enforcement.

Q Was anything else said during this call?

A No, there -- I don't believe there was.

Q I'm showing you a document that's being marked as GC-14.

**(General Counsel Exhibit Number 14 Marked for Identification)**



Q BY MS. MCCONNELL: Do you recognize this document?
A Yes, this is a copy of my phone logs from AT&T.
Q Okay. How did you go about getting this document?
A I just went on to my AT&T account and logged in and brought this up.
Q Okay. It looks like from the first page to the second page, is that sequential?
A No, it's not. This is the first page from --
Q And then it jumps?
A Yes, there's quite a few pages.
Q Okay. So then turning to that second page, there's some highlighting there. Who put this highlighting in?
A I did.
Q Okay. So let's go to the first highlighted area. It looks like that was on a Tuesday and it's got some what look like dates?
A Yes.
Q Okay. So what's this -- what does this represent?
A The first one that's highlighted would've been my call to Mr. Manson.
JUDGE GIANNOPOULOS: And that's the phone number ending 9619?
THE WITNESS: Yes.
JUDGE GIANNOPOULOS: All right.
Q BY MS. MCCONNELL: Okay. And then looking down there, it



looks like more yellow. What's that next one?

A The one below that is Mark Salopek.

Q And then below that in yellow?

A I believe that is Lt. Lux.

Q And then there are some numbers that are in white. Are those two --

A Mark Salopek, the 337 --

JUDGE GIANNOPOULOS: Let's just say -- let's just have the last four digits.

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: So Mr. Salopek's -- anyway, the one you said was to Lt. Lux, was the 9898?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: All right.

Q BY MS. MCCONNELL: And then I'm assuming -- so and the stuff that doesn't have any highlighting, is that unrelated calls?

A Yes. There is one I didn't highlight that is Mark Salopek.

Q Which would be the 9619 or is there another number?

A The 4117, just below the 9898.

Q Okay. Is that a -- that's another number for Mr. Salopek?

A Yes. That's his home phone.

Q Okay. So do we need to talk about -- is there anything of note about the next number down? It's not highlighted but the



7101?

A No, that --

Q Okay. Then how about moving to the next green number. What's shown there?

A That is an emergency call, the 911.

Q Okay. And what was that about?

A That was me calling local law enforcement.

Q Okay. Then anything of note about, you know, what number -- the next green, which --

A That is the deputy calling me back.

Q Okay. And then the deputy -- and who is the deputy?

A I believe his name was Russell.

Q Oh, this was the deputy -- law -- the call that you made to law enforcement?

A Yes.

Q Okay.

JUDGE GIANNOPOULOS: Is that where it says, blocked?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: All right. Identify, the last four digits. Don't just say, the next one, the next one, the next one.

MS. MCCONNELL: Sure. Yes, Your Honor.

JUDGE GIANNOPOULOS: Or something over here where it says Bellingham or something else. You know, so when we read the record we can identify what we're talking about.



Q BY MS. MCCONNELL: All right. Then moving down to the next in yellow which is 9898, last four digits, Bellingham, Washington?

A 9898, that is the lieutenant's cell phone number.

Q Which lieutenant's cell phone number?

A That is the lieutenant's phone. That is --

JUDGE GIANNOPOULOS: Lux?

THE WITNESS: That wasn't Lt. Lux's personal number. That was his -- that was the --

JUDGE GIANNOPOULOS: Work number?

THE WITNESS: Company number.

JUDGE GIANNOPOULOS: All right. So that was Lt. Lux's number. At least, that's your testimony?

THE WITNESS: Yes.

Q BY MS. MCCONNELL: Okay. Then moving down, I see two calls there, 9898, and then I see a 4400, what's that?

A I believe that is Lt. Lux's personal cell phone number.

Q Okay. And then the next number is 4117?

A Mark Salopek.

Q Okay. And then I see several other calls that day to --

A Yes.

Q -- 4119? Okay.

MS. MCCONNELL: Counsel for the General Counsel moves for admission into evidence of GC-14.

MR. STANEVICH: No objection.



JUDGE GIANNOPOULOS: All right. From the Union?

MR. OLSZEWSKI: No objection.

JUDGE GIANNOPOULOS: All right. So what I want to do is, I don't think we want to get people's cell phone numbers into the record. There's no reason why. This is going to be a public document, why other people should know --

MS. MCCONNELL: Sure.

JUDGE GIANNOPOULOS: -- these cell phone numbers, unless it becomes an issue with Respondent whether these calls actually came in or not. I would recommend that we just redact, you know, the middle three digits. Does that sound fair? So we'd have the last four digits could be identified. We could even redact everything up to the last four digits. I really -- it doesn't matter to me which ones we get out but there's really no reason to have people's phone numbers, the full phone numbers.

And if it becomes an issue, keep an unredacted version that we can then look at. All right. So it's admitted. General Counsel is admitted but again, tomorrow, introduce a redacted version.

**(General Counsel Exhibit Number 14 Received into Evidence)**

MS. MCCONNELL: Certainly. Will do, Your Honor.

JUDGE GIANNOPOULOS: And the same thing with this gentleman's phone number. We don't need to have his entire phone number in the record for someone to call him.



MS. MCCONNELL: I'm sorry, which gentleman?

JUDGE GIANNOPOULOS: The witness.

MS. MCCONNELL: Oh, yeah. Certainly.

JUDGE GIANNOPOULOS: It says right here at the very top the mobile number.

MS. MCCONNELL: Sure. We'll redact all that.

JUDGE GIANNOPOULOS: All right.

Q BY MS. MCCONNELL: What did you -- you said you spoke to the deputy?

A Yes, I did.

Q This was what law enforcement agency?

A Kitsap County Sherriff's Department.

Q Okay. And what did you say?

A I read him the text message.

Q okay. And did you -- what happened further in that call, if anything?

A He told me there wasn't a whole lot he could do about it because it was a veiled threat. He didn't come right out and say, I'm going to shoot you or I'm going to beat you up. It wasn't a direct threat; it was a veiled threat.

Q Did you get any case number or anything like that as a result of this phone call?

A Yes, I did.

Q And I'm not asking you to remember it, but yeah, you got a number?



A Yes, I did.

Q Okay. Now, having spoken to Lt. Lux, did you hear anything back from the supervisors of Xcel?

A No, I did not.

Q When were you next scheduled to go to work?

A The 13th, I believe.

Q And what did you do that day?

A Since I had not heard anything, I called -- excuse me, the on-duty lieutenant which I believe was Lt. Powless, and told him that I would not be coming in until these matters -- until these threats, and harassment was addressed.

Q Okay. And was anything further said in that call?

A No, there wasn't.

Q Did Mr. Powless say anything?

A He just said, okay.

Q All right. After making this phone call into work to Mr. Powless, what did you do next?

A On the 14th, since I hadn't heard anything, I wrote an email to Michael Terry.

Q Okay. And I'm showing you a document, that's a giant, fat document marked Joint Exhibit 7, but I'm going to give you a page number. Can you turn to page 1454, near the back? And if you need to take the binder clipping off, that's okay. And I'm setting aside the stuff up at the top. I don't -- but look down toward the bottom of page 1454. Do you recognize what's



down there?

A Yes.

Q What is that?

A That's my email to Michael Terry.

Q Okay. What if any response did you get to this email?

A None. I didn't receive any -- no phone calls, no text messages, no emails.

Q Okay. And what did you feel at this point about what was going on with work?

A I felt that the knew about this, they knew about the text message threat from Kevin David, Michael Terry was in his office. I could hear him talking on the 9th. I could hear him talking on the 9th in his office when I was in the training room. It's pretty to safe that he heard Tom Cunningham yelling at me and did nothing. I sent him an email, advising him of both incidents, heard nothing. The company wasn't going to do anything.

Q How did you feel about going back to work?

A I did not want to go back to work. It was not safe for me.

Q What did you do next?

A Due to the workplace harassment and not being a safe place for me to go, I resigned.

Q I'm showing you another fat packet marked Joint Exhibit 4. Can you turn to page 1225? Do you recognize this document?



Q Okay. And it sounds like a number of your colleagues went to Mr. Schroder's house to shoot certain weapons. Is that your understanding?

A Yes, sir.

Q Okay. And if they were at Mr. Schroder's house to practice or to shoot weapons, they would not be using Naval -- Navy-issued firearms. Is that correct?

A That is correct.

Q And they would not be using Navy-issued ammunition?

A That is correct.

Q And in fact, any shooting that took place at his house, that could not be considered a qualification because it's not in a Naval-approved range. Is that fair to say?

A That is correct.

Q And it's your understanding that the officers who did shoot at Mr. Schroder's house on a particular day, that was considered a qualification?

A Yes, sir.

Q And the date that you've referenced in your testimony is July 7, 2017?

A Yes, sir.

Q And did you ever submit any documents to the Navy, to OSHA, or to any third party, showing that the fire arms qualifications that were allegedly granted on July 7, 2017?

A There is -- excuse me, a document. It's a 3591 form.



Q Okay. My question is, did you submit that to any third party?

A Mark Salopek has that document.

Q My question is, you, sir, have you submitted it to any third party?

A I did not.

Q Okay. And you know Mr. Salopek has this document?

A Yes, sir.

Q And have you seen it?

A Yes, sir. I --

Q Has he shared it to you -- with you?

A Yes, I actually have a picture of it on my phone, sir.

Q Okay.

MR. STANEVICH: I'm going to ask that that be produced by this witness.

JUDGE GIANNOPOULOS: Let's -- why don't you take a screenshot and email it the General Counsel?

And General Counsel, you can print it off and produce it.

MS. MCCONNELL: So do you want me to do that now?

JUDGE GIANNOPOULOS: Let's go off the record for a second. If you have that on your phone, sir, see if you can find it.

(Off the record at 4:23 p.m.)

JUDGE GIANNOPOULOS: We're back on the record. Let the record reflect that we'd asked the witness to email a copy of the picture that he testified about to the General Counsel,



and General Counsel has made copies of this document.

All right. Mr. Stanevich, what do you plan to do with this document? Is this a document that you're going to want to introduce into the record?

MR. STANEVICH: I'm not sure yet --

JUDGE GIANNOPOULOS: Okay.

MR. STANEVICH: -- at this time. So I do have a few questions --

JUDGE GIANNOPOULOS: All right.

MR. STANEVICH: -- but if we can mark it for identification.

JUDGE GIANNOPOULOS: Let's mark it for identification because quite honestly, I'm going to have some questions about it. And it'll probably get in one way or the other, whether it gets in for the substantive things that are filled in on there or not. But I personally have some questions of the witness about this document. So let's mark it as your exhibit.

MR. STANEVICH: Okay. Just choose a number?

**(Respondent Exhibit Number 42 Marked for Identification)**

Q BY MR. STANEVICH: Do you have a copy, Mr. Mullen?

A I do not.

Q Mr. Mullen, I'm going to show you a document that's been marked for identification as Respondent's Exhibit 42.

Q Mr. Mullen, you testified a few moments ago that Mr. Salopek had provided you with this document?



A No, sir. I obtained this document while I was a lieutenant.

Q I thought it was your testimony that when I had asked you if you had any documents, you submitted any documents, that Mr. Salopek had this document?

A I had given it to Mr. Salopek.

Q Okay. And approximately when did you give it to Mr. Salopek?

A Some time in early July, I believe.

Q Okay.

JUDGE GIANNOPOULOS: Of 2018?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: All right.

Q BY MR. STANEVICH: Okay. And when did you obtain a copy of this document?

A While I was a lieutenant. Probably in April --

Q April of which year?

A Of 2018.

Q April of 2018. And here it has a date of firing of July 7, 2017. Do you see that?

A Yes.

Q Okay. And this is the alleged shooting incident at Ofc. Schroder's house?

A Yes, it is.

Q Okay. And was Mr. Powless present for that incident?



General Counsel calls Richard Rake to the stand.

JUDGE GIANNOPOULOS: All right. Thank you.

Mr. Rake, please come around this way. Just be careful, sir. There's an outlet there on the floor.

MR. RAKE: Okay.

JUDGE GIANNOPOULOS: I'll have you raise your right hand.

Whereupon,

**RICHARD RAKE**

having been duly sworn, was called as a witness herein and was examined and testified as follows:

JUDGE GIANNOPOULOS: All right. Have a seat. And please and spell your full name for the record.

THE WITNESS: My name is Richard Rake, R-I-C-H-A-R-D; last name is Rake, R-A-K-E.

JUDGE GIANNOPOULOS: All right.

Go ahead, General Counsel.

**DIRECT EXAMINATION**

Q BY MS. MCCONNELL: Mr. Rake, where do you work?
A I work for Region Northwest -- Navy Region Northwest at Bangor, Washington.
Q And so the U.S. Navy is your employer?
A Yes. Yes, ma'am.
Q What is your position there?
A I am what they call a SPAR, senior performance assessment rep.

Q Do you have any other job titles?
A Yes. I've got many of them.
Q Which ones?
A Okay. So I'm also a COR. That is a contracting officer representative. I'm also access control. I'm also physical security. And I'm also DBIDS, which stands for defense biometric identification system administrator. I'm also the BAVR, base authorization visit requests administrator.

JUDGE GIANNOPOULOS: All right. Let's hold on a second.

Let the record reflect that Mr. Olszewski, the Union's counsel, has shown up.

So Mr. Rake, I'm going to ask you just to hold off a second while Mr. Olszewski gets himself set up.

All right. Let's go off the record for a second, Bruce.

(Off the record at 9:02 a.m.)

JUDGE GIANNOPOULOS: Okay. We're back on the record.

General Counsel, proceed. You were asking Mr. Rake his job -- various job titles.

MS. MCCONNELL: Right.

Q BY MS. MCCONNELL: And you had gotten, it sounds like, partway through the list.
A So I'm the BAVR administrator, which is a base authorized and visit request administrator. I'm the OpenFox administrator, which is a background investigation administrator, I'm the National -- National Justice Institute

assessment rep on contract -- civilian contract --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- representative.

JUDGE GIANNOPOULOS: Do you oversee various kind of contracts or specifically security contracts?

THE WITNESS: I see -- well, yes, on both.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: So I do -- I currently have right now three security contracts. One at Bayview, Idaho, one at Bangor, one at Indian Island, which is the Xcel one.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: I have several security contracts. I have all the reserve centers for the northwest. That's 11 reserve centers. And the northwest, I have a contract for the security of it. That's IES. I have the region IDS contract for all the bases in the region. I have the badge authorization visit request contracts for the IA portion of that contract -- or IA portion of that requirement. I have -- there's a -- one or -- one other one. But I'm a COR on three of them, because that's the maximum you're allowed to have. So --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- I -- I am a -- a contractor officer representative on the Bayview one, on the Indian Island one, and on the reserve center one.

JUDGE GIANNOPOULOS: All right.

All right. Go ahead, General Counsel. Thank you. Sorry for interrupting.

MS. MCCONNELL: Okay.

Q BY MS. MCCONNELL: Well, I was about to ask you about your job duties. Briefly, specifically in connection with being senior performance assessment rep, what are your specific job duties there?

A So as a senior performance assessment rep, I oversee my performance assessment rep to make sure he does his monthly assessments. I also reply to any customer complaints that come in. I'm the go-between between the contracting officer and my -- and the government. So I make sure the government and the contractor abide by the contract.

Q And you had mentioned that you oversee a performance assessment rep?

A Yes, ma'am. That's Steve Manson.

Q Okay. And do you supervise Mr. Manson?

A Yes, I do.

Q Okay. Is this -- being a SPAR, a senior performance assessment rep, is this a civilian position? I'm not sure that's the right term. But you tell me.

A Yes, it is a civil service position.

Q And do you work with the Navy's contract with Xcel at Indian Island?

A Yes, I do.

Q How long have you worked on this contract?
A On this specific contract as of the contract --
Q No. Actually how long have you worked on contracts for Indian Island?
A Since about 2004. This current contract started in '14.
Q And --

JUDGE GIANNOPOULOS: And let me ask another question.

What can you tell the Court, tell me, about Indian Island that's not secret, that's -- it's open to the public?

THE WITNESS: It's a Naval ammunitions command base.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: So we are the -- in the Northwest, the second based on the west coast for dispositions of all ammo and other types of stuff.

JUDGE GIANNOPOULOS: Okay. And ships go there. And do you load and unload ships --

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: -- with ammunition?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. And it's stored on -- ammunition is on Indian Island, stored --

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: -- there? All right.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Thank you. Very well. I just wanted

them what -- what they have to do to carry weapons. They have to do special training, they have to do special weapon familiarization, they have to do weapon shoots, and they have to qualify and carry a gun card in order to get a weapon.

Q If an Xcel employee makes a complaint to the Navy, who in the Navy would handle this complaint?

A It would all come down to me to handle the complaint. If the -- if a contractor, a visitor, a government employee, anybody puts in a complaint, it would go to me.

Q Okay. And I think I heard you use the term customer earlier. When you say "customer," who's the customer that you're referring to?

A So anyone can be a customer. A visitor, a person visiting the base, a government person could be a customer, a Navy employee could, a Navy personnel could be a customer. All of those are considered customers. We're protecting all of them on the base.

Q Okay. Now, you -- so you -- these complaints that might be made by an Xcel employee, they would come to you, you just testified. Did you handle any such complaints in 2018?

A Yes, ma'am, I did.

Q And who made these complaints?

A So there were two different, separate complaints made. One was made to the -- the commanding officer, three individuals visited the commanding officer, one individual who

made a complaint sent an email to the security officer, and made a complaint to him. The security officer sent that complaint to me, and the CO called me to talk to me about the complaint.

Q And again, who was -- so first of all, let's say -- who made the complaint to the commanding officer?

A Ofc. Salopek, Ofc. Mullen, and Ofc. Lein.

Q And who sent the email to the installation security officer?

A Ofc. Mullen.

Q And when did you become aware of these complaints?

A The date?

Q If you can remember. Or range. Approximate is fine.

A It was -- well, I want to say July -- July something. I don't remember the exact date.

Q 2018?

A Pardon?

Q 2018?

A Yes. Yes, ma'am.

Q I'm showing you a document marked Respondent's 1. Let me see if I can find you a copy here. I'll just let you have my copy. I think I've seen this enough. I know it.

Take a look at Respondent's 1.

A Yes, ma'am. I'm very familiar with this.

Q Okay. What is it?

A This is the email that Mr. Mullen sent to the security officer, Michael Jones. And this outlined the exact complaint that he had with Xcel.

Q Now, after -- you testified that the installation security officer passed this email on to you?

A Yes, ma'am.

Q And when -- after you received the email, what did you do next?

A Well, there was several --

JUDGE GIANNOPOULOS: Well, let me just ask.

This email above -- so right above here, there's an email from Terry -- from Michael Terry -- oh, I'm sorry. Let's see. It's from you to Michael Terry.

I'm sorry, General Counsel. I --

You said he forwarded it to you. How?

THE WITNESS: Yes, ma'am (sic). So the --

JUDGE GIANNOPOULOS: Sir. That's all right. Not a problem.

THE WITNESS: The security officer forwarded the email to me.

JUDGE GIANNOPOULOS: To you. Okay.

THE WITNESS: And then I forwarded it Mr. Terry.

JUDGE GIANNOPOULOS: I see.

Sorry, General Counsel, for interrupting you. I got confused when I was looking at documents. So go ahead.

Q Okay.
A Excuse me. The commanding officer was going to pull off all the contract guards until he was proven that they met the requirements to stand post.

So after all this happened, I contacted Steve Manson. We went through the records of the current guards that were standing post right at that moment, and then each shift after that until we can get our feet on the ground to start doing the checks and stuff on the complaint.
Q And you had mentioned that you -- so you forwarded the email from Mr. Mullen to Mr. Terry?
A Yes, ma'am.
Q And you also called him, but you didn't initially reach him?
A Correct. Yes, ma'am.
Q Did you have contact with him?
A I did not have contact with him until the next morning. He did reply back to me later that evening, just saying, hey, I've received this. I'll look into it. And I'll see you tomorrow. Because I had told him I -- I -- on the voice mail that I would be up there in the morning time to visit.
Q So when you were going through these records, was Mr. Terry involved in going through these records at all?
A So Mr. Terry was, Mr. Gerald Powless was, and Mr. Mitch Vancura also assisted us.

Q And how did they assist you?
A So when we go through the records, we have a contractor with us to go through everybody's records. So we went through all their training jackets, we went through all the hand -- every record that he do for training, we went through, we go through the -- we're not allowed into our own RFI, per instruction.
Q What's the RFI?
A RFI is ready for issue room. So we have to get signed in. So in order for us to look at the documents inside the RFI, the ready for issue room, we have to have -- we sign in, and then we go in there and we review all the records and what weapons were issued out to everybody. We went through all past -- no, not at that time we didn't. Okay. So that's what we did right away.
Q Okay. And other than going through documents, with a else did you do as part of your inquiry into these complaints?
A So we also set up appointments to interview all the initial three individuals to get their complaints.
Q How did you go about setting up these appointments?
A With Mr. Terry and Xcel to -- wanted to know when they are on post because we have a -- what we call a reaction patrol that we could put in their place and we could interview them without incurring any overtime for the -- for Xcel or any extra costs for the government. So we scheduled appointment times

for everybody.

