**ORAL ARGUMENT HAS BEEN SCHEDULED FOR MAY 8, 2023**

**No. 19-CA-232786**
**No. 19-CA-233141**
**No. 19-CA-234438**
**No. 19-CA-237861**

**Docket No. 22-1264**

---

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA**

---

XCEL PROTECTIVE SERVICES, INC.,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

---

**FINAL BRIEF OF PETITIONER/CROSS RESPONDENT**
**XCEL PROTECTIVE SERVICES, INC.**

---

Jason R. Stanevich (DC53510)
jstanevich@littler.com
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone:  203.974-8700
Facsimile:   203.974.8799

**Attorneys for Petitioner/Cross-Respondent**
**XCEL PROTECTIVE SERVICES, INC.**

Date:  April 6, 2023

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

**(A)    Parties and Amici**

The following were parties, intervenors or amici who appeared before the National Labor Relations Board in Case Nos. **19-CA-232786, 19-CA-233141, 19-CA-234438, and 19-CA-237861**: Xcel Protective Services, Inc., Region 19 of the National Labor Relations Board, and the International Union, Security, Policy and Fire Professionals of America, Local 5.  The parties in this Court are:  Petitioner/Cross-Respondent Xcel Protective Services, Inc. and Respondent/Cross-Petitioner National Labor Relations Board.

**(B)    Rulings under Review**

The ruling at issue in this Court is the Decision and Order issued by the National Labor Relations Board on September 8, 2022, in Case Nos. 19-CA-232789, 19-CA-233141, 19-CA-234438, and 19-CA-237861. The Decision and Order is captioned <u>Xcel Protective Services, Inc., and International Union, Security, Police, and Fire Professionals of America, Local 5</u>, and the Decision and Order are published at 371 NLRB No. 134. A true and correct copy of the Decision and Order was attached to the Petition for Review filed with this Court on October 13, 2022.

**(C)    Related Cases**

There are no related cases.

**(D)    Corporate Disclosures**

Pursuant to Local Rule 26.1, Petitioner/Cross-Respondent Xcel Protective

- -

Services, Inc. states that it has no parent corporation, and no corporation owns 10%

or more of its stock.

# TABLE OF CONTENTS

PAGE

I.    STATEMENT OF SUBJECT MATTER AND JURISDICTION..........................2

II.   STATEMENT OF STATUTORY AUTHORITY.............................................2

III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................3

IV.   STATEMENT OF FACTS......................................................................4

    A.    Procedural History ...................................................................4

    B.    Statement Of Relevant Record Evidence......................................5

        1.    Xcel Protective Services, Inc. and Scope of Work at Indian Island..............................................................................5

        2.    Mark Salopek's Complaints to Xcel Chief Executive Officer John Morgan.................................................................7

        3.    Meeting with U.S. Navy Commanding Officer .................................8

        4.    July 9, 2018 Complaint.....................................................8

        5.    U.S. Navy Investigation, Report, and Written Recommendation to Remove Mark Salopek from the Contract ......10

            a.    Richard Rake .......................................................10

            b.    Investigation and Report Prepared for Contracting Officer and Commanding Officer of Indian Island...............11

            c.    Testimony of Richard Rake Concerning Mark Salopek........13

            d.    Richard Rake Meets with Xcel on October 26, 2018 and Recommends Mark Salopek's Removal from Indian Island ..............................................................16

            e.    Termination of Mark Salopek .................................19

V.    SUMMARY OF ARGUMENT .........................................................21

VI.   STANDING...................................................................................22

VII.   ARGUMENT ....................................................................................23

    A.   Standard of Review .................................................................23

    B.   Wright Line Standard .............................................................24

    C.   The Court Has Jurisdiction to Consider the Issues Regarding the
Lack of Protection to be Afforded Mark Salopek's Communications. ......24

    D.   Mark Salopek's Conduct Was Not Protected Where It Was Not for
the Mutual Aid or Protection of the Company's Security Guards. ............25

    E.   The Board's Decision that Mark Salopek Engaged in Protected
Concerted Activity is Contrary to the NLRA, Jefferson Standard, and
Well-Established Precedent Applying Jefferson Standard Where He
Failed to Disclose the Existence of an Ongoing Labor Dispute, as
Required. ...................................................................................28

    F.   Mark Salopek's Communications Were Sufficiently Disloyal,
Reckless and Maliciously Untrue as to Lose the Protection of the
Act. ...........................................................................................31

    G.   Mark Salopek's Alleged Protected Concerted Activity was Not a
Motivating Factor in His Discharge ...........................................35

    H.   Xcel Would Have Terminated Mark Salopek, Even Absent His
Alleged Protected Concerted Activities .....................................38

VIII.   CONCLUSION ..................................................................................43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Aroostook County Regional Ophthalmology Center v. NLRB*,
    81 F.3d 209 (D.C. Cir. 1996) .......................................................................... 32

*Avecor, Inc. v. NLRB*,
    931 F.3d 924 (D.C. Cir. 1991) ....................................................................... 23

*Cook Paint & Varnish Co. v. NLRB*,
    648 F.2d 712 (D.C. Cir. 1981) ....................................................................... 24

*Eastex, Inc. v. NLRB*,
    437 U.S. 556 (1978) ........................................................................................ 26

*Endicott Interconnect Technologies, Inc.*,
    345 NLRB 448 (2005) ..................................................................................... 30

*Endicott Interconnect Techs., Inc., v. NLRB*,
    453 F.3d 532 (D.C. Cir. 2006) .................................................................. 24, 32

*Fresenius USA Manufacturing, Inc.*,
    362 NLRB 1065 (2015) .............................................................................. 42, 43

*George A. Hormel & Co. v. NLRB*,
    962 F.2d 1061 (D.C. Cir. 1992) ..................................................................... 33

*Harter Tomato Prods. Co. v. NLRB*,
    133 F.3d 934 (D.C. Cir. 1998) ....................................................................... 23

*Mountain Shadows Golf Resort*,
    330 NLRB 1238 (2000) ............................................................................. 30, 32

*NLRB V. Local Union 1229, Int'l Brotherhood of Electrical Workers
(Jefferson Standard)*,
    346 U.S. 464 (1935) ............................................... 22, 29, 30, 31, 32, 33, 36

*Nova Se. Univ. v NLRB*,
    807 F.3d 308 (D.C. Cir. 2015) ....................................................................... 25

*Oncor Electric Delivery Co. v. NLRB*,
    887 F.3d 488 (D.C. Cir. 2018) ....................................................... 30

*PAE Applied Technologies, LLC*,
    367 NLRB No. 105 (2016) ............................................................ 43

*People Gas Sys., Inc. v. NLRB*,
    629 F.2d 35 (D.C. Cir. 1983) ........................................................ 23

*Reno Hilton Resorts v. NLRB*,
    196 F.3d 1275 (D.C. Cir. 1999) .................................................... 24

*Schaeff, Inc. v. NLRB*,
    113 F.3d 264 (D.C. Cir. 1997) ...................................................... 24

*St. Luke's Episcopal-Presbyterian Hosp., Inc. v. NLRB*,
    268 F.3d 575 (8th Cir. 2001) ........................................................ 33

*Tic-The Indus. Co. v. NLRB*,
    126 F.3d 334 (D.C. Cir. 1997) ...................................................... 24

*Valley Hosp. Med. Ctr., Inc.*,
    351 NLRB 1250 (2007) ................................................................ 35

*Xcel Protective Services, Inc., and International Union, Security, Police,*
   *and Fire Professionals of America, Local 5,*
    371 NLRB No. 134 (2022) ............................................. 1, 2, 27, 39

**Federal Statutes**

29 U.S.C. § 157 ..................................................................................... 2, 3, 30

29 U.S.C. § 158 ....................................................................................... 3, 4, 5

29 U.S.C § 160 ..................................................................................... 2, 3, 23

29 U.S.C. § 160(c) ...................................................................................... 29

29 U.S.C. § 160(f) .................................................................................. 2, 23

**Rules**

Rule 15(a) of the Federal Rules of Appellate Procedure ........................ 2, 5

# GLOSSARY

**"Act"** refers to the National Labor Relations Act.

**"ALJ"** refers to Administrative Law Judge John Giannopoulos.

**"Board"** or **"NLRB"** refers to the National Labor Relations Board.

**"Company"** or **"Xcel"** refers to Petitioner/Cross-Respondent Xcel Protective Services, Inc.

**"Decision"** refers to Xcel Protective Services, Inc., and International Union, Security, Police, and Fire Professionals of America, Local 5, 371 NLRB No. 134 (2022).

**"Dissent"** refers to the Dissenting Opinion in Xcel Protective Services, Inc., and International Union, Security, Police, and Fire Professionals of America, Local 5, 371 NLRB No. 134 (2022).

