**Nos. 22-1264, 22-1295**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### XCEL PROTECTIVE SERVICES, INC.

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION
## FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

_____

**KIRA DELLINGER VOL**
*Supervisory Attorney*

**MICAH P.S. JOST**
*Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-0656**
**(202) 273-0264**

**JENNIFER A. ABRUZZO**
    ***General Counsel***
**PETER SUNG OHR**
    ***Deputy General Counsel***
**RUTH E. BURDICK**
    ***Deputy Associate General Counsel***
**DAVID HABENSTREIT**
    ***Assistant General Counsel***

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Rule 28(a)(1) of the Rules of this Court, counsel for the National Labor Relations Board ("the Board") certify the following:

**A.     Parties, Intervenors, and Amici:**  Xcel Protective Services, Inc. ("Xcel") was the respondent before the Board and is the petitioner/cross-respondent before the Court.  The Board is the respondent/cross-petitioner before the Court.  International Union, Security, Police, and Fire Professionals of America, Local 5 ("the Union") was the charging party before the Board.  The Board's General Counsel was also a party before the Board.

**B.     Ruling Under Review:**  The ruling under review is a Decision and Order of the Board in *Xcel Protective Services*, 371 NLRB No. 134 (Sept. 8, 2022).

**C.     Related Cases:**  This case has not previously been before this or any other court.  Board counsel are unaware of any related cases either pending or about to be presented before this or any other court.

# TABLE OF CONTENTS

**Headings**                                                                                        **Page(s)**

Statement of jurisdiction ................................................................1

Statement of the issues ..................................................................2

Relevant statutory and regulatory provisions ............................................2

Statement of the case.....................................................................2

   I.   The Board's findings of fact............................................................2

      A.  Background ........................................................................2

      B.  Officer Mark Salopek learns that Xcel is violating Navy weapons-qualification policies, discusses safety concerns with his coworkers, and raises those concerns to Xcel ..............................................4

      C.  When Xcel fails to take action, Salopek and other officers go to the Navy ........................................................................6

      D.  Xcel management responds with hostility.................................7

      E.  The Navy investigates. .......................................................9

      F.  Salopek raises officers' concerns to the Navy's Office of the Inspector General.............................................................10

      G.  Xcel discharges Salopek but gives Lein a second chance ......................11

      H.  Xcel fails to provide requested information .............................12

      I.  Lein complains when Xcel shorts his pay; Xcel retaliates by telling employees they will not be allowed to go home early anymore .............12

   II.  Procedural history .....................................................................13

## TABLE OF CONTENTS (cont'd)

**Headings**                                                                                    **Page(s)**

III. The Board's conclusions and Order ................................................................14

Summary of argument.........................................................................................15

Standard of review .............................................................................................17

Argument.............................................................................................................18

I.  The Board is entitled to summary enforcement of the uncontested
    portions of its Order .................................................................................18

II. Substantial evidence supports the Board's finding that Xcel violated
    Section 8(a)(1) by discharging Salopek for raising employees' shared safety
    concerns ...................................................................................................20

    A. Salopek engaged in protected concerted activity when he and his
       coworkers raised safety concerns to Navy leadership ...........................20

       1. The Court is jurisdictionally barred from considering Xcel's
          arguments regarding mutual protection.............................................21

       2. In any event, Salopek's concerted activities were undertaken for
          mutual protection .............................................................................25

    B. Xcel failed to demonstrate that Salopek lost the Act's protection.........28

       1. Xcel did not establish that Salopek's complaint was maliciously
          false ..................................................................................................29

       2. The Court lacks jurisdiction to consider Xcel's argument that
          Salopek failed to disclose the existence of a labor dispute, and
          the Board reasonably rejected that argument in any event..............37

    C. Xcel discharged Salopek because of his protected activity ...................41

ii

## <u>TABLE OF CONTENTS (cont'd)</u>

**Headings**                                                                    **Page(s)**

    1.   Salopek's protected activity was a motivating factor in his discharge ...................................................................................43

    2.   Xcel failed to prove that it would have discharged Salopek in the absence of his protected activity.......................................................50

Conclusion ....................................................................................................55

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alden Leeds, Inc. v. NLRB*,
  812 F.3d 159 (D.C. Cir. 2016) ........................................................... 24

*Allied Aviation Serv. Co.*,
  248 NLRB 229 (1980), *enforced mem.*,
  636 F.2d 1210 (3d Cir. 1980) ............................................................. 28

*Arlington Elec.*,
  332 NLRB 845 (2000) ......................................................................... 41

*Aroostook Cnty. Reg'l Ophthalmology Ctr. v. NLRB*
  81 F.3d 209 (D.C. Cir. 1996) .............................................................. 35

*Bally's Park Place v. NLRB*,
  646 F.3d 929 (D.C. Cir. 2011) ........................................................... 43

*Boston Mut. Life Ins. Co. v. NLRB*,
  692 F.2d 169 (1st Cir. 1982) .............................................................. 46

*CC1 Ltd. P'ship v. NLRB*,
  898 F.3d 26 (D.C. Cir. 2018) ....................................................... 43, 48

*Chevron Mining, Inc. v. NLRB*,
  684 F.3d 1318 (D.C. Cir. 2012) ......................................................... 18

*Citizens Inv. Servs. Corp. v. NLRB*,
  430 F.3d 1195 (D.C. Cir. 2005) ....................... 18, 20, 42, 44, 50, 51

*Colart Ams., Inc.*,
  372 NLRB No. 9 (2022), *petition for review pending*,
  No. 22-3462 (3d Cir.) ......................................................................... 47

*Compuware Corp. v. NLRB*,
  134 F.3d 1285 (6th Cir. 1998) ........................................................... 48

*DaimlerChrysler Corp. v. NLRB*,
  288 F.3d 434 (D.C. Cir. 2002) ........................................................... 19

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                    **Page(s)**

*DHSC, LLC v. NLRB,*
  944 F.3d 934 (D.C. Cir. 2019) ..................................................... 24, 25, 43, 47

*DirecTV, Inc. v. NLRB,*
  837 F.3d 25 (D.C. Cir. 2016) .............. 18, 26, 27, 28, 29, 30, 32, 36, 37, 39, 41

*Durham Sch. Servs., LP v. NLRB,*
  821 F.3d 52 (D.C. Cir. 2016) ........................................................... 24

*Eastex, Inc. v NLRB,*
  437 U.S. 556, 565 (1978)........................................................................27

*Endicott Interconnect Techs., Inc. v. NLRB,*
  453 F.3d 532 (D.C. Cir. 2006) ..................................................... 35, 37

*Five Star Transp., Inc. v. NLRB,*
  522 F.3d 46 (1st Cir. 2008) ......................................................... 37, 40

*Fort Dearborn Co. v. NLRB,*
  827 F.3d 1067 (D.C. Cir. 2016) ...................................................... 43

*Fortuna Enters., LP v. NLRB,*
  789 F.3d 154 (D.C. Cir. 2015) ....................................................... 21

*Frazier Indus. Co. v. NLRB,*
  213 F.3d 750 (D.C. Cir. 2000) ....................................................... 53

*Fresenius USA Mfg.,*
  362 NLRB 1065 (2015) ................................................................. 54

*George A. Hormel & Co. v. NLRB,*
  962 F.2d 1061 (D.C. Cir. 1992) ..................................................... 35

*Guardsmark, LLC v. NLRB,*
  475 F.3d 369 (D.C. Cir. 2007) ....................................................... 47

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*HealthBridge Mgmt., LLC v. NLRB*,
   798 F.3d 1059 (D.C. Cir. 2015) ...................................................... 24

*Horizon Air Servs.*,
   272 NLRB 243 (1984) ................................................................... 45

*Inova Health Sys. v. NLRB*,
   795 F.3d 68 (D.C. Cir. 2015) ......................................................... 21

*Jarrar v. NLRB*,
   858 F. App'x 374 (D.C. Cir. 2021) ................................................. 47

*Kinder-Care Learning Ctrs., Inc.*,
   299 NLRB 1171 (1990) ............................................................ 27, 47

*Laro Maint. Corp. v. NLRB*,
   56 F.3d 224 (D.C. Cir. 1995) ............................................. 17, 42, 43

*Limestone Apparel Corp.*,
   255 NLRB 722 (1981), *enforced*,
   705 F.2d 799 (6th Cir. 1982) ........................................................ 43

*MasTec Advanced Techs.*,
   357 NLRB 103 (2011) ..........................................................30, 33, 36

*Minnesota Mining & Mfg. Co.*,
   261 NLRB 27 (1982), *enforced sub nom.*
   *Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*,
   711 F.2d 348 (D.C. Cir. 1983) ...................................................... 25

*Monmouth Care Ctr. v. NLRB*,
   672 F.3d 1085 (D.C. Cir. 2012) ..................................................... 25

*Mountain Shadows Golf Resort*,
   330 NLRB 1238 (2000) ................................................................. 28

## TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*N.W. Rural Elec. Coop.*,
   366 NLRB No. 132 (2018) .................................................. 25

*NLRB v. Cheney Cal. Lumber Co.*,
   327 U.S. 385 (1946) ........................................................ 23

*NLRB v. Contemporary Cars, Inc.*,
   667 F.3d 1364 (11th Cir. 2012) ........................................ 24

*NLRB v. Gen. Fabrications Corp.*,
   222 F.3d 218 (6th Cir. 2000) ........................................... 20

*NLRB v. Hale Container Line, Inc.*,
   943 F.2d 394 (4th Cir. 1991) ........................................... 45

*NLRB v. Local Union No. 1229, IBEW (Jefferson Standard),*
   346 U.S. 464 (1953) ............................................... 37, 40, 41

*NLRB v. Me. Coast Reg'l Health Facilities*,
   999 F.3d 1 (1st Cir. 2021) .............................................. 31

*NLRB v. Neuhoff Bros., Packers*,
   375 F.2d 372 (5th Cir. 1967) ........................................... 46

*NLRB v. Shelby Mem'l Hosp. Ass'n*,
   1 F.3d 550 (7th Cir. 1993) .............................................. 19

*NLRB v. Tamara Foods, Inc.*,
   692 F.2d 1171 (8th Cir. 1982) ......................................... 25

*NLRB v. Transp. Mgmt. Corp.*,
   462 U.S. 393 (1983) ........................................................ 42

*NLRB v. UFCW Local 23*,
   484 U.S. 112 (1987) ........................................................ 17

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                          **Page(s)**

*NLRB v. Washington Aluminum Co.*,
   370 U.S. 9 (1962) ................................................................. 41

*Oncor Elec. Delivery Co. v. NLRB*,
   887 F.3d 488 (D.C. Cir. 2018) ........................................ 30, 31, 38, 40

*Ozburn-Hessey Logistics, LLC v. NLRB*,
   833 F.3d 210 (D.C. Cir. 2016) ........................................... 42

*PAE Applied Techs., LLC*,
   367 NLRB No. 105 (2019) ................................................. 54

*Paragon Sys.*,
   362 NLRB 1561 (2015) ......................................... 27, 48, 53

*Parsippany Hotel Mgmt. Co. v. NLRB*,
   99 F.3d 413 (D.C. Cir. 1996) ...................................... 42, 45

*Parts Depot, Inc.*,
   332 NLRB 670 (2000), *enforced*,
   24 F. App'x 1 (D.C. Cir. 2001) ........................................ 46

*Shamrock Foods Co.*,
   366 NLRB No. 117 (2018), *enforced*,
   779 F. App'x 752 (D.C. Cir. 2019) ................................... 43

*Sierra Publ'g Co. v. NLRB*,
   889 F.2d 210 (9th Cir. 1989) ....................................... 27, 37

*Sitka Sound Seafoods, Inc. v. NLRB*,
   206 F.3d 1175 (D.C. Cir. 2000) ................................... 19, 49

*Sogard Tool Co.*,
   285 NLRB 1044 (1987) .................................................. 45

*Spectrum Health-Kent Cmty. Campus v. NLRB*,
   647 F.3d 341 (D.C. Cir. 2011) .......................................... 21