JUDGE GIANNOPOULOS: And is that a -- are those Navy -- the reaction patrol, is that a --

THE WITNESS: No, sir. That -- they're contractors --

JUDGE GIANNOPOULOS: Other contractors.

THE WITNESS: -- right now. So we -- the terminology is not, and realistically, reaction. There are extra personnel --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- because we don't have enough government, civil service, nor military on Indian Island to cover everything.

JUDGE GIANNOPOULOS: Got it.

THE WITNESS: So we have what we call our reaction patrol, an extra personnel, to assist us standing --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- post somewhere else.

JUDGE GIANNOPOULOS: All right.

Go ahead, General Counsel.

Q BY MS. MCCONNELL: And so you scheduled interviews with Mr. Mullen and Mr. --

A I tried -- I did schedule interviews with Mr. Salopek, Mr. Lein. I tried to schedule a -- an appointment with Mr. Mullen. He called in sick. Three different times I tried to schedule with him.

Q Okay. But just to be clear, again, you were working with

the Employer, with Xcel, to schedule these?

A Yes.

Q You did not work directly with Mr. Mullen?

A Nope. Didn't work -- we do not work directly with any employee because I cannot direct their employees without going through their supervision down to their workers. So in all of our contracts, all our security services contracts, we also work through the chain of command in order -- because it -- if every government employee told a guard what to do, the guards would -- they wouldn't know what to do. So we have a chain of command working to get a hold of each guard.

Q Okay. And other than scheduling -- you scheduled with these three folks. Did you schedule anything with anyone else?

A Yes, ma'am. As we interviewed people, they gave us names.

Q Who's "they"?

A The people we interviewed.

Q I see.

A So -- and then also in Mr. Mullen's complaint, he also had stated other individuals who were involved; Mr. Schryver -- I'm trying to think of who else -- Mr. Armstrong, Mr. Schroder. So we also set up appointments to see all those that were named in everybody's documents or was brought up in the interviews.

Q Who was present -- so did you, in fact, conduct interviews with employees --

A Yes, ma'am.

Q -- of Xcel? Okay. And who was present during these interviews?
A Mr. Manson and myself were present for every interview.
Q Along with --
A I do that as a safety precaution.
Q Is Xcel management present?
A No, ma'am.
Q Other than -- so other than the interview you did with Mr. Salopek, did you otherwise communicate with him during your investigation?
A Yes, ma'am. He sent me several emails in the last several months asking me questions. And I replied to him -- with the answers (sic) that he asked, there was nothing that I could reply to him about until I was directed by counsel not to talk to anyone anymore. That was after your subpoena.
Q I'm showing you a document that's been marked GC Exhibit 8. Do you recognize this document?
A Yes, ma'am. This is the second complaint that Mr. Salopek had sent to us. Because in each one of our -- our interviews, we stated -- because people remember things after he leave. We gave them our email addresses and our phone numbers. If they had anything else, they would need to put it in formal written format and send it to us.
Q Okay.
A So in my -- I did a report. In the report, this email

from Mr. Salopek and they're -- each in the original complaint were broken by paragraph by paragraph until my file to the court.

Q Okay. How many hours did you spend on the review of the complaints from Mr. Mullen, Mr. Salopek, and Mr. Lein?

A So last Tuesday, when we met, I had told you 240 hours, but I talked to our government counsel afterwards because I thought that might become an issue, so I actually tried to sit down and calculate how many hours was actually with the government asking questions and you asking questions and other counsel asking questions, the IG asking questions, NCIS asking questions --

Q But for now, I want to actually just stick to the --

A Oh.

Q -- your original investigation, that --

A So --

Q -- July investigation.

A So 400 -- a little over 400 hours.

Q Okay. And does that include Mr. Manson's efforts?

A Yes, ma'am.

Q Okay.

A That's Mr. Manson and myself's (sic) time.

Q Okay. Do you recall when you concluded your review of the complaints?

A I completed the report in -- on the 25th.

Q Of?
A October I believe, of '18.
Q Okay. And you mentioned you wrote a report?
A Yes, ma'am.
Q Okay. And as a result of your review, did you find any merit to the complaints?
A On three occasions, yes, I did. Yes, ma'am. All of the other ones, I did not find any merit nor anyone could produce any documents for me for any of the issues that were brought to my attention.
Q Okay.
A Or to the CO's attention or the security officer's attention.
Q Okay. I'm going to show you a document marked Joint Exhibit 10. Do you recognize this document?

JUDGE GIANNOPOULOS: Keep going into like maybe the third page, sir, third -- okay.

THE WITNESS: Oh, yes.

JUDGE GIANNOPOULOS: Okay. I think you probably recognize that.

THE WITNESS: Oh, I -- I think I said October 25th. July 25th. I'm sorry.

That is my report that I did --

MS. MCCONNELL: Okay.

THE WITNESS: -- yes, ma'am.

Q BY MS. MCCONNELL: And then I'm not sure that -- you were speaking quietly. You said something about a date you wanted to correct?

A Date I wanted to correct.

JUDGE GIANNOPOULOS: You said October 25th. The report actually is dated July 25th --

THE WITNESS: July 25th, yes, ma'am.

JUDGE GIANNOPOULOS: -- 2018.

Q BY MS. MCCONNELL: Okay. So that's when you completed your review?

A Yes, ma'am.

Q Okay.

A On July 25th, 2018.

Q Now, once you had written this report, what did you do with it?

A So the report went to the commanding officer at Naval station, Indian Island -- or Naval ammunitions commanding Indian Island, and it also went to the contracting officer, Melissa Burris.

Q And what is your connection to Ms. Burris?

A Ms. Burris is the contracting officer for three of my contracts.

Q Is she your supervisor?

A No, ma'am.

Q Oh, okay.

A She is the contracting officer.

Q And so what is a contracting officer as opposed to the senior performance assessment rep?

A The contractor (sic) officer is the one that's allowed to sign government contracts for the government. I -- I am what they call a -- I report to her on anything -- on any issues regarding the contract.

Q So you gave this to Ms. Burris and to the commanding officer. Is that -- are we talking about the commanding officer of Indian Island?

A Yes, ma'am.

Q Okay.

A So it went to many other people after that, but originally the email went to Ms. Burris and commanding officer, my -- Steve Manson, and the contract specialist.

Q And who's the contract specialist?

A At that time, it was -- I can't remember her name. She's not here anymore.

Q Okay. At that time, when you first sent this report, when you finished it and you sent it out to Ms. Burris, did you send it to anyone who was not a Navy employee?

A No, ma'am -- oh, yes, ma'am.

Q Who was that?

A Brian Morgan from OSHA.

Q Okay. And when did you send it to Mr. Morgan of OSHA?

A Three days after I completed the report.

Q Okay. And why did you send it to Mr. Morgan of OSHA?

A Because Mr. Mullen, Mr. Salopek made a complaint to OSHA about a Whistleblower Act.

Q Okay. Now --

A So Mr. -- oh.

Q No. I'm sorry. Yeah. So is this your normal procedure, who you sent this to, with your reports?

A Except for Mr. Morgan, it's my normal procedures. So my normal procedures on a customer complaint is it goes to the contracting officer, normally just to her, and then she can tell me I can disperse it throughout the other ones. But because of the nature of the report and the nature of the services that are provided up at Indian Island, it also went to the CO who has a right to know to defend his base, the commanding officer, and the security officer.

Q Is it normal that you would send -- you would not send it to anyone outside the Navy? Is that typical on this -- on an Indian Island contract?

A I would not send it outside to anybody else outside the Navy, no.

Q And you wouldn't provide it to the contractor themselves?

A Yes, I would. After the contracting officer let me -- gives -- gives me permission to release it to the contractor, then I would release it to the contractor.

Q And is it -- typically does she allow you to do that?
A Yes, ma'am. Usually it happens right away. But because Mr. Morgan contacted the contracting officer -- or actually he contacted me first, and I contacted. She asked me to hold up the report.
Q Okay. And how long did holding up the report last?
A I can't tell you the exact date. It was released until after you contacted the Navy for talking about getting documents and for a subpoena for me.
Q Okay. And that was in what year?
A 2019.
Q Okay. You mentioned that you were working with Mr. Manson on this review of the complaints. Did he have access to your report?
A Yes, ma'am.
Q And to your knowledge, did he pass it on to the contractor, to Xcel?
A No, ma'am, he did not.
Q Okay. While Ms. Burris' hold was in effect, did you pass your report to anyone outside the Navy?
A Outside the Navy? Mr. Morgan.
Q Okay.
A Did you --
Q And once --
A Oh, I was going to say, just Mr. Morgan.

Q And that once Ms. Burris' hold was released in 2019, did you then pass it on to Xcel?
A Yes, ma'am.
Q Now, you have concerns about a guard who's working on the Indian Island contract for Xcel, what would -- what can you do?
A We ask -- if I ever have an issue with a guard, not just on this contract, on any contract, I go through the -- I do a -- a review of the complaint, and then I make my recommendation to the contracting officer. And I can ask the contracting officer to have them removed from the contract.
Q There are any other steps that you can take? Well, let's say -- so is there anything you might do if it wasn't as serious and you weren't necessarily going to ask for their removal, is there anything shy of that that you can --
A Yes, ma'am, I can partner with the contractor and work out what the issues are and make sure the issues -- I cannot direct the contractor do any punishment or any -- any issues like that.
Q Can you discipline guards?
A No, ma'am, I did not discipline a guard.
Q Can you have them fired?
A No, cannot have them fired. I can only recommend that he be removed from the contract.
Q Okay. And so if -- and the contractor -- you've requested

Q And what were those?
A I asked -- I asked the contracting officer for removal of Mr. Salopek from the contract because he left the ready for issue room open that contained a little over 5,000 rounds of ammo; M9s, M4s, M500 shotguns, and most importantly, M240 belt-fed machine guns.
Q Okay. And did you make -- was this recommendation passed on to Xcel?
A At one point, yes it was. After the contracting officer let me know that I could go ahead and pass it off to Xcel.
Q And was he removed from the contract?
A No, ma'am, he was not. Mr. Terry, the contract security manager at the time, kind of pleaded a little case with me about him, and asked if he could be removed as the shift lieutenant but keep him as a contract guard, because he knew Mr. Salopek from the days when he was law enforcement in Nevada.
Q After you had completed your report about the 2000- -- moving back to 2018. After you had completed your report in July 2018, you had testified that Ms. Burris placed a hold on it. So you didn't pass it to Xcel. So during that time when she had the hold on it, did you convey to Xcel your recommendation -- oh, actually, let's back up.
It looks to me like in your report -- did you recommend in your report, in Joint Exhibit 10, your July 25th report, did

you recommend that Mr. Salopek be removed?
A Yes, ma'am.
Q Okay. And so during the time the hold on this report was in place, did you convey that recommendation to Xcel?
A At a -- verbally I did at a meeting we had on October 25th of 2018.
Q Okay.
JUDGE GIANNOPOULOS: And what did you tell them? Well, first of all, let me get some foundation. Who did you -- who was present at this meeting?
THE WITNESS: So --
JUDGE GIANNOPOULOS: You said October when?
THE WITNESS: October 25th.
JUDGE GIANNOPOULOS: Okay.
THE WITNESS: So in that meeting -- there was a management change in Xcel --
JUDGE GIANNOPOULOS: Uh-huh.
THE WITNESS: -- and they had requested to meet with the new contracting officer, myself, my performance assessment rep to introduce the new management.
JUDGE GIANNOPOULOS: Okay.
THE WITNESS: And so we had a meet and greet. And towards the ends of the meet and greet, Mr. Filibeck asked a question of how are we doing on the contract, or are there -- do you have any issues or concerns on the contract? I looked at

Q Okay. And as regards termination of Mr. Salopek, did you make any comments about that that you recall?

A To terminate him?

Q About termination.

A No. Just that my --

MR. STANEVICH: Objection. Asked and answered.

JUDGE GIANNOPOULOS: That's all right. That's okay. It was, but I'll let him proceed.

Go ahead.

THE WITNESS: Just the fact that I said that he -- I was making my recommendation to remove him from the contract.

Q BY MS. MCCONNELL: Okay. And did you indicate whether removing him from the contract, you were requiring him to be fired?

A No, ma'am, I did not.

JUDGE GIANNOPOULOS: Did the contracting officers -- officer say anything at that meeting with respect to Mr. Salopek, the contracting officer, Ms. Burrows?

Is it Burrows?

THE WITNESS: Burris. Burris. B-U-R-R-I-S.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Not that I remember. No, I don't -- I know that it's drilled into us; we cannot --

JUDGE GIANNOPOULOS: Yeah.

THE WITNESS: -- fire a contractor.

JUDGE GIANNOPOULOS: Yeah. No. I get it. I'm just curious if she said anything. All right.

THE WITNESS: I -- if I remember correctly, during the whole time, I don't think she said more -- more than ten words.

JUDGE GIANNOPOULOS: Okay. And to your knowledge, did Ms. Burris, the contracting officer, ever -- I thought you said earlier that the contracting officer can require someone be removed from the contract.

THE WITNESS: That is correct.

JUDGE GIANNOPOULOS: To your knowledge, did Ms. Burris ever require Mr. Salopek to be removed from the contract?

THE WITNESS: Not at that time.

JUDGE GIANNOPOULOS: Did she at any time?

THE WITNESS: She was going to after the report was released. And then all -- all this broke up.

JUDGE GIANNOPOULOS: Okay. All right. But she -- but to your knowledge, she never actually did?

THE WITNESS: No, ma'am -- no, sir.

JUDGE GIANNOPOULOS: All right.

All right. I've got a couple of questions while, General Counsel, you're -- well, you were about to ask your next question.

But you said they asked you about how deep you dove into this -- into the allegations. You know, one of the things that I thought, that has come up in here, one -- there --

JUDGE GIANNOPOULOS: Do you know, did anyone -- did you or anyone that you know of inform anyone at Xcel that the commander wanted the guards removed?

THE WITNESS: Yes, sir. I had told Michael Terry how important it was that we jump on this real quick. Because I did tell Michael Terry, the CO, the commanding officer, wanted everyone removed.

JUDGE GIANNOPOULOS: Okay. All right. And as I read your report, I thought it -- it's -- regarding these, quote, unquote -- what do we call them --

THE WITNESS: Complaints?

JUDGE GIANNOPOULOS: -- "gravel pit ranges" --

THE WITNESS: Gravel pit.

JUDGE GIANNOPOULOS: -- right?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: I thought, from reading your report, your finding was that there was no qualifications done at the, quote, unquote, "gravel pit range," correct?

THE WITNESS: Correct.

JUDGE GIANNOPOULOS: But some of the are guards were going out there to practice?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Okay. And at least in one instance someone from Xcel gave them some -- either some shotgun shells or some ammunition to go out there --

Q Take a look at that.

A Okay.

Q Okay. Now, flip that over. The idea is I want to ask you what you now remember. Do you now remember anything further said by Ms. Burris at this meeting?

A So that would have been the comment when I looked at her, asking about the removal of Mr. Salopek or Mr. Mullen because of the recommendations I had made. And yes, she said that, "We cannot tell the contractor who to fire."

JUDGE GIANNOPOULOS: Had she said that during the meeting?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Okay.

Q BY MS. MCCONNELL: Now, after this meeting that you've been describing, this October 25th, 2018 meeting, did you speak with any officials from Xcel about Mr. Salopek after that?

A No.

Q Okay. Did you have any --

A Not -- not directly. If you're referring to when they are -- removed him from the contract -- when they informed us that he was removed from the contract; is that what you're asking?

Q Sure. When was that?

A Okay. So Mr. Terry informed us that he was removed from the contract, and we proceeded to do the proceedings to remove his CAC card.

Navy and certain things that are government. And a CAC card is government. It's not just the Navy.

Q Right. You compared card with the judge, so --

A Yes, ma'am.

Q Right. Mr. Salopek in his email -- in the second email in GC-11, he indicated that it was his discharge by Xcel that caused his TASS application to be revoked. Is that statement correct, in your eyes?

A Not entirely.

Q How so?

A The -- it was the fact that he was removed from the contract. Once he was removed from the contract, that's what was instituted as why he -- his TASS account was canceled.

Q Okay.

MS. MCCONNELL: I have no further questions for this witness at this time, Your Honor.

JUDGE GIANNOPOULOS: All right. Cross-examination? We've been on for about an hour.

Mr. Rake, would you like a ten-minute break?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Yeah. Let's take a 15-minute break. We'll give you a 15-minute break.

THE WITNESS: I just need to go to the restroom.

JUDGE GIANNOPOULOS: That will give you time, sir --

Let me ask -- before we go off the record --

**CROSS-EXAMINATION**

Q BY MR. STANEVICH: Good afternoon -- good morning, Mr. Rake. Are you how today?
A Just fine, sir.
Q You had testified earlier that three officers, I believe, had reported that -- reported to the commanding officers to make a complaint about weapons qualifications; is that correct?
A Yes, sir.
Q And those officers were Daniel Lein, Mr. Stephen Mullen, and Mark Salopek, correct?
A Yes, sir.
Q And ultimately you did recommend Mr. Salopek's removal from the Xcel contract; is that correct?
A Yes, sir. There was also another recommendation before that about Mr. Mullen.
Q Okay. And we'll get to Mr. Mullen in a moment.
Did you ever recommend the removal of Mr. Lein from the contract between Xcel and the Navy?
A No, sir.
Q Okay. And why did you not make such a recommendation?
A Mr. Lein in his testimony to me at the time was that he wasn't aware of all the other incidents. He had just started working there. And the only issue he had was with training. And he proceeded to tell us what the issues were about

training. And we corrected those issues for him, and did check back with him to make sure training was resolved.

Q And when you met with Mr. Filibeck and other company representatives in late October of 2018, was there any discussion of the termination of Daniel Lein's employment?

A No, sir.

Q Was there any discussion of removing Dan from the contract?

A No, sir.

Q Okay. Now, before you have --

A You mean -- you're talking about Mr. Lein?

Q Mr. Lein. I'm sorry.

A Yes, sir.

Q And earlier in your testimony you said you interviewed a number of people, including officer Jacob Schryver?

A Yes, sir.

Q Okay. And we'll get into more specifics later, but when you interviewed Mr. Schryver, was that in person?

A Yes, sir.

Q Okay. And who else was present?

A Mr. Manson.

Q Do you recall approximately how long the interview took place?

A No, sir. I couldn't tell you times on any of the interviews. I know some of them took longer than an hour, some

took less than an hour, some took three hours.

Q Okay. But in general, can you tell me what was discussed with Mr. Schryver?

A Yes, sir. So in the meeting with Mr. Schryver, the first thing I did was I had -- I had listed all these questions I wanted to ask everybody. So I went through all the questions. Some of the questions were, do you know your chain of command, do you know who your safety officer is, do you know who your immediate supervisor is? And then I proceeded --

JUDGE GIANNOPOULOS: Can I ask you a question? When you said, "do you know your chain of command," do you mean the chain of command within the company --

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: -- and/or also the chain of command at the base?

THE WITNESS: The chain of command in the -- within the company.

JUDGE GIANNOPOULOS: Within the company. Okay.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. Sorry for interrupting. But you can go ahead. What else did you ask?

THE WITNESS: So then we proceeded to ask him questions that were in the email that Mr. Mullen had sent to the security officer. And I highlighted some of those issues that -- directly to Mr. Schryver about taking someone to a rock quarry

for shooting, and Mr. Schryver -- can I tell you how his reaction was?

JUDGE GIANNOPOULOS: Yeah. Sure.

THE WITNESS: So when I first presented the question to Mr. Schryver about being accused of taking -- or he's part of taking people to a rock quarry, Mr. Schryver got very upset, pushed his chair back at the table -- well, I can't push this one back -- pushed his chair back at the table, stood up and leaned over the table, and Steve and myself kind of scooted back in our chairs. We were a little concerned, but he was just upset and letting us know that his prior Army career and his weapon knowledge from growing up, he would never ever take anyone to a rock quarry to shoot due to ricocheting and other things that can happen at a rock quarry.

JUDGE GIANNOPOULOS: And is Mr. Schryver the one that you said had set up a gun range in the back of his house.

THE WITNESS: No. That was Mr. Schroder, I believe.

JUDGE GIANNOPOULOS: That was Mr. Schroder. That's why I got the name -- okay. All right. Sorry.

MR. STANEVICH: Okay.

JUDGE GIANNOPOULOS: Sorry.

Q BY MR. STANEVICH: So let me just ask some follow-up questions there. And the judge just asked you about the chain of command, a question that you had posed to the interviewees. Why was it important you -- important to you to ask that

question to the folks you interviewed with?