**"Region 19"** refers to Region 19 of the National Labor Relations Board.

**"Union"** refers to International Union, Security, Police and Fire Professionals of America, Local 5

## I.    STATEMENT OF SUBJECT MATTER AND JURISDICTION

The Court had jurisdiction pursuant to Section 10(f) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. § 160(f), which provides in relevant part: "Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States Court of Appeals in the Circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such  person resides or transacts business, or in the United States Court of Appeals for the District of Columbia." *Id*.

The National Labor Relations Board ("NLRB" or the "Board") issued a final Decision and Order in this matter on September 8, 2022. The Board's Decision and Order is reported as <u>Xcel Protective Services, Inc., and International Union, Security, Police, and Fire Professionals of America, Local 5</u>, 371 NLRB No. 134 (2022) ("Order"). In accordance with Rule 15(a) of the Federal Rules of Appellate Procedure, Petitioner/Cross-Respondent Xcel Protective Services, Inc. ("Xcel" or the "Company" or the "Petitioner") petitioned this Court on October 13, 2022, for review of the Board's Decision and Order.

## II.    STATEMENT OF STATUTORY AUTHORITY

### National Labor Relations Act, 29 U.S.C. §§ 151-169

**Sec. 7. [29 U.S.C. § 157]** Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) [section 158(a)(3) of this title].

**Sec. 8. [29 U.S.C. § 158] [Unfair labor practices by employer]** It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

**Sec. 10. [29 U.S.C § 160] (b) [Complaint and notice of hearing; six-month limitation; answer; court rules of evidence inapplicable]** Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of title 28.

## III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

1) Did Respondent/Cross-Petitioner National Labor Relations Board err as a matter of law in holding that the issues of whether Mark Salopek ("Salopek") engaged in protected activity and whether Salopek's actions lost the protection of the Act were not properly before the Board?

2) Did Respondent/Cross-Petitioner National Labor Relations Board err as a matter of law in holding that Salopek engaged in protected activity by raising vague concerns with the Navy when his communications were not for mutual aid or protection within the

meaning of the Act?

3) Did Respondent/Cross-Petitioner National Labor Relations Board err as a matter of law in holding that Salopek's actions did not lose the protection of the Act when Salopek failed to adequately apprise the Navy of the existence of an ongoing labor dispute related to employees' terms and conditions of employment?

4) Did Respondent/Cross-Petitioner National Labor Relations Board err as a matter of law when it failed to find that Salopek's actions lost the protection of the Act when his communications were disloyal, reckless and/or maliciously untrue?

5) Did Respondent/Cross-Petitioner National Labor Relations Board err as a matter of law in determining that, under the *Wright Line* analysis, Petitioner/Cross-Respondent Xcel Protective Services, Inc. violated Section 8(a)(1) of the National Labor Relations Act in terminating Salopek's employment?

6) Is there substantial evidence in the record as a whole to support Respondent/Cross-Petitioner National Labor Relations Board's finding that Petitioner/Cross-Respondent Xcel Protective Services, Inc. violated Section 8(a)(1) of the National Labor Relations Act by terminating Salopek?

## IV.    STATEMENT OF FACTS

### A.    Procedural History

On July 31, 2019, Region 19 of the NLRB issued a Complaint asserting, in relevant part, that Xcel violated § 8(a)(1) of the act when it terminated Salopek.[1] Administrative

---

[1] The Complaint also alleged that Xcel violated § 8(a)(1) of the Act when Michael Terry allegedly asked some Xcel employees why they raised pay issues with the Union and told them that if they had any pay issues they needed to bring those issues to him; that Xcel

Law Judge John T. Giannopoulos (the "ALJ") heard the cases and issued a decision on December 7, 2020, finding that Xcel violated Section 8(a)(1) of the Act by retaliating against Salopek for his involvement with two complaints made to the U.S. Navy (the "Navy"). Xcel filed exceptions to the Board, challenging the ALJ's ruling, but the Board affirmed the ALJ's primary findings and conclusions and adopted the recommended Order as modified.

In accordance with Rule 15(a) of the Federal Rules of Appellate Procedure, Xcel filed a timely petition for review of the Board's Decision and Order with the Court. The Board filed a cross-application for enforcement on November 18, 2022.

**B. Statement Of Relevant Record Evidence**

**1. Xcel Protective Services, Inc. and Scope of Work at Indian Island**

Xcel, formerly called Basic Contracting Services, Inc. ("BCSI"), is a government contractor that provides armed security services to the federal government. APP[2], 625. The Board of Directors at the time was comprised of John Kubiak ("Kubiak"), Belinda Melton ("Melton") and Michael Filibeck ("Filibeck"), and there were contract managers for each contract that Xcel maintained. *Id.*, APP 626. At the time of trial, Xcel had nine contracts with the federal government.[3] *Id.* John Morgan ("Morgan") was previously the

---

violated § 8(a)(1) of the Act when it allegedly constructively discharged Stephen Mullen; that Xcel violated §§ 8(a)(1) and (a)(3) of the Act when Lieutenant l Powless announced that, because someone had complained about arm-up time, no one would be allowed to go home early in response to Daniel Lein's complaint about pay for arm-up time; that Xcel violated §§ 8(a)(1) and (a)(5) of the Act when it failed to furnish documents requested by the Union.

[2] All references to the transcript for this trial will hereinafter be referred to as "APP."

[3] Xcel's three government contracts geographically closest to the Indian Island contract are the contract in Oregon for the U.S. Army Corps of Engineers, the contract in North

Chief Executive Officer for Xcel, and he resigned from his position in September 2018, which is when Filibeck started working for Xcel. *Id*. Filibeck "assumed the full duties from the former CEO on or about the 12th of October." APP 394.

Xcel maintained the security contract at Indian Island until September 30, 2018, when it was subcontracted by the Navy to another security company called Homeland Security Solutions, Inc. APP 627-28. Michael Terry ("Terry") was the contract manager for the contract at Indian Island, meaning he was the top-ranked Xcel official on-site at that location. APP 395, 629. Indian Island is roughly a couple of thousand acres. *Id.*, APP 385. There are two patrols on the Island: North patrol and South patrol. APP 386. The security guards were responsible for patrolling the island and protecting the assets, including munitions. APP 381, 401. The security guards reported to lieutenants, who reported to Terry. APP 604.

Xcel's contract with the Navy included a Performance Work Statement ("PWS"), which contained several provisions outlining the scope of the work to be performed by Xcel and operational requirements. APP 263-94.[4] The PWS also describes the work that the security guards were required to perform pursuant to the contract: entry control point services; identification checks; commercial vehicle inspection; roving guard services perimeter patrol; interior patrol; building checks; and reaction patrol. APP 287-91.

---

Dakota at Cavalier Air Force Base and the contract in Texas for the U.S. Army Corps of Engineers. APP 626.

[4] Exhibits will be referred to as follows: Joint Appendix ("APP")

### 2. Mark Salopek's Complaints to Xcel Chief Executive Officer John Morgan

On March 9, 2018, Salopek reported various perceived violations relating to the weapons-qualification practices of various guards employed by Xcel to Morgan. APP 413. Morgan stated that he would investigate the various issues. APP 413-14. Thereafter on June 28, 2018, Salopek sent an email raising seven concerns:

- Someone could get hurt and the Company could potentially be liable;

- Guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base;

- The practices violated the Navy's "OPNAV" safety and operating procedures and ethics;

- If discovered by the Navy, or an Inspector General ("IG") complaint was made, the consequences could be "catastrophic" for the Company and tarnish the Company's name as well the names of the Company's guards;

- Xcel's rating with the government could be affected;

- Criminal actions may have occurred; and

- Violations of State law may have happened which could jeopardize the Company's ability to conduct business and the Navy's reputation.

APP 422-25, 341-45, 346.

Morgan's response to the email was not satisfactory to Salopek. *Id.* Instead, of approaching his union or filing a grievance, Salopek took it upon his own to complain directly to the Navy's commanding officer for Indian Island.

### 3.  Meeting with U.S. Navy Commanding Officer

On July 8, 2018, Salopek, along with his colleagues Stephen Mullen ("Mullen") and Daniel Lein ("Lein") met with Commander Pulley, who is the Navy's commanding officer for Indian Island.  They informed Commander Pulley that they were going to report a safety concern to the IG.  APP 426-27.  While Salopek, Mullen and Lein wanted to remain anonymous and report the concern only to the IG, the commanding officer eventually ordered them to tell him what was going on.  APP 428.  At that point, they relayed vaguely to the commanding officer that the concern involved alternate site ranges, the alteration of targets and falsified training records.  *Id.*  Furthermore, they vaguely expressed their concerns about the safety of visitors to the park across the street from the naval base due to the lack of proper training. APP 431.  The commanding officer responded that there would have to be an investigation done by Richard Rake ("Rake") and Steve Manson ("Manson"), contracting officers for the Navy.  *Id.*  Finally, the commanding officer asked that Mullen, Salopek and Lein send an e-mail to Michael Jones, the Installation Security Officer ("ISO") at the Navy, ("ISO Jones") to report what they had just reported to the commanding officer.  *Id.*, 429.