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*St. Luke's Episcopal-Presbyterian Hosps. v. NLRB*,
   268 F.3d 575 (8th Cir. 2001) ............................................................. 35

*Tamara Foods, Inc.*,
   258 NLRB 1307 (1981) ....................................................................25

*Tasty Baking Co. v. NLRB*,
   254 F.3d 114 (D.C. Cir. 2001) ......................................................... 19

*Triple Play Sports Bar & Grille*,
   361 NLRB 308 (2014), *affirmed sub nom.*
   *Three D, LLC v. NLRB*,
   629 F. App'x 33 (2d Cir. 2015) ........................................... 29, 33, 40

*U-Haul Co. of Nev. Inc. v. NLRB*,
   490 F.3d 957 (D.C. Cir. 2007) ......................................................... 39

*UFCW Local 400 v. NLRB*,
   989 F.3d 1034 (D.C. Cir. 2021) ................................................. 23, 38

*United Fed'n of Teachers Welfare Fund*,
   322 NLRB 385 (1996) ....................................................................... 44

*United Servs. Auto. Ass'n v. NLRB*,
   387 F.3d 908 (D.C. Cir. 2004) ......................................................... 52

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ......................................................................... 17

*Valley Hosp. Med. Ctr., Inc.*,
   351 NLRB 1250 (2007), *enforced sub nom.*
   *Nev. Serv. Emples. Union, Local 1107, SEIU v. NLRB*,
   358 F. App'x 783 (9th Cir. 2009) ............................ 27, 29, 31, 34, 47

*W&M Props. v. NLRB*,
   514 F.3d 1341 (D.C. Cir. 2008) ................................................. 18, 21

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                  **Page(s)**

*Wayneview Care Ctr. v. NLRB*,
  664 F.3d 341 (D.C. Cir. 2011) ........................................................... 18

*Woelke & Romero Framing v. NLRB*,
  456 U.S. 645 (1982) ............................................................................ 18

*Wright Line*,
  251 NLRB 1083 (1980), *enforced on other grounds*,
  662 F.2d 889 (1st Cir. 1981) .............................................................. 42

**Statutes**                                                                               **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ............................ 15, 17, 20, 21, 22, 25, 26, 27, 42, 47
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ........................ 2, 14, 15, 18, 19, 20, 42, 47
Section 8(a)(5) (29 U.S.C. § 158(a)(5)) ...................................................... 2, 14, 19
Section 10(a) (29 U.S.C. § 160(a)) ........................................................................ 1
Section 10(e) (29 U.S.C. § 160(e)) ........................................... 2, 18, 21, 22, 23, 24
Section 10(f) (29 U.S.C. § 160(f)) ........................................................................ 2

**Regulations**                                                                            **Page(s)**

29 C.F.R. § 102.45 ................................................................................... 22
29 C.F.R. § 102.46 ................................................................................... 22

# GLOSSARY

| | |
|---|---|
| Act | National Labor Relations Act |
| ALJD | Administrative Law Judge's Decision (Dec. 7, 2020) |
| Board | National Labor Relations Board |
| Br. | Opening brief filed by Xcel Protective Services, Inc. |
| D&O | The Board's Decision and Order reported at 371 NLRB No. 134 (Sept. 8, 2022) |
| ERX | Employer (Xcel) Exhibit |
| GCX | General Counsel Exhibit |
| JX | Joint Exhibit |
| Tr. | Transcript |
| Union | International Union, Security, Police, and Fire Professionals of America, Local 5 |
| Xcel | Xcel Protective Services, Inc. |

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## Nos. 22-1264, 22-1295

_____

### XCEL PROTECTIVE SERVICES, INC.

**Petitioner/Cross-Respondent**

### v.

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND
## CROSS-APPLICATION FOR ENFORCEMENT OF
## AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

_____

### STATEMENT OF JURISDICTION

This case is before the Court on the petition of Xcel Protective Services, Inc.

("Xcel") for review, and the cross-application of the National Labor Relations

Board ("the Board") for enforcement, of a Board Order against Xcel. The Board's

Decision and Order, which issued on September 8, 2022, is reported at 371 NLRB

No. 134. (D&O 1-47.) The Board had jurisdiction over the unfair-labor-practice

proceeding under Section 10(a) of the National Labor Relations Act. 29 U.S.C.

§ 160(a).  The Court has jurisdiction over this proceeding under Section 10(e) and (f) of the Act, which provides for the filing of petitions for review and cross-applications for enforcement of final Board orders in this Circuit.  29 U.S.C. § 160(e) and (f).  The petition and cross-application are timely, as the Act provides no time limit for those filings.

## STATEMENT OF THE ISSUES

1.     Whether the Board is entitled to summary enforcement of the provisions of its Order remedying Xcel's undisputed violations of Section 8(a)(5) and (1) of the Act.

2.     Whether substantial evidence supports the Board's finding that Xcel violated Section 8(a)(1) of the Act by discharging Mark Salopek for raising safety concerns about Xcel's failure to follow the Navy's weapons-qualification policies.

## RELEVANT STATUTORY AND REGULATORY PROVISIONS

Relevant statutory provisions are contained in an addendum to this brief.

## STATEMENT OF THE CASE

### I.     The Board's Findings of Fact

### A.     Background

Xcel is a contractor that provides security for multiple federal government facilities.  (D&O 1, 14-15; Tr. 40-41, 981.)  From 2013 to 2018, Mark Salopek worked for Xcel as an armed security officer at the United States Navy base on

Indian Island, near Seattle, Washington.  (D&O 1, 15, 17; Tr. 41, 57, 72.)

International Union, Security, Police, and Fire Professionals of America, Local 5

("the Union") represented him as a member of the bargaining unit of about 50

officers at the base.  (D&O 1, 15; Tr. 42, 76-77.)

 Xcel's officers on Indian Island each carried a pistol and either a shotgun or

assault rifle, which the Navy issued at the start of each shift.  (D&O 1, 16; Tr. 49,

52, 102-03, 233-34, 533-34, 654.)  The Navy required officers to qualify for each

weapon by passing shooting tests every six months at a Navy-approved shooting

range—typically Bangor Small Arms Training Center—using Navy weapons,

ammunition, and targets.  (D&O 1, 16; Tr. 53-57, 103-05.)

 The Navy established the rules for the shooting tests, but Xcel was

responsible for conducting them.  (D&O 1, 16-17; Tr. 235, 445-46.)  Until 2018,

when Salopek and other officers approached the Navy with the complaints at issue

in this case, Xcel routinely violated Navy policies by conducting the tests at

unapproved locations, using non-Navy weapons and ammunition.  (D&O 1, 17;

Tr. 135, 893-98, 962-63, 978.)  The Navy officials who oversaw Xcel's contract,

Richard Rake and his subordinate Steve Manson, knew that Xcel used

unauthorized locations and non-Navy weapons for qualification shoots, but they

did not object.  (D&O 17; Tr. 531, 895, 962-63.)  On at least one official form,

Xcel inaccurately certified that a qualification shoot held in an officer's backyard

had taken place at the Navy shooting range.  (D&O 17; Tr. 895-97, 969, ERX 42.)

### B. Officer Mark Salopek Learns that Xcel Is Violating Navy Weapons-Qualification Policies, Discusses Safety Concerns with His Coworkers, and Raises Those Concerns to Xcel

Starting in 2016, Salopek grew concerned that Xcel was violating Navy

policies in ways that put him and his fellow officers in danger.  (D&O 1, 18-19;

Tr. 106.)  That year, officer Jacob Schryver told Salopek that he had taken officer

Tom Cunningham for a practice shoot at an unauthorized location, and Xcel had

treated the practice as an official qualification.  (D&O 1, 18-19; Tr. 106, 280.)

Then in 2017, Xcel supervisor and shooting instructor Gerald Powless told Salopek

that he was planning a qualification shoot in an officer's backyard.  (D&O 16 n.6,

19; Tr. 75, 107-09.)  The next year, around February 2018, Salopek was serving as

a safety officer at an approved range when he saw Powless alter targets for three

officers who had already twice failed to qualify.  (D&O 1, 18; Tr. 110-11.)  He

believed all of those practices were unsafe.  And he talked to other officers,

including Steve Mullen, who agreed.  (D&O 1-2; Tr. 107, 114-15, 121, 449, 459.)

Salopek raised the officers' shared concerns to Xcel management.  On

March 9, 2018, he told Chief Executive Officer John Morgan that Xcel was

conducting shoots at unauthorized ranges and altering targets.  (D&O 2, 19;

Tr. 115-16.)  Morgan said he would address the matter.  (D&O 2, 19; Tr. 116.)

4

Several days later, Morgan told Salopek that he had instructed Xcel's operations manager, Michael Terry, to follow the Navy's weapons-qualification policies. (D&O 2, 19; Tr. 70, 120, 216, 653, 872-73.)

A few months later, in May 2018, new employee Daniel Lein failed to qualify with a weapon at the Navy's Bangor range, and Xcel invited him to try again at an unapproved gravel-pit range. (D&O 2, 19; Tr. 125-27, 657-58, 661-62.) Lein discussed the matter with Salopek, who told him that shoots like that were not allowed. (D&O 2, 19; Tr. 663-65.) Lein accordingly declined to participate. He later learned that another new employee, Emily Coler, who went to the gravel-pit shoot, was subsequently allowed to carry a rifle and shotgun. (D&O 19-20; Tr. 129, 666, 670, 673-75.)

Salopek, Mullen, Lein, and Schryver discussed their concern that Xcel's use of unauthorized shooting locations for weapons qualification jeopardized their safety. (D&O 20; Tr. 459, 678-79.) Salopek drafted a letter, which Mullen and Schryver fact-checked. (D&O 2, 20; Tr. 142-43.) Salopek emailed the letter to Morgan on June 28. (D&O 2; Tr. 143-44, GCX 3, GCX 4.)

The letter provided examples of Xcel's departures from Navy policies and described the officers' reasons for writing. (D&O 2, 20-21; GCX 3.) "First and foremost," the letter stated, "someone could have gotten hurt from a ricochet, or a twisted ankle, or tripping and accidental discharge." (D&O 2, 20-21; GCX 3 p. 5.)

5

Second, the letter added, "[w]e believe we *may* have officers that *may* be unable to safely fire their weapons accurately and handle them properly in the event we have a critical incident on the base."  (D&O 2, 20-21; GCX 3 p. 5.)

In his reply the next day, Morgan wrote that there seemed to be a "major disconnect" between Salopek and Operations Manager Terry, and "[w]e need to fix this relationship."  (D&O 2, 21; GCX 4.)  He said nothing about the weapons-qualifications issues Salopek had raised.  (D&O 2, 21; GCX 4.)

### C.    When Xcel Fails To Take Action, Salopek and Other Officers Go to the Navy

Salopek, Mullen, and Lein decided to escalate their concerns to the Navy. (D&O 2; Tr. 258, 461-62.)  On July 8, they went together to the office of the Indian Island base's commanding officer, Rocky Pulley.  (D&O 21; Tr. 160-61, 462-63, 679.)  They told Pulley that they had a "big safety issue" (Tr. 685)—that Xcel was holding qualification shoots at unauthorized ranges using non-Navy weapons and ammunition, that targets were being altered, and that unqualified officers were standing post (D&O 2, 21; Tr. 161-62, 684-86).  Pulley asked whether they had reported the issue up their chain of command, and they said they had.  (D&O 21; Tr. 687.)  Pulley then told them to notify Navy Installation Security Officer Mike Jones.  (D&O 21-22; Tr. 162-63, 464, 687-88.)  The officers later agreed that Mullen would prepare an email, which he did using material from

6

Salopek's letter to Morgan.  On July 9, Mullen sent the email to Jones.  (D&O 2, 21; Tr. 165, 299, 464-66, 688.)