A Because I normally do not have contractors go straight to the CO or to a security officer without going usually through their chain of -- their company chain of command, or coming to Steve and myself, who make the -- known that we were out there all the time asking everybody how things were going.

Q Now, is that a mandate, that the chain of command has to be followed or is that just your preference?

A There -- we follow the company's rules, and the company has a book that says their chain of command. All three of my contracts, I don't think they -- and I don't know how it's all worded, but their company books or company employment documents they give out to people, they tell them, here's who your chain of command is.

Q Okay. And you testified before you reviewed Mr. Mullen's complaint with Ofc. Schryver, correct?

A Yes. I -- I did not tell him it was Mr. Mullen that made the complaint, but I did go over issues in -- within the email that were -- was directly pertaining to him.

Q And I just want to make sure that we are talking about the same complaint. This is the July 9th complaint that came to the Navy --

A Yes, sir.

Q -- correct? Okay. And did you review the specific allegations with Mr. Schryver where he was named in the

complaint?

A Yes, sir. I went over the details saying, you know, you're -- this is what's being said. And I said the actual quotes straight out of the stuff.

Q Did he agree with any of the allegations outlined in --

A No, sir, he did not agree to a single one.

Q Please let me just finish the questions --

JUDGE GIANNOPOULOS: Yeah.

Q BY MR. STANEVICH: -- so the record's clear.

JUDGE GIANNOPOULOS: Yeah. Wait until he's finished.

THE WITNESS: Oh. I'm sorry.

Q BY MR. STANEVICH: Did Mr. -- did Ofc. Schryver substantiate or agree with any of the allegations that were outlined in the July 9th complaint?

A No, sir.

Q And what was his reaction to those allegations?

A He was very --

JUDGE GIANNOPOULOS: He already gave the reaction. He said what -- he was mad, he pushed his chair back, et cetera. So that's already in the record.

Q BY MR. STANEVICH: Now, before you -- you have two documents, General Counsel Exhibit 10 and General Counsel Exhibit 11. Do you see those documents?

A She took them back.

Q I'm sorry. I'll show you --

with his CAC regard -- from the TASS system.

JUDGE GIANNOPOULOS: So Mr. Rake, I have a question based on the Schryver questions that counsel was asking you. And I'm looking at your report here that's on pages Bates stamped 166. And it says,

"Finding 4, Ofc. Schryver denied the entire paragraph as worded. He would never take anyone to a gravel pit to shoot. Quote, 'This could lead to accidents due to ricochets, and I know better,' unquote. He was never asked to qualify anyone, but to provide remedial training to personnel who needed the extra time."

Is that what Schryver -- Ofc. Schryver told you, that he was asked to qualify anyone -- he wasn't asked to qualify anyone, but to provide remedial training to personnel who needed extra time?

THE WITNESS: So what he said -- stated was in the remedial training, if anybody wanted extra -- go out and shoot, he would be glad to go out and shoot with people.

JUDGE GIANNOPOULOS: Okay. Did he say that he has taken people out to shoot or he'd be glad to --

THE WITNESS: He had told us originally that he would be glad to take anybody out to shoot.

JUDGE GIANNOPOULOS: Uh-huh.

THE WITNESS: Some people had asked him to go out and

shoot, and he'd go out and shoot with him. He loves to shoot.

JUDGE GIANNOPOULOS: So he would just go out and help -- to shoot with them. All right. I just wanted to clarify that. All right. Thank you.

Sorry for interrupting, Mr. Stanevich. Go ahead.

Q BY MR. STANEVICH: Mr. Rake, was -- did you ever ask Mr. -- the company to remove Mr. Mullen from the contract?

A No, sir. I asked the contracting officer that I was going to remove Mr. -- you said Mr. Mullen, right?

JUDGE GIANNOPOULOS: Mr. Mullen.

MR. STANEVICH: Correct.

THE WITNESS: Yeah. I asked the contracting officer -- so at the beginning of my investigation -- so let me clarify everything. At the beginning of my -- excuse me. Not investigation, of a customer complaint --

JUDGE GIANNOPOULOS: Well, you know -- okay. Go ahead.

THE WITNESS: I can't call it an investigation.

JUDGE GIANNOPOULOS: I gotcha. But that's what it is in reality. That's all right. Go ahead.

THE WITNESS: So and my original customer complaint was, they met with the CO, and I had talked to the contracting officer and said if anybody left their post, I would be requesting that they be removed from the contract. Because we have 11 General Orders of a sentry, and General Order Number 5 says you will not be -- you will not be removed -- you will not

Q Okay. And what is the IG?
A IG is the Inspector General.
Q Okay. And the Inspector General reached out to you?
A Yes, sir.
Q And what was explained?
A So Mr. Mullen, Mr. Salopek made a complaint to the Inspector General. They also made a complaint to NCIS. And the Inspector General looked into the complaint, but they were -- also did some investigating on their own, and found out Mr. Salopek had a website -- excuse me -- LinkedIn cite that had FOUO information posted on there.
Q And what is that FOUO?
A For official use only.
Q And once you obtained that information from the IG, did you take any action?
A Yes, sir. I was required to reach out to the company. And I reached out to Mr. Terry and Mr. -- Mr. Terry and I -- the other gentleman I can't remember his name, and asked him to speak to Mr. Salopek. And I specifically put in there, Mr. Salopek denies. Do not push him, do not do anything. Just report back to me if he was going to remove it or not.
Q And why did you say, don't push him on this issue?
A Because the issues of him filing complaints with OSHA, filing the complaints IG, filing the complaints with NCIS.
Q Okay. And to the best of your knowledge, did Mr. Salopek

take this material down off of his LinkedIn page?

A I do not know if he ever -- ever -- I knew that he pulled it off for a period of time, but then it showed back up a few weeks after -- later on.

Q And how do you know that it appeared back on his LinkedIn page at some point?

A Because I keep looking at it for the -- due to the fact that I figured it might come up in this investigation that I got subpoenaed for. So I've been looking at it. And as of a week-and-a-half ago, maybe two weeks now, it's still on his website.

Q And when we say "website," are you referring to his --

A I --

Q -- LinkedIn page --

A LinkedIn.

Q -- or his company --

A No. His LinkedIn page. I'm sorry. LinkedIn page.

Q Have you also looked at the website for the company that Mr. Salopek administers?

A No. I did not even know he had a website. I knew that he had mentioned it in our interview, but I do not -- I did not go to his website.

Q Now, I assume there's a written contract between the Navy and with Xcel; is that correct?

A Yes, sir.

2.8 of the contract?

A Yes. The security boat by itself, no, but the two -- if you -- these picture are not very clear, but you could see that the FLIR system is very -- shown in this picture.

JUDGE GIANNOPOULOS: And he's pointing to the guys -- the picture where the two -- there's two people in the boat looking at a monitor.

THE WITNESS: Correct. And it also gives them a general idea of what the inside of the security boats look like.

Q BY MR. STANEVICH: Now, Mr. Rake, are you also familiar with Section J to the contract between the federal government and Xcel?

A Yes, sir.

Q And what is Section J in general, if there's such a general thing?

A They're -- that's called the attachments. So any attachments goes into Section J.

Q Okay. And what's -- and does that apply to all government contracts or is this just something with Xcel?

A Every single contract.

Q Okay. And are you familiar --

A Every security contract. I cannot say for other contracts.

Q Okay. And is there a -- so I assume there's a Section J for the contract between Xcel and the U.S. Navy; is that

was posted per the OSHA requirement. And then I found two other sheets that Mr. Terry had posted, saying about the acts -- the number -- you know, the -- I forgot what it's called. It's the report saying how many accidents the company has had, blah-blah-blah. And he had them posted on there.

On each one of one -- each one of those three sheets outlined who -- the safety officer. The importance to me was, I wanted to make sure they had a clear reporting scheme to who their safety officer was. That's what I was looking for.

Q And how would you describe Mr. Salopek's demeanor during this first interview?

A So Mr. Salopek's arrogant.

Q And why would you say that?

A So during the interview, we had questions that we had drafted up that we were asking each individual. Mr. Salopek brought up himself about the incidents of the RFI in 2015. We -- we weren't even -- that wasn't even on our radar to even ask. And to be honest with you, I had totally forgotten everything about the 2015 incident until he brought it up in the interview, about the RFI.

Q And what did Mr. Salopek say about the RFI incident?

A That it was blown out of proportion, that it wasn't such a big deal like everybody thought it was. And you know, he went on to -- just to describe that, you know, I walked out the door for a few minutes, and I got caught. And that -- and I

happened to tell him that's not the case. During that time, he also expressed his -- I don't know if it's a good word it is hatred, but his dislike Michael Terry. It was his assumption that it was Mr. Terry that demoted him from a shift lieutenant down to a guard.

Q He said that to you?

A He said that to me. And I responded to him -- since he said that, I responded back to him saying, that was not Mr. Terry that demoted you. That was me that demoted you. My recommendation was to fire you from the -- or excuse me -- fire's not the word -- to remave (sic) you -- remove you from the contract because of the incident, but Mr. Terry persuaded me to talk to the contracting officer to keep you on as a guard.

Q And did Mr. Salopek explain to you at all why he raised this issue in your interview?

A No, he never told us why. But Steve and I were curious about that, because he also raised another incident that was not part of our questionnaires to us.

Q And what incident was that, sir?

A The incident that he had when the IG, the Inspector General, were doing what they call a -- I'm forgetting the terminologies now. So the Inspector General look at various things throughout -- they have timelines when they go out and do inspections. And they were doing one of their inspections

on the security boats. And Mr. Mullen brought up the incident about how the IG misunderstood his comments that was asked to him about the security boats, that it also had happened in 2015.

At that time, I wasn't even aware of the incident of the security boats. I actually this to call the IG and ask them what happened. And they gave me the documentation. And the comment that Mr. Mullen had -- or excuse me -- Mr. Salopek had said to them in response to their audit -- IG, audits -- audits when he -- they were questioning him on responses and stuff.

Q Now, did he explain to you why he brought up that prior incident as well?

A No. He -- well, he made comments. I don't know if that -- if that's the reason why he brought them up. But he made the comment that, you know, it was taken out of context, it is no big deal. But that was all he said. He didn't say why he brought it up. But Steve and I were perplexed over several things that Mr. Salopek brought up in our -- that he brought up that we never asked him to bring up during those interviews.

Q Well, you just covered two topics that perplexed you. What other topics did?

A He brought up the -- Lt. Kirkpatrick, a female, how she used to be a dog groomer and she became a guard, and now she's

a shift lieutenant. And that it wasn't fair how, you know, women are being treated differently than men in the -- in the -- on the contract. And I explained to him that Lt. Kirkpatrick, to make lieutenant, they have to go through a process in the contract. If you look at --

THE WITNESS: Can I refer -- can I refer to the contract?

JUDGE GIANNOPOULOS: That's fine. It's not really that important --

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: -- but if -- but just tell us what you explained to --

THE WITNESS: So there -- in the contract, it states the requirements to become a shift lieutenant, and she met all the -- all the requirements. The government, myself, and Steve Manson are the only ones -- with the contracting officer's approval, are the only one that can say who a shift lieutenant is as shift lieutenant when they make them. So we approve them.

Q BY MR. STANEVICH: In your report it says that Ofc. Salopek eluded that women were problems as security officers. Did he give you any specific examples?

A He gave us several examples. One was the --

JUDGE GIANNOPOULOS: Is that something he said to you?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Oh, yes, sir.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Because that was a big surprise, that --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- that someone would say that --

JUDGE GIANNOPOULOS: All right.

THE WITNESS: -- especially nowadays.

JUDGE GIANNOPOULOS: And then the examples.

THE WITNESS: So he brought up -- oh God, I might not have all the names. There were two -- two officers -- security officers who switched shifts, and how they're special, and they get to switch shifts any time they want to.

So I had to call the gentleman that was taken Mr. Terry's place at the time to find out the process on how people switch shifts. And it was explained to me that if two individuals are -- a graveyard person and a day shift person, just want to switch, they submit a form. If it doesn't cost the company any overtime and it does not violate the Union rules, they're allowed to switch shifts. And it's not a -- it's -- they're not getting that shift permanently, they're just switching it for a day or so.

He also brought up the fact of a pregnant woman who was -- shot at the Port Townsend range, and the Port Townsend range is an offer -- is an official second location for the government to shoot military rifles at when our range at the SATC is shut

THE WITNESS: Right. And he knew -- he knew more than the IG person that was doing the interviews on boats. But he did not know the IG guy that was doing it was one of the Navy personnel who wrote the harbor security boat instruction.

JUDGE GIANNOPOULOS: Okay. And then it's my understanding, at least, that the boat -- the boat control is now done by the Navy.

THE WITNESS: That is correct.

JUDGE GIANNOPOULOS: Okay. And how -- do you know when that switch was made?

THE WITNESS: I want to say '16, but don't quote me, off the top of my head.

JUDGE GIANNOPOULOS: All right.

THE WITNESS: But I think it was in 2016 we de-scoped it from the contract.

JUDGE GIANNOPOULOS: Okay. All right.

Sorry for interrupting, Mr. Stanevich. Go ahead.

Q BY MR. STANEVICH: Mr. Rake, if you can turn back to page 1666, take a moment to review issue number six.

A Yes, sir.

Q And where did this issue come from? Did you pull it from a particular complaint or report?

A So issue 6 came from the original issue from Mr. Mullen that he submitted to the security officer.

Q And what was the allegation concerning issue 6?

Q I'm sorry. I believe that that's on July 22nd?
A Yes, sir.
Q Okay. And is that -- the email that he provided to you, did you embed that in your report at all?
A He did not provide it to me. He provided that to Steve Manson, my PAR, who then sent that to me. And yes, that is in my report. So to distinguish between the two is, I put in the -- in this -- on the Salopek, I put Salopek finding one, Salopek finding two. Those are how to distinguish from the first email to the second email.
Q Okay. And to the best of your recollection, Mr. Salopek never clarified the date at issue in number 6?
A No. I -- no one's ever told me a date change.
Q Now, I understand -- we all understand that there's a recommendation in your report to remove Mr. Salopek from the contract. Can you explain to us how you arrived at that recommendation?
A So it's over several things. So one is the RFI issue came back up. We didn't bring it up. He brought it up. Kind of treated it like it was nothing. I mean, to him, it was a small incident. The belt-fed machine guns that are in there is a big issue.
The second part is the issue with the IG. You know, he would shoot first and ask questions later instead of following the rules of engagement. That scares me. And I did not know

that at the fact -- at that -- in 2015 when that happened until I called the IG after he brought it to my attention.

JUDGE GIANNOPOULOS: So when you mean -- when you said "the issue with the IG," did you mean in 2015 --

THE WITNESS: IG, yes, sir.

JUDGE GIANNOPOULOS: -- IG report or when he went to the IG in 2018?

THE WITNESS: 2015.

JUDGE GIANNOPOULOS: 2015. Okay.

THE WITNESS: That was the --

JUDGE GIANNOPOULOS: A boat issue?

THE WITNESS: Yes, sir. That was the IG audit they were doing.

JUDGE GIANNOPOULOS: The IG audit? Not he didn't go in --

THE WITNESS: Right.

JUDGE GIANNOPOULOS: -- 2015, but the boat -- the IG audit of the boats? Okay.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right.

THE WITNESS: And then --

JUDGE GIANNOPOULOS: Proceed.

THE WITNESS: And then the other issues were -- he brought up to our attention about an individual, Ofc. Coler, pointing a rifle at her leg during a jam. He also brought up about Ofc. Cunningham -- it's either Cunningham or Armstrong -- it's

in my report, I don't remember -- with a shotgun, bringing it down to his shoulder and -- and doing something with it, and might have blown his head off.

So when those two incidents were brought to my attention, I checked with the line safety officer, who was Ofc. Schryver, and he did not know about them. And number two, I asked the range safety officer, who sits in a glass cage behind the range watching the entire range, and that was Mr. Powless, and he was not aware of the incident. And then I asked him, are you aware of the rules? When you see a safety issue, what are you supposed to do? And he's aware of what the rules say, but he never yelled, cease fire, cease fire, cease fire, three times to say there's incident -- there's a safety incident. But he brings it up to me -- or brings it up to the CO two months -- two months or three months later to the CO.

JUDGE GIANNOPOULOS: Mr. -- meaning Mr. Salopek?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: And then --

JUDGE GIANNOPOULOS: And you're -- and the rules -- you were talking about the rules that anyone on the range, when they see something like that, is supposed to tell -- Mr. Salopek should have yelled, cease fire?

THE WITNESS: That is correct. Mr. Salopek, Mr. Mullen, Mr. Lein, Mr. Bob Hope (sic).

JUDGE GIANNOPOULOS: Whoever saw --

THE WITNESS: Any -- any incident that goes on, on the range, the rules are if you see a safety issue, you yell cease fire until the firing is stopped.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Normally you yell three times, cease fire, cease fire, cease fire.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: But if it doesn't stop, you keep yelling until everybody stops.

JUDGE GIANNOPOULOS: Okay. All right.

THE WITNESS: And it was never brought up to the line safety officer, the range safety officer, or any SATC, small arms training center, personnel about any safety issues.

So with all that combined, that's what made my -- my -- when I talked to Ms. Burris, I told her that was why I wanted him removed; I'm afraid -- and excuse the way my -- the way I say this. I was afraid, when I told Ms. Burris, I don't want to be the guy on the TV 4 News saying the government was aware of problems with an individual with an out rifle, and someone got hurt.

Q BY MR. STANEVICH: Mr. Rake, there's references towards the end of your report concerning Mr. Salopek's prior experience with law enforcement. Do you recall that conversation with him?

A Yes. That was my comment about earlier when he asked me what I thought of him, the arrogance. So he told Steve Manson or myself in the -- in the interview that he -- during his term as law enforcement he was well-known to go to testify in cases, and the judge would tell the prosecutor and the -- the defense attorney that Mr. Salopek is an expert witness and we have -- he has proven himself over and over, and whatever he says is -- is the truth. And Steve and I, when that was first come out -- and whatever he provides to us we should take as the truth.

Steve and I both looked at each other at that time and we just shook our heads, and then we excused ourselves for a few minutes when that happened, went outside and talked about that incident, because we were a little concerned that no -- well, I'm not sure. I'm not a judge. But I'm sure that no judge would tell both counsels, whatever this guy says is the truth.

Q And you outline that conversation in the very last -- in your recommendation paragraph. Why did you deem it so important to include it in your recommendation?

A Because that shows that I -- that I feel that that guy is not -- is unsafe. And you know, if I'm supposed to take everything he says as gospel, to me that's -- that's a safety issue right there.

Q Okay. Now, after you prepared your reports, you provided it to the contracting officer?

A And the commanding officer, yes, sir.

Q Okay. And did you have a conversation with the contracting officer regarding your recommendation to remove Mr. Salopek from the contract?

A Yes, sir.

Q Did she agree with your recommendation?

A She has never -- she has never come out and formally agreed with anybody, but -- I mean, with me on anything on the report because she was waiting for the report from Brian Morgan.

Q Okay. And you met with Mr. Filibeck and other company representatives?

JUDGE GIANNOPOULOS: So before you go to that -- to that meeting, did you ever have a conversation with the commanding officer about your report?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. And what did the commanding officer have to say?

THE WITNESS: He -- he actually stated that he -- he liked all my recommendations and he would go forward with the recommendations.

JUDGE GIANNOPOULOS: All right.

THE WITNESS: So his -- when I had told Melissa Burris that the security officer -- and I am going to add the security officer -- and the commanding officer were in enjoinment (sic)

of mine of removing him from the contract --

JUDGE GIANNOPOULOS: In agreement --

THE WITNESS: -- as a safety --

JUDGE GIANNOPOULOS: -- with you?

THE WITNESS: Or agreement.

JUDGE GIANNOPOULOS: And you told that Melissa Burris?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: Sorry for interrupting. Go ahead.

Q BY MR. STANEVICH: And did Ms. -- did the -- sorry. Did Melissa Burris ever tell you that she disagreed with your recommendation?

A No, sir.

Q Did she tell you that she disagreed with the recommendation of the commanding officer or the security officer?

A No, sir. She told me she was waiting on the response from Mr. Brian Morgan before she made her final decision.

Q And you met with Mr. Filibeck and other company representatives in late October 2018; is that correct?

A Yes, sir.

Q And was that your first meeting with Mr. Filibeck?

A Yes, sir.

Q Okay. And prior to that meeting, had you shared your report with him?

A No, sir.