### 4.  July 9, 2018 Complaint

On July 9, 2018, Mullen sent an e-mail to ISO Jones, stating that he, and fellow Xcel security guards Salopek, Lein and Jacob Schryver ("Schryver")[5] were reporting a

---

[5] Salopek testified that the e-mail complaint was not shared with Schryver before or after it was sent to ISO Jones on July 9, 2018.  APP 445.  This is not surprising considering how Schryver disagreed with all of the allegations that were attributed to him when he was interviewed by the Navy.

safety issue concerning weapons qualifications.  APP 221-22.  In this e-mail, Mullen set

forth several allegations about his colleagues at Xcel:

- At an unknown date, Officer Cunningham failed at the range on his shotgun and was subsequently brought to either a gravel pit or another location by Officer Schryver who supplied his personally owned shotgun to Officer Cunningham to use.  After that incident, Officer Cunningham was rendered "qualified." When this was brought to Terry's attention, he replied that it was allowed by the Navy.

- Lieutenant Gerald Powless asked Officer Schryver to bring officers to a gravel pit to qualify, but Officer Schryver said he was not comfortable doing this.

- On July 7, 2017, Officer Armstrong drove up and stated to Terry, who was standing next to Salopek, that he had the AR15 and a 9mm.  When Salopek asked what he was talking about, Officer Armstrong stated that he was bringing those weapons for range at Officer Schroeder's house.

- On May 9, 2018, three officers, Officer Lauritzen, Officer Cunningham and Officer David, did not pass their rifle qualification.  Officer Cunningham could not pass his shotgun either, and his ability to effectively handle and manipulate the two weapons was called into question by Officer Mullen.

- At this time, Lieutenant Powless altered their targets by putting a large black cross with a black felt pen on the targets, and Lieutenant Mitch Vancura helped Officer Cunningham by putting a white piece of paper at the six o'clock position so that Officer Cunningham could see and aim his shotgun at the target. Officer Cunningham still did not pass with his rifle.

- Officer Emily Coler was at the range and was struggling with how to handle both the rifle and the shotgun.  She failed her M4 Rifle and shotgun qualification.  Officer Daniel Lein did not pass the M4 rifle qualification.

- Officer Cunningham came back qualified with the rifle.

- Lieutenant Powless told Officer Lein and Officer Coler that they were going to be taken to a gravel pit to qualify with the M4 Rifle.  Lieutenant Powless said they would not be paid for this.  Officer Lein declined to go.

- After the "gravel pit range," Officer Coler was allowed to work all posts with all weapons, as she had qualified with the rifle and the shotgun.

As outlined below, the Navy investigated and dismissed nearly all of these allegations without merit.

At 1:50 p.m. on July 9, 2018, Rake, a Senior Performance Assessment Representative and Xcel's Contracting Officer's Representative for the Indian Island contract, sent an e-mail to Terry, forwarding the complaint sent by Mullen to ISO Jones. APP 221-22.  This was the first time that Terry had been notified of who had actually made the complaint.  APP 606.  Terry shared the complaint with Morgan.[6]

### 5. U.S. Navy Investigation, Report, and Written Recommendation to Remove Mark Salopek from the Contract

#### a. Richard Rake

Rake is employed by the Navy in Bangor, Washington.  APP 492.  Rake holds various positions with the Navy, including acting as the Senior Performance Assessment Representative ("SPAR") and the Contracting Officer Representative ("COR").  APP 492-93.  As a SPAR, Rake supervises Manson, the Performance Assessment Representative, and is responsible for monitoring effectiveness of government contracts. In his COR role, Rake makes sure the government and the contractor "abide by the

---

[6] Mullen testified that he overheard Terry and Morgan speaking on the phone where Morgan allegedly stated that one of the employees was easy to get rid of because he was on probation and that the other two were "cancers" in the workplace.  APP 470.  Mullen did not hear Morgan reference any employees by name.  APP 584-85.  Regardless of whether this statement occurred, it is of no relevance, as Morgan did not take any adverse action against Mullen, Lein, Schryver or Salopek for filing a complaint with the Navy. Rather, Mullen resigned his employment even though Terry was conducting an investigation as directed by Morgan. Lein and Schryver were never disciplined. Likewise, Morgan left the Company in early September and was not involved in the decision to terminate Salopek.

contract" and acts as a liaison between the contracting officer and the government.  APP 495.  Rake supervises various security contracts for the Navy, including Xcel's security contract at Indian Island.  APP 494-96.  As part of his responsibilities as the SPAR and COR, Rake investigates complaints concerning contract compliance.  APP 495, 497.

### b.    Investigation and Report Prepared for Contracting Officer and Commanding Officer of Indian Island

In July 2018, Rake and Manson investigated two related complaints involving Xcel employees.  The first matter involved a complaint that Salopek, Mullen, and Lein had made directly to the commanding officer of Indian Island and the second complaint was related to the e-mail complaint that Mullen sent ISO Jones on July 9, 2018.  APP 497-99.  ISO Jones e-mailed Mullen's complaint to Rake, and Rake subsequently forwarded the e-mail to Terry at 1:50 p.m.  APP 499; 221-22.  Earlier in the day, Commander Pulley called Rake to tell him that he "was going to pull all of the contract guards [off post] until he was proven that they met the requirements to stand post."  APP 498-99.  Rake immediately contacted Manson and went through the firearms qualifications records for Xcel employees "standing post right at that moment" and then moved on to check the other shifts.  APP 500.

Rake and Manson met with Terry and other Company representatives the next day and started reviewing training records for all Xcel employees.  APP 500-01.  Rake and Manson also "set up appointments to interview . . . the initial three individuals to get their complaints."  APP 501.  Rake scheduled interviews with Lein and Salopek and tried several times to get an appointment with Mullen.  Rake testified that Mullen "called in

sick" the "three different times [Rake] tried to schedule with him." APP 502. Mullen then resigned, for unrelated reasons according to his testimony, the day before he was next scheduled to meet with Rake. APP 248-53. Subsequently, Rake and Manson met with all Xcel employees named in Mullen's complaint and/or who were referenced in the interviews of the other employees. APP 503.

By July 25, 2018, Rake and Manson had completed an extensive report for the contracting officer and commanding officer. APP 207.

The report covered all of the allegations included in the July 9, 2018 e-mail from Mullen as well as additional allegations made by Salopek during his interview and in a supplemental e-mail from July 22, 2018. APP 209-19.

Rake testified that he and Manson interviewed Schryver, who was named as a co-complainant in the complaint that Mullen filed on July 9, 2018, but that Schryver "got very upset" with the allegations and "did not agree with a single one." APP 522-24. Indeed, Schryver denied entire paragraphs of Mullen's complaint even though many of the allegations were attributed to him. APP 525.

In addition, while Mullen made several comments in his July 9, 2018 complaint about Officer Cunningham's inability to safely handle and unsling weapons at the range, Schryver disagreed and told Rake that "as the line coach for [Officer] Cunningham if any safety issues would have arisen he would have called out to stop the shoot." APP 211-12 (Issue / Finding 6).

Overall, of the 12 different allegations made in the July 9, 2018 complaint, Rake and Manson found merit with respect to only one allegation. APP 213-14. Notably, the

report stated that, "No falsifying of any federal documents were found in reviewing armory records, training jackets, 3591.1 forms, SATC records or ammo draw. No one interviewed could provide any documents that GOV records were falsified, only comment was 'that was what I heard.'" APP 214.

The report also reviewed nine specific issues raised in a supplemental e-mail from Salopek. Rake and Manson again concluded that, except for the Coler-related allegations outlined above, no action was needed in response to Salopek's allegations. Notably, the report covered multiple concerns about Salopek and how he conducted himself during the interview process. The report concluded Salopek was trying to get back at the Company for a prior incident and that Salopek was not trustworthy as he told Rake and Manson that he had a high level of integrity and they did not need to question his facts. APP 217-19. In the report, Rake recommended that Salopek should be removed from the contract because he could not provide a single fact behind his allegations, and wasted their time chasing his allegations, and due to his disregard to Navy policy. APP 217-19 (emphasis added).

Finally, while the report recommended Salopek's removal from the contract, it did not recommend any action against Mullen, Lein, or Schryver. APP 219-20. Overall, Rake and Manson spent "a little over 400 hours" investigating the allegations raised by the employees. APP 505.

### c. Testimony of Richard Rake Concerning Mark Salopek

In response to direct examination questions from the General Counsel, Rake explained that in 2015 he had previously "asked the contracting officer for removal of Mr.

13

Salopek from the contract because he left the ready for issue room open that contained over 5,000 rounds of ammo; M-9s, M4s, M500 shotguns, and most important, M240 belt-fed machine guns." ("RFI Incident"). APP 512.   The contracting officer approved Salopek's removal, and Rake subsequently informed Xcel of the decision to remove Salopek from the contract.  However, as Rake explained, "Mr. Terry, the contract security manager at the time, kind of pleaded a little case with me about [Salopek], and asked if he could be removed as the shift lieutenant but keep him as a contract guard, because he knew Mr. Salopek from the days when he was law enforcement in Nevada."  APP 512.