The July 9 email stated that Mullen, Salopek, Lein, and Schryver were "coming forward with a safety issue concerning [w]eapons qualifications." (D&O 2, 21-22; ERX 1.)  It alleged that officers who had struggled to safely handle their weapons at approved ranges had been permitted to carry those weapons on post.  (D&O 2; ERX 1.)  It described Schryver's belief that Cunningham had been considered qualified based on a shoot the officers had done together at a location the Navy had not approved.  (D&O 22; ERX 1.)  It stated that Powless had altered targets.  (D&O 1, 22; ERX 1.)  And it discussed the qualification shoot Xcel held for Coler at a gravel pit, which Lein declined to attend.  (D&O 22; ERX 1.)  Finally, the email made clear that the complaining officers believed those practices to be "unsafe, against Navy policy, and illegal" and that they had sent Xcel's chief executive officer "a detailed memo of these practices."  (D&O 22; ERX 1.)

Jones forwarded the email to Rake, the Navy official who oversaw Xcel's contract, and Rake sent it on to Xcel management.  (D&O 2, 22; Tr. 536, 884.)

### D.    Xcel Management Responds with Hostility

On July 9, after learning of the officers' complaint, Terry called Lein and angrily asked him who he had gone with to talk to Pulley.  Lein said he had gone

with Salopek and Mullen.  Terry said Lein had "made a big mistake" and that he would pull Lein "off the post" and "off the contract."  (D&O 22; Tr. 725.)

That afternoon, when Mullen came to work, he overheard Terry on speakerphone with Morgan talking about the three officers who had gone to Pulley's office.  (D&O 23; Tr. 466.)  Morgan said that one of them was on probation and was easy to get rid of.  The other two, he said, were "a cancer." (D&O 23; Tr. 467, 760.)  At the time, Lein was a probationary employee. (D&O 23; Tr. 466-67, 759-60.)

Terry then summoned Mullen into his office.  (D&O 23; Tr. 474.)  Morgan, still on the speakerphone, asked Mullen whether he was one of the officers who met with Pulley.  Mullen said he was.  (D&O 23; Tr. 474-75.)  Morgan said Mullen could be facing discipline and asked whether he wanted a union representative to be present.  When Mullen said he did, Morgan ended the conversation.  (D&O 23; Tr. 476.)

At the end of Lein's shift that day, Terry had him speak with Morgan on the phone as well.  Morgan said he was mad that Lein broke the chain of command by reporting issues to Pulley.  (D&O 23; Tr. 726-27.)

On July 17, Mullen resigned, citing harassment and threats from other officers who had learned that they were mentioned in the July 9 email.  (D&O 25; Tr. 477-90, GCX 6.)

8

### E.     The Navy Investigates

Meanwhile, Rake began an investigation.  The original complaint he set out to investigate was that officers had left their posts to meet with Pulley.  (D&O 26; Tr. 589.)  He also looked into the issues the officers had raised in that meeting and in the July 9 email to Jones.  (D&O 26; ERX 2.)  Between July 10 and 25, Rake interviewed and took written statements from Salopek, Lein, Schryver, and other Xcel personnel.  (D&O 26; Tr. 541-42, 690.)  He asked every officer he interviewed:  "[D]o you know your chain of command?"  (D&O 26; Tr. 582-83.)

In his written statements for the investigation, Salopek confirmed that he saw targets modified at an authorized shoot in early 2018.  (D&O 27; ERX 2 pp. 13-15.)  He said he believed he had seen Coler on post carrying a shotgun after her gravel-pit shoot.  (D&O 27; ERX 2 pp. 13-15.)  And he stated that he saw a Bangor range score sheet for July 7, 2017, but another officer told him that day's shoot was at an officer's house.  (D&O 27; ERX 2 pp. 13-15.)  Lein, in his written statement, reaffirmed that Powless asked him to qualify with Coler at a gravel pit in May 2018 after both officers failed tests at Bangor.  (D&O 27; ERX 2 pp. 16-17.)  Schryver's statement confirmed that he had taken Cunningham to shoot at an unapproved location.  But Schryver emphasized that he did not say Cunningham was qualified because he was not certified to qualify other officers.  (D&O 27;

ERX 2 p. 24.)  Powless admitted in his statement that he had modified targets to make them more visible.  (D&O 28; ERX 2 p. 20.)

On July 25, Rake issued a report.  (D&O 29; Tr. 544, ERX 2.)  He found that Coler had been improperly issued a shotgun or rifle on multiple occasions when she had not qualified for those weapons, and he recommended steps for Xcel to take to ensure the same thing would not happen again.  (D&O 31; ERX 2 pp. 5-6.)  As to targets, Rake determined that Navy rules did not prohibit Powless from making alterations to improve target visibility.  (D&O 30; ERX 2 p. 4.)  He concluded that no officer had produced documents proving that official forms were falsified or that qualification shoots occurred at unauthorized ranges.  (D&O 29; ERX 2 pp. 1-2, 6.)  As to those allegations, Rake characterized the information officers provided as "he said, she said, I heard, no names."  (D&O 29; ERX 2 p. 2.)

Rake's report concluded that Salopek had failed to provide documents to substantiate his claims and had relied instead on hearsay, requiring the government to "waste time" investigating.  (D&O 31; ERX 2 p. 11.)  It closed with a recommendation to remove Salopek from the Indian Island contract.  (D&O 31; ERX 2 p. 11.)

## F.    Salopek Raises Officers' Concerns to the Navy's Office of the Inspector General

In August, Salopek and Lein submitted a complaint to the Navy's Office of the Inspector General.  (D&O 2, 31; Tr. 185-86, 188, GCX 9.)  Their

accompanying memorandum continued to raise safety concerns stemming from Xcel's weapons-qualifications practices, including that one officer could be unable to "defend herself" or "her coworkers." (D&O 2; Tr. 188, GCX 9 p. 25.) It described hazards associated with holding shooting tests in gravel pits, including ricochets and accidents, and asserted that Salopek had raised those concerns to Rake, who had agreed with him. (D&O 2-3; GCX 9 p. 30.) The memorandum alleged that Coler had received insufficient training and stated that "she has a right to defend herself, and we have a right to be confident she can defend us, and the public has a right to be safe." (D&O 3; GCX 9 p. 30.) In a September 11 response, the Office of the Inspector General stated that the matter was "not appropriate for an [Inspector General] investigation." (D&O 3, 32; GCX 9 p. 13.)

### G. Xcel Discharges Salopek but Gives Lein a Second Chance

In October 2018, Rake met with Xcel's new chief executive officer, Michael Filibeck. (D&O 15, 33; Tr. 60, 71, 980.) Rake went over his report, including his recommendation to remove Salopek from the Indian Island contract. (D&O 33; Tr. 998, 1002-03.) He stated that the Navy was not pleased that Salopek, Mullen, and Lein had gone on a "junket" to talk to Pulley. (D&O 33; Tr. 997.) He said the Navy had wasted time investigating the officers' complaints, which, he asserted, "with few exceptions had no basis in reality." (D&O 33; Tr. 998.) And the Navy, he emphasized, "really did not appreciate it." (D&O 33; Tr. 998.)

11

On October 27, after discussing the matter with Terry and Powless, Filibeck discharged Salopek.  (D&O 3, 33, 34; Tr. 201-04.)  Xcel's internal personnel document stated that Salopek was discharged for "chain of command violation and dishonesty."  (D&O 34, 40; Tr. 947-48, JX 5 p. 1285.)

At the end of Lein's shift on October 27, Powless invited him into Terry's office.  (D&O 35; Tr. 705-06.)  Powless told Lein that Xcel had planned to fire him but decided to give him a second chance because it was his first time "jumping the chain of command."  (D&O 35; Tr. 706-07.)

### H.    Xcel Fails To Provide Requested Information

On October 30, 2018, the Union filed a grievance challenging Salopek's discharge and requesting information to support the grievance.  (D&O 44; JX 1, JX 2.)  Among other things, it sought Salopek's personnel file, a copy of the rules he was accused of violating, and any documents he signed during the investigation.  (D&O 44; JX 2.)  Xcel took three months to provide any of the requested information.  It never provided some of the information.  (D&O 44; Tr. 821-25, JX 1, JX 3.)

### I.    Lein Complains When Xcel Shorts His Pay; Xcel Retaliates by Telling Employees They Will Not Be Allowed To Go Home Early Anymore

The collective-bargaining agreement between Xcel and the Union provided for 30 minutes of "guard mount pay" for each shift to allow officers to arm-up and

12

receive a briefing at the start of the shift, and to arm-down at the end.  (D&O 35, 43; Tr. 708-11, 950.)  Xcel's practice was to allow employees to leave early with full pay when they finished arming down.  (D&O 36, 43; Tr. 952.)

In December 2018 and January 2019, Lein complained to Xcel when supervisors prevented him from claiming his full 30 minutes of paid time for a shift.  (D&O 36; Tr. 713-15.)  In response, Powless informed the officers that someone had complained about arm-up time and therefore Terry had said no one could go home early anymore.  (D&O 36, 43; Tr. 717-18.)  Later, Powless reversed course and stated that officers would no longer be prohibited from leaving early. (D&O 36, 43; Tr. 724, 742, 952-53.)

## II.    Procedural History

Acting on unfair-labor-practice charges filed by the Union, the Board's General Counsel issued a complaint alleging multiple violations of the Act.  (D&O 14; GCX 1(a), GCX 1(d), GCX 1(f), GCX 1(h), GCX 1(j), GCX 1(l), GCX 1(n), GCX 1(p), GCX 1(r), GCX 1(t), GCX 1(bbb).)  An administrative law judge held a hearing and issued a recommended decision and order finding that Xcel violated the Act by discharging Salopek, telling employees they would not be allowed to go home early because someone had complained about guard mount pay, and refusing to provide, or delaying in providing, information to the Union.  (D&O 14-47; ALJD.)

13

### III.    The Board's Conclusions and Order

The Board (Chairman McFerran and Member Wilcox; Member Ring dissenting in part) found, in agreement with the administrative law judge, that Xcel violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by discharging Salopek for raising safety concerns about Xcel's failure to follow Navy weapons-qualification policies.  (D&O 1-5.)  The Board also adopted, in the absence of exceptions, the judge's findings that Xcel violated Section 8(a)(1) by telling employees they would not be allowed to go home early because someone had complained about guard mount pay, and violated Section 8(a)(5) and (1), 29 U.S.C. § 158(a)(5), (1), by failing to timely provide relevant, requested information to the Union.  (D&O 1 n.1.)  In addition, the Board adopted the judge's recommended dismissal of several other allegations, which are not before the Court here. (D&O 1 n.1.)

The Board's Order requires Xcel to cease and desist from the unfair labor practices found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under the Act. (D&O 6.)  The Order further directs Xcel to offer Salopek reinstatement to his former job or a substantially equivalent position, and to make him whole for any losses he suffered as a result of Xcel's discrimination against him.  (D&O 6.)  It

also requires Xcel to provide the information it unlawfully withheld and to distribute a remedial notice to employees.  (D&O 6.)

## SUMMARY OF ARGUMENT

1.    Xcel does not contest the Board's findings that it violated the Act by telling employees that they would no longer be allowed to go home early because someone complained about guard mount pay, and by failing to timely provide information to which the Union was entitled.  The Board is therefore entitled to summary enforcement of the provisions of its Order remedying those unfair labor practices.

2.    Substantial evidence supports the Board's finding that Xcel violated Section 8(a)(1) of the Act by discharging Salopek for joining with other officers to raise shared workplace-safety concerns to the Navy.  Section 7 of the Act gives employees the right to concertedly complain to third parties—including their employer's clients—in an effort to improve their working conditions.  Here, the administrative law judge found that the officers' complaints fell within the broad scope of Section 7's protection, and Xcel conceded that point before the Board. The Court lacks jurisdiction to consider Xcel's argument, which it did not urge before the Board, that the complaints were not protected because the officers were not trying to improve their own working conditions.  In any event, the argument

15

fails because the officers made it clear that they wanted the Navy to address Xcel's noncompliant weapons-qualification practices so they would be safer on the job.

The Board reasonably rejected the one argument Xcel did make regarding Salopek's protected activity in the administrative proceeding: that he forfeited the Act's protection by making maliciously false statements. Employees' protected communications with third parties can lose the Act's protection if they are maliciously false—that is, made with knowledge of their falsity or reckless disregard for their truth or falsity. But substantial evidence supports the Board's finding that the core safety issues Salopek raised were, in fact, true. The Court lacks jurisdiction to consider Xcel's distinct argument—which Xcel, again, did not raise before the Board—that Salopek needed to do more to inform the Navy that the officers had a labor dispute with Xcel. In any event, the Board reasonably rejected that claim because the Navy was fully aware of the context from which the officers' complaints arose.