Q Have you shared any documentation with him regarding the complaint that Mr. Salopek, Mr. Lein, and Mr. Mullen had put forward?
A Prior to that meeting?
Q Correct.
A No, sir, we have not.
Q Okay. And at that meeting, what did you tell Mr. Filibeck in regard to your report?
A Well, my first comment to Mr. Filibeck was I -- I believe I -- we have a safety issue.
Q And why did you raise that -- what safety issue were you referring to?
A Mr. Salopek.
Q Okay. And did you explain what the issue were?
A Well, that's what I -- I read the report.
Q Okay. And what else did you tell Mr. Filibeck?
A I didn't read the report. I refers to the report. And then I just discussed everything that was in the report.
Q And I believe on direct examination, you testified that Mr. Filibeck had asked you, what did you find; is that correct?
A Yes.
Q He asked you, how deep did you dig in your investigation?
A Yes, sir.
Q He asked you, did you check with everyone?
A Yes. Well, he asked me -- yes, he did ask me if we

Q Okay. And when you --
A Just my recommendation.
Q And when you gave that recommendation, did Ms. Burris say that she disagreed with you at all?
A No.
Q Did she have the opportunity to do so?
A Yes. I'm assuming so. I mean, she was sitting there.

MR. STANEVICH: Your Honor, can we take maybe a five-minute break? It's --

JUDGE GIANNOPOULOS: Yes.

MR. STANEVICH: -- been about an hour and --

JUDGE GIANNOPOULOS: Yes. Let's take a five-minute break. Let's go off the record.

(Off the record at 11:08 a.m.)

JUDGE GIANNOPOULOS: Mr. Stanevich, cross -- continue your cross.

MR. STANEVICH: Your Honor, I have no further questions at this time.

Thank you, Mr. Rake.

JUDGE GIANNOPOULOS: All right. Before we go to redirect examination, I had a question I wanted to ask Mr. Rake about the --

THE WITNESS: Oh, shoot.

JUDGE GIANNOPOULOS: Is there something you forgot or do you need to go?

A '18. April of 2018.
Q Before working at Indian Island, what was your background?
A The prior nine-and-a-half years, contract security.
Q And where did you work contract security?
A I worked at the submarine base in Bangor and also the submarine base in Point Loma, San Diego.
Q Why did you stop working at Bangor?
A I just needed a change of pace. It's very busy over there.
Q Is Indian Island less busy than Bangor?
A Yes.
Q So tell me about the hierarchy in your workplace working for Xcel at Indian Island. Who supervises you?
A It would be the -- the lieutenants and the site manager.
Q Who's the site manager?
A Mike -- Michael Terry.
Q What shift do you normally work?
A My first year, I worked the day shift, and --
Q And the day shift is when to when?
A The day shift is 5:45 in the morning until 14:25 in the afternoon.
Q Okay. And now, what do you work?
A I work the swing shift.
Q And what's -- what are those hours?

A That is 13:45 in the afternoon until 22:15 at night.
Q And feel free to make use of the tissues there, if you need them.
A Okay. Thank you.
Q Do you carry weapons as a security guard at the -- at Indian Island?
A We do.
Q What weapons?
A A sidearm. It's a 9mm Beretta. And we also carry an M500 Mossberg shotgun. And we also carry a M4 rifle.
Q Where do you get these weapons?
A From our armory.
Q And who owns these weapons?
A The Navy.
Q Can you take these weapons home with you?
A No.
Q How do you go about getting them?
A Depending on what post you're on, specific posts have specific weapons, whether it be a shotgun or a rifle. For example, if I was the main gate cover guard, that would be Post 5. You have to have a shotgun. And so you have weapons cards. So when you go up to the armory, you turn in your yellow weapons cards for the specific weapon. And in exchange, they give you the weapon, the ammunition, and the -- it's a white card. And then in reverse when you turn it back in.

Q When did you first take the qualification test?
A For my in-hire, it was May 9th of 2018.
Q And when was that?
A At -- at Bangor.
Q Do you recall -- do you know if anyone else from Xcel took the shooting test that day?
A It was a very big group. I would say possibly 15 guards.
Q Were there any other new hires at that time?
A Yes. There was myself and Emily Coler.
Q How did you do on the test that day?
A I passed my pistol, I passed the shotgun, and I failed the rifle. I had never shot an M4 before. So I took two tries. You need a 140 score to qualify, to pass. On my second shoot, I ended up getting a 135. So I was still not good enough. And it was the end of the day, so I didn't have an opportunity to shoot again.
Q What did you understand were the consequences of failing your rifle?
A That I was not working.
Q That you were --
JUDGE GIANNOPOULOS: Say it again.
THE WITNESS: I was not -- I was not employed.
JUDGE GIANNOPOULOS: I see.
Q BY MS. MCCONNELL: Why did you believe that?
A Because of my -- the previous companies that I have worked

for, four other companies. If you don't fail -- if you don't pass your physical fitness test, you don't get a job. If -- and that's the first thing you do. So if you don't get past that, then you're out of work. So if you pass your physical fitness standard, then during the in-hire, the next qualification would be your weapons quals. And if you don't pass any of your weapons quals, then you're not working.

Q How did Emily Coler do on the weapons test that day, on May 9th, if you know?

A I know she passed her pistol. She didn't -- she failed on the shotgun and the rifle.

Q How do you know this?

A Because I consoled her. She was upset. She was crying. So -- and I saw her targets.

Q After you had failed the rifle qualification, what, if anything, did you do about it?

A That day?

Q Yes.

A There wasn't a whole lot I could do because the -- you only get -- once the people -- once the people running the range says your time's up, you got to get out. After we departed the building, I approached Lt. Powless, who is --

Q And Lt. Powless is -- what's his first name?

A Gerald. And I was concerned because I had just left one job to come over to work for Xcel. And my understanding was I

A I would say probably within two to three days.
Q Okay. And what happened then?
A I believe it was in our building, outside of the armory. And I approached him and -- because I was concerned. I wanted to get this done and get the other qualification. I believe that's when he said that he would take myself and Emily Coler -- initially that -- that particular conversation didn't -- he didn't say where we were going. I just assumed we were going to the range at Bangor. And he didn't give a specific date that they -- that conversation -- so it was still kind of up in the air. But he said, I'm going to get you guys qualified.
Q And did you get any more clarity after that about where he was going to take you?
A Yes. I want to say it was two or three days before. We had a conversation that I was -- myself and Emily Coler were to meet him at a U-Haul facility -- U-Haul facility. I'm not sure where it was. I'm not familiar with that area too much. We were going to meet there, and then we were going to ride with him to a gravel pit, slash, rock slab.
Q And you're speaking softly. So I just want to make sure I heard that. Gravel pit or rock slab, you said?
A Yes.
Q Okay. And did he say when this was going to be?
A It was the 27th or 28th of May, I believe.

Q And was anyone else present when you had this conversation with him?

A No.

JUDGE GIANNOPOULOS: So the conversation was the 27th or 28th of May, or you were going to go out to the gravel pit slash rock slab that -- on the 27th or the 28th?

THE WITNESS: Correct. The 27th or 28th was going to be the shoot -- the qualification.

JUDGE GIANNOPOULOS: The shoot. Okay.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. Go ahead, General Counsel.

Q BY MS. MCCONNELL: Now, what did he say about what you were going to do at the gravel pit or rock slab?

A That we were going to qualify.

Q He didn't say practice?

A No.

Q Now, did you -- what was your reaction to hearing these remarks from Mr. Powless?

A Pretty odd.

Q What seemed odd about it to you?

A In my ten previous years working for other companies, I never heard or seen anybody go outside an official Navy range to qualify.

Q Did -- since you reacted that this -- you thought this was

odd, did you discuss -- these conversations with Powless, did you discuss them with anybody else?

A I did not have any further discussion with Lt. Powless.

Q Okay. Did -- but did you talk to anybody else about weapons qualification?

A Yes.

Q Who?

A I spoke to Mark Salopek and Steve Mullen.

Q And do you recall if you talked to anybody else?

A I believe I spoke to Steve Ridgeway (phonetic) and James Shaver (phonetic) and Jake Schryver.

Q Now, do -- did you speak to all these people, all together?

A No. Different -- different times.

Q And who are these people?

A They're all co-workers.

Q Why did you speak to them?

A I didn't really know any of them because I was new. I felt a connection with them.

Q With whom? With whom?

A With some of my co-workers. Like I said, I was new, so we're trying to get to know each other. And specifically Mark Salopek. It just seemed like we had a good connection right off the bat. And we became friends.

Q Now, where did you have these conversations about weapons

qualifications?

A On post.

Q Is that what -- the case with all the people you've mentioned?

A Yes.

Q All these conversations happened on post? Okay.

Now, can you recall any particular conversations about weapons qualifications with fellow guards?

A Just asking the question, inquiring is this something that normally goes on around here?

Q Who did you ask that of?

A Mark and Steve.

Q And that's Steve Mullen and Mark --

A Steve Mullen.

Q Mark Salopek and Steve --

A Correct.

Q -- Mullen? Okay. And do you remember when this conversation that you -- you're recalling happened?

A Not an exact date, no.

Q So where was it -- so you had the qualification range at Bangor on May 9th?

A Yes.

Q Where in relation to May 9th was this conversation that you're recalling?

A I would say a week-and-a-half later.

Q And did this -- where did this conversation take place?
A All our -- all of our conversation, we're normally standing post or in crossing at the building.
Q And what can you recall about what was said during this conversation?
A I brought it up to Mark, and I thought it was odd.
Q Brought what up to Mark?
A The -- the -- the gravel pit shoot. And when I brought it to him, he was very angry in his response.
Q Angry about what?
A I'm trying to -- I believe he was like, you're doing what? In that -- that manner. And that's when we started talking about -- and he was sharing information to me about the practices that had been going on prior to me getting hired. And I was not aware of that because I was a new hire.
Q And what did he share with you about what had been going on?
A That he had on numerous occasions spoke to Mike Terry to stop these practices.
Q Which practices?
A Taking people to unauthorized sites that weren't authorized by the Navy to qualify personnel.
Q And did you -- as a result of these conversations did come to any conclusions?
A Yes.

Q What was that?

A I had made up my mind that I was not going to the gravel pit to qualify. I was going to wait for the next official range.

Q Did you ever hear anything again about shooting at a gravel pit?

A Not at a gravel pit, no.

Q Okay. At a rock slab?

A No.

Q Okay. Shooting where?

A I had heard that there was a qualification done on one of our guard's properties.

Q Which guard's property?

A Evan Schroder.

Q How did you hear about this?

A From Mark and Steve.

JUDGE GIANNOPOULOS: Have you ever been to Mr. Schroder's house?

THE WITNESS: I have not.

JUDGE GIANNOPOULOS: Okay. All right.

Q BY MS. MCCONNELL: Did you hear again from Mr. Powless about the -- about a -- how you were going to qualify? Or I'm sorry. Actually, I withdraw that question. Let me just rephrase this.

Did you hear anything more -- did you -- from -- did you

you've been recounting with Mark Salopek, did you -- when did you, if at all, did you next hear about taking another test for qualifying on the weapon?

A Not until there was an email. And at this time, I didn't have an email account.

Q Actually, I want to -- I want to back up here. Did you speak again to Mr. Powless about this -- about the arrangements he was making?

A Yes.

Q Okay. When did you think that conversation occurred?

A It was the day of -- I was supposed to meet him and Emily Coler at a U-Haul place. I don't know where it was at. I was on post at the vehicle inspection post. I called him on the telephone. I told him I was coming off a 12-hour shift, from 2 in the morning until 2 in the afternoon, and I was not comfortable with going out to this gravel pit. He didn't object.

Q Now, I think you had testified that you -- this gravel pit range was -- you thought this was scheduled late May, May 27th; is that -- did I hear you correctly?

A I want to say 27, 28, May.

Q Okay. Now, do you recall if anything further was said other than -- you testified that you said that you're not going. And what, if anything else, was -- further was said? Can you recall? Did you say anything further?

Q Gerald Powless was?
A Yes. Just for curiosity, I asked him, I said, how did Emily do? And he said, she passed.
Q And when you said "Emily," Emily who?
A Emily Coler.
Q Okay. He said she passed?
A Yes. And I said, how did she do on the rifle? And he responded, she got a 141. Which is one point over passing.
Q And what was your reaction to hearing this?
A I just walked away. Just gathered the information.
Q Reaction in your own head. What did you think?
A There's no way she passed. No way.
Q When, if at all, did you encounter Emily Coler after this?
A I believe it was the next -- the next day, the next workday.
Q Okay. And then do you recall -- so this -- was this still in May?
A Yes. It was I believe the last day in May.
Q Okay. And where did you encounter her?
A Outside of the building, 848.
Q Okay. And what did you see? What was she doing?
A She was loading her bag into one of the patrol trucks.
Q Was anyone else with her when you saw her?
A No.

Q Okay. And did you -- so did you speak with -- did you speak with her?

A Just in passing. She has parked here in the parking lot, and my car was over here. So as I was walking by, I said, hey, I heard you passed your quals. And she was happy about it. And she said, yeah, this is my first south patrol post.

JUDGE GIANNOPOULOS: And when was this?

THE WITNESS: Probably the day after or two days after they shot -- they shot out at --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- the gravel pit.

JUDGE GIANNOPOULOS: But as far as like months, the year. Is this 2018?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: And when?

THE WITNESS: The end of May.

JUDGE GIANNOPOULOS: End of May. Okay.

Q BY MS. MCCONNELL: What weapons does the south patrol require?

A Back then? They've changed it since. But back then, everybody has to have their pistol, and the south patrol and the north patrol trucks, you carry a shotgun.

Q And when you carry the shotgun, where is the shotgun while you're in the truck?

A It's in the back seat on the floor.

Q Now, after this -- after you'd had this conversation with Emily Coler, did you have any other reason to believe that Emily Coler was working a post with the shotgun?
A Yes.
Q And why did you -- what were those reasons?
A The schedule. Our work schedule.
Q Okay. And how do you see the schedule?
A It's in our -- in our guard mount room where we do our briefing.
Q Okay. And the schedule is a piece of paper?
A It is. It's a matrix, a bunch of different -- the numbers pertain to what post you're standing.
Q So it has names and the number of the post?
A Yes. And what shift.
Q Okay. Did you eventually retake the weapons qualification test?
A I did.
Q When was that?
A June 20th.
Q And where did you take it?
A At the range at Bangor.
Q Okay. And was this -- this was your -- was this your first opportunity to take the test again at Bangor?
A There was an email that came out for the range at Bangor for June 13th. Okay?

A No.

Q Okay. And did you have any conversations with any of your co-workers -- because you'd mentioned you'd had some conversations with co-workers about weapons; any conversations you recall about weapons, at that point, at work?

A No.

Q Okay. Did you talk to anybody about why Emily Coler was on that list again?

A On the -- on the range list?

Q Right.

A Just conversation with Mark and Steve.

Q About what?

A Why she was listed to go to the range, when she was already qualified.

Q Okay. What can you recall about this conversation?

A Just thought it was odd. It was, like, if the end of May 27-28 gravel pit was authorized and she qualified on her shotgun and rifle, why would she be on two different emails to go to the range to requalify again? And she's already working those posts on the schedule? It made no sense.

Q And did you come to any conclusions after talking about this?

A Yes.

Q What were those?

A That something was not right and we had talked about how

to get -- get these practices stopped.

Q Who is "we"?

A Myself, Mark Salopek, Steve Mullen, Jake Schryver.

Q And did you do anything to get the practices stopped?

A We talked amongst ourselves. I don't think anybody knew specifically which avenue to take, how to get this resolved without -- you know, the biggest thing was, it's unsafe. Can't have people armed up that are not qualified and are scared of the weapons. So it's not only the safety for Emily Coler, it's the safety of all the guards, the safety of anybody working on that base. You can't handle the weapon safely and you can't shoot the weapon safely, you should probably get another job.

Q So you decided this was unsafe. Did you do anything about this concern that this was unsafe?

A We did. We had talked to -- t wasn't anything solid -- about talking to the commanding officer of the base.

Q So you said this wasn't anything solid; did you go talk to the commanding officer?

A We did.

Q Who is "we"?

A Myself, Mark Salopek, and Steve Mullen.

Q When?

A it was, I believe, July 8th.

Q 2018?

after encountering Mr. Mullen and Mr. Salopek?

A We went up to the building and the door was locked, so the commanding officer had to come from his office to open -- open up the building door to let us in.

Q How did he know you were out there?

JUDGE GIANNOPOULOS: Rang the doorbell?

THE WITNESS: No.

JUDGE GIANNOPOULOS: Okay. Sorry.

THE WITNESS: Where his office is, if we're standing on the ground, it's just up one level. Always has the windows open, so we yelled up there and he came down.

Q BY MS. MCCONNELL: Okay. And what happened next after he came down?

A He invited us up to his office and we all sat down. And he was wondering what we -- what we were doing there. And it was kind of quiet because nobody knew how to start. So Mark did most of the talking -- Salopek. And Mark had always told me, because he was privy to sitting in on "weekly commanders meetings" they called it. I'd never been part of one, but that's where the commanding officer and other folks from Xcel, the Navy, get together and probably talk about the security stuff.

Q And who gets to be in there? I mean, you mentioned that the management and the commanding officer was there.

A Right.

Q But who, of the guards, gets to be there?
A Well, Mark was privy to these meetings at certain --
Q That's all you know?
A Yeah.
Q Okay.
A And he had always told me the commanding officer -- always put out at the meetings, if anybody has any issues, serious issues, I have an open door policy. Come and tell me. Come and talk to me.

JUDGE GIANNOPOULOS: All right. But I think the question -- the question was, what was said -- what the commanding said, and we've now --

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: -- drifted far afield. So why don't you re-ask the question, General Counsel.

And then listen to the question and try to give a direct answer.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: And if there's stuff that the government attorney wants to get out, she'll get it out for me. She's a good lawyer. So listen to the question.

Go ahead.

Q BY MS. MCCONNELL: Well, you said Mark Salopek did most of the talking; what did Mark Salopek say?
A Yes. He had said that we have a big safety issue. And he

was trying to get direction on how to go about fixing it.

Q Did Mark Salopek say what the safety issue was?

A No.

Q And so what was said next?

A The commanding officer stated that if we came out and told him directly, he would have to be -- he would have to -- he -- he was obligated to report it to his superiors, and he would have to name names. He was guessing, and he -- he told us, don't tell me, or I'm going to be obligated to go in this direction with it. So he was guessing. Okay, what is it guys? What -- what the hell's going on here? Are you having safety issues with your gear? Are you having safety issues with this? No, no, no.

Q How long did this guessing game go on?

A Five minutes.

Q And how did it end?

A He got frustrated, the CO, and hit his hand on his desk and said, guys, just tell me what's going on.

Q And what happened next after he said that?

A That's when Mark told him, he said, we've had unauthorized weapon shoots. We have people that are not qualified that are standing post. And we have a public park across the street, which is a big concern. That's how -- that was basically the gist of it. And Mark, that was pretty much it, he just came out and told him.

Q And did the commanding officer respond?
A He thought -- he had to sit back and think about what we -- he just heard. He did ask, did we report this to the chain of command? We all said yes. I'm trying to think what else was said.
Q Did he say anything about what you should do next?
A Yes. After we all said yes that the chain of command was aware of this, he said, have you talked to Mike Jones, who at the time was the installation security officer, the person between Mike Terry and the commanding officer, as far as our security chain of command. One of us had spoke to Mike Jones.
JUDGE GIANNOPOULOS: And Mike Jones is an employee of the Navy? He doesn't work for Xcel?
THE WITNESS: Correct.
JUDGE GIANNOPOULOS: Okay.
THE WITNESS: We all responded no, that we had not talked to Mike Jones about what was going on. So the commanding officer directed us. He said, whatever information you guys have, to send a memo to Mike Jones, like, ASAP. So that's what happened.
Q BY MS. MCCONNELL: Did he give you any further direction, if you recall, about what needed to happen?
A Mark had mentioned the possibility of going the IG route. He wanted -- because that's what Mark said. We -- none of us had ever been in this situation, so we were inquiring about the

whistleblower program. And he said, you guys were all protected under the whistleblower program. So that was it. We left his office.

Q About how long did this conversation last?

A I would say ten minutes, 15 minutes tops. It seemed a lot longer because it was kind of tense.

Q And you mentioned that Stephen Mullen was on duty at that time, right?

A Yes.

Q Did he get somebody to take over his post?

A No.

Q And why not, if you know?

A I don't know.

Q Okay.

A I know building 69 is one of the buildings he checks on his patrol route.

Q So he was still within his patrol route; is that right?

A Yes.

Q Okay. All right. After you left the commanding officer's office, did anybody contact Mr. Jones -- Mike Jones?

A I believe Stephen Mullen sent him a memo.

Q Okay. I'm going to show you Respondent's 1 if I can find it. Let's see. I'm having a hard time putting my finger on that one. Give me just a moment.

JUDGE GIANNOPOULOS: It might already be up here --

Jones --
Q Okay.
A -- from Steve.
Q Did anyone from the Navy contact you about the complaints that you had raised?
A Yes. Mr. Rake and Mr. Steve Manson -- Richard Rake and Steve Manson.
Q Okay. Do you remember when that was?
A July 10th.
Q Okay.
A It was July 10th.
Q And what happened on July 10th?
A I was told I needed to do a interview and a statement with Mr. Rake and Mr. Manson.
Q Okay. And so were you interviewed by them?
A I was.
Q Okay. And did you provide a statement?
A I did.
Q In writing?
A Yes.
Q Okay. Let me just see here. I'm showing you a document that's been marked Respondent's 2. And I'm going to see if I can get my hands on your statement.
JUDGE GIANNOPOULOS: Page 16.
Q BY MS. MCCONNELL: Do you recognize this document?

then go home --

A Right.