Rake explained that Salopek raised the 2015 incident when he was interviewed by Rake and Manson concerning the complaint Mullen filed on July 9, 2018.  In regard to the "RFI incident" Rake was surprised by Salopek's decision to raise the prior incident and was surprised that Salopek described the incident as being blown out of proportion and not a big deal and that Salopek was upset with Terry over his demotion from that incident.  Rake then advised Salopek that he demoted him and in fact he recommended Salopek be removed from the contract, but Terry persuaded him to keep Salopek on as a guard. APP 530-30.  Rake explained that Salopek never told him why he had raised this incident during his interview with Salopek.  Salopek, during cross-examination, originally denied discussing this incident with Rake, even though it is outlined in detail in the July 25, 2018 report.  APP 457-58.  Subsequently, Salopek acknowledged it was discussed but that Rake had raised the prior incident.  APP 459.

Rake explained further that "Steve [Manson] and I were perplexed over several things that Mr. Salopek brought up in our - - that he brought up that we never asked him

14

during those interviews." APP 532. For example, Salopek stated to Rake and Manson that the IG wrongly criticized him for certain comments he made about security boats a few years earlier during an IG audit. APP 531-32. Rake testified that Salopek said "he knew more than the IG person that was doing the interviews on boats. But he did not know the IG guy that was doing it was of the Navy personnel who the harbor security boat instruction." APP 535. Salopek also provided Rake and Manson with several examples of how he thought female officers were problems as security officers because they receive special treatment from the Company. APP 533-34. Indeed, Salopek complained about how one female guard "used to be a dog groomer . . . and now she is a shift lieutenant." APP 532-33. Salopek denied making this statement. APP 448.

Rake testified in detail that in making his recommendation to remove Salopek from the security contract he considered the fact that Salopek brought upon the prior incidents, and that Salopek thought it was a minor incident, and that Salopek had informed Rake that he had witnessed two other guards improperly handling a weapon and he did not follow proper procedure despite witnessing these incidents. APP 536-39. Additionally Rake wanted Salopek off the contract because he felt Salopek's arrogance made him unsafe. APP 540. Salopek had informed Rake that during his term as law enforcement he was well-known to testify in cases, and the judge would tell the attorneys that Salopek was an expert witness and what he says is the truth, and therefore whatever information Salopek provided to Rake, Rake should take Salopek's word for it. APP 540.

Upon completion, the report was sent to Commander Pulley and to Contracting Officer Melissa Burris ("Burris"). APP 507-08. Rake testified that he discussed the report

with the commanding officer and the contracting officer and that they were in agreement with removing Salopek from the contract.  APP 541-42.

The Navy report was shared with OSHA Investigator Brian Morgan because Mullen and Salopek "made a complaint to OSHA about a Whistleblower Act."[7]  APP 508-09.  Notably, while these types of reports are "usually" shared "right away" with the contractor, the report was not shared with Xcel for several months because Burris instructed Rake not to share the report with Xcel due to the pending OSHA investigation. APP 510.  The report, however, included Rake's "recommendation to remove Mr. Salopek" from Indian Island.  APP 512, 519.  In response to questions from the ALJ, Rake testified that while Burris did not require Xcel to remove Salopek from the contract at the time, she was "going to after the report was released."  APP 515.  As noted above, the commanding officer and the security officer agreed with the recommendation to remove Salopek from the contract.  Burris was also "sitting there" with Rake when he made his recommendation to Xcel.[8]  APP 544.

### d.  Richard Rake Meets with Xcel on October 26, 2018 and Recommends Mark Salopek's Removal from Indian Island

Several weeks after Morgan's resignation from Xcel, Filibeck – who had just

---

[7] On November 5, 2018, Salopek filed a complaint with OSHA, claiming that he was terminated in retaliation for complaints he had made from 2017 through 2018 and for his participation in an investigation by the IG.  APP 254-59.  OSHA dismissed his complaint, and he requested review of the decision.  OSHA issued a final determination on August 15, 2019, dismissing his case, concluding that his "protected activity was not the reason for [his termination]" and that "the evidence demonstrates that [Xcel] terminated [his] employment due to integrity issues and inappropriate statements to Navy investigators." APP 260.

[8] Filibeck testified also that Burris was sitting next to Rake and was "not disagreeing" with him.  APP 641.

recently joined the Company and had no knowledge whatsoever of any pending complaint by Mullen or Salopek, left a message with the previous contracting officer, Anna Cabella, to introduce himself.  APP 630.  Filibeck received a phone call back from Rake "[o]n or about 22nd or 23rd of October," which was Filibeck's very first interaction with Rake.  APP 630.  Filibeck did not know Rake prior to joining Xcel in September 2018.  APP 630.  Filibeck subsequently called Burris to schedule a meeting as Rake had "recommended that [he] come out for a meet and greet to discuss some pending issues."  APP 631-32.  When asked why he scheduled the meeting so quickly, Filibeck stated that "[a]nytime the Navy says well I would recommend you come out here, when the Navy says we recommend it's not a polite suggestion, I understood."  APP 632.

The meeting took place in Bangor in the contracting officer's office.  Rake and Burris attended on behalf of the Navy.[9]  Filibeck, Kubiak, Melton, and Francesca Cubino ("Cubino") attended on behalf of Xcel.  Kubiak and Melton own the Company, and Cubino is an administrative assistant.  APP 633.   The meeting lasted appropriately ninety minutes.  APP 633.  After opening pleasantries, Rake described issues involving the Indian Island contract. APP 634-36.  Indeed, Rake testified that his first comment to Filibeck was that "we have a safety issue" *concerning Salopek* and that he then "discussed everything that was in the report."  APP 543.

Likewise, Filibeck described further how Rake had a copy of a written report with him at the meeting and that he verbally reviewed the report with the Xcel representatives.

---

[9] This meeting was the first time that Filibeck and Burris had met one another in person. APP 633.

APP 636.  Rake outlined the allegations regarding firearms qualification that he believed were false and shared concerns specific to Salopek, including Salopek's use of "classified pictures" from security boats used at Indian Island.  APP 637-38.

In addition to concerns about firearms qualifications, Rake spoke to Filibeck about how the IG found that Salopek had inappropriately posted "[f]or official use only" information on his Linkedin page.  APP 527; 248-53.   Rake explained that Salopek removed the information from Linkedin "for a period of time" but then it showed back up a few weeks later.  APP 528.  Indeed, Rake testified that the material was still posted on Salopek's Linkedin "as of a week-and-a-half ago, maybe two weeks ago now."  APP 528.  Specifically, Rake explained he was concerned that Salopek had posted pictures of "the inside of the security boats" including the "FLIR system."  APP 529; 248-253.

Filibeck provided extensive testimony concerning Rake's recommendation to remove Salopek from the contract at Indian Island, in particular because Rake described Salopek as dishonest, and that the Navy had lost all confidence in his ability to carry out his duties.  APP 639-40.

Filibeck did not receive anything in writing from Rake or Burris directing removal, but explained why he moved forward with removing Salopek from the contract regardless because there were extremely serious allegations, and because the Navy had clearly conducted a very thorough investigation.  APP 642-43.

Filibeck also acknowledged that he terminated Salopek's employment even though Rake had only recommended his removal from Indian Island due to the serious allegations, due to the lack of proximity of another contract location, and because Salopek

still had classified photos on his website, he would not be able to get a CAC card there.

APP 642-43.  In discussing removal for cause and how it affected Salopek's CAC card,

the ALJ commented to Filibeck: "***But in your mind, I understand what your mind was.***

***In your mind at least, the Navy told you to do it; you thought, I want to keep these guys***

***happy, I'm going to do it***."  APP 644 (emphasis added).  Filibeck agreed with the ALJ's

characterization of the decision-making process that led to Salopek's termination.  APP

644.  Earlier Filibeck testified "[m]y primary focus is maintaining the relationship with

customers.  They were the most important aspect of what I do, that make sure Xcel keeps

our contracts."  APP 627.

### e.  Termination of Mark Salopek

Filibeck and Kubiak met with Salopek the morning after Filibeck's meeting with

Rake and Burris.  APP 645-47.  At the time Filibeck terminated Salopek, he was not aware

that there was also a pending complaint at the Navy's Office of the IG.[10]  APP 649.  In

addition, prior to terminating Salopek, Filibeck had not seen the underlying complaint that

---

[10] The IG conducted an investigation and dismissed the complaint.  APP 447.  This included a review of Rake's report.  Also, the IG posted a number of written questions to Rake.  The IG sent an e-mail, requesting additional information regarding the investigation done by Rake and Manson, including what percentage of Xcel employees' weapons-issuance records were reviewed and for what period of time.  APP 295-300. Rake and Manson reviewed 100% of the staff's records for the period of time of September 2017 through August 2018.  *Id.*  Rake and Manson also noted that they "interviewed everyone that was mentioned/connected in the fact finding and including additional as necessary.  [They] interviewed everyone that Mr. Mullen/Mr. Salopek mentioned to [them] including interviewing personnel twice because Mr. Salopek said they had more to tell [Rake and Manson]." *Id.*  Finally, in response to the IG's question about whether any guards were issued weapons for which they were not qualified, they noted that Coler had been issued weapons for which she was not qualified.