Finally, ample evidence supports the Board's finding that Salopek's discharge was motivated by his protected activity. The credited testimony of Xcel's managers established that Xcel discharged Salopek because it viewed the officers' complaints to the Navy with disfavor. And the Board reasonably found that Xcel failed to carry its burden of proving that it would have discharged Salopek in the absence of his protected activity. It is no defense that Xcel believed

16

Salopek jumped the chain of command in approaching the Navy, for settled law does not permit an employer to restrict Section 7 activity to particular channels. Xcel also asserts that it relied on the Navy's request to remove Salopek from the contract, but it fails to justify its independent decision to discharge him instead of transferring him to another location.  In any event, substantial evidence supports the Board's findings that Xcel knew the Navy's removal recommendation was grounded in animus toward Salopek's protected activity.  For that additional reason, the recommendation cannot justify his discharge.

## STANDARD OF REVIEW

The Board's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole.  29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951).  Under that "highly deferential" standard of review, the Court will not disturb the Board's findings even if it would have reached a different result reviewing the case de novo.  *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 228-29 (D.C. Cir. 1995).

The Board's interpretation of the Act will be upheld as long as it is "rational and consistent with the statute."  *NLRB v. UFCW Local 23*, 484 U.S. 112, 123 (1987).  Finally, the Court will not overturn the Board's credibility determinations unless they are "hopelessly incredible" or "self-contradictory."  *Citizens Inv. Servs.*

17

*Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005) (citation and internal

quotation marks omitted).

## ARGUMENT

**I.    The Board Is Entitled to Summary Enforcement of the Uncontested Portions of Its Order**

In Section 10(e) of the Act, Congress placed a jurisdictional limit on the

issues courts of appeals may consider when they review Board orders.  *Woelke &*

*Romero Framing v. NLRB*, 456 U.S. 645, 665-66 (1982); *Chevron Mining, Inc. v.*

*NLRB*, 684 F.3d 1318, 1330 (D.C. Cir. 2012).  On review, "[n]o objection that has

not been urged before the Board . . . shall be considered by the court, unless the

failure or neglect to urge such objection shall be excused because of extraordinary

circumstances."  29 U.S.C. § 160(e).  Ordinarily, then, the Court cannot consider

arguments a party raises for the first time on appeal.  *Woelke & Romero*, 456 U.S.

at 665-66; *W&M Props. v. NLRB*, 514 F.3d 1341, 1345-46 (D.C. Cir. 2008).  In

addition, when an employer's opening brief fails to challenge the Board's finding

of a violation of the Act, the Court considers the issue waived and the Board is

entitled to summary enforcement of the portions of its Order remedying the

violation.  *DirecTV, Inc. v. NLRB*, 837 F.3d 25, 32 (D.C. Cir. 2016); *Wayneview*

*Care Ctr. v. NLRB*, 664 F.3d 341, 347 (D.C. Cir. 2011).

Here, Xcel raised no objection before the Board to the administrative law

judge's recommended finding that it violated Section 8(a)(1) by telling employees

18

that they would no longer be allowed to go home early because someone complained about guard mount pay. *See Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001) (employer violated Section 8(a)(1) by telling employees it was implementing "new 'get tough' policy" in response to protected activity). Nor did it object to the judge's finding that it violated Section 8(a)(5) and (1) by failing to provide or delaying in providing relevant information that the Union requested to pursue its grievance contesting Salopek's discharge. *See DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 443 (D.C. Cir. 2002) (employer violated Section 8(a)(5) and (1) by failing to provide relevant information for grievance handling). The Court therefore lacks jurisdiction to consider any challenge to those findings. And in any event, Xcel has waived any challenge by failing to contest those findings in its opening brief. *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000).

The Board, accordingly, is entitled to summary enforcement of its Order to the extent that it remedies those unfair labor practices. "The uncontested violations do not disappear, however; they remain, lending their aroma to the context in which the contested issues are considered." *NLRB v. Shelby Mem'l Hosp. Ass'n*, 1 F.3d 550, 567 (7th Cir. 1993) (citation, alterations, and internal quotation marks

omitted).  *Accord NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 232 (6th Cir. 2000).

## II.    Substantial Evidence Supports the Board's Finding that Xcel Violated Section 8(a)(1) by Discharging Salopek for Raising Employees' Shared Safety Concerns

Section 7 of the Act guarantees employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of their Section 7 rights.  29 U.S.C. § 158(a)(1).  "Accordingly, an employer violates Section 8(a)(1) by discharging an employee for engaging in concerted activities protected by the Act."  *Citizens Inv.*, 430 F.3d at 1197.

Applying those principles, the Board found that Section 7 protected Salopek's efforts, together with his coworkers, to stop workplace practices that they believed put them in danger.  The Board further found that Xcel did not carry its burden of showing that the officers' complaints lost the Act's protection. Finally, the Board found that Xcel discharged Salopek for his protected activity. Substantial evidence supports each of those findings.

### A.    Salopek Engaged in Protected Concerted Activity When He and His Coworkers Raised Safety Concerns to Navy Leadership

The Board unanimously found (D&O 3, 7 n.2, 37), and Xcel does not dispute, that Salopek's activity was concerted within the meaning of Section 7

20

when he collaborated with other officers to raise shared concerns about workplace safety issues to the Navy in person and in writing.  *See Fortuna Enters., LP v. NLRB*, 789 F.3d 154, 157 (D.C. Cir. 2015) (employees engaged in concerted activity when they gathered to present concerns to employer); *Inova Health Sys. v. NLRB*, 795 F.3d 68, 75 (D.C. Cir. 2015) (nurses acted concertedly when they agreed one of them would "send an email on their collective behalf" to convey "shared concerns").  As the Board also found, Salopek's concerted complaints to the Navy about workplace safety issues were undertaken for "mutual aid and protection," and thus fell within the protection of Section 7.  (D&O 4-5, 37.)  Xcel did not object to that finding before the Board, and the Court therefore cannot consider the challenge to it that Xcel now raises.  In any event, substantial evidence supports the Board's finding.

### 1.  The Court is jurisdictionally barred from considering Xcel's arguments regarding mutual protection

Section 10(e) of the Act, as noted above (p. 18), bars the Court from considering objections a party did not urge before the Board, absent extraordinary circumstances.  *W&M Props.*, 514 F.3d at 1345-46.  To preserve objections for purposes of Section 10(e), "a party must raise them in the time and manner that the Board's regulations require."  *Spectrum Health-Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 349 (D.C. Cir. 2011).  As the Board observed here (D&O 4), its regulations require that objections to an administrative law judge's decision be set

21

forth in exceptions and "specifically urged." 29 C.F.R. § 102.46(a)(1)(ii), (f).

Arguments not raised in that manner are waived before the Board. 29 C.F.R.

§ 102.46(a)(1)(ii), (f). If a party, thereafter, attempts to raise a waived issue on

appeal, Section 10(e) jurisdictionally bars the Court from considering it.

    Xcel did not preserve any argument about mutual aid and protection before

the Board. The Board majority found that Xcel "d[id] not dispute that Salopek

engaged in protected concerted activity by raising safety concerns about [Xcel]'s

weapons-qualification practices to Navy leadership" (D&O 3), and the dissenting

member did not disagree (D&O 7 n.2 (Member Ring, dissenting in part)). As the

Board observed, Xcel "ma[de] no argument in its exceptions or supporting brief

that Salopek's communications with Navy leadership were not for the purpose of

mutual aid or protection." (D&O 4.) Indeed, Xcel conceded that Salopek's

activity was protected. It argued:

> Because Xcel relied on both Salopek's allegations in his complaint, *which constituted protected concerted activity*, as well as his demeanor and comments during the investigation, as justification for his termination, this case does not turn solely on activities protected by Section 7.

(Brief in Support of Exceptions p. 36 (emphasis added).)[1] Aside from that explicit

concession, the argument Xcel made before the Board—"that, because the

---

[1] Xcel's brief in support of exceptions is not part of the agency record before the Court. *See* 29 C.F.R. § 102.45(b) (describing the record before the Board and referencing exceptions and answering briefs, but not initial briefs in support of exceptions). Because that brief is necessary to show the positions Xcel urged—

[officers'] statements were maliciously untrue, they lost the protection of the Act"—presupposed that his activity was protected to begin with.  (Exceptions p. 2.)

Under Section 10(e), Xcel's failure to contest that Salopek's activity was protected before the Board removes that issue from the Court's jurisdiction on appeal.  The Board cannot have been "on notice," as Xcel claims (Br. 25), that Xcel would pursue on appeal a point that it gave up both explicitly and implicitly.  And Xcel does not suggest that any extraordinary circumstance within the meaning of Section 10(e) excuses its failure to preserve its mutual-aid-and-protection argument.  It has therefore forfeited any extraordinary-circumstances argument. *UFCW Local 400 v. NLRB*, 989 F.3d 1034, 1038 (D.C. Cir. 2021).

It is beside the point whether, as Xcel asserts, the evidentiary record on the issue is adequately developed.  (Br. 25.)  "[M]erely including evidence that could support an objection is not the same as urging the objection itself."  *UFCW Local 400*, 989 F.3d at 1038.  "Congress desired that all controversies of fact, and the allowable inferences from the facts, be threshed out, certainly in the first instance, before the Board."  *NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 389 (1946).  Consistent with that congressional intent, the Court has recognized that "Section

---

and failed to urge—before the Board, the Board has filed a motion to lodge it with the Court along with this brief.  It is also available at https://apps.nlrb.gov/link/document.aspx/09031d458334f780.

10(e) applies regardless of whether the questions raised be considered questions of law, questions of fact, or mixed questions of fact and law." *Alden Leeds, Inc. v. NLRB*, 812 F.3d 159, 168 (D.C. Cir. 2016) (citation and internal quotation marks omitted).

The Court has also squarely rejected Xcel's suggestion (Br. 25) that a party should be entitled to raise a new issue on appeal if the Board majority and a dissenting member discussed it. *Durham Sch. Servs., LP v. NLRB*, 821 F.3d 52, 60 (D.C. Cir. 2016); *HealthBridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1069 (D.C. Cir. 2015). "[S]ection 10(e) bars review of any issue not *presented* to the Board, even where the Board has discussed and decided the issue." *HealthBridge*, 798 F.3d at 1069 (citation and internal quotation marks omitted). Thus, the Board's "sua sponte discussion" of an issue "does not excuse [a party's] failure to raise the issue on its own." *DHSC, LLC v. NLRB*, 944 F.3d 934, 939 (D.C. Cir. 2019).

Finally, Xcel contends that the objections it belatedly seeks to raise are important. (Br. 26.) It evidently did not think so when it framed its arguments before the Board. But in any event, Section 10(e) applies irrespective of an issue's importance. *See, e.g.*, *DHSC*, 944 F.3d at 939 (concluding that the Court lacked jurisdiction to consider argument that Acting General Counsel lacked authority to prosecute complaint); *NLRB v. Contemporary Cars, Inc.*, 667 F.3d 1364, 1368 (11th Cir. 2012) (applying Section 10(e) to bar due-process argument). Xcel's

"waiver of [its] argument before the Board deprives this [C]ourt of authority to consider the issue." *Monmouth Care Ctr. v. NLRB*, 672 F.3d 1085, 1094 (D.C. Cir. 2012).