Q -- but that's not what happened today --

A No.

Q -- that day?

A Well, I assumed I was getting fired also, so that was my mindset. It was kind of odd. I walked in the building. I believe I crossed paths with Mr. Filibeck and some of the other folks that came to the island.

Q Did you recognize Mr. Filibeck?

A I had never met him before, no.

Q So you didn't know it was Mr. Filibeck?

A Other than when he drove in that -- that morning. I saw him in the vehicle. So that was my only recognition --

Q And you had --

A -- for the first time.

Q -- the list? You had the access list, right?

A Right.

Q Okay. All right. So you walk in and you see this person that you had just seen earlier coming onto base. You saw him when you went into building 848; is that right?

A Correct.

Q Okay. So then what happened after you walk in?

A I turned in my weapon. I was trying to get a hold of Ms. Amber Anglin, who at that -- on that day, was our Union

representative for the guards. She walked away from me, which I thought was odd. I didn't see Mike Terry. I assumed if I was getting fired, I was going to get called in Mike's office with the bosses. I believe the bosses were leaving the building. I did not see Mike Terry.

Somebody at the armory, I can't remember the attendant's name, he said, Lt. Powless needs to speak to you. I said, okay. I looked to my left which is where the locker room is, and I saw Lt. Powless standing there. I said, do you need to speak to me? And he went inside the locker room, so I followed him in there. I said, I heard you needed to talk to me. He said, well, let's go talk in Mike's office. I said, okay. So we went in Mike's office.

And before he even said anything, I said, am I fired? Because now I'm pissed off. I said, am I fired? Because I'm not going to sit here and have a conversation with you if you're going to fire me. So he --

Q Did he respond?

A -- didn't come out and say yes or no, right off the bat. He just said, well, they were going to fire you but they decided, since it was your first time jumping the chain of command, that they would give you a second chance.

Q What if anything else was said further, during this conversation? And I just want to be clear; you're in Mike Terry's office, and who's present while you're having this

conversation?

A Just myself and Lt. Powless.

Q Oh, okay. So this is a conversation, Lt. Powless and Cpt. Terry?

A No.

Q No, this is Powless?

A Just myself and -- and Lt. Powless.

Q Oh, okay.

A Mike Terry was gone.

Q Okay.

A I don't know where he went.

Q So Powless tells you that because this is the first time you jumped the chain of command, they weren't going to fire you?

A Correct.

Q Okay. And what if anything else did Powless say?

A He said that we really hadn't -- since all this went down back in July, going to the commanding officer and reporting the violations, we hadn't had a chance to talk. So I thought we were going to have a man-to-man conversation. No apologies for putting me in that position, nothing. He responded that he was ticked off at me for not letting him know that he was doing something wrong. I -- I couldn't believe it. That's all he had to say.

Q Did you say anything?

A I can't recall what I said. I think -- I know we had a little bit of conversation, and that was it. And I left.

Q You had mentioned that you had spoken to Mr. Terry about -- you had spoken to the Union about your pay --

A Correct.

Q -- and to Mr. Terry; and did you ever have any further concerns about your rate of pay -- or I'm sorry -- about your pay? Did any issues with what you were getting paid come up at work after this?

A Yes.

Q What issue was that?

A The arm-up and download time for our weapons.

Q And tell me, what is arm-up and arm-down (sic) time?

A You have 15 minutes on each side of your scheduled shift to get your briefing, get your weapons, and -- in a safe manner, arm up your -- with your weapons, and go to post.

Q So arming up is getting your weapon checked out to you?

A Correct.

Q Okay.

A So you get your weapons, you go -- there's a clearing barrel -- it's called a clearing barrel.

Q I don't think we need to know the whole steps.

A Okay.

Q I think that --

A So you go load up your weapons, you get in the vehicle,

you go to post, and you do the same in reverse when you come back. If there's any turnover, whoever's relieving you, you pass on to your relief, hey, this is what's going on today. Anything -- what's going in the base, operations, blah, blah, blah. You get in the vehicle, you go back to the building. You go to the clearing barrel, you download your weapons in a safe manner. You take them to the armory. You turn them in.

JUDGE GIANNOPOULOS: Meaning, you take the ammunition out and make sure it's clear?

THE WITNESS: Correct.

JUDGE GIANNOPOULOS: Okay. All right. Go ahead.

THE WITNESS: And so that's it. You get your -- you change cards, you go home.

Q BY MS. MCCONNELL: And you're paid during these times when you're checking out your weapons and checking your weapons back in and clearing them of ammunition?

A Yes.

Q And what caused you to be concerned about arm-up and arm-down time?

A On one occasion, the first occasion, I was off a particular night. They called me up the night before. They said, hey, we need somebody to work a four-hour shift. I said, yes. I always volunteer. I always say yes. I come in.

Q I want to stop you. Do you know what day it was that you came in for this four-hour shift?

A I know it was around the holidays, so around Decem- -- it was in December.
Q Okay. Around Decem- -- you're saying, holiday, meaning Christmas?
A Yes.
Q Okay. So around Christmas?
A I believe so.
Q Okay.
A Okay. So not matter which shift --
Q And I'm sorry. Christmas of 2018?
A '18.
Q Okay.
A Correct. No matter what shift you stand, you're going to get paid for arming up and arming down. There is no -- and according to our CBA, it does not specify whether you work two hours, four hours, six hours, 20 hours, you are getting paid for both sides, to arm up and disarm.
Q And how much time are you paid for the arming up and arming --
A It's 15 minutes on each side, so it's a total of 30 minutes.
Q Okay. So what happened on this day around Christmas 2018?
A So I came in for a four-hour shift. Armed up, and on my time sheet -- my paper time sheet, I put four-and-a-half hours, 4.50. While -- I'm assuming, while I was on post, the shift

lieutenant --

MR. STANEVICH: Objection. The witness is speculating.

JUDGE GIANNOPOULOS: He didn't speculate. So just tell us what happened, so --

THE WITNESS: Okay. So after I got off -- did my four hours, I checked my time sheet, and somebody had whited it out. I took it to --

Q BY MS. MCCONNELL: And I just want to see what you saw; you saw that the sheet that you had filled out earlier looked different?

A Yes.

Q It had white-out on it?

A It had white-out, and it had 4.25 written on it instead of the 4.50.

JUDGE GIANNOPOULOS: So you're a half hour -- or a quarter hour short?

THE WITNESS: Correct.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Okay?

Q BY MS. MCCONNELL: And who's in charge of the time sheets?

A Mike Terry.

Q Okay. But do the --

A Now, the shift --

Q -- lieutenants do --

A All the shift lieutenants, they touch the time sheets.

A I believe the next morning I had an opportunity to take my time sheet and present it to Mike Terry to get clarification on it.

Q Where did you present it to him?

A In Mike's office.

Q And what time of day was this?

JUDGE GIANNOPOULOS: You said, the next morning, so --

THE WITNESS: I'm not sure exact time, but in the morning.

Q BY MS. MCCONNELL: Okay.

A So I took the time sheet in to Mike. Explained to him what happened.

Q Was anyone else present?

A No. Just myself and Mike.

Q And the way I read his --

JUDGE GIANNOPOULOS: Body language?

THE WITNESS: -- body language, go ahead and put forth 4.50. Basically, I felt like he was appeasing me, like, get out of my office now. Just put your four-and-a-half and get out.

Q BY MS. MCCONNELL: But before that happened, was anything said?

A No. I mean, I explained to him that -- I said, I don't appreciate the -- Lt. Lont whiting out my time sheet. If he has an issue with it, come to talk to me. We can discuss it, not do it and then don't -- don't have any discussion about

it.

Q And so you said that; did Mr. Terry say anything to you in response?

A No.

Q Okay.

A I think it -- there's just my feelings; Mike didn't want to have anything to do with me after that -- after we went to the commanding officer. He didn't want to have nothing to do with me.

Q Okay. And what gave you that idea?

A Never spoke to me again, pretty much.

Q And had he --

A I mean, it was --

Q -- spoken to you before?

A More friendly, yes.

Q All right. So did -- the issue of arm-up time, arm-down time, did that ever come up for you again at work?

A It did.

Q When was that?

A A few days -- within the same week, because I did another four-hour shift

Q Okay. So you're saying that the first incident was sometime around Christmas, and so then a week later would've been getting into January of 2019?

A Yes.

Q Okay. You worked another four-hour shift?

A I did.

Q What happened that day?

A I arrived at work at 1:30 in the morning. The shift was from 2 in the morning until 6 in the morning. There was myself and another guard.

Q Who was the other guard?

A Grady Johnson. So we were both doing four-hour shifts. We were there at 1:30. At 1:45, we approached the cage. We call it "the cage," the armory. Lt. Lux is the shift lieutenant. At quarter 'til, he wouldn't let us arm up. He said, you guys have to wait until 2:00.

Q Was anything further said?

A Yeah. I told him he was wrong. I said, I just had this discussion with Mike Terry last week about this 4.25 -- or, you know, the .25. I said, everybody -- it's in the CBA, everybody gets 30 minutes. He wouldn't let us arm up until 2:00 in the morning, which caused a ripple effect to relieve the guards on post late.

Q A ripple effect of what sort?

A Well, you arm up, you're at the post at the top of the hour, not at --

Q Okay, and you armed up at quarter to, and then that gives you enough time to get there at the -- on the hour?

A Correct.

A Yes. The next day, I came into work, working a day shift. And where we normally have our briefing and guard mount time which is in the guard mount room, it was myself and one other guard sitting in there. Nobody else was in there.
Q Who -- what was the other -- who was the other guard?
A I believe it was Eric Gee.
Q Okay. And that's an unusual name. Is that G-E-E?
A G-E-E.
Q Okay.
A G, double E. So we're sitting there. We're waiting for the lieutenant and the rest of the guards to come in so we could get our brief. Lt. Powless showed up, and he said, hey, we're having the -- we're having guard mount in the lieutenant's office. So me and Gee looked at each other, like, this is weird. We don't have guard mount in the lieutenant's office.

So we worked across the building to the lieutenant's office and everybody's in there. And half of the night shift guards are in there, which, the guards are not in -- if I'm a day shifter, I'm not in somebody else's briefing, as a day shifter, if -- if it was a swing shift or a night shift. So there's half of the night shift guards. The night shift lieutenant is in there.

As soon as I walked in, I knew something was wrong. All

eyes were on me, so I was standing there, and the only thing that was put out at guard mount was, hey, somebody complained about the arm-up time, and Mike Terry -- I spoke to Mike Terry, and he said, nobody's going home early anymore.

Q Who said this?

A Gerald Powless. Nothing was put out on base operations, nothing for your normal briefing.

Q When you say nobody gets to -- did you say, go home early?

A Correct.

Q What does that mean?

A When you get relieved from post, by the time you drive back, turn in your weapons, there could be five, seven minutes left on the clock possibly. It's up to the lieutenant -- the shift lieutenant to say, hey, I'm going to use these seven minutes and, you know, put you to doing something -- doing some kind of work. Or he can say, go ahead and go home. So it's at their discretion.

Q So after you heard this briefing from Powless, what did you do next?

A I was pissed, because this -- I knew exactly where it came from, and did -- had no opportunity to sit down with Mike Terry. All I wanted -- it was, like, can we get some clarification on this so every time I do a four-hour shift, I'm not dealing with this stuff? I wasn't given that opportunity.

A It was before I got off shift. My -- my email -- the government email needed to be reset, so in order for me to do that, I had to go up to the building. And I sat next to Lt. Powless, and we got the email fixed. And I told him, I said, these guys on post have been harassing me all day. Didn't get a whole lot of response from him. And before I went back to post, he had told me, you know, if you have any issues or concerns, you know, maybe next time you should bring them up to your peers. And that was it. There was no -- nobody took action.

Q Was there anything said or done about this ban on going home early? Did that get -- anything said about that?

A Right before I left, Mr. Powless, he had got -- I don't know if he got a phone call or how he got the communication, but he told me that Mike Terry said that nobody has to stay late anymore. So basically, it was back to normal operations. But no apology for harassment or anything like that. No action was taken on the guards for harassment, in fact.

Q Now, I'm sorry. There was something I forgot to ask you about, and I'm sorry to do this out of order, but I want to take you back to right around the time that you had gone to the commanding officer, right? And then July 9th, Mr. Mullen sends the email to Mike Jones, right?

A Yes.

Q So kind of going back in time now. Did you work -- let's

see, so he's -- Mullen sent the email on the 9th. Do you recall if you worked the 10th -- July 10th?

A I did.

Q Okay. And did you hear from anyone about the complaints the three of you were making at work that day?

A Yes. From -- from Mike --

Q Who did you --

A From Mike --

Q Okay.

A -- Terry.

Q Okay, so how did you first hear from Mr. Terry?

A I was on post at the vehicle inspection post.

Q And approximately what time of day would this have been?

A It was the day shift. And I'm not sure if I was working a 12-hour shift or it was just an eight-hour shift. It was at the vehicle inspection post, and I was the cover guard, I believe, Post 9.

Q And how did you hear from Mr. Terry?

A I received a phone call via the landline phone. I answered the phone. It was Mike Terry, very angry by his tone of voice. He said, did you go talk to the commanding officer? I said, yes, I did. He said, who did you go with? I said, I went with Mark Salopek and Steve Mullen. He said, I'm pulling you off the post and I'm pulling you off the contract, and you made a big mistake. And he hung up the phone. And that was

until I got up to his office. So I assumed I was getting fired.

Q Did you have any further conversations with supervisors that same day after you had -- Terry had called you on the phone?

A While I was on post?

Q While you were at work.

A While I was at -- when I -- when I finished my shift, I went into Mike's office. And Mr. John Morgan was on speaker phone.

Q Okay. And how did you know John Morgan was on speaker phone?

A Mark had told me.

Q Okay. So what happened in the office? And was anyone -- so you're present there, physically; Mike Terry is physically present?

A Correct.

Q And then you understand that Morgan is on the speaker phone?

A Yes.

Q Anybody else there?

A Nobody else in the room.

Q Okay. So what happened?

A Mike had told me that Mr. John Morgan would like to ask me some questions. Said, okay. So we started a conversation.

The gist of it, he was mad because we -- the biggest thing was I broke the chain of command. That's what he said.

Q By doing what?

A By reporting illegal weapons violations to the commanding officer. We talked about chain of command, me being retired Navy. He asked that question.

Q What was the question?

A He said, I know you're a retired Navy chief. He said, how would you feel if somebody bypassed you in the chain of command? I said, if they had a problem with me, they don't have to come and talk to me. The chain of command was designed a certain way. And I always told my sailors, I said, hey, if you have a problem with me, yeah, I would like the courtesy to say, hey, you know, what's going on, chief? But you don't have to talk to me. You can go talk to the senior chief or the mast chief.

So I didn't think I -- and when I opted out of the -- the weapons shoot at the gravel pit, Lt. Powless is my chain of command. I already told him I didn't feel comfortable going. So I -- I didn't -- I didn't feel I jumped the chain of command.

Q Anything further you recall in this conversation?

A He had said that the names that were listed on the memo, people could possibly lose their job. He asked me if I had qualified on my rifle. I said, yes. He asked me if I'd gone

A I was.

Q Now, a few days later Mr. Powless announced that officers would no longer be able to go home early?

A Correct.

Q Okay. and you were there at that meeting?

A I was.

Q And he didn't identify you by name in that meeting, did he?

A He did not.

Q And then the next day you spoke to Mr. Terry about this situation?

A That same day.

Q That same day. And Mr. Terry's immediate reaction is, the guards should be mad at him and not you, correct?

A Correct.

Q Okay. And then later that day, Mr. Terry rescinded whatever order had existed about guards not being able to go home early, right?

A Correct.

Q So this change in practice or policy, at most it was in place for one day?

A One shift.

Q One shift. And the -- how long is a shift, four hours, eight hours, 12 hours?

A It depends. A normal shift is eight hours.

A Yes, sir.

Q And Dan was a pretty new employee with the company?

A Yes, sir. He was.

Q I believe he just started, like, April 2018; does that sound right?

A Yeah. That sounds correct.

Q And your testimony on direct examination was that you heard Mr. Morgan on the phone, stating that Lein would be easy to get rid of because he's a probationary employee; did I summarize that correctly?

MS. MCCONNELL: Objection, Your Honor. I think that somewhat mischaracterizes the testimony.

JUDGE GIANNOPOULOS: All right. Well, it is cross.

MR. STANEVICH: I'm just asking if I --

JUDGE GIANNOPOULOS: It is --

MR. STANEVICH: -- summarized it correct -- sorry, if I --

JUDGE GIANNOPOULOS: It is cross-examination, so overruled.

THE WITNESS: Could you repeat --

Q BY MR. STANEVICH: Sure.

A -- the question, please?

Q I believe it was your -- let me know if I summarize this correctly. It was your testimony that you heard Mr. Morgan on the phone saying that it'd be easy to get rid of you because you're -- I'm sorry -- Mr. Lein, because he's a probationary

employee?
A Yes, sir.
Q Okay. And did you hear him say Daniel Lein's name?
A I did not.
JUDGE GIANNOPOULOS: Okay. Well, what did you hear?
THE WITNESS: I heard him talking about the three officers that went to the CO's office, and the one officer would be easy to get rid of because he was on probation.
JUDGE GIANNOPOULOS: Okay. All right.
Q BY MR. STANEVICH: And you're familiar with the CBA?
A Somewhat, yes.
Q Okay. And do you know if there's a probationary period set forth in the collective bargaining agreement?
A Yes. There is.
Q Okay. And that's a 180 days, right
A Six months, I believe, yes.
Q Okay. So you would agree that as of July 9th, 2018, Mr. Lean was still in his probationary period?
A Yes, sir.
Q And are you aware that the contract says that there's no recourse to the arbitration procedure for discharge and discipline for a probationary employee?
A Yes, sir.
Q Now, during your employment with the company, was Mr. Lein disciplined at all by the company?

A Yes, sir. As I said, it's been over a year.
Q Did you ask him, what lies are you referring to, to Tom?
A No, sir. I didn't.
Q And I assume you'd agree that you did not write any lies about his range qualifications?
A No, sir. I didn't write --
Q Okay.
A -- any lies.
Q But I think we've had some discussion that there may have been some mistakes in your email, concerning Mr. Cunningham's qualifications, correct?
A Yes. There's mistakes on the dates.
Q Okay. I just want to show you Respondent's Exhibit 1. The mistake that you're referring to is at the bottom of the page, right?
A I believe so. Yes, sir.
Q And here it says on May 9th, Ofcs. Lauritzen, Cunningham, and David could not pass their rifle qualification, right?
A Yes, sir.
Q Okay. Any other mistakes in this document that you've spotted?
A Not that I can recall.
Q Now, I believe it was your testimony that that May 9th date should've actually been a date back in February; is that accurate?

knowledge, do you know when this happened?

A I -- well, I've seen it several times, you know, in the qualifications when I've been at range with them.

Q And when you filed your complaint on July 9th, did you believe that either Ofc. Lauritzen, Cunningham, or David were not qualified on the rifle at that time?

A They qualified, but as an --

JUDGE GIANNOPOULOS: What did you believe? The document he just showed you, there's nothing in there that proves it's true. I don't believe it's true. There is no evidence in front of me that's it true. What did you think had happened?

THE WITNESS: I -- I believed that they qualified on altered targets.

JUDGE GIANNOPOULOS: Okay. All right.

Q BY MR. STANEVICH: Well, your report doesn't mention altered targets. It says, cannot pass their rifle qualification. So when you filed this on July 9th, what information did you have to support this allegation?

JUDGE GIANNOPOULOS: And were you going to say --

MS. MCCONNELL: I'm going to object --

JUDGE GIANNOPOULOS: -- something, objection?

MS. MCCONNELL: -- that it mischaracterizes the document.

JUDGE GIANNOPOULOS: All right. Well, I mean, you know, let's show him the document. I don't remember exactly what -- I mean, we've been back and forth on R-1, but basically, the

question is valid.

Meaning, what did you rely on for your statement that they did not qualify?

THE WITNESS: On -- I relied on my memory, sir --

JUDGE GIANNOPOULOS: All right.

THE WITNESS: -- and the fact that I had seen altered targets.

Q BY MR. STANEVICH: So going back to my question. As of July 9th, did you believe that any of these three officers were qualified to hold a rifle post?

A My personal opinion is, no, sir.

Q You believe that they were not qualified as of July 9th?

A They were not qualified, in my mind, because of the altered targets.

Q And in your mind, is there a difference between altered targets and someone not passing their rifle qualification?

A Yes, sir.

Q What's the difference?