Mullen had filed with ISO Jones on July 9, 2018.  APP 651.  Filibeck testified that he first received the July 9, 2018 complaint, as well as Rake's report, from OSHA during early December 2018.  APP 651-52.  Nonetheless, Filibeck testified that he did not discipline any other employees after his meeting with Rake in October 2018 or after obtaining Rake's report in December 2018.  APP 653-54.

Salopek denied during his testimony that Filibeck told him about his meeting with the Navy or how the Navy wanted him removed from the contract.  APP 449.  Salopek testified that Filibeck told him he was being terminated for being dishonest, for his lack of candor, and for going outside the chain of command.[11]  APP 436, 450, 596.  However, his testimony conflicts with the confidential affidavit he provided to the General Counsel and with at least three documents he prepared immediately after his termination in late October 2018. APP 451.  In addition, Salopek wrote several emails to Scott Harger from the Union immediately after his termination outlining what Filibeck told him when explaining the reasons for termination.  APP 301-04.  After reviewing the letters during his testimony, Salopek agreed that neither communication referenced any chain of command violation.  APP 597.  Indeed, Salopek agreed that he is not aware of any written communication between himself and the Union that references a chain of command violation.  APP 597.  He agreed further that, while he outlined several reasons for his termination in a three-page summary dated October 28, 2018, he did not reference any alleged chain-of-command violation.  APP 598-602; 305-07.

---

[11] Salopek testified that Filibeck was the only person who may have mentioned a "chain of command" violation.  APP 450.

20

Salopek testified that he spoke to Terry about the reasons for his termination just a few minutes after his meeting with Filibeck and Kubiak.  APP 452.  According to Salopek, Terry told him "*this is all Rake. He said they went down and talked to Rake and called me and said you're going to be fired*."  APP 452 (emphasis added).  Terry did not give Salopek any other reason for his termination.  APP 453; *see also* APP 305-07 ("He additionally told me that all of this is coming from Richard Rake.").  Terry testified that he told Salopek, "this was out of our hands.  This is what the Navy requested."  APP 614.

## V.    SUMMARY OF ARGUMENT

This case involves a clear misapplication of the facts and the law.  In this case, the Board not only  found Salopek's vague comments of general "safety concerns" to be protected speech made for the purpose of mutual aid or protection, but it also refused to acknowledge that such speech – even if it were protected – lost the protection of the Act under the standard set forth in *NLRB V. Local Union 1229, Int'l Brotherhood of Electrical Workers (Jefferson Standard)*, 346 U.S. 464 (1935), and subsequent case law, which make clear that such speech loses the protection of the Act where Salopek failed to disclose to the Navy the existence of an ongoing labor dispute between Xcel and the employees and where his speech was disloyal, reckless and maliciously untrue.

Moreover, even if such speech were protected, the facts are clear that Xcel did not terminate Salopek because of his protected activities.  A thorough investigation was conducted by Rake into Salopek's allegations.  Following that investigation, Rake requested that Xcel remove Salopek from the contract due to his dishonesty in the claims he raised, his lack of concern for safety and his general attitude and demeanor displayed

during Rake's investigation. Indeed, virtually all of the allegations made by Salopek to the Navy regarding weapons qualifications were not substantiated—and many were found to be flat out false. Rake spent several hundred hours investigating these claims, including reviewing a plethora of training records and interviewing numerous people, only to conclude that Salopek simply had a vendetta against Xcel due to issues he had had in the past with Terry.

Notably Xcel did not discipline anyone else involved with the complaint, i.e., Lein, Mullen or Schryver, and simply adhered to the Navy's well-supported recommendation to remove Salopek from the contract. Moreover, Rake's reasons for requesting that Salopek be removed from the contract were fully supported by a thorough and complete investigation—an investigation that the ALJ and now the Board second-guessed to find that it was Rake who harbored animus towards Salopek.

## VI.  STANDING

The Company has standing to petition this Court for review of the Board's decision based on Section 10(f) of the National Labor Relations Act, as amended 29 U.S.C. §160(f), which provides in relevant part: "Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United Stated court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia." *Id.*

## VII.   ARGUMENT

### A.  <u>Standard of Review</u>

The Court reviews the Board's factual conclusions for substantial evidence, defers to NLRB rulings if they are rational and consistent with the Act, and upholds the Board's application of law to facts unless arbitrary or otherwise erroneous.  *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 937 (D.C. Cir. 1998) (internal quotation marks and citations omitted).  The Court does not, however, simply rubber stamp agency decisions.  *Avecor, Inc. v. NLRB*, 931 F.3d 924, 928 (D.C. Cir. 1991).  Findings of fact by the Board are upheld only "if supported by substantial evidence on the record considered as a whole …" 29 U.S.C. § 160(f).  It is the Court's responsibility to examine carefully both the Board's findings and its reasoning. *People Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C. Cir. 1983).  It is appropriate to set aside the Board's decision where, as here, the Court "cannot conscientiously find that the evidence supporting [the] decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Cook Paint & Varnish Co. v. NLRB*, 648 F.2d 712, 719 (D.C. Cir. 1981) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  A petition to review should also be granted where the Board erroneously applies established law to the facts of the case.  *Endicott Interconnect Techs., Inc., v. NLRB*, 453 F.3d 532, 536 (D.C. Cir. 2006) (setting aside decision where Board misapplied precedent to situation where bargaining unit member made disparaging remarks about his company to newspaper reporter and on newspaper website).

**B.     Wright Line Standard**

It is undisputed that the *Wright Line* analysis is applicable in this matter. Under *Wright Line,* "the general counsel must first show that the protected activity was a motivating factor in the adverse employment decision. If this *prima facie* showing is made, the burden shifts to the employer to demonstrate that it would have made the adverse decision even had the employee not engaged in protected activity." *Jackson Hosp. Corp.,* 647 F.3d at 1141; *quoting Int'l Union of Operating Eng'rs, Local 470 v. NLRB,* 350 F.3d 105, 110 (D.C. Cir. 2003). The General Counsel's burden is one of persuasion, while the employer must provide rebuttal evidence under the preponderance of evidence standard. *Tic-The Indus. Co. v. NLRB,* 126 F.3d 334, 337 (D.C. Cir. 1997); *Reno Hilton Resorts v. NLRB,* 196 F.3d 1275, 1282 (D.C. Cir. 1999). The ultimate burden of persuasion, however, remains with the General Counsel. *Schaeff, Inc. v. NLRB,* 113 F.3d 264, 267 fn. 5 (D.C. Cir. 1997); *citing Dir., Office of Workers' Comp. Programs v. Greenwich Collieries,* 512 U.S. 267, 276-78 (1994).

**C.     The Court Has Jurisdiction to Consider the Issues Regarding the Lack of Protection to be Afforded Mark Salopek's Communications.**

The majority asserts that two of the issues raised by the dissent should not be considered: (1) the fact that Salopek's actions were not protected because he did not engage in them for the mutual aid and protection of the other security guards; and (2) the fact that Salopek's actions – to the extent protected – lost the protection of the Act because he failed to disclose to the Navy the existence of an ongoing labor dispute.  This is simply not true, and the Court, here, should consider both arguments where there is a clear and sufficient record to consider them, Xcel addressed the argument generally in its

24

Exceptions and the Board analyzed both issues at length – in both the majority and dissenting opinions.

First and foremost, the record is replete with sufficient evidence to enable the Court to address and adjudicate these two specific issues, both of which Xcel raises in its appeal. As evidenced from both the majority and dissenting opinions, there is testimonial and documentary evidence in the record to support these arguments advanced by Xcel here.

Further, Xcel *did* raise both issues generally in the Exceptions it filed, as it argued that Salopek's communications lost the protection of the Act given the nature of his speech. Thus, the Board was on notice of the general arguments Xcel was making. *See Nova Se. Univ. v NLRB*, 807 F.3d 308, 313 (D.C. Cir. 2015) ("To properly present and preserve a claim, a party's exception to an ALJ finding must fairly put the Board on notice of the specific grounds for its objections.") (internal quotation marks omitted.). Finally, both the dissent and the majority addressed and adjudicated these arguments at length. There is, therefore, no reason for the Court not to address these arguments here, both of which have been fully briefed by Xcel.

The arguments regarding Salopek's communications not being protected are not only logical extensions of the arguments made by Xcel in its Exceptions but are also important for the Court to address here where such a significant issue (and corresponding liability) are before it.

### D.    Mark Salopek's Conduct Was Not Protected Where It Was Not for the Mutual Aid or Protection of the Company's Security Guards.