### 2.    In any event, Salopek's concerted activities were undertaken for mutual protection

If the Court had jurisdiction to consider the issue, Xcel's arguments would still fail because the Board reasonably determined that Salopek's efforts to address safety concerns regarding Xcel's weapons-qualifications practices were for mutual protection. "Few matters can be of greater legitimate concern to individuals in the workplace . . . than exposure to conditions potentially threatening their health, well-being, or their very lives." *Minnesota Mining & Mfg. Co.*, 261 NLRB 27, 29 (1982), *enforced sub nom. Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348 (D.C. Cir. 1983). Employees who work to improve those conditions are literally acting for their own protection. And so it is well settled that Section 7 protects employees who take concerted action "over what the employees believe to be unsafe or unhealthy working conditions." *NLRB v. Tamara Foods, Inc.*, 692 F.2d 1171, 1176 (8th Cir. 1982) (quoting *Tamara Foods, Inc.*, 258 NLRB 1307, 1308 (1981)). *See, e.g.*, *DHSC*, 944 F.3d at 939 (employees engaged in protected activity by speaking up together about unsafe workplace practices); *N.W. Rural Elec. Coop.*, 366 NLRB No. 132, 2018 NLRB LEXIS 279, *57-58 (2018)

25

(employee's Facebook posts criticizing employer's safety practices and training were for mutual aid and protection).

Determining whether activity is protected under Section 7 "is a task that implicates the Board's expertise in labor relations," and its finding on that score "is entitled to considerable deference if it is reasonable." *DirecTV*, 837 F.3d at 33 (citation, internal quotation marks, and brackets omitted). Here, the Board reasonably found that Salopek and his coworkers "consistently emphasized their personal concerns about workplace safety" in their communications with the Navy. (D&O 5 n.10.) From the start, they told Commanding Officer Pulley they were raising "a concern of safety" (Tr. 161) and that Xcel's weapons-qualification practices were a "big safety issue" (Tr. 685). In their letter to Navy Installation Security Officer Jones, their statements to Rake during his investigation, and their subsequent Inspector General complaint, the officers described issues that directly affected their physical well-being as workers. Their stated concerns included unsafe weapons handling at the shooting range, the danger of ricochets at gravel pits, and the need for adequate training to allow officers to defend themselves and their colleagues. (*See* pp. 6-7, 9-11, above.) In presenting those concerns to the Navy, which had the authority to enforce its weapons-qualification rules, the officers "requested the Navy's assistance in changing what [they] perceived to be unsafe working conditions at the base." (D&O 4.)

26

Xcel points out (Br. 27-28) that the officers also said that making Xcel follow the rules would be in the best interests of Xcel itself, the Navy, and the public. But that does not make the officers' appeals any less protected. The broad statutory language of Section 7 "encompasses efforts by employees 'to improve terms and conditions of employment' through appeals to third parties standing 'outside the immediate employee-employer relationship.'" *DirecTV*, 837 F.3d at 33 (quoting *Eastex, Inc. v NLRB*, 437 U.S. 556, 565 (1978)). It includes, for example, employees' appeals to "an employer's customers, its advertisers, its parent company, a news reporter, [or] the public in general." *Kinder-Care Learning Ctrs., Inc.*, 299 NLRB 1171, 1171 (1990) (footnotes omitted). And it extends to security guards who concertedly reach out to their employer's government client for help resolving workplace issues. *Paragon Sys.*, 362 NLRB 1561, 1564 (2015).

If employees could not "address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers' undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision." *Sierra Publ'g Co. v. NLRB*, 889 F.2d 210, 217 (9th Cir. 1989). Thus, the Act protects appeals, like those at issue here, that highlight the confluence of third parties' interests with employees' own. *See, e.g.*, *Valley Hosp. Med. Ctr., Inc.*, 351 NLRB

27

1250, 1252 (2007) (statements that focused on effect of understaffing on patient care were protected), *enforced sub nom. Nev. Serv. Emples. Union, Local 1107, SEIU v. NLRB*, 358 F. App'x 783 (9th Cir. 2009); *Allied Aviation Serv. Co.*, 248 NLRB 229, 230-31 (1980) (letter to employer's customers emphasizing dangers to the public was protected), *enforced mem.*, 636 F.2d 1210 (3d Cir. 1980). Highlighting the fact that other parties would be best served by having capable, well-trained officers wielding lethal weaponry while protecting a significant military installation did not alter the officers' message—or the reality—that Salopek and his coworkers would be safer, too.

## B.    Xcel Failed To Demonstrate that Salopek Lost the Act's Protection

In *Mountain Shadows Golf Resort*, 330 NLRB 1238, 1240 (2000), the Board formulated a framework, which this Court has approved, for evaluating whether employees' otherwise protected communications to third parties lost the Act's protection. *DirecTV*, 837 F.3d at 34. Under *Mountain Shadows*, an otherwise protected employee communication may be a lawful basis for discharge if: (1) employees failed to sufficiently disclose the connection between their complaint and a labor dispute, so as to allow a third-party to critically evaluate the motivations underlying the complaint, or (2) the communication was so disloyal, reckless, or maliciously false as to forfeit the Act's protection. *Id.* at 35.

Xcel argued before the Board that Salopek forfeited the Act's protection by making maliciously false complaints, and the Board reasonably rejected that argument. Xcel did not, and does not now, argue that Salopek's complaints were otherwise disloyal, but in any event the Board reasonably found that they were not. Xcel also failed to preserve before the Board the argument it now makes that Salopek did not sufficiently disclose the connection between the officers' complaints and their dispute with Xcel. In any event, the Board reasonably rejected that contention as well.

### 1.    Xcel did not establish that Salopek's complaint was maliciously false

Before the Board, Xcel argued that Salopek's complaints lost the Act's protection because his complaints were maliciously false. (Exceptions pp. 1-2.) If "employees make maliciously untrue statements about their employer, their conduct is no longer protected and their employer can discharge them for cause." *DirecTV*, 837 F.3d at 28. It is an employer's burden to establish that a statement was maliciously untrue, however, and that burden is not easily met. *Triple Play Sports Bar & Grille*, 361 NLRB 308, 312 (2014), *affirmed sub nom. Three D, LLC v. NLRB*, 629 F. App'x 33 (2d Cir. 2015); *Valley Hosp.*, 351 NLRB at 1260. As the Board observed (D&O 37), and as Xcel concedes (Br. 35), "the mere fact that statements are false, misleading or inaccurate is insufficient to demonstrate that they are *maliciously* untrue." (D&O 37 (quoting *Valley Hosp.*, 351 NLRB at 1252)

29

(emphasis added).)  "For statements to be 'maliciously untrue and unprotected,' they must be 'made with knowledge of their falsity or with reckless disregard for their truth or falsity.'"  *DirecTV*, 837 F.3d at 41 (quoting *MasTec Advanced Techs.*, 357 NLRB 103, 107 (2011)).

When an employer contests the Board's finding that statements did not "r[i]se to the level of malicious untruth," the Court will "review those arguments under the substantial evidence standard."  *DirecTV*, 837 F.3d at 42.  Because "possible malice is an arguable question of fact, [the Court] defer[s] to the Board's weighing of the evidence."  *Oncor Elec. Delivery Co. v. NLRB*, 887 F.3d 488, 499 (D.C. Cir. 2018).  Here, the Board unanimously found that Xcel had not carried its burden of proving malicious falsity because "the core issues Salopek raised with Navy leadership were true."  (D&O 4 n.8, 38, 42-43.  *See also* D&O 7 n.2 (Member Ring, dissenting in part).)  Substantial evidence supports that finding.

Terry—Xcel's own operations manager—admitted that Xcel did precisely what the officers alleged with respect to qualification shoots.  Specifically, for years, until the officers complained and the Navy cracked down, Xcel had a "longstanding practice of using unauthorized locations to qualify guards," using non-Navy weapons and ammunition.  (D&O 38; Tr. 893-98, 962-63, 978.)  Terry also confirmed that at least one official form falsely certified that a shoot occurred at Bangor when it in fact happened in an officer's backyard.  (D&O 38; Tr. 504-05,

895-97, 969, ERX 42.)  As for Coler, Xcel initially denies in its brief that she was "issued a weapon for which she was not qualified" (Br. 34-35), but it later concedes that the Navy found exactly that had occurred on multiple occasions (Br. 40).  (D&O 38, 42; ERX 2 pp. 5-6.)  Finally, Powless admitted that he altered targets at qualification shoots, just as the officers alleged.  (D&O 28, 38; ERX 2 p. 20.)

Xcel provides no basis for overturning the Board's sound factual findings.  It is insufficient, first of all, for Xcel to argue that some of the officers' allegations were "unsubstantiated."  (Br. 34.)  A statement may be "imprecise, even careless" without crossing the line into malicious falsehood.  *Oncor*, 887 F.3d at 498.  As the Board explained, when "an employee relays in good faith what he or she has been told by another employee, reasonably believing the report to be true, the fact that the report may have been inaccurate does not remove the relayed remark from the protection of the Act."  (D&O 37 (quoting *Valley Hosp.*, 351 NLRB at 1252).)  Even employees who convey a "clear falsity" about their employer do not lose protection if they "made this error in reasonable reliance on" another person's statements.  *NLRB v. Me. Coast Reg'l Health Facilities*, 999 F.3d 1, 13 (1st Cir. 2021).  Complaints are not unprotected merely because they are, in Rake's words, "he said, she said."  (ERX 2 p. 2.)

As to the concerns the officers attributed to Schryver, Xcel asserts that he denied having qualified Cunningham at a gravel pit and was upset at the allegation that he had.  (Br. 12, 34.)  According to Rake, that was because Schryver insisted "he would never ever take anyone to a rock quarry to shoot due to ricocheting and other things that can happen at a rock quarry."  (Tr. 584.)  Schryver, however, confirmed that he took Cunningham out to shoot, and they did not use "an approved course with approved weapons" because he did not have authority to conduct an official qualification.  (ERX 2 p. 24.)  And that was exactly the officers' complaint:  they believed that after Schryver had taken Cunningham to a "gravel pit or other location" to shoot personal weapons, Xcel improperly counted that shoot as a qualification when it was not—or should not have been—one.  (D&O 22; Tr. 415.)  Schryver did not contradict that key allegation.  (ERX 2 p. 24.)

Even if there was some inaccuracy or misunderstanding among the officers about what happened—and again, Xcel does not demonstrate that there was—the law still protected Salopek's good-faith effort to convey what he understood.  As in *DirecTV*, where the Court upheld the Board's finding that employees did not lose the Act's protection for publicly airing grievances their employer had failed to resolve, Salopek's allegations were accurate "for the most part," and "[a]ny

32

arguable departures from the truth . . . were no more than good-faith misstatements or incomplete statements."  837 F.3d at 42 (quoting *MasTec*, 357 NLRB at 108).

When it comes to Salopek's allegations about officers Terry Lauritzen, Kevin David, and Cunningham, Xcel simply has the facts wrong.  (Br. 34.) Salopek's allegation was not that all three officers "could not pass the weapons qualifications test" (Br. 34); it was that Powless modified their targets after they initially failed.  (D&O 22, 26; Tr. 777-78.)  As noted above (p. 10), Powless confirmed that he had done so.  (D&O 28.)  Salopek initially provided the wrong date for the shoot at issue, relying on input from Mullen that turned out to be incorrect.  (Tr. 387, 771, 803-04.)  But "the fact that a statement may ultimately prove inaccurate does not in itself remove the statement from the protections of the Act when it is relayed by others." *Triple Play*, 361 NLRB at 313 n.19.  As the Board found, Salopek corrected the error as soon as possible, and Rake confirmed that Cunningham in fact failed to qualify on the corrected date.  (D&O 26, 30, 38 & n.36; Tr. 387, 418, ERX 2 p. 2.)

Xcel also points out that Salopek had not read the underlying regulations on modifying targets.  (Br. 34-35.)  But Salopek's imperfect knowledge of Navy regulations does not make his truthful report maliciously false.  And Xcel does not dispute the facts Salopek reported, nor does it contest the Board's finding that Salopek and his fellow officers raised a legitimate safety concern regarding

33

Powless's practice of modifying targets.  (D&O 38.)  Whether or not the rules expressly prohibited Powless from making targets easier to hit, officers on post had reason to find the practice concerning, given that they "could hardly expect criminals, terrorists, or other wrongdoers to be walking around outlined with a large black cross to help their coworkers focus on the potential threat."  (D&O 38.)