A If you are -- get or receive a passing score on an altered target, that is not a qualification.

Q So just to be clear, as of July 9th, you believe that these three officers did not hold proper qualifications?

A Yes, sir.

JUDGE GIANNOPOULOS: All right. and let me ask the witness to step out for a second. Sorry, just -- I want you to

honestly, when I saw this, Respondent's 48, I thought it came in January 2019 of 2019, and to -- I thought, well, that's kind of strange.

THE WITNESS: That would've been July 10th, the date that happened.

JUDGE GIANNOPOULOS: Okay.

Q BY MS. MCCONNELL: You --

A No. Yes, July 10th.

JUDGE GIANNOPOULOS: All right.

MS. MCCONNELL: Okay.

JUDGE GIANNOPOULOS: Thank you.

Q BY MS. MCCONNELL: You had mentioned going to range. So you have to go -- you've gone to range like every six months -- you've gone to do qualifications every six months while -- for the whole time you worked for Xcel, right?

A Yes.

Q Okay. And so how many times would you therefore have gone to range yourself, just like, ballpark?

A Fourteen times.

Q And then -- and you mentioned -- so we've talked about going to range with -- let's start with Mr. Lauritzen; can you guesstimate how many times you went to range with Mr. Lauritzen?

A Seven, eight --

Q And similarly --

A -- ten times, yeah.

Q -- with Mr. Cunningham?

A Yes, ma'am.

Q How -- ballpark --

A But --

Q -- estimate of --

A About -- about the same. Most of the time we were on the same -- excuse me -- the same rotation.

Q So it could've been up to 14, but somewhere around in there?

A Yes.

Q Okay. And then how about Mr. David?

A I believe we were all on the same rotation.

MS. MCCONNELL: That's the only questions I had.

JUDGE GIANNOPOULOS: All right. From the Union, any --

MR. OLSZEWSKI: No.

JUDGE GIANNOPOULOS: Any recross?

**RECROSS-EXAMINATION**

Q BY MR. STANEVICH: How many times did you go to the range with Mr. Cunningham in 2018?

A I believe once.

Q Do you recall approximately when that was?

A No. I don't.

Q How many times did you go to the range with Mr. Lauritzen in 2018?

**PROCEEDINGS**

JUDGE GIANNOPOULOS: All right. Good morning, everyone. We're back on the record in Xcel Protective Services.

Mr. Harger is back on the witness stand.

Whereupon,

**SCOTT HARGER**

having been previously sworn, was called as a witness herein and was examined and testified as follows:

JUDGE GIANNOPOULOS: Go ahead, General Counsel.

**DIRECT EXAMINATION (CONTINUED)**

Q BY MS. MCCONNELL: Mr. Harger, I am showing you a document marked GC Exhibit 3 -- I'm sorry -- Joint Exhibit 3. Take a moment. It's a number of pages.

A Yes.

Q Do you recognize?

A I do.

Q And what is it?

A It's a string of email communications between myself and Mr. Filibeck, with a --

JUDGE GIANNOPOULOS: Mr. Harger, keep your voice up a little bit, please.

THE WITNESS: Yes. It's a string of email communications between myself and Mr. Filibeck.

Q BY MS. MCCONNELL: Regarding what?

A Regarding the grievance we filed and the request for



information, asked for by the Union.

Q About Mr. Salopek?

A About Mr. Salopek.

Q Now, having taken a look at these emails -- and take your time again if you want to go through it -- were there any other written communications, besides these, between you and Respondent, about your Salopek information request?

A I don't believe so.

Q Okay. Besides these communications in writing by email, did you ever speak to anyone in management -- Xcel management about the Salopek information requests you made?

A Yes.

Q Who was that?

A Mr. Filibeck.

Q Okay.

JUDGE GIANNOPOULOS: Mr. Olszewski, please don't. Please put the muffin away -- or the sweet roll away. All right. Thanks.

Go ahead.

Q BY MS. MCCONNELL: And were these in person or on the phone?

A Telephone.

Q About how many calls did you have with Mr. Filibeck about the Salopek information request?

A Four.



Q What was discussed in these calls?

A When we spoke, I would ask him about the grievance we filed, and primarily about the Union's request for information in the case -- in the Salopek grievance.

Q Can you recall when the first call was? I know you'd mentioned that you'd had a conversation right after Mr. Salopek was fired.

A Right.

Q You know, but moving to after you'd filed the information request, do you recall when the first call you had with Mr. Filibeck was?

A Either around November 4th or November 12th, one of those two days, if not both.

Q Okay. So in this first call, did you speak to him?

A I -- I believe -- either spoke with him or he called me back.

Q Okay.

A But we spoke.

Q Okay, so what occurred during this first phone conversation?

A I asked him about the Union's request for information in the -- in the Salopek grievance, and he said that would -- he would send it to me.

Q Okay. Mow, after that, what was the next -- do you remember when the next conversation you had with Mr. Filibeck?



A I think that was November 12th, on or about.

Q Okay. And what happened in that conversation?

A I think I called him on the 12th and left a message, and I think he'd called me back on the following day, on November 13th.

Q Okay. And what happened during that conversation?

A I -- I again reminded him that the Union had a request for information in the Salopek grievance. We would appreciate receiving that information. And he said he would -- he -- he'd get it to me.

Q Okay. Now, do you recall when the next conversation would've been?

A November 27th time frame.

Q And we're talking 2018. I just want to make that --

A 2018 --

Q -- yeah.

A -- correct.

Q Okay. So what happened during that call?

A I think I called and left him another message. We didn't speak that day, if I -- if -- I don't remember if we spoke that day. We spoke a day or two later. He had called back or I had called him again, and we'd spoke again.

Q And what was said during that call?

A Again, I reminded her (sic) that the Union had not yet received its information requested in the Salopek grievance,



and we would appreciate receiving that. And he said he would send it to me.

Q And so I think you talked about a few conversations. Was there -- what -- do you remember when the last conversation you had with Mr. Filibeck about these information requests was?

A I believe it was on or about December 3rd, another telephone conversation. And we spoke. I again reminded him of the Union's request for information, and that we would appreciate receiving the information requested.

Q Okay. Did you in fact receive the information requested?

A No.

Q Did you receive any of it?

A No.

Q All right. Moving on to another topic.

I wanted to ask you, are you familiar with an Xcel guard named Daniel Lein?

A Yes.

Q How did you first become acquainted with him?

A It goes back a number of years when Daniel Lein was a member of another bargaining unit of our Local at the Bangor Submarine Base.

Q Okay. And did you have any contact with him once he was working for Xcel?

A Yes.

Q What -- do you recall when that was?



today?

A Good, sir. How are you?

Q Good. Thank you. Now, I believe it was your testimony earlier this week that you had met in person with Mr. Filibeck concerning your termination; is that fair to say?

A Yes, sir.

Q And in that meeting he had explained to you the reasons for your termination?

A Yes, sir.

Q And it was your testimony that he had said you were dishonest?

A Yes, sir.

Q And he referenced lack of candor?

A Yes, sir.

Q And that he told you, you went outside the chain of command, correct?

A Yes, sir.

Q Okay. And prior to this meeting with Mr. Filibeck, you had been advised by someone from the Union that you were going to be terminated?

A Yes.

Q And was that Mr. Harger?

A No. That was Amber Anglin.

Q And did Ms. Anglin explain to you how she knew you were going to be terminated?



meeting, and specifically, the name of the person, and his position with Xcel, who told you of the termination"?

Do you remember if then you wrote this -- if that's what this second letter was in --

THE WITNESS: It must've been, Your Honor.

JUDGE GIANNOPOULOS: -- reply to? All right.

Q BY MR. STANEVICH: And Mr. Salopek, you would agree with me that neither letter references any chain of command violation?

A No. It doesn't sir.

Q Okay. Is there a particular reason that you left that out of your two letters to Mr. Harger?

A The only thing I can think of, sir, was that I was so angry over the dishonesty issue, with my inability to have the opportunity to clear my name, that I was so focused on that. It -- it appears consistent that it's not in the documents, but I -- I just don't have an explanation why.

Q Do you have an -- there were voluminous documents that your counsel produced to me this morning. I've not had the opportunity to review all of them yet, but are you aware of any correspondence between yourself and the Union, where you outlined this allegation of a chain of command violation?

A I'm not.

**(Respondent Exhibit Number 52 Marked for Identification)**



MR. STANEVICH: I'd like to show the witness a document that has been marked as Respondent's Exhibit 52.

Q BY MR. STANEVICH: Mr. Salopek, I am showing you a three-page document that appears to be a statement that was signed by you on 10/28/18. Let me know when you've had the opportunity to quickly -- or take your time, but let me know when you've had the opportunity to review this document.

A Yup. I'm ready.

Q Okay. Familiar with this document?

A I remember it -- I mean, I don't remember it, but it looks like I wrote it.

Q And is that your signature on the last page?

A Yes, sir.

Q Okay. Any recollection why this document was prepared?

A This was prepared off of notes that I had written by hand.

JUDGE GIANNOPOULOS: But why did you prepare it, if you remember?

THE WITNESS: I -- I think it was just to write everything down.

Q BY MR. STANEVICH: Did anybody ask you to prepare a statement?

A No. Not at all.

Q And did you provide this to anyone back in October or any time in 2018?

 A No.
Q Did you ever provide a copy of this statement to the Union, at any point in time?
A I don't know.
Q Did you ever provide this statement to Mr. Rake?
A No.
Q Did you ever provide this statement to the OSHA investigator?
A I don't know.
Q Now, you mentioned that this statement was prepared based upon handwritten notes?
A Yes. I transferred over -- you had asked me for notes, and I can't find them.
Q That was my next question. You did look for those notes?
A I looked for them.
Q And is --
A And I -- I figured this must be it.
Q And the notes that you're referring to, those were handwritten notes made by yourself?
A Yes, sir.
Q Okay. And when did you make those handwritten notes?
A Pretty soon after.
Q Okay. When you say --
A The 27th.
Q -- after, after your --



A After the 27th.
Q -- termination, so --
A Yeah.
Q So this -- and those notes that you're referring to, was this kind of a running list of what had happened that you were preparing over the time, or it's something that you put down on paper after you were terminated?
A After.
Q If you could take a look at the second page.
A Yes, sir.
Q And then the second paragraph.
A Yes, sir.
Q It appears here, that you had a bit of a disagreement with Ofc. Anglin, in terms of whether or not she had contacted the Union about your termination?
A Yes.
Q Okay. What do you recall about that?
A It was prior to her coming out with a pad and pen, and talking to Mr. Filibeck and Mr. Kubiak, I agree.
Q And did she in fact tell you that --
A And --
Q -- she -- sorry, go ahead.
A -- it was her, and basically I walked in and I said, what's going on? And I said, you called Harger. What's going on? And she said, I never called Harger. I said, what do you



mean, you never called Harger? And so we had this conversation, me trying to figure out what the heck is going on.

Q All right. And you were surprised by her response?

A I was extremely surprised.

Q Well, going down a few paragraphs, there's a paragraph that starts with, "Shortly after Ofc. Anglin exited the training room." Do you see that?

A Yes.

Q And here, it says that she told you that she was -- that you were being charged with dishonesty and had a choice to resign or be fired. Is that an accurate representation of what she told you at the time?

A Yes.

Q And in the next paragraph it describes the meeting that took place between yourself, John Kubiak, and Michael Filibeck, during the conversation that led to your termination, correct?

A Uh-huh.

Q Okay.

JUDGE GIANNOPOULOS: You --

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: -- have to say yes.

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Yeah. Thank you, sir.

Q BY MR. STANEVICH: Okay. And here, it says that you were



told that you were being terminated for something regarding candor with supervisors, dishonesty, and affecting the morale of the workplace with coworkers and supervisors; do you see that?

A Yes, sir.

MS. MCCONNELL: Your Honor, this has been going a while, but this document is not in the record, so this is all a whole bunch of hearsay. So I just --

JUDGE GIANNOPOULOS: It is, but these are, in essence, you know, statements against Mr. Salopek's interest. I think that -- overruled. I understand your objection. But it's overruled.

Q BY MR. STANEVICH: And is there any reference in this document at all to this alleged chain of command violation?

A There's not one, sir.

MR. STANEVICH: Okay. Your Honor, I'd move Respondent's Exhibit 52 into evidence at this time.

JUDGE GIANNOPOULOS: All right. Any objections?

MS. MCCONNELL: No, Your Honor.

JUDGE GIANNOPOULOS: All right. From the Union?

MR. OLSZEWSKI: No.

JUDGE GIANNOPOULOS: All right. Then 52 is admitted.

**(Respondent Exhibit Number 52 Received into Evidence)**

JUDGE GIANNOPOULOS: And Mr. Salopek testified that's his signature on this document. He transferred his notes over, at



February 2013 until about February 2015, and we're -- and that's about the time Mr. John Morgan had asked me to come take over Indian Island.

Q And what positions have you held at Indian Island, sir?

A Well, it would be, you know, guard II, and then acting lieutenant, and then as the captain or contract manager.

Q Okay. And is -- the acting lieutenant position, is that a bargaining unit position?

A Well, I'm -- so still with the Union, paying them my Union dues as acting lieutenant.

Q Okay. And did there come a point when you were promoted out of the bargaining units?

A Yes.

Q Okay.

A As soon as I took the job in Tacoma, that was -- and it was still with the same company, just a different contract.

Q Okay. And what positions -- I think -- not sure if you've -- I've asked you this, but what positions have you held at Indian Island?

A So it'd be guard II, acting lieutenant, and the captain.

Q Okay. And can you give us an overview of your responsibilities as a captain?

A All administrative duties, scheduling, operations, training. You know, I'm responsible for the whole contract, and we -- we normally had about 50 guards out there -- armed

guards --
Q Did you have any --
A -- at any given time.
Q -- payroll-related responsibilities?
A Of course. I did the payroll.
Q Okay. And did you have any responsibilities in terms of interacting with the Union?
A Of course.
Q Okay. And what type --
A I had --
Q What type of responsibilities did you have related to Union --
A Well, any --
Q -- activities?
A -- any type of Union issue, I would liaison with Scott Harger, was at the -- was the Union rep at the time.
Q And can you just give us an overview of the chain of command that existed at Indian Island while you were the captain?
A It's pretty simple. You know, I'm -- as the captain, I was responsible for the -- for all. And then I had about three to four full-time lieutenants, and then after that, we had about four to five acting lieutenants that would cover the contract. In other words, we had to have a supervisor 24 hours, 7 days a week.

shift and most -- most of the time they worked the main gate. And it's -- they're on a -- they're senior officers for the -- for the contract, and so their seniority is, you know, they work Monday through Friday -- or Monday through Thursday, actually.

Q Okay. And did you personally, Mr. Terry, reach out to any of these five officers --

A No.

Q -- on July 9th to let them know that they've been identified in a complaint?

A No.

Q Now, you testified you received the -- a copy of the actual complaint later in the day; is that --

A I did.

Q -- fair to say?

A I did.

Q Okay. And in what form did you receive that complaint?

A I received it in an email from Richard Rake (phonetic).

Q And who is Richard Rake?

A He's the -- the PAR. He's the -- he's our liaison for the contractors --

Q Okay.

A -- for the Navy.

Q And prior -- we'll go to that email in a moment. Prior to getting to that email, did you have any conversation with Mark

assuming --

THE WITNESS: Obviously, I read it, yes.

JUDGE GIANNOPOULOS: -- you read it.

Go ahead.

THE WITNESS: I read it, yeah.

Q BY MR. STANEVICH: And after you read the email, what was your reaction to these allegations that the officers put forward to the commanding officer?

A One of surprise, because I -- I felt like my -- my range instructor, which is Lt. Powless, was -- his integrity's above reproach, as far as he's never done anything that would -- that would have me question his integrity, as far as, you know, doing the qualifications. He's been in charge of doing firearms qualifications for years, and so I -- this was -- caught me quite off guard.

Q Okay. And this -- the first part right after the email, it's from Mr. Mullen, it identifies that Mr. Salopek, Mr. Lein, and Mr. Schryver, were coming forward with a complaint; is this the first time you saw those names, in response to the complaint itself?

A Yes.

Q Okay.

A Yeah.

Q And did you notify any of the bargaining unit guards that these four employees had filed a complaint with the Navy?

fire the shotgun --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- for the sustainment shoot.

JUDGE GIANNOPOULOS: But on the sustainment shoot, you still have to hit the targets?

THE WITNESS: Absolutely.

JUDGE GIANNOPOULOS: And have a certain score?

THE WITNESS: Absolutely.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: It's still a pass, though.

JUDGE GIANNOPOULOS: Okay. All right.

Q BY MR. STANEVICH: And for the qualification sustainment shoots, do the guards use Navy-issued weapons and ammunition?

A Yes.

Q Okay. And where does -- and where do these qualification shoots and sustainment shoots occur?

A They go to the Bangor range.

Q Okay. And has there been any change in the practice of that over your time at Indian Island?

A Yes.

Q Okay. And when was the change, and what was the change?

A The change actually occurred, not that I knew -- not that we knew about it, but the change in the Navy instruction happened in the first of the year in 2018. Prior to that, the Navy let us go to different ranges, like the Port Townsend

range or anywhere we needed to, to qualify our officers. And they -- we had done this for years. And we would provide our own weapons, but there had -- comparable with the Navy's weapons. In other words, it had to be a 9 mm pistol. It had to be a 12-gauge shotgun, or a AR-15, or something similar to the M4. And then the officers would -- would go through the -- the exact same course that they have to qualify with for the Navy. They just wasn't using Navy weapons.

When -- and these were -- this only occurred when we had make-up shoots or we had somebody that did not qualify at the range and we had one person or two people to do a make-up shoot and we didn't -- we didn't have -- we couldn't get to the range -- to the Bangor range. So for years, we practiced this. This is -- you know, when we -- and it didn't happen very often, but -- but the Navy gave us -- you know, didn't have no problems with us qualifying off the range -- off the Bangor range. So that's what we did. And we -- we felt like we were, you know, working within the parameters of the instruction -- of the Navy instruction the whole time we were out there. So when this did start coming up, some of these allegations, I felt like we were good. I hadn't heard no different.

Q Okay. So since there's been a change, you said this was first quarter of 2018?

A Right.

Q What is the change going forward --

A The change --

Q -- from the time --

A -- is, you can only use, for qualifications, you only use Navy ammunition and Navy weapons, whether it be at the, you know, Port Townsend range or the Pier (phonetic) range, but that was -- that was the change that was made that we were unaware of.

Q Okay. And is your testimony, then, the Navy was aware of the company's practice prior to 2018?

A Yes.

Q And who, particularly, in the Navy?

A It would've been Steve Matts (phonetic) and Richard Rake.

Q I'd like to show you a document that has been -- I believe it's been entered into evidence as Respondent's Exhibit 42. Mr. Terry, just take a moment to look at this document. Let me know when you're ready to proceed.

A Okay.

Q Okay. What is this particular document that's entitled Small Arms Qualification Record?

A Yeah. This is a sustainment shoot, so as you can see, where it says NHQC and RQC Rifle Qualification Course and Navy Handgun Qualification Course, those two things. So this was the -- this was a sustainment shoot for these four officers -- five officers.

Q Okay. And here, it says that the range location, towards the top left-hand corner, was Naval Base Kitsap in Bangor. Did this qualification shoot actually take place at Bangor?
A I don't think so.
Q Okay. Do you have any understanding of where this qualification sustainment shoot took place?
A I think it was at a private range, private residence range in the Sequim area. I don't know exactly where.
Q Okay. And just, can you explain to us why he doesn't note that on this record, instead, he notes that it took place in Bangor?
A He should've crossed out the Naval Base Kitsap Bangor and put down the actual location.
Q Okay.
A But this is the form we use, and he just neglected to --
JUDGE GIANNOPOULOS: But you weren't -- you have no idea; you weren't there when this guy filled this out, were you?
THE WITNESS: No. I was not.
JUDGE GIANNOPOULOS: All right. There's no objection but this witness cannot testify as to what another person did unless he has actual knowledge of it. So let's try to only elicit questions which this witness has actual knowledge. And let's proceed.
Q BY MR. STANEVICH: Mr. Terry, do you have actual knowledge that this shoot did not take place in Bangor?

A Yes.
Q Okay. And how do you have that knowledge?
A Just from what I was told from Gerald Powless.
Q Okay.

JUDGE GIANNOPOULOS: Okay.

MR. STANEVICH: I'll move on.

JUDGE GIANNOPOULOS: That's fine.

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: All right? But you -- but you weren't there when Mr. Grackley (phonetic), is that who -- or Mr. Powless -- is that --

THE WITNESS: Yeah.

JUDGE GIANNOPOULOS: Mr. Powless --

THE WITNESS: Yeah.

JUDGE GIANNOPOULOS: -- signed this document?

THE WITNESS: Gerald Powless signed it.

JUDGE GIANNOPOULOS: Okay. You didn't -- you weren't there. You didn't discuss him signing this document --

THE WITNESS: No, sir.