As the dissent properly concluded, Salopek's conduct was not protected by the Act

because the evidence clearly showed that his communications with Morgan and the Navy were not, in fact, for the mutual aid or protection of the Company's security guards.  As the U.S. Supreme Court held in *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978), concerted activity is undertaken for the purpose of mutual aid and protection where employees are seeking to "improve terms and conditions of employment or otherwise improve their lot as employees."  Salopek's conduct did not meet this standard.

First, Salopek's e-mail to Morgan raised seven separate issues, only one of which had any bearing on the security guards' conditions of employment.  The seven issues were as follows:

- Someone could get hurt and the Company could potentially be liable;

- Guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base;

- The practices violated the Navy's "OPNAV" safety and operating procedures and ethics;

- If discovered by the Navy, or an IG complaint was made, the consequences could be "catastrophic" for the Company and tarnish the Company's name as well the names of the Company's guards;

- Xcel's rating with the government could be affected;

- Criminal actions may have occurred; and

- Violations of State law may have happened, which could jeopardize the Company's ability to conduct business and the Navy's reputation.

The only concern Salopek raised that was even remotely related to safety was in

claiming that "someone could have gotten hurt" as a result of the weapons qualifications shootings being done at a gravel pit. As for the other issues Salopek raised in his e-mail to Morgan, including the use of unauthorized weapons and ammunition and the altering of targets for the guards during qualifying shoots, Salopek did not raise any employee safety concerns related to these issues. As the dissent properly concluded, "the concerns mentioned in Salopek's email to Morgan chiefly focused on Xcel's interests and to a lesser extent, the Navy's." *Xcel Protective Services, Inc., and International Union, Security, Police, and Fire Professionals of America, Local 5*, 371 NLRB No. 134, at pg. 11 (2022). Indeed, Salopek opined that "the consequences could be catastrophic for the [C]ompany" if the Navy discovered this conduct, that "Xcel's rating with the government could be affected" and "violations of State law may have happened which could jeopardize the [C]ompany's ability to conduct business and the Navy's reputation." APP 422-25; 341-45; 346. Salopek also complained that Xcel's practices might cause the base to be vulnerable to a successful attack stating, "guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base." *Id.* Clearly these concerns do not implicate any concern for the improvement of the terms and conditions of employment for the security guards.

Similarly, with respect to the conversation Salopek, Lein and Mullen had with Commander Pulley, there is equally an absence of any evidence that the purpose of the communication was to improve the terms and conditions of employment for the security guards. During this conversation, they relayed vaguely to Commander Pulley that they wanted to raise a concern regarding alternate site ranges for qualifications shoots, the

alteration of targets and falsified training records.  APP 428.  They did not address the safety of the guards but rather, Salopek stated his concerns were with the safety of *visitors to the park across the street* from the naval base.  Thus, his concerns were about public safety, not the safety of the guards.  Again, the evidence shows that Salopek was not seeking to improve the guards' conditions of employment through his communication with Commander Pulley.

Attempting to fill in the gaps, the majority claims that, "[i]t required no inferential leap for Navy leadership to understand that Salopek's references to weapons-qualification practices and other security officers' inability to operate certain weapons . . . pertained to concerns about the risk of workplace injuries by, for example, improperly-qualified coworkers misfiring their weapons or failing to neutralize a threat."  APP 078.  However, neither Salopek, Lein or Mullen ever made any statement even resembling these statements offered by the majority, and the majority is simply trying to bolster its finding that Salopek's conduct was protected by surmising what Salopek *may* have been trying to convey – because it could not point to what Salopek *actually* said.

The dissent properly concluded that Salopek's conduct was not protected because it did not constitute concerted activity for the purpose of mutual aid or protection.

**E.  The Board's Decision that Mark Salopek Engaged in Protected Concerted Activity is Contrary to the NLRA, *Jefferson Standard*, and Well-Established Precedent Applying *Jefferson Standard* Where He Failed to Disclose the Existence of an Ongoing Labor Dispute, as Required.**

Even if Salopek's conduct were protected – and it was not – it lost the protection of the Act when Salopek failed to disclose the existence of an ongoing labor dispute, as

required under *Jefferson Standard*.

In *Jefferson Standard*, the Supreme Court held that employees who were engaged in a labor dispute with their employer, which operated a television station in Charlotte, North Carolina, were not protected by the NLRA when they distributed a handbill that criticized the quality of the station's programming. The company fired the employees because it believed they had "turned from trying to persuade the public that we are unfair to you [to] trying to persuade the public that we give inferior service to them." *Jefferson Standard,* 346 U.S. at 469 n.4. The Court found that the employees' handbill was an act of disloyalty that provided "cause" for their discharge, within the meaning of Section 10(c) of the Act, 29 U.S.C. §160(c). *Id.* at 472. Although the handbill constituted "concerted activity wholly or partly within the scope of those mentioned in § 7," 29 U.S.C. § 157, it was not protected by the Act because it was a "separable attack purporting to be made in the interest of the public rather than in that of the employees." *Id.* at 477.

Consistent with *Jefferson Standard*, the Board subsequently created a two-prong test for determining whether an employee's otherwise protected, disparaging statements made regarding his employer, directed to a third party, retain the protection of the Act. Pursuant to this test set out in *Mountain Shadows Golf Resort*, 330 NLRB 1238, 1240 (2000), this type of communication is protected only if: (1) it indicates to the third party that it is related to an ongoing labor dispute; and (2) it is "not so disloyal, reckless or maliciously untrue as to lose the Act's protection." The Board subsequently clarified that in order to prove the first prong of the test, employee communications to a third party disparaging an employer must disclose a nexus between the speech and the terms and

conditions of employment in order for the third party to "grasp the connection." *Endicott Interconnect Technologies, Inc.*, 345 NLRB 448, 451 (2005). This Court explained that this nexus is critical because the purpose of the first prong "is of course to enable the recipients to evaluate the statements in a fuller context, applying what the listener or reader regards as a suitable discount or enhancement." *Oncor Electric Delivery Co. v. NLRB*, 887 F.3d 488, 492 (D.C. Cir. 2018). In other words, the third party needs to know the *context* of the employee's speech. Salopek certainly did not provide any such context in his communications with the Navy here.

For instance, in the conversation with Commander Pulley, as the dissent correctly points out, "the evidence fails to show that in what was said to Commander Pulley, either Salopek, Mullen or Lein disclosed *any* ongoing dispute with Xcel, let alone an ongoing labor dispute." APP 086. While the guards disclosed to Commander Pulley weapons qualifications practices violative of the Navy's rules and procedures, there is no evidence or testimony in the record to show that that they told Commander Pulley that they had raised these issues with Xcel prior to reporting their concerns to him.

Even if Salopek's communications disclosed an ongoing dispute between the security guards and Xcel, there is no evidence that he disclosed to the Navy an ongoing *labor* dispute, or, as the dissent described it, "a dispute with Xcel over the impact of its weapons-qualification practices on the guards' on-the-job safety." APP 086. As detailed above, Salopek's communications did not address directly – or even indirectly – the safety *of the guards*. The evidence is clear that Salopek's communications were intended solely to alert the Navy to alleged policy, procedural and legal violations by Xcel and were not

30

intended in any way to garner support as part of a dispute between the Xcel security guards and Xcel over terms and conditions of employment. Colloquially, Salopek was simply trying to get Xcel in trouble, not improve his colleagues' working conditions. Regardless of Salopek's motivations, his words were clear, and there is no evidence that he, at any point in his communications with the Navy, disclosed the existence of an *ongoing labor dispute* between the security guards and Xcel.

### F.  Mark Salopek's Communications Were Sufficiently Disloyal, Reckless and Maliciously Untrue as to Lose the Protection of the Act.

Under *Jefferson Standard/Mountain Shadows*, not only did Salopek have to disclose to the Navy the existence of an ongoing labor dispute, but his communications also could not be so disloyal, reckless and maliciously untrue as to lose the protection of the Act. Salopek's communications did not meet this standard.

In *Endicott Interconnect Technologies, Inc. v. NLRB,* 453 F.3d 532 (D.C. Cir. 2006), this Court disagreed with the Board's application of *Jefferson Standard*. In that case, an employee criticized the company's decision to lay off employees to the newspaper. The employee stated that the layoff was leaving "gaping holes in this business." *Id.* at 534 (citation omitted). Furthermore, in comments posted on the newspaper's website, the employee alleged that "[t]his business is being tanked by a group of people that have no good ability to manage it" and they will "put it into the dirt." *Id.* at 535 (citation omitted). These statements caused the vice president of the company's main customer to express concerns over the employee's remarks.

This Court applied the *Mountain Shadows* two-prong test and held that the Board

had erred in applying the test by focusing only on the latter two elements of the second

prong of that test (the "reckless or maliciously untrue" elements) and "seemingly ignored

the very attribute that justified discharging the technicians in *Jefferson Standard* for cause:

the 'detrimental disloyalty' of their assault on their employer." *Id.* (citations omitted). The

Court held that, as in *Jefferson Standard,* the employee's "sharp, public, disparaging

attack upon the quality of the company's product and its business policies" was not

protected by the Act and, therefore, his termination was for cause. *Id.* at 537-38. *See also,*

*e.g., Aroostook County Regional Ophthalmology Center v. NLRB,* 81 F.3d 209 (D.C. Cir.