Finally, Xcel splits hairs when it faults the officers for referring to falsified "documents" in the plural when they ultimately could point to only one such document.  (Br. 35.)  The officers knew there was inaccurate documentation from a qualification shoot at an unauthorized location on July 7, 2017.  (D&O 17, 42; Tr. 504-07.)  And they believed—correctly, as Operations Manager Terry confirmed—that Xcel was routinely conducting such shoots.  It was not unreasonable for them to infer that Xcel was also routinely providing inaccurate paperwork for those occasions, since the Navy required Xcel to document all weapons-qualification shoots.  *See Valley Hosp.*, 351 NLRB at 1261 (employee whose statements were based on "inferences she drew from her conversations [and] her observations" retained the Act's protection).  Even if the officers' reference to "documents" could be called an overstatement, "the mere fact that statements made in the context of an emotional labor dispute are hyperbolic does not remove them from the protection of the Act."  *Id.* at 1254.

Xcel's cases do not support a contrary result.  Xcel cites *St. Luke's Episcopal-Presbyterian Hospitals v. NLRB*, 268 F.3d 575 (8th Cir. 2001), in which the Eighth Circuit concluded that a nurse made numerous public statements about her employer that were "materially false" and served "no legitimate purpose." (Br. 33.)  But as explained above, the same cannot be said about Salopek's complaints here.

The remaining cases on which Xcel relies are not on point.  (Br. 32-33.)  In *Aroostook County Regional Ophthalmology Center v. NLRB*, this Court concluded that employees in a medical facility engaged in unprotected misconduct by "grousing in the presence of patients."  81 F.3d 209, 214 (1996).  The truth or falsity of employees' grievances simply was not at issue in *Aroostook*, and the special considerations regarding patient care that the Court relied on are not present here.  *Id.*

*Endicott Interconnect Technologies, Inc. v. NLRB*, 453 F.3d 532 (D.C. Cir. 2006), and *George A. Hormel & Co. v. NLRB*, 962 F.2d 1061 (D.C. Cir. 1992), are also unhelpful because they do not address malicious falsity.  Those cases instead turn on the question of disloyalty.  *Endicott*, 453 F.3d at 537-38; *Hormel*, 962 F.2d at 1064-66.  But here, Xcel does not separately argue that Salopek's complaints were so disloyal as to lose the Act's protection, regardless of their truth or falsity.  Nor would the Court have jurisdiction to consider that argument, because Xcel did

not raise it before the Board.  (*See* pp. 18-19, above.)  Before the Board, Xcel

excepted to the judge's recommended findings on the basis that the complaints

"were maliciously false, in that they were made either with knowledge of their

falsity, or with reckless disregard as to their truth or falsity." (Exceptions p. 1.)  Its

supporting brief made no distinct argument as to disloyalty.  Nor has Xcel even

attempted, before the Board or the Court, to meet the Board's standard for

disloyalty by showing that Salopek's complaints were "flagrantly disloyal, wholly

incommensurate with any grievances which the employees might have." *DirecTV*,

837 F.3d at 36 (quoting *MasTec*, 357 NLRB at 108) (brackets omitted).

        In any event, "the Board specifically examined the question of disloyalty on

the facts of this case, concluding that the [officers'] statements were not so disloyal

as to lose the Act's protection." *Id.* at 41.  "The question of whether a third-party

appeal is *so* disloyal as to fall outside the Act's protection is an inherently fact-

intensive, context-dependent one." *Id.* at 40.  Accordingly, the Court "assess[es]

only whether there is substantial evidence in the record to support the Board's

conclusion." *Id.* at 41.  And here, the evidence fully supports the Board's finding

that Salopek's actions were not so disloyal as to forfeit the Act's protection.

(D&O 37.)

        Like the employees in *DirecTV*, Salopek and his fellow officers first

attempted to resolve their concerns by complaining to their employer directly.  837

F.3d at 37, 41.  *See Five Star Transp.*, *Inc. v. NLRB*, 522 F.3d 46, 54 (1st Cir.

2008) (noting that employees' appeals to third party were "reasonably necessary to

carry out their lawful aim" because employer had "ignored [their] advances").  It

was only after then-Chief Executive Officer Morgan declined to respond

substantively to Salopek's email that the officers decided to approach

Commanding Officer Pulley.  And as in *DirecTV*, the officers' complaints focused

on an issue that directly affected their working conditions:  compliance with Navy

weapons-qualification requirements.  837 F.3d at 41.  Finally, as the Board noted,

there is no evidence that the officers complained "at a critical time" in Xcel's

business operations with the intention of harming Xcel's reputation or causing the

Navy to drop its services.  (D&O 37 (quoting *NLRB v. Local Union No. 1229,*

*IBEW (Jefferson Standard)*, 346 U.S. 464, 472 (1953)).)  *See Endicott*, 453 F.3d at

537 (concluding that injurious statements made when employer "was struggling to

get up and running under new management" lost the Act's protection).  Rather, the

officers wanted the Navy to help Xcel perform its role better, with safety

improvements that would benefit employees as well as the Navy.  (D&O 37-38.)

*See DirecTV*, 837 F.3d at 37 (upholding Board's finding that employees' lack of

intent to cause service cancellations weighed against finding unprotected

disloyalty); *Sierra Publ'g*, 889 F.2d at 217 (noting "constructive and hopeful" tone

of protected appeal).

37

2.    **The Court lacks jurisdiction to consider Xcel's argument that Salopek failed to disclose the existence of a labor dispute, and the Board reasonably rejected that argument in any event**

Xcel raises one more objection that the Court cannot consider:  that Salopek failed to adequately disclose the connection between officers' complaints and a labor dispute with Xcel.  (Br. 29-31.)  As the Board majority found—and as the dissenting member did not dispute—Xcel never made that argument to the Board. (D&O 3-4; D&O 7 n.2 (Member Ring, dissenting in part).)  In its exceptions and supporting brief, Xcel argued only that Salopek lost the Act's protection because what he said was maliciously untrue; it never claimed that his complaints were unprotected because of what he left unsaid.

This case is thus unlike *Oncor*, in which the Court concluded that an employer had preserved its argument concerning that first part of the *Mountain Shadows* framework by arguing before the Board that there was no evidence that an employee had sought "to publicize a labor dispute."  887 F.3d at 494.  There, the Court noted that the General Counsel had briefed a responsive argument before the Board, giving it adequate notice that the issue was contested.  *Id.* at 495.  Here, by contrast, Xcel's filings with the Board did not mention the first prong of *Mountain Shadows*.  They did not cite that case.  They never even used the term "labor dispute."  And the answering briefs of the General Counsel and Union made

no mention of the issue, either.  There is no hint that anyone believed it to be in play.

Xcel's argument that Salopek did not disclose a labor dispute cannot be considered a "logical extension[] of" (Br. 26), or a sub-issue that was "generally" raised by (Br. 25), Xcel's position before the Board that Salopek's complaints were maliciously false.  As the Court has emphasized, the *Mountain Shadow* prongs are distinct components of the Board's analysis.  *DirecTV*, 837 F.3d at 35.  The second prong is not a sub-part of the first; it "does independent work."  *Id.*  Under either prong, to be sure, the ultimate issue is whether Salopek lost the protection of the Act.  "But there [a]re different paths to get there."  *UFCW*, 989 F.3d at 1038.  And the path Xcel chose before the Board did not leave open the one it now asks the Court to explore.  *See id.* (argument that employer discriminated by disparately enforcing policy did not preserve argument that employer discriminated because it acted with anti-union animus); *U-Haul Co. of Nev. Inc. v. NLRB*, 490 F.3d 957, 963 (D.C. Cir. 2007) (arguments that campaign misrepresentations interfered with employee free choice under one legal test did not preserve argument under an alternative framework).  As explained above (p. 24), it does not matter that a dissenting Board member raised the issue and the Board majority addressed it.

In any event, in responding to the dissent, the Board reasonably found that the officers' communications with the Navy "satisfied the first prong of *Mountain*

39

*Shadows*." (D&O 5.) "The purpose of the first condition," the Court has recognized, "is of course to enable the recipients to evaluate the statements in a fuller context, applying what the listener or reader regards as a suitable discount or enhancement." *Oncor*, 887 F.3d at 492. Here, Salopek, Lein, and Mullen made it unmistakably plain that they were Xcel employees who objected to workplace practices of their employer that they believed had a negative effect on their safety on the job. Thus, as the Board found, they "provided sufficient context regarding their dispute with [Xcel] for the Navy to filter their complaints critically." (D&O 5 n.13.) *See Five Star*, 522 F.3d at 53 (upholding Board's finding that letters complaining about negative effect on their working conditions put recipient "on notice that there existed an ongoing labor dispute"); *Triple Play*, 361 NLRB at 312 (by complaining about employer's tax-withholding practices, employees "clearly disclosed the existence of an ongoing labor dispute concerning" that issue).

This case is nothing like *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard)*, 346 U.S. 464 (1953), on which Xcel relies. (Br. 29-30.) In that case, employees sought to gain leverage in an undisclosed labor dispute over contractual arbitration language by damaging their employer. *Id.* at 475-77. They did so by distributing a handbill that denigrated the quality of the television programming the employer provided. The handbill purported to speak "in the interest of the public rather than in that of the employees." *Jefferson Standard*, 346 U.S. at 477. It

40

"'related itself to no labor practice of the company,' and 'made no reference to wages, hours or working conditions.'"  *DirecTV*, 837 F.3d at 34 (quoting *Jefferson Standard*, 346 U.S. at 476).  Readers therefore could not evaluate the handbill for what it was:  they would have had no idea that its authors wanted their help to win more favorable terms in a collective-bargaining agreement.  Here, by contrast, the officers' complaints "established a clear nexus to [their] terms and conditions of employment and their dispute with [Xcel]."  (D&O 5.)

The only additional information Xcel suggests the officers should have conveyed was the fact that they had already presented their safety concerns to Xcel.  (Br. 31.)  But if they somehow did not make that clear enough by telling Pulley they had notified their chain of command (D&O 21; Tr. 687), the officers' July 9 email specified that they had given Xcel a "detailed memo" on the very issues they were asking the Navy to help resolve.  (ERX 1.)  Thus, as the Board found, the officers promptly cured any conceivable ambiguity in that regard.  (D&O 5.)  In any event, as the Board noted, a labor dispute can exist—and employees can ask third parties for support in it—before employees have raised their issues to their employer.  *See Arlington Elec.*, 332 NLRB 845, 846 (2000).  *Cf. NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962) ("The language of [Section] 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made.").  The first prong of

41

*Mountain Shadows* is satisfied if a third-party listener can identify the speaker's labor-related motives.  Employees need not spell out what, if anything, those motives have already led them to tell their employer.

### C.    Xcel Discharged Salopek Because of His Protected Activity

Because the Act protected Salopek's complaint to Navy leadership, Xcel could not lawfully discharge him for it.  In assessing whether an employer discharged an employee because of protected activity in violation of Section 8(a)(1), the Board applies the framework set forth in *Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d 889 (1st Cir. 1981), which the Supreme Court approved in *NLRB v. Transportation Management Corporation*, 462 U.S. 393 (1983).  Under that framework, if the Board finds that Section 7 activity was "a motivating factor" in a discharge, the employer may avoid an unfair-labor-practice finding only by proving, as an affirmative defense, that it would have taken the same action in the absence of any protected conduct. *Transp. Mgmt.*, 462 U.S. at 401-02; *Citizens Inv.*, 430 F.3d at 1198.

The Board may infer unlawful motivation based on circumstantial or direct evidence.  *Laro Maint.*, 56 F.3d at 229.  That evidence can include the employer's knowledge of protected activity, *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 218 (D.C. Cir. 2016), hostility toward that activity, *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 423-24 (D.C. Cir. 1996), and false, exaggerated, or

pretextual reasons for a discharge, *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1075 (D.C. Cir. 2016); *CC1 Ltd. P'ship v. NLRB*, 898 F.3d 26, 32 (D.C. Cir. 2018); *Shamrock Foods Co.*, 366 NLRB No. 117, 2018 NLRB LEXIS 221, *132 (2018), *enforced*, 779 F. App'x 752 (D.C. Cir. 2019).