JUDGE GIANNOPOULOS: -- at the time? All right.

THE WITNESS: No sir.

JUDGE GIANNOPOULOS: Fair enough.

Q BY MR. STANEVICH: And if, in fact, this shoot did take place at some place other than Bangor --
A Uh-huh.

Q -- was that consistent with the company practice prior to 2018?

A Yes.

JUDGE GIANNOPOULOS: What -- let me ask a question. You said a private range; what kind of private range?

THE WITNESS: Somebody's -- from my understanding, because I've talked to --

JUDGE GIANNOPOULOS: Uh-huh.

THE WITNESS: -- Gerald Powless about this, it was at Ofc. Schroeder's house --

JUDGE GIANNOPOULOS: Uh-huh.

THE WITNESS: -- one of the officers that are listed here.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: And behind his -- he's got property.

JUDGE GIANNOPOULOS: I see.

THE WITNESS: And --

JUDGE GIANNOPOULOS: So it's at someone's house?

THE WITNESS: Yeah. Exactly.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: So he made --

JUDGE GIANNOPOULOS: All right.

THE WITNESS: -- a big berm --

JUDGE GIANNOPOULOS: All right.

THE WITNESS: -- where it was safe to shoot.

JUDGE GIANNOPOULOS: Let -- let me say this for the

Q And who were you told that by?
A By Mr. Martin.
Q Okay. Did this come a time when a decision was made to terminate Mr. Salopek's employment?
A Yes.
Q Okay. And were you involved in that decision-making process?
A Not really.
Q Okay. Did anybody tell you that Mr. Salopek was going to be terminated?
A Yes.
Q Okay. And who told you that?
A Mr. Filibeck.
Q And do you recall approximately when it was? Month, time of the month?
A I think it was on a Friday on October 26th of last year.
Q Okay. And what did Mr. Filibeck tell you?
A That he had just got through with a meeting with the Navy and that they had mentioned the person that was responsible for this investigation over the qualified individuals -- or the weapons quals they'd been investigating over the last few months, and they basically wanted him gone.
Q And Mr. Filibeck told you that?
A Yes.
Q Okay. And we've heard that there was a termination

meeting where Mr. Filibeck met with Mr. Salopek. Were you part of that meeting?

A No.

Q Okay. Did you have any role in setting up that particular session?

A The only role that I had was letting Mr. Filibeck know that -- you know, what his schedule was when he was working, and basically setting up, you know, a meeting with him.

Q After Mr. Salopek was terminated, did you have any conversation with him about the reasons for termination?

A Yeah. He approached me, and I don't know if he asked me or maybe I even volunteered it, but I just said, you know, this was out of our hands. This is what the Navy requested.

Q And do you mean it was out of your hands?

A We had -- I did not have no choice in his termination.

Q And during that conversation, was there any discussion of the fact that Daniel Lein may be terminated, too?

A Not that I -- not that I recall.

Q Okay. Did anybody from the company, whether it's Mr. Filibeck, Mr. Morgan, anyone else ever tell you that Mr. Lein could be terminated?

A Not that I recall.

Q When someone is terminated from the company, is there any paperwork that's completed?

A Yes. Usually you have to sign a debriefing. And it's a

security debriefing for your -- your clearance. And you have to turn in your CAC card, which is your access to the base, and -- and any equipment that we have that was issued to them.

Q Is there any type of recordkeeping recording that the company does to outline the reasons for the termination?

A We do a change of status statement, and it's sent to HR.

Q And did you complete a change of status statement for this particular --

A I --

Q -- situation?

A I did.

Q Okay. And why did you do so?

A We always do. Any time there's a change in employment with any of our employees, I have to commit a CO -- a change of status to HR.

Q I'm going to show you a document that's in the record as Joint Exhibit 5, Bates stamped 1285.

Mr. Terry, are you familiar with this document?

A I am.

Q And what is this document?

A It's a change of -- change of status dock.

Q For a particular employee?

A For Mr. Salopek.

Q And who completed this document?

A I did.

Q Okay. And I see towards the bottom there's a section of termination?

A Yes.

Q And it has the effective date of termination 10/27/2018, right?

A Correct.

Q Okay. And it notes the reason for termination. Can you tell us what the listed reasons are?

MS. MCCONNELL: The document speaks for itself.

JUDGE GIANNOPOULOS: It does speak for itself.

But let me ask. Did -- and sir, please try to keep your voice up, if you could.

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: It says, "Termination of chain of command violation and dishonesty." Did you write that in there on your own accord, or did someone instruct you to write that?

THE WITNESS: I was instructed to write that.

JUDGE GIANNOPOULOS: All right. And by whom?

THE WITNESS: Mr. Filibeck.

JUDGE GIANNOPOULOS: All right. I probably short-circuited some of your questions, but that's fine.

MR. STANEVICH: That's okay, Your Honor.

JUDGE GIANNOPOULOS: All right.

Q BY MR. STANEVICH: So Mr. Filibeck told you these reasons?

A Yes, sir.

Q Okay. And did you ever do or conduct an independent -- or did you ever reach an independent determination as to whether or not Mr. Salopek engaged in a chain of command violation?
A No.
Q Okay. Did you ever conduct any or reach any independent determination that he engaged in dishonesty?
A No.
Q So the reason you wrote this here is because you were told to?
A Yes.
Q Now, are you familiar with the collective bargaining agreement between the Union and Xcel?
A Yes, I am.
Q Okay.
JUDGE GIANNOPOULOS: Again, sir, you're going to have to your voice --
THE WITNESS: Oh.
JUDGE GIANNOPOULOS: -- up, if you would, please. Thank you.
Q BY MR. STANEVICH: And how are you familiar with that document?
A Just because I read it several times, and we use it -- any -- any type of -- in the workplace for any questions that any of the employees have or any issues that come up.
Q And is there any provision in the collective bargaining

agreement about what we've heard guard mount pay or arm-up, arm-down pay?

A There is.

Q Okay. And can you explain to us what -- what that pay is and the reason for it?

A In -- in the CBA and in the contract, the officers get 15 minutes to arm up and 15 minutes to arm down, plus like a shift briefing or a debriefing at the end of the shift.

Q And what -- what's the standard duration of a particular shift?

A The standard duration is 8.5 hours.

Q Okay.

A And that's including the arm-up time and arm down.

Q Okay. And do officers ever work four-hour shifts?

A Occasionally they work four-hour shifts.

Q Okay. And has there been any confusion as to the amount of arm-up time that officers receive for working a four-hour shift?

A There has been.

Q And explain to us what you mean by that.

A I believe some of my lieutenants determined that it was only the -- if -- if it was four hours, they were only to receive .25 hours, not .5 hours of arm-up time because the billing for the government has to be -- we have a certain amount of hours, and it has to all equal up. So on our

clarify what the practice should be when somebody works a four-hour shift?

A Well, once it was brought to my attention, I basically -- because of the confusion that was going on and all the questions, I said, okay, I -- I -- I told the lieutenants, I said, just have everybody stay 15 minutes after their shift, just like we -- just stay for the time that we're paying them for, and then they can go. This happened for about 24 hours, and then I decided, you know, after thinking about it, that I didn't want to feel -- I didn't want the -- the employees feeling like, you know, they're being punished for some reason because when they're done with shift and they arm down and they're standing there for you know, seven, eight, nine, five minutes past their time after they've armed (sic), there was no reason for them to stay. So we'd let them go home. There was -- I mean, their -- their duty's over, they armed down, they're ready to go home.

Q And just the make sure that we're clear on this point, traditionally if they're done before the 15 minutes, they can go home, right?

A They can.

Q And for maybe one day in question you changed that?

A Yes.

Q And you changed it to what?

A I changed everybody stay, you know, the 15 minutes

after -- you know, the full arm-up time (sic).

JUDGE GIANNOPOULOS: Arm-down time?

THE WITNESS: Arm-down time.

JUDGE GIANNOPOULOS: Okay. All right.

THE WITNESS: And arm-up time, it speaks for itself, because you've got to be there 15 minutes before your shift starts.

JUDGE GIANNOPOULOS: Yeah.

Q BY MR. STANEVICH: And after that one day, you changed it back?

A I did.

Q Did anybody direct you to change it back?

A No. I did it myself.

Q Okay. And what was the reason you did that?

A I just thought morale that -- I didn't want to feel like, you know, I'm punishing everybody for some of the questions that were made about what was getting -- who was getting paid and who was not getting paid.

Q Did Ofc. Daniel Lein ever come to you with a question about how much arm-up, arm-down time pay he should receive for a four-hour shift?

A Yes.

Q Okay. And did he explain to you why he was coming to you?

A Yeah.

MS. MCCONNELL: Objection, Your Honor. This is -- we -- no

MS. MCCONNELL: -- I will point you to the Bates numbers.

THE WITNESS: Okay.

MS. MCCONNELL: So we're looking at -- now I've lot it.

JUDGE GIANNOPOULOS: Did you say Joint Exhibit 7?

MS. MCCONNELL: Joint Exhibit 7.

Well, I'll move on, and I'll ask you a different question. We'll come back to that.

JUDGE GIANNOPOULOS: All right. Just set that aside, sir --

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: -- for now.

THE WITNESS: Okay.

Q BY MS. MCCONNELL: And in fact, you were talking about these practices of doing some -- having ranges not at the Bangor range, right?

A Yes.

Q That you had -- on some occasions people had done qualifications elsewhere than Bangor?

A Yes, ma'am.

Q All right. And you're also talking elsewhere then -- you mentioned the Port Townsend gun range --

A Yes.

Q -- right? And that, in fact, people had done qualifications at Schroeder's house?

A Yes.

Q Okay. And in fact, when -- so the Navy did an investigation of the complaints by Mr. Mullen and Salopek, right?
A Yes.
Q And in fact, you got your hand slapped as a result of that for these ranges that weren't at Bangor, right?
A That is correct.
Q Okay. But nobody was disciplined for that?
A No.
Q Okay.

JUDGE GIANNOPOULOS: Did you talk to Mr. Rake or the other individual? Who did you talk to?

THE WITNESS: Steve Manson is the one that I usually talk to, but I did talk to Mr. Rake also.

JUDGE GIANNOPOULOS: All right. And did you tell either of those two that the ranges had been going on outside of Bangor?

THE WITNESS: Previous to that, yes --

JUDGE GIANNOPOULOS: Yes.

THE WITNESS: -- I did.

JUDGE GIANNOPOULOS: And that it's someone's backyard?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Okay. And what about the gravel pit? There's been some discussion previously here about the gravel pit. Are you a range -- are you aware -- are you aware of allegation or claims that people were being qualified at a

JUDGE GIANNOPOULOS: -- same thing --

THE WITNESS: But --

JUDGE GIANNOPOULOS: -- but it didn't?

THE WITNESS: But 42, it says the same thing, but --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: -- I know that it didn't because --

JUDGE GIANNOPOULOS: All right.

THE WITNESS: -- I had conversations --

JUDGE GIANNOPOULOS: Yeah. No. I --

THE WITNESS: -- with --

JUDGE GIANNOPOULOS: I understand.

THE WITNESS: -- Range Master Powless.

JUDGE GIANNOPOULOS: I'm just curious -- I'm sorry. Conversations with?

THE WITNESS: With Range Master Lt. Powless.

JUDGE GIANNOPOULOS: All right. Very good.

THE WITNESS: So --

JUDGE GIANNOPOULOS: All right. My question was just from the face of the document --

THE WITNESS: Correct.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Okay.

JUDGE GIANNOPOULOS: Yep.

Q BY MS. MCCONNELL: And Mark Salopek he'd done some training on behalf of Xcel; is that right?

JUDGE GIANNOPOULOS: I do have a question about that. When did you find out? Because I thought your testimony was that you didn't know about that the Navy had these qualifications, correct?

THE WITNESS: Correct.

JUDGE GIANNOPOULOS: And that somehow in 2018 you found out about it, did you find out about it before Mr. Rake's investigation or after or as part of it?

THE WITNESS: As part of the investigation is when I found out. So --

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: So even at this time in February we may have been going out and doing remedial training, you know, with firearms or maybe even qualifications before July, the July investigation, when we realized that we were not following the instruction in the Navy and we'd get our hand slapped.

JUDGE GIANNOPOULOS: Okay. All right. Very good. Any further questions based on that clarification, Mr. Stanevich?

MR. STANEVICH: No, nothing further.

JUDGE GIANNOPOULOS: General Counsel?

MS. MCCONNELL: Nothing further, Your Honor.

JUDGE GIANNOPOULOS: All right. Mr. Olszewski? Mr. Terry, I thank you very much for your testimony today. I appreciate you coming in.

THE WITNESS: Thank you.

Q Good, thank you. What's your position? Actually, what's your position with Xcel?

A I am the senior vice president. I manage around the day to day operations with the company.

Q Okay. And when did you join Xcel?

A September of 2018.

Q Well, before we get into your role of duties and responsibilities at Xcel, can you give us an overview of your background in government contracting, if any?

A Sure. I have been in government contracting now for just a -- a little bit over 27 years. I started out back in 1992 with American Protective Services out of California. We managed security at quite a few western house and nuclear plants, various federal facilities and other things of that nature, and at the time we were the third largest security company in the world, I ran the state of California.

Q And what is -- back to Xcel, what is Xcel Protective Services?

A Sure. So Xcel Protective Services, formally BCSI, Basic Contracting Services Inc., we're a government contractor. We provide security specifically our niche, classified security with -- what are known as cleared American guards, to the federal government.

Q Okay. And what's the corporate structure of where -- the executive leadership of the company?

A Sure. We have a board of directors comprised of John Kubiak, Balinda Melten, and myself Michael Filibek. Down line of the -- I run all of the operations. And then on flat line directly underneath me I have contract managers for each contract that we have that report directly to me. And then everybody in that contract reports direct to them.

Q Approximately how many contracts does Xcel Protective Services have right now with the federal government?

A At this moment including one of our wholly own subsidiaries, Xcel Management, 9.

Q And do you have any current contracts in the greater Seattle area?

A We do not.

Q Okay. And what is the closest government contract that Xcel has at this time?

A US Army Corps -- the engineers for the -- what's known as the cascade locks. That's a series of dams on the lower Columbia River, about 10080 miles from here, Bonneville Dam, The Dalles Dam, and the John Day dam.

Q What's the next closest location?

A It's about a 50/50. It's either Cavalier Air Force station in North Dakota, or US Army Corps of Engineers in Galveston, Texas.

Q And we've heard some testimony about the individual by the name of John Morgan, are you familiar with Mr. Morgan?

THE WITNESS: Yep.

JUDGE GIANNOPOULOS: Sorry.

Q BY MR. STANEVICH: And in 2015, you were not affiliated with the company, correct?

A No, sir.

Q Okay. You said you were responsible for everything as of September 2018, what does everything include?

A Wow, it was a little bit of a chaotic turnover. Didn't get a lot of information, day to day operations, management personnel, human resources, payroll, accounting, everything.

Q Okay. My question was what are you responsible for?

A So I oversee on a -- we'll call it the 10000 foot level, the day to day operations, the project management, our initiatives with the guard track system, part of our quality control. My primary focus is maintaining the relationship with the customers. They were the most important aspect of what I do, that make sure that Xcel keeps our contracts.

Q And when you say customers, who are you referring to?

A That would be the Navy, the Air Force, the Coast Guard, the Army, the federal government, part of homeland security, federal protective services.

Q Does Xcel still have the security contract at Indian Island?

A We do not.

Q And when did that change?

A September 30th of this year, 2019.
Q Okay. And what was the reason for the change?
A The contract after -- it renews every five years, and after being on the job for 20 years the last five year contract had expired.
Q What is the name of the -- does someone have the contract now?
A Yes.
Q And what is the name of that company?
A So it's been assumed by a BOSS contractor called Chugach where they handle everything that happens on a base, and they have subcontracted it out to another security company called HSSI.
Q What's BOSS contract?
A Base Operating Support Services contract, that's where you have a facility and one company manages absolutely everything that has to do with the physical infrastructure of the base. The guys that come and mow the lawn, change the light bulbs, everything. And basically they are truly just a management tool, they subcontract everything but they handle all that work for the federal government.
Q And what's the name of the company that has the most contract now?
A Chugach.
Q How do you spell that?

Making sure that they all understood if there was any issues or whatever, let me know and I was now going to be the guy that was taking care of that.

Q As of September 3rd or thereabout when you assumed in your position of Xcel, did you know Mark Salopek at all?

A No.

Q Did you know Stephen Mullen at all?

A No, sir.

Q Daniel Lein?

A Nope.

Q Jacob Schroeder?

A No.

Q Can you give us an overview of what the local leadership, the management structure looked like on Indian Island as of September of 2018?

A Sure. Our contract manager who was here earlier today, his name is Michael Terry, I felt confident in his leadership. One of the first things I did was I reviewed the backgrounds, experience of all of our contract managers to make sure there wasn't any kind of a -- an issue. I felt he was strong and solid and he had a pretty good person underneath him, the Lieutenant training officer, his name was Gerald Powless. And we had acting Lieutenants on the down line underneath both of them.

Q And who did Michael Terry report to, if anyone?

Q And did you know Mr. Rake prior to joining Xcel in September of 2018?
A No, I did not.
Q When was the very first interaction with Mr. Rake?
A After I reached out to the -- to the Navy to let them know of the change of management structure in Xcel, I got a phone call from him.
Q Let me just back up. Who did you reach out to at the Navy?
A The previous contracting officer, I think her name was Anna Cabella. And I left a message, and I received a phone call back from Richard Rake.
Q Can you recall approximately when that phone call was?
A On or about the 22nd or 23rd of October.
Q Okay. And tell us about that phone call?
A Sure. So Mr. Rake called me, I said, you know, you know, nice to meet you. This get together, he wanted to know what happened to Johnny Morgan. I said well, Mr. Morgan resigned, he was having some significant health issues and a few other things, and anything you need I'm the guy, I can help you out. He says well, you may want to have a discussion with Melissa Burris, the contracting officer at your earliest convenience. And I said well, how's Friday? I think this was on a Tuesday, so well how's Friday? And so I in very short order hopped on a plane and came out here.

Q So did it --

A Actually my first visit to Seattle ever, yeah.

Q So did he explain to you why he suggested that you reach out to Ms. Burris?

MS. MCCONNELL: Objection, calls for hearsay.

JUDGE GIANNOPOULOS: Well, it does. What's the purpose of this?

MR. STANEVICH: Trying to get to the point of why Mr. Rake went out to Seattle.

JUDGE GIANNOPOULOS: Well, he testified that this guy told him to come out to Seattle. So what did you do when you got here?

THE WITNESS: I met with -- at a meeting at the Bangor submarine base with Mr. Rake, the COR and Melissa Burs, the senior contracting officer.

JUDGE GIANNOPOULOS: Okay. All right, go ahead. Go ahead Respondent.

Q BY MR. STANEVICH: Before flying out to Seattle, did you reach out to Ms. Burris in response to your conversation with Rake?

A I did.

Q Okay. And how did you reach out to Ms. Burris?

A By email and telephone call.

Q All right. And the email, what did you explain to her?

A I explained -- my name is Michael Filibek, the person I've

spoken with, Richard Rake, and he recommended that I come out for a meet and greet to discuss some pending issues.

Q And you also talked to her by phone?

A I did.

Q And what was the reason, did you call her? Did she call you?

A I don't remember.

Q Okay. And what was discussed on the phone?

A Dates, time of the -- of the meeting. I followed up with email confirming the time; I think she responded back to me in her schedule for I think 10 a.m. on that Friday the 26th. Our ferry was late, so the meeting was like a half hour later but --

Q So this sounds like it unfolded in a pretty quick time frame?

A Yeah.

Q And why did you come up so quickly?

A Anytime the Navy says well I would recommend you come out here, when the Navy says we recommend it's not a polite suggestion, I understood.

Q Okay. And did you in fact meet with Mr. Rake?

A I did.

Q And where did this meeting take place?

A Contracting officer's office, the Kitsap Naval launch -- facility on Bangor -- I think it's Bang Bridge Island at the

Bangor submarine base.

Q Where is that in relation to the Indian Island?

A About 30 miles south.

Q And in your testimony, that was the contracting officer's office?

A Yes, sir.

Q And who was the contracting officer at the time?

A Melissa Burris.

Q And did anyone attend this session other than you and Mr. Rake?

A Yes.

Q Okay, and who was there?

A In attendance on the Navy side, Mr. Rake, Melissa Burris. On our company side it was both of our company's owners, John Kubiak, Balinda Melten, myself and my assistant, Francesca Cubino.

Q Okay. And when did this meeting take place?

A October 26th, about 2018.

Q And prior to this meeting, have you ever met Mr. Rake before in person?

A I have not.

Q Have you ever met Ms. Burris before in person?

A I have not.

Q How long did the meeting last?

A A little over an hour and a half.

Q And tell us how the meeting started?