1996) (denying enforcement of a Board order that found that employees in a medical

office who complained about scheduling of hours within earshot of patients were not

engaged in activity protected by the Act); *George A. Hormel & Co. v. NLRB,* 962 F.2d

1061 (D.C. Cir. 1992) (reversing the Board decision and holding that an employee

engaged in unprotected, disloyal conduct when he participated in a parade and rally that

called for a boycott of his employer's product and in applying this objective test, the Court

held that the employee had engaged in disloyalty because "any reasonable observer of

these events would have to infer that [the employee] ... acted in furtherance of the

boycott."); *St. Luke's Episcopal-Presbyterian Hosp., Inc. v. NLRB,* 268 F.3d 575, 577 (8th

Cir. 2001) (denied enforcement of the Board's decision in a case in which an employee

appeared on a local television broadcast and claimed that a hospital's shift and work

assignments were "jeopardizing the health of mothers and babies." The Court found that

the statement was unprotected under *Jefferson Standard* because the employee "clearly

disparaged the quality of patient care being provided by St. Luke's in a way guaranteed

to adversely affect the hospital's reputation with prospective patients and the public at large.").

In this case, the Board disregarded this well-established precedent, and found that Salopek's communications with the Navy were protected.  However, disloyal attacks on an employer's products or services are held to be unlawful because they attack "the very interests which the attackers [are] being paid to conserve and develop." *Jefferson Standard,* 346 U.S. at 476. They are attacks that purport to be made "in the interest of the public rather than in that of the employees." *Id.* at 477. Like an act of physical sabotage, public attacks on the quality of a company's products or services have "more the character of coercion than of collective bargaining." *Id.* "Nothing would contribute less to the Act's declared purpose of promoting industrial peace and stability." *Id.* at 476.

Here, Salopek's complaints to the Navy accused Xcel of, *inter alia*, violating Navy regulations, falsifying federal documents, and engaging in a cover-up.  These comments were sufficiently disloyal, reckless and/or, in part, maliciously false.

Regarding Salopek's allegation that Xcel allowed weapons qualifications to occur in a gravel pit and that Xcel was falsifying the weapons qualification form, Rake investigated these claims and determined them to be false.  APP 227; 223-24; 228. Moreover, Salopek's allegation that Xcel was falsifying targets was also investigated and determined to be untrue.  Instead, Rake reported that Salopek had not actually read the instructions pertaining to the altering of targets, rendering his report of the issue reckless at best.  APP 226.

There were several other complaints made by Salopek that were found to be

unsubstantiated.  As noted above, there were several allegations related to Schryver that Schryver flat-out denied, including allegations that he had qualified Officer Cunningham at a gravel pit range and that he had been asked by Lieutenant Powless to qualify other officers at a gravel pit range.   Additionally, his allegation that officers Lauritzen, Cunningham, and David could not pass the weapons qualifications test proved to be false. APP 225-26.  Lastly, the allegation that Officer Coler had been issued a weapon for which she was not qualified, proved to be false, as well.  APP 228-29.

Salopek's false statements at a minimum constituted reckless disregard for the truth. *Valley Hosp. Med. Ctr., Inc.,* 351 NLRB 1250, 1252 (2007). (Statements do not lose the protection of the Act if they are not true; they must be maliciously untrue, meaning they were made with knowledge of their falsity or with reckless disregard for their truth or falsity).  Indeed, Salopek was apparently aware of only one instance of a qualification outside of a Navy-approved range and yet stated that Xcel was "falsifying federal documents" and that qualifications at a gravel pit range had occurred "on several occasions."  R. 2.  Further, even Salopek, Mullen and Lein's statements related to the alteration of targets were made with reckless disregard for their truth or falsity, given that Salopek admitted that he had not read the rules related to the alteration of targets.

Because of the seriousness of Salopek, Mullen and Lein's allegations, upon receiving their complaint, the commanding officer called Rake to tell him that he was going to pull all of the contract guards off post until an investigation proved that they had met the qualification requirements.   APP 498-99, 516.   Clearly, the exaggerated allegations about falsification of documents and several occurrences of improper

qualifications led the Navy to believe that there was a serious issue with falsified weapons

qualifications among the Xcel guards, which was simply not the case.

Moreover, after completing the investigation, Rake concluded that Salopek "had a

hidden agenda of his own," in that he seemed to be "trying to get back at the [C]ompany

for some [prior] incidents that occurred with him," namely his prior discipline and

demotion.  APP 232-33.  This finding is directly relevant to Salopek's intent in raising the

predominantly false claims.

As evidenced above, most of the issues raised were false and/or not substantiated.

Further, Salopek's exaggeration of the issues without any proof, repeating of statements

allegedly made by Schryver that were wholly untrue and alleging issues with alteration of

targets without even reading the relevant rules on the topic—coupled with his

demonstrated agenda to "get back at the [C]ompany"—clearly show that Salopek's

allegations were maliciously untrue.  Under these circumstances, Salopek's comments

lose the protection of the Act, as they were sufficiently disloyal, reckless and/or

maliciously untrue.

The Board's effort to ignore the precedent of *Jefferson Standard* and its progeny is

contrary to the statutory goal of promoting industrial peace.  Thus, the Board's decision

should be reversed because the Board committed error in finding that the Salpoek engaged

in protected activity.

### G.  Mark Salopek's Alleged Protected Concerted Activity was Not a Motivating Factor in His Discharge.

The Board erred in adopting the ALJ's findings in determining that Xcel acted with

significant animus against Salopek's protected concerted activity.

The ALJ identified three main factors in concluding that Xcel's action was discriminatorily motivated. First, the ALJ found that Filibeck "looked upon the actions of the three guards, in taking their complaints to Cdr. Pulley and then to ISO Jones, with disfavor and believed it was done in violation of the chain of command." APP 115.

However, the evidence established that, while the change of status document for Salopek's termination stated that Salopek was terminated for a chain of command violation and dishonesty (APP 167), Terry testified that he was instructed to include that language. APP 616. Furthermore, Filibeck testified that Salopek did not follow the appropriate *military* chain of command when he brought his complaint to the commanding officer of the base, instead of the IG.[12] *Id.*, 1021-22. The chain of command violation was a concern because "the military is a very rigid structure, and [Xcel] [has] to operate inside of its confines . . . ." APP 648.

Thus, had Salopek raised the complaint with the IG first, as he was supposed to do, he would not have committed a chain of command violation.

Secondly, the ALJ found that animus existed due in part to Filibeck's "fictional explanation regarding one of the reasons Salopek could not be transferred to another Xcel contract." APP 115. The ALJ cited to Filibeck's testimony that Xcel could not transfer Salopek to another contract because the next closest contract was 10,080 miles away. *Id.*

---

[12] Clearly recognizing that they were supposed to bring their complaint to the IG first, Salopek testified that they informed Commander Pulley that they wanted to remain anonymous and report the concern only to the IG. APP 428.

However, this statement was clearly a typo or a translation error. It defies logic to believe that Filibeck claimed that the nearest contract was *10,080 miles away*, as that would mean that Xcel does not have any contracts within the United States. Additionally, the ALJ points out, the dams at which Xcel had contracts were 245 and 330 miles away. However, Filibeck testified that these contracts were geographically too far. Additionally, Filibeck mentioned two other contract locations: Cavalier Air Force Base in North Dakota and U.S. Army Corps of Engineers in Galveston, Texas. APP 626. Thus, the 10,080-mile statement was a clear error.

Finally, the ALJ identified the following statements from "Respondent's officials" as evidence of the Company's animus: (1) a statement by Lieutenant Powless to Lien; (2) a statement by Morgan about Lein, Salopek and Mullen; (3) a statement by Terry to Lien; and (4) a statement by Morgan to Lien. However, these statements concerned Lien, who was not even disciplined for any actions he took in connection with the Complaint. Additionally, not one of these statements was made by the individual who made the decision to terminate Salopek. All of the alleged statements pre-dated Filibeck's employment by several months. Thus, any alleged animus on the part of Lieutenant Powless, Lien or Morgan has no relevance to whether Xcel's decision to terminate Salopek was motivated by discriminatory animus.

Thus, the ALJ's reasons for finding animus on the part of Xcel, adopted by the Board, simply do not suffice. This means that the General Counsel did not meet its burden of showing that Salopek's termination was discriminatorily-motivated, and the Board erred in adopting the ALJ's findings.

### H. **Xcel Would Have Terminated Mark Salopek, Even Absent His Alleged Protected Concerted Activities.**

The Board erred in finding "no merit in [Xcel's] . . . exceptions to the judge's finding that [Xcel] . . . failed to establish that it would have discharged Salopek even absent his protected concerted activity based on his conduct during the investigation into his actions, his failure to follow the Navy's chain of command, and Rake's recommendation that [Xcel] . . . remove him from the contract." *Xcel Protective Servs., Inc.*, 371 NLRB No. 134, at 3 (Sept. 8, 2022).