To establish its affirmative defense, an employer must prove that "it *would* have fired the employee" regardless of the employee's protected activity, "not that it *could* have done so." *DHSC*, 944 F.3d at 938 (citation and internal quotation marks omitted). It is not enough for the employer to present "a valid basis" for the discharge. *Id.* And the affirmative defense necessarily fails if the employer's proffered justifications for its action are pretextual—that is, if they are either false or were not in fact relied upon. *Bally's Park Place v. NLRB*, 646 F.3d 929, 937 n.6 (D.C. Cir. 2011); *Limestone Apparel Corp.*, 255 NLRB 722, 722 (1981), *enforced*, 705 F.2d 799 (6th Cir. 1982).

Whether an employer acted with unlawful motivation "is a question of fact." *Laro Maint.*, 56 F.3d at 229. Because making factual findings as to motive "invokes the expertise of the Board," *id.*, the Court's review here is "especially deferential," *CC1*, 898 F.3d at 32 (citation and internal quotation marks omitted).

### 1.    Salopek's protected activity was a motivating factor in his discharge

Substantial evidence supports the Board's finding that protected activity was a motivating factor in Salopek's discharge. (D&O 3.) It is undisputed that Xcel

43

knew Salopek joined with other officers to present complaints to the Navy, and the record overwhelmingly demonstrates that Xcel's decision to discharge him was motivated by that activity.

Xcel was open about its hostility toward the officers' protected activity. Chief Executive Officer Filibeck, who made the final discharge decision, admitted that he viewed the officers' complaints to Pulley as a circumvention of the chain of command, and it is undisputed that he instructed Operations Manager Terry to document "chain of command violation" as a basis for the discharge.  (D&O 40; Tr. 947-49, 1016-17, 1021, JX 5 p. 1285.)  As Filibeck testified, he believed that employees were not entitled to "barge into the commanding officer's offices" to make complaints.  (Tr. 1022.)  Those admissions that Filibeck viewed Salopek's protected activity "with disfavor" (D&O 41) support the Board's finding of unlawful motivation.  *See Citizens Inv.*, 430 F.3d at 1201 (upholding Board's reliance on evidence that employer "took a dim view of [employees'] complaints").

Other Xcel managers likewise expressed in the clearest possible terms their antipathy toward the officers' protected activity.  (D&O 41.)  Upon learning that Lein had gone to the Navy with the other officers, Terry told him he had made a "big mistake."  (D&O 41.)  *See United Fed'n of Teachers Welfare Fund*, 322 NLRB 385, 392 (1996) (employer demonstrated unlawful motivation by stating

44

that employee "made a big mistake involving the Union").  And the same day, then-Chief Executive Officer Morgan said it would be easy to get rid of Lein, but called Salopek and Mullen a "cancer."  (D&O 41.)  *See NLRB v. Hale Container Line, Inc.*, 943 F.2d 394, 398 & n.29 (4th Cir. 1991) (employer's description of union organizers as a "cancer" evidenced unlawful motivation).  *Accord Sogard Tool Co.*, 285 NLRB 1044, 1048 (1987); *Horizon Air Servs.*, 272 NLRB 243, 255 (1984), *enforced*, 761 F.2d 22 (1st Cir. 1985).

Morgan also explicitly told Lein that he was mad that Lein had broken the chain of command, and warned Mullen that he could face discipline after Mullen admitted that he had met with Pulley.  (D&O 41.)  Then, after Xcel was rid of Mullen and Salopek, supervisor Powless warned Lein that he escaped discharge for "jumping the chain of command" only because it was his first time.  (D&O 41.)  The fact that Xcel gave Lein another chance does not undermine the Board's finding of unlawful motivation, as Xcel implies (Br. 38), for Xcel made it clear that his protected activity, if repeated, would be punished.  Together, Xcel's comments leave no room for doubt about its view that it was unacceptable for officers to go to Navy leadership with safety complaints.

Xcel cannot disclaim responsibility for comments that Powless, Terry, and Morgan made (Br. 38), for it is bound by its own agents' expressions of hostility toward protected activity.  *See Parsippany Hotel*, 99 F.3d at 423 (whether or not

they are involved in a discharge, "it is eminently reasonable to assume that high-level corporate managers speak on behalf of the company when they express anti-union animus").  Moreover, Filibeck consulted with Powless and Terry before deciding to discharge Salopek—and found Powless in particular to be "just a fountain of information" on Salopek.  (D&O 33; Tr. 1015.)  Thus, leaving aside the evidence of Filibeck's own unlawful motivation—which was amply documented, as shown above (p. 44)—Salopek's discharge was "tainted" by input from Powless and Terry.  *Parts Depot, Inc.*, 332 NLRB 670, 672 (2000), *enforced*, 24 F. App'x 1 (D.C. Cir. 2001).  *See, e.g.*, *Boston Mut. Life Ins. Co. v. NLRB*, 692 F.2d 169, 171 (1st Cir. 1982) (Breyer, J.) (where "neutral superior" acted on recommendation of unlawfully motivated supervisors, discharge was unlawful); *NLRB v. Neuhoff Bros., Packers*, 375 F.2d 372, 374-75 (5th Cir. 1967) (where individuals "had a significant role in the discharge," their animus "significantly infected what might otherwise have been an innocent sterile act").

Nor is it clear why Xcel even tries to disavow its managers' and supervisor's statements, given that it appears to admit that it discharged Salopek because he complained to the commanding officer instead of following what Xcel considered to be the appropriate chain of command.  (Br. 37 & n.12.)  Xcel says Salopek was "supposed to" go to the Navy's Inspector General first.  (Br. 37.)  What Xcel fails to grasp, however, is that an employer cannot "impose a procedural prerequisite to

the exercise of employees' Section 7 rights." *Kinder-Care*, 299 NLRB at 1172.

*Accord Jarrar v. NLRB*, 858 F. App'x 374, 378 (D.C. Cir. 2021) ("Board

precedent confirms that 'an employer may not interfere with an employee's right to

engage in Section 7 activity by requiring that the employee take all work-related

concerns through a specific internal process.'" (quoting *Valley Hosp.*, 351 NLRB

at 1254)); *Colart Ams., Inc.*, 372 NLRB No. 9, 2022 NLRB LEXIS 526, *1 (2022)

(employer violated Section 8(a)(1) by instructing employees "to follow the chain

of command"), *petition for review pending*, No. 22-3462 (3d Cir.).  That principle

applies to security firms no less than employers in other industries.  *See, e.g.*,

*Guardsmark, LLC v. NLRB*, 475 F.3d 369, 374 (D.C. Cir. 2007) (chain-of-

command policy prohibiting complaints to clients violated the Act).

Because employers cannot lawfully impose such rules, "it is an unfair labor

practice to retaliate against employees for engaging in concerted activities for the

purpose of mutual aid or protection, even if those activities ignored an employer's

chain of command." *DHSC*, 944 F.3d at 939 (citations, internal quotation marks,

and ellipsis omitted).  And so, by citing a chain-of-command violation to justify

Salopek's discharge, Xcel's managers effectively admitted, and Xcel's brief

confirms, that Xcel's motivation was unlawful.

Xcel seems to argue that it had no choice but to enforce the Navy's chain of

command.  (Br. 37.)  But as the Board found, Xcel failed to prove that there was,

in fact, any Navy requirement that Xcel employees—who are not themselves
military personnel—follow a particular military chain of command in submitting
complaints.  (D&O 34, 40 & n.38.)  Indeed, the Board noted, Commanding Officer
Pulley "seemed to welcome their complaints."  (D&O 40 n.38.)  And there is no
evidence Rake's focus on chain of command within his investigation was based on
an official Navy policy.  As discussed below (pp. 51-52), he was motivated by
anger that the officers had gone above his head because they revealed repeated
violations of Navy qualification requirements that he had condoned in his role
overseeing Xcel's compliance with its Navy contract.  In any event, even if the
Navy had a chain-of-command policy applicable to the officers, it would be no
defense.  As the Board noted, an employer is not free to violate the Act simply
because it believes a client wants it to do so.  (D&O 43.)  *See Compuware Corp. v.
NLRB*, 134 F.3d 1285, 1291 (6th Cir. 1998) (employer who discharged employee
for protected activity at the request of its client committed an unfair labor practice).
"The fact that the direction comes from a Government actor does not alter [the]
analysis."  *Paragon Sys.*, 362 NLRB at 1565 n.14.

        In addition, in finding unlawful motivation, the Board appropriately relied
on Xcel's patently fictitious excuses for discharging rather than transferring
Salopek.  *See CC1*, 898 F.3d at 32 (noting that Board "can infer from falsity of
employer's stated reason for discharge that motive is unlawful" (citation and

internal quotation marks omitted)).  One reason Filibeck gave was distance. Filibeck testified twice that the nearest location to which Salopek could have been sent was "10,080 miles away," when in fact the distance was only a few hundred miles.  (D&O 41.)  Xcel (Br. 37) tries to dismiss as an error Filibeck's use of that figure, which the Board found to be "wildly exaggerated" (D&O 41), but Xcel does not explain why Filibeck repeated it (Tr. 981, 1005).  Before the Court, Xcel also suggests the true distance was still too far for a transfer (Br. 43), but it cites no law or evidence to support that claim.

The Board similarly discredited Filibeck's claim at the hearing that Salopek could not have worked another Xcel contract without a government-issued credential.  Both Filibeck and Rake acknowledged that Salopek only lost that credential because Xcel discharged him.  (D&O 41; Tr. 571, 579, 1006.)  And the Board found that there was simply no basis for Filibeck's additional claim that Salopek was under investigation at the time of his discharge for misuse of photographs Salopek had taken on Navy boats.  (D&O 41.)  Before the Court, Xcel mentions those two disproven justifications for the discharge.  (Br. 19.)  But tellingly, it declines to defend them in the argument section of its brief.  Xcel has thus waived any further argument along those lines.  *See Sitka Sound*, 206 F.3d at 1181.

### 2.     Xcel failed to prove that it would have discharged Salopek in the absence of his protected activity

Having found that Salopek's involvement in presenting workplace complaints to Navy leadership was a motivating factor in his discharge, the Board reasonably rejected Xcel's argument that it would have discharged Salopek even absent that protected activity.  (D&O 41-43.)  In its brief (Br. 38-44), Xcel argues that it would have discharged Salopek no matter what based on Rake's recommendation.  Rake, however, never asked Xcel to discharge Salopek, and there is no question that he lacked authority to do so.  (D&O 42; Tr. 549, 554-55, 558, 571.)  As the Board found, Xcel could have satisfied Rake's request to take Salopek off the Indian Island contract by transferring Salopek to one of its other worksites.  (D&O 41.)  It has never provided a lawful, credible reason for choosing not to do that.

Damningly, in addition to the pretextual justifications discussed above, Filibeck testified that he chose to discharge rather than relocate Salopek because "if this guy is going to do this kind of activity here, he's going to do it there." (D&O 35.)  The Board took that to be a straightforward admission that Xcel "did not want to employ someone who, like Salopek, might violate the chain of command and go directly to the head of a client agency with concerted complaints about working conditions."  (D&O 41.)  *See Citizens Inv.*, 430 F.3d at 1203 (employer's asserted defense that it discharged employee because "he was a

50

troublemaker and not a team player" was "simply another way of indicating that he was terminated because he engaged in protected concerted activity when he persistently complained" (citation and internal quotation marks omitted)).  The Board's reading lines up with Filibeck's undisguised hostility toward what he considered to be a chain-of-command violation (*see* p. 44, above), and Xcel fails to show that it was unreasonable (Br. 43 n.15).  Given "the Board's expertise in drawing reasonable inferences from the evidence to make a determination about an employer's motive," its interpretation of Filibeck's testimony "merit[s] the [C]ourt's deference." *Citizens Inv.*, 430 F.3d at 1200.

Xcel further undermines its own defense by continuing to take the position that it discharged Salopek because Rake accused him of "dishonesty in the complaint allegations."  (Br. 41.)  That too is an admission of unlawful motive because, as explained above, the Board found that Salopek never communicated the sort of malicious falsehood that would forfeit the Act's protection.