A The general pleasantries, passing out business cards, how are you doing, let me tell you about my background, let me tell you about John and Balinda's background. We're here to serve and what can I do to make your lives easier and perform better for you on the contract?

Q And did you receive a response to that offer to Mr. Burris -- Ms. Burris and/or Mr. Rake?

A Yes, I did.

Q Okay. And who responded?

A Richard Rake.

Q Okay. And what did Mr. Rake tell you?

A Mr. Rake asked me if I was aware of some of the issues that were going on Indian Island, and from my prior discussions with Michael Terry, I said no, I think everything's running about as -- about as well as it can be. He said well, we need to bring you up to speed on a few things. And he started discussing some performance issues we had with some of the security officers. And he says I'm not sure if -- let me see if I'm at liberty to discuss this, he looks over and says Melissa, and she like gives him the nod, and then he proceeds to discuss some of the performance issues that were happening at the time.

Q And what performance issues did you learn about?

A We had a couple. The first one that was discussed was a

gentleman, Stephen Mullen. Apparently the Navy doesn't handle violation of general post -- post order number five, never quit your post until properly relieved, and Mr. Mullen abandoned his post for a couple hours to go on a junket with a couple other security officers and they were less than pleased about that.

JUDGE GIANNOPOULOS: A junket? Like what, he went to the casino?

THE WITNESS: No, he went across to the commanding officer's office and showed up, which is --

JUDGE GIANNOPOULOS: And who referred to that as a junket? Mr. Rake said it was a junket?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: All right, go ahead.

THE WITNESS: Sure.

JUDGE GIANNOPOULOS: A junket to me doesn't mean you go to the base commander. It means you're off to the movies or the -- or, you know, Wendy's.

THE WITNESS: Sure. We have a --

JUDGE GIANNOPOULOS: Go ahead. What happened at the meeting? I just want to know who used that word. I'm just curious.

THE WITNESS: Sure. That was Mr. Rake.

JUDGE GIANNOPOULOS: Okay.

THE WITNESS: Yeah, so he proceeded to tell us we were having a lot of performance issues and that the Navy was -- had

just completed a very significant investigation or what he described as wasted between four and five hundred hours of their time on alleged complaints that basically with few exceptions had no basis in reality. And they really did not appreciate it.

Q BY MR. STANEVICH: Now this investigation, did Mr. Rake or Ms. Burris share a copy of the investigation with you during the reports -- during this meeting?

A They actually did not, but they read from it.

Q Okay. And who particularly read from it? Ms. Burris or Mr. Rake?

A Mr. Rake.

Q All right. And what did Mr. Rake review from that report?

A Well, it was a fairly lengthy report and it detailed a sequence of events that went on for some time on an allegation of officers who had not been properly trained and were standing posts without the proper qualifications. One of the interesting parts was and while I could see how it would have --

JUDGE GIANNOPOULOS: Wait, wait. That's not a response. Just answer the questions. To what Mr. Rake tell you, what did he read? I don't want to know what in your mind you found interesting unless the Counsel asks you.

THE WITNESS: Sure.

Q BY MR. STANEVICH: Specifics on what did Mr. Rake tell

you?

A He told us that we had an employee that had filed false reports that cost the Navy and the DON, investigative services, a lot of time, effort and money. I think he specifically said chasing their tails because it turned out the reports didn't have any basis in reality.

Q Did he explain what was false about the reports?

A He did.

Q And what did he explain?

A Sure. We had I think five officers were involved in the report. Four of them -- they weren't even listed on the days he made these allegations; they pass a certain qualification because they had previously passed the previous months so it didn't make any difference. And he said and one of the people they -- they have to -- all of our -- our officers need to qualify on three different types of weapons. They have to qualify on M9, they have to qualify on the sidearm, 9-millimeter sidearm, a M500 and a M4A1 assault rifle. We had an employee, Emily Coler, she had qualified on the M9 and on the M500. However she had not yet qualified on the M4A1 and she was up at the CVIS, the commercial vehicle inspector station right up in the front. And there's three positions there, one of those positions, overwatch, actually uses as part of their job the M4A1 assault rifle. However she never held that position, she was always the person that was up in the

front talking to the drivers, initiating inspection which only required her to have the M9 pistol which she was qualified for.

JUDGE GIANNOPOULOS: This is what Mr. Rake was telling you?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Okay.

MS. MCCONNELL: I'm going to object because there's lack of foundation, multiple layers of hearsay --

JUDGE GIANNOPOULOS: There is multiple layers of hearsay. It is I'm assuming, Counsel, this is just going to into his ultimate decision making, what he's going to do afterwards.

MR. STANEVICH: That is correct, Mr. Rake did testify to what Mr. Filibek was told. But we're getting to the decision to --

JUDGE GIANNOPOULOS: Yep, and that's what he said is what -- Mr. Rake told him. Whether Mr. Rake told him that or not is a different story, different question, but that's what he is saying was told to him. So overruled based on that understanding.

Q BY MR. STANEVICH: Did Mr. Salopek -- I'm sorry, did Mr. Rake share any other concerns about Mr. Salopek?

A Yeah.

Q And what did he explain?

A So Mr. Salopek has a -- and by the way, I learned this the first time at this meeting, I didn't even know who Mr. Salopek

capabilities of what we can see and what we can do. So how we detect people in the water, people and objects under the water at nighttime, and it is a very significant threat to our national security. As you know in Indian Island is one of the United States three tier one national security sites.

Q BY MR. STANEVICH: Did you receive any direction from Mr. Rake at this meeting concerning Mr. Salopek's position on Indian Island?

A Yes, I did.

Q And what direction if any did you receive from Mr. Rake?

A We strongly recommend his immediate removal from the contract.

Q And did he explain why he recommended immediate removal from the contract?

A Yes, he did. He's dishonest, he cannot be trusted, the Navy has lost all confidence in his ability to fulfill his duties at the jobsite and we don't want him, get rid of him.

Q Now did you push back on Mr. Rake to make sure that he had a valid basis for these concerns?

A I actually did. I couldn't believe I hadn't heard about this prior. And I asked well, how I mean did you guys investigate this? I mean how extensive was the investigation? Was it one of these half hour things or did you spend some time? And he told me heh, they -- and again, I didn't know this at the time, they spent between four and five hundred

hours of investigative time because I wanted to make sure it was an accurate investigation and it was a fair investigation. And by the time I was done speaking with Mr. Rake, I knew it was -- they did a thorough job and when they said get rid of him they weren't kidding. Because when the Navy asks you to immediately remove somebody, it's not a polite suggestion.

Q Did the Navy ask you to terminate Mr. Salopek's employment?

A No, they didn't. They just asked us to remove immediately him from the contract.

Q Did the Navy give you anything in writing demanding his removal from the contract?

A They did not.

Q Okay. Now, you testified before that you've been in the federal contracting business for a long time, right?

A Yes.

Q So does the government usually provide this contractor something in writing directing removal?

A They do.

Q And did you ever get that here?

A I didn't.

Q And why did you move forward with removing him from the contract and in fact terminate his employment?

A Well, there's a couple of reasons: one, these were extremely serious allegations; two, they had clearly conducted

a very thorough investigation even though I hadn't seen or received a written report of it at the time. But one of the contracting officers, the COR, was basically our direct boss says we recommend his immediate removal from the contract. And his boss's boss is sitting next to him and she's not disagreeing, it's pretty serious.

Q Let me see this --

A And I want to keep the contract to keep the customer happy.

Q When you say boss's boss, who are you referring to?

A Melissa Burris, the senior contracting officer.

Q And is there any -- obviously, I think you've heard testimony there is a contract between -- well, there was a contract between Xcel and the Navy, correct?

A Yes, sir.

Q Was there anything in that contract that gives the Navy the right to direct the company to remove employees from the jobsite?

A Sure. It's a -- in closed what's called the PWS which is the performance work statement.

Q And what's your understanding of that contractual provision?

A The Navy, or for that matter any part of the department of defense or the military, can remove for I think it's titled the convenience of the government any contract employees they want

for any reason or no reason at all. But generally speaking at 27 years of experience, they really don't do that unless there's a really valid reason.

Q Now you told us that the Navy did not demand termination; just it was a recommendation to remove him from the contract. Did you offer Mr. Salopek another position within the umbrella of Xcel Protective services?

A I did not.

Q And why not, Mr. Filibek?

A Again, very serious allegations like this. The next closet contract we had was 10,080 miles away at the lower Columbia River, but there's a couple of issues with that. One, if this guy is going to do this kind of activity here, he's going to do it there. Two, there's still an ongoing -- actually, is my understanding as of this very day an active investigation regarding those classified photos that are still up his website. That contract at lower Columbia River is part of the US Army; he's not going to be able to get a CAC card down there either.

Q And what's your understanding of the -- to support that statement, that he would not be able to get a CAC card?

A So any time an employee is removed for cause, unless they resign, we have to give the -- the government the official form we fill out and send in that details the reasons of why they are no longer on the contract. And they put that information

on their federal file at OPM, office of personnel management. And if we tried to reenlist him down there that would come up and there's no way they would give him access to those facilities. But the truth of the matter is just based upon his conduct and the fact that he still has classified photos up on his own personal website for another company, I could never employ him.

JUDGE GIANNOPOULOS: All right. But that's your understanding, that's what your belief is.

THE WITNESS: Yes, sir. Yes, sir.

JUDGE GIANNOPOULOS: Because you said then in this answer that you said once someone is removed for cause, it's difficult for them to get a CAC card again, right?

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: That's what you said. But if you hadn't removed him and you just transferred him down there, that wouldn't have been a reason for cause, right? Because the Navy had removed him, correct?

THE WITNESS: Well, they ordered us to remove him.

JUDGE GIANNOPOULOS: No, but I'm just saying technically though if you had transferred him from one position to another, it wouldn't be a removal for cause?

THE WITNESS: That's right.

JUDGE GIANNOPOULOS: Okay. I just wanted to clarify that.

THE WITNESS: No, you're absolutely right.

JUDGE GIANNOPOULOS: But in your mind, I understand what your mind was. In your mind at least, the Navy told you to do it; you thought, hey I want to keep these guys happy, I'm going to do it.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: At the time, did you know that that contract was going to end, was up for renewal the next year?

THE WITNESS: I did know it was up for renewal. And whether you get it or not, it's --

JUDGE GIANNOPOULOS: And when did Xcel actually submit -- did they submit a bid for renewal?

THE WITNESS: We did.

JUDGE GIANNOPOULOS: And when did they submit the bid?

THE WITNESS: July of 2018.

JUDGE GIANNOPOULOS: July of 2018.

THE WITNESS: Excuse me, 2019.

JUDGE GIANNOPOULOS: In 2019.

THE WITNESS: Yep, yep.

JUDGE GIANNOPOULOS: So a while after this?

THE WITNESS: Yes.

JUDGE GIANNOPOULOS: Yeah, perfect. Fine. Go ahead, Mr. Stanevich.

MR. STANEVICH: I was going to get to this area in a moment.

JUDGE GIANNOPOULOS: It just hopped in my mind, that's why

THE WITNESS: I was happy to get it.

JUDGE GIANNOPOULOS:

Q BY MR. STANEVICH: Mr. Filibek, I know you went down a different path. I want to bring you back to the interview. The meeting you had with Mr. Rake and Ms. Burris, how did that meeting come to an end?

A We discussed remedies and they wanted to know how I wished to proceed. And I basically told them I was going to meet with the employee in question --

JUDGE GIANNOPOULOS: Meaning Mr. Salopek?

THE WITNESS: Yes, sir. Okay, correct. Meet with Mr. Salopek, and I would let them know in very short order how I was going to take care of it.

Q BY MR. STANEVICH: Okay. And did you in fact meet with Mr. Salopek?

A Yes, sir. I did.

Q Okay. And when in relation to this meeting with Mr. Rake and Ms. Burris?

A The very next morning.

Q Okay. And was anyone else there?

A Yes.

Q Who was there?

A So I -- there were four of us, again it was myself, John Kubiak, Balinda Melten and Francesca Cubino. Balinda and Francesca stayed in Michael Terry's office. And I met with Mr.

Salopek and John Kubiak in the training room which is across from Mr. Terry's office.

Q Okay. And was Mr. Terry in that session with you guys?

A He was not.

Q And prior to meeting with Mr. Salopek, did you reach out to Michael Terry or Mr. Powless to discuss the Navy's report?

A Both of them.

Q All right. And why did you do so?

A Well one, I felt like I got blindsided. I don't even know how come I hadn't heard about it earlier. And I needed to understand exactly how this happened and if, in fact, did we actually have any training issues that I didn't know about or that the Navy didn't uncover. And the answer turned out to be no, but I really needed to have those conversations. And Mr. Powless being her training officer, he was just a fountain of information regarding Mr. Salopek.

Q Now tell us about the meeting you had with Mr. Salopek.

A Sure. So I brought Mr. Salopek in, again we had asked him if he wanted his Union rep there. Her name was Angie or Angela, I don't recall. And he said no, and so she left. But even though she left, she was still kind of standing on the fringes outside the door where she could hear what was going on, but she definitely was not actually inside the room. I told him, I said I just had a meeting with the Navy, and I understand that you've been an employee of Xcel for some time.

I said I don't know you, but I'm going to tell you the Navy has directed me to remove you from the contract and I went through the list, I said dishonesty and falsifying the reports, lack of candor during the investigation which caused them hundreds and hundreds of hours of investigative time. One of the phrases from Mr. Rake, chasing their tail. You have not done this company any favors, so I'm going to ask at this point in time would you like to resign, and he says I do not wish to resign. I said well you're terminated, effective immediately.

Q In this conversation with Mr. Salopek, did you mention any -- in terms of chain of command, or chain of command violations in the session with Mr. Salopek?

A No.

Q Okay. Was that a concern to you at all?

A There was not from an employee standpoint but definitely from a contractual standpoint, as a company on a department of defense contract we as a company any time we have an issue, we have to follow a military chain of command. And so when something's brought to our attention, we would then bring it up to the PAR, performance assessment rep or his boss, the SPAR. And we go to the COR sometimes or one in the same, contracting officer representative and then to the contracting officer. Ultimately if it goes past that and we don't feel that the contracting officer is giving it the weight it deserves, then we as a company meaning the contractor can turn it over to the

office of inspector general. The office of inspector general will then initiate and conduct their own completely independent investigation, and if they find the merit in the claims then they will go to the military chain of command with what they found out in their official investigation. We don't jump that.

Q Is it your testimony that Mr. Mullen should not have gone to the command -- to the commanding officer?

A Absolutely not.

Q And is it your testimony that Mr. Mullen was prohibited from going to anyone at the US Navy?

A It is definitely a violation of the rules and regulations for sure. The military is a very rigid structure, and we have to operate inside of its confines because when you don't what just happened to us is what happens. They will tell somebody something that turned out to be completely unfounded allegations for the most part, there's a knee jerk reaction to problems. See when the office of inspector general gets ahold of it, they have an opportunity to take an objective look at things, make correct decisions. And then if something actually needs to happen, they will go to the commanding officer and say here's the official findings of our investigation. Does that answer your question?

Q Let me ask it a little bit differently. Is there a particular body or office within the US Navy that these employees should have gone to?

A Office of inspector general.

Q And at the time you made your decision to terminate Mr. Salopek, were you aware that there actually was a current pending complaint at the office of inspector general?

A I was not.

Q Now you testified before but -- and you mentioned to Mr. Salopek that you believed or you had heard that he was dishonest, did you give him any examples of why you believed he was dishonest?

A Yes, I did.

Q And what did you share with him?

A Well, I didn't have a copy of the report in front of me. Mr. Rake was -- the previous day was very thorough in his explanation. And several of the officers that he claimed falsified training records and failed their qualifications on certain days turned out and I had the opportunity at Indian Island before I clipped Mr. Salopek to review those records.

Q Clipped?

JUDGE GIANNOPOULOS: Clipped? Sorry.

THE WITNESS: Terminated him.

JUDGE GIANNOPOULOS: But you said clipped, right?

THE WITNESS: Clipped.

JUDGE GIANNOPOULOS: That means terminate.

THE WITNESS: Yes, sir.

JUDGE GIANNOPOULOS: All right. Sorry, all right.

not cooperating with the investigation and so that would be my definition of lack of candor. He just wasn't being forthcoming with them.

Q Now earlier you --

A Maybe I phrased it wrong, but that's -- yeah.

Q You were here earlier today when Mr. Terry testified, correct?

A Yes, sir.

Q And you reviewed a change of status document that listed chain of command in dishonesty?

A Yes, sir.

Q Why were those reasons included in the change of status document? There's the reasons for termination.

A Sure. So dishonesty, that was the -- sorry, the false allegations. If we're a federal contractor and employed the federal contractor, if you're going to make an allegation officially in writing you better make sure it's correct, because there is repercussions to that. Sometimes repercussions that cancel your company's contract. It doesn't always go great. Chain of command, he should have brought that up through the appropriate military chain of command so that we could have reported it appropriately to the government as we are supposed to.

JUDGE GIANNOPOULOS: I think you testified earlier that would have been the IG.

THE WITNESS: That would have been the inspector general, yes sir.

JUDGE GIANNOPOULOS: Okay, all right. In your --

MR. STANEVICH: Yes, sir.

JUDGE GIANNOPOULOS: Okay, very good.

THE WITNESS: Yeah, we just don't get the option to go barge into the -- leave our post and go into the -- barge into the commanding officer's offices. It reflects very badly on the employees and on the company as a whole.

Q BY MR. STANEVICH: Now you Mr. Filibek, prior to terminating Salopek, have you ever seen the underlying complaint that Mr. Mullen had filed with the Navy on July 9th, 2019?

A At that point, no I hadn't.

Q And when was the first time you had? I'm sure you've seen that complaint since, correct?

A Yes sir, I have.

Q When was the first time you've seen that complaint?

A It was early in December; I received it from a guy named Brian Morgan. He was the whistleblower investigator from OSHA.

Q Now reference that Mr. Rake had prepared a report, and he did not provide it to you in this meeting you had in late October, correct?

A He did not.

Q Did you ever receive a copy of it, the report?

A I did.

Q Did ever receive a copy of it from the Navy?

A Never.

Q How did you obtain a copy of that report?

A It was emailed to me from Brian Morgan.

Q And you recall approximately when it was emailed to you?

A December 3rd, 4th, 5th of '18 ish.

Q I'm going to show you what is it -- a packet of documents that have been marked as Respondent's 20. Mr. Filibek, please take a look at Respondent's 20 which has been marked for identification purposes and let me know when you're ready to proceed.

A I recall this.

JUDGE GIANNOPOULOS: Give me a second, let me have a chance to look at it all. Okay, go ahead. Mr. Stanevich, some of these look familiar. I'm assuming some of these attachments are already in the record?

MR. STANEVICH: They're in evidence already.

JUDGE GIANNOPOULOS: All right. Very good. All right, go ahead.

Q BY MR. STANEVICH: Mr. Filibek, what is this packet of documents?

A So this is files that we have from the whistleblower investigation from OSHA. Details things like the initial complaint --

A 10, 12.

Q And that you mentioned that there's some sort of form that you typically get about when they're making a request for removal?

A It's when we actually do the termination, if it's on a defense contract and we have to report on their -- it's called a suitability, why we actually terminated them, and it's kind of a check and balance for -- for the government. We told you to get rid of him, did you?

Q Okay. But then that sort of the previous step, the other way around, is there a form that they -- government would use to make the request?

A It's not a form, it's just usually a letter from the contracting officer. Sometimes it's just an email.

Q And you testified that you -- Mr. Rake read his report to you in that October meeting when you first met with him?

A Say 85 percent of it.

Q Okay. But then you actually got a copy of the report from OSHA, right? In December of 2018?

A In December, yes.

Q Right. And when you got this report, you didn't -- there weren't any surprises, right?

A No.

Q Okay. Did you discipline anyone other than Mr. Salopek in connection with what you learned in October from Mr. Rake?

A We did not.

Q Okay. And did you discipline anybody after you actually got the report itself in after December of 2018?

A We did not.

Q Okay. I have no further questions, Your Honor.

JUDGE GIANNOPOULOS: All right. Mr. Olszewski?

MR. OLSZEWSKI: None.

JUDGE GIANNOPOULOS: All right. Any redirect based on those -- that limited cross?

MR. STANEVICH: Nothing further, Your Honor.

JUDGE GIANNOPOULOS: All right. Mr. Filibek, thank you sir for your testimony, you can step down. Again just to remind you your -- the sequestration order is still in place. Thank you very much, sir.

THE WITNESS: Should I leave these up here?

JUDGE GIANNOPOULOS: Just leave those there, yeah. All right. Let's go off the record for a second.

(Off the record at 2:17 p.m.)

JUDGE GIANNOPOULOS: All right. We're back on the record. Mr. Stanevich, do you have any other witnesses scheduled for today?

MR. STANEVICH: I do not, Your Honor.

JUDGE GIANNOPOULOS: All right. So we will reconvene tomorrow at 9 o'clock. All right, thank you. We will be off the record.