Here, there is no support for the ALJ's finding that Filibeck was aware that Rake allegedly harbored animus towards Salopek, Mullen and Lien based on the fact that they had brought a complaint to the commanding officer and ISO Jones.[13]   Indeed, neither

---

[13] The ALJ claimed that Filibeck knew Rake wanted Salopek "gone" because he was involved in the concerted complaints which resulted in the Navy's investigation. Decision, p. 55.  The ALJ cited to testimony from Terry.  Decision, p. 55; APP 613.  The ALJ mischaracterizes the testimony, which was as follows:

Q:  Okay. Did anybody tell you that Mr. Salopek was going to be terminated?

A:  Yes.

Q:  Okay. And who told you that?

A:  Mr. Filibeck.

Q:  And do you recall approximately when it was? Month, time of the month?

A:  I think it was on a Friday on October 26th of last year.

Q:  Okay. And what did Mr. Filibeck tell you?

A:  That he had just got through with a meeting with the Navy and that they mentioned the person that was responsible for this investigation over the qualified

Filibeck, nor anyone from Xcel, was present for Rake's interviews of the employees and/or was involved in the writing of the report. Moreover, Filibeck did not receive Rake's report related to his investigation until well after Salopek was terminated. Thus, while Rake reviewed his findings with Filibeck during their meeting in late October 2018, Filibeck did not have access to the full report until *after* Salopek was terminated. Thus, Xcel is able to rely on Rake's recommendation to remove Salopek from the contract where it was unaware of any alleged animus on the part of Rake.

In addition, even absent any dishonesty Salopek displayed in the allegations he made to the commanding officer and ISO Jones, Xcel would have terminated his employment anyway. Rake made the recommendation to remove Salopek from the contract based on his conduct and demeanor *during the investigation*, as well, including his arrogance, his downplaying of his prior disciplinary issues and his apparent lack of concern for the safety of his colleagues.

Rake testified that he recommended Salopek's removal from the government contract based on his dishonesty with respect to the complaints he raised. Rake was able to confirm as true only the Coler-related allegations made by Salopek regarding the fact that Officer Coler was issued weapons for which she had not qualified. APP 213-14. As

---

individuals -- or the weapons quals they'd been investigating over the last few months, and they basically wanted him gone.

Clearly, this testimony provides that Filibeck stated that, at the meeting with the Navy they simply mentioned the individual who was responsible for sparking the investigation and that they wanted him gone. Terry did not state that Filibeck said that the Navy said they wanted Salopek gone *because* he was responsible for sparking the investigation.

to the other allegations, Rake was unable to substantiate them.  In fact, he found many of them to be patently false.  Rake and Manson spent hundreds of hours investigating these complaints, including reviewing training records for all Xcel employees and interviewing all Xcel employees named in Mullen's complaint and/or who were referenced in the interviews of the other employees.  APP 500-515; 503.  While Salopek's dishonesty in the complaint allegations was part of Rake's justification for removal of Salopek from the contract, it was not the sole reason.

Rake also made the recommendation to remove Salopek from the contract based on his conduct and demeanor during the investigation.  Salopek made numerous troubling comments. For instance, he told Rake and Manson that he felt female officers were "problems" as security officers because they receive special treatment from the Company. APP 533-34.  He also cited numerous alleged instances of female officers receiving special treatment to support his theory.  APP 218.  His blatant dislike of and/or disrespect for female security guards was incredibly disturbing to Rake.

Salopek also displayed incredible arrogance while being interviewed with Rake and Manson.  For instance, he claimed that, while he was a police officer, he was so well-respected that, when he testified in court, the judge informed the attorneys that Salopek was an expert witness and that everything he said should be taken as the truth.  APP 540. Rake felt that Salopek's unchecked arrogance was, in itself, a safety concern.  *Id*.

Further, Rake was troubled by the fact that Salopek brought up two prior issues with Xcel, as he felt this was evidence that Salopek was trying to "get back at the [C]ompany" for repercussions from prior incidents.  APP 218.

Finally, Rake recommended removal of Salopek from the contract based on his disregard for the safety of his colleagues. APP 537-38. As the safety officer, Salopek noted he observed incidents in which fellow guards were mishandling their weapon and failed to address it as he was supposed to. *Id*., 538. Instead, Salopek merely reported them months after the fact, thereby evidencing only a likely desire to criticize and embarrass his colleagues, and not to assist and protect them. *Id*.

Rake relayed all of this to Filibeck when he met with Filibeck and Burris on October 26, 2018. During this meeting, Rake evidenced an extreme distrust and dislike of Salopek based not only on the fact that he had forced the Navy to waste hundreds of hours investigating a baseless complaint based only on hearsay, but also based on the fact that he displayed a disturbing demeanor during the investigation process that led Rake to recommend his removal from the contract.

The Board further disregarded the clear case law that permitted Xcel to terminate Salopek based on his conduct during the investigation. In *Fresenius USA Manufacturing, Inc.*, 362 NLRB 1065 (2015), the Board held that the Respondent met its burden under *Wright Line* of showing that it would have terminated the employee even in the absence of his alleged protected activity.[14] In *Fresenius*, the employee made handwritten comments on union flyers and some other employees complained that the comments were inappropriate. The company did an investigation and in the course of doing so, the

---

[14] Notably, the Board here held that *Wright Line* was the relevant standard, even though the company's decision to terminate the employee was based, in part, on his alleged protected, concerted activities.

41

employee lied about being the author of the statements and then lied again when he unwittingly confessed by trying to conceal his identity as the confessor. The company suspended and discharged the employee for both his handwritten comments and for his dishonesty during the investigation. The Board assumed without deciding that the employee's handwritten statements constituted protected, concerted activity and that they did not lose the protection of the Act and therefore concluded that the General Counsel had met its burden of showing that the protected activity was a motivating factor in the employee's suspension and termination. *Id.* at 1066. However, the Board found that dishonesty was not protected activity and that the company had met its burden of showing that it would have taken the same action even in the absence of the handwritten statements based on the employee's dishonesty during the investigation. *Id.*

The facts here are similar. Salopek's conduct and demeanor during the investigation were part of Xcel's reasoning for terminating his employment. This is considered a proper reason for termination, even if the other part of Xcel's reasoning is considered protected concerted activity that did not lose its protection under the Act.

Finally, although Rake had only recommended removing Salopek from the contract, Xcel had legitimate business reasons to terminate his employment. Indeed, it was not able to offer Salopek another position. First, there was no position in a geographically close location. Second, Filibeck felt that if he was going to behave in this manner at Indian Island—i.e., dishonestly, arrogantly and without regard for the safety of

his colleagues—he would do so at another location, as well.[15] *See PAE Applied Technologies, LLC*, 367 NLRB No. 105, at *5 (2016) ("Employers have the right to discipline employees for being rude and discourteous towards a customer. This is especially true in the case of a government contractor that provides security services at military installations. In such circumstances, it is incumbent on employees to show proper respect towards government officers to provide the safety and security of the military installation, as well as to not place their employer at risk of losing its contract.") Thus, Xcel really had no choice but to terminate Salopek's employment.

## VIII. CONCLUSION

For all the foregoing reasons, Xcel requests that the Court grant its petition for review and deny the Board's cross-application for enforcement of its Order.

---

[15] The ALJ interpreted Filibeck's comment that he did not want to transfer Salopek because "if this guy is going to do this kind of activity here, he's going to do it there" to mean that Filibeck "did not want to employ someone who, like Salopek, might violate the chain of command and go directly to the head of a client agency with concerted complaints about working conditions." APP 115. The ALJ's interpretation here is not supported by any evidence or testimony and is simply an assumption. It is not a credibility determination.

Dated: April 6, 2023                 Respectfully submitted,

*/s/ Jason R. Stanevich*
Jason R. Stanevich (DC53510)
jstanevich@littler.com

LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT  06510
Telephone:  203.974.8700
Facsimile:   203.974.8799

**Attorneys for Petitioner/Cross-Respondent**
**XCEL PROTECTIVE SERVICES, INC.**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: New Haven, CT
         April 6, 2023

*/s/ Jason R. Stanevich*
Jason R. Stanevich (DC53510)

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 6th day of April, 2023, a copy of the foregoing was

served by electronic means on:

> Linda Dreeben, Esquire
> Ruth E. Burdick, Esquire
> Deputy Associate General Counsel
> National Labor Relations Board
> appellatecourt@nlrb.gov
>
> Carolyn McConnell, Esquire
> Counsel for the General Counsel
> National Labor Relations Board, Region 19
> Carolyn.McConnell@nlrb.gov
>
> Richard M. Olszewski, Esq.
> rich@unionlaw.net

> */s/ Jason R. Stanevich*
> Jason R. Stanevich (DC53510)