In any event, as the Board found, Xcel cannot rely on Rake's removal recommendation because it knew that the recommendation was motivated by Rake's own hostility toward Salopek's protected conduct.  (D&O 42.)  Ample evidence supports the Board's finding as to Rake's reasons for wanting Salopek gone.  As the Board explained, the credited testimony of Xcel's own manager, Terry, established that Rake knew of and condoned Xcel's practice of conducting

unauthorized weapons-qualification shoots.  (D&O 42-43.)  Thus, Rake was

"caught in an embarrassing situation" when Salopek, Mullen, and Lein exposed

that practice to Rake's superior, who strongly disapproved of it.  (D&O 42.)  It was

for that reason, the Board found, that Rake was intent on reviewing the chain of

command with every officer he interviewed.  (D&O 42.)  That was also why Rake

refused to acknowledge in his report that the officers' complaints about

unauthorized shoots were true.  (D&O 42.)  Instead, as the Board found, he sought

to discredit the officers' allegations and portray Salopek as having "a hidden

agenda of his own."  (D&O 42.)  Under those circumstances, the Board reasonably

found Rake's attacks on Salopek to be nothing more than evidence that Rake

"harbored animus against his involvement in the concerted complaints."

(D&O 42.)

Substantial evidence also supports the Board's finding that Filibeck knew

Rake's removal request was based on his animus toward Salopek's protected

activity.  As the Board found, Filibeck had talked enough with Terry and Powless

to know that allegations Rake had found to be false were, in fact, true.  (D&O 43.)

And Terry's credited testimony established that Rake "mentioned the person that

was responsible for this investigation" to Filibeck and "wanted him gone."

(D&O 42; Tr. 945.)  Xcel again disregards the standard of review when it attacks

the Board's interpretation of that testimony.  (Br. 39 n.13.)  The most natural

interpretation—certainly a permissible one for the finder of fact—was that Rake wanted Salopek gone because of his complaints.  Because Xcel knew of Rake's animus, it cannot cite his removal recommendation as a legitimate justification for adverse action against Salopek.  *See Paragon Sys.*, 362 NLRB at 1565 n.14 (noting that an employer cannot rely on a client request that it knows to be driven by animus toward Section 7 activity).

That is so notwithstanding Rake's expressions of displeasure with Salopek's "conduct and demeanor during the investigation." (Br. 40-41.)  Even if Rake disliked Salopek's attitude, the Board reasonably found that nothing Salopek said exceeded the protection of the Act.  (D&O 42.)  In addition, as the Board noted, Rake admitted that his investigation was designed from the start to target protected activity—the officers' meeting with Pulley.  (D&O 42; Tr. 589.)  Thus, the Board reasonably concluded that any responses the investigation provoked were not a proper basis for Salopek's discharge.  (D&O 42.)  *See United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 917 (D.C. Cir. 2004) (employer could not discharge employee for dishonesty in response to investigation into her protected activity).

In any event, even if the comments or attitudes Rake attributed to Salopek during the investigation *could have* been a legitimate basis for discharge, Xcel offers nothing to satisfy its evidentiary burden of establishing that it *would have* discharged Salopek based on those allegations.  *See Frazier Indus. Co. v. NLRB*,

53

213 F.3d 750, 759-60 (D.C. Cir. 2000) (employer who initially stated that it discharged employee for harassment could not establish that it would have discharged him for insubordination and dishonesty). *Fresenius USA Manufacturing*, 362 NLRB 1065 (2015), is therefore of no help to Xcel. As Xcel notes (Br. 42), the employer in that case met its affirmative-defense burden by proving that it would have discharged an employee for his unprotected misconduct even in the absence of his statutorily protected activity. It did so by demonstrating that it had previously discharged two other employees under comparable circumstances. *Id.* at 1066. Xcel has made no such showing. And Xcel does no better (Br. 43-44) with *PAE Applied Technologies, LLC*, 367 NLRB No. 105, 2019 NLRB LEXIS 167 (2019). In that case, the Board did not apply *Wright Line* because it was undisputed that the employee was disciplined for his unprotected misconduct during a confrontation with a customer. *PAE*, 2019 NLRB LEXIS 167, at *5 n.11. Here, by contrast, Xcel's decision to discharge Salopek was motivated by his protected activity and it did not demonstrate that it would have taken the same action in the absence of that activity.

In sum, ample evidence establishes that both Xcel and Rake resented that Salopek and his fellow officers communicated their statutorily protected safety complaints to Navy leadership and each took action against Salopek for that reason. But the Act gave the officers the right to bring their concerns to the top of

54

the chain of command.  And nothing they said caused them to forfeit the Act's broad protection.  Xcel violated the Act by discharging Salopek for his protected activity, and the Board is entitled to enforcement of its remedial Order.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court deny Xcel's petition, grant the Board's cross-application, and enter a judgment enforcing the Board's Order in full.

Respectfully submitted,

/s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

/s/ Micah P.S. Jost
MICAH P.S. JOST
*Attorney*

JENNIFER A. ABRUZZO
    *General Counsel*

PETER SUNG OHR
    *Deputy General Counsel*

RUTH E. BURDICK
    *Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

National Labor Relations Board
1015 Half St. SE
Washington, DC 20570
(202) 273-0656
(202) 273-0264

National Labor Relations Board

February 2023

55

# STATUTORY ADDENDUM

## National Labor Relations Act, 29 U.S.C. §§ 151, et. seq.

Section 7 (29 U.S.C. § 157) ........................................................................ ii
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ..................................................... ii
Section 8(a)(5) (29 U.S.C. § 158(a)(5)) ..................................................... ii
Section 10(a) (29 U.S.C. § 160(a)) ............................................................ ii
Section 10(e) (29 U.S.C. § 160(e)) ............................................................ ii
Section 10(f) (29 U.S.C. § 160(f)) ............................................................ iii

## The Board's Rules and Regulations

29 C.F.R. § 102.45(b) ................................................................................ iv
29 C.F.R. § 102.46 ..................................................................................... iv

# NATIONAL LABOR RELATIONS ACT

## Section 7 of the Act (29 U.S.C. § 157): Rights of Employees

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

## Section 8 of the Act (29 U.S.C. § 158): Unfair Labor Practices

(a)      [Unfair labor practices by employer]

It shall be an unfair labor practice for an employer-

    (1)      to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

    \*          \*          \*

    (5)      to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

## Section 10 of the Act (29 U.S.C. § 160): Prevention of Unfair Labor Practices

(a)      [Powers of Board generally]

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [section 158 of this title]) affecting commerce . . . .

    \*          \*          \*

(e)      [Petition to court for enforcement of order; proceedings; review of judgment]

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person

resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

(f)     [Review of final order of Board on petition to court]

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside . . . .

## THE BOARD'S RULES AND REGULATIONS

**29 C.F.R. § 102.45(b)**

(b) Contents of record. The charge upon which the complaint was issued and any amendments, the complaint and any amendments, notice of hearing, answer and any amendments, motions, rulings, orders, the transcript of the hearing, stipulations, exhibits, documentary evidence, and depositions, together with the Administrative Law Judge's decision and exceptions, and any cross-exceptions or answering briefs as provided in § 102.46, constitutes the record in the case.

**29 C.F.R. § 102.46**

(a) Exceptions and brief in support. Within 28 days, or within such further period as the Board may allow, from the date of the service of the order transferring the case to the Board, pursuant to § 102.45, any party may (in accordance with Section 10(c) of the Act and §§ 102.2 through 102.5 and 102.7) file with the Board in Washington, DC, exceptions to the Administrative Law Judge's decision or to any other part of the record or proceedings (including rulings upon all motions or objections), together with a brief in support of the exceptions. The filing of exceptions and briefs is subject to the filing requirements of paragraph (h) of this section

    (1) Exceptions

        (i) Each exception must:

            (A) Specify the questions of procedure, fact, law, or policy to which exception is taken;

            (B) Identify that part of the Administrative Law Judge's decision to which exception is taken;

            (C) Provide precise citations of the portions of the record relied on; and

            (D) Concisely state the grounds for the exception. If a supporting brief is filed, the exceptions document must not contain any argument or citation of authorities in support of the exceptions; any argument and citation of authorities must be set

iv

forth only in the brief. If no supporting brief is filed, the exceptions document must also include the citation of authorities and argument in support of the exceptions, in which event the exceptions document is subject to the 50-page limit for briefs set forth in paragraph (h) of this section.

(ii) Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged will be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded.

(2) Brief in support of exceptions. Any brief in support of exceptions must contain only matter that is included within the scope of the exceptions and must contain, in the order indicated, the following:

(i) A clear and concise statement of the case containing all that is material to the consideration of the questions presented.

(ii) A specification of the questions involved and to be argued, together with a reference to the specific exceptions to which they relate.

(iii) The argument, presenting clearly the points of fact and law relied on in support of the position taken on each question, with specific page citations to the record and the legal or other material relied on.

(b) Answering briefs to exceptions.

(1) Within 14 days, or such further period as the Board may allow, from the last date on which exceptions and any supporting brief may be filed, a party opposing the exceptions may file an answering brief to the exceptions, in accordance with the filing requirements of paragraph (h) of this section.

(2) The answering brief to the exceptions must be limited to the questions raised in the exceptions and in the brief in support. It must present clearly the points of fact and law relied on in support of the position taken on each question. Where exception has been taken to a factual finding of the Administrative Law Judge and the party filing the answering brief proposes to support the Judge's finding, the answering brief must specify those pages of the record which the party contends support the Judge's finding.

(c) Cross-exceptions and brief in support. Any party who has not previously filed exceptions may, within 14 days, or such further period as the Board may allow, from the last date on which exceptions and any supporting brief may be filed, file cross-exceptions to any portion of the Administrative Law Judge's decision, together with a supporting brief, in accordance with the provisions of paragraphs (a) and (h) of this section.

(d) Answering briefs to cross-exceptions. Within 14 days, or such further period as the Board may allow, from the last date on which cross-exceptions and any supporting brief may be filed, any other party may file an answering brief to such cross-exceptions in accordance with the provisions of paragraphs (b) and (h) of this section. Such answering brief must be limited to the questions raised in the cross-exceptions.

(e) Reply briefs. Within 14 days from the last date on which an answering brief may be filed pursuant to paragraphs (b) or (d) of this section, any party may file a reply brief to any such answering brief. Any reply brief filed pursuant to this paragraph (e) must be limited to matters raised in the brief to which it is replying, and must not exceed 10 pages. No extensions of time will be granted for the filing of reply briefs, nor will permission be granted to exceed the 10-page limit. The reply brief must be filed with the Board and served on the other parties. No further briefs may be filed except by special leave of the Board. Requests for such leave must be in writing and copies must be served simultaneously on the other parties.

(f) Failure to except. Matters not included in exceptions or cross-exceptions may not thereafter be urged before the Board, or in any further proceeding.

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————————————— )
                                                    )
XCEL PROTECTIVE SERVICES, INC.            )    Nos.  22-1264
                                                    )           22-1295
        Petitioner/Cross-Respondent       )
                                                    )    Board Case Nos.
        v.                                          )    19-CA-232786
                                                    )    et al.
NATIONAL LABOR RELATIONS BOARD    )
                                                    )
        Respondent/Cross-Petitioner       )
—————————————————————— )

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that this brief contains 12,861 words of proportionally spaced,

14-point type, and the word-processing system used was Microsoft Word for

Office 365.

                          /s/ Ruth E. Burdick
                          Ruth E. Burdick
                          Deputy Associate General Counsel
                          NATIONAL LABOR RELATIONS BOARD
                          1015 Half Street, SE
                          Washington, DC 20570
                          (202) 273-2960

Dated at Washington, DC
this 23rd day of February 2023

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____ )
                                                )
XCEL PROTECTIVE SERVICES, INC.                  )     Nos.  22-1264
                                                )            22-1295
            Petitioner/Cross-Respondent         )
                                                )     Board Case Nos.
            v.                                   )     19-CA-232786
                                                )     et al.
NATIONAL LABOR RELATIONS BOARD                  )
                                                )
            Respondent/Cross-Petitioner         )
_____ )

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2023, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for District of Columbia Circuit by using the CM/ECF system.  I certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 23rd day of February 2023